# PART ONE OF EXHIBITS TO COMPLAINT

# EXHIBITS 1-15

# AMERICAN ARBITRATION ASSOCIATION
## BEFORE ARBITRATOR MICHAEL T. LOCONTO

---

**In the Matter of the Arbitration between**

**MASSACHUSETTS NURSES ASSOCIATION**

**and**

**SAINT VINCENT HOSPITAL.**

AAA No. 01-24-0000-4700.

Issue:  LRC Case Administration (Class Action).

---

## AWARD OF THE ARBITRATOR

The grievance is sustained. The Employer violated Article XXI of the Agreement by unilaterally directing the Labor Relations Connection (LRC) to cease administration of grievance arbitrations filed by the Union.

The Employer shall cease and desist from all actions that may inhibit the LRC from administering pending or future arbitrations between the parties. The Employer shall also compensate the Union for all attorney's fees and costs incurred in obtaining procedural rulings from arbitrators in matters assigned through the LRC, as more fully described herein.

The Arbitrator will retain limited jurisdiction for ninety (90) days from the date of this Award for the sole purpose of resolving any disputes, upon the request of the parties and pursuant to the limitations described herein, that may arise from the implementation of the remedies ordered in this Award.

Michael T. Loconto, Esq.
Arbitrator
Dated: June 12, 2025

**Exhibit 1**

**In the Matter of the Arbitration between**

**MASSACHUSETTS NURSES ASSOCIATION**

|  |  |  |
|---|---|---|
| **and** | | **OPINION**<br>**AND**<br>**AWARD** |

**SAINT VINCENT HOSPITAL.**

AAA No. 01-24-0000-7400 (Class Action; LRC Case Administration).

---

The parties submitted this matter to arbitration pursuant to Article XXI of the collective bargaining agreement ("Agreement") effective January 3, 2022 through December 31, 2025 between the Massachusetts Nurses Association ("MNA" or the "Union") and Saint Vincent Hospital (the "Hospital" or the "Employer"), a unit of Tenet Healthcare. The Union alleges that the Employer violated Article XXI of the Agreement when it unilaterally directed the Labor Relations Connection (LRC) to cease active case administration of grievance arbitrations filed with the service involving this Employer and the Union. An *ex parte* arbitration hearing was held at the Hilton Garden Inn in Worcester, Massachusetts on March 17, 2025.

Jason Powalisz, Esq. of the McDonald Lamond Canzoneri LLC law firm in Southborough appeared on behalf of the Union, and was assisted by Samantha Sinclair, Esq. The Employer's representative, Marc Sugerman, Esq. of the Orlando, Florida offices of the FordHarrison LLP law firm, declined to participate in the hearing. Post-hearing briefs were received from the Employer and the Union on May 9, 2025, at which time the Arbitrator declared the record closed. Additional filings were received from the parties on May 23, 2025, which are addressed in this Opinion and Award.

**Exhibit 1**

## ISSUE

At the hearing, the Arbitrator adopted the following proposed issue for resolution:

> Did the Employer violate the parties' CBA as alleged in the MNA's October 20, 2023 grievance? If so, what shall be the remedy?

## RELEVANT PROVISION OF THE AGREEMENT

**ARTICLE VIII.**
**WORK SCHEDULE**
…
**8.05 Overtime**
…
Any grievance submitted under this Section shall be processed under the AAA rules for expedited arbitration rather than the procedure set forth in Article XXI ("Grievance and Arbitration").

**ARTICLE XXI.**
**GRIEVANCE AND ARBITRATION**
…
If the grievance is not adjusted in Step 3, the MNA may file a demand for arbitration under Step 4 with AAA or LRC with simultaneous written notice to the Hospital's Chief Human Resources Officer not later than 30 working days after the written answer in Step 3 was received.

> **Step 4:** should the MNA request arbitration in accordance with the time limits specified herein, an arbitrator shall be selected pursuant to the Voluntary Labor Arbitration Rules of the American Arbitration Association or the applicable procedures of the Labor Relations Connection. The decision of the arbitrator shall be final and binding. The arbitrator shall be requested to issue a written decision within 30 days after the conclusion of the hearing. The arbitrator shall have no authority to add to, subtract from, modify, alter or disregard any of the provisions of this Agreement. Costs of the arbitrator and the American Arbitration Association or the Labor Relations Connection shall be borne equally by the hospital and the MNA.
> …

3

**Exhibit 1**

**ARTICLE XXV.**
**COMPLETENESS OF AGREEMENT**

This agreement contains the complete agreement of the parties, and no additions, waivers, deletions, changes or amendments shall be effective during the life of this agreement, unless evidenced in writing, dated and signed by the parties hereto. An oral waiver or a failure to enforce any provision in a specific case shall not constitute a precedent or preclude either party from relying upon or enforcing such provision in any other case.

**BACKGROUND**

This dispute concerns one party's unilateral directive that a third-party service provider cease providing case administration services in arbitrations filed between the Employer and the Union.

**The Parties.**  The Employer and the Union have had a charged collective bargaining relationship.  The Employer, St. Vincent Hospital, is a large, acute-care facility located in Worcester.  In 1998, the Massachusetts Nurses Association organized a unit of nurses employed by the Hospital.  Jack Canzoneri, the Union's outside counsel, provided a history of the parties' relationship and the development of the collective bargaining agreement's grievance procedures.

In brief, the Union engaged in a strike in 2000, and an initial collective bargaining agreement was settled following resolution of the strike.  The parties have negotiated new agreements at roughly 3-year intervals since 2000.  One exception to this regular schedule occurred in 2021, when the Union engaged in a 300-day strike.  The Agreement was settled at the table in December, and was ratified by the Union membership on January 3, 2022.

**The Process for Filing a Grievance or Arbitration.**  The first contract included a grievance procedure, Article XXI, and each of the parties' successor CBAs have contained nearly identical grievance procedures.  Specifically, the Agreement provides a process for the

4

**Exhibit 1**

Union to initiate grievances and, if unresolved through multiple steps of the grievance procedure, file a demand for arbitration with either the American Arbitration Association (AAA) or the Labor Relations Connection (LRC).  Initial versions of the collective bargaining agreement exclusively utilized the AAA for all arbitration demands; in 2010, the parties agreed to add the LRC as a second option.  Throughout the duration of the Agreement, the Union has retained the authority to choose between the AAA and the LRC when filing a demand for arbitration under Article XXI.

In cases involving disputes with the Employer over the terms of the parties' collective bargaining agreement, the Union filed 26 demands for arbitration with the AAA between 2000 and 2013.  The parties did not utilize the LRC during this period.  From 2013 through the end of 2021, the Union filed 9 demands for arbitration with the LRC.  The parties did not use the AAA during this period.  From January 2022, following the settlement of the current Agreement, until December 2023 – the frequency of the Union's demands for arbitration increased dramatically. The Union filed 77 demands during this roughly 24-month period, and did so exclusively by utilizing the LRC.

**Agency Labor Arbitration Rules.**  Each of the agencies provides rules that bind the agencies, the parties and the arbitrator to certain procedures in the arbitration process.  The current AAA Labor Arbitration Rules (AAA Rules) have remained in effect since 2013.  The current LRC Labor Arbitration Rules (LRC Rules) have remained in effect for at least 10 years.

By way of example, LRC Rule 1 sets the parties' expectations for agency administration of the arbitration:

> **1. Application of Rules**
> The parties must mutually agree to use the Labor Relations Connection to administer their Grievance Arbitration, Mediation, Fact Finding and/or Interest Arbitration cases. Parties may do so

**Exhibit 1**

either during the collective bargaining process or by memorandum of agreement. The parties may, by written agreement, amend the procedures outlined in the Labor Arbitration rules.

The AAA Rules contain similar requirements:

> **1. Agreement of Parties**
> The parties shall be deemed to have made these rules a part of their arbitration agreement whenever, in a collective bargaining agreement or submission, they have provided for arbitration by the American Arbitration Association (hereinafter the AAA) or under its rules. These rules and any amendment of them shall apply in the form in effect at the time the administrative requirements are met for a demand for arbitration or submission agreement received by the AAA. The parties, by written agreement, may vary the procedures set forth in these rules.
>
> **2. AAA and Delegation of Duties**
> When parties agree to arbitrate under these rules or when they provide for arbitration by the AAA and an arbitration is initiated under these rules, they thereby authorize the AAA to administer the arbitration. The authority and duties of the AAA are prescribed in the agreement of the parties and in these rules, and may be carried out through such of the AAA's representatives as it may direct. The AAA may, in its discretion, assign the administration of an arbitration to any of its offices.

**Case Administration Procedures.** Canzoneri, who has represented the Union throughout the term of its collective bargaining relationship with the Employer and has handled most of the arbitration disputes involving the Employer during this period, described the case administration procedures followed by each agency as nearly identical from 2000 to the present. In addition to this bargaining unit, Canzoneri and his law partners represent the MNA's 25,000 members in collective bargaining relationships across the Commonwealth, in the public and private sector. More expansively, the McDonald Lamond Canzoneri law firm represents unions covering approximately 60,000 employees in New England and nationally, and virtually all of these represented units utilize the case administration services of AAA or LRC; one unit utilizes

6

**Exhibit 1**

the labor arbitration roster maintained by the Federal Mediation and Conciliation Service (FMCS).

Canzoneri likened the role played by case administrators to a clerk in the court system. Canzoneri first described the procedural steps from the filing of the demand for arbitration through the selection of the arbitrator. A union submits the demand for arbitration to the chosen case administration agency, which acknowledges receipt by email. The agency then distributes a list of arbitrators to the employer and the union, each of which individually ranks the listed arbitrators in order of preference. The parties may also strike arbitrators from the list. Each party then returns a copy of the list with its preferred ranking to the agency, which evaluates the parties' rankings to determine whether a match is possible. If the parties have mutually ranked an acceptable arbitrator, the agency informs the mutually acceptable arbitrator of the appointment. If the arbitrator accepts the appointment, the agency solicits initial hearing dates from the arbitrator. The agency then notifies the parties of the arbitrator's appointment to hear the given dispute and provides the arbitrator's offer of hearing dates to the parties for consideration.

If the parties have not mutually ranked an acceptable arbitrator on the initial strike list, the agency circulates a second list for the parties to consider. The second list contains a new set of arbitrators who were not included on the first list. The same initial process is repeated, and the agency may make an administrative appointment if no match is made during the second round. Canzoneri conceded that there may be minor differences between the AAA's and the LRC's respective appointment processes, but asserted that the basic attributes of this process are substantively indistinguishable. It is important to note that the FMCS also operates in a similar fashion for some of its arbitrator appointment processes, although the FMCS does not participate

7

**Exhibit 1**

in any further aspect of case administration following the appointment of the arbitrator. The FMCS and the AAA also provide a separate, "list-only" option,[1] by which the parties purchase a list of arbitrators from the agency but engage in a party-to-party process to select an arbitrator from the list.

Canzoneri then described the case administration procedures of the AAA and the LRC that follow the initial appointment of the arbitrator. These procedures continue through the conclusion of the matter, which can occur through withdrawal, settlement, administrative closure, or award of the arbitrator. Initially, the agency coordinates communications with the parties and the arbitrator to schedule the evidentiary hearing. *See* LRC Rule 12.[2]

It is important to note that the agencies' rules prohibit the parties' direct communication with the arbitrator, unless the arbitrator has authorized such communications.[3] For example, the LRC rules provide

> **8. Contact with the Arbitrator**
> The Labor Relations Connection functions as a liaison and facilitator between the parties and the Arbitrator. It is essential that there be no direct communication by the parties to the Arbitrator on substantive matters. Any necessary communication to the Arbitrator shall be conveyed through the Labor Relations Connection.

---

[1] The AAA's "list-only" option is listed among "Optional Labor Services" and is not included in the agency's numbered Labor Arbitration Rules. *See* https://adr.org/media/izfl4pme/labor-rules.pdf, at 24 (accessed on June 12, 2025).

[2] This section on case administration references applicable LRC rules to illustrate the topics covered under each administrative agencies' rules. The AAA rules contain similar provisions, and are cited where specifically relevant to this dispute.

[3] Occasionally, an arbitrator may respond directly to the parties, with a carbon copy to the case administrator. Case administrators and the parties may also include the arbitrator as a carbon copy on communications. Ultimately, the agency enforces party communications pursuant to the rule, and the arbitrator retains discretion to relax the agency rules or adopt alternative norms for correspondence. *See* AAA Rule 25 – Order of Proceedings ("The arbitrator, exercising his or her own discretion, shall conduct the proceedings…"); *see also* AAA Rule 47 – Interpretation and Application of Rules ("The arbitrator shall interpret and apply these rules insofar as they relate to the arbitrator's powers and duties.").

**Exhibit 1**

AAA Labor Rule 46[4] includes similar restrictions.  As a result, the agency engages in direct communications with each party and with the arbitrator, and acts as an intermediary to facilitate scheduling.  If initial efforts to schedule the hearing via email are unsuccessful, the agency, the arbitrator, or the parties may request that a conference call be convened to discuss scheduling.

The agency may coordinate other pre-hearing correspondence between the parties. Topics may include, for example, resolution of disputes over the hearing venue (LRC Rule 13), or the provision of evidence and other documents or the release of certain witnesses from work to attend a hearing (collectively covered by LRC Rule 14 – Subpoenas).  Given the agencies' rule-based restrictions on direct contact with the arbitrator, the agency will typically "exhaust the exchange."  The agency may set deadlines for the parties to respond to issues raised by an opposing party, sometimes in consultation with the arbitrator.  The agency holds all individual correspondence on an issue until the parties have completed communication on the topic, and then the case administrator delivers the package of correspondence to the arbitrator for review.

The agency may facilitate remote videoconferencing during the evidentiary hearing, and may also offer in-person hearing facilities, upon the request of the parties.  After the conclusion of the hearing, the agency collects post-hearing briefs (LRC Rule 21), communicates the close of

---

[4]  The AAA Rule provides:

**46. Communication with Arbitrator.**

There shall be no direct communication between the parties and a neutral arbitrator on substantive matters relating to the case other than at oral hearings, unless the parties and the arbitrator agree otherwise. Any other oral or written communication from the parties to the arbitrator shall be directed to the AAA for transmittal to the arbitrator.

What this rule does not prohibit communications on non-substantive matters such as travel arrangements and driving directions, nor does it prohibit direct communications in special circumstances (such as emergency delays) when the AAA is unavailable.

9

**Exhibit 1**

the record and the due date for the arbitrator's award to the parties, and then distributes the award and the arbitrator's invoice to the parties (LRC Rule 24). At that point, active case administration ends and the agency closes its case file. At any point prior to the close of the hearing, the agency may also provide communications relating to the status of the case; for example, placing the matter in abeyance (LRC Rule 30); cancelling or rescheduling a hearing (LRC Rule 22); or informing the arbitrator that the matter has been withdrawn or scheduled.

**The Employer Unilaterally Directs the LRC to Cease Active Case Administration Between the Parties.** On September 20, 2023, Christopher Borruso, the director and senior counsel for labor relations with the Employer's parent corporation, Tenet Healthcare, sent an email to Jan Teehan, the director of the LRC. The message, entitled "Saint Vincent Hospital Arbitration Matters," was also addressed to various lawyers in the FordHarrison law firm, which represents the Employer, and the McDonald Lamond Canzoneri law firm, which represents the Union. Borruso wrote:

> Please be advised that the collective bargaining agreement between Saint Vincent Hospital ("Hospital") and the Massachusetts Nursing [*sic*] Association ("MNA") provides for the selection of arbitrators pursuant to the Voluntary Labor Arbitration Rules of the American Arbitration Association or the applicable procedures of the Labor Relations Connection. It does not provide for the application of either agency's rules or for the "administration" of any matters by either agency.
>
> Accordingly, effective as of the date and time of this email, you are instructed to cease any purported "administration" of, or any other participation of any kind in, any of the Hospital's currently pending matters. Please provide me the arbitrator's contact information in each of the Hospital's currently pending cases at your absolute earliest convenience, but by no later than the close of business tomorrow, September 21, 2023.

10

**Exhibit 1**

Borruso's September 20 email represented the first time that the Employer had objected to case administration by either the AAA or the LRC during the parties' 23-year collective bargaining relationship.[5]

The Union ceased filing demands for arbitration with the LRC following receipt of the Employer's communication. Subsequently, and in response to Borruso's correspondence, the LRC declined to accept further demands for arbitration involving the Employer, although the LRC remained the case administrator of record for the 77 open arbitration demands that remained pending and were filed prior to September 20.

After September 20, the Employer began directly contacting the arbitrators of record in open matters that were filed through the LRC. Arbitrators assigned to those disputes issued at least 15 procedural rulings shortly thereafter. Each ruling rejected the Employer's demand that the LRC cease active case administration in the pending arbitration disputes. By way of example, in LRC #655-22, Arbitrator Marc Greenbaum provided an October 10, 2023 ruling on the contractual and historical bases for retaining the LRC as an active case administrator in that case:

> 3. Contract provisions like Article XXI of the parties' agreement are generally understood as envisioning the designated administrator conducting the arbitrator appointment process and administering the case in accordance with its rules. In my experience where the parties have sought to limit the arbitrator's role to the arbitrator selection process, a so-called "list only" process, that intention has been made clear. My own experience with cases involving the Hospital, prior to the change in its outside counsel, was that the Labor Relation Connection ("LRC") performed all of the administrative and communications functions typically performed by the administrator referenced in a collective bargaining agreement. The Hospital has not presented any past practice evidence even suggesting that the parties have administered the article in a manner reflecting the Hospital's present interpretation. I see no basis for interpreting

---

[5] The evidentiary support for this assertion is discussed in the section on "Pre-Hearing Disputes Over Access to Information" below. *Infra,* at 17; *see also* footnote 7.

**Exhibit 1**

Article XXI as limiting the LRC's role to the arbitrator selection process.

4. Because I interpret the agreement as calling for the LRC's administration of the proceeding and application of its rules, absent the agreement of the parties, the agreement requires me to proceed consistent with that interpretation. Indeed, I implicitly agreed to abide by those rules when I accepted this appointment. I am not aware of any contract interpretation principle permitting compliance with a unilateral directive from one party conflicting with the parties' bilateral agreement, not to mention my agreement, to proceed in the manner contemplated by Article XXI.

In LRC #864-22, Arbitrator Mark Grossman also provided a historical basis for his October 12, 2023 ruling:

I interpret the parties' CBA as requiring them to follow the rules of the LRC for the administration of LRC Case 864-22. Those rules require that there be no direct contact between the parties and the arbitrator and that all such communications be sent through the LRC. Accordingly, I will grant the MNA's motion. I also note that I have worked with parties in LRC cases for close to 20 years and the practice, consistent with the LRC rules, has always been that the parties communicate to the arbitrator only through the LRC. Accordingly, I do not intend to communicate directly to the parties in Case LRC 864-23 and will only communicate to them through the LRC.

The MNA motions is as follows:
1. There shall be no ex parte communications with the Arbitrator and all communications must be through LRC rather than directly with the arbitrator.
2. When there are multiple communications about an issue, the LRC shall proceed as it has for decades, which is to collect all communications from inception through all replies and then send as a package to the arbitrator.

Following receipt of the Employer's September 20 email, the Union resumed filing new arbitration demands involving the Employer with the AAA. From September 20, 2023 through the March 17, 2025 arbitration hearing in this matter, the Union filed another 24 demands for arbitration through the AAA.

12

**Exhibit 1**

**The Grievance.** On October 20, 2023, Union representative Wendy McGill transmitted the Step 1 Grievance in this matter by email to Francis Henderson, an Employer representative. The Grievance was filed with several named bargaining unit representatives but effectively named a class of grievants, alleging "all staff RNs in the MNA-bargaining unit" were harmed by the Employer's violation. In relevant part, the Grievance challenged the Employer's September 20 email to the LRC as a violation of Article XXI. The Grievance continued,

> Thereafter [the September 20 email], in multiple arbitrations involving the parties-counsel for St. Vincent Hospital, Ford Harrison, has, in each case, directly contacted the arbitrators and advised of Mr. Borruso's declaration and advised that the Hospital through counsel would only communicate directly with the arbitrator, and not through LRC. This action by the Hospital triggered the need for MNA to have its lawyers engage in drafting and communications with the arbitrators (via the LRC) to obtain a ruling to enforce the ongoing function of the LRC as administrator in each such arbitration from the inception of the arbitration to conclusion. The aggrieved nurses incorporate by reference the rulings of Arbitrators Buckalew, Cenci, Garraty, Greenbaum, Grossman, Marra, Overton, and Saylor, and any rulings thereafter, granting MNA's motion and requiring administration of the arbitration through its conclusion by the LRC.
> This is in violation of Article XXI, Grievance and Arbitration; any other provisions which MNA may further discern at a later date as is permitted expressly by Article XXI; and in the alternative by unchallenged, binding past practice that is enforceable under the collective bargaining agreement where, as here, there have been over 100 demands for arbitrations under the parties' collective bargaining agreements from 2000 to September 20, 2023 where the arbitration agency administered the process from inception through conclusion.
>
> PROPOSED REMEDY: Make whole the bargaining representative of the aggrieved nurses, MNA, including but not limited to for all expenses incurred in all arbitrations due to this violation; cease and desist continued failure and refusal to abide by the collective bargaining agreement; all other relief that the arbitrator finds just and appropriate.

13

**Exhibit 1**

A Step 1 meeting was held on November 2, and Henderson denied the Grievance on November 17.  The Employer asserted that the Union did not follow the procedures outlined in Article XXI when it failed to first present the Grievance at Step 1 with each of the named grievants' department managers or designees, and further asserted that the Agreement does not permit the filing of class action grievances.

The Union filed the Step 2 Grievance on November 10.  A Step 2 meeting was held on November 17, and Henderson again denied the Grievance on behalf of the Employer on December 1.  The Step 2 Grievance and answer repeated the parties' respective positions on the matter.  The Union then filed the Step 3 Grievance on December 1, realleging its position once more.

The Union filed a demand for arbitration with the American Arbitration Association on February 14, 2024.  Arbitrator Michael Loconto was notified of his appointment to hear this matter on March 11, 2024.

**Pre-Hearing Disputes Over Access to Information.**  The parties initially agreed on a hearing date of August 12, 2024.  On July 25, 2024, Employer's counsel Marc Sugerman unilaterally contacted the Arbitrator to request the issuance of subpoenas in this matter; Sugerman did not copy the AAA case administrator, Patrick Kimm, or Union counsel Canzoneri on his email to the Arbitrator.  The Arbitrator forwarded Sugerman's email to Kimm on July 26 and directed him to provide the following message to the record representatives of each party:

> The attached subpoena request was sent to Arbitrator Loconto unilaterally.  The arbitrator would like to advise you of the following:
>
> 1. A reminder that all correspondence with the arbitrator is to be routed through the AAA case manager.
> 2.  If a subpoena is requested, it must be shared with the other side prior to submission to the arbitrator for consideration.

14

**Exhibit 1**

3.  If and when a subpoena is requested, the arbitrator will schedule a conference call to discuss the underlying requested items.

The parties subsequently agreed to postpone the August 12 hearing, and after receiving a timely objection to the Employer's subpoena,[6] the Arbitrator convened a conference call with counsel to discuss the dispute on August 29.  During the call, the Arbitrator ordered a briefing schedule followed by oral argument on the multiple issues presented by the Employer's information request.

The Arbitrator issued an Order on December 23, 2024, directing the Union to produce certain requested documents by February 14, 2025.  Specifically, the Arbitrator ordered

> With respect to **Section 1** of the subpoena, **the Union shall produce a limited set of non-privileged documents relating to the 111 arbitration demands for the period between the year 2000 and September 20, 2023**:
>
> 1.  the Demand for Arbitration;
>
> 2.  with respect to the subject of the LRC or AAA administering the arbitration process after the selection of the arbitrator ("<u>the Subject</u>"), any objection transmitted by the Hospital to MNA or LRC about the Subject;
>
> 3.  any exchange of positions about the Subject where the Hospital or MNA presented arguments about the Subject;
>
> 4.  any rulings by arbitrators resolving any dispute about the Subject;
>
> 5.  one example for each case of LRC and AAA administering the arbitration process <u>after</u> the selection of the arbitrator, such as issuance of a notice of hearing, coordinating communication and issuing notices of arbitrator decisions about any other arbitration issues; and,

---

[6] The Employer's unilateral request for subpoenas to be issued, dated July 25, 2024, included a second *subpoena duces tecum* directed to representatives of the LRC.  The Employer did not resubmit the LRC subpoena to the Arbitrator for consideration following the Arbitrator's July 26, 2024 directive.

15

**Exhibit 1**

6. LRC and AAA communication relating to the final disposition of the case, including withdrawal, withdrawal upon report of the matter settled, issuance of an arbitration award, placing in abeyance, closing the case.

With respect to **Section 3** of the subpoena, **the Union shall only produce material responsive to subsections b and c** of the Employer's request:

1. the parties' alleged agreement to agree to abide by AAA and/or LRC rules relating to the administration of the case;

2. the parties' alleged agreement to hold arbitrators to the ethical guidelines of the National Academy of Arbitrators.

(**emphasis in original**).  The balance of the Employer's document requests were denied.  The

Arbitrator relied on the AAA Labor Rules as the basis for determining the relevance of the

requested information:

> Rule 27 of the AAA Rules governs evidence in a related labor arbitration proceeding. Relevance is the standard of review. The arbitrator retains the discretion to determine whether evidence is material and necessary to determine the disposition of the dispute. The Rule continues:
>
>> The arbitrator shall determine the admissibility, the relevance, and materiality of the evidence offered and may exclude such evidence deemed by the arbitrator to be cumulative or irrelevant.
>
> Strict adherence to legal rules of evidence are not required.
>
> Other provisions of the AAA Rules are also relevant to the current dispute. Specifically, Rule 25 governs the Order of Proceedings:
>
>> The arbitrator, exercising his or her discretion, shall conduct the proceedings with a view to *expediting the resolution of the dispute* and may

16

**Exhibit 1**

> direct the order of proof, bifurcate proceedings and *direct the parties to focus their presentations on issues the decision on which could dispose of all or part of the case.*

(*emphasis added*). Labor arbitration practice does not typically include traditional forms of legal discovery. Parties have other legal, and possibly contractual, rights or procedures to access information as collective bargaining representatives – which parties may exercise in or outside of the arbitration process. The AAA Rules are typically invoked during or just prior to an evidentiary hearing, when the parties seek the admission of evidence. Nevertheless, the AAA Rules remain instructive for resolving the disputed portions of the Employer's subpoena.

The Union complied with the Arbitrator's Order.[7] The responsive materials did not contain any evidence that the Employer had objected to the LRC's or the AAA's administration of arbitrations between the parties prior to September 20, 2023.

Upon receiving the December 23, 2024 Order, the Union also filed its own document request. The Employer did not file a timely objection to the Union's subpoena, and the Arbitrator signed and issued the Union's subpoena as requested on January 6, 2025.

Two days later, the Employer objected to the subpoena. The Arbitrator provided leave for the Employer to file a written objection, and the Union submitted a response to the Employer's objection. The Arbitrator convened a conference call on January 24. Later that day, the Arbitrator issued an Order directing the Employer to produce certain requested documents by the same deadline established in the first Order on Union document production: February 14.

---

[7] The Union submitted a binder of documents, which the Union represented were responsive to the Order, as evidence at the March 17, 2025 arbitration hearing.

The Arbitrator also notes that the parties were engaged in an Unfair Labor Practice (ULP) dispute before the National Labor Relations Board (the Board), which included *subpoenas duces tecum* relating to some of the materials covered by the Employer's subpoena requests in this matter. The full Board issued an Order on the subpoenas, which was referenced in the Arbitrator's December 23, 2024 Order. *See VHS Acquisition Subsidiary Number 7, Inc. D/B/A Saint Vincent Hospital and Massachusetts Nurses Association*, No. 01-CA-290852 *et seq.* (Order dated July 19, 2024).

17

**Exhibit 1**

The materials ordered for production by each party were effectively the same: correspondence and related agreements, if any, relating to case administration.[8]  The parties were also ordered to set a location for the first day of hearing no later than March 10, 2025.

The Employer did not produce information responsive to the Order by the specified deadline.[9]  On February 25, AAA case administrator Kimm delivered the following message to the parties on behalf of the Arbitrator:

> Mr. Sugerman is directed to respond to this message with an explanation for the Employer's failure to meet the production timeline outlined in my [January 24, 2025] order.  The Employer is

---

[8] The Arbitrator's January 24, 2025 Order:

> As discussed, I am providing the following written summary of my rulings on the Employer's Objections to the Union's Subpoena Duces Tecum, which I signed and issued on January 6, 2025.  Specifically:
> 1. Objection to Section A of the subpoena - *overruled*.
> 2. Objection to Section B - *withdrawn* by the Employer.
> 3. Objection to Section C - *overruled*. The Union confirmed that the request is limited to the processing of the underlying grievance in this matter (01-24-0000-7400).
> 4. Objection to Section D - *overruled*.  The Union confirmed that the request excludes items that may be protected by the Employer's various claimed privileges, and the Employer confirmed that documentation does exist with respect to the subject matter of the request.
> 5. Objection to Section E - *withdrawn* by the Employer.
> 6. Objection to Section F - *overruled*.
> 7. Objection to Section G - *overruled*.

Section A of the Union's subpoena sought the same information from the Employer that the Union was ordered to produce in Section 1 of the Employer's subpoena.  *Supra,* at 15-16.  Section E of the Union's subpoena sought evidence of previous Employer objections to the LRC's or AAA's authority to administer cases.

[9] On February 13, the Employer objected to the Arbitrator's appointment to hear this matter and requested the Arbitrator to recuse himself from the proceedings.  As grounds for its request, the Employer asserted that it was unaware of the Arbitrator's membership on the LRC's labor arbitrator roster when the Arbitrator was appointed by the AAA to hear this matter, and further asserted that the Arbitrator's association with the LRC presented a conflict of interest.  The Union objected to the request, and on February 19 the Arbitrator denied the request by email:

> The Employer based its request on an assertion that notice of my LRC roster membership was not disclosed. However, it is clear that the Employer has had actual notice of my membership on the LRC rosters since at least 2023. …[M]y records reflect that I was selected to hear a matter [involving these parties and] administered by the LRC in 2023. Specifically, the matter of "LRC #607-23: Colleen Romer and Dominique Muldoon et al. - flex-down/floating." I received notice of my appointment on May 19, 2023. I received notice that the Union withdrew the matter on March 7, 2024.

18

**Exhibit 1**

> further directed to produce the information as ordered without further delay.  Failure to do so will permit the Union to request that I draw an adverse inference against the Employer on the assumption that the material that has not been produced would be damaging to the Employer's position(s) in this matter.

The Employer did not provide the requested explanation, and has not produced materials responsive to the Arbitrator's Order.

**The Evidentiary Hearing.**  On September 20, 2024, the AAA case administrator issued a notice of hearing to the parties, which scheduled two evidentiary hearing dates for March 17 and April 2, 2025.  The parties were reminded about the scheduled hearing dates in subsequent correspondence regarding materials ordered for production on December 23, 2024 and January 24, 2025.  On March 14, 2025, Kimm notified the Arbitrator that the parties could not agree on the location for the March 17 hearing, nor could the parties agree on the selection of a court reporter to produce a transcript of the proceedings.  The Union offered several options for the hearing location, and the Arbitrator ordered the use of a neutral hotel located near the worksite following the Employer's effective failure to participate in the selection process.  The Employer also failed to effectively participate in the process for selecting a court reporter, and the Arbitrator permitted the Union to obtain the services of an available court reporter.[10]

---

[10] The Arbitrator denied the Employer's request to employ a second court reporter during the hearing, at its own expense.

19

**Exhibit 1**

The hearing proceeded on March 17, but the Employer declined to participate. The hearing was held on an *ex parte* basis, as permitted by AAA Rule 26.[11] The Union was represented by Canzoneri's law partner, Jason Powalisz, during the hearing. Canzoneri was the Union's only witness. The Union also requested that the Arbitrator draw an adverse inference against the Employer for its failure to respond to the Arbitrator's January 24, 2025 Order to produce a response to the Union's information request. The Arbitrator granted the Union's request. A transcript of the proceedings was produced, and the Employer obtained a copy of the transcript at its own expense.

*Employer Declines Opportunity to Present Rebuttal Case.* At the conclusion of the hearing, the Arbitrator asked the Union for its position on whether to allow the Employer to present a rebuttal case during a second day of the hearing, which had been previously scheduled for April 2. The Union opposed a second day of hearing and requested that the record of the hearing be closed. After the hearing adjourned on March 17, via correspondence with the AAA case administrator and Union and Employer counsel, the Arbitrator offered the Employer an opportunity to show good cause for leave to present its rebuttal case on April 2. The Employer failed to show good cause in its response, but on March 21 the Arbitrator permitted the April 2 hearing to proceed:

> In considering the equities, I am nevertheless compelled to allow a
> second day of hearing to proceed because a decision on the merits
> of this matter would benefit from the Employer's presentation of its

---

[11] The AAA Rule provides:

**26. Arbitration in the Absence of a Party or Representative.**

Unless the law provides to the contrary, the arbitration may proceed in the absence of any party or representative who, after due notice, fails to be present or fails to obtain a postponement. An award shall not be made solely on the default of a party. The arbitrator shall require the other party to submit such evidence as may be required for the making of an award.

20

**Exhibit 1**

defense. As the Employer has given its assurances that it intends to proceed, the April 2 hearing will move forward.

Also on March 21, the Employer filed a series of eight subpoenas for non-Employer personnel to attend the hearing and give testimony. The Union objected. The Arbitrator directed the Employer to provide an offer of proof for the testimony to be elicited from each of the individuals requested to appear on April 2. The Employer did not do so. Accordingly, the Arbitrator declined to order non-Employer personnel to attend the hearing; these individuals included representatives of the AAA, including Kimm – the case administrator assigned to this dispute; representatives of the LRC and the MNA, including Canzoneri; and secretarial staff employed by the law firm representing the Union. In issuing his Order, the Arbitrator remarked that denial of the subpoena requests were borne of the Employer's previous acts and omissions in this matter. For example, the Employer could have cross-examined on March 17 but waived an opportunity to do so through its failure to appear. Referring to AAA Rule 27, on relevance, and Rule 25, on the Order of Proceedings, the Arbitrator then directed the Employer to focus its proofs:

> it would be of particular relevance to the merits of this dispute for the Employer to call its own employee(s) to testify about the subject matter contained in the September 20, 2023 electronic mail message that generated the grievance in this matter. Testimony of this nature would be probative of the Employer's position on this matter.

By March 31, additional correspondence between the parties and the Arbitrator made it apparent that the Employer would not call its own employees, such as Borruso – the author of the September 20, 2023 email, as witnesses at the next day of hearing. The Arbitrator then directed the Employer to indicate whether it would proceed with a presentation of its rebuttal case. The Employer failed to do so. On April 1, the Arbitrator wrote that

21

**Exhibit 1**

further proceedings in this matter were specifically premised on the Employer's appearance and submission of evidence to substantiate its offers of proof. The Employer has declined to do so. As such, the hearing is now closed.

The Arbitrator ordered a May 2 deadline for the submission of post-hearing briefs. The parties agreed to extend the deadline to May 9, and subsequently filed timely post-hearing briefs with the AAA case administrator.

**MNA's Motion to Strike.** On May 15, the Union filed a motion with the AAA to strike portions of the Employer's post-hearing brief. The Employer responded on May 22 and requested that an adverse inference be drawn against the Union. The AAA provided the parties' correspondence to the Arbitrator on May 23. The Arbitrator informed the parties on May 28, via the AAA case administrator, that the motion and related response would be addressed in this Opinion and Award.

## POSITION OF THE UNION

The Employer violated the Agreement. Article XXI clearly specifies that the rules of the chosen case administration agency control the conduct of a given arbitration between the parties. The Union asserted that the parties had an unbroken, 23-year practice of arbitrations administered by either the AAA or LRC, prior to the Employer's unilateral direction to the LRC to cease active case administration of new and existing arbitration demands.

The Union asserted that traditional principles of contract interpretation support its position in this matter. First, the plain and unambiguous language of the Agreement requires that

> an arbitrator be selected pursuant to the Voluntary Labor Arbitration Rules of the American Arbitration Association or the applicable procedures of the Labor Relations Connection.

22

**Exhibit 1**

The Agreement obligates the parties to proceed according to agency rules, and as a result the rules of the respective agencies are incorporated in the Agreement. Specifically, LRC Rule 1 obligates the parties to proceed according to the LRC's rules, which provide for active case administration. The AAA rules contain similar requirements. The rules of each agency also require a written agreement between the parties in order to deviate from the agencies' rules. The Union and Employer have not agreed to do so.

Assuming, *arguendo*, that the Arbitrator does not find that the Agreement is clear, the Union asserted that the other traditional principles of contract interpretation yield a similar result. First, the Agreement may be interpreted as a whole by harmonizing the sum of its parts. In this regard, the Union asserted that the applicable agency rules make it abundantly clear that the agency's role in case administration extends from receipt of the initial demand through the conclusion of a matter. The most relevant rules in this regard are those which position the agency as an intermediary for communications between the parties and the arbitrator. LRC Rule 8 and AAA Rule 46 prohibit parties from directly contacting an arbitrator, which the Employer sought to do following its September 20, 2023 email to the LRC, and subsequently did in contacting arbitrators in at least 15 matters filed with the LRC. The Employer also repeatedly engaged in direct contact with the Arbitrator in this matter, despite the Arbitrator's directions to the contrary.

The Union further asserted that the LRC's rules govern other aspects of case administration following the initial appointment of the arbitrator. Rules 7 and 12 govern the scheduling of hearings. Rules 10 and 11 govern the process for replacing an arbitrator due to dismissal, conflict or other vacancy; Rule 22 governs postponements. Rule 14 governs the process for subpoena requests; Rule 15 governs the process for obtaining a hearing stenographer.

23

**Exhibit 1**

Rules 20 and 21 govern the process for submitting post-hearing briefs; Rules 24 and 25 govern the process for disseminating the arbitrator's award. By comparison, the Union asserted that the AAA Rules are substantially the same as those promulgated by the LRC. In addition, the AAA provides for an expedited process and other optional services. However, the Union asserted that there is nothing in Article XXI that indicates the parties' intent to utilize these separate services, such as "list-only" options that do not include case administration procedures.

The Union further asserted that the Agreement may also be interpreted according to the past practice of the parties. The Union conceded that the past practice may not ordinarily contradict an express or implied term of the contract. However, in this case, the parties have a clear 23-year practice established whereby arbitrations between the parties have been administered by the LRC or AAA from inception to conclusion. This is bolstered by the historical bases reflected in the procedural rulings of 15 other arbitrators, which uniformly rejected the Employer's attempts to cut off LRC case administration and engage in direct communications with the arbitrators.

As an initial matter, the Arbitrator granted the Union's request that an adverse inference be drawn against the Employer. Adverse inferences may be drawn in three distinct instances. First, an adverse inference may be drawn where a party fails to call a witness who may refute testimony contrary to its position. Second, an adverse inference may also be drawn where a party fails to produce documentary evidence to refute testimony contrary to its position. Finally, an adverse inference may be drawn where a party fails to produce documentation responsive to a duly issued subpoena. The Union asserted that each of these principles may be applied against the Employer in this matter.

**Exhibit 1**

Specifically, the Employer failed to appear at the March 17, 2025 hearing, and thereby failed to cross-examine the Union's witness, or present its own witnesses or documentary evidence. For example, the Union asserted that the Employer could have called its own employee, Borruso, to testify about the contents of the September 20, 2023 email. The Employer could have also called any of the lawyers from the seven law firms that have represented the Hospital in negotiations and arbitrations with the Union over the period from 2000 to 2023. Because the Employer failed to call these witnesses, the Union asserted that the specific adverse inference that may be drawn should be that

> their testimony would have fully confirmed: (1) the past practice of AAA and LRC administration in all aspects outlined by Canzoneri, from inception to conclusion of each of the 112 cases filed form 2000 to September 20, 2023; (2) that prior to September 20, 2023, the Hospital never objected to the AAA or LRC administering the arbitration after the appointment of the arbitrator; (3) though the Arbitrator should not consider the Hospital's potential evidence-free argument about LRC bias, that there was no such bias shown in any one of those 112 cases by the actions of the LRC; and (4) that the Hospital failed and refused to produce documents in response to the subpoena that MNA served upon the Hospital.

Thereafter, the Employer also failed to show good cause for the issuance of subpoenas requested for documents and witness testimony – and then failed to participate in a second day of hearing that was offered for the purpose of hearing the Employer's rebuttal case.

Moreover, the Employer failed to provide materials responsive to the Arbitrator's Order. "The party's refusal to comply with an arbitrator's subpoena allows an arbitrator to draw adverse inferences about the party's case..." Elkouri & Elkouri, *How Arbitration Works*, at 362 (8th Ed. 2020). The Union asserted that the adverse inference drawn from the Employer's failure to produce any records that would support its position should result in the same inferences drawn from the Employer's failure to produce witnesses to support its position.

25

**Exhibit 1**

Contrary to the Employer's failure to produce any evidence of practices that support its position in this matter, Canzoneri – the Union's counsel throughout its collective bargaining relationship with the Employer, provided clear and unequivocal testimony in support of an unbroken, mutually acknowledged and 23-year practice.  Specifically, throughout the parties' collective bargaining relationship, the AAA or the LRC has provided active case administration from the receipt of an arbitration demand through the conclusion of a case.  The Union further asserted that the clarity and consistency of these practices were reflected in the voluminous documents that it produced in response to the Arbitrator's December 23, 2024 Order, which partially granted the *subpoena duces tecum* requested by the Employer.  The conclusion is simple: the Employer never objected to the LRC's or AAA's administration of any arbitration filed with either agency prior to September 20, 2023.

The Union further asserted that the arbitrators' findings in each of the 15 preliminary rulings on the issue in this grievance are uniformly in support of the Union's position.  The rulings were issued to countermand the Employer's efforts at direct communication with the arbitrators, in circumvention of the agency assigned to administer each case, the LRC.  Each ruling found that the Agreement vested authority in the LRC to administer the underlying case according to the agency's Rules.  Although not precedential in nature, the Union asserted that the rulings should be considered persuasive in this matter.

Turning to the Employer's anticipated extraneous defenses, the Union asserted that the Arbitrator should ignore any baseless allegations that the LRC is somehow corrupt or has tainted the arbitration process with bias toward the Union.  Even if such baseless allegations had a shred of merit, the Union further asserted that the allegations are immaterial to the interpretation of the

**Exhibit 1**

Agreement and the Employer's obligations thereunder. The Employer's anticipated assertion that the *ex parte* hearing in this matter was somehow improper is likewise baseless:

> A general arbitration clause in a contract would be rendered meaningless if its implementation depended on the willingness of each party to the contract to present its case, as the party desiring no change in relationships could nullify arbitration simply by refusing to make an appearance.

Elkouri, at 322 fn. 216, *citing Velvet Textile Corp.* 7 LA 685, 691 (Pope, 1947). AAA Rule 26 permitted the Arbitrator in this dispute to proceed with the hearing "in the absence of any party or representative who, after due notice, fails to be present or fails to obtain a postponement." The Arbitrator's Code of Professional Responsibility[12] contains a similar provision:

> An arbitrator must be certain before proceeding *ex parte* that the party refusing or failing to attend the hearing has been given adequate notice of the time, place and purposes of the hearing.

Here, the arbitration was duly scheduled in September 2024, and the Employer received notice of the March 17 and April 2, 2025 hearings. The Employer was indisputably aware of the pending hearing as it argued over venue and the use of a court reporter during the days leading up to the hearing. Even after failing to appear on March 17, the Employer failed to seize an opportunity to present its rebuttal case on a subsequent day of hearing that was scheduled to take place on April 2. "[T]he Company willfully and deliberately defaulted and must accept the consequences of failing to take advantage of its right to present its case." *Thompson Fuel Service*, 42 BNA LA 62 (Kerrison, 1962).

For these reasons, the Union respectfully requested that the Arbitrator sustain the grievance and find that the Employer violated the Agreement. As a remedy, the Union requested

---

[12] Code of Professional Responsibility for Arbitrators of Labor Management Disputes, sec. 5(c)(2), at 20 (as amended and restated, Sept. 2007) (accessed on June 8, 2025, at https://adr.org/sites/default/files/document_repository/Code%20of%20Professional%20Responsibility%20for%20Arbitrators%20of%20Labor-Management%20Disputes_0.pdf).

27

**Exhibit 1**

that the Arbitrator order that the Employer pay damages to the bargaining unit as a result of the costs incurred by the Union in defending against the Employer's frivolous rejection of LRC case administration, which was made in bad faith.  The Union contended that an order requiring the Employer to pay damages relating to costs incurred through litigation is not an affront to the 'American Rule' – which expects each party to pay its own attorney's fees and costs absent a contractual or statutory right to recover.  The Union asserted that it is not requesting compensation for attorney's fees and costs relating to the processing of the instant matter, but is seeking fees and costs as a remedy for "damages incurred as a result of the Hospital's willful and repeated collective bargaining agreement breach that lead to the instant grievance and arbitration."

The Union asserted that its request is supported by traditional principles of labor arbitration, which permit damages in the form of attorney's fees incurred as a result of the opposing party's "bad-faith refusal to comply with the terms of a collective bargaining agreement."  *See* Hill & Sinicropi, *Remedies in Arbitration*, at 474 (2d Ed. 1991).  Such an award is not punitive if "limited to the actual expenses incurred in the unnecessary legal proceedings."  *Leavenworth Times*, 71 BNA LA 396, 409 (Bothwell, 1978).  Courts have upheld an arbitrator's award of attorney's fees as damages in a labor arbitration where the prevailing party suffered "losses occasioned by obvious attempts to frustrate access to the contractually created arbitration forum."  *Synergy Gas Co.* 91 BNA LA 77 (Simon, 1987); award upheld in *Synergy Gas Co. v. Sasso*, 853 F.2d 59, 65 (2d. Cir. 1988) (*internal citations omitted*).

The Union further asserted that the breaching party is responsible for damages that are the natural and direct consequences of the breach, pursuant to Massachusetts law.  *See White Spot Const. Corp. v. Jet Spray Cooler, Inc.*, 344 Mass. 632, 635 (1962).  Here, the Union

28

**Exhibit 1**

asserted that the Employer's September 20, 2023 email repudiated the parties' Agreement, despite the plain language of the Agreement and a 20+ year practice that included more than 100 instances of arbitration case administration. Thereafter, the Union was required to spend money on attorney's fees in at least 15 active or subsequently filed arbitrations to seek enforcement of its rights under the Agreement. Enforcement efforts required Union counsel to engage in varying amounts of correspondence, conferences, document review, research and briefing to seek orders from arbitrators in each matter in dispute.

As such, the Union respectfully requested the following remedies in this matter:

1. A letter from the Arbitrator to the case administration agencies that:

   a. Rescinds the Employer's September 20, 2023 email;
   b. Asserts that the Employer may not oppose the agencies' active case administration efforts; and
   c. Rescinds any other currently pending correspondence from the Employer that seeks to interdict case administration by the agencies.

2. An order that the Employer cease and desist from all actions that inhibit the agencies from administering arbitrations to conclusion;

3. A make whole remedy for "all losses suffered due to the Hospital's breach of contract" to include "reimbursement of MNA for all reasonable attorney's fees and costs incurred" as described above; and

4. Any other appropriate relief.

**POSITION OF THE EMPLOYER**

The Employer did not violate Article XXI of the Agreement when it directed the LRC to cease active case administration of arbitrations filed by the Union.

As an initial matter, the Employer asserted that the Agreement is clear and unambiguous in limiting the use of agencies to the selection of arbitrators. The Employer also asserted that the issue has already been decided by this Arbitrator, who determined in his December 23, 2024

29

**Exhibit 1**

Order that the provision is "silent" on case administration, and the Union in subsequent correspondence agreed that the Order was "the law of the case." Because Article XXV of the Agreement does not permit additions to, waivers or deletion of its terms without written agreement by the parties, and no such agreement exists between the parties, the Arbitrator must uphold the clear and unambiguous language of Article XXI to limit the role of agencies in the arbitration process.

The Employer further asserted that the parties knew how to differentiate the use of the agencies named in Article XXI, by drawing a comparison to Article VIII of the Agreement. Section 8.05 provides that overtime grievances between the parties "shall be processed under the AAA rules for expedited arbitration" as an exception to the Article XXI process. The Employer asserted that the theory of *expressio unius est exclusio alterius* is instructive for interpreting the parties' chosen use of alternative terms in Articles VIII and XXI. Specifically, the Employer asserted that because the parties chose to use the term "processed" to describe agency rules in Article VIII, but failed to do so in Article XXI, the parties are not required to use agency rules to process grievances under Article XXI. The Employer asserted that the language of Article VIII has remained unchanged since the inception of the Agreement. Practically speaking, the Employer further asserted that this interpretation can be read consistently with the AAA's Rules, which provide for a limited alternative arbitrator appointment process that does not include active case administration.

Moreover, the Employer asserted that the Union failed to establish a clear past practice, which is unnecessary given the clarity and lack of ambiguity in Article XXI. The Employer asserted that the Union's evidence was deficient, and failed to conclusively demonstrate that the Employer agreed to utilize the LRC as an active case administrator in each individual case filed

30

**Exhibit 1**

between the parties.  Union counsel Canzoneri provided general testimony about past arbitrations between the parties rather than specific testimony about individual disputes.  Such evidence does not demonstrate that the claimed practice was "readily ascertainable or unequivocal."  *See United Mine Workers of America Local 1791*, 1994 BNA LA Supp. 107345 (Brunner, 1994) [*other citations omitted*].  The language used in individual demands for arbitration that were submitted as evidence in this matter includes statements such as, "Kindly note that by agreement the parties ask that the Labor Relations Connection administer this case."  The Employer asserted that the Union never made clear what "agreement" it was referencing in these demands, and there was no evidence of Employer assent to make such statements.

The Employer further asserted that the previous procedural rulings from other arbitrators, which were cited by the Union as support for its view of the dispute, have no precedential value in the present dispute.  Those arbitrators lacked authority to make binding determinations on issues not submitted for arbitration between the parties.  One arbitrator, Greenbaum, limited his ruling to a "pre-trial procedural dispute," which has no precedential value beyond the dispute in which it was raised.  Two other arbitrators, Boulanger and O'Brien, misinterpreted Article XXI to include "LRC procedures" and the "policies of LRC."  The Employer asserted that the Arbitrator should disregard those previous rulings and focus his analysis on the issue presented in this dispute and the relative merits of the facts and arguments presented thereunder.

In any event, the Employer asserted that Article XXV acts as a "zipper clause" and prohibits the establishment of a past practice.  The Employer is not restricted from raising a violation of the Agreement despite inconsistent past practices of the parties; as such, the Employer's September 20, 2023 was a permissible exercise of its rights to reassert the clear limitations contained in Article XXI.

31

**Exhibit 1**

The Employer further asserted that it has a right to demand cessation of the LRC's role in the parties' grievance and arbitration process, due to changed circumstances.  Specifically, the Employer asserted that the Union filed 66 arbitrations in 2022 – all with the LRC and in the year immediately following a prolonged strike that led to the settlement of the current Agreement. The Employer further asserted that most of the grievances filed by the Union were frivolous and were withdrawn soon after filing.  The Employer further asserted that it incurred a fee from the LRC with each Union filing, and that the Union engaged in "extortionate" demands for settlement of pending grievances.  The Employer asserted that it has a reasonable and legitimate business purpose to demand that the LRC cease active case administration in arbitrations between the parties.  *See United Refining Company*, 105 LA 411, 416 (Harlan, 1995).  In *United Refining Company*, the employer unilaterally changed the traditional time for meeting with the union to resolve grievances, following a steep increase in the number of grievances filed by the union.  *Id.* at 416-417.  The arbitrator rejected the Union's claim of a past practice.  *Id.*

Had the Arbitrator permitted the Employer to call Jan Teehan of the LRC to testify in this matter, the Employer asserted that it would have been able to demonstrate that the LRC ceased functioning as a neutral agency.  The Employer asserted that Teehan had already testified under oath in an administrative hearing about topics that the Employer claimed demonstrated her organization's bias in favor of the Union and against the Employer.  The Employer also asserted that the Arbitrator improperly refused to allow the Employer "the benefit of a hearing in this matter and improperly refused to issue the Hospital's requested subpoenas."  The Employer proffered six exhibits as attachments to its post-hearing brief to further its assertion of the LRC's bias as justification for its demand that the agency cease administration of Article XXI arbitrations between the parties.  The Employer also asserted that it has participated in these

32

**Exhibit 1**

proceedings under protest, citing "the Union's continuing corruption of the parties' grievance and arbitration procedure," conflicts of the Arbitrator and the AAA, lack of notice regarding the arbitration hearing, the Arbitrator's refusal to issue subpoenas requested by the Employer, the "Arbitrator's refusal to permit the Hospital the benefit of a hearing and various other denials of due process."

In conclusion, the language of the Agreement is clear in limiting the use of the LRC or the AAA to the selection of arbitrators in disputes filed pursuant to Article XXI, and no past practice exists with respect to permitting the LRC to actively administer a case following selection of the arbitrator. As such, the Union has failed to meet its burden to prove a violation of the Agreement, and the grievance must be denied in its entirety.

**ADDITIONAL CONTENTIONS**

*Union's Motion to Strike*

The Union requested that the Arbitrator strike from consideration eight items in the Employer's post-hearing brief. Specifically, the Union requested that the Arbitrator strike the exhibits that the Employer impermissibly appended to its post-hearing brief. The evidentiary hearing is the opportunity for parties to submit evidence tending to support its positions or counter those of the opposing party. The Employer had an opportunity to appear at the evidentiary hearing that was held on March 17, 2025, and also failed to appear and present its rebuttal case on April 2. By failing to do so, the Employer failed to establish a foundation for admitting these exhibits, or provide the Union with an opportunity to object to their admission. The exhibits were not, in fact, admitted by the Arbitrator.

Second, the Union moved to strike the Employer's reference to prior versions of Article VIII, Section 8.05. Prior versions of Article VIII from expired collective bargaining agreements

33

**Exhibit 1**

between the parties were not submitted into evidence in these proceedings, and the Employer offered conclusory assertions, without foundation, about the lack of any substantive changes to Article VIII since 2000. Third and sixth, the Union moved to strike references to Jan Teehan's testimony in previous administrative proceedings, and prospective references to Teehan's purported testimony in this matter had she been subject to subpoena. The Union asserted that Teehan's prior statements are not properly in evidence in this dispute, and Teehan was not subject to testimony or cross-examination in this dispute. Practically speaking, the conclusions that the Employer draws therefrom are bogus and false.

Fourth and fifth, the Union moved to strike the Employer's assertions about changed circumstances. Specifically, the Employer's assertions about 66 arbitrations that the Union filed in 2022 are not in evidence, and the Employer's conclusory statements about the "frivolous" nature of the grievances, the MNA's "delay" in processing the cases and "extortionate type "settlement" demands," and the Employer's conclusions drawn therefrom, are not in evidence, are inappropriate characterizations, and otherwise lack support in fact.

Seventh, the Union moved to strike the Employer's assertion that it was improperly refused the benefit of a hearing, among other claims that relied on materials that are not in evidence and are immaterial to the case. The Union asserted that the Arbitrator provided the Employer with an opportunity to make an offer of proof that may have permitted the disputed subpoenas to issue, and the Employer failed to do so. The proffer of additional evidence, after the closure of the record in this matter, is impermissible, and the false conclusions drawn by the Employer from those materials should be stricken from consideration.

Finally, the Union moved to strike the Employer's statement that the "LRC actively colluded with several arbitrators to convince them to rule in such a way as to benefit both the

**Exhibit 1**

Union and the LRC itself." The Union asserted that the Employer's inappropriate characterization of facts not in evidence should be stricken.

*Employer's Opposition and Motion for Adverse Inference*

The Employer generally opposed the Union's motion to strike portions of its post-hearing brief, asserting that a more fulsome response to the Union's motion is not warranted because the Arbitrator need not look beyond the four corners of the Agreement to make a determination in this matter. The Employer also asserted that it has preserved its rights with respect to the procedural deficiencies in this matter.

The Employer also raised its own motion to strike portions of the Union's brief that it asserted are not supported by the record, and further asserted that the Arbitrator should draw an adverse inference against the Union for failing to timely comply with his December 23, 2024 Order to produce certain materials. Specifically, the Employer asserted that the Union provided the materials responsive to the Order four days late without the assent of the Employer. As such, the Employer asserted that evidence presented by the Union that was also subject to production under the Arbitrator's Order should be excluded from consideration, and the Arbitrator should accordingly draw an adverse inference against the Union with respect to the establishment of a past practice in this dispute.

**OPINION**

Despite the extended prologue presented by the factual and procedural background in this dispute, this is a relatively simple case. Indeed, the parties agree on one central premise – the clarity and lack of ambiguity in the language of Article XXI. Although the parties differ in their opinions with respect to what Article XXI clearly states, the factual record supports the

35

**Exhibit 1**

conclusion that the contract obligates the parties to utilize the agencies named in the provision to administer arbitration cases from inception to conclusion.

For the following reasons, the grievance is sustained.

**The Union's Motion to Strike.**  First, it is necessary to establish the proper level of focus on the factual record before me.  The Union's Motion to Strike is granted in all respects, and the Employer's request that I draw an adverse inference is denied.  Independent of the Union's motion, I would have disregarded the items in the Employer's post-hearing brief that were subject to the motion.

The Employer was provided ample opportunity to present its proofs in this dispute.  It failed to do so at every turn.  The Employer failed to appear at the first day of the evidentiary hearing.  When the Employer was provided an opportunity to present its rebuttal case at the second day of hearing that had been scheduled, over the objection of the Union, the Employer likewise failed to appear.  The Employer was also granted the opportunity to make offers of proof, on the eve of the second scheduled hearing day, to support its request that multiple subpoenas be issued for documents to be produced and for witnesses to appear and give testimony.  Again, the Employer failed to provide any substantive offers of proof tending to demonstrate the anticipated relevance of the testimony or documents it sought.  The hearing record was closed on April 1, 2025.

Instead, the Employer sought to submit through the post-hearing briefing process what it did not offer for admission during the evidentiary hearing.  By doing so, the Employer failed to establish any foundation for the exhibits attached to the brief, and the Union was effectively denied any opportunity to test the relevance of those documents.  They are excluded, and the Employer's assertions that are drawn from those documents are likewise stricken from the record.  I have taken similar action in previous disputes, and I see no reason to depart from well-

36

**Exhibit 1**

established processes in the arbitral forum.  *See Teamsters Local 320 and Chisago County (MN)*, Minnesota BMS No. 23-PA-1511 to 23-PA-1515 (2023); *see also* AAA Rule 25 (Order of Proceedings – "Exhibits may, when offered by either party, be received in evidence by the arbitrator."); AAA Rule 27 (Evidence and Filing of Documents – "The arbitrator shall determine the admissibility, the relevance, and materiality of the evidence and may exclude evidence deemed by the arbitrator to be cumulative or irrelevant…  All evidence shall be taken in the presence of … the arbitrator… and all of the parties").

The Employer's response failed to present any rationale for the submission of materials not in evidence, or its reliance therein.  Instead, the Employer simply asserted that the Arbitrator need not look beyond the four corners of the Agreement in resolving this matter.  On this point, we agree.  However, the Employer's assertion that an adverse inference should be drawn against the Union for failing to make a timely response to the Arbitrator's December 23, 2024 Order strains credulity.  First, the deadline for the Union's compliance was February 14, 2025, and the Employer first raised its concerns about the completeness of the Union's response in its May 22 response to the Union's motion.  The interim period featured an evidentiary hearing, dozens of emails, and a post-hearing brief.  In asking that the Arbitrator draw an adverse inference, the Employer stated that the Union's response was late and incomplete, yet provided no substantive assertions about materials missing from the response.  It is true that the Union did not fulfill document production by the February 14 deadline, but the Union did take steps to obtain the Employer's assent for an extension.  The Employer did not reply, and the Union completed its response a few days later.

Of course, the Employer has *never* fulfilled its own obligation to provide documents requested by the Union.  My January 24, 2025 Order included the same deadline for the Employer to produce documents responsive to the Union's request.  The Employer failed to meet

37

**Exhibit 1**

that deadline, and failed to respond to my queries about the status of its efforts to comply with the Order – with a clear warning that an adverse inference would be drawn in light of its own inaction.  The Employer provided nothing.

Simply put, there is absolutely no basis to draw an adverse inference against the Union on the basis suggested by the Employer.

**Article XXI Incorporates Agency Rules.**  The plain language of the provision in dispute dictates that this grievance be sustained.  Article XXI of the parties' Agreement provides that the Union may initiate a demand for arbitration at Step 4 of the grievance procedure.  The arbitrator "shall be selected pursuant to the Voluntary Labor Arbitration Rules of the American Arbitration Association or the applicable procedures of the Labor Relations Connection."  By incorporating the agency rules in the arbitrator selection process described in Step 4, the parties agreed to be bound by those rules.  Likewise, the rules themselves bind the parties; LRC Rule 1 states that the parties must mutually agree to use the LRC "to administer" their cases, and the parties may only amend the procedures outlined in the Rules by written agreement.  AAA has a similar set of provisions: Rule 1 states the parties "shall be deemed to have made these rules a part of their arbitration agreement whenever, in a collective bargaining agreement or submission, they have provided for arbitration by the [AAA] or under its rules."  The AAA rules may only be modified by written agreement of the parties.  Rule 2 makes it clear that by proceeding under the AAA's Rules, the parties "authorize the AAA to administer the arbitration."  The parties have not entered any agreement to depart from the rules of the AAA or the LRC in administering arbitrations.

*Pre-Hearing Assessment Not Binding.*  Granted, I made an initial observation during the pre-hearing process of this matter that the disputed language was "silent on the issue of case

38

**Exhibit 1**

administration."[13]  The pre-hearing issue in dispute concerned the production of records tending to prove or disprove the establishment of a past practice with respect to case administration, and did not address the plain language of the provision.  My initial observation was made without the benefit of a fully-developed record, prior to the evidentiary hearing and the submission of testimony and supporting documentation, and the submission of post-hearing briefs.  With the benefit of the AAA Rules and the LRC Rules in evidence, it is clear that the provision – standing alone – requires the chosen agency to administer arbitrations between the parties.

*It is Unnecessary to Compare Other Provisions to Interpret Article XXI.*  The Employer argued that the parties knew how to differentiate between the selection of an arbitrator and the processing of a grievance pursuant to agency rules.  Article VIII of the Agreement contains a provision calling for overtime disputes to be "processed under the AAA rules for expedited arbitration…"  This argument fails for several reasons.  As an initial matter, the principles of contract interpretation call for an inquiry to end upon a finding that the language at issue is clear and unambiguous.  I have determined that the disputed provision in Article XXI is clear on its face.

Even if Article XXI were not sufficiently clear, Section 8.05 is not probative on the parties' intent in drafting the competing terms of the Agreement.  As the Union noted, prior versions of Section 8.05 are not in evidence, and as a result, the Employer's assertion that the

---

[13] In relevant part, my December 23, 2024 Order stated,

> The parties have asserted competing theories on the past practice of case administration in arbitration disputes. The existence of a past practice can act as a gap-filler for missing or ambiguous contract language. The applicable contract language in this case – "an arbitration shall be selected pursuant to the" applicable rules of the AAA or the LRC – is silent on the issue of case administration. In contrast to the Union's assertion, captured above, the Employer has proffered that the parties may have sought to utilize the AAA's "list-only" option to select arbitrators at some point over the past 24 years. The Union's asserted past practice is the apparent genesis for the Employer's subpoena.

**Exhibit 1**

provision has remained unchanged throughout the lifetime of the Agreement is not supported by the factual record in this matter. Put simply, we do not know why the parties chose to differentiate the language used in each provision.

As a practical matter, Section 8.05 calls for the parties to use a different process than the one described by Article XXI. By reviewing the AAA Rules that are incorporated by reference in each provision, it becomes clear that the "Expedited Labor Arbitration Procedures" in the AAA Rules is a separate process that streamlines many of the same case administration procedures found elsewhere in the arbitration rules. In other words, Section 8.05 calls for one expedited process to replace the regular process for administering arbitration cases.

**Agency Rules Describe Detailed Case Administration Procedures.** The agency functions in a dispute have been aptly described as similar to those of a court clerk. In brief, the rules of each agency describe a case administration process that extends well beyond the initial appointment of an arbitrator. By way of example, LRC Rules 7 and 12 govern the scheduling of hearings. Rules 10 and 11 govern the process for replacing an arbitrator. Rule 22 governs the postponement of a hearing. Rule 14 governs the process for subpoena requests. Rules 20 and 21 govern the process for submitting post-hearing briefs; Rules 24 and 25 govern the process for disseminating the arbitrator's award. The AAA Rules contain similar procedures.

Taken as a whole, the process described by the agency rules reflect the expectations of parties who agree to use the AAA or the LRC as a case administration service. Parties pay a filing fee to the AAA or the LRC, and the agency shepherds the matter from the initial filing to the conclusion of the matter. The agency oversees a process for the selection of an arbitrator from a roster of qualified individuals, and acts as an intermediary between the parties and the arbitrator once selected, to: schedule the hearing; resolve pre-hearing disputes; receive and disseminate post-hearing briefs; and distribute the award, among other key functions.

**Exhibit 1**

By extension, the parties never manifested an intent to utilize the "list-only" option provided by the AAA, which permits selection of an arbitrator with no further case management services provided. Similar to the expedited arbitration process described by Section 8.05 of the Agreement, which the parties utilize to resolve overtime disputes, the "list-only" service exists in a separate section of the AAA Rules and is labeled as one of many "Optional Services" provided by the AAA. The Employer offered no evidence to support its assertion that it may have suggested use of the "list only" option, and no other record evidence reflects an agreement by the parties to do so.

**The Past Practice of the Parties Reinforces the Clarity of the CBA.** Although this dispute has been resolved by interpreting the clear language of Article XXI, the record reflects that the Employer and the Union have made frequent use of the full suite of case administration services offered by the AAA and the LRC. A past practice is evident, and reinforces the finding that the plain language of Article XXI is clear on the parties' intent to use the AAA and the LRC to administer cases from inception to conclusion. The Union presented testimonial evidence to support this determination. The Union also presented reams of correspondence and other documents produced from over 100 arbitration demands filed from 2000 through 2023, which were devoid of any indication that the Employer ever objected to case administration by either the LRC or the AAA. By comparison, the materials demonstrated that the agencies consistently performed a range of case administration services in arbitration disputes between these parties. This conclusion is also supported by the 15 procedural rulings by arbitrators in pending disputes between the parties that were filed with the LRC. In each instance, the arbitrators found support in the Agreement to rule that the LRC would continue to provide active case administration services to the conclusion of the matter; multiple arbitrators offered their own personal

41

**Exhibit 1**

observations that the LRC has provided a full suite of case administration services in previous disputes before the arbitrator and involving these parties.

On the other hand, the Employer offered nothing to support Borruso's September 20, 2023 assertion that the LRC's role in an arbitration demanded under Article XXI ends upon the selection of an arbitrator. The Employer could have called Borruso to describe his motivation for sending the correspondence; or, as the Union noted, the Employer could have called counsel from any of the seven law firms that have represented the Hospital in negotiations and arbitrations over the relevant period to provide context for the Employer's interpretation of Article XXI. The Employer failed to appear at the evidentiary hearing, where it could have cross-examined the Union's witness, challenged the Union's document submissions, or presented its own witnesses and documentary evidence to support its interpretation of Article XXI.

*Adverse Inference and Waiver.* In assessing the extent of the parties' practices, which are extensive, it is unnecessary to engage in an extended discussion of the Employer's omissions at the evidentiary hearing. I have drawn an adverse inference against the Employer's position on past practice. The Employer failed to produce materials requested by the Union and ordered for production. The Employer failed to do so despite a clear warning that an adverse inference would follow.

In this sense, the Employer's disregard for the arbitral forum is particularly acute. The labor-management community's preferred method for the resolution of contractual disputes relies on the provision of information necessary to determine the truth of the matter asserted, and necessitates the full participation of the parties in the process to interpret the collective bargaining agreement. A party cannot simply pick and choose how, when, or to what extent it will participate, and expect the finder of fact to accept assertions made without an established foundation. The Employer expects the Union and the Arbitrator to accept its interpretation of the

42

**Exhibit 1**

contract without providing a shred of evidence in support of its contentions. I cannot do that, and the only reasonable conclusion that may be reached is that the information that the Employer failed to produce would have been harmful to its position.

By the same token, the Employer has made conclusory statements that it was denied a sufficient hearing to present evidence in support of its position. Nothing before me supports such a conclusion. AAA Rule 25 provides an arbitrator with the discretion to

> conduct the proceedings with a view to expediting the resolution of the dispute and [the arbitrator] may direct the order of proof, bifurcate proceedings and direct the parties to focus their presentations on issues the decision on which could dispose of all or part of the case.

The procedural record in this matter is replete with instances where the Employer declined opportunities to appear at the first evidentiary hearing, and failed to provide good cause for leave to attend a second evidentiary hearing, and failed to make an offer of proof to support subpoena requests.

In addition, and notwithstanding the adverse inference that has been drawn in this matter, the Employer's failure to appear at the evidentiary hearing and cross-examine the Union's witness acts as a waiver to challenge the information elicited from the witness's testimony. For example, the Employer asserted that Canzoneri's testimony should be disregarded because he failed to testify specifically about individual cases, and therefore the Union lacked information sufficient to conclude that the parties agreed to use the LRC's (or AAA's) case administration services on a consistent basis. Such a line of questioning may have proven probative during cross-examination, but the Employer failed to make effective use of the forum provided by the parties' Agreement.

**Exhibit 1**

**REMEDY**

The Union is entitled to an Award of damages as compensation for the Employer's violation of the Agreement. The appropriate measure of damages is dependent on the extent of the Employer's violation. The violation began on September 20, 2023 when the Employer's representative unilaterally directed the LRC to "cease any purported "administration" of, or any other participation of any kind in, any of the Hospital's currently pending matters." The record further reflects that the Employer directly contacted arbitrators assigned to matters between the parties that were being administered by the LRC. The Employer did so in violation of LRC Rule 8, which prohibits direct contact between the parties and the arbitrator and is incorporated as a term of the Agreement under Article XXI. The record also reflects that the Union obtained at least 15 procedural rulings from arbitrators assigned to the matters in dispute. Union counsel provided undisputed testimony to substantiate the efforts undertaken by the Union and its legal representatives to engage in varying amounts of correspondence, conferences, document review, research and briefing to obtain the rulings in each matter, which were uniformly in favor of the Union's position.

The Employer's unilateral directive to the LRC was without apparent basis in fact or the parties' Agreement. The Employer failed to provide any evidence to support its position in this dispute, and the only reasonable conclusion can be that the Employer's position was taken in bad faith. As articulated in the Union's post hearing brief, labor arbitrators permit damages in the form of attorney's fees incurred as a result of the opposing party's bad-faith refusal to comply with the terms of a CBA. This principle is consistent with Massachusetts law, which holds the breaching party is responsible for damages that are the natural and direct consequences of a contractual breach.

**Exhibit 1**

The Employer's bad faith violation of Article XXI was the direct and proximate cause of the Union's expenditures associated with defending its rights under the Agreement.  As such, I am hereby ordering the Employer to compensate the Union for all attorney's fees and related costs incurred in obtaining procedural rulings from arbitrators in matters assigned through the LRC.  The period of liability shall commence on September 20, 2023, and shall continue until the Employer abandons its position on the LRC's role in administering arbitration disputes between the parties.

In this regard, the Employer shall immediately cease and desist from all actions that may inhibit the LRC from administering pending or future arbitrations between the parties.  I decline to issue a letter to the LRC or the AAA as requested by the Union, as further correspondence is unnecessary in light of this cease and desist order.

In satisfaction of this Award, the Union shall promptly provide the Employer's representatives with copies of all invoices, redacted to protect any privileged information, to substantiate the attorney's fees and costs incurred during the period described above.  For the avoidance of doubt, promptly shall mean no later than 30 days following the date of this Award. Upon timely receipt of the materials produced for the Employer's review, the Employer shall issue payment to the Union no later than 30 days following receipt of said materials.

Additionally, each party shall issue prompt payment to the Arbitrator in satisfaction of his fees, current and outstanding, in this matter.  Article XXI of the Agreement provides that the costs of the Arbitrator "shall be borne equally by the Hospital and the MNA."  The Employer has an outstanding balance of $1,850.00 from a previous invoice (#128) that was issued in this dispute on December 23, 2024, and which is unpaid and is past due.  In addition, payment is due from each party on the current invoice (#166), which I have issued with this Award, within 30 days of the date entered below.

45

**Exhibit 1**

The Arbitrator will retain limited jurisdiction of this matter for a period of 90 days from the date of this Award, which may be invoked by either party for the sole purpose of resolving any disputes that may arise from the implementation of the remedy described herein.  Upon timely invocation of the Arbitrator's retained jurisdiction, such jurisdiction shall continue until the remedial dispute is concluded.

**AWARD**

The grievance is sustained. The Employer violated Article XXI of the Agreement by unilaterally directing the Labor Relations Connection (LRC) to cease administration of grievance arbitrations filed by the Union.

The Employer shall cease and desist from all actions that may inhibit the LRC from administering pending or future arbitrations between the parties.  The Employer shall also compensate the Union for all attorney's fees and costs incurred in obtaining procedural rulings from arbitrators in matters assigned through the LRC, as more fully described herein.

The Arbitrator will retain limited jurisdiction for ninety (90) days from the date of this Award for the sole purpose of resolving any disputes, upon the request of the parties and pursuant to the limitations described herein, that may arise from the implementation of the remedies ordered in this Award.

Michael T. Loconto, Esq.
Arbitrator
June 12, 2025

46

**Exhibit 1**

**AGREEMENT**

**BETWEEN**

**SAINT VINCENT HOSPITAL**

**AND**

**MASSACHUSETTS NURSES ASSOCIATION**

**JANUARY 3, 2022 – DECEMBER 31, 2025**

**Exhibit 2**

# Table of Contents

ARTICLE I. .................................................................................................................................... 1

ASSOCIATION/EMPLOYER RELATIONS ............................................................................... 1

   1.01. Recognition Clause ........................................................................................................... 1

   1.02. Participation in Association ............................................................................................... 1

   1.03. Agency Service Fee ........................................................................................................... 2

   1.04. Payroll Deductions of Association Dues .......................................................................... 2

   1.05. Local Unit Dues ................................................................................................................ 2

ARTICLE II. ................................................................................................................................... 3

ASSOCIATION RIGHTS .............................................................................................................. 3

   2.01. Association Representative ................................................................................................ 3

   2.02. Association Business ......................................................................................................... 3

   2.03. Bulletin Boards ................................................................................................................. 3

   2.04. Copy of Agreement ........................................................................................................... 3

   2.05. Voicemail .......................................................................................................................... 3

   2.06. Association Leave of Absence ........................................................................................... 4

   2.07. Storage Space .................................................................................................................... 4

   2.08. Pay for Negotiations ......................................................................................................... 4

   2.09. Association Rights ............................................................................................................. 4

ARTICLE III. .................................................................................................................................. 4

EMPLOYEE RIGHTS .................................................................................................................... 4

   3.01. Work Environment ............................................................................................................ 4

   3.02. Nurses Lockers .................................................................................................................. 5

ARTICLE IV. .................................................................................................................................. 6

MANAGEMENT RIGHTS ............................................................................................................ 6

ARTICLE V. ................................................................................................................................... 6

FAIR PRACTICE ........................................................................................................................... 6

   5.01. Non-Discrimination .......................................................................................................... 6

ARTICLE VI. .................................................................................................................................. 6

DEFINITIONS ................................................................................................................................ 6

   6.01. Definitions......................................................................................................................... 6

   6.02. Regular Full-Time Nurse .................................................................................................. 7

   6.03. Regular Part-Time Nurse .................................................................................................. 7

   6.04. Flex Nurse ......................................................................................................................... 7

   6.05. Per Diem Nurse ................................................................................................................. 7

   6.06. Temporary Nurse ............................................................................................................... 7

   6.07. Working Days .................................................................................................................... 7

**Exhibit 2**

ARTICLE VII. .................................................................................................................. 8

SALARIES/DIFFERENTIALS .......................................................................................... 8

   7.01.Wages ..................................................................................................................... 8

   7.02. Per Diem Wages ................................................................................................ 11

   7.03. Shift Differential ............................................................................................... 11

   7.04. On-Call ............................................................................................................... 12

   7.05. Week-End Differential ...................................................................................... 13

   7.06.Relief in Higher Classification .......................................................................... 13

   7.07.Pay Schedule ...................................................................................................... 13

   7.08.Preceptor Pay ..................................................................................................... 14

   7.09.Resource Nurses ................................................................................................. 14

ARTICLE VIII. ............................................................................................................... 15

WORK SCHEDULE ....................................................................................................... 15

   8.01.Hours of Work .................................................................................................... 15

   8.02. Release Time ...................................................................................................... 16

   8.03. Posting of Work Schedules ............................................................................... 17

   8.04. Staff Self-Scheduling ........................................................................................ 18

   8.05. Overtime ............................................................................................................ 19

   8.06. Overtime Pay ..................................................................................................... 20

   8.07. Weekends ........................................................................................................... 20

   8.08. Weekend Option ................................................................................................ 21

   8.09. Rotation .............................................................................................................. 21

   8.10. Floating .............................................................................................................. 22

ARTICLE IX. .................................................................................................................. 24

PER DIEM STAFFING ................................................................................................... 24

   9.01. Per Diem Staffing .............................................................................................. 24

   9.02. Terms Of Employment ...................................................................................... 24

   9.03. Level I Per Diem RN .......................................................................................... 26

   9.04. Level II Per Diem RN ......................................................................................... 26

   9.05. Floating .............................................................................................................. 27

   9.06. Transfer From Per Diem Position To Regular Hours Position ......................... 27

ARTICLE X. .................................................................................................................... 28

FLEX POSITIONS .......................................................................................................... 28

   10.01. Flex Nurse ........................................................................................................ 28

ARTICLE XI. .................................................................................................................. 29

HOLIDAYS ..................................................................................................................... 29

   11.01. Eligibility ......................................................................................................... 29

**Exhibit 2**

11.02. Floating Holidays ...................................................................................................... 30

11.03. Holiday Accrual and Pay ......................................................................................... 30

11.04. Failure to Work as Scheduled ................................................................................. 31

11.05. Scheduling Holiday Work ........................................................................................ 31

11.06. Listed Holiday Occurring During Scheduled Vacation .......................................... 32

11.07. Use of Holiday Time During Leaves of Absence .................................................... 32

11.08. Effect of Change In Employment Status ................................................................. 32

11.09. Holiday Carryover ................................................................................................... 32

11.10. Release on a Holiday ............................................................................................... 33

ARTICLE XII. ....................................................................................................................... 33

VACATION TIME ................................................................................................................. 33

12.01. Eligibility ................................................................................................................ 33

12.02. Accrual .................................................................................................................... 33

12.03. Vacation Pay ........................................................................................................... 34

12.04. Requests and Scheduling ........................................................................................ 34

12.05. Maximum Accrual of Vacation ............................................................................... 36

12.06. Use of Vacation During Leaves of Absence ........................................................... 36

12.07. Holiday Occurring During Scheduled Vacation ..................................................... 36

12.08. Effect of Change In Employment Status ................................................................. 36

12.09. Vacation Approvals ................................................................................................. 37

ARTICLE XIII. ...................................................................................................................... 37

FLEXIBLE BENEFITS ......................................................................................................... 37

13.01. Flexible Benefits Program ...................................................................................... 37

13.02. Health and Dental Insurance Benefits .................................................................... 37

13.03. Disability Insurance ................................................................................................ 40

13.04. Life Insurance ......................................................................................................... 40

13.05. HIV and Hepatitis-C Insurance .............................................................................. 40

13.06. Professional Liability Insurance Coverage ............................................................. 40

13.07. Retirement Savings Plan ......................................................................................... 40

ARTICLE XIV ....................................................................................................................... 41

SICK LEAVE ........................................................................................................................ 41

14.01. Eligibility ................................................................................................................ 41

14.02. Accrual .................................................................................................................... 41

14.03. Maximum Accumulation, Use and Pay .................................................................. 42

14.04. Use of Sick Time During Leaves of Absence ......................................................... 42

14.05. Fitness-for-Duty Assessments and Physician Notes ............................................... 42

14.06. Effect of Change In Employment Status ................................................................. 43

iii

**Exhibit 2**

14.07. Banked Sick Time Hours ................................................................................ 43

14.08. Assault Pay.................................................................................................... 43

14.09. Massachusetts Earned Sick Time.................................................................. 43

ARTICLE XV. ............................................................................................................. 44

LEAVES OF ABSENCE .............................................................................................. 44

15.01. Definition ..................................................................................................... 44

15.02. Eligibility ..................................................................................................... 46

15.03. Duration of Leave ......................................................................................... 46

15.04. Required Notice ............................................................................................ 47

15.05. Medical Certifications................................................................................... 48

15.06. Benefit Continuation and Accrual ................................................................ 49

15.07. Return to Work Following Leave .................................................................. 50

15.08. Effect of Layoff While on Leave .................................................................. 50

15.09. Bereavement ................................................................................................. 51

15.10. Jury Duty....................................................................................................... 51

15.11. Legal Proceedings ........................................................................................ 52

ARTICLE XVI............................................................................................................. 52

SENIORITY ................................................................................................................ 52

16.01. Seniority........................................................................................................ 52

16.02. Loss of Seniority and Employment Rights ................................................... 53

16.03. Absences for which Credit in Service is Granted .......................................... 54

16.04. Reduction in Force ........................................................................................ 55

16.05. Recall ............................................................................................................ 58

16.06. Benefits ......................................................................................................... 58

16.07. Vacancies ...................................................................................................... 59

16.08. Probationary Period ...................................................................................... 60

16.09. Resignation ................................................................................................... 60

16.10. Discipline and Discharge .............................................................................. 60

ARTICLE XVII. .......................................................................................................... 60

EDUCATIONAL ADVANCEMENT ........................................................................... 60

17.01. Educational Reimbursement ......................................................................... 60

17.02. Continuing Education .................................................................................... 61

17.03. Preceptor Program ........................................................................................ 62

17.04. Educational Meetings.................................................................................... 63

ARTICLE XVIII. ......................................................................................................... 63

STAFFING .................................................................................................................. 63

18.01. Staffing.......................................................................................................... 63

**Exhibit 2**

18.02. ICU ........................................................................................................................... 63

ARTICLE XIX. .................................................................................................................... 64

NURSING PRACTICE ........................................................................................................ 64

19.01. Delegation of Nursing Activities ......................................................................... 64

ARTICLE XX. ..................................................................................................................... 64

MISCELLANEOUS ............................................................................................................ 64

20.01. Hospital Personnel Policies .................................................................................. 64

20.02. Labor/Management Committee ............................................................................. 64

20.03. Parking .................................................................................................................. 65

ARTICLE XXI. .................................................................................................................... 66

GRIEVANCE AND ARBITRATION ................................................................................. 66

ARTICLE XXII. ................................................................................................................... 68

EMPLOYMENT AND CONTRACT SECURITY .............................................................. 68

22.01. Subcontracting ..................................................................................................... 68

22.02. Successor ............................................................................................................. 69

ARTICLE XXIII. ................................................................................................................. 69

NO STRIKE: NO LOCKOUT ............................................................................................. 69

ARTICLE XXIV. ................................................................................................................. 69

LEGAL CONFLICT ............................................................................................................ 69

ARTICLE XXV. ................................................................................................................... 70

COMPLETENESS OF AGREEMENT ................................................................................ 70

ARTICLE XXVI. ................................................................................................................. 70

DURATION ......................................................................................................................... 70

ARTICLE XXVII. ................................................................................................................ 70

MOVE ISSUES ................................................................................................................... 70

27.01. Move Issues ......................................................................................................... 70

ARTICLE XXVIII. .............................................................................................................. 70

STAFFING GUIDELINES .................................................................................................. 70

28.01. Staffing Guidelines .............................................................................................. 70

ARTICLE XXIX. ................................................................................................................. 71

SUPERVISORY DUTIES ................................................................................................... 71

29.01. Supervisory duties ............................................................................................... 71

APPENDIX B:  Clinical Specialists and Nurse Education ................................................. 74

APPENDIX PSY .................................................................................................................. 75

APPENDIX H ....................................................................................................................... 78

APPENDIX I:  Staffing Guidelines .................................................................................... 82

SIDE LETTER A ................................................................................................................. 94

v

**Exhibit 2**

SIDE LETTER B ............................................................................................................... 95

SIDE LETTER C ............................................................................................................... 96

SIDE LETTER D ............................................................................................................... 97

SIDE LETTER E ............................................................................................................... 98

PAYMENT OF OVERTIME ......................................................................................... 100

INDEX ............................................................................................................................ 102

**Exhibit 2**

This collective bargaining agreement (the "Agreement") is entered into effective January 3, 2022 by and between Saint Vincent Hospital (the "Hospital") and Massachusetts Nurses Association (the "Association" or "MNA").

## ARTICLE I.
## ASSOCIATION/EMPLOYER RELATIONS

### 1.01. Recognition Clause

In accordance with the certification of the National Labor Relations Board, Case Number 1-RC-20743, dated February 18,1998, the Saint Vincent Hospital (the "Hospital") recognizes Massachusetts Nurses Association ("MNA" or the "Association") as the sole and exclusive bargaining representative for all full-time, regular part-time and per diem registered nurses who work an average of four hours or more per week, including Admissions Coordinator, Nurse IV, Patient Educator, Registered Nurse, ERCP Coordinator, Diabetic Nurse, Nurse Practice-Research, Trauma Coordinator, Dysrhythmia Specialist, Nurse Pulmonary Education Coordinator, Nurse Clinical Risk Reviewer/Data Coordinator, Pharmacy Research Coordinator, Operating Room Service Coordinator, CC Business Information Services Manager, Case Managers, Enterostomal Therapist, Clinical Nurse Specialist, Nurse Liaison, TCC,  Clinical Ed Specialist II, Case Management Assistant Director, Clinical Quality Assistant Director, Emergency Mental Health Counselor and Childbirth Educator employed by the Hospital located in Worcester,  Massachusetts but excluding Office Coordinator (Orthopedics), Anesthesia Work Room Supervisor, Infection Control Coordinator, Operating Room Materials Supervisor, Nurse Clinician Radiation/Oncology, Assistant Clinical Manager, Nurse Recruiter, Health Office Coordinator, Manager of Pain Services, Nurse Manager of HEM/On/Am, Nurse Manager of Ambulatory Clinic, Cardiac Rehab Coordinator, Non-invasive Cardiology Manager, Administrative Coordinator, Nurse Manager I, Nurse Manager II, Administrative Director, Director of Risk Management, Independent Contractors, Confidential Employees, Managerial Employees, Guards and Supervisors as defined in the National Labor Relations Act.

### 1.02. Participation in Association

The Hospital and MNA recognize the right of any Bargaining Unit RN to join or refrain from joining the MNA, and neither party will interfere with the RN's exercise of that right.

**Exhibit 2**

The Hospital will provide to the Association, by electronic attachment, on a monthly basis, the name, address, phone number, pay rate, date of hire, position title, unit, shift and budgeted hours of all bargaining unit members.

The Hospital agrees to permit an Association Representative to speak at all nursing orientation blocks for 15 minutes regarding the Association status as Bargaining Agent and the services offered by the Association.  If the nursing orientation is on site and the designated Association Representative is on duty, the nurse will be released without loss of pay from her/his shift for 15 minutes.  If the nursing orientation is off site, the designated Association Representative must be off duty and the Hospital will pay the nurse for one-half hour at her/his regular straight-time hourly rate.

## 1.03. Agency Service Fee

Upon completion of 30 days of credited service, a nurse in the bargaining unit who is not a member of the Association shall, as a condition of employment, pay to the Association a weekly service fee, in such amount as the Association shall certify as proportionately commensurate with the cost of collective bargaining and contract administration.

## 1.04. Payroll Deductions of Association Dues

The Hospital agrees to deduct the annual MNA membership dues from the bi-weekly earnings of any nurse who has voluntarily authorized the making of such deduction. Such deductions shall be in the amount certified by the Association from time to time, and shall be made in accordance with the terms of said authorization.  Withheld amounts will be forwarded to the designated Association office by the 20th day of the calendar month following the actual withholding, together with the amount and the names of those for whom deductions have been made.

## 1.05. Local Unit Dues

The Hospital will deduct, upon receipt of a written and signed authorization form from the MNA/Saint Vincent Hospital treasurer, Local Unit dues from the earnings of the employee.  Such deductions will be made in accordance with the executed authorization form.  Such withheld amounts shall be mailed on a monthly basis to the local MNA/Saint Vincent Hospital treasurer, along with the names of the nurses.

**Exhibit 2**

# ARTICLE II.
# ASSOCIATION RIGHTS

## 2.01. Association Representative

Duly authorized representatives of the MNA may visit the premises of the Hospital at reasonable times to discharge the MNA's duties as collective bargaining representative. Where reasonably possible, the MNA shall provide 24 hours advance notice of such visit, otherwise, the MNA shall provide as much advance notice as possible under the circumstances.  Upon arrival at the Hospital, the visiting representative shall notify the Human Resources Office and while at the Hospital shall not interfere with the Hospital's operating needs or patient care.

The MNA will not schedule or hold meetings of its entire membership, or portions thereof (defined as more than 10 bargaining unit members) on Hospital premises unless the MNA obtains advance approval from the Hospital's Director of Human Resources.  Such approval shall not be unreasonably denied.

## 2.02. Association Business

On an annual basis, the Association will provide the Hospital with a list of the Association's local elected officers, and will notify the Hospital of any changes in that list as they occur.

## 2.03. Bulletin Boards

The Hospital will provide space on each nursing unit, in a mutually agreeable location, for the posting of notices of Association meetings, of elections, and the results thereof, and the Association's clinical programs.  All other notices will be submitted to Hospital Chief Nursing Officer (CNO) or designee concurrently with their being posted.

## 2.04. Copy of Agreement

The Association and the Hospital will equally share the cost of printing the Agreement and will provide a copy of the Agreement to each nurse.

## 2.05. Voicemail

The Hospital shall assign a voicemail box to the Association.

**Exhibit 2**

## 2.06. Association Leave of Absence

An unpaid leave of absence for a period not to exceed one year shall be granted to nurses in order to accept a full time position with the Association. If such leave does not exceed three calendar months, the nurse will be reinstated to her/his former bargaining unit position. Upon returning from such leave of more than three months, the nurse will be given the first opportunity to return to a position for which she/he is qualified and will be given the first opportunity to return to her/his former position when the position is open. No more than two bargaining unit members may be on an Association Leave at the same time, and no individual employee may take more than one Association Leave during the term of this Agreement.

## 2.07. Storage Space

The Hospital will, within 30 calendar days of February 16, 2007, assign a file cabinet (with lock and key) to the Association in a mutually agreeable location.

## 2.08. Pay for Negotiations

All members of the Association Negotiating Committee shall be paid at the rate of 50% for all time spent in each scheduled negotiation session for successors to this Agreement, to a cumulative total cap of 750 hours.

## 2.09. Association Rights

There will be no loss of pay or benefit accrual time for two unit representatives to attend RIF meetings where management meets with a nurse to discuss her options under the layoff provisions of the collective bargaining agreement.

## ARTICLE III.
## EMPLOYEE RIGHTS

### 3.01.Work Environment

The Hospital will make reasonable efforts to provide a healthy, safe and sanitary work environment (all Hospital property including parking facilities) and will take reasonable measures to remediate any condition which is determined not to be healthy, safe and sanitary.

4

**Exhibit 2**

Workplace Violence

"Workplace Violence" is defined as physical assault, threatening behavior or verbal abuse occurring in the work setting.  The Hospital recognizes the potential for workplace violence and recognizes its responsibility to provide a safe environment.  To meet this responsibility the Hospital maintains a zero tolerance policy.  The Hospital will make available post crisis support measures to all affected bargaining unit nurses.  In this regard all reports of workplace violence involving bargaining unit nurses shall be a standing agenda item at the monthly Labor/Management meetings.  Further, the Hospital recognizes and supports the individual nurse's right to notify the police if he/she has been assaulted.

The Hospital shall continue to provide security surveillance of Hospital grounds and parking areas.  Both shall continue to be well-lit consistent with limitations of local law or ordinance.  Upon request, the Hospital shall provide escorts to cars.

The parties agree that a new staff education program with respect to workplace violence will be developed and implemented.  To this end, a committee will be established that includes staff nurse participation as designated by the MNA (up to two nurses), to develop and implement such a new program for bargaining unit nurses.  The new program and a plan for implementation will be developed within six months of ratification.

The Hospital agrees to add two (2) MNA positions to the Public Safety Committee in which matters concerning workplace violence are discussed. The Public Safety Director shall attend the parties' labor management meeting a minimum of twice per calendar year, one in the first six months of the year and one in the last six months of the year. Workplace violence shall be a standing agenda item at the monthly labor management meeting. One of the MNA members of the Public Safety Committee shall serve as a regular member of the labor management team and will report out on nurses' concerns.

## 3.02. Nurses Lockers

The Hospital shall endeavor to provide a lockable locker for each nurse within the Hospital.  The lockers are the property of the Hospital and are not to be considered as private property.

**Exhibit 2**

# ARTICLE IV.
# MANAGEMENT RIGHTS

Except as there is contained in this Agreement an express provision specifically limiting the rights or discretion of the Hospital, all rights, functions and prerogatives of the management of the Hospital formerly exercised or exercisable by it remain vested exclusively in the Hospital administration.  Without limiting the generality of the foregoing, the Hospital specifically reserves to itself the management of the Hospital and the following rights:  to assign work; to direct the work force; to determine nurse qualifications and evaluate competency; to establish and require standards of performance and to promulgate reasonable rules of conduct; to determine staffing and patient load requirements; to determine and re-determine job content; to determine medical, nursing care and counseling standards, security measures, and operational and other policies; to hire; to promote; to suspend, demote, discharge or otherwise discipline nurses for just cause; to transfer nurses; to lay off nurses for lack of work or for other legitimate reasons; to promulgate and enforce all rules respecting operations, safety measure and other matters; to determine all equipment and supplies to be used; to utilize the services of auxiliary, on-call, temporary or volunteer nurses; and to decide the number and location of its facilities, provided that such rights do not conflict with any other specific term of this Agreement and are reasonably exercised.

# ARTICLE V.
# FAIR PRACTICE

## 5.01. Non-Discrimination

Neither the Hospital nor MNA will discriminate unlawfully against any nurse because of race, color, creed, sex, age, national origin, marital status, handicap, religious belief, sexual orientation, or veteran status in accordance with applicable law.

# ARTICLE VI.
# DEFINITIONS

## 6.01. Definitions

Use of the female noun, pronoun or adjective shall be deemed to include reference to the male noun, pronoun or adjective wherever the context of this Agreement requires or permits.

6

**Exhibit 2**

The term "nurse" and "nurses" as used hereafter in this Agreement refer only to such persons as are covered in the bargaining unit as described in Section 1.01 ("Recognition Clause").  Temporary nurses are not included in the bargaining unit.

## 6.02. Regular Full-Time Nurse

The terms "regular full-time nurse" and "regular full-time nurses" refer only to those nurses regularly employed to work 36 or more hours per week.

## 6.03. Regular Part-Time Nurse

The terms "regular part-time nurse" and "regular part-time nurses" refer only to those nurses regularly employed to work less than 36 hours per week.

## 6.04. Flex Nurse

A nurse regularly employed to work in either the 32 hours per week flex or 24 hours per week flex categories whose hours may be flexed up or down in accordance with Section 10.01 ("Flex Nurse").

## 6.05. Per Diem Nurse

Nurses who are not scheduled on a regular basis but who may be available to work on an as-needed basis.

## 6.06. Temporary Nurse

A nurse hired for a specific project or for a definite period of time, not to exceed 13 weeks unless extended by mutual agreement between the Hospital and the MNA, with a definite understanding that her/his employment will end upon completion of the project or at the end of the period.

## 6.07. Working Days

The term "working days" shall mean any day Monday through Friday which is not a listed holiday recognized in this Agreement.

**Exhibit 2**

# ARTICLE VII.
## SALARIES/DIFFERENTIALS

**7.01. Wages**

RNs will move up the pay scale one step on the start of the first pay period closest (whether before or after) to their step anniversary date.

- For all nurses (full-time, part-time, and per diem) a lump sum payment of 3% of 2021 W-2 compensation payable in June 2022. The nurse must be employed as of August 15, 2021, and remain continuously employed through June 1, 2022 to receive this payment.

- For all nurses (full-time, part-time, and per diem) who worked at any time during calendar year 2020 and who remain continuously employed through June 1, 2022, shall receive a lump sum payment of 3% of 2020 W-2 compensation payable in June 2022.

- Any nurse who is eligible for a lump sum payment in both 2020 and 2021 will be entitled to the higher of the two payments but not the other.

As set forth at Appendices A through C, the salary-scale adjustments during the term of this Agreement are as follows:

Full-time and Part-time (Both Scales)

a. Effective the start of the first full pay period following January 1, 2021; 1% across-the board increase.

b. Effective the start of the first full pay period following August 1, 2021:
    i. Each nurse will advance one step on the Step scale[1];
    ii. Drop the Hire Step, and renumber steps (Hire Step- Step 20[2]); and
    iii. 1% across the board increase.

---

1 This is in addition to regular step movement. For example, a nurse with an anniversary date of <u>June 1</u> that moved from Step 2 to Step 3 on <u>June 1, 2021</u>, will move to Step 4 effective the first pay period following <u>August 1, 2021</u>, and then move to renumbered Step 4 (currently Step 5) on <u>June 1, 2022</u>.

2 Hire Step through Step 19 for the Clinical Specialist/Nurse Educator Scale.

8

**Exhibit 2**

c. For employees at the top step as of December 31, 2021, a lump sum payment of 1% calculated as follows: Base Weekly Hours as of December 31, 2021 X Base Hourly Rate as of December 31, 2021 X 52 weeks X 1%.  Payment will be made in June 2022 provided the nurse remains continuously employed through June 1, 2022.

d. Effective the start of the first full pay period after June 30, 2022; 2% across-the-board increase.

e. Effective the start of the first full pay period after June 30, 2023; 2% across-the-board increase.

f. Effective the start of the first full pay period after June 30, 2024; 2% across-the-board increase.

g. Effective the start of the first full pay period after June 30, 2025; 2% across-the-board increase.

To receive any retroactive payment, a nurse must be employed on the date that the retroactive payment is made.

The following job classifications will be paid according to the clinical specialist and nurse educator's pay scale: Patient Educator, Trauma Coordinator, Nurse Pulmonary Education Coordinator, OR Service coordinator, ET Nurse, CC business Information Services Manager, Clinical Nurse Specialist, Nurse Liaison TCC, and Clinical Education Specialist II.  All remaining job classifications, excluding per diems, will be paid according to the staff nurse pay scale.

For purposes of new RN hires:

(a)  Steps on the scale represent years of RN service.  The Hospital will place a new RN on the scale based on her/his full years of work experience as a Registered Nurse (e.g., a nurse with 5½ years of RN experience will be placed based on having five years of experience).

(b)  RNs with prior LPN experience hired after the ratification date of the 2003-2005 collective bargaining agreement will receive one year of RN credit for two LPN years up to a maximum of four years RN credit.

**Exhibit 2**

(c)  Prior RN experience not at the Hospital will count year for year and RNs will be placed on the scale commensurate with their RN experience.

Per Diems will not be paid according to the scale.

- Effective the start of the first full pay period following August 1, 2021, increase all Per Diem rates (I and II) by 3%.
- Effective the start of the first full pay period after January 1, 2022, increase all Per Diem rates (I and II) by 3%.
- Effective the start of the first full pay period after January 1, 2023, increase all Per Diem rates (I and II) by 3%.
- Effective the start of the first full pay period after January 1, 2024, increase all Per Diem rates (I and II) by 3%.
- Effective the start of the first full pay period after June 30, 2025, increase all Per Diem rates (I and II) by 3%.

**Per Diem II Nurses**

(a)
Per Diem II nurses who have less than three years of experience (as determined per Section 7.01 for purposes of new RN hires) will be paid:

Effective the start of the first full pay period following August 1, 2021, $44.55.

Effective the start of the first full pay period after January 1, 2022, $45.89.

Effective the start of the first full pay period after January 1, 2023, $47.26.

Effective the start of the first full pay period after January 1, 2024, $48.68.

Effective the start of the first full pay period after June 30, 2025, $50.14.

(b)
All per Diem II nurses not included in paragraph (a) above will be paid:

Effective the start of the first full pay period following August 1, 2021, $45.58.

Effective the start of the first full pay period after January 1, 2022, $46.95.

Effective the start of the first full pay period after January 1, 2023, $48.35.

**Exhibit 2**

Effective the start of the first full pay period after January 1, 2024, $49.80.

Effective the start of the first full pay period after June 30, 2025, $51.30.

To receive any retroactive payment, a nurse must be employed on the date that the retroactive payment is made.

**Per Diem I Nurses**

Effective the start of the first full pay period following August 1, 2021, $41.46.

Effective the start of the first full pay period after January 1, 2022, $42.70.

Effective the start of the first full pay period after January 1, 2023, $43.98.

Effective the start of the first full pay period after January 1, 2024, $45.30.

Effective the start of the first full pay period after June 30, 2025, $46.66.

**7.02. Per Diem Wages**

The Hospital may raise per diem rates for a rate up to 5% more than UMass Memorial's per diem rate for comparable work, provided that such rate will be published to the MNA, be applied evenly to all per diems, and not exceed 10% above the highest staff nurse hourly rate under this Agreement.

**7.03. Shift Differential**

Nurses assigned and working the evening shift shall receive a differential of $3.00 per hour for each hour worked during such shift effective the start of the first pay period after ratification (January 3, 2022).  Nurses assigned and working the night shift shall receive a differential of $5.00 per hour for each hour worked during such shift effective the start of the first pay period after ratification (January 3, 2022). Nurses who work any block of hours that fall predominantly (50% or more) in the evening or night shifts shall receive the differential of the predominant shift.  The shift differential shall be included in computing holiday pay, vacation pay, bereavement pay and jury duty pay for those nurses regularly employed to work evening or night shifts.  The shift differential shall be included in computing overtime.

11

**Exhibit 2**

## 7.04. On-Call

A nurse designated to remain "on-call" must be contactable by phone/beeper and effective the start of the first pay period after ratification (January 3, 2022) shall be paid $5.00 per hour for all non-worked hours.  A nurse must be able to report at the Hospital within 30 minutes.  This time period may be extended by mutual agreement.

A nurse called in to work from "on-call" status who does report and works shall be paid for the time she/he works at time and one-half (1½) her/his regular straight-time hourly rate plus shift and/or weekend differentials, if applicable and if more than 50% of her/his hours so worked fall on the evening or night shift, but in no event will she/he be paid for less than three hours at this rate.  Each time a bargaining unit RN is called back to work will be considered a separate event.  The payment of "on-call" pay shall end once the nurse has reported to work.  "On-call" pay shall resume once the nurse has returned to "on-call" status.

A bargaining unit RN who, after working a full shift, is on call immediately following the shift and must remain past the end of the shift for up to 45 minutes in order to continue activity which began during the shift; such time shall be considered an extended day and paid as time and one-half worked.  However, if the activity extends beyond 45 minutes, such bargaining unit RN shall receive call-back pay which shall commence at the end of the full shift.  In addition, a bargaining unit RN who is scheduled to be on-call immediately following the shift and is informed by the Hospital that she/he should remain on duty due to an imminent patient arrival will receive call back pay.

In no event will a nurse receive pay for hours in excess of the time the nurse is on "on-call" status, including time actually called in and working during "on-call" status.

Non-worked on-call hours shall not be included as hours worked for the purpose of computing overtime.  The following Departments/Units have assigned on-call:

1. OR
2. PACU
3. Cath Lab
4. Dialysis
5. GI Lab
6. Radiology
7. Outpatient IV Infusion Center

12

**Exhibit 2**

The Hospital may establish assigned on-call systems in other departments, provided that (i) no such system shall be established to staff a unit that operates on a 24-hours-per-day, seven-days-per-week schedule, (ii) no such system shall be established to staff a current (as of August 30, 2006) unit, and (iii) no such system shall be established in a unit until the Hospital has fulfilled its obligation to bargain with the Association about such system to the extent required by law.  Departments that do not have assigned on-call may establish voluntary on-call assignments, and such assignments shall be mutually agreed to by the Hospital and the RN.

By mutual agreement of the nurse and the Nurse Manager or designee, nurses performing assigned on-call who are called back to work during the 11:00 p.m. - 7:00 a.m. shift and are scheduled to work the day shift immediately following, may elect to take sleep time during the day shift immediately following the call back time worked. The sleep time may be taken at the beginning or at the end of the scheduled shift. The nurse shall have the option to take the time off without pay or use accrued benefit time and effective as soon as possible following the ratification of the 2017-2019 Agreement will not lose any benefits or accruals if she/he elects to take such time off without pay or use of benefit time.

Effective as soon as possible following ratification, the Dialysis Unit will not schedule on-call when the unit is open.

## 7.05. Week-End Differential

Nurses working between the hours of 11:00 p.m. Friday and 11:30 p.m. Sunday will be paid a differential of $2.25 per hour for each hour worked during such period, provided that at least 45 minutes during such period are worked.  The weekend differential shall be included in computing overtime.

## 7.06. Relief in Higher Classification

Nurses assigned for one full shift or more to relieve in a higher classification shall receive additional compensation for such temporary service at the rate of $1.00 per hour above their straight time hourly rate, including differential, if applicable.

## 7.07. Pay Schedule

Nurses will be paid on a bi-weekly payroll on the Friday following the end of the two-week pay period.

**Exhibit 2**

## 7.08. Preceptor Pay

Employees assigned preceptor duties in accordance with Section 17.03 ("Preceptor Program") will be paid $1.50 per hour (in addition to their base rate and other applicable differentials).

## 7.09. Resource Nurses

Resource nurses shall have up to a full patient assignment outside of the units and times, unless otherwise expressly provided in this Agreement.  The Hospital may, if it so chooses, augment coverage based on its assessment of the unit needs.  The resource nurse's patient assignment shall be considered when determining whether the Hospital has made a good faith effort to follow the staffing guidelines.

In addition to providing assistance to other nurses, the Resource Nurses also assist with patient flow, e.g. facilitating admissions and discharges.  Either party may seek to discuss the role of the Resource RN at the parties' monthly Labor-Management meeting.  The Resource Nurse assignments in Section 7.09 shall not result in an increase in patient assignments for other nurses inconsistent with the staffing guidelines.

Subject to patient care needs, Resource Nurse Assignment by Units shall be as follows:

| Emergency Department | No assignment |
|---|---|
| PACU | No assignment |
| CVIL | No assignment |

| OR | No assignment |
|---|---|
| Endoscopy | No assignment |
| Outpatient Chemo Infusion | 0-2 patients |
| 36N | No Assignment |
| ICU/PCU | No Assignment |
| CWI – L&D | No assignment |

**Exhibit 2**

| Psychiatry | Days, Evenings: Reduced assignment; Nights: Up to a 5 patient assignment. |
|---|---|
| Cardiac Telemetry 23S, 24N | Days, Evenings:  No more than 2 patients. |
| Med/Surg 21S, 22S, 33S, 34N, 35N | Days, Evenings: Resource Nurse will have no more than 2 patients. |
| CWI – Mother/Baby |  Days, Evenings: Resource Nurse will have no more than 2 Couplets. |
| CWI-Nursery | Days, Evenings and Nights: Resource Nurse included in the RN staffing |

# ARTICLE VIII.
# WORK SCHEDULE

## 8.01. Hours of Work

The normal workweek shall consist of seven consecutive days commencing with the day shift on Sunday and ending with the night shift on Saturday.  The regular workday shall begin with the day shift.

The regular workday for the day and evening shifts shall consist of eight and one-half (8½) consecutive hours, including an unpaid half-hour meal period.  As part of the eight hours for which day and evening shift nurses are paid, they are permitted paid break periods totaling 30 minutes, which shall normally be taken in 15-minute increments, each occurring roughly during the first half and during the second half of the shift.

The regular work day for the night shift shall consist of eight consecutive hours, including paid break/meal period(s) totaling 30 minutes.  The regular workday for 12-hour shifts shall consist of twelve and one-quarter (12¼) consecutive hours, including

15

**Exhibit 2**

a  half-hour meal period, half of which will be paid, and paid break periods totaling 30 minutes, which shall normally be taken in 15-minute increments, each occurring roughly during the first half and during the second half of the shift.  The Hospital will make every reasonable effort to enable nurses to take break time away from the nursing unit if that is what the nurse chooses; however, the needs of patient care may require that paid break time be taken without leaving the nursing unit.  This restriction shall not, in itself, constitute break time not taken.  Nurses who normally have an unpaid one-half hour meal period in their scheduled shift who must remain in the patient care area during their designated meal time, as determined by the Nurse Manager or Off-Shift Coordinator, will be paid for one-half hour.

The regular day shift shall be 6:45 a.m. to 3:15 p. m.; the regular evening shift shall be 2:45 p.m. to 11:15 p.m.; and the regular night shift shall be 11:00 p.m. to 7:00 a.m.  In the department/units with shifts presently beginning at different times, those shifts will continue to begin at such times.  Where the normal workday presently consists of shifts other than eight and one-half (8½) or 12 hours including breaks and meal periods, such shifts will continue.

If the Hospital wishes, for legitimate operational needs, to institute work schedules which provide different work weeks, work days, hours of work, shifts, and/or starting and quitting times from those defined heretofore, the Hospital shall provide the Association notice of its proposed changes and the reasons therefore, and may implement such proposed changes upon passage of the 30 calendar days' notice to the Association and the affected nurses.  Nothing herein shall constitute a guarantee of work for any particular number of hours or particular days of the week, provided that any reduction in a nurse's work schedule outside of the Hospital's Release Time Policy shall be made pursuant to Section 16.04 ("Reduction in Force").

## 8.02. Release Time

In the event the Hospital intends to release any nurse from work, the Supervisor/Director will make a good faith effort to speak with the Resource Nurse on the impacted unit prior to releasing such nurse(s) and they shall first release the agency nurses (if any) that may be scheduled on that unit.  If the Hospital determines that this is insufficient, it shall then cancel overtime shifts on that unit.  If the Hospital determines that this is insufficient, it shall then solicit volunteers from that unit in order of seniority on a rotating basis.  If there continues to be a need to release a nurse, the Hospital shall release nurses in the following order from the specified unit:

a)  Level 1 per diem nurses; then

16

**Exhibit 2**

b) Level II per diem nurses; then
c) Nurses working an extra shift that is not overtime; then
d) Flex nurses prescheduled above their budgeted hours pursuant to Article X; then
e) Flex nurses as obligated by their position pursuant to Article X.

Nurses who volunteer for release under this provision who elect to take such time off without pay will not lose any benefits or accruals because of such election.

Any nurse who is released will receive a minimum of two hours pay from the start of her/his scheduled shift.

## 8.03. Posting of Work Schedules

The Hospital will post work schedules a minimum of 14 calendar days (but not more than 21 calendar days) prior to the schedule cycles to which they apply, and will make every reasonable effort to maintain such schedules.

Requests for time off must be submitted at least 28 calendar days prior to the schedule cycles to which they apply. In the event that two or more nurses assigned to the same unit request the same time off by such deadline and not all requests can be accommodated, seniority shall be the determining factor for the granting of time off requests. After such deadline, nurses may continue to request time off, and such time off requests will be considered without regard to seniority.

Uncovered shifts in the work schedule (the "needs list") will be made available to regularly-scheduled part-time nurses upon its being posted. Such part-time nurses may sign up for extra shifts when the "needs list" is posted, provided that the Hospital shall not be obligated to permit any such sign-up if it would result in the payment of overtime. In the event that two or more nurses sign-up for the same extra shift during the five-day posting period, the extra shift will be awarded as follows:

a. On-unit Flex nurses not prescheduled above their budgeted hours for straight time.

b. On-unit Part-time nurses and Flex nurses prescheduled above their budgeted hours for straight time.

c. Off-unit part-time nurses for straight time.

Per diem nurses may sign up for open shifts on the "needs list" starting five calendar days after the "needs list" is posted. Per diem nurses shall be awarded a shift at

**Exhibit 2**

straight time before any nurse is awarded a shift that would result in overtime. Overtime shifts shall be awarded no later than seven (7) days in advance of the date of the subject overtime shift.  Cancellation of a shift awarded to a Flex nurse pursuant to paragraph 3 shall not be considered a flex down.  A nurse must notify her supervisor no later than seven (7) days in advance of the scheduled shift in question if she/he believed that the shift was awarded erroneously.

It is the intent of the parties that extra shifts be awarded equitably and that disputes under this provision be dealt with informally, when possible.

The Hospital will create and maintain an annual posting schedule with the deadlines for time off requests, the expected dates for posting the four-week work schedule, the expected dates that the "needs list" will become available for regularly-scheduled part-time nurses, and the dates that the "needs list" will become available for per diem nurses.  Such list, a copy of which will be provided to the bargaining-unit Chairperson, will be established in December of each year and will be available to nurses in each unit/department.

The Hospital may revise or supersede such schedules in the event of emergency circumstances.  In such event, affected nurses will be notified of the change as soon as possible.

## 8.04. Staff Self-Scheduling

Nurse Managers will permit staff self-scheduling provided that the self-scheduling approach is supported by a majority of nurses on the unit.  The Hospital shall have no obligation to provide paid time for nurses to conduct self-scheduling.  A final self-schedule will be submitted to the Nurse Manager a minimum of 21 calendar days prior to the schedule cycle to which it applies.  The self-schedule will be posted only after final approval by the Nurse Manager or his/her designee.  If, in the judgment of the Nurse Manager, the self-schedule does not meet the RN staffing needs of the unit, or if a final self-schedule is not submitted to the Nurse Manager a minimum of 21 calendar days prior to the schedule cycle to which it applies, the Nurse Manager will meet with the schedule person(s) with the goal of reaching a mutually-agreeable resolution.  If there is no agreement between the Nurse Manager and the schedule person(s) by 17 calendar days prior to such schedule cycle, the Nurse Manager will post a work schedule.

Regular nurses (full-time or part-time, may swap shifts or cover for each other, provided that no overtime is incurred, there is advance written notice to, and confirmation by, the manager or director of the unit, there is at least one

**Exhibit 2**

Resource/Charge competent nurse scheduled for the shift, and other necessary unit competencies are met (e.g., a sufficient number of CABG qualified nurses in the ICU, a triage qualified nurse in the ED or ERCP qualified nurse in GI, etc.)  If a regular nurse finds another regular nurse to cover her/his shift (as opposed to a swap), he/she shall use vacation time in order to receive pay equal to (but not over) her/his budgeted hours for the week.

A per diem nurse may fill in at the request of and for a regularly scheduled nurse, subject to the approval of the Nurse Manager.  Such approval will not be unreasonably denied.  The Nurse Manager, or designee, shall make every reasonable effort to fill existing schedule holes prior to denying a staff request for per diem coverage.  If, however, a per diem nurse has been scheduled to work at least half of her/his required commitment, then the per diem nurse may fill in at the request of and for a regularly scheduled nurse, upon notice to the Nurse Manager, and provided that no overtime is incurred.

If consistent problems occur with the self-scheduling approach on any unit, either party (the Association or the Hospital) may forward the issue to the joint Labor/Management Committee for resolution.  In the event that the parties are unable to reach a mutual resolution, the Chief Nursing Officer shall decide the outcome.

## 8.05. Overtime

The Hospital shall exercise its best efforts to maintain full staffing in order that overtime work is kept to a minimum.  Where overtime work is necessary on any unit, the Hospital will use its best efforts to fill such needs with volunteers from on or off the unit where such work is needed, and from on-duty and off-duty nurses.  If there are insufficient volunteers, the Hospital shall request coverage from its per diem nurses and nursing agencies.

If after following the process outlined in paragraph 1 additional help is still needed to cover patient care, the Hospital may require a nurse to perform a reasonable amount of overtime work, provided that no nurse shall be required to work more than 12 consecutive hours.

An overtime list consisting of staff nurses shall be maintained for each unit.  The list initially shall be set in order of reverse seniority unless otherwise agreed by the nurses on the unit.  Overtime shall be assigned to an off going nurse in accordance with the unit list.

**Exhibit 2**

Any nurse may refuse overtime for personal fatigue or personal illness.  If overtime is refused, the overtime will be assigned to the next nurse on the unit list.  A nurse who refuses an overtime assignment shall be placed on the top of the unit list.

No nurse shall be required to work overtime more than twice per calendar quarter.

Following every occurrence of overtime worked under paragraph 2 above, an occurrence report documenting the time of calls and responses and the details of all other efforts made by the Hospital to cover the overtime at issue shall be filed by the nurse manager on whose unit the overtime was worked and be sent to the CNO and the Association Chairperson.  The Nurse Manager and the nurses affected by the overtime will meet with the Staffing Committee at the next scheduled Staffing Committee meeting to review the conditions leading to such overtime.

Any grievance submitted under this Section shall be processed under the AAA rules for expedited arbitration rather than the procedure set forth in Article XXI ("Grievance and Arbitration").

## 8.06. Overtime Pay

In order to be compensated, all overtime work must be approved in advance by the nurse's supervisor or designee, except in the case where a medical emergency does not reasonably permit such advance approval.  Hours worked by a nurse in excess of 40 in a workweek shall be paid at one and one-half (1½) times the nurse's straight-time hourly rate for that pay period, including shift and/or weekend differentials, if applicable.  If a nurse's scheduled shift is eight or more hours, any hours worked by the nurse in excess of her/his scheduled shift shall be paid at one and one-half (1½) times the nurse's straight time hourly rate for that pay period, including shift and/or weekend differentials, if applicable.  There shall be no duplication or pyramiding of overtime pay.

## 8.07. Weekends

The present practice with respect to the frequency of weekends off will be continued, provided that on any unit where the practice does not provide for at least every other weekend off, weekend assignments shall be equitably distributed among the staff on such unit.

If the Hospital decides to operate on weekends in a unit that does not currently operate on weekends, the Hospital will provide at least 30 days advance notice of the

**Exhibit 2**

change to the nurses on the unit and thereafter will schedule nurses so that they have at least every other weekend off.

After more than two (2) occurrences of a nurse calling in sick on a weekend during a rolling twelve (12) month period, she/he may be required by the Hospital to make up the shift(s).  Such makeup shift(s) will be scheduled during the subsequent schedule posting or another time mutually agreed upon by the nurse and the manager/director.

## 8.08. Weekend Option

Nurses presently working in a weekend option program may continue to so work in such program under the terms and conditions presently in effect, except as may be otherwise provided in this Agreement.  Should the Hospital wish to expand the program to other nurses, it shall first give notice to the Association and bargain over all aspects of such program which constitute mandatory subjects of bargaining.

## 8.09. Rotation

Nurses employed to work the day shift in a unit or department which operates 24 hours per day may be scheduled to rotate up to 50% of the time into any and all shifts as assigned by the Hospital, except that a nurse may be scheduled to work no more than two different shifts within a week unless the Hospital and nurse agree otherwise. The Hospital will endeavor not to schedule a nurse for more than two different shifts in a four-week schedule.  Bargaining unit nurses in a unit or department that operates 24 hours per day who have at least 30 years of benefit seniority shall not be required to rotate shifts during a four-week work schedule, except (i) where day shift nurses in the same unit/department who have less than 30 years of benefit seniority have been scheduled to rotate at least 25% of the time during such work schedule, and (ii) for substantial operating considerations.

Nurses employed to work the day shift in a unit or department which does not operate 24 hours per day will not be required to rotate to evenings or nights unless mutually agreed to between the nurse and the Hospital.  Nurses employed to work evenings or nights will not be required to rotate unless mutually agreed to between the nurse and the Hospital.

The Hospital will honor a nurse's request for rotation to a particular shift where it determines it is operationally feasible to do so.  In addition, where the Hospital determines it is operationally feasible, the Hospital will attempt to not schedule a

**Exhibit 2**

rotating nurse on an evening or night shift immediately prior to her/his weekend, vacation or holiday off.

## 8.10. Floating

In an effort to minimize floating, the Hospital will make all reasonable efforts to staff each patient care area through regular assignments.  When this is not possible and where there are insufficient nurses in the float pool to meet the needs of a particular unit, the Hospital may require floating in accordance with the following procedure:

A.  All nurses who have successfully completed their orientation (i.e. corporate, nursing, and department -specific for their assigned department) may, at the discretion of the Hospital, be required to float.

B.  When floating occurs, it will be within the following patient care clusters and will be based on the specific competencies of the RN to be floated and the needs of the patient:

1.  ICU/PCU
2.  Med-Surg/ Telemetry/PCU
3.  Same Day Surgery (SDS)/PACU Holding
4.  SDS/Outpatient Areas on the Worcester Medical Center campus (e.g., Fracture Room, Infusion Center, and Podiatry Center)
5.  GI Lab/Radiology Recovery (reciprocal floating to recovery only)
6.  Nursing/Post-partum/Labor and Delivery

The Hospital will make all reasonable efforts to assure that a nurse shall not be floated to another unit if a nurse from the unit that is to receive the float is to be floated to another unit related to the above clusters (i.e., a nurse may not be floated from Unit "A" to Unit "B" if a nurse from Unit "B" is to be floated to Unit "C") except when necessary to meet the staffing guidelines.

Nurses who are interested in volunteering to float will so indicate on a list maintained by unit in the Nursing Staffing Office.  Nurses may add or remove their names from the volunteer list by notifying the Nursing Staffing Office in writing not later than the 15th of each month with the change to be effective the first day of the following month of the requested change.  Nurses may volunteer to float outside of the clusters designated above without restriction if they so desire.

**Exhibit 2**

The Hospital will make reasonable efforts to make float assignments in the following order based on the specific competencies of the nurse to be floated and the needs of the patient:

1.  Float Pool Nurses inclusive of Per diem Float Pool Nurses; if none then,
2.  Request volunteers from the volunteer list referenced above; if none then,
3.  Per Diem Level I
4.  Per Diem Level II
5.  Regularly scheduled nurses in rotation by inverse order of seniority, provided however the Hospital will not require newly licensed nurses to float in the first six months of employment as a nurse except in the event the nurse's regular unit is closed.  In the event of a unit closure, if the Hospital requires the newly licensed nurse to float, the newly licensed nurse may opt to exercise her/his rights pursuant to the last paragraph of Article VIII, Section 8.10(B).

A nurse working a double shift will float in accordance with the rotation schedule.

When a nurse is required to float within the above clusters (1-6), the nurse shall work independently while on the float assignment unless the nurse reasonably believes that she/he is not competent to provide the nursing care required for a particular patient(s) in that assignment.  For that particular patient(s), the nurse will work under the clinical supervision of a nurse competent in the nursing care for that patient and will assist in delivering patient care.

C.  In the event of urgent need, a Department/Nurse Manager or designee may require a nurse to float outside of the patient care clusters identified above (B 1-6) or from a specialty area.  If a nurse is required to float outside of their above patient care clusters (B 1-6) or from a specialty area, the nurse will work under the clinical supervision of a nurse competent in the nursing care for that patient population and will assist in delivering patient care.  In no event will the Hospital require a nurse to work independently in a patient care area that falls outside of the above patient care clusters (B 1- 6), or from a specialty area if that nurse reasonably believes that she/he is not competent to work independently in that area.

D.  When a float pool nurse works on a unit, she/he shall work independently while on the float assignment unless the nurse reasonably believes that she/he is not competent to provide the nursing care required for a particular patient(s) in that assignment.  For that particular patient(s) the nurse will work under the clinical supervision of a nurse competent in the nursing care for that patient(s) and will assist in delivering patient care.

23

**Exhibit 2**

## ARTICLE IX.
## PER DIEM STAFFING

### 9.01. Per Diem Staffing

The Hospital retains the right to utilize per diem nurses for the following purposes:

A.     To fill in for nurses who are absent due to taking paid or unpaid time off.
B.     To replace nurses who are on an LOA, including a worker's compensation leave.
C.     To temporarily fill in vacant hours which the Hospital intends to fill.
D.     To meet increases in patient volume or acuity which the Hospital reasonably determines may not be sustained.

Per diem nurses will work as needed and will be scheduled in advance, where possible. Regular staff will have the first opportunity in their department to fill scheduling needs for which they are qualified and available, provided overtime is not required.  Any nurse affected by layoff who has signed up for per diem scheduling will have first option for available hours over any other per diem nurse, provided she/he is qualified and available.  Per diem nurses will be eligible to apply for regularly scheduled positions as they become available.  Per diem nurses shall receive holiday, weekend and shift differentials appropriate to assigned shifts worked.

A per diem nurse may fill in at the request of and for a regularly scheduled nurse, subject to the approval of the Nurse Manager.  Such approval will not be unreasonably denied.  The Nurse Manager, or designee, shall make every reasonable effort to fill existing schedule holes prior to denying a staff request for per diem replacement coverage.  If, however, a per diem nurse has been scheduled to work at least half of her/his required commitment, then the per diem nurse may fill in at the request of and for a regularly scheduled nurse, upon notice to the Nurse Manager, and provided that no overtime is incurred.

Cancellations by the per diem nurse after acceptance of a scheduled shift must be approved by the Nurse Manager.

### 9.02. Terms Of Employment

A.     The per diem RN is not guaranteed any fixed or minimum amount of work.

**Exhibit 2**

1.     The per diem RN must be available to receive a notice of cancellation a minimum of two hours prior to the start of the scheduled shift.

2.     If staffing needs change after a shift has begun, a per diem nurse may be sent home.  In this case, the minimum shift will not be less than two hours.

3.     Any per diem II shift canceled by the Hospital will be counted towards the minimum work schedule described in Section 9.04(B) below.

4.     For purposes of this section, a Level I per diem RN will be cancelled prior to a Level II per diem RN being cancelled within the unit.

B.     For the purposes of scheduling, a Level II per diem RN will have priority for shifts within a Unit over Level I per diem RNs.

C.     The per diem nurse may not work in excess of 40 hours in any calendar week without the prior written approval of a Nurse Manager.  Any approved hours worked in excess of 40 in a calendar week will be paid the appropriate overtime rate.

D.     The per diem nurse shall meet the following requirements:

1.     The per diem nurse shall meet all employment requirements for registered nurses at the Hospital, including a health screening, and the initial and on-going assessments of competencies as determined by the organization.

2.     The per diem nurse shall provide the Hospital with adequate verification of her/his license as a Registered Nurse annually.

3.     The per diem nurse shall notify the Scheduling Office, or the Nursing Supervisor on off-shifts, at least three hours prior to a scheduled shift if she/he will be unable to work because of illness or injury, and it is understood that cancellation by the nurse for any other reason after acceptance of a scheduled shift is subject to the approval of the Nurse Manager/designee.

4.     The per diem nurse is responsible for recording her/his time in conformance with appropriate procedures at the time of each shift worked.

**Exhibit 2**

## 9.03. Level I Per Diem RN

A.     Level I per diem RNs are individuals occupying a per diem position as of January 25, 2002 under the terms and conditions identified above.

B.     Level I per diem RNs shall be required to work an average of four hours per week over the course of each and every six-month period.

C.     The status of Level I per diem RNs with regard to this four-hour requirement shall be computed based upon two six-month periods, each year.  Twice each year, the Hospital will review all hours worked by each and every Level 1 RN in the previous six-month period and shall provide such information to the Association.

D.     If an RN has not worked an average of four hours per week over the course of the six-month period reviewed, the nurse will be notified in writing that she/he has not met the minimum work schedule requirements.  All Level 1 per diem RNs who have failed to meet the minimum work schedule and the competency requirements will be instructed to contact their manager(s) to make themselves available to fulfill their work schedule requirements.  Any Level 1 per diem RN who does not contact her/his nurse manager within two weeks of notification will be considered to have voluntarily resigned employment.

E.     If a per diem RN does not meet her/his work schedule requirement for two consecutive six-month periods, the nurse will be removed from the Hospital's personnel roster and, in accordance with Section 1.01 ("Recognition Clause"), will no longer be considered part of the bargaining unit represented by the Association.

F.     Compensation for Level I per diem RNs shall be in accordance with Section 7.01 ("Wages").

## 9.04. Level II Per Diem RN

A.     All individuals hired into a per diem position on or after January 25, 2002 shall be hired into a Level II per diem position.

B.     The per diem nurse agrees to be available to work as defined in this paragraph:

1.     A minimum of 32 hours per month;

26

**Exhibit 2**

2.     Two shifts each month must be weekend shifts.  In those departments/units that require all RN staff to work greater than eight-hour shifts, the per diem nurses will work those department/unit customary shifts.

3.     Weekend shifts (for the sole purpose of fulfilling the weekend commitment, not for payroll purposes) are defined as all shifts starting with the evening shift on Friday, and ending with the night shift on Sunday ending Monday morning.

4.     During the course of a calendar year, the per diem nurse is required to work one winter holiday (Thanksgiving, Christmas Eve, Christmas, New Year's Eve or New Year's Day) and one summer holiday (Memorial Day, Fourth of July or Labor Day).  Holiday pay is equal to one and one-half (1½) times base pay per hour for all hours worked, and there is no other holiday benefit available for per diem staff.

C.     The per diem position will be considered resigned if a nurse accepts a regularly-scheduled position within the Hospital or fails to meet her/his minimum work requirement for a period of three months within a 12-month rolling period.

D.     Compensation for Level II per diem RNs shall be in accordance with Article VII ("Wages").

## 9.05. Floating

Per diem nurses will be floated in accordance with Section 8.10 ("Floating").

## 9.06. Transfer From Per Diem Position To Regular Hours Position

A.     A Hospital RN, who during a period of unbroken service had transferred to a per diem position prior to January 25, 2002, or transfers to a per diem position on or after January 25, 2002 and remains in a per diem position for one year or less and transfers back into a regularly scheduled position will be placed on the step of the wage schedule (Appendices A through C, as applicable) the individual occupied prior to the transfer to the per diem position.  She/he will move to the next step on the wage schedule based on her/his step anniversary date.

B.     A per diem nurse who transfers from a per diem position to a regularly-scheduled-hours position will be placed on the wage schedule (Appendices A through C, as applicable) in accordance with Article VII ("Wages").  She/he will move to the next step on the wage schedule based on her/his step anniversary date.

27

**Exhibit 2**

# ARTICLE X.
# FLEX POSITIONS

## 10.01. Flex Nurse

Flex nurses are nurses who have agreed to be regularly employed to work in either the 32 hours per week flex or 24 hours per week flex categories. Flex nurses generally will work 32 or 24 hours per week. However, based upon the Hospital's patient care requirements as determined at the discretion of the flex nurse's manager or designee, a flex nurse may be required to flex her/his hours either up or down. A nurse that is having her/his hours flexed up will have them prescheduled and identified on the posted schedule. Such flexing up may occur up to a total of four times in a schedule cycle (i.e., four weeks) and shall be equitably distributed among all flex nurses within the unit. In satisfying this requirement, a flex nurse has the option to refuse a maximum of two flex shifts (up or down or one of each) in a schedule cycle. If a flex nurse refuses to flex her/his hours up more than twice in a schedule cycle, the flex nurse may be subject to discipline in accordance with Section 16.10 ("Discipline and Discharge"). It is understood that a nurse will not be required to flex up more than four times in a schedule cycle. In addition, a flex nurse may be flexed down up to two times during a schedule cycle. A flex nurse may not be flexed down below her/his budgeted hours more than one time in a schedule cycle nor more than 12 times in a calendar year and no more than 96 hours in a calendar year. When a flex nurse's hours are decreased, the flex nurse will receive at least two hours advance notice whenever possible. If a flex nurse signs up for an extra shift beyond her/his flex obligation and that shift is cancelled by the Hospital, such cancellation shall not count as an instance of being flexed down. A Flex Nurse who has been flexed down, either mandatory or voluntary, shall have the option to take such time off with or without pay (using his/her benefit time). If the Flex Nurse wishes to take such time without using benefit time, she/he must notify her supervisor in advance or benefit time will be used.

The nurse shall notify the manager, or designee, as soon as possible and no later than one week after the posting of the schedule; otherwise the up flexes identified on a schedule cycle will be adhered to by both the Hospital and the flex nurse, unless they agree to a different arrangement.

Any nurse employed in a flex category position may request to have her/his flex category status removed and become a regular part-time employee, provided that such change does not reduce the percentage of flex positions on the specific shift in the specific unit/cost center below 50%. Should two or more employees make a request and all requests may not be granted, the requests will be granted in order of

28

**Exhibit 2**

bargaining unit seniority.  Requests will be reviewed once per scheduling cycle and will be effective with the scheduling cycle after the one in which they were received.

In addition, see Section 8.02 ("Release Time").

**Flex Nurse Benefits**

Benefits for flex nurses shall be credited as follows:

• Vacation will be credited biweekly on base hours (i.e., either 32 or 24 hours depending on the position); holiday will be credited one pay cycle in advance of the holiday (except floating holidays) on base hours (i.e., either 32 or 24 hours depending on the position); and sick leave will be credited during the first full pay period of each month on base hours (i.e., either 32 or 24 hours depending on the position). Vacation, holiday and sick time will be adjusted quarterly to reflect any increase due to flex hours during that quarter.  Effective no later than 1 year from ratification, vacation, holiday, and sick time will no longer be adjusted down.

• Flex time nurses in 32-hour positions will receive health and dental benefits as if they were regularly employed as full-time nurses, and will receive the tuition reimbursement benefit based on average paid hours during the course semester (provided that hours for which the nurse has been "flexed down" by the Hospital will not be counted).

• Flex time nurses in 24-hour positions will receive health and dental benefits as are received by 32-hour flex nurses with less than one year of employment, and will receive the tuition reimbursement benefit based on average paid hours during the course semester (provided that hours for which the nurse has been "flexed down" by the Hospital will not be counted).

**ARTICLE XI.**
**HOLIDAYS**

**11.01. Eligibility**

All regular full-time and regular part-time nurses who are regularly employed to work at least 20 hours per week are eligible to accrue holiday time.

**Exhibit 2**

**Listed Holidays**

The following seven holidays constitute listed holidays recognized by the Hospital under this Agreement:

New Year's Day
Presidents Day
Memorial Day
Independence Day
Labor Day
Thanksgiving Day
Christmas Day

For nurses in those departments which normally operate Monday through Friday, each of the above-listed holidays shall be observed on the day established by the law of Massachusetts for its observance as a legal holiday, except that listed holidays occurring on a Saturday shall be observed on the preceding Friday and listed holidays occurring on a Sunday shall be observed on the following Monday.

For nurses in those departments which normally operate seven days per week, the listed holiday shall be observed on its actual calendar date (e.g., New Year's Day, January 1).

## 11.02. Floating Holidays

In addition to the listed holidays, eligible nurses will accrue three floating holidays. The three floating holidays will be earned on January 1, May 1, and September 1 of each year.  A floating holiday must be scheduled with the approval of the nurse's supervisor.

## 11.03. Holiday Accrual and Pay

A nurse who is regularly employed to work 40 hours per week will accrue holiday time at a rate of eight hours for each listed and floating holiday.  Eligible part-time nurses shall accrue holiday time on a pro rata basis.  Accrued holiday time taken will be paid at the nurse's straight-time hourly rate, including differentials, if applicable, provided the nurse is regularly employed to work the evening or night shift.  Use of holiday time will not count as hours worked, except that if a nurse actually works 40 or more hours in a week and also takes prescheduled holiday time during that same week, the

**Exhibit 2**

prescheduled holiday time will count as hours worked for purposes of computing overtime pay.

Holiday time will continue to accrue during any paid Leaves of Absence.  Holiday time will not accrue during Occupational Medical Leaves of Absence and any unpaid leave of absence or time off.

If a nurse works on the actual calendar date of a listed holiday, the nurse will be paid holiday worked premium pay of one and one-half (1½) times her/his straight-time hourly rate, including shift and/or weekend differentials, if applicable, for the hours actually worked during the listed holiday.  Listed holiday-worked premium pay shall be paid for hours worked between 11:00 p.m. the night before the listed holiday and 11:15 p.m. the night of the listed holiday, (provided, however, that the employee must actually work at least one (1) hour between 11 p.m. the night before the listed holiday and 11:15 p.m. the night of the listed holiday to receive premium pay), except that on Christmas Eve and New Year's Eve, the listed holiday premium will also be paid for hours worked on the evening shift.  Nurses who are on-call and are called in on the holiday are exempt from the one-hour rule described in the parenthetical in the preceding sentence.

Upon separation from employment, nurses will be paid for all accrued and unused holiday time.

During a week in which a holiday falls, a nurse may request to be paid an additional eight hours of her accrued, unused holiday time above her/his budgeted hours, but will in no event be paid for more than 40 hours for the week.

## 11.04. Failure to Work as Scheduled

An otherwise eligible nurse scheduled to work the day prior to the listed holiday, the listed holiday itself, or the day after the listed holiday, who fails to work any of those days will not be eligible to accrue holiday time for the listed holiday

## 11.05. Scheduling Holiday Work

All nurses are required to work every other listed holiday in this Agreement unless otherwise scheduled as determined by the needs of the department to which the nurse is assigned.  No nurse shall be required to work the Christmas holiday in consecutive years, except in the event the nurse has transferred to another bargaining unit

**Exhibit 2**

position; in which case the RN will assume the holiday commitment of the position vacancy.

In order to grant more equitable time off on Thanksgiving, Christmas and New Year's Day, preference for the day off before or after the holiday will be distributed by seniority first among RNs who work the holiday (or are on-call on the holiday) and who request such time off.  This shall supersede the weekend rotation requirement.  All other requests for the day off before or the day after the holiday shall be granted in accordance with applicable contract language.

## 11.06. Listed Holiday Occurring During Scheduled Vacation

If a listed holiday occurs during a nurse's scheduled vacation, the nurse may elect to use either accrued vacation time or accrued holiday time; however; if the nurse is assigned to work on that listed holiday, she/he is responsible for obtaining coverage and notifying her/his manager, or designee of the change.

## 11.07. Use of Holiday Time During Leaves of Absence

All accrued, unused holiday time must be used concurrently with any Leaves of Absence, except Occupational Medical Leaves of Absence.  No holiday time will be available to nurses on Occupational Medical Leaves of Absence until they return to work or terminate employment.

## 11.08. Effect of Change In Employment Status

A nurse who changes her/his employment status during the year shall have her/his future holiday time accrual adjusted accordingly effective as of the date of the change in status.

## 11.09. Holiday Carryover

1.     For those holidays that a nurse accrues for the period January 1 through September 30, she/he shall endeavor to schedule holiday time off (in accordance with Section 8.04 ["Staff Self-Scheduling"]) by November 15 of the calendar year for which such holidays accrue.  A nurse whose request is denied by her/his Nurse Manager will be so informed in writing, with a copy sent to Payroll.

2.     A full-time nurse may carry over four accrued, unused holidays into the next calendar year, which will remain in the nurse's holiday bank, and a regular part-time

32

**Exhibit 2**

nurse who is employed to work a committed schedule of at least 20 hours per week but fewer than 40 hours per week may so carry over a prorated number of holidays."

3.      A nurse who exceeds the maximum as of January 1, 2007 will have the excess holiday hours "frozen" as of such date (at her/his straight-time hourly rate as of January 14, 2007) and available for future time off; provided, however, that a nurse may notify the Hospital's Director of Human Resources or designee in writing by April 1, 2007 that she/he wishes to "cash out" some or all of such excess holiday hours, in which event she/he will be paid for such excess holiday hours (at her/his straight-time hourly rate as of January 14, 2007).

4.      A nurse who has complied with the first sentence of paragraph (a) above but who nonetheless exceeds the maximum as of January 1 of any year thereafter shall have such excess holiday hours "cashed out" (at her/his then-current straight-time hourly rate) for the holiday time off that she/he had so requested but been denied.

## 11.10. Release on a Holiday

Each unit that operates on a holiday will maintain a holiday release list. The intent of the list is to ensure that RNs will be afforded opportunities to take voluntary release by seniority in rotation on a holiday shift. This shall be a separate list maintained solely for holiday release time.

**ARTICLE XII.**
**VACATION TIME**

## 12.01. Eligibility

All regular full -time and regular part-time nurses who are regularly employed to work at least 20 hours per week and who have worked for a minimum of six consecutive months will be eligible to accrue paid vacation time.

## 12.02. Accrual

Eligible full-time nurses shall accrue paid vacation time in accordance with the following schedule:

| Benefit Seniority | Total Vacation Time |
| --- | --- |
| 6 months to 2 years | 2 weeks |

33

**Exhibit 2**

| 3 years to 9 years | 3 weeks |
| 10 years to 14 years | 4 weeks |
| 15 or more years | 5 weeks (Regular full-time) |
| | 4 weeks (Regular part-time)[3] |

Vacation time accrues biweekly from a nurse's date of hire, except that no vacation time will accrue during a nurse's first six months of employment.  Following a nurse's successful completion of the first six months of employment, the Hospital will credit the nurse with vacation time accrual for that six-month period.  A nurse's vacation accrual schedule will be determined by her/his Benefit Seniority.  Eligible part-time nurses shall accrue vacation pro rata based on the number of hours they are regularly employed to work (40 hours equals a full-time schedule).  Vacation time will continue to accrue during any paid Leaves of Absence, except that a nurse who is unable to work due to an occupational injury or illness for which she/he is receiving workers' compensation benefits will accrue vacation time only for up to four weeks following the date the nurse became unable to work.  Vacation time will not accrue during any unpaid Leaves of Absence or time off.

## 12.03. Vacation Pay

Vacation time is paid based on the nurse's straight-time hourly rate, including differentials, if applicable, provided the nurse is regularly employed to work the evening or night shift.  A nurse who actually works on her/his scheduled vacation day is not eligible to receive vacation pay for the hours actually worked.  Use of vacation time will not count as hours worked.  Upon separation from employment, nurses will be paid for all accrued and unused vacation time.  During a vacation week, a nurse may request to be paid an additional eight hours of her/his accrued, unused vacation time above her/his budgeted position hours, but will in no event be paid for more than 40 hours for the week.

## 12.04. Requests and Scheduling

Requests for vacation time must be in writing and approved by the nurse's supervisor.  Requests covering the period June 15 through the week including Labor Day.  By January 15 of each year, the department manager will post a vacation request schedule covering the period from June 15 through the week including Labor Day (prime time).  Any nurse may request vacation time for up to one week within this period.  Each nurse who makes a request for vacation time during prime time shall be granted at least one week of vacation.  The schedule will be taken down on January

---

[3] Regular part-time nurses who have been grandfathered at the five week level will continue to enjoy such level.

**Exhibit 2**

31 and responses to vacation requests will be made by February 15 and shall be based upon Benefit Seniority. The results will be made available on each unit. Availability of additional vacation time during the period June 15 through the week including Labor Day shall be determined by the department manager and, if available, shall be approved on the basis of Benefit Seniority.

Requests covering the periods of January 1 through June 14 and the week following, including Labor Day through December 31. Requests for vacation time during these periods may be made no more than nine months in advance of the requested vacation time. Responses to requests for vacation time covering the periods from January 1 through June 14 and the week following the week including Labor Day through December 31 will be provided within two weeks of the request.

Requests for available time off (vacation/holiday) that fall within one of the four holiday weeks, including Christmas, New Year's Day, Presidents' Day and Patriot's Day, will be granted on a rotating basis, starting with the senior most nurse, as determined by Benefit Seniority date, on each unit. The Hospital will create, on each nursing unit, a seniority list of all benefit eligible nurses covering the four holiday weeks noted above. Seniority and/or rotational order permitting, a nurse may be granted time off (vacation/holiday) during one or more of these four weeks based on availability of time as determined by the Hospital. For purposes of maintaining rotational order, once a nurse is granted time off (vacation/holiday) during any one of the four designated holiday weeks, she/he will be placed at the bottom of the list. If an eligible nurse decides to pass on her/his opportunity to be granted a time off (vacation/holiday) request during any one of the four designated holiday weeks, she/he will retain her/his priority for each subsequent year until such time as she/he requests and is granted the time off (vacation/holiday), after which she/he will be placed at the bottom of the rotational order. A time off (vacation/holiday) request schedule covering the time that falls within the above four designated holiday weeks in the following calendar year shall be posted from October 1 through October 15 and the results will be posted on each unit not later than October 29.

Benefit Seniority will be used to resolve conflicts. Once the vacation time request has been approved, there will be no bumping by a more senior nurse. Any week of conflict (excluding the period between June 15 and the week containing Labor Day) which is resolved by Benefit Seniority shall exclude that awarded individual from the same week the following year if a similar conflict exists.

35

**Exhibit 2**

In the Dialysis unit, there shall be a separate RN vacation allocation; provided, however, that if a RN picks a vacation week that includes her weekend "on", the nurse will find coverage for her weekend.

## 12.05. Maximum Accrual of Vacation

Effective July 1, 2007, a nurse may accrue vacation time up to a maximum equal to her/his annual allotment.  A nurse who exceeds the maximum at the effective date will have the excess vacation hours cashed out at her/his then-current rate pursuant to Section 12.03 ("Vacation Pay").  Thereafter, a nurse will not accrue further vacation time until she/he has used enough vacation time to fall below her/his maximum allotment.  In the event a nurse is denied vacation time, requested in accordance with Section 12.04 ("Requests and Scheduling"), which would result in the cessation of further accruals, the Hospital will allow the nurse to continue to accrue vacation until such time as she/he is able to take vacation.

However, the Hospital shall have the right to require the employee to take time off at a mutually agreed time within 60 days to keep her/his vacation under the limits.  A nurse seeking accruals in excess of the maximum must bring the situation to the attention of the immediate supervisor upon the vacation denial; otherwise, any accrual in excess of the maximum is waived.

## 12.06. Use of Vacation During Leaves of Absence

All accrued, unused vacation time must be used concurrently with any Leaves of Absence, except Occupational Medical Leaves of Absence. No vacation time will be available to nurses on Occupational Medical Leaves of Absence until she/he returns to work or terminates employment.

## 12.07. Holiday Occurring During Scheduled Vacation

If a listed holiday occurs during a nurse's scheduled vacation, the nurse may elect to use either accrued vacation time or accrued holiday time; however; if the nurse is assigned to work on that listed holiday, she/he is responsible for obtaining coverage and notifying her/his manager, or designee, of the change.

## 12.08. Effect of Change In Employment Status

A nurse who changes her/his employment status during the year shall have her/his future vacation time accrual adjusted accordingly effective as of the date of the change in status.

**Exhibit 2**

## 12.09. Vacation Approvals

If a nurse does not have enough benefit time accrued by the time of an approved vacation and the time off is cancelled by the Hospital, the nurse will receive as much advanced notice as possible and no less than two weeks in advance of the planned time off.  In the event a nurse's vacation is cancelled, the nurse will have the right to appeal the decision and a review of the individual nurse's time and attendance will be conducted within 72 hours.  If it is determined that the nurse's benefit accruals have been depleted as a result of being flexed down below her/his budgeted hours and/or due to an approved, continuous personal medical leave of absence the cancellation will be rescinded restoring the vacation.

## ARTICLE XIII.
## FLEXIBLE BENEFITS

## 13.01. Flexible Benefits Program

A Flexible Benefits Program will be made available to nurses regularly employed to work 20 hours per week in accordance with the terms provided below.   The Hospital retains the right to make changes with respect to insurance carriers, participating health care providers, plan administrators, eligibility, coverage, benefits and/or costs, provided that the programs offered are comparable to the programs in effect on the date of this agreement.  The Hospital will provide nurses affected by any such action the same opportunity as is provided to other Hospital employees to change their elections.

Any elections and participation shall be in accordance with the terms set forth in the Flexible Benefits Plan applicable to this Agreement.

To the extent there is a conflict between the Flexible Benefits Program and this Agreement, the terms of this Agreement shall prevail.

## 13.02. Health and Dental Insurance Benefits

Eligible nurses may elect to participate in the health and dental plan(s) offered by the Hospital.

A.  <u>Health Insurance</u>

**Exhibit 2**

All regular full-time and regular part-time nurses who are regularly employed to work 20 hours or more per week are eligible to participate in the group health insurance plan(s) which from time to time may be offered by the Hospital.  Newly hired nurses who are eligible and newly eligible nurses may enroll in a plan on the 31st day following their date of hire.  All other eligible nurses may enroll during the annual open enrollment period.

B.  Dental Insurance

All regular full-time and regular part-time nurses who are regularly employed to work 20 hours or more per week are eligible to participate in the group dental insurance plan(s) which from time to time may be offered by the Hospital.  Newly hired nurses who are eligible and newly eligible nurses may enroll in a plan on the 31st day following their date of hire.  All other eligible nurses may enroll during the annual open enrollment period.

C.  Hospital Contribution to Premium Payments

(1)  Health Insurance.  Effective January 1, 2022, the Hospital will contribute to the cost of any eligible nurse's health insurance plan premium in accordance with the following schedule:

| Eligibility | Hospital/Employee contributions (Individual and Family coverage) |
|---|---|
| | |
| Full-time (30 or more hours per week), 24-Hour Nurses and 24-Flex Nurses, effective the first of the month following the completion of one year of employment | 80%/20% |
| Full-time (30 or more hours per week) prior to the first of the month following the completion of one year of employment; and 24 Flex | 60%/40% |

38

**Exhibit 2**

| Part-time nurses regularly employed to work at least 20 hours per week but less than 30 hours per week | 40%/60% |
|---|---|

Effective January 1, 2022, the premium split for 24-Hour Nurses and 24-Flex nurses effective the first of the month following the completion of one year of employment shall be changed to 80% / 20%.

An enrolled nurse who changes her/his employment status during the year shall have the Hospital's contribution rate adjusted accordingly, effective as of the date of the change in status.

(2)   Dental Insurance.  In the event of an increase in the overall cost of dental insurance premiums, the Hospital and the nurse will share the increased costs on a 50% Hospital/50% nurse basis of the offered plan(s).

D. Termination of Coverage

The Hospital's contribution to health and dental insurance premiums shall cease immediately upon termination, resignation of employment, and certain leaves of absence in accordance with the Hospital's policies or a reduction in hours below 20 per week.  A nurse's continued participation in the plan(s) in any of these circumstances will be subject to the continuation provisions of state and federal law, including the Consolidated Omnibus Budget Reconciliation Act (COBRA).  During the COBRA period, a nurse shall pay 102% of the cost of the premium.

E. Reservation of Rights

The Hospital agrees to provide the insurance coverage specified in the plan(s) in effect as of the effective date of this Agreement, while reserving the right to provide comparable health and comparable dental insurance benefits through any other plan, insurance carrier, other institution or combination thereof.  All matters concerning such health and dental insurance not covered by this Agreement, including but not limited to benefits and coverage, shall be governed by the terms of the plan(s).  The Hospital assumes no obligation to any employee electing not to participate in the Hospital's plan for medical, surgical, hospital, or other like insurance.

**Exhibit 2**

## 13.03. Disability Insurance

The Hospital will allocate to all regular full-time and regular part-time nurses who are regularly employed to work 30 hours or more per week, flexible benefit dollars for group long-term disability insurance which generally will provide a covered nurse with 60% of the nurse's monthly earnings up to a maximum of $11,000 per month after a 90-day waiting period.  Eligible nurses must select long-term disability insurance coverage.  All matters concerning such disability insurance not covered by this Agreement, including but not limited to benefits and coverage, shall be governed by the terms of the plan(s).

## 13.04. Life Insurance

The Hospital will allocate to all regular full-time nurses flexible benefit dollars for group life insurance coverage which generally provides an amount equal to a nurse's annual earnings.  The Hospital will allocate to all regular part-time nurses who are regularly employed to work 20 or more hours per week, flexible benefit dollars for group life insurance coverage in an amount equal to $5,000.  Eligible nurses must select life insurance coverage.  All matters concerning such life insurance not covered by this Agreement, including but not limited to benefits and coverage, shall be governed by the terms of the plan(s).

## 13.05. HIV and Hepatitis-C Insurance

The Hospital will provide to all nurses $25,000 of insurance coverage for work-related occurrences of HIV and $25,000 of insurance coverage for work-related occurrences of Hepatitis-C.  All matters concerning such insurance, including but not limited to benefits and coverage shall be governed by the terms of the insurance plan.

## 13.06. Professional Liability Insurance Coverage

The Hospital will continue its present professional liability insurance coverage at no cost to nurses covered by this Agreement.

## 13.07. Retirement Savings Plan

All nurses are eligible to participate in the 401(k) retirement savings plan offered by the Hospital following their 91st day of employment.  The Hospital will match the nurse's contribution up to 5%.

**Exhibit 2**

The Hospital's contribution will vest according to the following schedule:

| Number of Calendar Years In Which Nurse Has Worked 1,000 Hours[4] | Amount Vested |
|---|---|
| <1 | 0% |
| 1 | 20% |
| 2 | 40% |
| 3 | 60% |
| 4 | 80% |
| 5 or more | 100% |

A nurse whose employment with the Hospital is involuntarily terminated by reason of a RIF pursuant to Section 16.04 ("Reduction in Force") will receive her/his matching contribution (to be paid when matching contributions are made for eligible nurses).

Except for the terms and conditions set forth above, all matters affecting a nurse's participation in the plan, including but not limited to benefits, eligibility, investment options, transfers, vesting requirements, and withdrawals shall be governed by the terms of the plan, and any dispute over such matters shall be subject to the terms of the plan and shall not be subject to Article XXI ("Grievance and Arbitration").

## ARTICLE XIV.
## SICK LEAVE

### 14.01. Eligibility

All regular full-time and regular part-time nurses who are regularly employed to work at least 20 hours per week and who have successfully completed their probationary period will be eligible to accrue sick time for their personal illness or injuries following the completion of 60 calendar days of employment.

### 14.02. Accrual

A nurse who is regularly employed to work 40 hours per week will accrue eight hours of sick time per month.  Eligible part-time nurses will accrue sick time on a pro-rata basis.  Sick time will continue to accrue during any paid Leaves of Absence, except that a nurse who is unable to work due to an occupational injury or illness for which

---

[4] Vesting credit prior to October 1, 1999 is based on actual hours worked.  Vesting credit as of October 1, 1999 will be given at the rate of 45 hours per week, for all employees, regardless of status.

**Exhibit 2**

she/he is receiving workers' compensation benefits will accrue sick time only for up to four weeks following the date the nurse became unable to work. Sick time will not accrue during any unpaid Leaves of Absence or time off.

## 14.03. Maximum Accumulation, Use and Pay

Maximum accumulation of sick time is limited to 480 hours for a full-time 40-hour-per-week nurse, and such limit is prorated for other nurses based on budgeted hours. Sick time is paid based on the nurse's straight-time hourly rate. Use of sick time will not count as hours worked. It is understood that although a nurse has accrued but unused sick time, she/he is not excused from the requirement of regular attendance. Sick time may not be used during the two-week resignation notice period provided by a nurse. Upon separation from employment, nurses will not be paid for accrued and unused sick time.

Notification

In-Patient Departments

A nurse who is unable to report to work to an in-patient department must notify the nursing office and the department supervisor or designee at least two hours (for day shift) or three hours (for evening or night shift) prior to the start of her/his scheduled shift. Failure to do so will result in the inability to use any paid time (including sick time, vacation time or holiday time) for the work time missed.

All Other Departments
A nurse who is unable to report to work due to illness or injury must notify her/his supervisor or designee either: (i) at least two hours prior to the start of her/his scheduled shift, or (ii) in accordance with the department's established procedure. Failure to do so will result in the inability to use any paid time (including sick time, vacation time or holiday time) for the work time missed.

## 14.04. Use of Sick Time During Leaves of Absence

All accrued sick time must be used concurrently with any Leaves of Absence due to the nurse's personal illness or injury, except any Occupational Medical Leave of Absence during which the nurse is receiving worker's compensation benefits.

## 14.05. Fitness-for-Duty Assessments and Physician Notes

42

**Exhibit 2**

The Hospital may require a nurse to provide satisfactory evidence of illness at any time.

A nurse who has been absent due to an occupational illness or injury, a non-occupational illness or injury which causes her/him to be absent for five or more scheduled working days, or any absence due to hospitalization or surgery, must, before returning to work, schedule a fitness-for-duty assessment with the Employee Health Office.  At the time of the assessment, the nurse must provide a written statement from her/his health care provider regarding her/his health status and her/his ability to resume work.  The nurse will not be allowed to return to work until receiving approval from the Employee Health Office.  The Hospital may require a fitness-for-duty assessment for a nurse who appears unable to perform the essential functions of her/his job and/or appears to be in a condition which might compromise the safety of the nurse, other employees, patients or visitors.

## 14.06. Effect of Change In Employment Status

A nurse who changes her/his employment status during the year shall have her/his future sick time accrual adjusted accordingly effective as of the date of the change in status.

## 14.07. Banked Sick Time Hours

Any nurse who has any hours accrued in the sick leave bank shall be entitled to access those leave hours on the same terms and conditions as are applicable to other Hospital employees.

## 14.08. Assault Pay

Any nurse who receives workers compensation benefits as a result of a workplace assault by a patient or visitor, and who uses vacation or sick time as the result of the assault during the first five (5) calendar days after the assault prior to receiving workers compensation benefits shall be credited with the vacation or sick hours used during such five (5) day period.

## 14.09. Massachusetts Earned Sick Time

Hospital earned sick time accruals include Massachusetts Earned Sick time and are not in addition to Massachusetts Earned Sick Time.

**Exhibit 2**

# ARTICLE XV.
# LEAVES OF ABSENCE

## 15.01. Definition

The Hospital will make available the following leaves of absence to all nurses who meet the eligibility criteria specified in Section 15.02 ("Eligibility").  Unless otherwise stated, all leaves of absence will be unpaid; provided, however, that nurses must exhaust all accrued paid benefit time (e.g., vacation, sick, holiday) during the period of the leave, except that sick leave benefit time may only be used when the leave is for the nurse's own medical condition.

## Types of Leaves of Absence

1.  The Hospital and the Association agree that the Leaves of Absence described in sections 2(a), 3, 4 and 5 below shall be subject to all definitions, requirements and restrictions of the Federal Family and Medical Leave Act and the Massachusetts Small Necessities Leave Act.

Medical Leave (Non-Occupational and Occupational)

2.

(a)  Non-Occupational.  The Hospital will provide a Non-Occupational Medical Leave of Absence for eligible nurses who are unable to work due to their own serious health conditions.  A serious health condition is an illness, injury, impairment or physical or mental condition which involves:  (i) in-patient care in a hospital, hospice or residential care facility, (ii) continuing treatment by a health care provider which does (or could if untreated) result in a period of incapacity of four or more consecutive calendar days; (iii) any period of incapacity due to pregnancy or for prenatal care; (iv) any period of incapacity or treatment for such incapacity due to a chronic serious health condition; (v) any period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective; (vi) any period of absence to receive multiple treatments (and to recover therefrom) by a health care provider for restorative surgery or a condition that would likely result in a period of incapacity of three or more consecutive calendar days if left untreated.  Incapacity is defined as the inability to work or perform other regular daily activities.

44

**Exhibit 2**

(b)  Occupational.  The Hospital will provide an Occupational Medical Leave of Absence to nurses who suffer an industrial accident covered by workers' compensation insurance for the period of the disability, in accordance with applicable law, until one of the following events occurs: (i) the nurse is released for duty; (ii) satisfactory medical evidence demonstrates that the nurse will not be able to return to work; (iii) the nurse has engaged in activities which negate the worker's compensation claim or status; (iv) the nurse informs the Hospital that she/he will not be able or does not intend to return to work; (v) the actions of the nurse indicate that she/he does not intend to return to work (e.g., acceptance of other employment, move out of state); or (vi) business necessity requires replacement of the nurse.  If the nurse meets the eligibility requirements and if the condition qualifies as a serious health condition defined in 2(a) above, the nurse shall be entitled to all of the rights, obligations and benefits as described for Non-Occupational Medical Leaves of Absence.  If those rights have been exhausted and business necessity has required the replacement of the nurse, the nurse will be offered the next suitable position for which she/he is qualified which becomes available within 30 calendar days of the nurse's release to return to work.

When a nurse is absent because of an industrial accident, the Hospital will pay her/his sick leave to the extent she/he has accrued sick leave available, unless she/he advises her/his manager to the contrary by the close of business on the next business day following the accident.  In the event that the nurse is entitled to receive workers' compensation benefits for any period in which accrued sick leave has been paid, appropriate steps will be taken to reinstate her/his sick leave and to ensure that she/he does not receive duplicate payments.

3.  Parental Leave.  The Hospital will provide a Parental Leave of Absence to eligible nurses for the purpose of fulfilling family obligations relating to childbirth, adoption or the placement of a foster child.

4.  Serious Health Condition in Immediate Family Leave.  The Hospital will provide a Serious Health Condition in Immediate Family Leave of Absence to eligible nurses for the purpose of caring for a child, spouse or parent with a serious health condition.  A serious health condition is defined in section (2) (a) above.

5.  Small Necessities Leave.  The Hospital will provide a Small Necessities Leave of Absence to eligible nurses for the purpose of:  (i) participating in school activities directly related to the educational advancement of the nurse's son or daughter (e.g., parent-teacher conferences, school interviews); (ii) accompanying the nurse's son or daughter to routine medical or dental appointments (e.g., annual physicals,

**Exhibit 2**

vaccinations); or (iii) accompanying the nurse's elderly relative to routine medical or dental appointments or appointments for other professional services related to the elder's care (e.g., interviews at a nursing home).

6. <u>Military Leave</u>.  The Hospital will provide Military Leaves of Absence in accordance with applicable law and Hospital Policy for eligible nurses who are called for military duty and nurses who are called for military duty and nurses who are members of reserve units.  Hospital policy may be changed from time to time at the discretion of the Hospital.

7. <u>General Leave</u>.  Eligible nurses may request a General Leave of Absence for leaves other than (1)-(6) above.  The Hospital may, in its discretion, grant a General Leave of Absence based upon a consideration of all relevant factors, including but not limited to: seniority, job performance, level of responsibility, reasons for the request, and the ability to obtain a satisfactory replacement.  A General Leave of Absence shall not be used to extend vacation to other paid time off.  In the case of a leave request for humanitarian reasons (e.g., for a nurse to aid victims at the site of a natural disaster), a leave request that does not exceed one calendar week will not be unreasonably denied.

## Procedures for Leaves of Absences

## 15.02. Eligibility

All nurses who have completed their probationary period are eligible for Parental, Serious Health Condition in Immediate Family, Small Necessities, Non-Occupational Medical and General Leaves of Absence.  Nurses meeting the eligibility requirements in accordance with applicable law are eligible for Military Leaves of Absence.  All nurses are eligible for Occupational Medical Leaves of Absence.

## 15.03. Duration of Leave

Eligible nurses are entitled to take Parental and Serious Health Condition in Immediate Family Leaves of Absence for the period of the covered event up to a combined total of 12 work weeks in any rolling 12-month period, measured backward from the date of any Parental or Serious Health Condition in Immediate Family Leave of Absence taken.

Eligible nurses may take a Non-Occupational Medical Leave of Absence for up to 12 months in any rolling 12-month period, measured backward from the date of any Non-Occupational Medical Leave of Absence taken.

**Exhibit 2**

Eligible nurses are entitled to take a Maternity Leave of Absence for a period of up to 12 weeks.

Eligible nurses are entitled to take Small Necessities Leaves of Absence for a period of up to 24 hours in any rolling 12-month period, measured backward from the first day of any Small Necessities Leaves of Absence taken.
Eligible nurses are entitled to take Military Leaves of Absence for the period provided by applicable law.

The Hospital may grant a General Leave of Absence for a period up to 30 days and, in the Hospital's discretion, a General Leave of Absence may be extended.

Nurses may take up to 12 weeks of Non-Occupational Medical Leave or Serious Health Condition in Immediate Family Leave on a reduced schedule or intermittent basis provided the nurse submits a certification from a health care provider of the need for a reduced schedule or intermittent, including the dates upon which treatment will be provided and its expected duration.  Intermittent leave is defined as non-consecutive leave.  Reduced leave is defined as leave which allows a nurse to reduce the usual number of hours worked per week or per day.  Nurses using intermittent or reduced schedule leave may be transferred temporarily to an alternative equivalent position which better accommodates recurring periods of leave.

If a nurse qualifies for more than one type of Non-Occupational Medical, Occupational Medical, Parental, Maternity and/or Serious Health condition in Immediate Family Leaves of Absence, the periods of leave shall run concurrently unless otherwise required by applicable law.

Spouses who are both employed by the Hospital and who are both eligible for a Parental Leave of Absence may take a combined total of 12 weeks of Parental Leave.

## 15.04. Required Notice

Nurses absent from work due to non-work-related illness or disability for 14 or more calendar days must request and receive approval for a Non-Occupational Medical Leave of Absence.  If a Medical Leave of Absence is approved, it will be deemed to have begun on the first day of the illness or disability.  Any absence from work of more than 14 calendar days without being on an approved leave of absence or vacation will be considered an unauthorized absence.

**Exhibit 2**

Nurses making requests for Leaves of Absence must notify their manager, complete the Leave of Absence form and submit the form to their manager for the manager's signature. The manager will submit the form to Human Resources for final approval. An approved copy of the form will be sent to the employee. Any leave commenced prior to the final approval from Human Resources will be conditional until final approval is received.

Nurses shall make requests for Medical, Parental, Serious Health Condition in Immediate Family and General Leaves of Absence at least 30 days in advance of foreseeable events, and as soon as possible for unforeseeable events. Requests for Medical and Serious Health Condition in Immediate Family Leaves of Absences must be accompanied by the following information: (i) the reason for the medical leave; (ii) the anticipated dates the medical leave will begin and end; and (iii) a health care provider's statement verifying the need for the leave.

Nurses shall make requests for Maternity Leaves of Absence at least two weeks prior to the anticipated date of departure and shall indicate at the time of making the request the intention to return to work following the leave. Nurses may continue to work beyond the anticipated date of departure if medically able to do so, and their leaves shall not begin until their actual date of departure.

Nurses shall make requests for Small Necessities Leaves of Absences at least seven days in advance of foreseeable events and as soon as possible for unforeseeable events. Nurses also may be required to provide the Hospital with a certification of the need for Small Necessities Leave.

Nurses shall make requests for Military Leaves of Absence 30 days in advance of the need for the leave, or as soon as possible if the nurse is notified that she/he must report to duty in less than 30 days.

During any approved Leave of Absence, the Hospital may require periodic updates concerning the nurse's status and expected date of return, and the nurse must as soon as possible notify the Human Resources Department of a need to change the duration of the leave.

## 15.05. Medical Certifications

Nurses must submit a medical certification of a health care provider for Medical Leaves of Absence and Serious Health Condition in Immediate Family Leaves of Absence no later than 15 days following the leave request in a form prescribed by the Hospital

**Exhibit 2**

which shall include, at a minimum, the following (i) the need for the leave; (ii) the start date of the leave; and (iii) the expected end date of the leave.  Any changes in this information should be promptly reported to the Human Resources Department.

Nurses returning to work following any Occupational Medical or a Non-Occupational Medical Leave of Absence which involved either:  (i) an absence of five or more scheduled working days; (ii) any hospitalization; or (iii) any surgery must, before returning to work, schedule a fitness-for-duty assessment with the Occupational/Employee Health Office.  At the time of the assessment, the nurse must provide a written statement from her/his health care provider regarding her/his health status and her/his ability to resume work, including the date she/he is able to resume work, the identification of any work restrictions and the period those restrictions will be in place.  The nurse will not be allowed to return to work until receiving approval from the Occupational /Employee Health Office which shall not be reasonably denied.  If after the fitness for duty examination, the Occupational/Employee Health Office disagrees with the employee's physician, the parties shall agree upon a neutral physician to conduct an examination of the employee and that physician's determination shall be final and binding.  The Hospital shall pay for the cost of that exam.

## 15.06. Benefit Continuation and Accrual

The Hospital will continue to provide health and dental insurance benefits, with the same premium contribution levels, for the first 12 weeks of approved Maternity, Non-Occupational Medical, Parental and/or Serious Health Condition in Immediate Family Leaves of Absence, and the first 24 hours of approved Small Necessities Leaves of Absence.  Thereafter, if a nurse remains out of work on an approved leave of absence or if a nurse is on an approved General Leave of Absence and wishes to continue health and dental insurance benefits, the nurse will be responsible for paying the full cost of such benefits.  The Hospital will continue to provide health and dental insurance benefits as required by law for Military Leaves of Absence.  Benefits for an Occupational Medical Leave of Absence will be coordinated with workers' compensation in an effort to minimize the impact of the leave for both the nurse and the Hospital and to ensure that the nurse's total compensation does not exceed regular earnings.

Nurses will continue to accrue vacation, holiday and sick time during any Leave of Absence, or portion thereof, for which the nurse receives pay through the use of accrued benefit time (e.g., vacation, holiday or sick), except that a nurse who is unable to work due to an occupational injury or illness for which she/he is receiving

49

**Exhibit 2**

workers' compensation benefits will accrue no holiday time and will accrue vacation and sick time for up to four weeks following the date she/he became unable to work.

## 15.07. Return to Work Following Leave

Nurses shall notify the Hospital at least two weeks in advance of the date they intend to return to work.  Nurses who have completed their probationary period who return to work after taking up to 12 weeks of any combination of approved Medical, Parental and/or Serious Health Condition in Immediate Family Leaves of Absence in a rolling 12-month period or up to 24 hours of approved Small Necessities Leave of Absence in a rolling 12-month period will be reinstated to the same position.  Nurses returning to work after taking up to 12 weeks of approved Maternity Leave of Absence will be reinstated to the same position.
Nurses returning to work following a Military Leave of Absence will have reinstatement rights in accordance with applicable law.

For all other nurses returning from approved general leaves of absence, the Hospital will endeavor to return the nurse to the same position (if it is available) or a similar position for which the nurse is qualified; however, the Hospital cannot guarantee reinstatement to any position.

The Hospital will make every effort to reasonably accommodate the disabilities of nurses who are released for duty from a Medical Leave of Absence, as required by law.

Upon their return to work, nurses who have been out on an approved Leave of Absence for more than 12 weeks will have their step anniversary date adjusted by the amount of time the approved Leave of Absence exceeds 12 weeks.

## 15.08. Effect of Layoff While on Leave

Notwithstanding anything herein, in the event of a reduction in force during the term of a nurse's approved leave of absence which results in the removal of the nurse's position, either through selection for layoff or as a result of bumping, the rights of the nurse on leave to reinstatement and/or recall shall be in accordance with Section 16.04 ("Reduction in Force").

**Exhibit 2**

## 15.09. Bereavement

In the event of a death in the immediate family of a nurse who is employed to work at least 24 hours per week, the nurse will be paid bereavement pay up to three days for otherwise scheduled working time (within a period of 14 consecutive days beginning with the date of death or beginning with the date of services) from which the nurse is absent by reason of such death for the purpose of making necessary funeral arrangements, attending the funeral or otherwise assisting in family matters relating to the death.  A day's bereavement pay shall be computed on the basis of the nurse's straight-time hourly rate, including differential, if applicable, times the number of hours which the nurse was scheduled to work on the bereavement day(s).

In the event of a death in the immediate family of a nurse who is employed to work less than 24 hours per week, excluding per diem nurses, the nurse will be paid bereavement pay for up to one day for otherwise scheduled working time (within a period of 14 consecutive days beginning with the date of death or beginning with the date of services) to permit the nurse to attend the funeral.  A day's bereavement pay for a nurse who is employed to work less than 24 hours per week shall be computed on the basis of the nurse's straight-time hourly rate, including differential, if applicable, times the number of hours the nurse was employed to work on the day of the funeral.

For purposes of the section, "immediate family" shall include only the nurse's mother, father, brother, sister, current spouse, current step-parent, current brother-in-law, current sister-in-law, child, grandmother, grandfather, grandchild, current mother-in-law, current father-in-law, legal guardian, daughter-in-law, son-in-law, parent of the nurse's children, or other person permanently living in the nurse's household.  The Hospital may require a nurse to furnish satisfactory evidence of death.

## 15.10. Jury Duty

Any nurse called for jury duty must notify her/his supervisor that she/he has been selected for jury duty as soon as she/he has received notice to report for jury duty.  If the nurse is impaneled for a trial lasting more than one day, she/he should notify her/his supervisor of her/his extended jury service.  To be compensated for jury duty, the nurse must provide her/his supervisor with a juror service certificate (voucher) indicating the date(s) of service.  A nurse will be paid the difference between jury pay paid by the court and her/his straight-time hourly rate, including differential, if applicable, provided she/he is scheduled to work on those days.

**Exhibit 2**

A nurse working on the evening shift who is selected for jury duty will not be required to report to work on the evening she/he serves jury duty.

A nurse working on the night shift who is selected for jury duty will not be required to work on the night shift prior to the day she/he serves jury duty.
Time spent by a nurse attending any proceeding covered by this Article shall not adversely affect any benefit accrual.

## 15.11. Legal Proceedings

Any nurse who is required, or requested by the Hospital, to appear in court or an administrative proceeding or who is required, or requested by the Hospital, to give a deposition in any matter pertaining to the Hospital, shall be considered to be on working time during such appearance.

Time spent by a nurse attending any procedure covered by this Article shall not adversely affect any benefit accrual.

Such working time shall include any travel time beyond a nurse's normal commuting time.  If the appearance occurs during a nurse's scheduled shift, the nurse can choose to take the remainder of the shift off and may elect to use benefit time or take the time off without pay.  The nurse will be reimbursed for mileage, tolls and parking costs.

## ARTICLE XVI.
## SENIORITY

## 16.01. Seniority

The Hospital recognizes the following types of seniority for regular full-time and regular part-time nurses:

**Benefit Seniority**.  Benefit seniority shall be defined as the length of continuous employment since the nurse's most recent date of hire within Saint Vincent Hospital LLC and its affiliates, which include Providence Extended Care Center, Providence House of Milbury, Providence House of Southbridge, Saint Vincent Hospital, CliniTech Services, District Nursing Society and Certified Nursing Services. For purposes of Benefit Seniority, The Hospital shall also include the nurse's service with Fallon Healthcare System prior to February 5, 1998.

**Exhibit 2**

For nurses hired after the date of ratification of the 2014-2016 agreement, benefit seniority shall be defined to include also the length of continuous employment since the nurse's most recent date of hire within any facility owned by Tenet Healthcare Corporation ("Tenet").  This paragraph shall cease to apply in the event that Tenet no longer owns St. Vincent Hospital, provided however, that nurses hired during the time Tenet owns St. Vincent Hospital shall keep the same benefit seniority date.

**Bargaining Unit Seniority**.  Bargaining Unit Seniority shall be defined as the length of continuous employment by the Hospital in a position covered by this Agreement.  All Bargaining Unit members who have worked at the Hospital in other RN positions, prior to February 5, 1998, will receive full credit for such time worked.  For purposes of Bargaining Unit Seniority, a registered nurse who was continuously employed by the Hospital as an LPN (and immediately prior to entering into an entry level registered nurse position) shall receive one year of Bargaining Unit Seniority credit for each two years of LPN service at the Hospital, to a maximum of four years of Bargaining Unit Seniority credit.  Bargaining Unit Seniority will be frozen with appointment to a non-bargaining unit position within the Hospital.  If and when the nurse is reappointed to a Bargaining Unit position, Bargaining Unit Seniority will be bridged after one year of service over the time out of the bargaining unit, and then will go forward from the time she/he returns to a bargaining unit position.

Bargaining Unit Seniority is relevant to reductions in force, recall and to the filling of vacancies.

The use of the word "seniority" is deemed to mean Bargaining Unit Seniority. Benefit Seniority will apply only in circumstances where the term is specifically stated.

## 16.02. Loss of Seniority and Employment Rights

All seniority and all employment rights will be lost by:

Resignation;

Discharge for just cause;

Failure to report for work at the expiration of an approved leave of absence, unless an extension is granted in writing by the Hospital;

Employment elsewhere during an authorized absence from work or during an approved leave of absence, unless approved in writing by the Hospital;

**Exhibit 2**

Failure to perform any work for the Hospital during the period of one calendar year, or a period equal to one's employment by the Hospital, whichever is less (this shall not include a nurse who is absent due to an illness or injury approved for worker's compensation);

Failure to return to work from layoff on the date stated in the notice of recall which in no event will be less than 14 days from the date of receipt of notice of recall by registered mail;

Failure to report to work for three consecutive days without notice to the Hospital.

If re-employed following the loss of seniority, a nurse shall be deemed a new employee for all purposes under this Agreement.

## 16.03. Absences for which Credit in Service is Granted

A nurse will continue to accumulate seniority:

a.      Up to the length of any absence due to paid vacation or paid holiday or other paid absence;

b.      If the nurse has completed the probationary period, either up to the time equaling the nurse's length of credited service or for 150 days, whichever is less, for absences for which the Hospital has granted the nurse a leave of absence for reasons of military leave, adoption leave, personal illness, maternity or industrial accident;

c.      Up to 60 days for critical illness in the nurse's immediate family or death in the nurse's immediate family; or

d.      Up to 30 days for any absence by the nurse which has been excused or for which the Hospital has granted any other leave of absence.

e.      Up to 84 days for any absence that qualifies under the Family and Medical Leave Act (FMLA).

Upon return from an approved leave of absence, the nurse's seniority will be adjusted to reflect any absence for which seniority was not granted hereunder.  Any nurse whose seniority date is adjusted will be advised in writing of such adjustment.

54

**Exhibit 2**

## 16.04. Reduction in Force

In the event that the Hospital decides that there is a need for a reduction in force (RIF), the Hospital will notify the MNA at least seven days prior to the effective date of the RIF.  The parties shall meet within 24 hours, or as soon thereafter as possible, of receipt of the notice to discuss the procedures to be followed to effectuate the RIF and other issues, including whenever practicable, attrition, transfer, reassignment or reduction in hours.  If no agreement is reached within 24 hours of the beginning of the above meeting as to the procedure to be followed, the Hospital shall implement the RIF in accordance with the following procedures.

## Section 1. Layoff Procedure

A.      If a reduction in force occurs, the Hospital will provide the affected nurses with two weeks' notice of the layoff.

B.      For all purposes under a RIF, the Hospital will merge full-time and part-time positions into one seniority list, broken down by Bargaining Unit seniority by unit, shift and hours.  All references to seniority in this Article shall mean Bargaining Unit Seniority.

C.      The Hospital will permit bargaining unit nurses within the particular classification within the department(s) to be affected by the layoff to volunteer for layoff in order of seniority within the classification within the affected department(s), beginning with the most senior nurse.  All references to classification in this Article shall mean a particular job title.  The Hospital will make available voluntary layoff up to the slated FTE reduction in force unless in the sole discretion of the Hospital it is operationally infeasible to do so.  If more nurses apply than required, seniority shall be the determining factor.

D.      If the Hospital determines that the voluntary layoffs are inadequate and that further layoffs are necessary in the particular classification within the affected department(s), the Hospital will review each potentially affected nurse in that classification within the affected department(s) to determine which nurses, if any, are in their probationary period.  Layoffs shall then occur in the following order until the Hospital determines that no more layoffs are necessary.
Nurses in the classification in the affected department and shift who have not completed their probationary period in the reverse order of their date of hire, with the most recently hired nurse being laid off first;

55

**Exhibit 2**

Remaining nurses in the classification in the affected department and shift in reverse order of seniority, with the least senior nurse being laid off first.

E.      The Hospital will not oppose receipt of unemployment compensation for any nurse laid off whether such layoff is voluntary or involuntary.

F.      In the context of a reduction in force, per diem, agency and/or temporary nurses will not be utilized by the Hospital in an affected department and shift, except for the following purposes: (1) to fill in for expected and unexpected absences due to nurses taking paid or unpaid time off; (2) in order to maintain minimum staffing levels; (3) to temporarily fill in vacant hours which the Hospital intends to fill; or (4) to meet temporary increases in patient volume or acuity which the Hospital reasonably determines may not be sustained.

## Section 2.  Bumping, Bidding for Vacancies and Per Diem Hours

A.      Any nurse selected for layoff shall have the following options:

Choose a layoff.

Choose to bid for any available vacancy in the Hospital for which the nurse is qualified.[5]

Bump a nurse according to the following guidelines:

A nurse may only bump a less senior nurse.

Bumping may occur only to an equal or lower classification.

A nurse may bump into a position only if in the reasonable judgment of the Hospital the nurse will be qualified and able to perform that position with a reasonable period of orientation not to exceed four weeks.  It is agreed that in determining the nurse's qualifications to bump into another position, the Hospital may rely on the nurse's educational background and work experience as evidenced in the nurse's personnel file, as well as the current orientation process for the position.

The bumping nurse will assume the bumpee's shift and hours.

---

[5] Any posted vacancies that have not been filled at the time the Hospital notifies the MNA of the need for a RIF will not be filled until the bumping procedures set forth in this paragraph have been completed.

56

**Exhibit 2**

If a nurse opts to bump into a lower classification, the nurse's hourly rate of pay shall remain the same, except where the nurse's hourly rate of pay exceeds the maximum hourly rate of pay of the lower classification in which case the nurse's hourly rate of pay will be reduced to the maximum hourly rate of pay of the lower classification.

A nurse must notify the Hospital as to whether or not she/he will exercise any bumping rights within two working days after the nurse has been notified that she/he has been selected for layoff or has been displaced by a more senior nurse, as the case may be.

Bumping may occur as follows:

(i)    A nurse initially selected for layoff may bump a less senior nurse with the same shift and hours, or, if there are none, a less senior nurse on any shift with up to eight hours more or less per week, or any less senior nurse within her/his unit (any shift, any hours).

(ii)   A nurse displaced as a result of the bumping procedure will be then placed on the layoff list in order of seniority (most senior first) and may bump a less senior nurse with the same shift and hours, or, if there are none, a less senior nurse on any shift with up to eight hours more or less per week, or any less senior nurse within her/his unit (any shift any hours).

(iii)  A nurse displaced as a result of the procedure under g(ii) above may bump any less senior nurse within her/his unit (any shift, any hours), or if there are none, one of the three least senior nurses on separate units on any shift with up to eight hours more or less per week.

(iv)   Any nurse unable to bump under g(i)-g(iii) may bump the least senior nurse in her/his department or the least senior nurse in the Hospital.

(v)    There shall be no further displacement rights other than those enumerated in g(i)-g(iv) above.  Any nurse unable to bump under g(i)-g(iv) above shall be laid off.

A.    Any nurse who is laid off who signs up for per diem after the layoff will have first option in order of seniority for any available hours for which the nurse is qualified, provided the nurse contacts the staffing coordinator by noontime on the Monday two weeks prior to the next posted schedule and states availability for the next four weeks

57

**Exhibit 2**

schedule.  If the nurse's expressed availability does not meet the Hospital's staffing needs, other nurses may be utilized.

## 16.05. Recall

A.      For one year from the date of her/his displacement, a nurse who continues to be employed by the Hospital will be afforded the first option to return to her/his original position if it becomes available.  In order to be eligible for such position, such nurse must apply for such position as set forth in Section 16.07 ("Vacancies") and must advise the Hospital at the time of such application that she/he has a recall right under this Section 16.05.

B.      Vacant positions that are not filled under paragraph A will be posted pursuant to Section 16.07 ("Vacancies").  Nurses on layoff may apply and will be considered on the same basis as all other bargaining unit applicants for the position, as provided in Section 16.07, and such a laid off nurse will retain her/his seniority for a period equal to her/his length of employment by the Hospital (but in no event more than one year from the date of layoff); in so applying Section 16.07, the words "nurses from within the Hospital" will include nurses on layoff who so retain their seniority.  In order to be eligible for recall, a nurse on layoff must return to work within 21 days of the date that she/he has been notified that such application has been approved.  If such nurse does not so return to work, all recall rights shall be deemed forfeited and such nurse will be removed from the recall list.

## 16.06. Benefits

A.      Nurses who are laid off shall be paid all accrued but unused vacation and holiday time.

B.      Nurses who are laid off shall have their accrued seniority and accrued sick time hours frozen during the period of layoff for a period equal to her/his seniority, but in no event in excess of one year, and shall no longer accrue or be eligible for benefits, except as required by law.  Nurses reinstated during the period in which their accrued seniority and sick time hours have been frozen will have both restored on the date they return to work at the Hospital.

C.      Any nurse affected by layoff who received prior approval for tuition reimbursement and who otherwise satisfies the requirements for reimbursement under Section 17.01 ("Educational Reimbursement") shall be reimbursed in accordance with the Hospital's normal procedure.

**Exhibit 2**

## 16.07. Vacancies

In filling a vacancy in any Bargaining Unit position, the vacancy shall be posted on a Hospital designated bulletin board for seven days.  The Hospital shall designate bulletin boards for this purpose in the following locations: by the cafeteria and in the basement by the elevators on both the north and south sides of the building.  All current bargaining unit vacancies shall be accessible through the Hospital's website.

The vacancy shall be filled on the basis of qualifications (including such factors as relevant job experience, proven ability, job performance, and education) of the nurses who have applied.  When two or more nurses from within the Hospital are found to be relatively equally qualified, first Bargaining Unit seniority, and then, if necessary, Benefit seniority will be the determining factor, except that first preference shall be given to nurses regularly employed in the department where the opening exists.

Applications for vacant positions shall be made to the Human Resources Department within the period of posting. All bargaining unit applicants will receive confirmation that their application has been received. All bargaining unit nurse applicants who are not selected for a position will receive notice she/he has not been selected.

Probationary nurses and nurses who have been in their current position for less than six months (nine months for the following specialty units, Emergency Dept., OR, L&D, Level IIB Nursery, ICU, PCU, PACU, Cath Lab, Endo, Dialysis,) are not eligible to bid unless bidding limitations are waived by the Hospital. The six-month or nine-month limitation, as applicable, will not apply for nurses seeking on-unit transfers.

An RN who is the selected candidate for a transfer to another bargaining unit position will move into their new position, subject to operational needs, within 4 weeks after the end of the schedule in effect at the time of selection, but in any event, not more than 8 weeks from the date of offer.

The parties agree that it is beneficial to both the Hospital and its nurses to fill vacancies from within the bargaining unit wherever possible.  Accordingly, in the normal course, qualified internal applicants will be given preference in the filling of vacancies over external applicants.  However, in the circumstance where applicant(s) from within the bargaining unit are only marginally qualified for the position, the Hospital may hire an external applicant whose relevant qualifications are substantially superior to those of any of the internal applicants.

**Exhibit 2**

## 16.08. Probationary Period

All newly hired nurses will be on probation for a period of 90 days, during which period the Hospital may discipline or discharge the nurse without recourse to the grievance process. The probationary period may be extended for up to 30 days at the sole discretion of the Hospital. Once a nurse has completed her/his probationary period, her/his date of seniority will date from her/his day of hire.

## 16.09. Resignation

A nurse who desires to terminate her/his employment with the Hospital shall give her/his manager prior written notice of such termination at least two weeks prior to the date of expected termination. No paid time off may be used by the nurse during the two-week notice period, unless otherwise permitted by the Hospital.

## 16.10. Discipline and Discharge

A nurse who has completed her/his probationary period shall not be suspended, discharged, demoted or otherwise disciplined except for just cause. The Hospital shall inform the Unit Chair or her/his designee of any suspension, demotion or discharge (unless the nurse who has been disciplined objects) within three days from the date of the suspension, demotion or discharge.

For purposes of this Section 16.10, days shall be defined as Monday-Friday. A nurse shall have the right to have an Association representative present at any counseling/disciplinary session provided that the nurse has so requested representation. No negative documents or entries shall be entered in a nurse's personnel record during her/his period of employment without notice to the nurse. Any disciplinary notation shall be removed from a nurse's record if there has been no recurrence of misconduct warranting discipline within a two-year period from the disciplinary notation, provided that this provision shall not apply to notations involving violence, abusive behavior, grossly negligent nursing practice(s) or moral turpitude.

## ARTICLE XVII.
## EDUCATIONAL ADVANCEMENT

## 17.01. Educational Reimbursement

In order to be eligible for reimbursement by the Hospital, a course must be approved in writing in advance by the Hospital as: (a) job-related, (b) taken at an accredited

**Exhibit 2**

institution of higher education, (c) taken on the nurse's own time, and (d) taken at a time that does not interfere with the normal performance of the nurse's job.

An eligible nurse must submit an educational reimbursement form prior to the start of the course.  Reimbursement is limited to tuition only and is dependent upon a successful passing grade of C or better.

## Benefit Eligibility

For a regular full-time or part-time nurse who has an actual paid-hour average of 32 hours per week during the semester in which the course is taken, 100% of tuition cost up to $1,600 per year.

For a regular part-time nurse who has an actual paid-hour average of at least 20 (but less than 32) hours per week during the semester in which the course is taken, 50% of tuition cost up to $800 per school year.
Upon completion of the course, the nurse must submit proof of tuition payment and a copy of the grade report to Human Resources for processing.  Nurses in their probationary period may apply for reimbursement, however, no payment will be made unless and until the nurse successfully completes the probationary period.  Under no circumstances will reimbursement be made to an individual who is no longer employed by the Hospital prior to completion of the course, except as provided in the Reduction-in Force Article of this Agreement.

Reimbursement under this policy is not available in any instance where benefits of a similar nature are available from any other source.

## 17.02. Continuing Education

Should the Hospital mandate any training, the Hospital will pay for the time that the nurse is in attendance at the mandated training session(s) at the nurse's straight-time hourly rate, plus differential, if applicable, and will count the time as hours worked. The Hospital also shall be responsible for paying any fees associated with attendance or enrollment.

The Hospital will make reasonably available in-service education which will provide the contact hours as required by Massachusetts General Laws, chapter 112, Section 74, as amended, for all nurses.

**Exhibit 2**

## 17.03. Preceptor Program

A.  Newly hired RNs or RNs who transfer or are promoted to a new position shall be precepted.

B.  Preceptors shall be assigned on a one-to-one basis.  During the period of precepting, the new, transferred or promoted RN shall not be counted in the staffing allotment for that unit and shift and shall share the same patient assignment with the preceptor.

C.  The period of time a RN is assigned to a preceptor shall be determined by the needs of the individual RN in consultation with the Nurse Manager, preceptor, Nurse Educator, and the RN. Requests to extend the precepted period will not be unreasonably denied.

D.  A precepted employee shall be assigned to a primary preceptor for each shift throughout her/his precepted period and be assigned the same work schedule as her/his preceptor.  In the event the primary preceptor is not available the precepted employee shall be assigned an alternate preceptor.  Every reasonable effort will be made to provide continuity and consistency during the precepted experience.

E.  Preceptors will be exempt from floating and acting as Resource Nurse when assigned a Preceptee.

F.  Individuals will be eligible to act as a preceptor based on the following criteria:

1)  Must have met the minimum standards on their most recent performance appraisal.

2)  No active Performance Management Reports of any nature.

3)  Have successfully completed all competencies and certifications as appropriate.

4)  Have a minimum of one year recent, appropriate, clinical experience.

5)  Successful completion of the Preceptor Training Program.

G.  The Preceptor Training Program will be developed by the Hospital, in consultation with the Association, and may be modified by the Hospital from time to time as required.

**Exhibit 2**

H.     Preceptors will be evaluated on an annual basis; such evaluation will include the criteria contained in "F" above and preceptee evaluations from the previous year for continued selection as a preceptor.

I.     Preceptors will receive training prior to their first assignment.

J.     Employees assigned preceptor duties shall be paid in accordance with Section 7.08 ("Preceptor Pay").

## 17.04. Educational Meetings

Effective January 1, 2016, full-time employees and part-time employees who are regularly scheduled for 24 hours or more per week shall be eligible, with prior approval, for one 8-hour paid day off per year to attend educational meetings related to the practice of clinical nursing skills.

**ARTICLE XVIII.**
**STAFFING**

## 18.01. Staffing

The Hospital will ensure safe, Registered Nurse staffing levels on all shifts within each patient care area.

The Hospital will make a good faith effort to implement the staffing changes as soon as possible after ratification, but in any event not later than four (4) months after the Effective Date of the Agreement (January 3, 2022).

## 18.02. ICU

The Hospital is committed to complying with the new ICU law.  To that end the Hospital agrees to establish 24/7 voluntary on-call as necessary based on the ongoing assessment and recommendations of the joint ICU committee.  The committee is comprised of a minimum of 50% staff nurses from the ICU (but no more than four (4) nurses).  The committee will establish standing monthly meetings at a mutually agreeable time.  Nurses shall be paid for their participation in this committee.  After one (1) year, the parties will assess whether to continue the committee or discuss these issues in Labor-Management.

**Exhibit 2**

## ARTICLE XIX.
## NURSING PRACTICE

### 19.01. Delegation of Nursing Activities

No nurse shall be required or directed to delegate nursing activities to other personnel in a manner that is inconsistent with the judgment of a reasonable and prudent nurse. Likewise, no nurse shall be required to delegate activities contrary to the Massachusetts Nurse Practice Act or the Code of Massachusetts Regulations, 244 CMR Board of Registration in Nursing Sec. 305 (1998) or any regulation of the Massachusetts Board of Registration in Nursing and the standards of the Joint Commission on Accreditation of Healthcare Organizations.

## ARTICLE XX.
## MISCELLANEOUS

### 20.01. Hospital Personnel Policies

The parties agree that nothing in the Hospital's personnel policies shall interfere with the rights of employees under the National Labor Relations Act. Further, the parties agree that, to the extent that any personnel policy conflicts with a provision of their collective bargaining agreement, the collective bargaining agreement shall control. Otherwise, the Hospital's personnel policies shall be applied to bargaining unit nurses, provided that the MNA and/or the nurse(s) reserve the right to grieve the reasonableness of any such policy or the application of any such policy to any nurse or nurses, provided however that the right to grieve shall arise only in the context of an actual case or controversy. The parties acknowledge that the Hospital may, from time to time, modify the personnel policies in the future. To the extent that any such modification impacts upon a mandatory subject of bargaining, the Hospital will abide by its obligations under the National Labor Relations Act.

### 20.02. Labor/Management Committee

There shall be a Labor/Management Committee consisting of not more than five nurses from the bargaining unit selected by the MNA (two of whom will be designated to serve as health and safety representatives) and not more than five representatives of Hospital management who shall meet monthly (excluding December), and at such other times as mutually agreed at a mutually agreed upon time of day to discuss matters of mutual interest and concern (including health and safety issues affecting members of the bargaining unit). Staffing shall be a permanent agenda item. This

64

**Exhibit 2**

Committee is not empowered to amend this Agreement, adjust grievances, or negotiate on behalf of the nurses or the Hospital.  An agenda shall be submitted by one party to the other no later than five days prior to the meeting.  The functioning of the Labor/Management Committee shall in no way usurp or displace the functioning of other committees at the Hospital, and no other committees at the Hospital shall usurp or displace the functioning of this committee.  The bargaining unit members selected for Labor/Management Committee shall not suffer a loss of pay or benefit accrual for time spent in joint Labor/Management Committee meetings.

After the ratification of the 2022 – 2025 agreement, the parties will mutually invite the FMCS mediator to conduct training on Labor Management committee practice and will request that such mediator moderate two (2) ensuing Labor Management committee meetings.

## 20.03. Parking

The Hospital shall provide parking for the nurses at one or more garages within reasonable walking distance to Worcester Medical Center (WMC).  The cost will be based on the number of hours you are budgeted to work.  These costs will automatically be deducted from your paycheck each week by the payroll department.  The cost breakdown is as follows:

| Budgeted Biweekly Hours | Biweekly Cost |
| --- | --- |
| 65-80 hours | $10.00 |
| 49-64 hours | $8.00 |
| 33-48 hours | $6.00 |
| 17-32 hours | $4.00 |
| 1-16 hours | $2.00 |

Per diem staff will be required to purchase validation stickers, which will be placed on their parking ticket upon departure.  They will be charged $1.00 per day for each day worked.  If there is no validation sticker, a charge of $4.00 will be incurred.

The Hospital will take reasonable steps to provide nurses with safe access to vehicles parked in Hospital garages or lots.

**Exhibit 2**

## ARTICLE XXI.
## GRIEVANCE AND ARBITRATION

The parties recognize that day-to-day problems affecting the nurses will normally be resolved by the nurse and her/his immediate supervisor.  Such matters shall not be deemed grievances and their settlement shall not establish a precedent for the resolution of other or similar problems between a nurse and her/his immediate supervisor or elsewhere in the Hospital.  It is understood that informal discussions between a nurse and her/his supervisor are not prohibited by this Article.

Purpose.  The purpose of this Article is to establish a procedure for consultation regarding, and the settlement of, grievances submitted by a nurse and/or the MNA concerning the meaning interpretation or application of the provisions of this Agreement.  The Hospital and the MNA agree to use every reasonable effort to prevent such grievances from arising and to accomplish just and reasonable settlement of grievances which do arise.

Procedure.  Should a complaint not be adjusted as contemplated by the first paragraph, such complaint may become a grievance.  A grievance shall be reduced to writing and shall contain detail sufficient to reasonably apprise the Hospital of the nature of the grievance and the issues involved, citing each applicable section of this Agreement provided that the failure to cite a particular section(s) shall not prohibit reliance thereon at a later step in the grievance/ arbitration process.  All grievances will be handled as follows:

**Step 1:**  The aggrieved nurse shall first present the grievance to her/his department manager or designee within 30 calendar days of the occurrence giving rise to the grievance or from the time the grievant should have known of the facts giving rise to the grievance.  The department manager or designee shall discuss the matter with the aggrieved nurse and the MNA department/unit representative and provide her/his answer not later than five working days after the time the grievance is presented to her/him.  Any settlement at Step 1 shall not establish a precedent for the resolution of other or similar problems elsewhere in the Hospital.

**Step 2:**  If the grievance is not adjusted satisfactorily in Step 1, it may be referred in writing to the CNO not later than five working days after the written answer of the department manager or designee has been received.  A meeting shall take place within five working days after the receipt of the grievance in Step 2.  The meeting shall be attended by the grievant, the MNA

66

**Exhibit 2**

department/unit representative, the grievance chair or designee and the CNO and/or designee(s).  The nurse's department manager or designee and/or the nurse's immediate supervisor may also attend the meeting.  The CNO or designee shall give an answer in writing not later than five working days after the date of the meeting.

**Step 3:**  If the grievance is not adjusted satisfactorily in Step 2, it may be referred in writing by the MNA Staff representative to the Hospital's Director of Human Resources or designee, not later than five working days after the written answer of the CNO or designee has been received.  The meeting at Step 3 shall take place within 10 working days after receipt of the grievance in Step 3 and may include the Hospital's Director of Human Resources or designee, the CNO or designee, the department manager or designee, the grievant, the grievance chair or designee and the MNA Staff representative.  The answer of the Hospital's Director of Human Resources or designee shall be given not later than five working days after the date of the meeting.

If a grievance is once settled in any of the steps, it shall be considered closed and shall not be reopened at a later date, except as may be necessary for enforcement of such settlement.

If the grievance is not adjusted in Step 3, the MNA may file a demand for arbitration under Step 4 with AAA or LRC with simultaneous written notice to the Hospital's Chief Human Resources Officer not later than 30 working days after the written answer in Step 3 was received.

**Step 4:**  Should the MNA request arbitration in accordance with the time limits specified herein, an arbitrator shall be selected pursuant to the Voluntary Labor Arbitration Rules of the American Arbitration Association or the applicable procedures of the Labor Relations Connection.  The decision of the arbitrator shall be final and binding.  The arbitrator shall be requested to issue a written decision within 30 days after the conclusion of the hearing.  The arbitrator shall have no authority to add to, subtract from, modify, alter or disregard any of the provisions of this Agreement.  Costs of the arbitrator and the American Arbitration Association or the Labor Relations Connection shall be borne equally by the Hospital and the MNA.

**Exhibit 2**

Time Limit for Processing

No grievance shall be considered under the foregoing procedure unless it is presented in the manner set forth herein. Extensions of the above time limits may be mutually agreed upon in writing in a particular case. Legitimate requests for extensions of time will not be unreasonably denied. A grievance must be appealed to the next step of the grievance procedure or to arbitration within the time limit provided in the procedure, or the grievance will be considered settled on the basis of the last answer given by the Hospital. If the Hospital does not provide an answer to the grievance within the above time limits, or any mutually agreed extension thereof, the grievance may be referred to the next step.

Working Days

The term "working days" shall mean any day Monday through Friday which is not a holiday recognized in this Agreement.

Payment

**Step 1:** There will be no loss of pay or benefit accrual time for grievant and unit representative.

**Step 2:** There will be no loss of pay or benefit accrual for grievant, unit representative and grievance chair.

**Step 3:** There will be no loss of pay or benefit accrual for grievant, unit representative and grievance chair.

Arbitration

There will be no loss of pay or benefit accrual time for grievant and grievance chair during the process.

## ARTICLE XXII.
## EMPLOYMENT AND CONTRACT SECURITY

### 22.01. Subcontracting

The Hospital will not contract out bargaining unit work in core service areas. For purposes of this Section 22.01, core service areas are defined as inpatient units, OR

68

**Exhibit 2**

services, PACU services, and ER services. Nothing herein shall limit the Hospital's right to use temporary, agency and per diem nurses in accordance with the other Articles of this Agreement. Should the Hospital wish for legitimate business reasons to contract out any other nursing services performed by bargaining unit nurses, it shall first satisfy its obligation to bargain over aspects of that matter which constitute mandatory subjects for bargaining.

## 22.02. Successor

In the event of a change in the ownership of the Hospital, the Hospital shall notify the purchaser in writing, with a copy to the MNA, of the existence of this Agreement, and, if the succeeding entity continues to operate a health care facility of the same general nature as the Hospital, the Hospital will include as a term of the transaction effecting such change in ownership, that the succeeding entity will (1) recognize the Association within the same bargaining unit as existed immediately before the transaction and (2) negotiate in good faith with the Association to agreement or impasse before changing any term or condition of employment in effect for bargaining unit nurses immediately prior to such transaction. The Hospital's obligation to the Association will be satisfied upon timely notification to the purchaser of the existence of this Agreement, with a copy to the Association, and the inclusion of items 1 and 2 in the preceding sentence as terms binding upon such succeeding entity in any such transaction.

**ARTICLE XXIII.**
**NO STRIKE: NO LOCKOUT**

The Association agrees that there shall be no strike of any kind whatsoever, including sympathy strike or unfair labor practice strike, slowdown, stoppage of work, sick-out, sit-in, or threat of such actions, or any other interference with the operations of the Hospital during the term of the Agreement. The Hospital will not lock out any bargaining unit member during the term of the Agreement.

**ARTICLE XXIV.**
**LEGAL CONFLICT**

Should any provision of this Agreement be adjudged unlawful by a court of competent jurisdiction or other tribunal, such provision shall be treated for all purposes as null and void but all other provisions of this Agreement shall continue to be in full force and effect.

**Exhibit 2**

## ARTICLE XXV.
## COMPLETENESS OF AGREEMENT

This Agreement contains the complete agreement of the parties, and no additions, waivers, deletions, changes or amendments shall be effective during the life of this Agreement, unless evidenced in writing, dated and signed by the parties hereto.  An oral waiver or a failure to enforce any provision in a specific case shall not constitute a precedent or preclude either party from relying upon or enforcing such provision in any other case.

## ARTICLE XXVI.
## DURATION

This Agreement shall be effective January 3, 2022 and shall remain in full force and effect through and including December 31, 2025, and will continue from year to year thereafter unless written notice of a desire to modify or terminate this Agreement is given by either party to the other party at least 90 days prior to December 31, 2025, or at least 90 days prior to the expiration of any annual renewal period.

## ARTICLE XXVII.
## MOVE ISSUES

### 27.01. Move Issues

The parties agree that "move issues" in the document titled "Statement of Issues of Massachusetts Nurses Association", dated 9/7/01 are resolved in accordance with Appendix H and Appendix H of this Agreement.

## ARTICLE XXVIII.
## STAFFING GUIDELINES

### 28.01. Staffing Guidelines

Section 7.09 (Resource Nurse) and these Guidelines are an addendum to the Agreement and subject to all provisions of this Agreement, including the management rights clause and grievance procedure.  The Hospital will make good faith effort to follow these Guidelines in staffing.  If there is a dispute as to the staffing under these Guidelines, then the Association will take the matter up with the Hospital Staffing Committee.  Failing to resolve the dispute with the Staffing Committee, the Association will take the matter to the contractual grievance procedure, subject to an arbitrator's

**Exhibit 2**

determination as to whether the Hospital has made good faith effort to follow the Guidelines (See Appendix I).

Article VII Section 7.09 in combination with the staffing guidelines will set forth the patient assignments; The Med/Surg (21,22,33,34,35) and Cardiac Telemetry (23,24) units shall be a mix of 4 and 5 patient assignments; The Post Cardiac Surgery Floor 36 shall be no more than 4 patients; Inpatient psychiatry (32) shall be no more than 5 patients.

## ARTICLE XXIX.
## SUPERVISORY DUTIES

### 29.01. Supervisory duties

The Hospital agrees that it will not challenge the bargaining unit status of any bargaining unit nurse at the National Labor Relations Board (NLRB) on the basis of the nurse's performance of alleged supervisory duties or responsibilities.  The Association agrees that it will not assert the supervisory status of these positions in any proceeding.  Should any nurse in the bargaining unit be determined by the NLRB to be a supervisor for the purposes of the National Labor Relations Act, the Hospital will, if requested to do so by the Association, relieve the nurse of her/his supervisory duties.

**Exhibit 2**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives.

**Massachusetts Nurses Association**          **St. Vincent Hospital**

_____          _____, CEO
Julie Pinkham, RN, Executive Director

_____          _____, RN
Wendy McGill, Associate Director

_____          _____, CHRO
Marlena Pellegrino, RN, Unit Co-Chair

_____          _____, Director of Labor Relations
Dominique Muldoon, RN, Unit Co-Chair

_____
Christine Donohue, RN

_____
Carolyn Moore, RN

_____
Marie Ritacco, RN

_____
Cindy Joslyn, RN

_____
Ann Allia, RN

_____
Deb Krasowsky, RN

_____
Deb Beer, RN

_____
Lauriel Spahl, RN

72

**Exhibit 2**

## APPENDIX A: Staff Nurse and Case Management

| Step | CURRENT | | Jan 1 2021 1% ATB | RENUMBER August 2021 | August 1, 2021- 1% ATB | 6/30/2022 2% | 6/30/2023 -- 2% | 6/30/2024 2% | 6/30/2025 - 2% |
|---|---|---|---|---|---|---|---|---|---|
| Hire | $ 30.06 | | $ 30.36 | | | | | | |
| 1 | $ 31.13 | | $ 31.44 | HIRE | $ 31.76 | $ 32.39 | $ 33.04 | $ 33.70 | $ 34.37 |
| 2 | $ 32.22 | | $ 32.54 | 1 | $ 32.87 | $ 33.52 | $ 34.20 | $ 34.88 | $ 35.58 |
| 3 | $ 33.35 | | $ 33.68 | 2 | $ 34.02 | $ 34.70 | $ 35.39 | $ 36.10 | $ 36.82 |
| 4 | $ 34.53 | | $ 34.88 | 3 | $ 35.22 | $ 35.93 | $ 36.65 | $ 37.38 | $ 38.13 |
| 5 | $ 35.73 | | $ 36.09 | 4 | $ 36.45 | $ 37.18 | $ 37.92 | $ 38.68 | $ 39.45 |
| 6 | $ 37.01 | | $ 37.38 | 5 | $ 37.75 | $ 38.51 | $ 39.28 | $ 40.06 | $ 40.87 |
| 7 | $ 38.28 | | $ 38.66 | 6 | $ 39.05 | $ 39.83 | $ 40.63 | $ 41.44 | $ 42.27 |
| 8 | $ 39.63 | | $ 40.03 | 7 | $ 40.43 | $ 41.24 | $ 42.06 | $ 42.90 | $ 43.76 |
| 9 | $ 41.02 | | $ 41.43 | 8 | $ 41.84 | $ 42.68 | $ 43.54 | $ 44.41 | $ 45.29 |
| 10 | $ 42.46 | | $ 42.88 | 9 | $ 43.31 | $ 44.18 | $ 45.06 | $ 45.96 | $ 46.88 |
| 11 | $ 43.95 | | $ 44.39 | 10 | $ 44.83 | $ 45.73 | $ 46.64 | $ 47.58 | $ 48.53 |
| 12 | $ 45.49 | | $ 45.94 | 11 | $ 46.40 | $ 47.33 | $ 48.28 | $ 49.24 | $ 50.23 |
| 13 | $ 47.10 | | $ 47.57 | 12 | $ 48.05 | $ 49.01 | $ 49.99 | $ 50.99 | $ 52.01 |
| 14 | $ 48.74 | | $ 49.23 | 13 | $ 49.72 | $ 50.71 | $ 51.73 | $ 52.76 | $ 53.82 |
| 15 | $ 50.50 | | $ 51.01 | 14 | $ 51.52 | $ 52.55 | $ 53.60 | $ 54.67 | $ 55.76 |
| 16 | $ 53.53 | | $ 54.07 | 15 | $ 54.61 | $ 55.70 | $ 56.81 | $ 57.95 | $ 59.11 |
| 17 | $ 56.20 | | $ 56.76 | 16 | $ 57.33 | $ 58.48 | $ 59.65 | $ 60.84 | $ 62.06 |
| 18 | $ 58.74 | | $ 59.33 | 17 | $ 59.92 | $ 61.12 | $ 62.34 | $ 63.59 | $ 64.86 |
| 19 | $ 60.80 | | $ 61.41 | 18 | $ 62.02 | $ 63.26 | $ 64.53 | $ 65.82 | $ 67.13 |
| 20 | $ 62.93 | | $ 63.56 | 19 | $ 64.19 | $ 65.48 | $ 66.79 | $ 68.12 | $ 69.49 |
| 21 | $ 64.19 | | $ 64.83 | 20 | $ 65.48 | $ 66.79 | $ 68.13 | $ 69.49 | $ 70.88 |

73

**Exhibit 2**

## APPENDIX B: Clinical Specialists and Nurse Education

| Step | January 1 2021<br><br>1% ATB | Renumber<br><br>August 2021 | 8/1/2021<br><br>1% | 6/30/2022<br><br>2% | 6/30/2023<br><br>2% | 6/30/2024<br><br>2% | 6/30/2025<br><br>2% |
|---|---|---|---|---|---|---|---|
| Hire | $32.84 | | | | | | |
| 1 | $33.97 | HIRE | $34.31 | $35.00 | $35.70 | $36.41 | $37.14 |
| 2 | $35.14 | 1 | $35.49 | $36.20 | $36.92 | $37.66 | $38.41 |
| 3 | $36.39 | 2 | $36.75 | $37.49 | $38.24 | $39.00 | $39.78 |
| 4 | $37.66 | 3 | $38.04 | $38.80 | $39.58 | $40.37 | $41.18 |
| 5 | $38.97 | 4 | $39.36 | $40.14 | $40.95 | $41.77 | $42.61 |
| 6 | $40.31 | 5 | $40.71 | $41.52 | $42.35 | $43.20 | $44.06 |
| 7 | $41.74 | 6 | $42.16 | $43.00 | $43.86 | $44.74 | $45.63 |
| 8 | $43.20 | 7 | $43.63 | $44.50 | $45.39 | $46.30 | $47.23 |
| 9 | $44.67 | 8 | $45.12 | $46.02 | $46.94 | $47.88 | $48.84 |
| 10 | $46.24 | 9 | $46.70 | $47.63 | $48.58 | $49.55 | $50.54 |
| 11 | $47.83 | 10 | $48.31 | $49.28 | $50.27 | $51.28 | $52.31 |
| 12 | $49.50 | 11 | $50.00 | $51.00 | $52.02 | $53.06 | $54.12 |
| 13 | $51.22 | 12 | $51.73 | $52.76 | $53.82 | $54.90 | $56.00 |
| 14 | $53.00 | 13 | $53.53 | $54.60 | $55.69 | $56.80 | $57.94 |
| 15 | $54.83 | 14 | $55.38 | $56.49 | $57.62 | $58.77 | $59.95 |
| 16 | $58.11 | 15 | $58.69 | $59.86 | $61.06 | $62.28 | $63.53 |
| 17 | $61.01 | 16 | $61.62 | $62.85 | $64.11 | $65.39 | $66.70 |
| 18 | $63.77 | 17 | $64.41 | $65.70 | $67.01 | $68.35 | $69.72 |
| 19 | $66.01 | 18 | $66.67 | $68.00 | $69.36 | $70.75 | $72.17 |
| 20 | $67.34 | 19 | $68.01 | $69.37 | $70.76 | $72.18 | $73.62 |

74

**Exhibit 2**

**APPENDIX PSY**

**MEMORANDUM OF AGREEMENT BY AND BETWEEN**
**MASSACHUSETTS NURSES ASSOCIATION AND**
**WORCESTER MEDICAL CENTER/SAINT VINCENT HOSPITAL**

WHEREAS the collective bargaining agreement by and between the Massachusetts Nurses Association (MNA) and Worcester Medical Center/ Saint Vincent Hospital (Hospital) at Article 27.01 provides for interest arbitration of "move issues"; and,

WHEREAS the MNA filed a Demand For Arbitration pursuant to Article 27.01 in the above-captioned matter; and,

WHEREAS, the parties wish to resolve issues that are move issues relating to the Center for Psychiatry/ 1 North (CFP) at the Vernon Hill campus;

NOW THEREFORE, the parties agree to the following terms and conditions as full resolution of the issues in the interest arbitration in the above-captioned matter relating to the Center for Psychiatry/ 1 North (CFP) at the Vernon Hill campus:

This document shall be denominated "Appendix C"; shall be attached to the parties' collective bargaining agreement as such; and shall be incorporated by reference in the parties' collective bargaining agreement by addition of the following as the last sentence of Article 27.01:  "The parties agree that 'move issues' relating to the Center For Psychiatry (1 North) (Identified as issues number 2 through 7 in the document titled "Statement of Issues of Massachusetts Nurses Association", dated 9/7/01) are resolved in accordance with Appendix C of this collective bargaining agreement."

The Hospital shall implement admissions policies regarding the CFP in a form substantially the same as the admission criteria policy dated February, 2003.

The Resource Nurse may request a discharge order where an inpatient's status meets one or more of the exclusionary criteria set forth in the admission criteria policy dated February, 2003.

The following operational changes shall be implemented forthwith, but no later than 60 days of the date of full execution of this agreement:

75

**Exhibit 2**

(a)  An intercom, electronic door-release ("buzzer") and camera apparatus shall be installed in CFP in order to facilitate rapid emergency access into the ARP and IRP of the CFP without staff having to physically proceed to the entrance door to permit entry by Police, Fire and/or emergency medical personnel as follows: (i) door release on ATP and ITP; (ii) camera location adjacent to existing surveillance cameras.

(b)  The Employer shall provide the Police and Fire departments and contracted ambulance companies with an accurate layout of the CFP.

(c)  The Employer shall designate the patio entrance between the ITP and ATP of the CFP as an emergency entrance and advise the Police and Fire departments and contracted ambulance companies of same.

This agreement shall be in effect from the date of full execution (i.e., date that last required signatory executes this agreement) through the current collective bargaining agreement, the successor collective bargaining agreement.

If a patient is to be transferred from another inpatient unit within the Hospital, there shall be a face-to-face psychiatric inpatient level of care evaluation.  The Saint Vincent Hospital psychiatric assessment team shall assess all other patients presenting for admission for inpatient level of care as delineated in the admission criteria policy dated February 2003.

At the time of admission, patients that meet one or more of the criteria established in number 4 of the admission criteria policy dated February 2003 shall be admitted to the ITP until such time that they are no longer at imminent risk.  Patients admitted on a Section 12b shall be admitted to the ITP.

The Resource Nurse may request a 1:1 staff for a patient that exhibits an imminent risk to self or others.  The Chief of Psychiatry or designee will determine if the 1:1 shall be ordered.

The Resource Nurse may authorize a security guard on the CFP for up to one hour in the case of an emergency.  Upon such authorization, the CFP Program Director or designee shall be notified immediately.  If the Resource Nurse determines that Security staff is needed beyond the initial one hour, the Resource Nurse may request that additional coverage from the Program Director or designee.  If the Program Director or designee agrees, she/he shall seek authorization from the authorizing administration representative.

**Exhibit 2**

If the Resource Nurse determines that unit acuity presents an imminent risk to patients and staff, the Resource Nurse may request from the Program Director or designee an additional staff person.  If the Program Director or designee agrees with the request, she/he shall determine the length of time that the additional staff person shall be authorized.

In consideration for the above, MNA agrees to withdraw issues relating to the CFP in the above-captioned interest arbitration.

[Signatures-MNA/Employer-each dated]

**Exhibit 2**

# APPENDIX H

## Saint Vincent Hospital
## Interest Arbitration Issues

### Settlement Agreement
### February 27, 2003

**Issues # 1 RE: Merger of SICU, MICU and CCU (Issue No.1 in Move Negotiations)**

WHEREAS the collective bargaining agreement by and between the Massachusetts Nurses Association (MNA) and Worcester Medical Center/St. Vincent Hospital (Hospital) for the period January 1, 2000 until January 1, 2003 at Article 27.01 provides for interest arbitration of "move issues"; and,

WHEREAS the MNA filed a Demand For Arbitration pursuant to Article 27.01 in the above-captioned matter; and,

WHEREAS, the parties wish to resolve issues that the MNA claims are move issues relating to the merger of the SICU, MICU and the CCU (Intensive Care Unit);

WHEREAS, the Hospital recognized that the members of the staff of the Intensive Care Unit (ICU) have expressed concerns about the consolidation of the ICU as it affects staffing, scheduling and patient assignments;

WHEREAS, the Hospital wishes to work with the Massachusetts Nurses Association (MNA) and staff of the ICU to resolve their concerns identified above within the ICU;

NOW THEREFORE, the parties agree as follows:

When a patient is admitted to the ICU, such patient shall be classified as a SICU, MICU or CCU patient.  As a general principle, patients shall be clustered within the ICU according to their classification as a SICU, MICU or CCU patient.

Nurses within the ICU hired prior to April 1, 2000 shall designate a preference to serve as a SICU, MICU, CCU or Universalist nurse not later than May 6, 2002.  Nurses hired on or after April 1, 2000 shall be designated as Universalist nurses.

**Exhibit 2**

Patients will be assigned to a nurse, by the Nurse Manager or her/his designee, in the following order:

(a)  An available nurse with the same designation as the patient.  If no such nurse is available, then;

(b)  An available Universalist nurse.  If no such nurse is available, then;

(c)  An available nurse deemed most appropriate to care for the patient.

Any nurse hired into or transferring to the ICU on/or after May 6, 2002 shall be informed that she/he is hired as an Universalist and will be designated as such.

There shall be one (1) Resource Nurse assigned when an Assistant Nurse Manager is not scheduled.  Every reasonable effort shall be made to ensure the Resource Nurse does not have a patient assignment.  Such efforts will not preclude the acceptance of additional patients to the ICU.

In the event a nurse believes that adequate measures have not been taken pursuant to numbers 1 through 5 above, the nurse may complete an "ICU Clustering Evaluation Form" and submit it to the Nurse Manager.  The Nurse Manager shall discuss the issue(s) with the nurse.  If the nurse is not satisfied with the response of the Nurse Manager the MNA may bring the issue to the Staffing Committee for discussion/resolution in accordance with Section 18.02, Staffing Committee, of this Agreement.

In consideration for the above, MNA agrees to withdraw issues relating to the ICU in the above-captioned interest arbitration.

This agreement shall be in effect from the date of full execution (i.e., date that last required signatory executes this agreement) through the collective bargaining agreement effective January 1, 2003, and thereafter until superseded by a further successor collective bargaining agreement.

**Issues #2 - #7 Center for Psychiatry – See Appendix PSY.**

**Issue #8 – Secure access to basement level garage.**

**RESOLVED:**

**Issue #9 – Security Staffing**

79

**Exhibit 2**

Employees may contact the Security Department and request an escort to their automobile parked within the Hospital garage.  Escorts will be provided, however, it is understood that employees may have to wait if security is not readily available.

**Issue #10 – Crisis Assessment Team Job Duties**

Subject to final settlement of all other matters currently awaiting Interest Arbitration Saint Vincent Hospital (SVH) agrees to recognize the pre-existing verbal agreement between SVH and the MNA concerning the CAT Team.  In concert with accepting the pre-existing verbal agreement, SVH will not initiate any changes to the current CAT Team for the remaining term of the Current CBA.  Upon expiration of the Current CBA (January 1, 2000 - January 1, 2003) or upon reaching a final agreement on a Successor CBA, whichever occurs first, the parties hereby acknowledge that the pre-existing verbal agreement relative to the CAT Team shall cease to be in effect.

Further, SVH and the MNA hereby agree to cancel the remaining Interest Arbitration sessions, recognizing that each party will be responsible for paying their respectively incurred costs and an equal share of any AAA-related costs associated with such cancellations.

**Issue #11 – Staffing Guidelines**

**RESOLVED:**

**Issues #12 – Operating Room Equipment**

**The Association agrees to withdraw subject to agreement in Issues #15.**

**Issue #13 – OR Charge Nurse Communication**

**RESOLVED:**

**Issue #14 – OR Ancillary Staffing**

**RESOLVED:**

**Issue #15 – OR Supplies affected by Central Supply Staffing**

**Exhibit 2**

The Hospital agrees to provide staff in the Sterile Processing Department (SPD) twenty-four (24) hours a day/seven (7) days a week.  The Hospital will transition to 24-hour coverage in the following manner:  a) not later than April 30, 2003, SPD staffing for weekends and holidays will move from today's schedule of 10:30 a.m. - 7:00 p.m. to 7:00 a.m. - 11:30 p.m.; from 11:30 p.m. until 7:00 a.m. the SPD will have a staff member on-call; b) not later than September 15, 2003 the SPD will staff 24 hours a day/7 days a week.  During the period of April 30, 2003 through September 15, 2003 when a surgical procedure is initiated or in progress on the night shift, the night supervisor will be notified and shall call in the on-call SPD staff.  The Hospital retains all rights under the Management Rights provisions of the Collective Bargaining Agreement to determine the appropriate staffing within SPD and to make changes as it deems appropriate in the future.

**Issue #16 – Hazard Control Policy**

**RESOLVED:**

**Issue #17 – Posting and filling of RN vacancies**

**RESOLVED:**

**Issue #18 - Preceptor**

The Association agrees to withdraw this issue relating to a Preceptor Program subject to reaching agreement in contract negotiations.

**Issue #19 – Location Pyxis**

The Hospital shall provide that all Pyxis machines are installed in the medication rooms on each nursing unit not later than June 1, 2003.

It is further agreed that this Interest Arbitration document will be included as an Appendix in the successor CBA.

_____     _____
For the Hospital                          Date     For the MNA                          Date

**Exhibit 2**

## APPENDIX I: Staffing Guidelines

| Med/Surg/Telemetry Units (21, 22, 33, 34, 35) | | | | | | |
|---|---|---|---|---|---|---|
| **Staff Per Shift** | | | | | | |
| **PROPOSED GUIDELINES** | | | | | | |
| CENSUS | DAY RN | PCA/CCT | EVE RN | PCA/CCT | NIGHT RN | PCA/CCT |
| 26 | 7 | 4 | 7 | 4 | 6 | 4 |
| 25 | 7 | 3 | 7 | 3 | 5 | 3 |
| 24 | 6 | 3 | 6 | 3 | 5 | 3 |
| 23 | 6 | 3 | 6 | 3 | 5 | 3 |
| 22 | 6 | 3 | 6 | 3 | 5 | 3 |
| 21 | 6 | 3 | 6 | 3 | 5 | 2 |
| 20 | 5 | 3 | 5 | 3 | 4 | 2 |
| 19 | 5 | 3 | 5 | 3 | 4 | 2 |
| 18 | 5 | 2 | 5 | 2 | 4 | 2 |
| 17 | 5 | 2 | 5 | 2 | 4 | 2 |
| 16 | 5 | 2 | 5 | 2 | 4 | 2 |
| 15 | 4 | 2 | 4 | 2 | 3 | 2 |
| 14 | 4 | 2 | 4 | 2 | 3 | 2 |
| 13 | 4 | 2 | 4 | 2 | 3 | 1 |
| 12 | 4 | 2 | 4 | 2 | 3 | 1 |
| 11 | 4 | 2 | 4 | 2 | 3 | 1 |
| 10 | 3 | 2 | 3 | 2 | 3 | 1 |
| 9 | 3 | | 3 | | 3 | |
| 8 | 3 | | 3 | | 3 | |
| 7 | 3 | | 3 | | 2 | |
| 6 | 2 | | 2 | | 2 | |
| 5 | 2 | | 2 | | 2 | |
| 4 | 2 | | 2 | | 2 | |
| 3 | 2 | | 2 | | 2 | |
| 2 | 2 | | 2 | | 2 | |
| 1 | 2 | | 2 | | 2 | |

Resource nurse included in the guidelines and subject to Article VII, Section 7.09. On 22 South OBS Unit – Dedicated Resource Nurse – 7 days a week, days and evenings.
On 22 South OBS Unit only, add 1 PCA at census of 18 days and evenings.

**Exhibit 2**

| PCU | | | | |
|---|---|---|---|---|
| **Staff Per Shift** | | | | |
| PROPOSED GUIDELINES | | | | |
| CENSUS | DAY | | NIGHT | |
| | RN | PCA/CCT | RN | PCA/CCT |
| 12 | 5 | 2 | 5 | 2 |
| 11 | 5 | 2 | 5 | 2 |
| 10 | 5 | 2 | 5 | 2 |
| 9 | 4 | 2 | 4 | 2 |
| 8 | 4 | 2 | 4 | 2 |
| 7 | 4 | 1 | 4 | 1 |
| 6 | 3 | 1 | 3 | 1 |
| 5 | 3 | 1 | 3 | 1 |
| 4 | 3 | 0 | 3 | 0 |
| 3 | 2 | 0 | 2 | 0 |
| 2 | 2 | 0 | 2 | 0 |
| 1 | 2 | 0 | 2 | 0 |

Resource nurse included in the guidelines and subject to Article VII, Section 7.09.


**Same Day Surgery – 6:1 would be the maximum ratio.  The Hospital will provide clerk coverage of one per level, 5 days per week, 8 hours per day.**

**PACU:**

Staffing according to Category of patient: Categories 1-4 with 4 most severe
Normal caseload shall never consist of more than 3 category 1 patients per nurse.
Category 4 – i.e. Critically ill, major complicated patient – would require 2 nurses
Category 3 – i.e. Vented, very involved lengthy surgical procedure- 1:1 ratio
Category 2 – i.e. Patient with mechanical airway, needs pain management – 2:1 ratio
Category 1 – i.e. Cataracts, dental – 3:1 ratio

The Hospital will create a voluntary call list for PCAs on the 11 p.m. to 7 a.m. shift, subject the Hospital's obligations under the National Labor Relations Act.
The Hospital will add PCA coverage on Saturdays when open (2 patient census).
1 Pedi Patient to 1 RN for a minimum of 30 minutes.

**Exhibit 2**

| Cardiac Telemetry Units (23, 24) | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Staff Per Shift** | | | | | | | |
| **PROPOSED GUIDELINES** | | | | | | | |
| CENSUS | DAY RN | PCA/CCT | EVE RN | PCA/CCT | NIGHT RN | PCA/CCT | |
| 26 | 8 | 4 | 8 | 4 | 7 | 4 | |
| 25 | 7 | 3 | 7 | 3 | 6 | 3 | |
| 24 | 7 | 3 | 7 | 3 | 6 | 3 | |
| 23 | 7 | 3 | 7 | 3 | 6 | 3 | |
| 22 | 6 | 3 | 6 | 3 | 5 | 3 | |
| 21 | 6 | 3 | 6 | 3 | 5 | 2 | |
| 20 | 6 | 3 | 6 | 3 | 5 | 2 | |
| 19 | 6 | 3 | 6 | 3 | 5 | 2 | |
| 18 | 5 | 2 | 5 | 2 | 4 | 2 | |
| 17 | 5 | 2 | 5 | 2 | 4 | 2 | |
| 16 | 5 | 2 | 5 | 2 | 4 | 2 | |
| 15 | 5 | 2 | 5 | 2 | 4 | 2 | |
| 14 | 4 | 2 | 4 | 2 | 3 | 2 | |
| 13 | 4 | 2 | 4 | 2 | 3 | 1 | |
| 12 | 4 | 2 | 4 | 2 | 3 | 1 | |
| 11 | 4 | 2 | 4 | 2 | 3 | 1 | |
| 10 | 3 | 2 | 3 | 2 | 3 | 1 | |
| 9 | 3 | | 3 | | 3 | | |
| 8 | 3 | | 3 | | 3 | | |
| 7 | 3 | | 3 | | 2 | | |
| 6 | 2 | | 2 | | 2 | | |
| 5 | 2 | | 2 | | 2 | | |
| 4 | 2 | | 2 | | 2 | | |
| 3 | 2 | | 2 | | 2 | | |
| 2 | 2 | | 2 | | 2 | | |
| 1 | 2 | | 2 | | 2 | | |

Resource nurse included in the guidelines and subject to Article VII, Section 7.09.

**Exhibit 2**

| Post Cardiac Surgery Floor * Unit 36 | | | | | | |
|---|---|---|---|---|---|---|
| **Staff Per Shift** | | | | | | |
| **PROPOSED GUIDELINES** | | | | | | |
| CENSUS | DAY | | EVE | | NIGHT | |
| | RN | PCA/CCT | RN | PCA/CCT | RN | PCA/CCT |
| 32 | 9 | 4 | 9 | 4 | 9 | 4 |
| 31 | 9 | 4 | 9 | 4 | 9 | 4 |
| 30 | 9 | 4 | 9 | 4 | 9 | 4 |
| 29 | 9 | 4 | 9 | 4 | 9 | 4 |
| 28 | 8 | 4 | 8 | 4 | 8 | 4 |
| 27 | 8 | 4 | 8 | 4 | 8 | 4 |
| 26 | 8 | 3 | 8 | 3 | 8 | 3 |
| 25 | 8 | 3 | 8 | 3 | 8 | 3 |
| 24 | 7 | 3 | 7 | 3 | 7 | 3 |
| 23 | 7 | 3 | 7 | 3 | 7 | 2 |
| 22 | 7 | 3 | 7 | 3 | 7 | 2 |
| 21 | 7 | 3 | 7 | 3 | 7 | 2 |
| 20 | 6 | 3 | 6 | 2 | 6 | 2 |
| 19 | 6 | 3 | 6 | 2 | 6 | 2 |
| 18 | 6 | 2 | 6 | 2 | 6 | 2 |
| 17 | 6 | 2 | 6 | 2 | 6 | 2 |
| 16 | 5 | 2 | 5 | 2 | 5 | 2 |
| 15 | 5 | 2 | 5 | 2 | 5 | 2 |
| 14 | 5 | 2 | 5 | 2 | 5 | 2 |
| 13 | 5 | 2 | 5 | 2 | 5 | 1 |
| 12 | 4 | 1 | 4 | 1 | 4 | 1 |
| 11 | 4 | 1 | 4 | 1 | 4 | 1 |
| 10 | 4 | 1 | 4 | 1 | 4 | 1 |
| 9 | 4 | | 4 | | 4 | |
| 8 | 3 | | 3 | | 3 | |
| 7 | 3 | | 3 | | 3 | |
| 6 | 3 | | 3 | | 3 | |
| 5 | 3 | | 3 | | 3 | |
| 4 | 3 | | 3 | | 3 | |
| 3 | 2 | | 2 | | 2 | |
| 2 | 2 | | 2 | | 2 | |
| 1 | 2 | | 2 | | 2 | |

Resource nurse included in the guidelines and subject to Article VII, Section 7.09.

85

**Exhibit 2**

| ICU Staff Per Shift | PROPOSED GUIDELINES | | | | | | |
|---|---|---|---|---|---|---|---|
| CENSUS | DAY | | EVE | | NIGHT | | |
| | RN | PCA/CCT | RN | PCA/CCT | RN | PCA/CCT | |
| 24 | 14 | 4 | 14 | 4 | 14 | 4 | |
| 23 | 14 | 4 | 14 | 4 | 14 | 4 | |
| 22 | 13 | 4 | 13 | 4 | 13 | 4 | |
| 21 | 13 | 4 | 13 | 4 | 13 | 4 | |
| 20 | 12 | 4 | 12 | 4 | 12 | 4 | |
| 19 | 12 | 4 | 12 | 4 | 12 | 4 | |
| 18 | 11 | 3 | 11 | 3 | 11 | 3 | |
| 17 | 11 | 3 | 11 | 3 | 11 | 3 | |
| 16 | 10 | 3 | 10 | 3 | 10 | 3 | |
| 15 | 10 | 3 | 10 | 3 | 10 | 3 | |
| 14 | 9 | 3 | 9 | 3 | 9 | 3 | |
| 13 | 9 | 3 | 9 | 3 | 9 | 3 | |
| 12 | 7 | 2 | 7 | 2 | 7 | 2 | |
| 11 | 7 | 2 | 7 | 2 | 7 | 2 | |
| 10 | 6 | 2 | 6 | 2 | 6 | 2 | |
| 9 | 6 | 2 | 6 | 2 | 6 | 2 | |
| 8 | 5 | 2 | 5 | 2 | 5 | 2 | |
| 7 | 5 | 2 | 5 | 2 | 5 | 2 | |
| 6 | 5 | 1 | 5 | 1 | 5 | 1 | |
| 5 | 4 | 1 | 4 | 1 | 4 | 1 | |
| 4 | 4 | 1 | 4 | 1 | 4 | 1 | |
| 3 | 3 | 1 | 3 | 1 | 3 | 1 | |
| 2 | 3 | 1 | 3 | 1 | 3 | 1 | |
| 1 | 2 | 1 | 2 | 1 | 2 | 1 | |

The assignment of critical care patients will be based on critical care admission criteria with input from physicians and nursing leadership.  AACN guidelines shall be a factor in the setting of such admission criteria.  Critical care patients will receive the same level of care regardless of their location in the Hospital.

Resource nurse included in the guidelines and subject to Article VII, Section 7.09.

**Exhibit 2**

| Pediatrics Staff Per Shift | | | | | | | |
|---|---|---|---|---|---|---|---|
| PROPOSED GUIDELINES | | | | | | | |
| | | | | | | | |
| CENSUS | DAY | | EVE | | NIGHT | | |
| | RN | PCA/CCT | RN | PCA/CCT | RN | PCA/CCT | |
| 4 | 1 | 1 | 1 | 1 | 1 | 1 | |
| 3 | 1 | 0 | 1 | 0 | 1 | 0 | |
| 2 | 1 | 0 | 1 | 0 | 1 | 0 | |
| 1 | 1 | 0 | 1 | 0 | 1 | 0 | |
| | | | | | | | |
| a) Age and Diagnosis appropriate patients will be admitted to the Pedi Unit – Pedi patients will always be admitted to the Pedi unit. | | | | | | | |
| b) If there are no age or diagnosis appropriate patients admitted to the Pedi Unit, the Pedi RN will be floated to CWI (Mother/Baby and Nursery) to assist in caring for baby. * Add 1 PCA at census 4 (regardless of Adult or Pedi patients). | | | | | | | |

**Exhibit 2**

| Mother/Baby Staff Per Shift | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| PROPOSED GUIDELINES | | | | | | | |
| | | | | | | | |
| CENSUS | DAY | | EVE | | NIGHT | | |
| | RN | PCA/CCT* | RN | PCA/CCT* | RN | PCA/CCT* | |
| 15 | 5 | 2 | 5 | 2 | 4 | 2 | |
| 14 | 5 | 2 | 5 | 2 | 4 | 2 | |
| 13 | 5 | 2 | 5 | 2 | 4 | 2 | |
| 12 | 4 | 1 | 4 | 1 | 3 | 1 | |
| 11 | 4 | 1 | 4 | 1 | 3 | 1 | |
| 10 | 4 | 1 | 4 | 1 | 3 | 1 | |
| 9 | 3 | 1 | 3 | 1 | 3 | 1 | |
| 8 | 3 | 1 | 3 | 1 | 2 | 1 | |
| 7 | 3 | 1 | 3 | 1 | 2 | 1 | |
| 6 | 2 | 1 | 2 | 1 | 2 | 1 | |
| 5 | 2 | 1 | 2 | 1 | 2 | 1 | |
| 4 | 2 | 0 | 2 | 0 | 2 | 0 | |
| 3 | 2 | 0 | 2 | 0 | 2 | 0 | |
| 2 | 2 | 0 | 2 | 0 | 2 | 0 | |
| 1 | 2 | 0 | 2 | 0 | 2 | 0 | |

Night PCA will be cross trained to provide secretarial coverage for CWI.

Mother/Baby couplet = 1 patient

CWI – 7 days per week (approximately 16 hours per day) of lactation nurse coverage.

Resource nurse included in the guidelines and subject to Article VII, Section 7.09.

* At census greater than 12, add second PCA or Pedi-Nurse.

88

**Exhibit 2**

| Nursery | | | | | | |
|---|---|---|---|---|---|---|
| **Staff Per Shift** | | | | | | |
| PROPOSED GUIDELINES | | | | | | |
| CENSUS | DAY | | EVE | | NIGHT | |
| | RN | PCA/CCT | RN | PCA/CCT | RN | PCA/CCT |
| 22 | 3 | 0 | 3 | 0 | 3 | 0 |
| 21 | 3 | 0 | 3 | 0 | 3 | 0 |
| 20 | 3 | 0 | 3 | 0 | 3 | 0 |
| 19 | 3 | 0 | 3 | 0 | 3 | 0 |
| 18 | 3 | 0 | 3 | 0 | 3 | 0 |
| 17 | 3 | 0 | 3 | 0 | 3 | 0 |
| 16 | 3 | 0 | 3 | 0 | 3 | 0 |
| 15 | 3 | 0 | 3 | 0 | 3 | 0 |
| 14 | 3 | 0 | 3 | 0 | 3 | 0 |
| 13 | 3 | 0 | 3 | 0 | 3 | 0 |
| 12 | 3 | 0 | 3 | 0 | 3 | 0 |
| 11 | 2 | 0 | 2 | 0 | 2 | 0 |
| 10 | 2 | 0 | 2 | 0 | 2 | 0 |
| 9 | 2 | 0 | 2 | 0 | 2 | 0 |
| 8 | 2 | 0 | 2 | 0 | 2 | 0 |
| 7 | 2 | 0 | 2 | 0 | 2 | 0 |
| 6 | 2 | 0 | 2 | 0 | 2 | 0 |
| 5 | 2 | 0 | 2 | 0 | 2 | 0 |
| 4 | 2 | 0 | 2 | 0 | 2 | 0 |
| 3 | 2 | 0 | 2 | 0 | 2 | 0 |
| 2 | 2 | 0 | 2 | 0 | 2 | 0 |
| 1 | 2 | 0 | 2 | 0 | 2 | 0 |

The Hospital will expand secretarial coverage to 12-hours per day, subject to the Hospital's obligations under the National Labor Relations Act.

The assignment of special care infants will be based on special care nursery (Level II) admission criteria which will be developed with input from physicians, staff nurses and nursing leadership. NANN and AAP guidelines shall be a factor in the setting of such admission criteria. After the criteria are developed, the parties will discuss the CWI care model further, including how to account for healthy infants and additional infant care training for post-partum nurses. Every reasonable effort will be made to maintain SCN RN staffing level at three (3) Special Care Nursery RNs when there are 4-5 or more special care infants as defined by the admission criteria.

**Exhibit 2**

**Behavioral Health Unit 32**

| CENSUS | DAY | | EVE | | NIGHT | |
|---|---|---|---|---|---|---|
| | RN | MHW/MHC | RN | MHW/MHC | RN | MHW/MHC |
| 20 | 5 | 2 | 5 | 2 | 4 | 2 |
| 19 | 4 | 2 | 4 | 2 | 4 | 2 |
| 18 | 4 | 2 | 4 | 2 | 4 | 2 |
| 17 | 4 | 2 | 4 | 2 | 4 | 2 |
| 16 | 4 | 2 | 4 | 2 | 4 | 2 |
| 15 | 4 | 2 | 4 | 2 | 3 | 2 |
| 14 | 3 | 2 | 3 | 2 | 3 | 2 |
| 13 | 3 | 2 | 3 | 2 | 3 | 2 |
| 12 | 3 | 1 | 3 | 1 | 3 | 1 |
| 11 | 3 | 1 | 3 | 1 | 3 | 1 |
| 10 | 3 | 1 | 3 | 1 | 2 | 1 |
| 9 | 2 | 1 | 2 | 1 | 2 | 1 |
| 8 | 2 | 1 | 2 | 1 | 2 | 1 |
| 7 | 2 | 1 | 2 | 1 | 2 | 1 |
| 6 | 2 | 1 | 2 | 1 | 2 | 1 |
| 5 | 2 | 1 | 2 | 1 | 2 | 1 |
| 4 | 2 | 1 | 2 | 1 | 2 | 1 |
| 3 | 2 | 1 | 2 | 1 | 2 | 1 |
| 2 | 2 | 1 | 2 | 1 | 2 | 1 |
| 1 | 2 | 1 | 2 | 1 | 2 | 1 |

Resource nurse included in the grid and subject to Article VII Section 7.09.

**Exhibit 2**

| Labor and Delivery Staff Per Shift | | | | | | |
|---|---|---|---|---|---|---|
| PROPOSED GUIDELINES | | | | | | |
| CENSUS | DAY | | EVE | | NIGHT | |
| | RN | PCA/CCT | RN | PCA/CCT | RN | PCA/CCT |
| 10 | 6 | 1 | 6 | 1 | 5 | 1 |
| 9 | 6 | 1 | 6 | 1 | 5 | 1 |
| 8 | 5/6 | 1 | 5/6 | 1 | 4/5 | 1 |
| 7 | 5/6 | 1 | 5/6 | 1 | 4/5 | 1 |
| 6 | 5/6 | 1 | 5/6 | 1 | 4/5 | 1 |
| 5 | 5 | 1 | 5 | 1 | 4 | 1 |
| 4 | 5 | 1 | 5 | 1 | 4 | 1 |
| 3 | 4 | 1 | 4 | 1 | 4 | 1 |
| 2 | 3 | 1 | 3 | 1 | 3 | 1 |
| 1 | 3 | 1 | 3 | 1 | 3 | 1 |

Resource nurse included in the guidelines and subject to Article VII, Section 7.09.

Voluntary call program implemented for daytime hours (until 7:00 p.m.)
The PCA on the night shift will be cross-trained to provide secretarial coverage for CWI, subject to the Hospital's obligations under the National Relations Act.

Extra staff not needed in the above numbers will assist in caring for patients throughout CWI as "Helping Hands"

There shall be a minimum of 3 L&D trained nurses in L&D when a patient is in active labor.
The Hospital will provide OB Tech coverage 24 hours per day/7 days per week.
The parties acknowledge that the above guidelines do not fully reflect the core staffing at the current census, which is presently 5-6 nurses on week days and evenings and 4-5 nurses on weekends and nights. The assignment of L&D patients will be based on criteria which will be developed with input from providers, staff nurses and nursing leadership. AWOHNN guidelines shall be a factor in establishing such criteria.

The Hospital will expand Voluntary On-Call 24/7 as necessary.

Recall of Helping Hands to L&D:

• At the time of a vaginal delivery, care changes from 1:1 to 2:2 (i.e., Mother/Baby). Def: Vaginal delivery is at the time when the baby is born.
• Increase of census.
• During an obstetric emergency, additional nurses may be recalled from Helping Hands to meet patient care needs; for example, cesarean birth, hemorrhage, and surgical intervention/stabilization when the patient care exceeds 1:1.

**Exhibit 2**

| Operating Room Staff Per Shift | | | | | | |
|---|---|---|---|---|---|---|
| **PROPOSED GUIDELINES** | | | | | | |
| | | | | | | |
| ROOMS | DAY | | EVE | | NIGHT | |
| OPEN | RN | PCA/CCT | RN | PCA/CCT | RN | PCA/CCT |
| 18 | 18 | 18 | 18 | 18 | 18 | 18 |
| 17 | 17 | 17 | 17 | 17 | 17 | 17 |
| 16 | 16 | 16 | 16 | 16 | 16 | 16 |
| 15 | 15 | 15 | 15 | 15 | 15 | 15 |
| 14 | 14 | 14 | 14 | 14 | 14 | 14 |
| 13 | 13 | 13 | 13 | 13 | 13 | 13 |
| 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| 9 | 9 | 9 | 9 | 9 | 9 | 9 |
| 8 | 8 | 8 | 8 | 8 | 8 | 8 |
| 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| 5 | 5 | 5 | 5 | 5 | 5 | 5 |
| 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| 1 | 1 | 1 | 1 | 1 | 1 | 1 |

**Exhibit 2**

| Emergency Room | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Staff Per Shift** | | | | | | | | |
| PROPOSED GUIDELINES | | | | | | | | |
| | 7 a – 11 a | | 11 a – 11p | | 11 p – 3a | | 3 a – 7 a | |
| | RN | PCA/CCT | RN | PCA/CCT | RN | PCA/CCT | RN | PCA/CCT |
| | 9 | | 15 | | 12 | | 9 | |

*When fast track opens, a 10th RN will be added.

**Exhibit 2**

## SIDE LETTER A

Stephen B. Perlman
(617) 951-7422
sperlman@ropesgray.com

February 16, 2007

Ms. Wendy McGill, Associate Director
Division of Labor Action
Massachusetts Nurses Association
340 Turnpike Street
Canton, MA 02021

Re:   Saint Vincent Hospital

Dear Wendy:

Pursuant to the terms of the Memorandum of Agreement (items H6(a), H9 and H23(9)), I am writing to confirm the following:

1.  Per item H6(a), we added "Outpatient IV Infusion Center" to the listing of Departments/Units in the fourth paragraph of Section 7.04 ("On-Call") of the collective bargaining agreement.  This addition is not a substantive change to the existing practice, in which the Outpatient IV Infusion Center does not utilize on-call for 24/7 coverage.

2.  Per item H9, in the first sentence of Section 8.10 ("Floating") of the collective bargaining agreement, we changed "every effort" to "all reasonable efforts".  In making this change, it was agreed by MNA and the Hospital that no substantive change is intended.

3.  Per item H23, paragraph (ix), we changed "anniversary date" to "step anniversary date" in the second paragraph of Section 7.01 ("Wages") and in Section 9.06(B) of the collective bargaining agreement, and in Section 15.07 ("Return to Work Following Leave"), we changed "Review Date" to "step anniversary date".  These changes were not intended as substantive changes, and that a dispute over the date for a step anniversary increase will remain subject to the provisions of Article XXI ("Grievance and Arbitration").

Very truly yours,

Stephen B. Perlman

94

**Exhibit 2**

**SIDE LETTER B**



Littler Mendelson, P.C.
One International Place
Suite 2700
Boston, MA 02110

March 21, 2012

Anthony D. Rizzotti
617.378.6009 direct
617.378.6000 main
617.904.1928 fax
arizzotti@littler.com

Wendy McGill
Associate Director
Division of Labor Action
Massachusetts Nurses Association
365 Shrewsbury Street
Worcester, MA 01604

Re:   Saint Vincent Hospital

Dear Wendy:

I write to confirm the bargaining table agreement between Saint Vincent Hospital (the "Hospital") and the Massachusetts Nurses Association (the "Union").

The parties agree that appropriate timely education and training is essential to providing high quality safe care. Further, the parties agree to work cooperatively to increase the amount of in-services and education provided as part of a nurse's regularly scheduled workweek/shift and to establish a joint committee to discuss and address the issue of education.

Within one month of ratification of the 2009-2012 agreement a committee shall be established to discuss the issue of education. The committee will be comprised of three (3) representatives designated by the MNA and three (3) representatives designated by the Hospital, one of whom will be the Chief Nursing Officer. The committee will meet no less frequently than monthly for six (6) months.

The committee will develop a plan to address education issues with the primary goal being scheduling such that nurses will be able to attend more education programs as part of their regularly scheduled workweek/shift. The parties recognize that there may be times when other options must be available to ensure that all nurses receive the required education. The following options will be discussed by the committee:

1. Stay at the end or come in before her/his regularly scheduled shift and complete the education on overtime;
2. Come in to complete the education on a day off;
3. Or if possible, complete the education at home and be paid at her/his regular hourly rate for the time necessary provided it does not result in overtime.

Sincerely,

Anthony D. Rizzotti

littler.com

95

**Exhibit 2**

## SIDE LETTER C

**Memorandum of Agreement**

**St. Vincent Hospital (SVH) and Massachusetts Nurses Association (MNA)**

It is agreed that, pursuant to Section 10.1 (Flex Nurse)

1.      Unless a nurse elects otherwise, pursuant to paragraph two (2) below, a nurse who is flexed down for the first half of a shift will report to work for the second half of the shift and will be credited with one flex.  A nurse scheduled to work a 12-hour night shift (7 p.m. – 7 a.m.) may only be flexed down initially for four (4) hours, and then, if flexed down again, for the remainder of her shift.

2.      If the nurse communicates to the manager her/his willingness to volunteer to flex down the second half of the shift, should the need occur, the manager will contact the nurse to communicate this need; and if the nurse chooses to flex down the second half of the shift, a second flex will be credited.  If the nurse declines to flex down the second half of the shift, he/she is expected to report to work.  A nurse may only be flexed down two (2) times per shift.

3.      Flexing for a whole shift (8 or 12 hours) will count as one flex credit.

4.      This Memorandum of Agreement is "with precedent" and becomes effective as an addendum to Article X, Section 10.1, upon the signing of the Memorandum of Agreement.  This Memorandum of Agreement supersedes the June 28, 2006 Memorandum of Agreement between the parties with respect to flexing.

5.      All other provisions of Section 10.1 remain in force as described in the collective bargaining agreement.

For Massachusetts Nurses Association          For St. Vincent Hospital


_____          _____
Wendy McGill


_____          _____
Date                                             Date

96

**Exhibit 2**

# SIDE LETTER D

**Leave of Absence**

**St. Vincent Hospital (SVH) and Massachusetts Nurses Association (MNA)**

This side letter memorializes the agreement reached during the 2014-2016 negotiations relative to medical or occupational leaves of absence.

Before the Hospital posts the job of a nurse who is on a medical or occupational leave of absence, the Hospital's senior nursing leadership will review the matter in order to determine whether the position should be posted.

For Massachusetts Nurses Association          For St. Vincent Hospital


_____          _____
Wendy McGill


_____          _____
Date                                                    Date

97

**Exhibit 2**

# SIDE LETTER E

## PACU Holiday

This is an agreement to outline how PACU Call on Christmas Eve and New Year's Eve is addressed when it occurs on a weekday.

Appropriate staffing levels must always be maintained according to staffing guidelines. In accordance with the contract, release of nurses pursuant to Article VIII Section 8.02 may occur as prescribed with regard to rotational order.

If all scheduled and add on cases are completed at any point during the evening shift, the evening staff may request that the 11:00 p.m. - 7:00 a.m. call team, assume responsibility for the remainder of the shift in an on call status from home.

If no agreement is reached with the 11:00 p.m. – 7:00 a.m. call team, the evening shift may punch out if there are no PACU cases and complete their shift in an on call status from home until 11:00 p.m.  At 11:00 p.m. the on call team shall then begin their Holiday call assignment.

**Exhibit 2**

SIDE LETTER F

Health and Safety

The parties share a mutual interest in a healthy and safe work environment for all employees.  As part of the parties' mutual commitment to a healthy and safe work environment, the Association may designate two bargaining unit members to join the existing Workplace Safety Committee, or its successor.  In addition, the Hospital will take the following steps as soon as practicable:

- The Hospital will staff the ED with a Special Police Officer detail during the night shift (7 days per week), on weekends (all three shifts) and holidays (all three shifts).  The Workplace Violence Committee will discuss whether the Special Police Officer will be armed.

- The Hospital will implement an updated Visitor Management System, which will require visitors to be registered and badged during designated hours and at designated entrances, to be determined by the Hospital after discussion with the Workplace Safety Committee.  Visitors entering through the Emergency Department will be required to be registered 24 hours per day/7 days per week.

- As part of its responsibilities, the Workplace Safety Committee will:

  o   review options and make recommendations with respect to the Visitor Management System;
  o   review options and make recommendations for identifying in the medical record or through some other means patients with a history of violence; and
  o   review options and make recommendations for additional locations for panic buttons.

- Security personnel will engage in enhanced rounding in areas identified by the Workplace Safety Committee.

- The Hospital will continue to maintain and staff a metal detector in the hospital's emergency department for screening all patients and visitors entering the Hospital's emergency department.

**Exhibit 2**

# PAYMENT OF OVERTIME

## MEMORANDUM OF AGREEMENT

St. Vincent Hospital (the "Hospital") and the Massachusetts Nurses Association (the "Association") hereby agree as follows:

1.      If two nurses swap shifts, each nurse is deemed to be working a "scheduled" shift of the length acquired through the swap. Thus, if an 8-hour shift nurse swaps a shift with a 10-hour shift nurse, the 8-hour shift nurse will be entitled to overtime if he/she works in excess of the 10-hour shift acquired, and the 10-hour nurse will be entitled to overtime if he/she works in excess of the 8-hour shift acquired.

2.      If a nurse picks up an extra shift on a day that he/she is not scheduled to work, the nurse will be deemed to be working a "scheduled" shift of the length acquired. Thus, an 8-hour shift nurse who volunteers to work a 10-hour shift will be entitled to overtime if he/she works in excess of the 10-hour shift acquired, and a 10-hour shift nurse who volunteers to work an 8-hour shift will be entitled to overtime if he/she works in excess of the 8-hour shift acquired.

3.      The parties recognize that there are units that have shifts of only one length (*e.g.* only 8-hour shifts) and other units that have shifts of varying lengths (*e.g.* 8, 10 and 12-hour shifts). The parties agree to the following rules with respect to nurses agreeing to work additional hours immediately before or immediately after a scheduled shift.

A.      In those units that have shifts of only one length, nurses will be entitled to daily overtime if they agree to work beyond a regularly scheduled shift of at least eight (8) hours regardless of when they agree to do so. For example, in a unit with only 8-hour shifts, a nurse who agrees to work four hours beyond the end of his/her shift will receive overtime for the additional hours worked, regardless of whether he/she agrees to do so on the day in question or a week in advance.

B.      In those units that have shifts of varying lengths, nurses will only be entitled to daily overtime, if he/she agrees to work beyond a regularly scheduled shift of at least eight (8) hours LESS THAN 24 hours in advance of the start of such shift. For example, if a nurse is scheduled to work from 7 a.m. to 3 p.m. on a Tuesday and agrees at 3 p.m. on Monday to work from 3 p.m. to 7 p.m. on Tuesday, the nurse would be entitled to overtime for the hours worked after 3 p.m. on Tuesday. Conversely, if a nurse is scheduled to work from 7 a.m. to 3 p.m. on a Tuesday and agrees at 3 p.m. on Sunday to work from 3 p.m. to 7 p.m. on Tuesday, the nurse would not be entitled to overtime for the hours worked after 3 p.m. on Tuesday.

4.      Notwithstanding the above, nurses are entitled to overtime if the hours worked result in the nurse working in excess of 40 hours in a work week or for a double shift (two full shifts of at least 8 hours). A nurse is also entitled to receive overtime whenever she/he works in excess of twelve (12) consecutive hours. Any meal period shall not count as hours worked. In no event will a nurse be entitled to overtime for a shift of less than 8 hours. There shall be no pyramiding of overtime.

**Exhibit 2**

5.    The Association will promptly withdraw the two arbitrations related to the issue of overtime: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (AAA Nos. 11-300-51-10 and 11-300-52-10)

6.    The Hospital agrees to make the following payments to the identified employees:

▓▓▓▓▓▓▓▓▓▓                                  $▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓                                  $▓▓▓▓

7.    This Agreement shall become effective at the start of the first full pay period after it is executed by both parties.

8.    This Agreement shall not constitute a precedent for any other purpose and shall not be cited by either party in any proceeding except a proceeding to enforce the terms of this Agreement.

THE HOSPITAL                                    THE ASSOCIATION

_Jan Peters_                                    _____

Dated: November 20, 2012                        Dated: November ____, 2012

Firmwide:112368897.1 063734.1000

101

**Exhibit 2**

**INDEX**

| | |
|---|---|
| agency service fee | 2 |
| arbitration | 68 |
| Association business | 3 |
| Association leave of absence | 4 |
| Association rights | 3 |
| Association storage space | 4 |
| bargaining unit seniority | 53 |
| benefit seniority | 52 |
| bereavment leave | 51 |
| bi-weekly payroll | 13 |
| break periods | 13 |
| bulletin boards | 3 |
| bumping | 56 |
| cardiac telemetry unit staffing guideline chart | 84 |
| completeness of Agreement | 70 |
| continuing education | 61 |
| copy of Agreement | 3 |
| court/legal proceedings | 52 |
| day shift hours | 16 |
| definitions | 6 |
| delegation of nursing activities | 62 |
| dental insurance | 38 |
| disability insurance | 40 |
| discipline and discharge | 60 |
| dues deductions | 2 |
| duration | 70 |
| education committee | 95 |
| educational advancement | 60 |
| educational meetings | 63 |
| educational reimbursement | 60 |
| emergency room staffing chart | 93 |
| employee rights | 4 |
| employment and contract security | 68 |
| evening shift hours | 16 |
| extra shifts | 17 |
| failure to work as scheduled | 31 |
| fair practice | 6 |

102

**Exhibit 2**

| | |
|---|---|
| fitness for duty assessments | 42 |
| flex nurse | 96 |
| flex nurse benefits | 29 |
| flex positions | 28 |
| flexible benefits program | 37 |
| floating | 22 |
| floating holidays | 30 |
| floating outside patient care clusters | 22 |
| general leave | 46 |
| grievance and arbitration | 66 |
| grievance process and release time pay | 68 |
| grievance time limits | 68 |
| health insurance | 37 |
| health insurance premium payments | 38 |
| HIV and Hepatitis-C insurance | 40 |
| holiday accrual and pay | 30 |
| holiday carryover | 32 |
| holiday occurring during vacation | 32 |
| holiday time during leave of absence | 32 |
| holidays | 29 |
| hospital personnel policies | 64 |
| hours of work | 15 |
| ICU law | 63 |
| ICU proposed staffing guideline chart | 86 |
| ICU voluntary on-call | 63 |
| information provided to the union | 2 |
| jury duty | 51 |
| just cause | 60 |
| labor and delivery staffing chart | 91 |
| Labor/Management Committee | 64 |
| layoff and benefits | 58 |
| layoff procedure | 55 |
| leave of absence posting | 97 |
| leave of absence, Association | 4 |
| leave, returning to work | 50 |
| leaves of absence | 46 |
| leaves of absence eligibility | 46 |
| leaves, and layoff | 50 |
| leaves, benefit continuation and accrual | 49 |

103

**Exhibit 2**

| | |
|---|---|
| leaves, duration | 46 |
| leaves, medical certifications | 48 |
| leaves, required notice | 47 |
| legal conflict | 69 |
| Level I Per Diem RN | 26 |
| Level II Per Diem RN | 26 |
| life insurance | 40 |
| list of bargaining unit employees | 2 |
| local unit dues | 2 |
| loss of seniority and employment rights | 53 |
| LPN experience | 9 |
| management rights | 6 |
| meal period | 16 |
| medical leave | 48 |
| merger of SICU, MICU and CCU | 78 |
| military leave | 46 |
| miscellaneous | 64 |
| mother/baby staffing chart | 88 |
| move issues | 70 |
| move issues, psychiatry | 75 |
| needs list | 18 |
| negotiations, paid release time | 4 |
| night shift hours | 16 |
| no strike no lockout | 69 |
| non-discrimination | 6 |
| non-occupational leave | 49 |
| nursery staffing chart | 89 |
| nurses lockers | 5 |
| nursing practice | 64 |
| occupational leave | 45 |
| on-call | 12 |
| on-call and sleep time | 12 |
| operating staffing chart | 92 |
| Outpatient IV Infusion Center | 94 |
| overtime | 19 |
| overtime lists | 19 |
| overtime pay | 20 |
| PACU holiday | 98 |
| paid release time for negotiations | 4 |

**Exhibit 2**

| | |
|---|---|
| parental leave | 45 |
| parking | 65 |
| participation in Association | 1 |
| payment of overtime | 100 |
| payroll deduction of Association dues | 2 |
| pediatrics staffing chart | 87 |
| per diem nurse | 7 |
| per diem pay | 11 |
| per diem staffing | 24 |
| per diem terms of employment | 24 |
| per diem to regular hours position | 27 |
| per diem wages | 11 |
| personnel policies | 64 |
| physician notes | 42 |
| placement on scale, prior experience | 9 |
| post cardiac surgery floor staffing chart | 85 |
| posting of work schedules | 17 |
| preceptor pay | 14 |
| preceptor program | 62 |
| prime time scheduling | 34 |
| probationary period | 60 |
| professional liability insurance | 40 |
| proposed staffing guideline chart | 82 |
| psych staffing chart | 90 |
| recall | 58 |
| recognition | 1 |
| reduction in force | 55 |
| regular full-time nurse | 7 |
| regular part-time nurse | 7 |
| regular worday | 16 |
| release time | 16 |
| relief in a higher classification | 13 |
| resignation | 60 |
| resource nurses | 14 |
| retirement savings plan | 40 |
| retroactive payment | 9 |
| rotation | 21 |
| salaries/differentials | 8 |
| same day surgery | 83 |

105

**Exhibit 2**

| | |
|---|---|
| schedule revisions | 17 |
| scheduling holiday work | 31 |
| security surveillance | 5 |
| seniority | 52 |
| seniority, bargaining unit | 53 |
| seniority, loss of | 53 |
| serious health condition in immediate family leave | 47 |
| shift differentials | 13 |
| sick leave | 41 |
| sick leave accrual | 41 |
| sick leave, maximum accumulation | 42 |
| sick time during leaves of absence | 46 |
| sick time hours, banked | 43 |
| signature page | 72 |
| small necessities leave | 45 |
| staff self-scheduling | 18 |
| staffing | 63 |
| staffing guideline charts | 82 |
| staffing guidelines | 70 |
| Step 20 | 8 |
| step anniversary date | 94 |
| subcontracting | 68 |
| successor | 69 |
| supervisory duties | 71 |
| temporary nurse | 7 |
| time off requests | 17 |
| union access | 3 |
| union meetings on premises | 3 |
| union orientation | 2 |
| vacancies | 59 |
| vacation approval | 37 |
| vacation during leaves of absence | 36 |
| vacation pay | 34 |
| vacation requests | 34 |
| vacation scheduling | 34 |
| vacation time | 33 |
| vacation, maximum accrual | 36 |
| voicemail | 3 |
| wage scales | 73 |

**Exhibit 2**

| wages | 8 |
|---|---|
| week-end differential | 13 |
| weekend option | 21 |
| weekends | 20 |
| work environment | 4 |
| work schedule | 15 |
| work schedule posting | 17 |
| workday | 15 |
| workplace violence | 5 |

**Exhibit 2**

410

                              BEFORE THE

                     NATIONAL LABOR RELATIONS BOARD

        --------------------------------: Case No.:

        In the Matter of:                : 01-CA-290852

        VHS ACQUISITION SUBSIDIARY       : 01-CA-298265 et al

        NUMBER 7, INC., D/B/A            :

        SAINT VINCENT HOSPITAL,          :

                      Respondent,        :

        And                              :

        MASSACHUSETTS NURSES ASSOCIATION, :

                      Charging Party.    :

        --------------------------------:


             The above-entitled matter came on for hearing pursuant to notice, before SUSANNAH MERRITT, Administrative Law Judge, at the National Labor Relations Board, Region 01, Thomas P. O'Neill Jr. Federal Building 10 Causeway St, Room 1002 Boston, Massachusetts 02222-1001 via Zoom, on Monday, September 23, 2024, at 9:20 a.m.

**Exhibit 3**

411

                    A P P E A R A N C E S

On Behalf of the General Counsel:

     ANDYELIZ PAPALEO, ESQ.

     MEREDITH B. GARRY, ESQ.

     National Labor Relations Board, Region 1

     Thomas P. O'Neill Jr. Federal Building

     10 Causeway St, Room 1002

     Boston, Massachusetts 02222-1001

     (617) 565-6725

     (857) 317-7798

     andyeliz.papaleo@nlrb.gov

     meredith.garry@nlrb.gov


On Behalf of the Respondent:

     HOWARD B. JACKSON, ESQ.

     FordHarrison LLP

     150 3rd Avenue South Suite 2010

     Nashville, Tennessee 37201-2045

     (615) 574-6702

     hjackson@fordharrison.com

**Exhibit 3**

A P P E A R A N C E S (Continued)

On Behalf of the Respondent:

    MARK E. LEVITT, ESQ.

    FordHarrison, LLP

    300 South Orange Avenue, Suite 1300

    Orlando, FL 32801

    (407) 418-2300

    Mobile: (813) 928-9765

    mlevitt@fordharrison.com


    MICHAELL J. SPAGNOLA, ESQ.

    FordHarrison LLP

    City Place II 185 Asylum Street

    Hartford, CT 06103

    (860) 740-1364

    mspagnola@fordharrison.com


    PATRICIA G. GRIFFITH, ESQ.

    FordHarrison LLP

    271 17th Street, NW, Suite 1900

    Atlanta, Georgia 30363

    (404) 888-3831

    pgriffith@fordharrison.com

**Exhibit 3**

413

A P P E A R A N C E S (Continued)

On Behalf of the Charging Party:

JACK J. CANZONERI, ESQ.

McDonald, Lamond & Canzoneri

352 Turnpike Road, Suite 210

Southborough, Massachusetts 01772

(508) 485-6600 x105

jcanzoneri@masslaborlawyers.com

HOWARD B. LENOW, ESQ.

Lenow & McCarthy

13 Pelham Island Road

Wayland, Massachusetts 01778

(508) 314-3180

lenow@masslaborlaw.com

**Exhibit 3**

438

procedure, right?

A    Yes.

Q    And that's a list that's chosen by LRC, correct?

A    Yes.

Q    And so when you send the initial list of 12 arbitrators that you told us on direct examination you cherry pick --

A    We do.

Q    -- it gets on the list, correct?

A    We do.

Q    And you have a personal relationship, you testified to with many of the arbitrators that you put on the list, correct?

A    Well, by personal what I meant was the fact of I've known the vast majority of arbitrators in the industry we used for 40 to 45 years and we are not robotic in the work that we perform. And so we establish a rapport and a relationship for the arbitrators that there's never any socialization with them.

Q    And what do you mean socialization?

A    In other words, we don't go out to dinner with them.  We don't visit them.  It's strictly business yet, you don't work with someone for 40 plus years and never ask how's your family, how are you, and I'm a pretty open person and so arbitrators share and I share with them things in my personal life.

Q    And so you testified that you spend a lot of time and effort to identify which arbitrators might be most acceptable to the parties --

**Exhibit 3**

A    Yes.

Q    -- correct?

A    Yes.

Q    So if a client tells you not to put an arbitrator on a list or a panel, would you follow that directive?

A    No.

Q    Okay.  And what about conversely if a client tells you that arbitrator John Doe is acceptable to me, so please put him on these cherry picked lists, do you follow that directive?

A    No.

Q    And would you agree that the list that LRC provides to the parties --

A    I would have no way of knowing that.

Q    Well, if you had any reason to suspect that an arbitrator might have bias, can we assume you would not put that arbitrator on the list?

MS. GARRY:  Objection, Your Honor, calls for speculation.

JUDGE MERRITT:  I'll allow it.  You can answer.

THE WITNESS:  Repeat the question please.

BY MS. GRIFFITH:

Q    If you had reason to suspect that an arbitrator might have a bias against a party --

A    Uh-huh.

Q    -- can we assume that you would not put that arbitrator on

**Exhibit 3**

552

JUDGE MERRITT:  Okay.  Sustained.

MS. GRIFFITH:  I'll rephrase it.

BY MS. GRIFFITH:

Q.   When you called the Union's lawyers' office, did you only speak to Suzanne?

A.   Yes.

Q.   Did you ever speak to anybody else about this call?

A.   No.

Q.   Have you ever spoken, other than to your own lawyer, about this call?

A.   No.

Q.   So when you called Suzanne and you alerted her to this call, did you tell her that Ford and Harrison was wildly unhappy with LRC?

A.   I did.

Q.   Those are the words you used?

A.   Essentially.

Q.   And you were referring to Ford and Harrison, not St. Vincent's?

A.   I sort of see them as one in the same, because they're representing St. Vincent's.

Q.   And I only ask you because you sort of made that distinction.  So is the they both, both of them, or only one?

A.   I can't recall.

Q.   And then you go on to say I asked Suzanne to not share all

**Exhibit 3**

553

of the details.  What were you asking Suzanne not to share?

A.    Essentially, a brief synopsis of that I had the conference call and felt that I had been beaten up and taken out to the woodshed.  And that was it.

Q.    Who did you not want her to share it with?

A.    The firm, the attorneys.

Q.    So when you called her in order to alert the attorneys at MNA that you had this phone call, did you distinguish to her what you wanted her to tell them and what you didn't want them to tell -- I'm sorry, what you didn't want her to tell them?

A.    During the call, I, I just asked her not to share with them at all.  And didn't --

Q.    Well, wasn't that the purpose of the call, Ms. Teehan?

A.    I think I was just venting to her.

Q.    And then you say, you end it with or we will be ruined. Do you see that?

A.    I do.

Q.    What did you mean by that?

A.    Here I am, financially.

Q.    And what does that mean?

A.    I'm put in the middle of a case that's really between the Union and the Employer.  And I'm a third party.  And this has cost me a tremendous amount of money.  And I saw it coming.  I mean that's why I had a lawyer ready to go, because this was unlike anything I'd ever seen.

**Exhibit 3**

571

CERTIFICATION

This is to certify that the attached proceedings before

the National Labor Relations Board (NLRB), Region 01, in the

matter of VHS Acquisition Subsidiary Number 7, Inc. d/b/a Saint

Vincent Hospital and Massachusetts Nurses Association, Case No.

01-CA-290852 et al, at Thomas P. O'Neill Jr. Federal Building

10 Causeway St, Room 1002 Boston, Massachusetts 02222-1001, on

September 23, 2024, was held according to the record, and that

this is the original, complete, and true and accurate

transcript that has been compared to the recording from the

hearing, that the exhibits are complete and no exhibits

received in evidence or in the rejected file are missing.

_____

Elaine M. LaRosee

**Exhibit 3**

## Saint Vincent Hospital Arbitration Matters

1 message

---

**Borruso, Christopher** <Christopher.Borruso@tenethealth.com>                    Wed, Sep 20, 2023 at 4:02 PM
To: Jan Teehan <janteehan@the-lrc.com>
Cc: "MSpagnola@fordharrison.com" <MSpagnola@fordharrison.com>, "MHarrington@fordharrison.com"
<MHarrington@fordharrison.com>, "msugerman@fordharrison.com" <msugerman@fordharrison.com>,
"rentin@fordharrison.com" <rentin@fordharrison.com>, "RWarren@fordharrison.com" <RWarren@fordharrison.com>,
"mlevitt@fordharrison.com" <mlevitt@fordharrison.com>, "cjones@fordharrison.com" <cjones@fordharrison.com>, Paul
Beshears <pbeshears@fordharrison.com>, "Henderson, Francis" <Francis.Henderson@tenethealth.com>, "Jack Canzoneri
(jcanzoneri@masslaborlawyers.com)" <jcanzoneri@masslaborlawyers.com>, Dennis Coyne
<dcoyne@masslaborlawyers.com>, Kristen Barnes <kbarnes@masslaborlawyers.com>, James Lamond
<jlamond@masslaborlawyers.com>

---

Ms. Teehan,


Please be advised that the collective bargaining agreement between Saint Vincent Hospital ("Hospital") and the
Massachusetts Nursing Association ("MNA") provides for the selection of arbitrators pursuant to the Voluntary Labor
Arbitration Rules of the American Arbitration Association or the applicable procedures of the Labor Relations Connection.
It does not provide for the application of either agency's rules or for the "administration" of any matters by either agency.


Accordingly, effective as of the date and time of this email, you are instructed to cease any purported "administration" of,
or any other participation of any kind in, any of the Hospital's currently pending matters.  Please provide me the
arbitrator's contact information in each of the Hospital's currently pending cases at your absolute earliest convenience, but
by no later than the close of business tomorrow, September 21, 2023.


Best regards,

Chris


**Christopher T. Borruso**

**Director & Sr. Counsel, Labor Relations**

**Tenet Healthcare**

**14201 North Dallas Parkway**

**Dallas, Texas  75254**

**C: 631-332-1959**

**F: 469-893-7028**

**christopher.borruso@tenethealth.com**



# Exhibit 4

# McDonald Lamond Canzoneri LLC
## Attorneys at Law

352 Turnpike Road, Suite 210
Southborough, MA 01772-1756
www.masslaborlawyers.com

Alan J. McDonald
James F. Lamond*
Jack J. Canzoneri
Jason R. Powalisz
Dennis M. Coyne**
John O. Killian
Melissa A. Scott
Samantha E. Sinclair

\*Also Licensed in New Hampshire
\*\*Also Licensed in New York

Tel: 508-485-6600
617-928-0080

Fax: 508-485-4477
617-928-0081

Of Counsel
Michael Kantrovitz

In Memoriam
Vida K. Berkowitz
(1994-2005)

February 14, 2024

**VIA E-MAIL**

Patrick Kimm, Case Manager
American Arbitration Association
200 State Street, 7th Floor
Boston, MA  02109

Re:   Massachusetts Nurses Association
and  St. Vincent Hospital
Demands for Arbitration

Dear Mr. Kimm:

I am enclosing for filing a Demand for Arbitration on behalf of the Massachusetts Nurses Association, a copy of which has this day been sent to St. Vincent Hospital in care of Christian Bartholomew, Chief Human Resources Officer.

Please send all notices to me at the above address with copies of same as well as all invoices to Julie Pinkham, Executive Director, Massachusetts Nurses Association, Canton Corporate Center, 340 Turnpike Street, 2nd Floor, Canton, Massachusetts 02021.

Thank you for your cooperation.

Very truly yours,

Alan J. McDonald

AJM/sh
Enclosure
cc:   Julie Pinkham, Executive Director (By E-Mail)
      Christian Bartholomew, Chief HR Officer (By E-Mail)

**Exhibit 5**

# American Arbitration Association

## LABOR ARBITRATION RULES

To institute proceedings, please send three copies of this demand *and the arbitration agreement*, with the filing fee as provided in the rules, to the AAA.  Send original demand to the respondent.

### DEMAND FOR ARBITRATION

DATE: _2/14/24_

To: Name of the Union ☐ Employer ☒   St. Vincent Hospital, in care of Christian Bartholomew, Chief Human Resources Officer

(of the Party on Whom the Demand Is Made)

Address _123 Summer Street_

City and State _Worcester, Massachusetts_   ZIP Code _01608_

Telephone _508   363-6310 x. 26310_   Fax _____

Name of Representative _____
Representative's Address _____
Name of Firm (if Applicable) _____

City and State _____   ZIP Code _____
Telephone _____   Fax _____

The named claimant, a party to an arbitration agreement contained in a written contract dated _01/03/22 - 12/31/25_ and providing for arbitration under the Labor Arbitration Rules of the American Arbitration Association, hereby demands arbitration thereunder.

THE NAME OF THE GRIEVANT: _____ Class Action _____

THE NATURE OF THE DISPUTE:

The Employer has improperly instructed the Labor Relations Connection to cease any purported administration of, or any other participation of any kind, in the Employer's currently pending matters.

THE CLAIM OR RELIEF SOUGHT (the Amount, if Any)

Cease and desist order; make whole the bargaining representative of the aggrieved nurses, MNA, including but not limited to for all expenses incurred in all arbitrations due to this violation; cease and desist continued failure and refusal to abide by the CBA; all other appropriate relief.

HEARING LOCALE REQUESTED: _Worcester, Massachusetts_
(City and State)

DOES THIS DISPUTE ARISE OUT OF AN EMPLOYMENT RELATIONSHIP?   ☒ Yes   ☐ No

You are hereby notified that copies of our arbitration agreement and of this demand are being filed with the American Arbitration Association at its _Boston, Massachusetts_ office with a request that it commence administration of the arbitration.  Under the rules, you may file an answering statement after notice from the administrator.

Signed _____ Title _Attorney_
(May Be Signed by a Representative)

Name of Claiming Union or Employer   Julie Pinkham, Executive Director
Massachusetts Nurses Association
Address (to Be Used in Connection with This Case)   Canton Corporate Center; 340 Turnpike Street

City and State _Canton, Massachusetts_   ZIP Code _02021_
Telephone (_781_) _821-4625_   Fax _781-821-4445_
Name of Representative _Alan J. McDonald_

Name of Firm (if Applicable) _McDonald Lamond Canzoneri LLC_
Representative's Address _352 Turnpike Road, Suite 210_
City and State _Southborough, MA  01772-1756_
Telephone _508-485-6600   508-485-4477_

☐ MEDIATION is a nonbinding process.  The mediator assists the parties in working out a solution that is acceptable to them.  If you wish for the AAA to contact the other parties to ascertain whether they wish to mediate this Form L2-5/94

**Exhibit 5**

## ARTICLE XXI.
## GRIEVANCE AND ARBITRATION

The parties recognize that day-to-day problems affecting the nurses will normally be resolved by the nurse and her/his immediate supervisor.  Such matters shall not be deemed grievances and their settlement shall not establish a precedent for the resolution of other or similar problems between a nurse and her/his immediate supervisor or elsewhere in the Hospital.  It is understood that informal discussions between a nurse and her/his supervisor are not prohibited by this Article.

Purpose.  The purpose of this Article is to establish a procedure for consultation regarding, and the settlement of, grievances submitted by a nurse and/or the MNA concerning the meaning interpretation or application of the provisions of this Agreement.  The Hospital and the MNA agree to use every reasonable effort to prevent such grievances from arising and to accomplish just and reasonable settlement of grievances which do arise.

Procedure.  Should a complaint not be adjusted as contemplated by the first paragraph, such complaint may become a grievance.  A grievance shall be reduced to writing and shall contain detail sufficient to reasonably apprise the Hospital of the nature of the grievance and the issues involved, citing each applicable section of this Agreement provided that the failure to cite a particular section(s) shall not prohibit reliance thereon at a later step in the grievance/ arbitration process.  All grievances will be handled as follows:

**Step 1:**  The aggrieved nurse shall first present the grievance to her/his department manager or designee within 30 calendar days of the occurrence giving rise to the grievance or from the time the grievant should have known of the facts giving rise to the grievance.  The department manager or designee shall discuss the matter with the aggrieved nurse and the MNA department/unit representative and provide her/his answer not later than five working days after the time the grievance is presented to her/him.  Any settlement at Step 1 shall not establish a precedent for the resolution of other or similar problems elsewhere in the Hospital.

**Step 2:**  If the grievance is not adjusted satisfactorily in Step 1, it may be referred in writing to the CNO not later than five working days after the written answer of the department manager or designee has been received.  A meeting shall take place within five working days after the receipt of the grievance in Step 2.  The meeting shall be attended by the grievant, the MNA

**Exhibit 5**

department/unit representative, the grievance chair or designee and the CNO and/or designee(s).  The nurse's department manager or designee and/or the nurse's immediate supervisor may also attend the meeting.  The CNO or designee shall give an answer in writing not later than five working days after the date of the meeting.

**Step 3:**  If the grievance is not adjusted satisfactorily in Step 2, it may be referred in writing by the MNA Staff representative to the Hospital's Director of Human Resources or designee, not later than five working days after the written answer of the CNO or designee has been received.  The meeting at Step 3 shall take place within 10 working days after receipt of the grievance in Step 3 and may include the Hospital's Director of Human Resources or designee, the CNO or designee, the department manager or designee, the grievant, the grievance chair or designee and the MNA Staff representative.  The answer of the Hospital's Director of Human Resources or designee shall be given not later than five working days after the date of the meeting.

If a grievance is once settled in any of the steps, it shall be considered closed and shall not be reopened at a later date, except as may be necessary for enforcement of such settlement.

If the grievance is not adjusted in Step 3, the MNA may file a demand for arbitration under Step 4 with AAA or LRC with simultaneous written notice to the Hospital's Chief Human Resources Officer not later than 30 working days after the written answer in Step 3 was received.

**Step 4:**  Should the MNA request arbitration in accordance with the time limits specified herein, an arbitrator shall be selected pursuant to the Voluntary Labor Arbitration Rules of the American Arbitration Association or the applicable procedures of the Labor Relations Connection.  The decision of the arbitrator shall be final and binding.  The arbitrator shall be requested to issue a written decision within 30 days after the conclusion of the hearing.  The arbitrator shall have no authority to add to, subtract from, modify, alter or disregard any of the provisions of this Agreement.  Costs of the arbitrator and the American Arbitration Association or the Labor Relations Connection shall be borne equally by the Hospital and the MNA.

**Exhibit 5**

Time Limit for Processing

No grievance shall be considered under the foregoing procedure unless it is presented in the manner set forth herein.  Extensions of the above time limits may be mutually agreed upon in writing in a particular case.  Legitimate requests for extensions of time will not be unreasonably denied.  A grievance must be appealed to the next step of the grievance procedure or to arbitration within the time limit provided in the procedure, or the grievance will be considered settled on the basis of the last answer given by the Hospital.  If the Hospital does not provide an answer to the grievance within the above time limits, or any mutually agreed extension thereof, the grievance may be referred to the next step.

Working Days

The term "working days" shall mean any day Monday through Friday which is not a holiday recognized in this Agreement.

Payment

**Step 1:**  There will be no loss of pay or benefit accrual time for grievant and unit representative.

**Step 2:**  There will be no loss of pay or benefit accrual for grievant, unit representative and grievance chair.

**Step 3:**  There will be no loss of pay or benefit accrual for grievant, unit representative and grievance chair.

Arbitration

There will be no loss of pay or benefit accrual time for grievant and grievance chair during the process.

## ARTICLE XXII.
## EMPLOYMENT AND CONTRACT SECURITY

### 22.01. Subcontracting

The Hospital will not contract out bargaining unit work in core service areas.  For purposes of this Section 22.01, core service areas are defined as inpatient units, OR

**Exhibit 5**



**Massachusetts
Nurses
Association**

**340 Turnpike Street
Canton, MA  02021-2711
(781) 821-4625/FAX # (781) 821-4445**

**GRIEVANCE**

STEP     1

GRIEVANT(S):   Aggrieved nurses to include MNA Bargaining Unit Co-Chairs Dominque Muldoon and Marlena Pellegrino, and each and every other staff RN in the MNA-bargaining unit who have the right under Article XXI to file a grievance.  Please see roster of MNA bargaining unit RNs employed at St. Vincent Hospital for the names of all such RNs, incorporated by reference.

UNIT:  All Units at St. Vincent Hospital in which MNA bargaining unit RNs are employed, including all units defined in the collective bargaining agreement at Appendix I, Staffing Guidelines.

UNIT REPRESENTATIVE:   Carla Leblanc RN, Dominique Muldoon RN, Co-Chair;
Marlena Pellegrino RN Co-Chair

EMPLOYER: St. Vincent Hospital

DATE: October 20, 2023

Violation commencing Sept. 20, 2023 and each day thereafter as a continuing violation.

STATEMENT OF GRIEVANCE:  By email date-stamped Sep 20, 2023, 4:02 PM from Christopher T. Borruso, on behalf of the Hospital, to the Director of the Labor Relations Connection (LRC), Jan Teehan, the Hospital declared as follows: "[E]ffective as of the date and time of this email, you are instructed to cease any purported 'administration' of, or any other participation of any kind in, any of the Hospital's currently pending matters."  Thereafter, in multiple arbitrations involving the parties—counsel for St. Vincent Hospital, Ford Harrison, has, in each case, directly contacted the arbitrators and advised of Mr. Borruso's declaration and advised that the Hospital through its counsel would only communicate directly with the arbitrator, and not through the LRC.  This action by the Hospital triggered the need for MNA to have its lawyers engage in drafting and communications with the arbitrators (via the LRC) to obtain a ruling to enforce the ongoing function of LRC as administrator in each such arbitration from the inception of the arbitration to conclusion.  The aggrieved nurses incorporate by reference the rulings of Arbitrators Buckalew, Cenci, Garraty, Greenbaum, Grossman, Marra, Overton, and Saylor, and any rulings thereafter, granting MNA's motion and requiring administration of the arbitration through its conclusion by the LRC.
This is in violation of Article XXI, Grievance and Arbitration; any other provisions which MNA may further discern at a later date as is permitted expressly by Article XXI; and in the alternative by unchallenged, binding past practice that is enforceable under the collective bargaining agreement where, as here, there have been over 100 demands for arbitrations under the parties' collective bargaining agreements from 2000 to September 20,2023 where the arbitration agency administered the process from inception through conclusion.

PROPOSED REMEDY:  Make whole the bargaining representative of the aggrieved nurses, MNA, including but not limited to for all expenses incurred in all arbitrations due to this violation; cease and desist continued failure and refusal to abide by the collective bargaining agreement; all other relief that the arbitrator finds just and appropriate.

Signature(s):  _____

Date:  _____

**Exhibit 5**

\_\_  Delivered a copy for Manager/Director

\_\_  FAX to MNA 781-821-4445

**Exhibit 5**



AMERICAN ARBITRATION ASSOCIATION® | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

Ann Lesser
Vice President
200 State Street, 7th floor
Boston, MA 02109
Telephone: (617)451-6600
Fax: (617)451-0763

March 11, 2024

Michael T. Loconto, Esq.
32 Tennyson St
West Roxbury, MA 02132-6436
Via Email to: mtl@locontoadr.com

Case Number: 01-24-0000-7400

Massachusetts Nurses Association
-and-
St. Vincent Hospital
Grievance: The Employer has improperly instructed the Labor Relations Connection to cease any purported administration of, or any other participation of any kind, in the Employer's currently pending matters.

Dear Arbitrator:

You have been chosen to serve as the arbitrator in this matter. Please review the *AAA-ICDR® Best Practices Guide for Maintaining Cybersecurity and Privacy* and *AAA-ICDR Cybersecurity Checklist* that are enclosed with this correspondence. AAA Panelists acknowledge the importance of cybersecurity in safeguarding case-related data and commit to proactively addressing cyber security concerns to uphold the confidentiality and integrity of the process. Panelists further agree to follow the *AAA-ICDR Best Practices Guide for Maintaining Cybersecurity and Privacy*. Listed below are the representatives for the parties:

Alan J. McDonald, Esq.
McDonald Lamond Canzoneri LLC
352 Turnpike Road, Suite 210
Southborough, MA 01772-1756

Lisa  Defazio
352 Turnpike Road, Suite 310
Southborough, MA 01772-1756

Robin Gannon
Massachusetts Nurses Association
340 Turnpike Street
Canton, MA 02021

Wendy McGill
Massachusetts Nurses Association
340 Turnpike Street
Canton, MA 02021

Julie Pinkham
Massachusetts Nurses Association
340 Turnpike Street

**Exhibit 6**

Canton, MA 02021

Cullan E. Jones, Esq.
Ford & Harrison, LLP
1300 19th St., NW
Suite 300
Washington, DC 20036

Christian Bartholomew
St. Vincent Hospital
123 Summer Street
Worcester, MA 01608

If you are willing to accept this appointment, please sign the enclosed Notice of Appointment and return it to the undersigned. Please remember to enter your available dates at the bottom of the page. If we do not receive your signed Notice of Appointment within seven days, we will assume that you are unable to accept this appointment.

*Just a reminder – Rule 46 states: There shall be no direct communication between the parties and a neutral arbitrator on substantive matters relating to the case other than at the oral hearings, unless the parties and the arbitrator agree otherwise. Any other oral or written communication from the parties to the arbitrator shall be directed to the AAA for transmittal to the arbitrator.*

Sincerely,


Patrick Kimm
Case Administrator
Direct Dial: (617)695-6014
Email: PatrickKimm@adr.org
Fax: (617)451-0763

**Exhibit 6**

**AMERICAN ARBITRATION ASSOCIATION**

**Case Number: 01-24-0000-7400**          **Case Administrator: Patrick Kimm**

Massachusetts Nurses Association
-and-
St. Vincent Hospital
Grievance: The Employer has improperly instructed the Labor Relations Connection to cease any purported administration of, or any other participation of any kind, in the Employer's currently pending matters.

**NOTICE OF APPOINTMENT**

**TO: Michael T. Loconto**

YOU HAVE BEEN SELECTED as arbitrator in the above case. If you are able to accept this responsibility, please sign below and return this form to the AAA.

> The Code of Professional Responsibility for Arbitrators of Labor-Management Disputes requires certain disclosures so that the parties can have complete confidence in the arbitrator's impartiality. Therefore, please disclose any current or past managerial, representational, or consultative relationship with the employer or labor organization involved in this proceeding, as well as any close personal relationship or other circumstances that might reasonably raise a question as to your impartiality. If you are serving concurrently as an advocate for or representative of parties in labor relations matters, or have done so in recent years, you should also disclose such activities before accepting appointment. Disclosure must also be made of any pertinent pecuniary interest. If you are aware of any such relationship, please describe it below. And, if any such relationship arises during the course of the arbitration, it must also be disclosed. The AAA will bring the facts to the attention of the parties.

**.__X__**          I HAVE NOTHING TO DISCLOSE.

**.____**          I HEREBY DISCLOSE AS APPENDED HERETO (attach additional sheets with disclosure).

**ACCEPTANCE OF APPOINTMENT**

The undersigned, being aware of the requirements for impartiality, hereby accepts this appointment and will faithfully and fairly hear and examine the matters in controversy between the above-named parties, in accordance with the arbitration agreement that will be furnished by the parties at the hearing and the rules of the AAA, and will make a just award according to the best of his or her understanding.

**MY AVAILABLE DATES FOR HEARING ARE: _____May 14, 21, 23; September 17, 30, 2024_____**

Dated: __March 12, 2024_____          Signed:_____*Michael Loconto*_____
                                                                          ARBITRATOR

*Notice to the arbitrator*: Please execute and return one copy to this office.

**Exhibit 6**

## DISCLOSURE GUIDELINES
### *For Arbitrators serving on American Arbitration Association Cases*

**General** – The American Arbitration Association Rules and the Code of Ethics require you to make full disclosure. Your duty to make disclosures is ongoing throughout all stages of the arbitration. The Case Manager may prompt you to conduct a subsequent conflict check during key points of the case, but you should conduct such checks and make disclosures on your own initiative whenever new information about the case participants comes to light.

Any doubt as to whether or not disclosure needs to be made should be resolved in favor of disclosure. You should not judge the significance of the potential conflict but rather you should make the disclosure and let the parties determine its significance. As a guiding principle, *if a relationship or interest crosses your mind – disclose it.* You must disclose:

- Any circumstance likely to give rise to justifiable doubt as to your impartiality or independence (per AAA rules).
- Any interest or relationship that might create an appearance of partiality (per the Code of Ethics).
- Any applicable statutes pertaining to arbitrator disclosures.

**Financial** – As to any party, attorney, witness and other arbitrator involved in *this* case, you must disclose any:

- Financial interest that is *direct* (existing or past) or *indirect* (existing or past)

**Relational** – You must disclose any *relationships* you have with any party, attorney, witness and other arbitrator involved in *this* case – this includes relationships with their:

- Families or household members
- Current employers
- Partners
- Professional and/or business associates

**How to Disclose** – When disclosing, specificity is extremely important. Provide enough detail in your disclosure so that the parties are fully informed of the potential conflict. Tell us:

- Who
- What
- When
- Where
- How

Failing to provide a sufficient level of detail will delay the confirmation of your appointment, as well as the progress of the case overall, since the Case Manager will need to contact you for additional information.

All disclosures must be provided in writing. In the rare situation where a disclosure comes to light at a hearing, you are obligated to excuse yourself from the proceeding and immediately contact the AAA who will facilitate the process for communicating the disclosure to the parties and obtaining their response. Pursuant to the AAA Rules, the AAA shall determine whether or not a challenge raised by a party to an arbitrator's continued service shall be granted or denied.

**Exhibit 6**



# Labor
# Arbitration Rules
(Including Expedited Labor Arbitration Rules)

 AMERICAN ARBITRATION ASSOCIATION®

Available online at **adr.org/labor**

Rules Amended and Effective July 1, 2013
Fee Schedule Amended and Effective January 1, 2019

**Exhibit 7**

If you would like to speak to a member of the AAA Labor Team,
please visit **https://go.adr.org/labor-contact.html**

American Arbitration Association

**Exhibit 7**

## Table of Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

Labor Arbitration Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

1. Agreement of Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

2. AAA and Delegation of Duties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

3. Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

4. Panel of Neutral Labor Arbitrators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

5. Initiation under an Arbitration Clause in a Collective Bargaining Agreement . . . . . . .   9

6. Answer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

7. Initiation under a Submission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

8. Fixing of Locale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

9. Qualifications of Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

10. Appointment from National Roster . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

11. Direct Appointment by Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

12. Appointment of Neutral Arbitrator by Party-Appointed Arbitrators . . . . . . . . . . . . .   11

13. Number of Arbitrators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

14. Notice to Arbitrator of Appointment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

15. Disclosure and Challenge Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

16. Vacancies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

17. Date, Time, and Place of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

18. Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

19. Stenographic Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

20. Interpreters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

21. Attendance at Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

22. Postponements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

23. Oaths . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

24. Majority Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

25. Order of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

26. Arbitration in the Absence of a Party or Representative . . . . . . . . . . . . . . . . . . . .   14

27. Evidence and Filing of Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

28. Evidence by Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

29. Inspection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

30. Closing of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

31. Reopening of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

32. Waiver of Oral Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

**Exhibit 7**

33. Waiver of Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

34. Extensions of Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

35. Serving of Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

36. Time of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

37. Form of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

38. Award Upon Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

39. Delivery of Award to Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

40. Modification of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

41. Release of Documents for Judicial Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

42. Judicial Proceedings and Exclusion of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

43. Administrative Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

44. Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

45. Suspension for Non-Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

46. Communication with Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

47. Interpretation and Application of Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Administrative Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Full Service Administrative Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Arbitrator Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Hearing Room Rental . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Fees for Additional Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Expedited Labor Arbitration Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

E1. Agreement of Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

E2. Appointment of Neutral Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

E3. Qualifications of Neutral Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

E4. Vacancies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

E5. Date, Time, and Place of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

E6. No Stenographic Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

E7. Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

E8. Post-hearing Briefs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

E9. Time of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

E10. Form of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

American Arbitration Association

**Exhibit 7**

**Administrative Fees** ........................................................ 23

    Expedited Administrative Fee .................................................... 23

    Arbitrator Compensation ....................................................... 23

    Hearing Room Rental .......................................................... 23

    Fees for Additional Services ..................................................... 23

**Optional Labor Services** .................................................... 24

    O1. List Only Service .......................................................... 24

    O2. List with Appointment ..................................................... 24

    O3. Rapid Resolve Procedure ................................................... 24

    O4. Documents Only Procedure .................................................. 25

    O5. Emergency Scheduling Procedure ............................................ 25

    O6. Administration of Permanent Panels .......................................... 25

    O7. Grievance Mediation Services ............................................... 25

    O8. Customized Services ...................................................... 26

**Exhibit 7**

# Labor Arbitration Rules
## (Including Expedited Labor Arbitration Rules)

## Introduction

Every year, labor and management enter into thousands of collective bargaining agreements. Virtually all of these agreements provide for arbitration of unresolved grievances. For decades, the American Arbitration Association® (AAA®) has been a leading administrator of labor-management disputes.

The American Arbitration Association is a public-service, not-for-profit organization offering a broad range of dispute resolution services to business executives, attorneys, individuals, trade associations, unions, management, consumers, families, communities, and all levels of government. Services are available through AAA headquarters in New York City and through offices located in major cities throughout the United States. Hearings may be held at locations convenient for the parties and are not limited to cities with AAA offices. In addition, the AAA serves as a center for education and training, issues specialized publications, and conducts research on all forms of out-of-court dispute settlement.

Arbitration is a tool of industrial relations. Like other tools, it has limitations as well as advantages. In the hands of an expert, it produces useful results. When abused or made to do things for which it was never intended, the outcome can be disappointing. For these reasons, all participants in the process — union officials, employers, personnel executives, attorneys, and the arbitrators themselves — have an equal stake in orderly, efficient, and constructive arbitration procedures. The AAA's Labor Arbitration Rules provide a time-tested method for efficient, fair, and economical resolution of labor-management disputes. By referring to them in a collective bargaining agreement, the parties can take advantage of these benefits.

American Arbitration Association

# Exhibit 7

The parties can provide for arbitration of future disputes by inserting the following clause into their contracts:

*Any dispute, claim, or grievance arising from or relating to the interpretation or application of this agreement shall be submitted to arbitration administered by the American Arbitration Association under its Labor Arbitration Rules. The parties further agree to accept the arbitrator's award as final and binding on them.*

For relatively uncomplicated grievances, parties who use the labor arbitration services of the American Arbitration Association may agree to use expedited procedures that provide a prompt and inexpensive method for resolving disputes. This option responds to a concern about rising costs and delays in processing grievance arbitration cases. The AAA's Expedited Labor Arbitration Procedures, by eliminating or streamlining certain steps, are intended to resolve cases within a month of the appointment of the arbitrator. The procedures are in the following pages.

**Exhibit 7**

## Labor Arbitration Rules

### 1. Agreement of Parties

The parties shall be deemed to have made these rules a part of their arbitration agreement whenever, in a collective bargaining agreement or submission, they have provided for arbitration by the American Arbitration Association (hereinafter the AAA) or under its rules. These rules and any amendment of them shall apply in the form in effect at the time the administrative requirements are met for a demand for arbitration or submission agreement received by the AAA. The parties, by written agreement, may vary the procedures set forth in these rules.

### 2. AAA and Delegation of Duties

When parties agree to arbitrate under these rules or when they provide for arbitration by the AAA and an arbitration is initiated under these rules, they thereby authorize the AAA to administer the arbitration. The authority and duties of the AAA are prescribed in the agreement of the parties and in these rules, and may be carried out through such of the AAA's representatives as it may direct. The AAA may, in its discretion, assign the administration of an arbitration to any of its offices.

### 3. Jurisdiction

**a.** The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement.

**b.** The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

**c.** A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

### 4. Panel of Neutral Labor Arbitrators

The AAA shall establish and maintain a National Roster of Labor Arbitrators and shall appoint arbitrators as provided in these rules.

# Exhibit 7

 American Arbitration Association

## 5. Initiation under an Arbitration Clause in a Collective Bargaining Agreement

Arbitration under an arbitration clause in a collective bargaining agreement under these rules may be initiated by either party in the following manner:

**a.** by giving written notice to the other party of its intention to arbitrate (demand), which notice shall contain a statement setting forth the nature of the dispute, the names and addresses of all other parties, including phone number and email address, the remedy sought, and the hearing locale requested.

**b.** by filing at any regional office of the AAA a copy of the notice, together with a copy of the collective bargaining agreement or other relevant documents that relate to the dispute, including the arbitration provisions, together with the appropriate filing fee as provided in the schedule included with the rules. After the arbitrator is appointed, no new or different claim may be submitted except with the consent of the arbitrator and all other parties.

## 6. Answer

The party upon whom the demand for arbitration is made may file an answering statement with the AAA within 10 days after notice from the AAA, simultaneously sending a copy to the other party. If no answer is filed within the stated time, it will be treated as a denial of the claim. Failure to file an answer shall not operate to delay the arbitration.

## 7. Initiation under a Submission

Parties to any collective bargaining agreement may initiate an arbitration under these rules by filing at any regional office of the AAA a copy of a written agreement to arbitrate under these rules (submission), signed by the parties and setting forth the nature of the dispute, the names and addresses of all other parties, including phone number and email address, the remedy sought and the hearing locale requested.

## 8. Fixing of Locale

The parties may mutually agree on the geographic region (locale) where the arbitration is to be held. If the locale is not designated in the collective bargaining agreement or submission, and if the parties disagree as to the locale, the AAA may initially determine the place of arbitration, subject to the power of the arbitrator(s), after their appointment, to make a final determination on the locale. All such determinations shall be made having regard for the contentions of the parties and the circumstances of the arbitration.

**Exhibit 7**

## 9. Qualifications of Arbitrator

Any neutral arbitrator appointed pursuant to Section 10, 11, or 12, or selected by mutual agreement of the parties or their appointees, shall be subject to disqualification for the reasons specified in Section 15. If the parties specifically agree in writing, the arbitrator shall not be subject to disqualification for those reasons. Unless the parties agree otherwise, an arbitrator selected unilaterally by one party is a party-appointed arbitrator and is not subject to disqualification pursuant to Section 15.

The term "arbitrator" in these rules refers to the arbitration panel, whether composed of one or more arbitrators and whether the arbitrators are neutral or party appointed.

## 10. Appointment from National Roster

If the parties have not appointed an arbitrator and have not provided any other method of appointment, the arbitrator shall be appointed in the following manner: immediately after the filing of the demand or submission, the AAA shall submit simultaneously to each party an identical list of names of persons chosen from the National Roster of Labor Arbitrators. The Parties are encouraged to agree to an arbitrator from the submitted list and to advise the AAA of their agreement. If the parties are unable to agree upon an arbitrator, each party shall have 10 days from the transmittal date in which to strike names objected to, number the remaining names to indicate the order of preference, and return the list to the AAA.

If a party does not return the list within the time specified, all persons named therein shall be deemed acceptable.

From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of an arbitrator to serve. If the parties fail to agree upon any of the persons named, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the submitted lists, the AAA shall have the power to make the appointment from among other members of the National Roster without the submission of any additional list.

 American Arbitration Association

**Exhibit 7**

## 11. Direct Appointment by Parties

If the agreement of the parties names an arbitrator or specifies a method of appointing an arbitrator, that designation or method shall be followed. The notice of appointment, with the name and address of the arbitrator, shall be filed with the AAA by the appointing party. Upon the request of any appointing party, the AAA shall submit a list of members of the National Roster from which the party may, if it so desires, make the appointment.

If the agreement specifies a period of time within which an arbitrator shall be appointed and any party fails to make an appointment within that period, the AAA may make the appointment.

If no period of time is specified in the agreement, the AAA shall notify the parties to make the appointment and if within 10 days thereafter such arbitrator has not been so appointed, the AAA shall make the appointment.

## 12. Appointment of Neutral Arbitrator by Party-Appointed Arbitrators

If the parties have appointed their arbitrators or if either or both of them have been appointed as provided in Section 11, and have authorized those arbitrators to appoint a neutral arbitrator within a specified time and no appointment is made within that time or any agreed extension thereof, the AAA may appoint a neutral arbitrator who shall act as chairperson.

If no period of time is specified for appointment of the neutral arbitrator and the parties do not make the appointment within 10 days from the date of the appointment of the last party-appointed arbitrator, the AAA shall appoint a neutral arbitrator who shall act as chairperson.

If the parties have agreed that the arbitrators shall appoint the neutral arbitrator from the National Roster, the AAA shall furnish to the party-appointed arbitrators, in the manner prescribed in Section 10, a list selected from the National Roster, and the appointment of the neutral arbitrator shall be made as prescribed in that section.

## 13. Number of Arbitrators

If the arbitration agreement does not specify the number of arbitrators, the dispute shall be heard and determined by one arbitrator, unless the parties otherwise agree.

**Exhibit 7**

## 14. Notice to Arbitrator of Appointment

Notice of the appointment of the neutral arbitrator shall be sent to the arbitrator by the AAA and the signed acceptance of the arbitrator shall be filed with the AAA prior to the opening of the first hearing.

## 15. Disclosure and Challenge Procedure

Any person appointed or to be appointed as an arbitrator shall disclose to the AAA any circumstance likely to give rise to justifiable doubt as to the arbitrator's impartiality or independence, including any bias or any financial or personal interest in the result of the arbitration. Such obligation shall remain in effect throughout the arbitration. Upon receipt of this information from the arbitrator or another source, the AAA shall communicate the information to the parties and, if it deems it appropriate to do so, to the arbitrator. Upon objection of a party to the continued service of a neutral arbitrator, the AAA, after consultation with the parties and the arbitrator, shall determine whether the arbitrator should be disqualified and shall inform the parties of its decision, which shall be conclusive.

## 16. Vacancies

If for any reason an arbitrator is unable to perform the duties of the office, the AAA may, on proof satisfactory to it, declare the office vacant. Vacancies shall be filled in accordance with the applicable provisions of these rules, and the matter shall be reheard by the new arbitrator unless the parties agree upon an alternative arrangement.

## 17. Date, Time, and Place of Hearing

The parties shall respond to requests for hearing dates in a timely manner, be cooperative in scheduling the earliest practicable date, and adhere to established deadlines and hearing schedules. Upon the request of either party or the AAA, the arbitrator shall have the authority to convene a scheduling conference call and/or issue a Notice of Hearing setting the date, time and place for each hearing.

The parties will receive a formal written Notice of Hearing detailing the arrangements agreed to by the parties or ordered by the arbitrator at least five days in advance of the hearing date, unless otherwise agreed by the parties.

**Exhibit 7**  American Arbitration Association

## 18. Representation

Any party may be represented by counsel or other authorized representative.

## 19. Stenographic Record

Any party desiring a stenographic record shall make arrangements directly with a stenographer and shall notify the other parties of such arrangements in advance of the hearing. The requesting party or parties shall pay the cost of the record. If the transcript is agreed by the parties to be or, in appropriate cases, determined by the arbitrator to be the official record of the proceeding, it must be made available to the arbitrator and to the other party for inspection, at a time and place determined by the arbitrator even if one party does not agree to pay for the transcript.

## 20. Interpreters

Any party wishing an interpreter shall make all arrangements directly with the interpreter and shall assume the costs of the service.

## 21. Attendance at Hearing

The arbitrator and the AAA shall maintain the privacy of the hearing unless the law provides to the contrary. Any person having a direct interest in the arbitration is entitled to attend hearings. The arbitrator shall otherwise have the power to require the exclusion of any witness, other than a party, during the testimony of other witnesses. It shall be discretionary with the arbitrator to determine the propriety of the attendance of any other person other than a party and its representatives.

## 22. Postponements

The arbitrator may postpone any hearing upon agreement of the parties, upon request of a party for good cause shown, or upon the arbitrator's own initiative.

## 23. Oaths

Before proceeding with the first hearing, each arbitrator may take an oath of office and, if required by law, shall do so. The arbitrator may require witnesses to testify under oath administered by any duly qualified person and, if required by law or requested by either party, shall do so.

**Exhibit 7**

## 24. Majority Decision

When the panel consists of more than one arbitrator, unless required by law or by the arbitration agreement, a majority of the arbitrators must make all decisions.

## 25. Order of Proceedings

A hearing shall be opened by the filing of the oath of the arbitrator, where required; by the recording of the date, time, and place of the hearing and the presence of the arbitrator, the parties, and counsel, if any; and by the receipt by the arbitrator of the demand and answer, if any, or the submission.

Exhibits may, when offered by either party, be received in evidence by the arbitrator. The names and addresses of all witnesses and exhibits in the order received shall be made a part of the record.

The arbitrator may vary the normal procedure under which the initiating party first presents its claim, but in any case shall afford full and equal opportunity to all parties for the presentation of relevant proofs.

The arbitrator, exercising his or her discretion, shall conduct the proceedings with a view to expediting the resolution of the dispute and may direct the order of proof, bifurcate proceedings and direct the parties to focus their presentations on issues the decision on which could dispose of all or part of the case.

## 26. Arbitration in the Absence of a Party or Representative

Unless the law provides to the contrary, the arbitration may proceed in the absence of any party or representative who, after due notice, fails to be present or fails to obtain a postponement. An award shall not be made solely on the default of a party. The arbitrator shall require the other party to submit such evidence as may be required for the making of an award.

## 27. Evidence and Filing of Documents

The parties may offer such evidence as is relevant and material to the dispute, and shall produce such evidence as the arbitrator may deem necessary to an understanding and determination of the dispute. An arbitrator or other person authorized by law to subpoena witnesses and documents may do so independently or upon the request of any party. The arbitrator shall determine the admissibility, the relevance, and materiality of the evidence offered and may



**Exhibit 7**

exclude evidence deemed by the arbitrator to be cumulative or irrelevant and conformity to legal rules of evidence shall not be necessary. All evidence shall be taken in the presence of all of the arbitrators and all of the parties, except where any of the parties is absent, in default, or has waived the right to be present.

All documents that are not filed with the arbitrator at the hearing, but arranged at the hearing or subsequently by agreement of the parties to be submitted, shall be filed with the AAA for transmission to the arbitrator or transmitted to the arbitrator directly if the parties agree. All parties shall be afforded the opportunity to examine such documents.

Documents may be filed by regular or electronic mail or telephone facsimile, and will be deemed timely if postmarked or otherwise transmitted to the arbitrator or the AAA on or before the due date.

## 28. Evidence by Affidavit

The arbitrator may receive and consider the evidence of witnesses by affidavit, giving it only such weight as the arbitrator deems proper after consideration of any objection made to its admission.

## 29. Inspection

Whenever the arbitrator deems it necessary, he or she may make an inspection in connection with the subject matter of the dispute after notice to the parties, who may, if they so desire, be present at the inspection.

## 30. Closing of Hearing

The arbitrator shall inquire of all parties whether they have any further proof to offer or witnesses to be heard. Upon receiving negative replies or if satisfied that the record is complete, the arbitrator shall declare the hearing closed.

If briefs or other documents are to be filed, the hearing shall be declared closed as of the final date set by the arbitrator for the receipt of briefs. If documents are to be filed as provided in Section 27 and the date for their receipt is later than the date set for the receipt of briefs, the later date shall be the date of closing the hearing. The time limit within which the arbitrator is required to make an award shall commence to run, in the absence of another agreement by the parties, upon the closing of the hearings.

**Exhibit 7**

### 31. Reopening of Hearing

The hearing may be reopened on the arbitrator's initiative, or upon application of a party, at any time before the award is made. If reopening of the hearing would prevent the making of the award within the specific time agreed upon by the parties in the contract out of which the controversy has arisen, the matter may not be reopened unless the parties agree on an extension of time. When no specific date is fixed in the contract, the arbitrator may reopen the hearings and shall have 30 days from the closing of the reopened hearing within which to make an award.

### 32. Waiver of Oral Hearing

The parties may provide, by written agreement, for the waiver of oral hearing. If the parties are unable to agree as to the procedure, the AAA shall specify a fair and equitable procedure.

### 33. Waiver of Rules

Any party who proceeds with the arbitration after knowledge that any provision or requirement of these rules has not been complied with and who fails to state an objection thereto in writing shall be deemed to have waived the right to object.

### 34. Extensions of Time

The parties may modify any period of time by mutual agreement. The AAA or the arbitrator may for good cause extend any period of time established by these rules, except the time for making the award. The AAA shall notify the parties of any such extension.

### 35. Serving of Notice

Any papers, notices, or process necessary or proper for the initiation or continuation of an arbitration under these rules, for any court action in connection therewith, or for the entry of judgment on any award made under these rules, may be served on a party by mail addressed to the party or its representative at the last known address or by personal service, in or outside the state where the arbitration is to be held, provided that reasonable opportunity to be heard with regard to the dispute is or has been granted to the party. The AAA, the arbitrator and the parties may also use overnight delivery or electronic facsimile

**Exhibit 7**

transmission, or other written forms of electronic communication to give the notices required by these rules.

Unless otherwise instructed by the AAA or by the arbitrator, any documents submitted by any party to the AAA or to the arbitrator shall simultaneously be provided to the other party or parties to the arbitration.

### 36. Time of Award

The award shall be rendered promptly by the arbitrator and, unless otherwise agreed by the parties or specified by law, no later than 30 days from the date of closing the hearing or, if oral hearings have been waived, the award shall be rendered no later than 30 days from the date of transmitting the final statements and proofs to the arbitrator.

### 37. Form of Award

The award shall be in writing and shall be signed (electronic signature acceptable) either by the neutral arbitrator or by a concurring majority if there is more than one arbitrator. The parties shall advise the AAA whenever they do not require the arbitrator to accompany the award with an opinion.

### 38. Award Upon Settlement

If the parties settle their dispute during the course of the arbitration and if the parties so request, the arbitrator may set forth the terms of the settlement in a "consent award".

### 39. Delivery of Award to Parties

Parties shall accept as legal delivery of the award the placing of the award or a true copy thereof in the mail, addressed to the party at its last known address or to its representative; personal or electronic service of the award; or the filing of the award in any other manner that is permitted by law.

### 40. Modification of Award

Within 20 days after the transmittal of an award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, to correct any clerical, typographical, technical, or computational errors in the award. The arbitrator is not empowered to redetermine the merits of any claim already decided. The

**Exhibit 7**

other parties shall be given 10 days to respond to the request. The arbitrator shall dispose of the request within 20 days after transmittal by the AAA to the arbitrator of the request and any response thereto. If applicable law requires a different procedural time frame, that procedure shall be followed.

## 41. Release of Documents for Judicial Proceedings

The AAA shall, upon the written request of a party, furnish to such party, at its expense, certified copies of documents contained in the arbitration case file in the AAA's possession that may be required in judicial proceedings relating to the arbitration.

## 42. Judicial Proceedings and Exclusion of Liability

**a.** Neither the AAA nor any arbitrator in a proceeding under these rules is a necessary or proper party in judicial proceedings relating to the arbitration.

**b.** Parties to an arbitration under these rules shall be deemed to have consented that neither the AAA nor any arbitrator shall be liable to any party in any action for damages or injunctive relief for any act or omission in connection with any arbitration conducted under these rules.

## 43. Administrative Fees

As a not-for-profit organization, the AAA shall prescribe an administrative fee schedule to compensate it for the cost of providing administrative services. The schedule in effect at the time of filing shall be applicable.

## 44. Expenses

The expenses of witnesses for either side shall be paid by the party producing such witnesses. Expenses of the arbitration, other than the cost of the stenographic record, including required traveling and other expenses of the arbitrator and of AAA representatives and the expenses of any witness or the cost of any proof produced at the direct request of the arbitrator, shall be borne equally by the parties, unless they agree otherwise, or unless the arbitrator, in the award, assesses such expenses or any part thereof against any specified party or parties.

 American Arbitration Association

# Exhibit 7

## 45. Suspension for Non-Payment

If administrative charges have not been paid in full, the AAA may so inform the parties in order that one of them may advance the required payment. If such payments are not made, the AAA may suspend or terminate the proceedings.

## 46. Communication with Arbitrator

There shall be no direct communication between the parties and a neutral arbitrator on substantive matters relating to the case other than at oral hearings, unless the parties and the arbitrator agree otherwise. Any other oral or written communication from the parties to the arbitrator shall be directed to the AAA for transmittal to the arbitrator.

This rule does not prohibit communications on non-substantive matters such as travel arrangements and driving directions, nor does it prohibit direct communications in special circumstances (such as emergency delays) when the AAA is unavailable.

## 47. Interpretation and Application of Rules

The arbitrator shall interpret and apply these rules insofar as they relate to the arbitrator's powers and duties. When there is more than one arbitrator and a difference arises among them concerning the meaning or application of any such rule, it shall be decided by a majority vote. If that is not possible, the arbitrator or either party may refer the question to the AAA for final decision. All other rules shall be interpreted and applied by the AAA.

**Exhibit 7**

## Administrative Fees

### Full Service Administrative Fee

The initial administrative fee is $375 for each party, due and payable at the time of filing. No refund of the initial fee is made when a matter is withdrawn or settled after the filing of the demand for arbitration or submission.

### Arbitrator Compensation

Unless mutually agreed otherwise, the arbitrator's compensation shall be borne equally by the parties, in accordance with the fee structure disclosed in the arbitrator's biographical profile submitted to the parties.

### Hearing Room Rental

Hearing rooms are available on a rental basis at AAA offices. Please check with your Case Management Center or local AAA office for specific availability and rates.

### Fees for Additional Services

The AAA reserves the right to assess additional administrative fees for services performed by the AAA that go beyond those provided for in the AAA's rules, but which are required as a result of the parties' agreement or stipulation.



**Exhibit 7**

## Expedited Labor Arbitration Procedures

In response to the concern of parties over rising costs and delays in grievance arbitration, the American Arbitration Association has established expedited procedures under which cases are scheduled promptly and awards rendered no later than seven days after the hearings. In return for giving up certain features of traditional labor arbitration, such as transcripts, briefs, and extensive opinions, the parties using these simplified procedures can obtain quick decisions and realize certain cost savings.

Leading labor arbitrators have indicated a willingness to offer their services under these procedures, and the Association makes every effort to assign the best possible arbitrators with early available hearing dates. Since the establishment of these procedures, an ever increasing number of parties have taken advantage of them.

### E1. Agreement of Parties

The Streamlined Labor Arbitration Rules, or the Expedited Labor Arbitration Rules of the American Arbitration Association, in the form obtaining when the arbitration is initiated, shall apply whenever the parties have agreed to arbitrate under them.

These procedures shall be applied as set forth below, in addition to any other portion of the Labor Arbitration Rules not in conflict with these expedited procedures.

### E2. Appointment of Neutral Arbitrator

The AAA shall appoint a single neutral arbitrator from its National Roster of Labor Arbitrators, who shall hear and determine the case promptly.

### E3. Qualifications of Neutral Arbitrator

Any person appointed or to be appointed as an arbitrator shall disclose to the AAA any circumstance likely to give rise to justifiable doubt as to the arbitrator's impartiality or independence, including any bias or any financial or personal interest in the result of the arbitration. The prospective arbitrator shall also disclose any circumstance likely to prevent a prompt hearing. The disclosure obligations in this section shall remain in effect throughout the arbitration. Upon receipt of such information, the AAA shall determine whether the arbitrator

**Exhibit 7**

should be disqualified and shall inform the parties of its decision, which shall be conclusive.

### E4. Vacancies

The AAA is authorized to substitute another arbitrator if a vacancy occurs or if an appointed arbitrator is unable to serve promptly.

### E5. Date, Time, and Place of Hearing

The arbitrator shall fix the date, time, and place of the hearing, notice of which must be given at least 24 hours in advance. Such notice may be given orally, electronically or by facsimile.

### E6. No Stenographic Record

There shall be no stenographic record of the proceedings.

### E7. Proceedings

The hearing shall be conducted by the arbitrator in whatever manner will most expeditiously permit full presentation of the evidence and arguments of the parties. The arbitrator shall make an appropriate minute of the proceedings. Normally, the hearing shall be completed within one day. In unusual circumstances and for good cause shown, the arbitrator may schedule an additional hearing to be held within seven days.

### E8. Post-hearing Briefs

There shall be no post-hearing briefs.

### E9. Time of Award

The award shall be rendered promptly by the arbitrator and, unless otherwise agreed by the parties, no later than seven days from the date of the closing of the hearing.

### E10. Form of Award

The award shall be in writing and shall be signed by the arbitrator. If the arbitrator determines that an opinion is necessary, it shall be in summary form.



# Exhibit 7

## Administrative Fees

### Expedited Administrative Fee

The initial administrative fee is $150 for each party, due and payable at the time of filing. No refund of the initial fee is made when a matter is withdrawn or settled after the filing of the demand for arbitration or submission.

An additional fee of $25.00 for each party shall apply if a list of arbitrators is requested.

### Arbitrator Compensation

Unless mutually agreed otherwise, the arbitrator's compensation shall be borne equally by the parties, in accordance with the fee structure disclosed in the arbitrator's biographical profile submitted to the parties.

### Hearing Room Rental

Hearing rooms are available on a rental basis at AAA offices. Please check with your Case Management Center or local AAA office for specific availability and rates.

### Fees for Additional Services

The AAA reserves the right to assess additional administrative fees for services performed by the AAA that go beyond those provided for in the AAA's rules, but which are required as a result of the parties' agreement or stipulation.

**Exhibit 7**

## Optional Labor Services

Parties who use the labor arbitration services of the American Arbitration Association may mutually agree to use any of the Optional Labor Services, as opposed to the process being managed under the standard Labor Rules.

These options respond to a concern about rising costs and delays in processing grievance-arbitration cases and were designed to give the parties more economical considerations to resolve their dispute. Any issue not specifically identified under these Optional Labor Services will default to the Labor Rules.

### O1. List Only Service

Parties can contact the AAA and request one list of no more than 15 names. Within 48 hours of receipt of the joint request, the AAA will submit the list of names and then the AAA closes its file. The administrative fee for a list only is $150 per party.

**Note:** The AAA Full Service Administration Fee is available at a cost of $375 per party.

### O2. List with Appointment

Parties can contact the AAA and request one list of no more than 15 names. Within 48 hours of receipt of the joint request, the AAA will submit a list with a return date of 10 days, for review and appointment of the arbitrator based on the parties' mutual selection. The AAA will notify the parties of the selection of the arbitrator. The administrative fee for list with appointment is $200 per party.

**Note:** The AAA Full Service Administration Fee is available at a cost of $375 per party.

### O3. Rapid Resolve Procedure

For relatively uncomplicated grievances, this procedure provides a prompt and inexpensive method for resolving labor disputes. Under this procedure, the parties have the option of filing up to three grievances in one demand. The same Arbitrator will hear all grievances within a single day of hearing being set aside. The written award will be rendered within 48 hours and is limited to a one-paragraph decision on each grievance, unless the Arbitrator determines otherwise. The total cost is $750.00 per party, which includes the AAA's Administrative Fee and the Fee of the Arbitrator.



American Arbitration Association

**Exhibit 7**

## O4. Documents Only Procedure

Under this procedure, the parties may agree to waive in-person hearings and resolve the dispute through the submission of documents. This is a simple process for the resolution of grievances where a face-to-face hearing is not necessary. The Arbitrator determines the time frame for the submission of written evidence, the record is closed and the award is issued within 14 days. A telephonic conference is optional. The total cost is $650.00 per party, which includes the AAA's Administrative Fee and the Fee of the Arbitrator.

## O5. Emergency Scheduling Procedure

This procedure allows the parties the opportunity to schedule hearing dates very quickly. Under this procedure, the parties will have the ability to file a demand and receive a limited list of experienced neutrals who have confirmed they are available for a hearing on a specific date within a 14-day time period. By agreement of the parties, a grievance can be scheduled within 24 hours of filing a demand. The procedures can be utilized on existing cases filed with the AAA. There are no additional costs for using these procedures (regular fees apply).

## O6. Administration of Permanent Panels

For parties who are engaged in an ad-hoc or non-administered arbitration system, the AAA can assist the parties with the management of their Permanent Panels. The AAA can identify new panel members, assist in rotating the panel members off their roster, or assist in appointing the arbitrator from their roster. The cost varies depending on the services provided.

## O7. Grievance Mediation Services

When negotiations are at an impasse, the AAA's Grievance Mediation Services can provide an informal, effective and confidential means of reaching settlement. These procedures can assist unions and management to define and clarify issues, understand differences, identify interests and explore solutions to reach mutually satisfactory agreements that preserve important relationships. Mediation is very cost-effective when compared to other dispute resolution options. At the AAA, there is no cost to search the AAA's roster of labor neutrals to identify an appropriate mediator for the case at hand. The total cost is $150.00 per party plus the fee of the Mediator.

**Exhibit 7**

## O8. Customized Services

The AAA's role in the dispute resolution process is to administer cases from filing to closing. Additional AAA services include assistance in the design and development of alternative dispute resolution (ADR) systems for corporations, unions, government agencies, law firms and courts. By agreement of the parties, they can customize the administration of their case, which can include limitations, identification of an alternative method for the appointment of the arbitrator, a specific process for the scheduling of the hearing, or to simply define the specific services needed on their case. Ultimately, the AAA aims to move cases through the arbitration process in a fair and impartial manner that is agreed upon by the parties.

For more information about any of these services, please contact 1.888.774.6904, or send an email to **labormediation@adr.org.**

Rules, forms, procedures, and guides, as well as information about applying for a fee reduction or deferral, are subject to periodic change and updating. To ensure that you have the most current information, see our website at **www.adr.org.**

American Arbitration Association

# Exhibit 7

*© 2019 American Arbitration Association, Inc. All rights reserved. These rules are the copyrighted property of the*
*American Arbitration Association (AAA) and are intended to be used in conjunction with the AAA's administrative services.*
*Any unauthorized use or modification of these rules may violate copyright laws and other applicable laws.*
*Please contact 800.778.7879 or websitemail@adr.org for additional information.*

**Exhibit 7**

Case 4:25-cv-40090-RG   Document 37-1   Filed 07/16/25   Page 210 of 293



AMERICAN ARBITRATION ASSOCIATION®

800.778.7879   |   websitemail@adr.org   |   adr.org

**Exhibit 7**

# CODE

## OF PROFESSIONAL RESPONSIBILITY FOR ARBITRATORS OF LABOR-MANAGEMENT DISPUTES

**OF THE
NATIONAL ACADEMY OF ARBITRATORS
AMERICAN ARBITRATION ASSOCIATION
FEDERAL MEDIATION AND CONCILIATION SERVICE**

*As amended and in effect September 2007*

**Exhibit 8**

# FOREWORD

This "Code of Professional Responsibility for Arbitrators of Labor-Management Disputes" supersedes the "Code of Ethics and Procedural Standards for Labor-Management Arbitration," approved in 1951 by a Committee of the American Arbitration Association, by the National Academy of Arbitrators, and by representatives of the Federal Mediation and Conciliation Service.

Revision of the 1951 Code was initiated officially by the same three groups in October, 1972. The following members of a Joint Steering Committee were designated to draft a proposal:

Chair
William E. Simkin

Representing American Arbitration Association
Frederick H. Bullen
Donald B. Straus

Representing Federal Mediation and Conciliation Service
Lawrence B. Babcock, Jr.
L. Lawrence Schultz

Representing National Academy of Arbitrators
Sylvester Garrett
Ralph T. Seward

1

**Exhibit 8**

The proposal of the Joint Steering Committee was issued on November 30, 1974, and thereafter adopted by all three sponsoring organizations. Reasons for Code revision should be noted briefly. Ethical considerations and procedural standards were deemed to be sufficiently intertwined to warrant combining the subject matter of Parts I and II of the 1951 Code under the caption of "Professional Responsibility." It also seemed advisable to eliminate admonitions to the parties (Part III of the 1951 Code) except as they appear incidentally in connection with matters primarily involving responsibilities of arbitrators. The substantial growth of third-party participation in dispute resolution in the public sector required consideration, as did the fact that the arbitration of new contract terms had become more significant. Finally, during the interval of more than two decades, new problems had emerged as private-sector grievance arbitration matured and became more diversified.

In 1985, the provisions of 2 C. 1. c. were amended to specify certain procedures, deemed proper, which could be followed by an arbitrator seeking to determine if the parties are willing to consent to publication of an award.

In 1996, the wording of the Preamble was amended to reflect the intent that the provisions of the Code apply to covered arbitrators who agree to serve as impartial third parties in certain arbitration and related procedures, dealing with the rights and interests of employees in connection with their employment and/or representation by a union. Simultaneously, the provisions of 2 A. 3. were amended to make clear that an arbitrator has no obligation to accept an appointment to arbitrate under dispute procedures adopted unilaterally by an employer or union and to identify additional disclosure responsibilities for arbitrators who agree to serve under such procedures.

In 2001, the provisions of 1 C. were amended to eliminate the general prohibition of advertising, along with certain qualifying statements added in 1996, and replace them with a provision that permits advertising except that which is false or deceptive.

In 2003, 1 C. was amended further to reflect that the same standard applies to written solicitations of arbitration work, but that care must be taken to avoid compromising or giving the appearance of compromising the arbitrator's neutrality.

In 2007, a new 6 E. was added and the previous 6 E. was re-designated 6 F. The purpose of the revision was to make clear that an arbitrator does not violate the Code by retaining jurisdiction in an award over application or interpretation of a remedy.

NOTE: From time to time, the Committee on Professional Responsibility and Grievances of the National Academy of Arbitrators prepares Advisory Opinions relating to issues arising under the Code which are adopted upon approval by the Academy's Board of Governors. These Advisory Opinions can be found on the Academy's website: naarb.org.

**Exhibit 8**

# TABLE OF CONTENTS

FOREWORD ................................................................................................................ 1

TABLE OF CONTENTS

PREAMBLE ................................................................................................................ 4

1. ARBITRATOR'S QUALIFICATIONS AND
   RESPONSIBILITIES TO THE PROFESSION ....................................... 6
   A. General Qualifications.......................................................................... 6
   B. Qualification for Special Cases............................................................ 6
   C. Responsibilities to the Profession ....................................................... 7

2. RESPONSIBILITIES TO THE PARTIES ................................................. 8
   A. Recognition of Diversity in Arbitration Arrangements ....................... 8
   B. Required Disclosures............................................................................ 8
   C. Privacy of Arbitration........................................................................ 10
   D. Personal Relationships with the Parties............................................. 11
   E. Jurisdiction ........................................................................................ 11
   F. Mediation by an Arbitrator ............................................................... 12
   G. Reliance by an Arbitrator on Other Awards ..................................... 12
   H. Use of Assistants............................................................................... 13
   I. Consent Awards ................................................................................ 13
   J. Avoidance of Delay........................................................................... 13
   K. Fees and Expenses ............................................................................ 14

3. RESPONSIBILITIES TO ADMINISTRATIVE AGENCIES.................... 17
   A. General Responsibilities.................................................................... 17

4. PREHEARING CONDUCT ...................................................................... 18

5. HEARING CONDUCT.............................................................................. 19
   A. General Principles.............................................................................. 19
   B. Transcripts or Recordings.................................................................. 19
   C. Ex Parte Hearings.............................................................................. 20
   D. Plant Visits........................................................................................ 20
   E. Bench Decisions or Expedited Awards ............................................. 20

6. POST HEARING CONDUCT ................................................................... 21
   A. Post Hearing Briefs and Submissions................................................ 21
   B. Disclosure of Terms of Award........................................................... 21
   C. Awards and Opinions......................................................................... 21
   D. Clarification or Interpretation of Awards .......................................... 22
   E. Retaining Remedial Jurisdiction ....................................................... 22
   F. Enforcement of Award....................................................................... 22

**Exhibit 8**

# PREAMBLE

## Background

The provisions of this Code deal with the voluntary arbitration of labor-management disputes and certain other arbitration and related procedures which have developed or become more common since it was first adopted.

Voluntary arbitration rests upon the mutual desire of management and labor in each collective bargaining relationship to develop procedures for dispute settlement which meet their own particular needs and obligations. No two voluntary systems, therefore, are likely to be identical in practice. Words used to describe arbitrators (Arbitrator, Umpire, Impartial Chair, Chair of Arbitration Board, etc.) may suggest typical approaches, but actual differences within any general type of arrangement may be as great as distinctions often made among the several types.

Arbitrators of labor-management disputes are sometimes asked to serve as impartial third parties under a variety of arbitration and related procedures dealing with the rights and interests of employees in connection with their employment and/or representation by a union. In some cases these procedures may not be the product of voluntary agreement between management and labor. They may be established by statute or ordinance, *ad hoc* agreement, individual employment contract, or through procedures unilaterally adopted by employers and unions. Some of the procedures may be designed to resolve disputes over new or revised contract terms, where the arbitrator may be referred to as a Fact Finder or a member of an Impasse Panel or Board of Inquiry, or the like. Others may be designed to resolve disputes over wrongful termination or other employment issues arising under the law, an implied or explicit individual employment contract, or an agreement to resolve a lawsuit. In some such cases the arbitrator may be referred to as an Appeal Examiner, Hearing Officer, Referee, or other like titles. Finally, some procedures may be established by employers to resolve employment disputes under personnel policies and handbooks or established by unions to resolve disputes with represented employees in agency shop or fair share cases.

The standards of professional responsibility set forth in this Code are intended to guide the impartial third party serving in all of these diverse procedures.

## Scope of Code

This Code is a privately developed set of standards of professional behavior for arbitrators who are subject to its provisions. It applies to voluntary arbitration of labor-management disputes and the other arbitration and related procedures described in the Preamble, hereinafter referred to as "covered arbitration dispute procedures."

The word "arbitrator," as used hereinafter in the Code, is intended to apply to any impartial person, irrespective of specific title, who serves in a covered arbitration dispute

4

**Exhibit 8**

procedure in which there is conferred authority to decide issues or to make formal recommendations.

The Code is not designed to apply to mediation or conciliation, as distinguished from arbitration, nor to other procedures in which the third party is not authorized in advance to make decisions or recommendations. It does not apply to partisan representatives on tripartite boards. It does not apply to commercial arbitration or to uses of arbitration other than a covered arbitration dispute procedure as defined above.

## Format of Code

**Bold Face** type, sometimes including explanatory material, is used to set forth general principles. *Italics* are used for amplification of general principles. Ordinary type is used primarily for illustrative or explanatory comment.

## Application of Code

Faithful adherence by an arbitrator to this Code is basic to professional responsibility.

The National Academy of Arbitrators will expect its members to be governed in their professional conduct by this Code and stands ready, through its Committee on Professional Responsibility and Grievances, to advise its members as to the Code's interpretation. The American Arbitration Association and the Federal Mediation and Conciliation Service will apply the Code to the arbitrators on their rosters in cases handled under their respective appointment or referral procedures. Other arbitrators and administrative agencies may, of course, voluntarily adopt the Code and be governed by it.

In interpreting the Code and applying it to charges of professional misconduct, under existing or revised procedures of the National Academy of Arbitrators and of the administrative agencies, it should be recognized that while some of its standards express ethical principles basic to the arbitration profession, others rest less on ethics than on considerations of good practice. Experience has shown the difficulty of drawing rigid lines of distinction between ethics and good practice, and this Code does not attempt to do so. Rather, it leaves the gravity of alleged misconduct and the extent to which ethical standards have been violated to be assessed in the light of the facts and circumstances of each particular case.

**Exhibit 8**

# 1

# ARBITRATOR'S QUALIFICATIONS
# AND RESPONSIBILITIES
# TO THE PROFESSION

### A. General Qualifications

1. **Essential personal qualifications of an arbitrator include honesty, integrity, impartiality and general competence in labor relations matters.**

   **An arbitrator must demonstrate ability to exercise these personal qualities faithfully and with good judgment, both in procedural matters and in substantive decisions.**

   a. Selection by mutual agreement of the parties or direct designation by an administrative agency are the effective methods of appraisal of this combination of an individual's potential and performance, rather than the fact of placement on a roster of an administrative agency or membership in a professional association of arbitrators.

2. **An arbitrator must be as ready to rule for one party as for the other on each issue, either in a single case or in a group of cases. Compromise by an arbitrator for the sake of attempting to achieve personal acceptability is unprofessional.**

### B. Qualifications for Special Cases

1. **When an arbitrator decides that a case requires specialized knowledge beyond the arbitrator's competence, the arbitrator must decline appointment, withdraw, or request technical assistance.**

   a. An arbitrator may be qualified generally but not for specialized assignments. Some types of incentive, work standard, job evaluation, welfare program, pension, or insurance cases may require specialized knowledge, experience or competence. Arbitration of contract terms also may require distinctive background and experience.

   b. Effective appraisal by an administrative agency or by an arbitrator of the need for special qualifications requires that both parties make known the special nature of the case prior to appointment of the arbitrator.

6

**Exhibit 8**

## C. Responsibilities to the Profession

1.  **An arbitrator must uphold the dignity and integrity of the office and endeavor to provide effective service to the parties.**

    a.  To this end, an arbitrator should keep current with principles, practices and developments that are relevant to the arbitrator's field of practice.

2.  **An arbitrator shall not make false or deceptive representations in the advertising and/or solicitation of arbitration work.**

3.  **An arbitrator shall not engage in conduct that would compromise or appear to compromise the arbitrator's impartiality.**

    a.  Arbitrators may disseminate or transmit truthful information about themselves through brochures or letters, among other means, provided that such material and information is disclosed, disseminated or transmitted in good faith to representatives of both management and labor.

4.  **An experienced arbitrator should cooperate in the training of new arbitrators.**

7

**Exhibit 8**

# 2

# RESPONSIBILITIES TO
# THE PARTIES

### A. Recognition of Diversity in Arbitration Arrangements

1.  **An arbitrator should conscientiously endeavor to understand and observe, to the extent consistent with professional responsibility, the significant principles governing each arbitration system in which the arbitrator serves.**

    a.  Recognition of special features of a particular arbitration arrangement can be essential with respect to procedural matters and may influence other aspects of the arbitration process.

2.  **Such understanding does not relieve an arbitrator from a corollary responsibility to seek to discern and refuse to lend approval or consent to any collusive attempt by the parties to use arbitration for an improper purpose.**

3.  **An arbitrator who is asked to arbitrate a dispute under a procedure established unilaterally by an employer or union, to resolve an employment dispute or agency shop or fair share dispute, has no obligation to accept such appointment. Before accepting such an appointment, an arbitrator should consider the possible need to disclose the existence of any ongoing relationships with the employer or union.**

    a.  If the arbitrator is already serving as an umpire, permanent arbitrator or panel member under a procedure where the employer or union has the right unilaterally to remove the arbitrator from such a position, those facts should be disclosed.

### B. Required Disclosures

1.  **Before accepting an appointment, an arbitrator must disclose directly or through the administrative agency involved, any current or past managerial, representational, or consultative relationship with any company or union involved in a proceeding in which the arbitrator is being considered for appointment or has been tentatively designated to serve. Disclosure must also be made of any pertinent pecuniary interest.**

    a.  The duty to disclose includes membership on a Board of Directors, full-time or part-time service as a representative or advocate, consultation work for a fee, current stock or bond ownership (other than mutual fund shares or appropriate trust arrangements) or any other pertinent form of managerial, financial or immediate family interest in the company or union involved.

8

**Exhibit 8**

2. **When an arbitrator is serving concurrently as an advocate for or representative of other companies or unions in labor relations matters, or has done so in recent years, such activities must be disclosed before accepting appointment as an arbitrator.**

   **An arbitrator must disclose such activities to an administrative agency if on that agency's active roster or seeking placement on a roster. Such disclosure then satisfies this requirement for cases handled under that agency's referral.**

   a. It is not necessary to disclose names of clients or other specific details. It is necessary to indicate the general nature of the labor relations advocacy or representational work involved, whether for companies or unions or both, and a reasonable approximation of the extent of such activity.

   b. *An arbitrator on an administrative agency's roster has a continuing obligation to notify the agency of any significant changes pertinent to this requirement.*

   c. When an administrative agency is not involved, an arbitrator must make such disclosure directly unless the arbitrator is certain that both parties to the case are fully aware of such activities.

3. **An arbitrator must not permit personal relationships to affect decision-making.**

   **Prior to acceptance of an appointment, an arbitrator must disclose to the parties or to the administrative agency involved any close personal relationship or other circumstance, in addition to those specifically mentioned earlier in this section, which might reasonably raise a question as to the arbitrator's impartiality.**

   a. Arbitrators establish personal relationships with many company and union representatives, with fellow arbitrators, and with fellow members of various professional associations. There should be no attempt to be secretive about such friendships or acquaintances but disclosure is not necessary unless some feature of a particular relationship might reasonably appear to impair impartiality.

4. **If the circumstances requiring disclosure are not known to the arbitrator prior to acceptance of appointment, disclosure must be made when such circumstances become known to the arbitrator.**

5. **The burden of disclosure rests on the arbitrator. After appropriate disclosure, the arbitrator may serve if both parties so desire. If the arbitrator believes or perceives that there is a clear conflict of interest, the arbitrator should withdraw, irrespective of the expressed desires of the parties.**

9

**Exhibit 8**

## C. Privacy of Arbitration

1. **All significant aspects of an arbitration proceeding must be treated by the arbitrator as confidential unless this requirement is waived by both parties or disclosure is required or permitted by law.**

   a. Attendance at hearings by persons not representing the parties or invited by either or both of them should be permitted only when the parties agree or when an applicable law requires or permits. Occasionally, special circumstances may require that an arbitrator rule on such matters as attendance and degree of participation of counsel selected by a grievant.

   b. *Discussion of a case at any time by an arbitrator with persons not involved directly should be limited to situations where advance approval or consent of both parties is obtained or where the identity of the parties and details of the case are sufficiently obscured to eliminate any realistic probability of identification.*

      A commonly recognized exception is discussion of a problem in a case with a fellow arbitrator. *Any such discussion does not relieve the arbitrator who is acting in the case from sole responsibility for the decision and the discussion must be considered as confidential.*

      Discussion of aspects of a case in a classroom without prior specific approval of the parties is not a violation provided the arbitrator is satisfied that there is no breach of essential confidentiality.

   c. *It is a violation of professional responsibility for an arbitrator to make public an award without the consent of the parties.*

      *An arbitrator may ask the parties whether they consent to the publication of the award either at the hearing or at the time the award is issued.*

      *(1) If such question is asked at the hearing it should be asked in writing as follows:*

      *"Do you consent to the submission of the award in this matter for publication?*
      *(    )        (    )*
      *  YES           NO*

      *If you consent you have the right to notify the arbitrator within 30 days after the date of the award that you revoke your consent."*

      *It is desirable but not required that the arbitrator remind the parties at the time of the issuance of the award of their right to withdraw their consent to publication.*

**Exhibit 8**

(2) If the question of consent to the publication of the award is raised at the time the award is issued, the arbitrator may state in writing to each party that failure to answer the inquiry within 30 days will be considered an implied consent to publish.

d.  It is not improper for an arbitrator to donate arbitration files to a library of a college, university or similar institution without prior consent of all parties involved.  When the circumstances permit, there should be deleted from such donations any cases concerning which one or both of the parties have expressed a desire for privacy.  As an additional safeguard, an arbitrator may also decide to withhold recent cases or indicate to the donee a time interval before such cases can be made generally available.

e.  *Applicable laws, regulations, or practices of the parties may permit or even require exceptions to the above noted principles of privacy.*

### D. Personal Relationships with the Parties

1.  **An arbitrator must make every reasonable effort to conform to arrangements required by an administrative agency or mutually desired by the parties regarding communications and personal relationships with the parties.**

    a.  *Only an "arm's-length" relationship may be acceptable to the parties in some arbitration arrangements or may be required by the rules of an administrative agency.  The arbitrator should then have no contact of consequence with representatives of either party while handling a case without the other party's presence or consent.*

    b.  *In other situations, both parties may want communications and personal relationships to be less formal.  It is then appropriate for the arbitrator to respond accordingly.*

### E. Jurisdiction

1.  **An arbitrator must observe faithfully both the limitations and inclusions of the jurisdiction conferred by an agreement or other submission under which the arbitrator serves.**

2.  **A direct settlement by the parties of some or all issues in a case, at any stage of the proceedings, must be accepted by the arbitrator as removing further jurisdiction over such issues.**

11

# Exhibit 8

<b>F. Mediation by an Arbitrator</b>

1. **When the parties wish at the outset to give an arbitrator authority both to mediate and to decide or submit recommendations regarding residual issues, if any, they should so advise the arbitrator prior to appointment. If the appointment is accepted, the arbitrator must perform a mediation role consistent with the circumstances of the case.**

    a. Direct appointments, also, may require a dual role as mediator and arbitrator of residual issues. This is most likely to occur in some public sector cases.

2. **When a request to mediate is first made after appointment, the arbitrator may either accept or decline a mediation role.**

    a. *Once arbitration has been invoked, either party normally has a right to insist that the process be continued to decision.*

    b. *If one party requests that the arbitrator mediate and the other party objects, the arbitrator should decline the request.*

    c. *An arbitrator is not precluded from suggesting mediation. To avoid the possibility of improper pressure, the arbitrator should not so suggest unless it can be discerned that both parties are likely to be receptive. In any event, the arbitrator's suggestion should not be pursued unless both parties readily agree.*

<b>G. Reliance by an Arbitrator on Other Arbitration Awards or on Independent Research</b>

1. **An arbitrator must assume full personal responsibility for the decision in each case decided.**

    a. *The extent, if any, to which an arbitrator properly may rely on precedent, on guidance of other awards, or on independent research is dependent primarily on the policies of the parties on these matters, as expressed in the contract, or other agreement, or at the hearing.*

    b. When the mutual desires of the parties are not known or when the parties express differing opinions or policies, the arbitrator may exercise discretion as to these matters, consistent with the acceptance of full personal responsibility for the award.

12

<b>Exhibit 8</b>

## H. Use of Assistants

1. **An arbitrator must not delegate any decision-making function to another person without consent of the parties.**

   a. *Without prior consent of the parties, an arbitrator may use the services of an assistant for research, clerical duties, or preliminary drafting under the direction of the arbitrator, which does not involve the delegation of any decision-making function.*

   b. *If an arbitrator is unable, because of time limitations or other reasons, to handle all decision-making aspects of a case, it is not a violation of professional responsibility to suggest to the parties an allocation of responsibility between the arbitrator and an assistant or associate. The arbitrator must not exert pressure on the parties to accept such a suggestion.*

## I. Consent Awards

1. **Prior to issuance of an award, the parties may jointly request the arbitrator to include in the award certain agreements between them, concerning some or all of the issues. If the arbitrator believes that a suggested award is proper, fair, sound, and lawful, it is consistent with professional responsibility to adopt it.**

   a. *Before complying with such a request, an arbitrator must be certain of understanding the suggested settlement adequately in order to be able to appraise its terms. If it appears that pertinent facts or circumstances may not have been disclosed, the arbitrator should take the initiative to assure that all significant aspects of the case are fully understood. To this end, the arbitrator may request additional specific information and may question witnesses at a hearing.*

## J. Avoidance of Delay

1. **It is a basic professional responsibility of an arbitrator to plan a work schedule so that present and future commitments will be fulfilled in a timely manner.**

   a. *When planning is upset for reasons beyond the control of the arbitrator, every reasonable effort should nevertheless be exerted to fulfill all commitments. If this is not possible, prompt notice at the arbitrator's initiative should be given to all parties affected. Such notices should include reasonably accurate estimates of any additional time required. To the extent possible, priority should be given to cases in process so that other parties may make alternative arbitration arrangements.*

2. **An arbitrator must cooperate with the parties and with any administrative agency involved in avoiding delays.**

   a. *An arbitrator on the active roster of an administrative agency must take the initiative in advising the agency of any scheduling difficulties that can be foreseen.*

13

**Exhibit 8**

b. *Requests for services, whether received directly or through an administrative agency, should be declined if the arbitrator is unable to schedule a hearing as soon as the parties wish. If the parties, nevertheless, jointly desire to obtain the services of the arbitrator and the arbitrator agrees, arrangements should be made by agreement that the arbitrator confidently expects to fulfill.*

c. *An arbitrator may properly seek to persuade the parties to alter or eliminate arbitration procedures or tactics that cause unnecessary delay.*

3. **Once the case record has been closed, an arbitrator must adhere to the time limits for an award, as stipulated in the labor agreement or as provided by regulation of an administrative agency or as otherwise agreed.**

a. *If an appropriate award cannot be rendered within the required time, it is incumbent on the arbitrator to seek an extension of time from the parties.*

b. If the parties have agreed upon abnormally short time limits for an award after a case is closed, the arbitrator should be so advised by the parties or by the administrative agency involved, prior to acceptance of appointment.

### K. Fees and Expenses

1. **An arbitrator occupies a position of trust in respect to the parties and the administrative agencies. In charging for services and expenses, the arbitrator must be governed by the same high standards of honor and integrity that apply to all other phases of arbitration work.**

   **An arbitrator must endeavor to keep total charges for services and expenses reasonable and consistent with the nature of the case or cases decided.**

   **Prior to appointment, the parties should be aware of or be able readily to determine all significant aspects of an arbitrator's bases for charges for fees and expenses.**

   a. *Services Not Primarily Chargeable on a Per Diem Basis*

   By agreement with the parties, the financial aspects of many "permanent" arbitration assignments, of some interest disputes, and of some "ad hoc" grievance assignments do not include a per diem fee for services as a primary part of the total understanding. *In such situations, the arbitrator must adhere faithfully to all agreed-upon arrangements governing fees and expenses.*

14

**Exhibit 8**

b. *Per Diem Basis for Charges for Services*

(1) *When an arbitrator's charges for services are determined primarily by a stipulated per diem fee, the arbitrator should establish in advance the bases for application of such per diem fee and for determination of reimbursable expenses.*

*Practices established by an arbitrator should include the basis for charges, if any, for:*

(a) hearing time, including the application of the stipulated basic per diem hearing fee to hearing days of varying lengths;
(b) study time;
(c) necessary travel time when not included in charges for hearing time;
(d) postponement or cancellation of hearings by the parties and the circumstances in which such charges will normally be assessed or waived;
(e) office overhead expenses (secretarial, telephone, postage, etc.);
(f) the work of paid assistants or associates.

(2) *Each arbitrator should be guided by the following general principles:*

(a) *Per diem charges for a hearing should not be in excess of actual time spent or allocated for the hearing.*
(b) *Per diem charges for study time should not be in excess of actual time spent.*
(c) *Any fixed ratio of study days to hearing days, not agreed to specifically by the parties, is inconsistent with the per diem method of charges for services.*
(d) *Charges for expenses must not be in excess of actual expenses normally reimbursable and incurred in connection with the case or cases involved.*
(e) *When time or expense are involved for two or more sets of parties on the same day or trip, such time or expense charges should be appropriately prorated.*
(f) *An arbitrator may stipulate in advance a minimum charge for a hearing without violation of (a) or (e) above.*

(3) *An arbitrator on the active roster of an administrative agency must file with the agency the individual bases for determination of fees and expenses if the agency so requires. Thereafter, it is the responsibility of each such arbitrator to advise the agency promptly of any change in any basis for charges.*

Such filing may be in the form of answers to a questionnaire devised by an agency or by any other method adopted by or approved by an agency.

15

**Exhibit 8**

*Having supplied an administrative agency with the information noted above, an arbitrator's professional responsibility of disclosure under this Code with respect to fees and expenses has been satisfied for cases referred by that agency.*

(4) *If an administrative agency promulgates specific standards with respect to any of these matters which are in addition to or more restrictive than an individual arbitrator's standards, an arbitrator on its active roster must observe the agency standards for cases handled under the auspices of that agency, or decline to serve.*

(5) *When an arbitrator is contacted directly by the parties for a case or cases, the arbitrator has a professional responsibility to respond to questions by submitting the bases for charges for fees and expenses.*

(6) *When it is known to the arbitrator that one or both of the parties cannot afford normal charges, it is consistent with professional responsibility to charge lesser amounts to both parties or to one of the parties if the other party is made aware of the difference and agrees.*

(7) *If an arbitrator concludes that the total of charges derived from the normal basis of calculation is not compatible with the case decided, it is consistent with professional responsibility to charge lesser amounts to both parties.*

2.  **An arbitrator must maintain adequate records to support charges for services and expenses and must make an accounting to the parties or to an involved administrative agency on request.**

16

**Exhibit 8**

# 3

# RESPONSIBILITIES TO ADMINISTRATIVE AGENCIES

### A. General Responsibilities

1. **An arbitrator must be candid, accurate, and fully responsive to an administrative agency concerning qualifications, availability, and all other pertinent matters.**

2. **An arbitrator must observe policies and rules of an administrative agency in cases referred by that agency.**

3. **An arbitrator must not seek to influence an administrative agency by any improper means, including gifts or other inducements to agency personnel.**

   a. It is not improper for a person seeking placement on a roster to request references from individuals having knowledge of the applicant's experience and qualifications.

   b. Arbitrators should recognize that the primary responsibility of an administrative agency is to serve the parties.

17

**Exhibit 8**

# 4

# PREHEARING CONDUCT

**1. All prehearing matters must be handled in a manner that fosters complete impartiality by the arbitrator.**

    a. The primary purpose of prehearing discussions involving the arbitrator is to obtain agreement on procedural matters so that the hearing can proceed without unnecessary obstacles. If differences of opinion should arise during such discussions and, particularly, if such differences appear to impinge on substantive matters, the circumstances will suggest whether the matter can be resolved informally or may require a prehearing conference or, more rarely, a formal preliminary hearing. When an administrative agency handles some or all aspects of the arrangements prior to a hearing, the arbitrator will become involved only if differences of some substance arise.

    b. *Copies of any prehearing correspondence between the arbitrator and either party must be made available to both parties.*

18

**Exhibit 8**

# 5

# HEARING CONDUCT

### A. General Principles

1. **An arbitrator must provide a fair and adequate hearing which assures that both parties have sufficient opportunity to present their respective evidence and argument.**

   a. *Within the limits of this responsibility, an arbitrator should conform to the various types of hearing procedures desired by the parties.*

   b. An arbitrator may: encourage stipulations of fact; restate the substance of issues or arguments to promote or verify understanding; question the parties' representatives or witnesses, when necessary or advisable, to obtain additional pertinent information; and request that the parties submit additional evidence, either at the hearing or by subsequent filing.

   c. *An arbitrator should not intrude into a party's presentation so as to prevent that party from putting forward its case fairly and adequately.*

### B. Transcripts or Recordings

1. **Mutual agreement of the parties as to use or non-use of a transcript must be respected by the arbitrator.**

   a. *A transcript is the official record of a hearing only when both parties agree to a transcript or an applicable law or regulation so provides.*

   b. An arbitrator may seek to persuade the parties to avoid use of a transcript, or to use a transcript if the nature of the case appears to require one. *However, if an arbitrator intends to make appointment to a case contingent on mutual agreement to a transcript, that requirement must be made known to both parties prior to appointment.*

   c. If the parties do not agree to a transcript, an arbitrator may permit one party to take a transcript at its own cost. The arbitrator may also make appropriate arrangements under which the other party may have access to a copy, if a copy is provided to the arbitrator.

   d. Without prior approval, an arbitrator may seek to use a personal tape recorder to supplement note taking. The arbitrator should not insist on such a tape recording if either or both parties object.

19

**Exhibit 8**

## C. Ex Parte Hearings

1. **In determining whether to conduct an ex parte hearing, an arbitrator must consider relevant legal, contractual, and other pertinent circumstances.**

2. **An arbitrator must be certain, before proceeding ex parte, that the party refusing or failing to attend the hearing has been given adequate notice of the time, place, and purposes of the hearing.**

## D. Plant Visits

1. **An arbitrator should comply with a request of any party that the arbitrator visit a work area pertinent to the dispute prior to, during, or after a hearing. An arbitrator may also initiate such a request.**

   a. *Procedures for such visits should be agreed to by the parties in consultation with the arbitrator.*

## E. Bench Decisions or Expedited Awards

1. **When an arbitrator understands, prior to acceptance of appointment, that a bench decision is expected at the conclusion of the hearing, the arbitrator must comply with the understanding unless both parties agree otherwise.**

   a. *If notice of the parties' desire for a bench decision is not given prior to the arbitrator's acceptance of the case, issuance of such a bench decision is discretionary.*

   b. *When only one party makes the request and the other objects, the arbitrator should not render a bench decision except under most unusual circumstances.*

2. **When an arbitrator understands, prior to acceptance of appointment, that a concise written award is expected within a stated time period after the hearing, the arbitrator must comply with the understanding unless both parties agree otherwise.**

20

**Exhibit 8**

# 6

# POST HEARING CONDUCT

### A. Post Hearing Briefs and Submissions

1. **An arbitrator must comply with mutual agreements in respect to the filing or nonfiling of post hearing briefs or submissions.**

   a. An arbitrator may either suggest the filing of post hearing briefs or other submissions or suggest that none be filed.

   b. When the parties disagree as to the need for briefs, an arbitrator may permit filing but may determine a reasonable time limitation.

2. **An arbitrator must not consider a post hearing brief or submission that has not been provided to the other party.**

### B. Disclosure of Terms of Award

1. **An arbitrator must not disclose a prospective award to either party prior to its simultaneous issuance to both parties or explore possible alternative awards unilaterally with one party, unless both parties so agree.**

   a. Partisan members of tripartite boards may know prospective terms of an award in advance of its issuance. Similar situations may exist in other less formal arrangements mutually agreed to by the parties. In any such situation, the arbitrator should determine and observe the mutually desired degree of confidentiality.

### C. Awards and Opinions

1. **The award should be definite, certain, and as concise as possible.**

   a. When an opinion is required, factors to be considered by an arbitrator include: desirability of brevity, consistent with the nature of the case and any expressed desires of the parties; need to use a style and form that is understandable to responsible representatives of the parties, to the grievant and supervisors, and to others in the collective bargaining relationship; necessity of meeting the significant issues; forthrightness to an extent not harmful to the relationship of the parties; and avoidance of gratuitous advice or discourse not essential to disposition of the issues.

21

**Exhibit 8**

### D. Clarification or Interpretation of Awards

1.  **No clarification or interpretation of an award is permissible without the consent of both parties.**

2.  **Under agreements which permit or require clarification or interpretation of an award, an arbitrator must afford both parties an opportunity to be heard.**

### E. Retaining Remedial Jurisdiction

1.  **An arbitrator may retain remedial jurisdiction in the award to resolve any questions that may arise over application or interpretation of a remedy.**

    a.  Unless otherwise prohibited by agreement of the parties or applicable law, an arbitrator may retain remedial jurisdiction without seeking the parties' agreement. If the parties disagree over whether remedial jurisdiction should be retained, an arbitrator may retain such jurisdiction in the award over the objection of a party and subsequently address any remedial issues that may arise.

2.  **The retention of remedial jurisdiction is limited to the question of remedy and does not extend to any other parts of the award. An arbitrator who retains remedial jurisdiction is still bound by Paragraph D above, entitled "Clarification or Interpretation of Awards," which prohibits the clarification or interpretation of any other parts of an award unless both parties consent.**

### F. Enforcement of Award

1.  **The arbitrator's responsibility does not extend to the enforcement of an award.**

2.  **In view of the professional and confidential nature of the arbitration relationship, an arbitrator should not voluntarily participate in legal enforcement proceedings.**

22

**Exhibit 8**

| | |
|---|---|
| **From:** | Marc A. Sugerman |
| **Sent:** | Thursday, July 25, 2024 9:33 AM |
| **To:** | 'mtl@locontoadr.com' |
| **Cc:** | Nicole R. Tordesillas; Heather Hassell |
| **Subject:** | MNA and St. Vincent Hospital, AAA Case No. 01-24-0000-7400 - Subpoena Request |
| **Attachments:** | Tenet - SVH - LRC Arbitration - LRC Subpoena.docx; Tenet - SVH - LRC Arbitration - MNA Subpoena.docx |

Arbitrator Loconto,

I am representing St. Vincent Hospital in AAA Case No. 01-24-0000-7400, which is set for hearing on August 12. On behalf of SVH, I am requesting that you issue the attached subpoenas returnable on August 2.

Thank you,

Marc Sugerman





## Marc A. Sugerman 🪪
*Attorney at Law*

# FORDHARRISON 🔗
300 South Orange Avenue, Suite 1300 | Orlando, FL 32801
msugerman@fordharrison.com | P: 407-418-2308

*FHPromise* | **Subscribe**

1

**Exhibit 9**

## AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| MASSACHUSETTS NURSES ASSOCIATION, | ) ) ) | |
| Claimant, | ) ) | |
| and | ) ) | AAA Case No. 01-24-0000-7400 |
| ST. VINCENT HOSPITAL | ) ) | **SUBPOENA DUCES TECUM (DOCUMENTS)** |
| Respondent. | ) ) ) | |

To:    The Labor Relations Connection, Inc.
       c/o Custodian of Records
       23 Kiahs Way
       East Sandwich, Massachusetts 02537
       janteehan@the-lrc.com

You are hereby commanded to produce documents responsive to the requests appearing in Attachment A, by e-mail or other agreed-upon means no later than 5:00 P.M. EST on August 2, 2024, to Marc A. Sugerman, Esq., FordHarrison LLP, 300 S. Orange Ave., Suite 1300, Orlando, FL 32801, msugerman@fordharrison.com, ntordesillas@fordharrison.com.


Signed:    _____
           Arbitrator Michael T. Locanto

Dated:     _____


# Exhibit 9

## ATTACHMENT A TO SUBPOENA SUCES TECUM

1. All documents concerning or relating to demands for arbitration filed by MNA against Saint Vincent Hospital between January 1, 2013 and the present, including but not limited to:
   a. the underlying grievance that led to the arbitration demand;
   b. the demand for arbitration;
   c. the receipt and docketing of the demand;
   d. the selection of the arbitrator;
   e. the selection of dates for arbitration;
   f. the selection of the venue of the arbitration;
   g. LRC's acting as "administrator" or "intermediator";
   h. the compiling of applicable communications from the parties;
   i. communications to and from the arbitrator(s);
   j. arrangements for court reporters;
   k. hearing transcripts;
   l. briefs submitted by the partes;
   m. arbitration awards issued.

2. All emails, text messages or any other communications between LRC, its employees, representatives, agents or anyone acting on its behalf and MNA, its employees, representatives, agents or anyone acting on its behalf that concern or relate in any way to Saint Vincent Hospital from January 1, 2013 to the present.

3. All personal and business phone records of any individual who communicated with MNA or any of its employees, representatives or agents on behalf of LRC concerning Saint Vincent Hospital from January 1, 2013 to the present.

4. All documents, including but not limited to notes, memoranda and recordings of conversations had between LRC, its employees, representatives, agents or anyone acting on its behalf and MNA, its employees, representatives, agents or anyone acting on its behalf that concern or relate in any way to Saint Vincent Hospital from January 1, 2013 to the present

5. All emails, text messages or any other communications between LRC, its employees, representatives, agents or anyone acting on its behalf and Saint Vincent Hospital, its employees, representatives, agents or anyone acting on its behalf from January 1, 2013 to the present.

6. All personal and business phone records of any individual who communicated with Saint Vincent Hospital or any of its employees, representatives or agents on behalf of LRC from January 1, 2013 to the present.

7. All documents, including but not limited to notes, memoranda and recordings of conversations had between LRC, its employees, representatives, agents or anyone acting on its behalf and Saint Vincent Hospital, its employees, representatives, agents or anyone acting on its behalf from January 1, 2013 to the present.

**Exhibit 9**

8.  For all arbitrations filed by MNA against Saint Vincent Hospital from January 1, 2013 to the present, all documents including but not limited to contracts, agreements, term sheets or any other writings or things concerning or relating the nature of the services provided by LRC to MNA, Saint Vincent Hospital and/or arbitrators and the terms under which any such services are provided.

9.  All invoices sent from or received by LRC in connection with all arbitrations filed by MNA against Saint Vincent Hospital from January 1, 2013 to the present.

10. All LRC labor arbitration or other applicable rules in effect from January 1, 2013 to the present and any revisions thereto.

11. All documents authorizing LRC to administer or otherwise involve itself in each of the arbitrations filed by MNA against Saint Vincent Hospital from January 1, 2013 to the present.

**Exhibit 9**

**AMERICAN ARBITRATION ASSOCIATION**

| | | |
|---|---|---|
| MASSACHUSETTS NURSES ASSOCIATION, | ) ) ) | |
| Claimant, | ) ) | |
| and | ) ) | AAA Case No. 01-24-0000-7400 |
| ST. VINCENT HOSPITAL | ) ) | **SUBPOENA DUCES TECUM (DOCUMENTS)** |
| Respondent. | ) ) ) | |

To:   Massachusetts Nurses Association
c/o Alan J. McDonald, Esq.
McDonald Lamond Canzoneri LLC
352 Turnpike Road, Suite 210
Southborough, MA 01772-1756
*amcdonald@masslaborlawyers.com*
*shilli@masslaborlawyers.com*

   You are hereby commanded to produce documents responsive to the requests appearing in Attachment A, by e-mail or other agreed-upon means no later than 5:00 P.M. EST on August 2, 2024, to Marc A. Sugerman, Esq., FordHarrison LLP, 300 S. Orange Ave., Suite 1300, Orlando, FL 32801, msugerman@fordharrison.com, ntordesillas@fordharrison.com.

Signed:   _____

   Arbitrator Michael T. Locanto

Dated:   _____

**Exhibit 9**

### ATTACHMENT A TO SUBPOENA DUCES TECUM

1.  All documents concerning or relating to arbitrations between Saint Vincent Hospital and the Massachusetts Nurses Association from January 1, 2000 to the present, including but not limited to:
    a.  the underlying grievance that led to the arbitration demand;
    b.  the demand for arbitration;
    c.  the receipt and docketing of the arbitration demand;
    d.  the selection of the arbitrator;
    e.  the selection of dates for arbitration;
    f.  the selection of the venue of the arbitration;
    g.  the relevant person or agency acting as "administrator" or "intermediator";
    h.  the compiling of applicable communications by the relevant agency;
    i.  communications to and from the arbitrator(s);
    j.  arrangements for court reporters;
    k.  the transmission of all communications to the arbitrator(s) by the agency;
    l.  hearing transcripts;
    m.  briefs submitted by the partes;
    n.  arbitration awards issued.

2.  All documents concerning or relating to the use of Labor Relations Connection ("LRC") from the time period January 1, 2013 to the present, including but not limited to:
    a.  All documents mentioning the use of LRC;
    b.  All communications between MNA, its employees, representatives, agents or anyone acting on its behalf and LRC, its employees, agents or anyone acting on its behalf;
    c.  All personal and business phone records of any individual who communicated with LRC or any of its employees or agents on behalf of MNA;
    d.  All documents reflecting conversations between MNA, its employees, representatives, agents or anyone acting on its behalf and LRC, its employees, agents or anyone acting on its behalf.

3.  From January 1, 2000 to the present, all documents concerning or relating to the "contractual relationship among four parties," (i.e., "the arbitrator, the [the agency], the Union and the employer"), as alleged by the Union, including but not limited to:
    a.  documents relating to the arbitrator providing services at a particular rate of pay, and
    b.  the parties' alleged agreement to agree to abide by AAA and/or LRC rules relating to the administration of the case;
    c.  the parties' alleged agreement to hold arbitrators to the ethical guidelines of the National Academy of Arbitrators.

4.  All documents concerning or relating to the use of the American Arbitration Association ("AAA") from the time period January 1, 2000 to the present, including but not limited to:
    a.  All documents mentioning the use of AAA;
    b.  All communications between MNA, its employees, representatives, agents or anyone acting on its behalf and AAA, its employees, agents or anyone acting on its behalf from January 1, 2022 to the present;

**Exhibit 9**

5. For the period January 1, 2000 to the present, all documents, including but not limited to letters, emails, text messages, notes, minutes, memoranda, leaflets, presentations, memorializations of oral communications, and audio or video media, showing all communication between and among MNA representatives regarding the following:
   a. MNA's opinion of Saint Vincent Hospital;
   b. The filing of grievances against Saint Vincent Hospital;
   c. The filing of arbitration demands against Saint Vincent Hospital;
   d. Labor Relations Connection, Inc.;
   e. American Arbitration Association;
   f. Arbitrator James Cooper;
   g. the grievance procedure contained in the parties' collective bargaining agreements.

6. For the period January 1, 2022 to present, all documents concerning or relating to Saint Vincent Hospital's requests for information relating to arbitration past practices alleged by the Union, including but not limited to:
   a. The requests for information;
   b. The efforts made by MNA to collect documents responsive to those requests;
   c. MNAs responses to those requests.

**Exhibit 9**

AMERICAN ARBITRATION ASSOCIATION
BEFORE ARBITRATOR MICHAEL LOCONTO

| In the matter of<br><br>Massachusetts Nurses Association,<br><br>and<br><br>St. Vincent Hospital<br><br>Gr.    Instructed LRC to Cease    Purported 'Administration' of    Pending Matters | AAA # 01-24-0000-7400 |
|---|---|

**MASSACHUSETTS NURSES ASSOCIATION
MOTION TO QUASH SUBPONEA DUCES TECUM
PROFERRED BY ST. VINCENT HOSPITAL**

### I.      BACKGROUND

On July 26, 2024 the American Arbitration Association (AAA) emailed the parties to alert them that St. Vincent Hospital (Hospital) had direct, *ex parte* communication with Arbitrator Michael Loconto (Arbitrator). Specifically AAA advised that the Hospital requested that the Arbitrator sign two subpoenas duces tecum, and issued the following direction from the Arbitrator at that time:

> The attached subpoena request was sent to Arbitrator Loconto unilaterally. The arbitrator would like to advise you of the following:
>
> 1. A reminder that all correspondence with the arbitrator is to be routed through the AAA case manager.
>
> 2. If a subpoena is requested, it must be shared with the other side prior to submission to the arbitrator for consideration.
>
> 3. If and when a subpoena is requested, the arbitrator will schedule a conference call to discuss the underlying requested items.

1

**Exhibit 10**

One subpoena duces tecum was addressed to Keeper of Records of the union in this matter, Massachusetts Nurses Association (MNA); and the second to a third party named "Labor Relations Connection" (LRC). A copy of each of the two subpoenas duces tecum is attached hereto respectively as Exhibit 1 (MNA) and Exhibit 2 (LRC).

Following a telephone conference with the Arbitrator, a schedule was established for MNA to submit a motion to quash. This submission is MNA's motion in that regard.

Before turning to MNA's argument in Part II, MNA reviews background relating to this. There is or should be no dispute as to the following.

MNA has represented non-supervisory registered nurses (RNs) employed by St. Vincent Hospital since MNA was certified by the NLRB after an election in 1998. After a strike in connection with negotiating the first collective bargaining agreement (CBA), a CBA was executed by MNA and the Hospital covering the period 2000-2003. The parties executed CBAs thereafter typically every three years, each of which CBA contained a grievance and arbitration procedure. Attached as Exhibits 3–6 are excerpts from four CBAs that contain the grievance and arbitration procedure.

As noted in the caption of the Demand for Arbitration, this case relates to a dispute between the parties about administration of the arbitration procedure by the LRC. In this regard it should be noted that the 2000-2003 CBA contained an agreement to arbitrate grievances at Article XXI at "Step 4" which stated in relevant part, as follows:

> Step 4: Should the MNA request arbitration in accordance with the time limits specified herein, an arbitration shall be selected pursuant to the Voluntary Labor Arbitration Rules of the American Arbitration Association.

2

**Exhibit 10**

Exh. 3 (2000-03 CBA Excerpt) (emphasis added).  Note that the language emphasized refers

only to the AAA at that point.  This same language continued through the 2006-09 CBA.   See

Exh. 4 (2006-2009 CBA Excerpt).

The 2010-2013 CBA shows an amendment to the parties agreement to arbitrate whereby

they agreed to add a second labor arbitration agency, the Labor Relations Connection (LRC)

under the language for Step 4, in relevant part, as follows:

> Step 4:  Should the MNA request arbitration in accordance with
> the time limits specified herein, an arbitration shall be selected
> pursuant to the Voluntary Labor Arbitration Rules of the American
> Arbitration Association <u>or the applicable procedures of the Labor
> Relations Connection</u>.

Exh. 5 (2010-13 CBA Excerpt) (emphasis added).  The identical language continued in all

contracts thereafter.  Thus, the current 2022-2025 CBA—which went into effect following a

301-day strike by the RNs from March 2021 to January 2, 2022—continued to include reference

to both the AAA and LRC.  See Exh. 6 (2022-25 CBA Excerpt).

On September 20, 2023—21 months after the nurses returned from the 301-day strike

referenced above, and the current contract taking effect—Hospital representative Christopher

Borruso sent an email to the LRC and multiple counsel of MNA and the Hospital demanding

LRC "cease" administration of the arbitration procedure after selection of the arbitrator.

Borruso's September 20, 2023 email stated as follows in that regard:

> Please be advised that the collective bargaining agreement between
> Saint Vincent Hospital ("Hospital") and the Massachusetts Nursing
> Association ("MNA") provides for the selection of arbitrators
> pursuant to the Voluntary Labor Arbitration Rules of the American
> Arbitration Association or the applicable procedures of the Labor
> Relations Connection. It does not provide for the application of
> either agency's rules or for the "administration" of any matters by
> either agency.

**Exhibit 10**

> Accordingly, effective as of the date and time of this email, you are instructed to cease any purported "administration" of, or any other participation of any kind in, any of the Hospital's currently pending matters. Please provide me the arbitrator's contact information in each of the Hospital's currently pending cases at your absolute earliest convenience, but by no later than the close of business tomorrow, September 21, 2023.

Exhibit 7 (Borruso 9/20/23 Email).

On October 20, 2023 MNA filed a grievance alleging that the Hospital violated the CBA by demanding that LRC "cease" all administration of arbitrations after the selection of the arbitrator.  Exhibit 8 (Step 1 Grievance).  After the internal grievance procedure did not result in resolution of the grievance, MNA advanced the grievance to arbitration by filing a Demand for Arbitration with the AAA in February 2024.  MNA filed with AAA because in November 2023—two months after Borruso's email of September 20, 2023 noted above—LRC advised it would no longer accept cases involving St. Vincent in context of the dispute.  Thus MNA under the CBA had only one option under the CBA at that point, and that was to file with AAA.

Where the Arbitrator is evaluating MNA's motion to quash the subpoena duces tecum, and where one of MNA's objections relates to relevance, the Arbitrator should understand the reasons why MNA contends that the Hospital violated the CBA by declaring that the LRC shall cease administration of arbitrations after the selection of the arbitrator.  MNA turns to a summary of those arguments that are pertinent to evaluating relevance of the subpoena paragraphs.

MNA will argue, inter alia, that the language of the CBA, without more, requires the parties to permit LRC and AAA to administrator the arbitration through the entire process from selection of the arbitrator to the final disposition of the case.  In addition, MNA will argue that, assuming arguendo the Arbitrator finds the language of the CBA ambiguous in that regard, then past practice (implementation) of CBA clarifies the parties' intent in favor of MNA's position

4

**Exhibit 10**

regarding the meaning of Step 4 of Article XXI; that such practice is clear, consistent, and longstanding; specifically, MNA will show that, for the twenty-three years period from 2000 to September 20, 2023,[1] MNA filed 111 Demands for Arbitration under the SHV CBA with AAA and LRC; and that AAA and LRC administered the process from inception to final disposition without objection by the Hospital.[2] This practice occurred during the pendency of language at Step 4 that was the same, except for the addition of the LRC as a second option for labor arbitration administration in 2010. See Exhibits 3–6 (CBA excerpts from 2020 to current CBA).

More specifically with respect to the 111 Demands for Arbitration MNA filed through September 20, 2023, and 26 Demands for Arbitration filed thereafter, the evidence will show the following:

- 26 AAA Demands filed from 2001 to 2013

- 9 LRC Demands filed from 2016 through Dec 2021 (end of strike)

- 76 LRC Demands filed from 2021 to Sept 20, 2023

- Total Demands through Sept 20, 2023: 111

- 26 AAA Demands filed from Nov 1, 2023 to Sept 12, 2024

---

[1] As noted above, September 20, 2023 is the date when Borruso sent the email to the LRC demanding that the LRC "cease" all administration after the selection of the arbitrator.

[2] For example, in those 111 cases, after the arbitrator was selected, the LRC and AAA were involved in activity ranging from offering dates for hearing provided by the arbitrator; scheduling; issuing notices of hearing; receiving motions or other communications from one party and coordinating the accumulation of any responses and replies to fruition and then sending the entire packet of such communications to the arbitration at once at a package of party positions (rather than piecemeal, one by one); coordinating telephone conferences for pre-arbitration issues and any submissions relating to same such as occurred in this case; communicating to establish details such as venue or court reporter; coordinating the exchange of briefs by the parties and transmitting briefs to the arbitrator; and/or, sending the arbitration award if one was issued; plus issuing notice of final disposition in all cases about final disposition (e.g., issuance of arbitration award, withdrawal of the arbitration).

**Exhibit 10**

In addition, MNA will show that the issue has been addressed by multiple arbitrators on a case-by-case basis; that at least fifteen arbitrators of LRC cases ruling that the parties must continue to use the LRC or AAA after the selection of the arbitrator; and the objection was raised in at least six of the AAA cases and arbitrators in those cases ruled in favor of continuing AAA administration.

Having set forth the foregoing background, MNA turns next to its arguments relating its objections to the subject subpoena duces tecum.

## II.     ARGUMENT

Below MNA quotes in bold each of the six paragraphs of the subpoena and then explains the reasons why the Arbitrator should strike the paragraph.

**1.     All documents concerning or relating to arbitrations between Saint Vincent Hospital and the Massachusetts Nurses Association from January 1, 2000 to the present, including but not limited to:**
  a. **the underlying grievance that led to the arbitration demand;**
  b. **the demand for arbitration;**
  c. **the receipt and docketing of the arbitration demand;**
  d. **the selection of the arbitrator;**
  e. **the selection of dates for arbitration;**
  f. **the selection of the venue of the arbitration;**
  g. **the relevant person or agency acting as "administrator" or "intermediator";**
  h. **the compiling of applicable communications by the relevant agency;**
  i. **communications to and from the arbitrator(s);**
  j. **arrangements for court reporters;**
  k. **the transmission of all communications to the arbitrator(s) by the agency;**
  l. **hearing transcripts;**
  m. **briefs submitted by the partes [sic];**
  n. **arbitration awards issued.**

MNA objects to paragraph one of the subpoena duces tecum (quoted above) on grounds that it is overly broad, seeks evidence that is not relevant, seeks immaterial cumulative material, and poses an undue burden.  In addition, the subpoena duces tecum has no limitations that define

6

# Exhibit 10

parameters, and therefore it purports to require production of attorney-client, work product, or other privileged materials.

The introductory sentence of paragraph one, uses the term "concerning or relating to arbitrations" involving the parties from "2000 to present" in describing documents that the Hospital seeks MNA to produce. On the issue of relevance, the only information that is necessary to confirm MNA allegations that it filed 111 Demands for Arbitration (as detailed in the Background section), and that LRC or AAA continued administration of the arbitration after the selection of arbitration. There are specific documents for each of the 111 arbitrations which go to the issue and the subpoena should be limited to those.

In this regard the Arbitrator should find that paragraph one should be limited to MNA producing non-privileged documents for the period 2000 to September 20, 2023, as follows:

1.    the Demand for Arbitration;

2.    with respect to the subject of LRC or AAA administering the arbitration process after the selection of the arbitrator ("the Subject"), any objection transmitted by the Hospital to MNA or LRC about the Subject;

3.    any exchange of positions about the Subject where the Hospital or MNA presented arguments about the Subject;

4.    any rulings by arbitrators resolving any dispute about the Subject;

5.    one example for each case of LRC and AAA administering the arbitration process after the selection of the arbitrator, such as issuance of a notice of hearing, coordinating communication and issuing notices of arbitrator decisions about any other arbitration issues; and,

6.    LRC and AAA communication relating to the final disposition of the case including withdrawal, withdrawal upon report of matter settled, issuance of an arbitration award, placing in abeyance, closing the case.

7

**Exhibit 10**

Anything beyond the six categories of documents described above should be stricken as irrelevant, overly broad, and seeking immaterial cumulative material about LRC and AAA administration after the selection of the arbitrator.

On the issue of paragraph one seeking documents that are immaterial, cumulative—the six categories of documents noted are sufficient to show LRC and AAA administration after the selection of the arbitrator and any objections to such administration.  Where paragraph one purports to require production of all examples of LRC or AAA administration, after the selection of the arbitrator, the Arbitrator should find that's unnecessary.  In any given case it is not a material issue whether there are only a handful of examples of administration after the arbitrator is selected (e.g., a notice of hearing and a dismissal letter after the case was settled)—versus dozens of examples (e.g., in a case with multiple notices of hearing, multiple telephone conferences coordinated by the LRC, and the LRC coordinating briefing of pre-arbitration issues and post-arbitration briefs, and then issuing the award and a letter closing the case).  The material issue is whether there was AAA and LRC administration in each arbitration after the arbitrator was selected to the final disposition of the case, and whether the Hospital ever objected.  Thus, paragraph one of the Hospital subpoena seeks immaterial cumulative evidence (and is overly broad) about post-arbitrator-selection administration by the LRC and AAA.  One example of such administration per arbitration, and evidence of notice of final disposition is sufficient.

The Arbitrator should also find that paragraph one seeks irrelevant information and is overly broad, where it seeks production of a vast array of documents about each grievance.  This is not remotely relevant to the arbitration and to the arbitration administration past practice issue.  Thus, there is no relevance to obtaining documents for each of the 111 arbitrations that includes the underlying grievance, grievance answers, notes of grievance procedure at each step,

8

**Exhibit 10**

documents exchanged during the grievance procedure, documents that MNA gathered about the grievance, emails about the case among MNA representatives, the grievant, or the Hospital representatives, documents concerning the merits of the grievance, exhibits introduced at arbitration, what transpired at the arbitration and any arbitration transcript, and the award that was issued.  None of that is relevant to the disposition of the arbitration nor specifically to the past practice issue asserted by MNA.  By seeking "[a]ll documents concerning or relating to arbitrations" between the Hospital and MNA (and including examples that reinforce its overly broad nature), the Hospital in paragraph one demands production of a massive volume of documents that are not relevant to the merits of this arbitration or the specific past practice issue alleged by MNA.  For this further reason the Arbitrator should strike paragraph one as overly broad and seeking irrelevant material to the extent it goes beyond the six categories of documents that relate to LRC and AAA administration that MNA has listed above.

Paragraph one is also objectionable separately and independently because it is imposes an egregious, undue burden upon MNA.  First, it should be noted that all documents the Hospital seeks the Hospital already possess.  To the extent an egregious burden is going to be imposed, the Hospital should be limited to imposing that egregious burden on itself.  For example, the Hospital can gather all of the irrelevant material it wants about the 111 arbitrations—all grievance materials, grievance, grievance answers, its grievance notes, evidence relating to the merits of the grievance, evidence introduced at arbitrations from 2000 to 2023, any arbitration transcript, and arbitration briefs.  If the Hospital attempts to introduce such material at the hearing, MNA will object on grounds of it being irrelevant, immaterial, cumulative evidence.

Second, the request seeks thousands of pages of documents and would require MNA to expend hundreds of hours to comply.  MNA knows this based upon what has transpired with

9

**Exhibit 10**

respect to a subpoena duces tecum that the Hospital served upon MNA in an ongoing unfair

labor practice (ULP) trial.  To understand that more specifically, MNA provides some context.

There is an ongoing ULP trial which being prosecuted by General Counsel of the National Labor

Relations Board (NLRB) against the Hospital as the Respondent; MNA is the Charging Party.

The past practice issue in this arbitration is also relevant in that NLRB ULP trial.  However,

there are issues in the ULP trial that are not presented here, including most notably an issue

relating to allegations of unlawful, pre-arbitration conduct of the Hospital.

In this context, the Hospital, as Respondent in the NLRB ULP trial, served a subpoena

duces tecum upon MNA that sought documents as sought in paragraph one of the subpoena at

issue here.  See Exhibit 10 (subpoena duces tecum - ULP trial).  The Administrative Law Judge

(ALJ) in the ULP trial issued a decision requiring production of some of the communications

that the Hospital seeks to produce here, but only for a three-year period 2020-2023.  See Exhibit

9 at page 4–6, attached hereto.  There are two sections of particular importance in the ALJ

decision:  Section 4 of the ALJ decision, Exh. 9 at 5–6, pertains to a ULP allegation about the

Hospital unlawfully demanding the LRC to cease all administration after the arbitrator is

selected; Section 3 of the ALJ decision, Exh. 9 at 4–5, relates to a ULP issue (not alleged in this

case) about the Hospital's conduct during the pre-arbitration grievance procedure.  See also

Exhibit 10 for the ULP trial subpoena paragraphs discussed in those section.  Both Section 3 and

Section 4 of the ALJ decision relate to material requested in subject subpoena at paragraph one.

Based upon MNA's experience complying with the subpoena duces tecum in the ULP

trial in response to the ALJ's decision in Section 3 and Section 4—which corresponds with

paragraph one of the subpoena at issue here—MNA has specific information about the burden of

production.  With respect to MNA complying with the ALJ's ruling in Section 4 (arbitration

**Exhibit 10**

procedure), Exh. 9 at 5–5, MNA produced approximately 30,000 pages of documents. That included production of all communications with the LRC and AAA. The process to obtain those documents included accumulating all emails, and attachments thereto, from this firm's email system for arbitrations involving MNA and the Hospital *only from* 2020 to 2023. Thousands of further pages would need to be located and produced if the request went back a further 20 years to 2000 and require accessing archives.

With respect to MNA complying with <u>Section 3</u> of the ALJ's decision regarding allegations about the Hospital commission of ULPs during pre-arbitration grievance procedure, Exh. 9 at 4–5, MNA produced approximately 50,000 pages of documents, and that's going back to only 2020 per the ALJ's decision. The work to produce this material required counsel for MNA, and MNA itself, to each retain IT consultants and gather documents, and directly obtain documents without such consultant, including emails and paper, and conducting investigative discussions about such material with more than a dozen individuals. The search would be even more onerous going back to 2000 and require searching archives and speaking to more people.

In order to search and produce material described above, MNA consumed hundreds of hours of attorneys, witnesses, and consultants searching for documents only going only back to 2020—not to 2000. Hundreds of further hours would need to be expended to produce documentation requested in paragraph one going back to 2000 without any limits (i.e., without limiting paragraph one to the six categories listed above).

Finally, the subpoena at paragraph one has no exclusion of attorney-client, work product, or other privileged material and should be stricken to the extent it seeks such material. Under the category of "other privileged" documents, MNA objects to production of communications by individual RNs to MNA representatives. Any such documents would constitute protected

11

**Exhibit 10**

concerted activity under Section 7 of the NLRA and are not subject to production.  See the ALJ's decision for discussion of this.  Exh. 9 at 2–5 (citing Chino Valley Medical Center, 362 NLRB 283, fn. 1 (2015)).[3]  All privileged material should be excluded from production.

Based upon the foregoing, MNA submits the Arbitrator should limit paragraph to production of documents for the period 2000 to September 20, 2023 as described in the six categories outlined above.

> **2.   All documents concerning or relating to the use of Labor Relations Connection ("LRC") from the time period January 1, 2013 to the present, including but not limited to:**
> a.   **All documents mentioning the use of LRC;**
> b.   **All communications between MNA, its employees, representatives, agents or anyone acting on its behalf and LRC, its employees, agents or anyone acting on its behalf;**
> c.   **All personal and business phone records of any individual who communicated with LRC or any of its employees or agents on behalf of MNA;**
> d.   **All documents reflecting conversations between MNA, its employees, representatives, agents or anyone acting on its behalf and LRC, its employees, agents or anyone acting on its behalf.**

MNA objects to paragraph two of the subpoena duces tecum (quoted above) on grounds that it is overly broad, seeks evidence that is not relevant, poses an undue burden, and purports to require production of attorney-client, work product, or other privileged materials.

First, with respect to the request being overly broad, there are no limitations on the request where, in the introductory paragraph it broadly seeks "[a]ll documents concerning or relating to the use of the [LRC] from January 1, 2013 to the present."  This request subsumes

---

[3] "The Board has held that employer subpoenas broadly requesting a union's records, including communications between the union and its members, are properly revoked to protect the bargaining process."  Bench Book (NLRB Trial Manual), § 8–460, citing Berbiglia, Inc., 233 NLRB 1476 (1977).

12

**Exhibit 10**

MNA's use of the LRC for any employer, not limited to St. Vincent Hospital; grossly overly broad and irrelevant. By defining the subject matter as anything concerning or relating to the "use" of the LRC, this subsumes a massive, grossly over broad range of irrelevant documents that could include communications with any person or any organization. For example, this paragraph purports to require MNA to produce documents that reflect its discussion of the use of the LRC with other unions, organizations, individuals, with other hospitals about using or agreeing to use the LRC. The request purports to require production hundreds of collective bargaining agreements and grievance documents pertaining to approximately 125 hospitals for which MNA represents the RNs for collective bargaining.

Paragraph two at clause "a" purports to require production of MNA's internal deliberations about the use of LRC. See e.g., Exh. 9 at 4, 7–9, and n.4 (ALJ upholding petition to revoke as relates to excluding internal deliberations, strategy).[4] See also Exhibit 10 for the ULP trial subpoena paragraphs discussed in those section. Such communications are irrelevant and privileged.

Paragraph two at clauses "b" through "d" reinforces the objections. Those clauses purport to require production of all documents showing communications by any MNA representatives with the LRC, and in general, not just limited to communications with the LRC about St. Vincent Hospital cases. There is no relevance to such communications in general, nor in particular as relates to this Hospital. Rather, all of those specific requests are quintessential

---

[4] See e.g., <u>SSC Mystic Operating Co., LLC v. N.L.R.B.</u>, 801 F.3d 302, 314 (D.C. Cir. 2015) (finding no prejudice where the ALJ revoked subpoena for production of internal union communications)..

**Exhibit 10**

fishing expeditions, and in this case a fishing expedition for irrelevant information.[5] The relevant

scope of information is information about past practice.

In summary, the entire paragraph two should be stricken, except to the extent it may be

construed as requiring information requested in paragraph one about past practice and limiting it

to the six categories noted above.

> **3.      From January 1, 2000 to the present, all documents concerning**
> **or relating to the "contractual relationship among four parties," (i.e.,**
> **"the arbitrator, the [the agency], the Union and the employer"), as**
> **alleged by the Union, including but not limited to:**
>   **a.  documents relating to the arbitrator providing services at a**
>       **particular rate of pay, and**
>   **b.  the parties' alleged agreement to agree to abide by AAA and/or**
>       **LRC rules relating to the administration of the case;**
>   **c.  the parties' alleged agreement to hold arbitrators to the ethical**
>       **guidelines of the National Academy of Arbitrators.**

MNA objects to paragraph three of the subpoena duces tecum (quoted above) on grounds

that it is overly broad, vague, seeks evidence that is not relevant, poses an undue burden, and

purports to require production of attorney-client, work product, or other privileged materials.

Paragraph three is vague and overly broad where it does not define "Union" or

"employer" and uses quotes without identifying the source or relevance to this case.  Assuming

that the "Union" is MNA, there is no limitation on the "employer," so it could include MNA's

dealing with any one or more of the approximate 125 employers for which RNs are employed

that MNA represents.  The reference to "alleged" is also vague.  Paragraph three does not define

who is making such allegation about a third-part contract.  This is compounded by the fact that

---

[5] The ALJ addressed this same issue in Section 4 in discussion paragraph 21 of the ULP trial
subpoena (which correlates with paragraph two of this subpoena, as well).  Exh. 9 at 5–6 (second
paragraph under section "4").

14

**Exhibit 10**

the grievance in this matter, Exh. 8, alleges a violation of the collective bargaining agreement. For all those reasons, the arbitrator may strike paragraph three on grounds of vagueness.

Paragraph three purports to require production of documents relating to a contract by the Hospital and MNA with the arbitrator and the LRC or AAA. The grievance alleges a violation of the CBA. There is no apparent relevance to the request. For example, the arbitrator in this case charges a particular amount per day of hearing; likewise arbitrators in the 111 other cases that MNA cites about past practice charged particular rates; and, for that matter in the hundreds and hundreds of arbitration demands MNA has filed under collective bargaining agreements with the other 124 employers at which MNA represents RNs, each arbitrator had a specified rate of pay. None of that is relevant to this case, and the request is overly broad as well for that reason.

With respect to clauses "b" and "c," there is no objection to the extent they relate solely to the labor arbitration procedure of MNA and the Hospital, and excluding privileged information, as follows. Clause "b" seeks documents that relate to "the parties' alleged agreement to agree to abide by AAA and/or LRC rules relating to the administration of the case," and "c" to "the parties' alleged agreement to hold arbitrators to the ethical guidelines of the National Academy of Arbitrators." Any such documents are relevant.

Based upon the foregoing, the Arbitrator should limit paragraph three to documents relating to clauses "b" and "c" only as relates to arbitrations involving the Hospital and MNA, excluding privileged documents. Paragraph three should be stricken to the extent it seeks documents beyond this.

> **4.      All documents concerning or relating to the use of the American Arbitration Association ("AAA") from the time period January 1, 2000 to the present, including but not limited to:**
> **a.  All documents mentioning the use of AAA;**
> **b.  All communications between MNA, its employees, representatives, agents or anyone acting on its behalf and**

15

**Exhibit 10**

> **AAA, its employees, agents or anyone acting on its behalf from January 1, 2022 to the present;**

MNA objects to paragraph four of the subpoena duces tecum (quoted above) on grounds that it is overly broad, seeks evidence that is not relevant, poses an undue burden, and purports to require production of attorney-client, work product, or other privileged materials. Paragraph four is substantially the same as paragraph two. The only difference is that it purports to require production of a massive volume of irrelevant documents in any context relating to MNA's internal communications about the use of the AAA and with the AAA.

In summary, the entire paragraph four should be stricken, except to the extent it may be construed as requiring information requested in paragraph one about past practice and limiting it to the six categories noted under paragraph one.

> **5.      For the period January 1, 2000 to the present, all documents, including but not limited to letters, emails, text messages, notes, minutes, memoranda, leaflets, presentations, memorializations [sic] of oral communications, and audio or video media, showing all communication between and among MNA representatives regarding the following:**
>    a. **MNA's opinion of Saint Vincent Hospital;**
>    b. **The filing of grievances against Saint Vincent Hospital;**
>    c. **The filing of arbitration demands against Saint Vincent Hospital;**
>    d. **Labor Relations Connection, Inc.;**
>    e. **American Arbitration Association;**
>    f. **Arbitrator James Cooper;**
>    g. **the grievance procedure contained in the parties' collective bargaining agreements.**

MNA objects to paragraph five of the subpoena duces tecum (quoted above) on grounds that it is overly broad, seeks evidence that is not relevant, is intended to harass and annoy, poses an undue burden, and purports to require production of attorney-client, work product, or other privileged materials.

16

**Exhibit 10**

Clauses (a), (d)-(f) of paragraph five do not have even plausible relevance. The ALJ addressed this same issue in discussion paragraph 24 of the ULP trial subpoena. Exh. 9 at 9; Exh. 10 at ¶24. The following table shows the clause of paragraph 5 of the arbitration subpoena that correlates with the clause of paragraph 24 if the ULP trial subpoena—all of which ULP subpoena requests were revoked by the arbitrator and should be here as well:

| Arbitration Subpoena | ULP Trial Subpoena |
|---|---|
| ¶5(a) "MNA's opinion of Saint Vincent Hospital - correlates with ULP subpoena" | ¶24(a) - same |
| ¶5(d) "Labor Relations Connection, Inc." | ¶24(l) - same |
| ¶5(e) "American Arbitration Association" | ¶24 (m) - same |
| ¶5(f) "Arbitrator James Cooper" | ¶24(n) - same |

Exh. 9 at 9 (ALJ decision); Exh. 10 at ¶24 (ULP trial subpoena). None of this is remotely relevant.

With respect to clause "g" ("the grievance procedure contained in the parties' collective bargaining agreements"), though the ALJ found this relevant (excluding internal deliberations) for the ULP trial subpoena, that is not relevant here. MNA's internal discussion of the grievance procedure has no relevance to the meaning of the CBA. The CBA's meaning is dictated by the language of the CBA, and if ambiguous, any _relevant_ extrinsic evidence. In this case, the relevant extrinsic evidence (parol evidence) is past practice relating to implementation of Step 4 (arbitration) of Article XXI, of the CBA. MNA's own, non-privileged internal deliberations are no more relevant to the meaning of that provision than the Hospital's internal deliberations about the meaning of that provision. The Arbitrator shall decide the meaning of that provision based upon the CBA and relevant extrinsic evidence where applicable. Therefore, the Arbitrator should strike ¶5(g) as well.

17

**Exhibit 10**

Paragraph five at clause "b" is objectionable where it seeks documents relating to MNA's internal communications about "[the] filing of grievances against Saint Vincent Hospital"; ¶5(c) is objectionable as well and purports to compel production of documents reflecting MNA communications about the "filing of arbitration demands against Saint Vincent Hospital.[6]  There is no relevance to MNA's discussion of grievances or filing demands for arbitrations; the request encompasses internal deliberations, strategy, and other privileged information; and it would be an undue burden for the same reasons that producing information about all grievance from 2000 to present would pose an onerous burden upon MNA, thousands of further pages emails, the need to search records for responsive paperwork.

For the above reasons the Arbitrator should strike paragraph five in its entirety.

**6.       For the period January 1, 2022 to present, all documents concerning or relating to Saint Vincent Hospital's requests for information relating to arbitration past practices alleged by the Union, including but not limited to:**
   **a.  The requests for information;**
   **b.  The efforts made by MNA to collect documents responsive to those requests;**
   **c.  MNAs responses to those requests.**

MNA objects to paragraph six of the subpoena duces tecum (quoted above) on grounds that it is overly broad, seeks evidence that is not relevant, poses an undue burden, and purports to require production of attorney-client, work product, or other privileged materials.

Paragraph six seeks production of documents relating to unidentified, alleged Hospital requests for information sent to MNA "relating to arbitration past practices alleged by the Union," from 2022 to present.  There are multiple objections relating to this.

---

[6] Paragraph five at clause "b" and "c" were not part of the Hospital's ULP trial subpoena ¶24.

**Exhibit 10**

First, the request is vague.  The phrase "arbitration past practices" is not defined and could relate to anything relating to arbitrations.  It is not limited for example to past practices relating to the LRC or AAA continuing to administer the arbitration after the selection of the arbitrator to final disposition.

Second, phrase "arbitration past practices" is overly broad to the extent it could be construed as encompassing any facet of arbitration past practice.  For example it could encompass what transpired at arbitration, whether witnesses were released from duty without a subpoena, whether witnesses were give paid time off if they were scheduled to work on the day of an arbitration hearing, whether there was a transcript, whether the hearing was held in person or remotely, whether hearings were held at any particular location if held in person, and how exhibits were exchanged if at all at or prior to the hearing.

Third, information requests about "arbitration past practices" are not relevant to this case.  This case is not about whether and how MNA responds to information requests.  Rather, this case is about LRC administration of the arbitration after the selection of the arbitrator.  For purposes of the issue of the past practice as to LRC administration after selection of the arbitrator, MNA has already set forth in response to paragraph one of the subpoena the six categories of documents which would relate to that issue showing the past practice from 2000 to September 20, 2023.  By sharp contrast (a) prior alleged information requests about that specific issue, if any were ever even sent by the Hospital, (b) how MNA accumulated documents to respond, and (c) how MNA responded—are not relevant.

Fourth, the request poses an undue burden.  To comply with this request MNA and its counsel would have to review files for information requests in the 102 arbitrations for which MNA filed demands from January 2022 (when RNs returned from the strike) to September of

19

**Exhibit 10**

2024.  This encompasses 76 arbitration demands filed from 2022 to Sept 2023, and 26 arbitration demands filed from Nov 2023 to Sept 2024.  This review of the record from 102 arbitration cases would entail extensive time.  This burden should not be imposed upon MNA where the Hospital has all of the information it needs, already, in its possession. If the Hospital made such information requests "arbitration past practices," it has a record of that and any MNA responses. As for the aspect of the paragraph six that seeks to learn of MNA's efforts to respond to information requests by the Hospital about "arbitration past practices," the Hospital does not have this of course, but it is patently irrelevant.  What matters is the bottom-line facts of the past practice and, not MNA's efforts to respond to information requests in other cases, if any such requests about "arbitration past practices" were even made by the Hospital.

For the above reasons the Arbitrator should strike paragraph six of the subpoena.

Respectfully submitted,

For the Massachusetts Nurses Association,

By its attorneys,

Jack J. Canzoneri
McDonald Lamond Canzoneri LLC
352 Turnpike Road, Suite 210
Southborough, MA  01772-1756
508-485-6600
jcanzoneri@masslaborlawyers.com

Dated:  October 21, 2024

20

**Exhibit 10**

| From: | AAA Patrick Kimm <PatrickKimm@adr.org> |
|---|---|
| Sent: | Friday, July 26, 2024 3:46 PM |
| To: | 'Suzanne Hilli'; ldefazio@masslaborlawyers.com; 'jpinkham@mnarn.org'; 'RGannon@mnarn.org'; 'wmcgill@mnarn.org'; Marc A. Sugerman; 'Christia.Bartholomew@stvincenthospital.com'; Cullan E. Jones |
| Cc: | AAA Patrick Kimm |
| Subject: | FW: MNA and St. Vincent Hospital, AAA Case No. 01-24-0000-7400 - Subpoena Request |
| Attachments: | Tenet - SVH - LRC Arbitration - LRC Subpoena.docx; Tenet - SVH - LRC Arbitration - MNA Subpoena.docx |
| Importance: | High |

**Caution: Originated Outside FordHarrison.**

Dear Parties,

The attached subpoena request was sent to Arbitrator Loconto unilaterally. The arbitrator would like to advise you of the following:

1. A reminder that all correspondence with the arbitrator is to be routed through the AAA case manager.
2. If a subpoena is requested, it must be shared with the other side prior to submission to the arbitrator for consideration.
3. If and when a subpoena is requested, the arbitrator will schedule a conference call to discuss the underlying requested items.



**AAA Patrick Kimm**
**Case Administrator**

American Arbitration Association

T: 617 695 6014  F: 617 451 0763  E: PatrickKimm@adr.org
200 State Street, 7th Floor, Boston, MA 02109
adr.org | icdr.org | aaamediation.org



The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.

**Exhibit 11**

| From: | Lenow@masslaborlaw.com |
|---|---|
| **Sent:** | Friday, October 18, 2024 2:41 PM |
| **To:** | PatrickKimm@adr.org |
| **Cc:** | Jack Canzoneri; Marc A. Sugerman |
| **Subject:** | Re: LRC and Case 01-24-0000-7400 |

| **Follow Up Flag:** | Follow up |
|---|---|
| **Flag Status:** | Completed |

**Caution: Originated Outside FordHarrison.**

I am sorry, but I am told that the subpoena for The LRC was not signed by the arbitrator but, at the same time, The LRC was never notified that there was even a request for the subpoena for The LRC. As such, The LRC respectfully requests two weeks from today to review the subpoena and submit the appropriate response or Motion.

Howard B. Lenow
Lenow & McCarthy
Labor and Employment Lawyers

Office:
310 Washington Street, Suite 203
Wellesley, MA 02481
(508) 358-8181 (office)
(508) 358-8989 (fax)
(508) 314-3180 (cell)
lenow@masslaborlaw.com

Statement of Confidentiality: This e-mail is intended only for the person or entity to which it is addressed, and may contain information that is privileged, confidential, or otherwise protected from disclosure. Dissemination, forwarding, other distribution, printing or copying of this e-mail or the information herein by anyone other than the intended recipient is prohibited. If you have received this e-mail in error, please notify the sender by reply e-mail or telephone and destroy the original message and all copies in your possession.

On Oct 18, 2024, at 2:24 PM, lenow@masslaborlaw.com wrote:

Dear Mr. Kimm:

It has come to my attention that a supboena may have been issued by the Arbitrator in the above referenced matter to my client, The Labor Relations Connection. I have checked with my client and I am informed that The LRC has never been notified or served with an arbitrator's subpoena in this matter. As such, until or unless The LRC is served, my client is under no obligation to comply or to exercise its right to Move to Quash.

1

**Exhibit 12**

Howard

Howard B. Lenow
Lenow & McCarthy
Labor and Employment Lawyers

Office:
310 Washington Street, Suite 203
Wellesley, MA 02481
(508) 358-8181 (office)
(508) 358-8989 (fax)
(508) 314-3180 (cell)
lenow@masslaborlaw.com

Statement of Confidentiality: This e-mail is intended only for the person or entity to which it is addressed, and may contain information that is privileged, confidential, or otherwise protected from disclosure. Dissemination, forwarding, other distribution, printing or copying of this e-mail or the information herein by anyone other than the intended recipient is prohibited. If you have received this e-mail in error, please notify the sender by reply e-mail or telephone and destroy the original message and all copies in your possession.

**Exhibit 12**

| | |
|---|---|
| **From:** | Marc A. Sugerman |
| **Sent:** | Wednesday, December 18, 2024 3:57 PM |
| **To:** | Jack Canzoneri; AAA Patrick Kimm |
| **Cc:** | Samantha Sinclair; Suzanne Hilli |
| **Subject:** | RE: Today's Motion Hearing: MNA/St. Vincent Hospital (LRC Administration - Case No. 01-24-0000-7400) |

No objection.

**From:** Jack Canzoneri <jcanzoneri@masslaborlawyers.com>
**Sent:** Wednesday, December 18, 2024 3:32 PM
**To:** AAA Patrick Kimm <PatrickKimm@adr.org>
**Cc:** Marc A. Sugerman <msugerman@fordharrison.com>; Samantha Sinclair <ssinclair@masslaborlawyers.com>; Suzanne Hilli <shilli@masslaborlawyers.com>
**Subject:** Re: Today's Motion Hearing: MNA/St. Vincent Hospital (LRC Administration - Case No. 01-24-0000-7400)

**Caution: Originated Outside FordHarrison.**

agreed

_____
**Jack J. Canzoneri**
McDonald Lamond Canzoneri LLC
352 Turnpike Road, Suite 210
Southborough, Massachusetts 01772
(508) 485-6600 Voice (ext. 105)
(508) 485-4477 Fax
email: jcanzoneri@masslaborlawyers.com
website:  www.masslaborlawyers.com

This document is intended only for the use of the person to whom it is addressed.  It may contain information that is privileged, confidential and exempt from disclosure under applicable law.   If you are not the intended recipient, any dissemination, distribution, copying or use of this document is strictly prohibited.  If you have received this communication in error, please notify me immediately at the e-mail address above and delete all copies of this communication.

On Wed, Dec 18, 2024 at 3:30 PM AAA Patrick Kimm <PatrickKimm@adr.org> wrote:

Hello All,

Please see below from Arbitrator Loconto:

1

**Exhibit 13**

Counsel,

I write to request a brief extension of the deadline for submission of my Interim Order on the current motion under review. I anticipate that I will be in a position to issue the Order on Monday, December 23, 2024. I do not believe that this brief extension will affect the pre-hearing production schedule, but please let me know if either party objects to this request.

Thank you for your consideration,



**AAA Patrick Kimm**
**Case Administrator**

American Arbitration Association
T: 617 695 6014 F: 617 451 0763 E: PatrickKimm@adr.org
200 State Street, 7th Floor, Boston, MA 02109
adr.org | icdr.org | aaamediation.org



The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, dis distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immed reply email and destroy all copies of the transmittal. Thank you.

**From:** Michael Loconto <mtl@locontoadr.com>
**Sent:** Monday, November 25, 2024 7:07 PM
**To:** AAA Patrick Kimm <PatrickKimm@adr.org>
**Cc:** Jack Canzoneri <jcanzoneri@masslaborlawyers.com>; Marc A. Sugerman <msugerman@fordharrison.com>; Samantha Sinclair <ssinclair@masslaborlawyers.com>; Suzanne Hilli <shilli@masslaborlawyers.com>
**Subject:** Today's Motion Hearing: MNA/St. Vincent Hospital (LRC Administration - Case No. 01-24-0000-7400)

**\*\*\* External E-Mail – Use Caution \*\*\***

To the parties and the AAA:

Good evening. I write to confirm a few items following our hearing this morning on the Union's motion to quash the Employer's subpoena duces tecum in this matter.

2

**Exhibit 13**

1. I plan to issue my Opinion and Order on this issue by **December 20, 2024**.

2.  Assuming an order that some materials be produced, the parties agreed that 30 days is a reasonable deadline for the production of materials in advance of the first day of evidentiary hearings in this matter, which is scheduled for March 17, 2025.  Accordingly, the deadline for production shall be **Friday, February 14, 2025**.

Should my Order be delayed, or the material ordered for production create the need for additional time to comply, the parties may request to revisit the hearing schedule.  I note that we have a second hearing date scheduled for April 2.

Finally, please follow this link for the audio record of today's hearing: https://drive.google.com/file/d/10bP-L91Eritqw1cBZto_zeCiUFtcHPRf/view?usp=sharing.  As we discussed, I am sharing this audio recording of today's hearing for party reference only and as a courtesy.  My notes remain the only official record of the hearing.  This recording is view-only and may not be downloaded or shared without my consent.  If you have colleagues who will work on the merits of this matter and need access, please share their emails with me and access will be granted (access is currently limited to Marc, Jack and Samantha).  This recording link will expire upon submission of the post-hearing briefs on the merits.

Have a nice Thanksgiving, and please let me know if you have any questions about the contents of this summary.

Regards,

Michael Loconto

Arbitrator

On Mon, Nov 18, 2024 at 7:51 AM Michael Loconto <mtl@locontoadr.com> wrote:

3

**Exhibit 13**

Good morning,

Thank you.  I believe I have received all materials in this matter.  I will review this week and will get in touch with the parties in advance of next week's scheduled conference if I have any questions.

Regards,

Michael Loconto
Arbitrator

On Mon, Nov 18, 2024 at 7:25 AM AAA Patrick Kimm <PatrickKimm@adr.org> wrote:

> Received and forwarded to Arbitrator Loconto.
>
> *Please note during the week of <u>November 25</u> (Thanksgiving Week 2024), the AAA will operate with a reduced staff as we look to provide the AAA team to disconnect and recharge. To ensure continuity of service, a dedicated team will be available to provide emergency, deadline-driven services as needed. Thank you, and we wish you a joyful Thanksgiving Holiday among friends and family.*
>
>
> **AAA Patrick Kimm**
> **Case Administrator**
>
> American Arbitration Association
> T: 617 695 6014 F: 617 451 0763 E: PatrickKimm@adr.org
> 200 State Street, 7th Floor, Boston, MA 02109
> adr.org | icdr.org | aaamediation.org
>
>
> The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.
>
> ---
>
> **From:** Jack Canzoneri <jcanzoneri@masslaborlawyers.com>
> **Sent:** Sunday, November 17, 2024 10:02 PM
> **To:** AAA Patrick Kimm <PatrickKimm@adr.org>
> **Cc:** Marc A. Sugerman <msugerman@fordharrison.com>; Samantha Sinclair <ssinclair@masslaborlawyers.com>; Suzanne Hilli <shilli@masslaborlawyers.com>
> **Subject:** MNA Reply - Motion To Quash Subpoena - MNA/St. Vincent Hospital (LRC Administration - Case No. 01-24-0000-7400)

**Exhibit 13**

*** External E-Mail – Use Caution ***

Patrick,

Attached please find MNA's Reply to the Hospital's Opposition, as well as Exhibits A, B and C, referenced therein.  This is regarding MNA's motion to quash the subpoena that St. Vincent Hospital sent to Arbitrator Loconto to sign for production of documents by MNA. I am copying Hospital counsel on this, and ask that you please forward this to Arbitrator Loconto.

Thank you.

Jack

_____

**Jack J. Canzoneri**

McDonald Lamond Canzoneri LLC
352 Turnpike Road, Suite 210
Southborough, Massachusetts 01772
(508) 485-6600 Voice (ext. 105)
(508) 485-4477 Fax
email: jcanzoneri@masslaborlawyers.com
website:  www.masslaborlawyers.com

This document is intended only for the use of the person to whom it is addressed.  It may contain information that is privileged, confidential and exempt from disclosure under applicable law.   If you are not the intended recipient, any dissemination, distribution, copying or use of this document is strictly prohibited.  If you have received this communication in error, please notify me immediately at the e-mail address above and delete all copies of this communication.

--

Arbitrator Michael Loconto

(617) 331-2112

mtl@locontoadr.com

5

**Exhibit 13**

The information contained in this transmission, including any attachments, are intended for the exclusive use of the addressees and may contain confidential or privileged information.  If you are not the intended recipient, please notify Arbitrator Loconto by telephone at 617-331-2112 or by email at mtl@locontoadr.com, and please destroy all copies of this message and any attachments.

Arbitrator Loconto works exclusively as a neutral, offering arbitration, mediation, and other dispute resolution services.  While Arbitrator Loconto is an attorney and a member of the Massachusetts bar, Loconto ADR is not a law practice.  Nothing in this email is intended to offer legal advice, and no attorney-client relationship is formed through any exchange of correspondence related to this email.

Receipt by anyone other than the intended recipient is not a waiver of any arbitrator's, mediator's, attorney-client, or work product immunity, privilege, or other applicable protection.

--

Arbitrator Michael Loconto

(617) 331-2112

mtl@locontoadr.com

The information contained in this transmission, including any attachments, are intended for the exclusive use of the addressees and may contain confidential or privileged information.  If you are not the intended recipient, please notify Arbitrator Loconto by telephone at 617-331-2112 or by email at mtl@locontoadr.com, and please destroy all copies of this message and any attachments.

Arbitrator Loconto works exclusively as a neutral, offering arbitration, mediation, and other dispute resolution services.  While Arbitrator Loconto is an attorney and a member of the Massachusetts bar, Loconto ADR is not a law practice.  Nothing in this email is intended to offer legal advice, and no attorney-client relationship is formed through any exchange of correspondence related to this email.

**Exhibit 13**

Case 2:25-cv-04009-MRG Document 17-1 Filed 06/25/26 Page 270 of 293

Receipt by anyone other than the intended recipient is not a waiver of any arbitrator's, mediator's, attorney-client, or work product immunity, privilege, or other applicable protection.

7

**Exhibit 13**

# AMERICAN ARBITRATION ASSOCIATION
## BEFORE ARBITRATOR MICHAEL T. LOCONTO

---

**In the Matter of the Arbitration between**

**MASSACHUSETTS NURSES ASSOCIATION**

**and**

**ST. VINCENT'S HOSPITAL.**

AAA Case No. 01-24-0000-7400.

Issue:  Case Administration
(Class Action).

---

## ORDER ON MOTION TO QUASH
### SUBPOENA DUCES TECUM


St. Vincent Hospital (the "Hospital" or "Employer"), through its representative, requested that the Arbitrator sign and issue two subpoenas duces tecum on July 25, 2024.  The subpoenas were requested for the purpose of obtaining information from the Massachusetts Nurses Association (the "MNA" or "Union") and the Labor Relations Connection (the "LRC"), a third-party provider of case administration services in labor-management disputes.  The underlying grievance challenged the Employer's unilateral demand that the LRC to cease active case administration of grievances submitted for arbitration between the parties.

The Union objected to the issuance of the MNA subpoena and party representatives subsequently attended a telephone conference with the Arbitrator, on August 29, 2024.  A schedule was established during the telephone conference, and the Union submitted a motion to quash the Employer's subpoena on October 21, 2024.  The Employer filed a response to the motion on November 5, 2024, and the Union filed a further reply to the Employer's response on

**Exhibit 14**

November 15, 2024.  The Arbitrator held a remote hearing on the motion via Zoom video conferencing software on November 25, 2024.  Marc Sugerman, Esq. of the Orlando, Florida office of the Ford Harrison, LLP law firm appeared on behalf of the Employer.  Jack Canzoneri, Esq. of the McDonald Lamond Canzoneri LLC law firm in Southborough, Massachusetts appeared on behalf of the Union.

**BACKGROUND**

The Employer and the Union have been engaged in a collective bargaining relationship since 1998 and negotiated their first contract in 2000.  The parties have continued to negotiate successor CBAs since that time.  Beginning with the 2000-2003 CBA, each contract has included a grievance and arbitration procedure for resolving disputes over the interpretation and application of the Agreement's terms.

Initially, Article XXI of the Agreement provided that

> Step 4: Should the MNA request arbitration in accordance with the time limits specified herein, an arbitration shall be selected pursuant to the Voluntary Labor Arbitration Rules of the American Arbitration Association.

The parties have modified Article XXI once, in 2010, adding a second agency to administer arbitrations between the parties:

> Step 4: Should the MNA request arbitration in accordance with the time limits specified herein, an arbitration shall be selected pursuant to the Voluntary Labor Arbitration Rules of the American Arbitration Association or the applicable procedures of the Labor Relations Connection.

Identical language has been carried forward with effect through the term of the current CBA.

On September 20, 2023, the Employer demanded that the LRC cease administration of arbitration cases following the selection of the arbitrator.  The instant grievance was filed with on

2

**Exhibit 14**

October 20, 2023, asserting that the Employer's unilateral demand violated the parties' Agreement. Following unsuccessful attempts to resolve the matter during the initial steps of the grievance process, the Union filed its demand for arbitration with the American Arbitration Association (the "AAA") on February 14, 2024.[1] Arbitrator Michael Loconto was notified of his selection to hear this matter on March 11, 2024.

An evidentiary hearing on the merits of the underlying grievance was initially scheduled for August 12, 2024. The Employer's subpoena requests on July 25, 2024 were followed by a mutual agreement to postpone the evidentiary hearing, which has been rescheduled for two days – March 17 and April 2, 2025 – at the Employer's facility in Worcester, Massachusetts.

**The MNA Subpoena.** The Employer's subpoena seeks the production of a substantial amount of material that is putatively in the Union's possession. Specifically, the subpoena is composed of six requests for documentation, which are summarized as follows:

1. All arbitrations between the Union and the Employer, from 2000 to the present;
2. The Union's use of the LRC, from 2013 to the present;
3. The contractual relationship between the AAA or LRC, the Union, the Employer and arbitrators appointed to disputes involving the parties, from 2000 to present;
4. The Union's use of AAA, from 2000 to the present;
5. Various internal Union correspondence relating to the Union, the LRC, AAA, a specific arbitrator, and the parties' contractual grievance procedure, from 2000 to the present; and
6. Materials relating to various Employer information requests, from 2022 to the present.

I will address the parties' arguments with respect to the relevance of these requests below.

---

[1] In November 2023, the LRC notified the parties that it would no longer accept requests to administer cases involving the Employer.

3

**Exhibit 14**

As an initial matter, a significant portion of the information sought by the Employer is – or was at some point since 2000 – in the possession of the Employer, the Employer's counsel, or the Employer's previous outside counsel.[2]  The Employer represented that it has discovered significant gaps in the materials that it has in its possession relating to the subpoena's target subjects.  These gaps date back to 2012; the Employer has further represented that it does not have access to any related materials prior to that time.

A portion of the information requested has been produced by the Union in response to an Employer's subpoena that was ordered for production in an unfair labor practice (ULP) proceeding before the National Labor Relations Board (NLRB).  The material that was produced covers a discrete period of time – 2020 to 2023 – and involves but is not limited to the past practice elements of the underlying grievance in this matter.

**POSITION OF THE UNION**

The Union has objected to the Employer's subpoena on various grounds, asserting that the subpoena is overly broad, seeks irrelevant evidence and cumulative material, and that production would impose an undue burden on the Union.  Additionally, the subpoena lacks limiting parameters, and implicates the production of materials that are protected by the attorney-client, work product or other privileges, including National Labor Relations Act (NLRA) Section 7 rights of union members to engage in concerted protected activity.  *See Chino Valley Medical*

---

[2] The Union made an offer of proof that, prior to the introduction of the Ford Harrison law firm as its representative in 2023, the Employer has been represented by a succession of outside counsel from Boston-based law firms.  Since the inception of the parties' collective bargaining relationship in or around the year 2000, the Employer's representatives have included counsel from the former Hill & Barlow law firm and, more recently, from Ropes & Gray and Littler Mendelson.  In response, the Employer offered that the Union's attorney of record in these proceedings has represented the Union throughout the term of its bargaining relationship with the Employer; concurrently, the Hospital's ownership has changed hands twice during the intervening period.  Tenet Healthcare, the current owner, operated the Hospital when the bargaining unit first organized, then sold the Hospital in the mid-2000s prior to reacquiring the property in the mid-2010s.

**Exhibit 14**

*Center*, 362 NLRB 283, fn. 1 (2015) ("The Board has held that employer subpoenas broadly requesting a union's records, including communications between the union and its members, are properly revoked to protect the bargaining process." [*internal citations omitted*]). The Arbitrator should reject the Employer's request that the Union produce a privilege log.

Specifically, the Union has asserted that Section 1 of the subpoena seeks information that is not relevant to determine the status of case administration in the 111 arbitration demands that have been filed since 2000. The Employer has conflated the relevance and materiality of the requested information, without considering the cumulative nature of its request. Rule 401 of the Federal Rules of Evidence defines the relevance of evidence as a two-part test: does the evidence make a fact more or less probable than in its absence; and, is the fact related to the question at hand? Moreover, FRE Rule 403 permits the exclusion of relevant evidence where the probative value of such evidence is outweighed by its cumulative nature or the undue delay associated with its production.

As an alternative, the Union has proposed production of a limited set of non-privileged documents relating to the 111 arbitration demands for the period between the year 2000 and September 20, 2023:

1. the Demand for Arbitration;
2. with respect to the subject of the LRC or AAA administering the arbitration process after the selection of the arbitrator ("the Subject"), any objection transmitted by the Hospital to MNA or LRC about the Subject;
3. any exchange of positions about the Subject where the Hospital or MNA presented arguments about the Subject;
4. any rulings by arbitrators resolving any dispute about the Subject;
5. one example for each case of LRC and AAA administering the arbitration process after the selection of the arbitrator, such as issuance of a notice of hearing, coordinating communication and issuing notices of arbitrator decisions about any other arbitration issues; and,

**Exhibit 14**

6. LRC and AAA communication relating to the final disposition of the case, including withdrawal, withdrawal upon report of the matter settled, issuance of an arbitration award, placing in abeyance, closing the case.

The Union has further asserted that this limited information is sufficient to demonstrate whether the applicable agency performed case administration tasks following the appointment of the arbitrator, and whether either party lodged an objection to administration. The Union is not aware of any Employer objection to the LRC's administration of arbitration cases prior to September 20, 2023. The remaining information requested in Section 1 of the subpoena is overly broad and not relevant.

Additionally, fulfillment of the request would present an undue burden for the Union, requiring production of hundreds of thousands of pages of documents and hundreds of hours of effort to locate, review and produce materials in compliance with the request. The Union is informed of the likely time and costs associated with compliance given its previous efforts to comply with the Employer's subpoena in the matter before the NLRB. The Administrative Law Judge in the NLRB proceeding ordered partial production of materials covered in section 1 of the instant subpoena for a three-year period from 2020 to 2023, which resulted in the production of approximately 80,000 pages of documents. Reaching back an additional 20 years in response to the Employer's request in this subpoena would require archival searches and exponentially increase the time and expense associated with production.

The Union has also asserted that the Arbitrator should ignore the Employer's claims that the Union has made false representations in previous arbitrations about the extent of the LRC's administration of arbitration cases. The Union has corrected the discrepancies in these proceedings, and the discrepancies do not have any bearing on the question of production in this matter.

6

**Exhibit 14**

Next, the Union has asserted that Sections 2 and 4 of the subpoena is overly broad and seeks information that is not relevant to the Union's use of the LRC or AAA to administer cases involving the Employer. Moreover, the Employer's assertion that the Union engaged in impermissible *ex parte* communications with the LRC is baseless – as a case administrator, the LRC routine engages in one-on-one correspondence with individual parties and arbitrators, akin to a "clerk of courts." In addition, the Union has asserted that the information sought also contemplates privileged communications between and among internal Union representatives and members. The Union has requested that Sections 2 and 4 be stricken in full.

The Union has asserted that Section 3 of the subpoena is vague and overly broad, and therefore contemplates the production of irrelevant information. Simply, the request for a "contract" is not relevant given the acknowledged relationship among the "four parties" listed. No written contractual relationship exists; rather, contracts are formed between the parties on the basis of services performed in exchange for consideration. The Union has not objected to producing the information requested in subsections b and c of the Employer's request.

The Union has asserted that section 5 of the subpoena seeks largely irrelevant information that was stricken from the Employer's subpoena before the NLRB. The Union further asserted that the subsections seeking the Union's internal, non-privileged deliberations about the use and meaning of the grievance procedure should also be stricken as irrelevant. The Union has requested that Section 5 be stricken in full.

Finally, the Union has asserted that section 6 of the subpoena is overly broad. The information requested is also irrelevant for the purpose of resolving the underlying grievance. The Union has challenged the Employer's unilateral rejection of the LRC as a case administrator in arbitration disputes between the parties. Information relating to satisfaction of vague

7

**Exhibit 14**

Employer requests about past arbitration practices is not relevant for the resolution of the underlying grievance.  Additionally, production would pose an undue burden that would require the review of at least 102 arbitration demands covering the request period.  The Union has requested that Section 6 be stricken in full.

**POSITION OF THE EMPLOYER**

The Employer has opposed the Union's motion to quash the subpoena.  The Employer alleged that the Union and its counsel have engaged in inappropriate *ex parte* communications with the LRC and have made false statements to arbitrators in other matters, without correction. The Employer has also alleged that the LRC failed to act as a neutral when administering disputes between these parties.  The information requested in the subpoena is reasonably related to the Employer's attempt to establish these assertions in response to the underlying grievance.

The Employer has asserted that Rule 27 or the AAA Labor Arbitration Rules ("AAA Rules") is controlling on the question before the arbitrator in this motion:

> The parties may offer such evidence as is relevant and material to the dispute and shall produce such evidence as the arbitrator may deem necessary to an understanding and determination of the dispute.

Specifically, the Employer has argued that a full response to Section 1 of the subpoena is necessary in order to test the duration of the past practice asserted – that is, the administration of arbitration cases by the LRC.  As an example, the Employer asserted that the Union made a false representation in a previous arbitration about the number of arbitration demands that the LRC has administered between the parties.  The requested information is relevant and the request itself is neither overly broad nor unduly burdensome.  Additionally, the Employer has asserted that the discovery dispute in the related ULP proceeding should have no effect on the outcome of

**Exhibit 14**

this motion.  By comparison, the ULP covers only a three-year period of time.  The Employer has further asserted that the Union must produce a privilege log in declining to produce any material protected by attorney-client, work product, or other legal privileges.

Next, the Employer has argued that full responses to Sections 2 and 4 of the subpoena are necessary in order to test the relationship between the Union and the case administration agencies.  The Employer believes that the plain language of the Agreement limits the role of the AAA and the LRC to arbitrator selection and does not permit further case administration.  By way of example, the AAA provides other limited services for parties that require an arbitrator in a labor-management dispute but do not want full case administration services.[3]  By accessing *ex parte* correspondence between representatives of the Union and the LRC and other related materials, the Employer may ascertain whether there was a lack of a mutual agreement or acquiescence to the asserted past practice.  By the same token, and based on assertions made by the Union in a previous arbitration, the Employer is entitled to test whether the LRC has acted as the exclusive case administrator in prior arbitrations.

The Employer has argued that a full response to Section 3 of the subpoena is necessary given the Union's own past characterization of the "contractual relationship among four parties" – the arbitrator, the case administrator, the Union and the Employer.  The Employer has also argued that a full response to Section 5 of the subpoena is necessary to test whether the Union's assertion that the LRC is entitled to administer arbitrations between the parties is based on an interpretation of the CBA, or some other circumstances.  The ALJ's determination in the related ULP proceeding is neither binding nor persuasive in this matter.  The Employer intends to defend its decision to order cessation of the LRC's administration of pending and future

---

[3] *See* AAA Labor Rules, at 24 ("Optional Labor Services").

9

**Exhibit 14**

arbitration cases between the parties by investigating whether the Union's use of the LRC is premised on bias against the Employer rather than a purported past practice.  The Employer is entitled to defend itself using related evidence.  *See Unted Food & Commercial Workers Int'l Union Local No. 576 v. NLRB*, 675 F.2d 346, 354 (D.C. Cir. 1982).  By way of example, the Employer has cited one derogatory email between an arbitrator and a representative of the LRC, which was obtained through discovery in the related ULP proceeding.  If other such correspondence exists, the Employer is entitled to it.

Finally, the Employer has argued that a full response to Section 6 of the subpoena is necessary in order to compel a full response from the Union on pending information requests.

**DISCUSSION**

**Standard of Review.**  Rule 27 of the AAA Rules governs evidence in a related labor arbitration proceeding.  Relevance is the standard of review.  The arbitrator retains the discretion to determine whether evidence is material and necessary to determine the disposition of the dispute.  The Rule continues:

> The arbitrator shall determine the admissibility, the relevance, and materiality of the evidence offered and may exclude such evidence deemed by the arbitrator to be cumulative or irrelevant.

Strict adherence to legal rules of evidence are not required.

Other provisions of the AAA Rules are also relevant to the current dispute.  Specifically, Rule 25 governs the Order of Proceedings:

> The arbitrator, exercising his or her discretion, shall conduct the proceedings with a view to *expediting the resolution of the dispute* and may direct the order of proof, bifurcate proceedings and *direct the parties to focus their presentations on issues the decision on which could dispose of all or part of the case*.

10

**Exhibit 14**

(*emphasis added*).  Labor arbitration practice does not typically include traditional forms of legal discovery.  Parties have other legal, and possibly contractual, rights or procedures to access information as collective bargaining representatives – which parties may exercise in or outside of the arbitration process.  The AAA Rules are typically invoked during or just prior to an evidentiary hearing, when the parties seek the admission of evidence.  Nevertheless, the AAA Rules remain instructive for resolving the disputed portions of the Employer's subpoena.

**The Grievance.**  The underlying contractual violation alleged by the Union is the appropriate measure for assessing the relevance of the requested information.  Here, the Union's grievance is not about its relationship with one of the third-party case administrators listed in Step 4 of the contractual grievance procedure.  Likewise, the grievance is not about the Union's purported conduct in other arbitration disputes.  Simply, the underlying grievance is not an Employer-initiated complaint; by definition, contractual grievances are initiated by the Union.  Broadly stated, the Employer's purported justifications for seeking information in this matter may or may not form the basis for action under the parties' Agreement or in some other forum – but they are not the subject of the instant grievance.

According to the Union's grievance, the Employer's September 20, 2023 demand that the LRC cease active case administration of the parties' pending labor arbitration disputes

> is in violation of Article XXI, Grievance and Arbitration; any other provisions which MNA may further discern at a later date as is permitted expressly by Article XXI; and in the alternative by unchallenged, binding past practice that is enforceable under the collective bargaining agreement where, as here, there have been over 100 demands for arbitrations under the parties' collective bargaining agreements from 2000 to September 20, 2023 where the arbitration agency administered the process from inception through conclusion.

The parties have asserted competing theories on the past practice of case administration in arbitration disputes.  The existence of a past practice can act as a gap-filler for missing or

11

**Exhibit 14**

ambiguous contract language. The applicable contract language in this case – "an arbitration shall be selected pursuant to the" applicable rules of the AAA or the LRC – is silent on the issue of case administration. In contrast to the Union's assertion, captured above, the Employer has proffered that the parties may have sought to utilize the AAA's "list-only" option to select arbitrators at some point over the past 24 years. The Union's asserted past practice is the apparent genesis for the Employer's subpoena.

**The Subpoena.** It is clear that the material that is relevant and necessary to determine whether a past practice has existed in this context is limited. The Employer's subpoena seeks information that is beyond this scope and is therefore irrelevant to the disposition of the underlying dispute. AAA Rule 25 reflects an arbitrator's duty to narrow the scope of the dispute. My Order below is intended to expedite resolution of this dispute by avoiding the introduction of irrelevant or extraneous material and narrowing focus on the issues that will determine the outcome of the case.

*Evidence of a Past Practice, or Lack Thereof.* Therefore, the Union's formulation of an alternative proposed response to Section 1 of the subpoena constitutes a reasonable requirement for the production of records tending to prove whether, and to what extent, a practice has existed with respect to third-party case administration of the parties' arbitration disputes. By limiting production to demonstrate *one* example of a case administration function after the appointment of an arbitrator in each case, but requiring production of *any* objections to administration, the record may be sufficiently developed such as to allow the parties to argue whether a past practice has been established. The remainder of the material sought by the Employer in Section 1 would be cumulative of the material subject to production and is therefore excluded from the Order below.

12

**Exhibit 14**

The Union has also agreed to produce material responsive to Section 3, subsections b and c of the subpoena. These materials are relevant to the obligations of the third-party case administration agencies named in Article XXI, Step 4 of the parties' Agreement, and the obligations of the arbitrators appointed through the operation of that provision. It is apparent that the "contractual relationship among four parties" that formed the basis for the remainder of the Employer's requests in Section 3 was taken out of context, as explained by the Union. If a written agreement existed among the arbitrator, the case administrator and the parties in a given arbitration under Article XXI of the Agreement, it should be produced – but the Union has effectively represented that no such agreements exist.

*Extraneous Material.* As previously noted, the remainder of the information sought by the Employer is not relevant to the issues presented by the underlying grievance in this matter, or otherwise cumulative of materials ordered for production. Specifically, the material sought in Section 6 is not relevant to the disposition of the underlying grievance. Additionally, Sections 2 and 4 of the subpoena sought material related to the Union's use of the AAA and the LRC. To the extent that such information is relevant to this matter, it shall be produced in accordance with my order on Section 1 of the subpoena. The request is otherwise beyond the scope of these proceedings where the Employer has, for example, sought material for the purpose of asserting wrongdoing on the part of the Union.[4]

For similar reasons, Section 5 of the subpoena seeks information that is also beyond the scope of these proceedings. By way of example, the Employer has proffered a communication between an arbitrator and a representative of the LRC to support the assertion that the Union and the LRC are biased against the Employer. In seeking production of correspondence across an

---

[4] This Order does not address the parties' arguments with respect to legal privileges. As noted, production is limited to relevant, non-privileged material.

13

**Exhibit 14**

expansive list of topics, the Employer has premised its request on the development of a theory that one piece of correspondence between non-Union individuals is an indicator of the Union's anti-Employer bias. Simply, whether or not such bias exists is not relevant to the question at hand.

Accordingly, this order requires the production of certain materials requested in Sections 1 and 3 of the subpoena. The Employer's remaining requests have been stricken in full.

## ORDER

**Sections 2, 4, 5 and 6** of the Employer's Subpoena Duces Tecum dated July 25, 2024 are **stricken in full**.

With respect to **Section 1** of the subpoena, **the Union shall produce a limited set of non-privileged documents relating to the 111 arbitration demands for the period between the year 2000 and September 20, 2023**:

1. the Demand for Arbitration;

2. with respect to the subject of the LRC or AAA administering the arbitration process after the selection of the arbitrator ("the Subject"), any objection transmitted by the Hospital to MNA or LRC about the Subject;

3. any exchange of positions about the Subject where the Hospital or MNA presented arguments about the Subject;

4. any rulings by arbitrators resolving any dispute about the Subject;

5. one example for each case of LRC and AAA administering the arbitration process after the selection of the arbitrator, such as issuance of a notice of hearing, coordinating communication and issuing notices of arbitrator decisions about any other arbitration issues; and,

6. LRC and AAA communication relating to the final disposition of the case, including withdrawal, withdrawal upon report of the matter settled, issuance of an arbitration award, placing in abeyance, closing the case.

14

**Exhibit 14**

With respect to **Section 3** of the subpoena, **the Union shall only produce material responsive to subsections b and c** of the Employer's request:

1. the parties' alleged agreement to agree to abide by AAA and/or LRC rules relating to the administration of the case;

2. the parties' alleged agreement to hold arbitrators to the ethical guidelines of the National Academy of Arbitrators.

As the parties have previously agreed, the **deadline for the Union's production of materials responsive to this order shall be the close of business on Friday, February 14, 2025.**

So ordered,

Michael T. Loconto, Esq.
Arbitrator
December 23, 2024

15

**Exhibit 14**

| From: | Suzanne Hilli <shilli@masslaborlawyers.com> |
|---|---|
| Sent: | Monday, December 23, 2024 3:22 PM |
| To: | AAA Patrick Kimm |
| Cc: | Jack Canzoneri; Samantha Sinclair; Wendy McGill; Gannon Robin; Marc A. Sugerman |
| Subject: | MNA/St. Vincent Hospital - LRC Administration - Case No. 01-24-0000-7400 |
| Attachments: | 2024-12-23 MNA SDT directed to SVH.pdf |

| Follow Up Flag: | Follow up |
|---|---|
| Flag Status: | Completed |

**Caution: Originated Outside FordHarrison.**

Dear Patrick,
Attached please find a subpoena duces tecum directed to St. Vincent Hospital that MNA requests the arbitrator to sign in the above-referenced matter.
Thank you,

Suzanne (sent for Jack J. Canzoneri)
_____
**Suzanne M. Hilli**
McDonald Lamond Canzoneri LLC
352 Turnpike Road, Suite 210
Southborough, MA  01772
(508) 485-6600, Voice (ext. 101)
(508) 485-4477 Fax
email: shilli@masslaborlawyers.com
website: www.masslaborlawyers.com

This document is intended only for the use of the person to whom it is addressed.  It may contain information that is privileged, confidential and exempt from disclosure under applicable law.  If you are not the intended recipient, any dissemination, distribution, copying or use of this document is strictly prohibited.  If you have received this communication in error, please notify me immediately at the e-mail address above and delete all copies of this communication.

1

**Exhibit 15**

AMERICAN ARBITRATION ASSOCIATION
BEFORE ARBITRATOR MICHAEL LOCONTO

<table>
<tr><td>

In the matter of

Massachusetts Nurses Association,

and


St. Vincent Hospital

Gr.    Instructed LRC to Cease
        Purported 'Administration' of
        Pending Matters

</td><td>

AAA # 01-24-0000-7400
Subpoena Duces Tecum

</td></tr>
</table>

To:   St. Vincent Hospital
      c/o Marc Sugerman
      FordHarrison
      300 South Orange Avenue, Suite 1300
      Orlando, Florida
      msugerman@fordharrison.com

You are hereby commanded to produce documents responsive to the requests appearing in Attachment A, by e-mail or other agreed-upon means no later than 5:00 P.M. EST on February 14, 2025, to Jack J. Canzoneri, Esq., McDonald Lamond Canzoneri LLC, 352 Turnpike Road, Suite 210, Southborough, MA 01772, jcanzoneri@masslaborlawyers.com.


Signed:     _____

           Arbitrator Michael T. Loconto


Dated:     _____


**Exhibit 15**

## <u>ATTACHMENT A TO SUBPOENA DUCES TECUM</u>

### Instructions and Definitions

The words "concerning," "communication," "documents," "identify," and "relating to" are defined as set forth in the United States District Court, Massachusetts, Local Rules at Local Rule 26.5(C).

<u>LRC</u> - means the Labor Relations Connection

<u>AAA</u> - means American Arbitration Association

<u>St. Vincent Hospital</u> - means the party to this arbitration, St. Vincent Hospital, and all predecessors that owned and operated the subject hospital from 2000 to September 23, 2023

<u>Possession, Custody and Control</u> - means all documents that the current party to this arbitration, St. Vincent Hospital, may access for production, plus all documents which it may access because its current or prior counsel has possession, custody, or control of such documents

<u>MNA</u> - means "Massachusetts Nurses Association"

<u>Muldoon to Henderson RFI - 12/4/2023</u> - shall refer to the information request attached hereto

<u>Past Practice Arbitrations</u> - shall refer to all arbitrations where MNA, and St. Vincent Hospital or its predecessors, were parties to an arbitration that was filed with LRC and AAA between 2000 and September 23, 2023, including the 123 arbitrations with the following case numbers:

| | | |
|---|---|---|
| 1. AAA # 11 300 02153 00 | 23. AAA #11 300 01072 10 | 45. LRC #665-20 |
| 2. AAA #11 300 01749 00 | 24. AAA #11 300 01073 10 | 46. LRC #666-20 |
| 3. AAA # 11 300 02560 03 | 25. AAA #11 300 01074 10 | 47. LRC #195-22 |
| 4. AAA #11 300 02160 04 | 26. AAA #11 300 01723 11 | 48. LRC #255-22 |
| 5. AAA #11 300 01632 05 | 27. AAA #11 300 01466 08 | 49. LRC #291-22 |
| 6. AAA #11 300 00702 0 | 28. AAA #11 390 00510 12 | 50. LRC #345-22 |
| 7. AAA #11 300 00733 04 | 29. AAA #11 390 00511 12 | 51. LRC #346-22 |
| 8. AAA #11 300 00013 05 | 30. AAA #11 390 00512 12 | 52. LRC #347-22 |
| 9. AAA #11 300 02076 06 | 31. AAA #11 390 00513 12 | 53. LRC #348-22 |
| 10. AAA #11 300 01842 07 | 32. AAA #11 390 00514 12 | 54. LRC #349-22 |
| 11. AAA #11 300 01336 07 | 33. AAA #11 390 00644 13 | 55. LRC #486-22 |
| 12. AAA #11 300 02411 07 | 34. AAA #11 390 00643 13 | 56. LRC #487-22 |
| 13. AAA #11 300 00829 08 | 35. AAA #11 390 01194 13 | 57. LRC #491-22 |
| 14. AAA #11 300 01113 08 | 36. AAA #11 390 01195 13 | 58. LRC #492-22 |
| 15. AAA #11 300 01045 08 | 37. AAA #11 390 01196 13 | 59. LRC #548-22 |
| 16. AAA #11 300 01046 08 | 38. LRC #233-16 | 60. LRC #549-22 |
| 17. AAA #11 300 02442 08 | 39. LRC #329-16 | 61. LRC #550-22 |
| 18. AAA #11 300 00659 09 | 40. LRC #309-17 | 62. LRC #553-22 |
| 19. AAA #11 390 00671 09 | 41. LRC #655-17 | 63. LRC #554-22 |
| 20. AAA #11 300 00051 10 | 42. LRC #60-18 | 64. LRC #555-22 |
| 21. AAA #11 300 00052 10 | 43. LRC #485-18 | 65. LRC #556-22 |
| 22. AAA #11 300 00354 10 | 44. LRC #50-19 | 66. LRC #557-22 |

**Exhibit 15**

| 67. | LRC #558-22 | 86. | LRC #655-22 | 105. | LRC #857-22 |
| 68. | LRC #559-22 | 87. | LRC #726-22 | 106. | LRC #858-22 |
| 69. | LRC #560-22 | 88. | LRC #727-22 | 107. | LRC #859-22 |
| 70. | LRC #561-22 | 89. | LRC #728-22 | 108. | LRC #860-22 |
| 71. | LRC #562-22 | 90. | LRC #729-22 | 109. | LRC #861-22 |
| 72. | LRC #563-22 | 91. | LRC #730-22 | 110. | LRC #862-22 |
| 73. | LRC #564-22 | 92. | LRC #732-22 | 111. | LRC #863-22 |
| 74. | LRC #565-22 | 93. | LRC #733-22 | 112. | LRC #864-22 |
| 75. | LRC #566-22 | 94. | LRC #734-22 | 113. | LRC #291-23 |
| 76. | LRC #569-22 | 95. | LRC #735-22 | 114. | LRC #292-23 |
| 77. | LRC #597-22 | 96. | LRC #736-22 | 115. | LRC #293-23 |
| 78. | LRC #598-22 | 97. | LRC #813-22 | 116. | LRC #304-23 |
| 79. | LRC #599-22 | 98. | LRC #814-22 | 117. | LRC #305-23 |
| 80. | LRC #600-22 | 99. | LRC #820-22 | 118. | LRC #306-23 |
| 81. | LRC #601-22 | 100. | LRC #850-22 | 119. | LRC #307-23 |
| 82. | LRC #637-22 | 101. | LRC #851-22 | 120. | LRC #324-23 |
| 83. | LRC #638-22 | 102. | LRC #852-22 | 121. | LRC #325-23 |
| 84. | LRC #641-22 | 103. | LRC #853-22 | 122. | LRC #326-23 |
| 85. | LRC #651-22 | 104. | LRC #854-22 | 123. | LRC #328-23 |

## Requests

A.      For each of the <u>Past Practice Arbitrations</u>, identify and provide the following documents in St. Vincent Hospital's possession, custody, and control:

1.      the Demand for Arbitration;

2.      with respect to the subject of the LRC or AAA administering the arbitration process after the selection of the arbitrator ("the Subject"), any objection transmitted by the Hospital to MNA or LRC about the Subject;

3.      any exchange of positions about the Subject where the Hospital or MNA presented arguments about the Subject;

4.      any rulings by arbitrators resolving any dispute about the Subject;

5.      one example for each case of LRC and AAA administering the arbitration process after the selection of the arbitrator, such as issuance of a notice of hearing, coordinating communication and issuing notices of arbitrator decisions about any other arbitration issues; and,

6.      LRC and AAA communication relating to the final disposition of the case, including withdrawal, withdrawal upon report of the matter settled, issuance of an arbitration award, placing in abeyance, closing the case.

**Exhibit 15**

B.     For each of the reasons asserted by St. Vincent Hospital for not considering the grievance—as set forth by St. Vincent Hospital in its answers to the grievance in the above-captioned matter—identify and provide all documents concerning each such reason.

C.     Identify and provide all documents concerning communications between representatives of MNA and St. Vincent Hospital during the grievance procedure, including, but not limited to as relates to scheduling and notes of grievance meetings.

D.     Identify and provide all documents concerning and relating to the procedural arbitrability defenses raised by the Hospital in this matter.

E.     Identify and provide all documents concerning and relating to the St. Vincent Hospital's position that the collective bargaining agreement only requires MNA and St. Vincent Hospital to use of AAA or LRC for selection of the arbitrator in each case, but not for administration of the arbitration after the selection of the arbitrator, including, <u>inter alia</u>, as set forth in the email dated Sep 20, 2023, 4:02 PM from Christopher T. Borruso, on behalf of the St. Vincent Hospital to the Director of the Labor Relations Connection (LRC) Jan Teehan.

F.     Identify and provide all documents that St Vincent Hospital transmitted to MNA specifically in response to the <u>Muldoon to Henderson RFI - 12/4/2023</u>.

G.     Identify and provide all documents responsive to the <u>Muldoon to Henderson RFI - 12/4/2023</u>.

**Exhibit 15**

**Subject**: LRC INFORMATION REQUEST
**From**: DOMINIQUE A Muldoon <dominique1muldoon@gmail.com>
**To**: Francis Henderson <francis.henderson@tenethealth.com>,Wendy McGill <wmcgill@mnarn.org>,Carla LeBlanc <csleblancrn@gmail.com>,Marlena pellegrino <mjpellegrino@charter.net>
**Date Sent**: Monday, December 4, 2023 3:16:04 PM GMT-05:00
**Date Received**: Monday, December 4, 2023 3:16:15 PM GMT-05:00

Francis,

This is in response to your email dated Friday December 1, 2023 where you provided St. Vincent Hospital's Step 2 response to the grievance.  I, nor our legal team are aware of any facts that support the basis for the six arbitrability defenses you raise in that response.  So that MNA may further evaluate those six defenses I am making the following information request.  Because several of the requests are time-sensitive I ask that you please  provide responsive information by Wednesday December 6.

The information request below is organized by quoting (in bold) each of the numbered arbitrability defenses and below each is the information request (lettered) relating to that defense.

**1.  The Grievant failed to present the grievance to her department manager or designee as required at step 1;**

1A.  By email dated July 9, 2022, 10:39 PM (see attached) you notified MNA that you are the designee for all steps of the grievance process.  Therefore, I am unclear on why you are raising this defense where the Step 1 grievance was filed with you.  Please identify the department manager or designee with whom you claim the grievance should have been filed at Step 1 and a copy of all documents that show St. Vincent Hospital changing the designee from you (per the July 9, 2022 email, attached) to someone else.

**2.  The department/unit representative failed to attend the step 1 meeting;**

2A.  You failed to raise a concern about this at the Step 1 meeting.  Though clearly implied by the fact that I presented the information in support of the grievance at Step 1—had you raised this issue during the grievance meeting, I would have advised you that I was presenting as the department/unit representative.  Is there any provision in the contract that you believe precludes MNA from assigning whomever it decides is appropriate to perform the role of the department/unit representative right up to the moment the grievance hearing commences?

2B. If so, please advise of the specific language that allegedly precludes MNA from making such a decision—i.e., to designate someone to be the department/unit representative at the start of a grievance hearing—and provide all documents that relate to your interpretation of the contract in that regard.

**3.  The Grievant and department/unit representative failed to discuss the grievance with the Grievant's department manager or designee within 5 days of the grievance being presented;**

There are several aspects of this defense which require clarification.  I will address each in term.

3A.  Which step of the grievance procedure does this relate to?

3B.  With respect to the term "Grievant" do you mean that a Grievant was not present at the Step 1 or Step 2 hearing?

3C.  I am expressly listed in this grievance at each step as an "aggrieved nurse" (which is the definition of a grievant in the CBA), along with all other members of the bargaining unit on the grievance.  Given this, please explain why you are saying the Grievant was not present.

3D.  Had you raised this issue during the grievance meeting, I would have advised that I was present as a Grievant.  Is there any provision in the contract that you believe prevents MNA from assigning one person to be present at the grievance hearing in the capacity as both the grievant and the department/unit representatives, and to be present on behalf of all grievants?  If so, please advise of the specific language that prevents MNA from doing so and provide all documents that relate to your interpretation of the contract in that regard.

3E.  With respect to the term "department/unit representative"—please see the information request at ¶¶2A and 2B above which relates to this same subject to the extent this defense objects to there not being a "department/unit representative" at the hearing.

**MNA-74190**

**Exhibit 15**

3F.  With respect to the term "department manager or designee"—please see the information request at ¶1A above which relates to this same subject to the extent this defense objects to the grievance not being filed with "department manager or designee" where St. Vincent Hospital has notified us that you are the designee.

3G.  With respect to the phrase -"within five days of the grievance being presented."  I know the step one was filed on October 20, 2023; I offered to meet within five business days and we could not find a date that worked for you in that.Period— Or you did not reply, until after the five days-and then through cooperative discussion we agreed upon a November 2, 2023. Also, I know contract language at article XXI under the heading " Time limit for processing" which says "there may be extensions, mutually agreed-upon and writing, and legitimate request for extension of time will not be unreasonably denied." Given these circumstances and the contract language, please explain why you are claiming that the grievance hearing on November 2 was not held within five days as a basis, for claiming the grievance is not procedurally arbitrable?

3H. With respect to the phrase within five days of the grievance being presented. I note the step two was filed on Friday, November 10, 2023; the grievance hearing was held within five business days later on Friday, November 17, 2023; and that occurred in context where I offered to meet with you even earlier on November 13 and you never responded to that date offer, and then you replied later and offered Friday, November 17. Given this, please explain why you are claiming that step two grievance hearing on November 17 was not held within five days?.

**4.  The grievance purports to be filed on behalf of several Grievants.  However, the collective bargaining agreement does not allow for the filing or processing of "class action" grievances.**

4A.  The grievance is filed on behalf of "aggrieved nurses"—the term used in the contract to define who may file a grievance. The grievance does not use the term "class action."  Given this, I'm not clear about the basis for this defense.  Please cite the provision in the contract that you rely upon for the conclusion that a grievance may not be filed on behalf of several "aggrieved nurses"—and provide all documents that relate to your interpretation of the contract in that regard.

**5.  The department/unit representative failed to attend the step 2 meeting;**

See ¶2.

**6.  The grievance chair/or designee failed to attend the step 2 meeting.**

6A.  I am the co-chair of the bargaining unit.  Please explain the basis of this defense.

Dominique

Sent from my iPhone

MNA-74191

**Exhibit 15**

## Henderson, Francis

| | |
|---|---|
| **From:** | Henderson, Francis |
| **Sent:** | Saturday, July 9, 2022 10:39 PM |
| **To:** | Wendy McGill; Marie Ritacco |
| **Cc:** | Holbrook, Anita |
| **Subject:** | Saint Vincent Hospital Grievance Handling |

Wendy and Marie:

Please be advised that effective immediately and until further notice, I will be the designee for all Step 1, 2 and 3 grievances under Article XXI of the collective bargaining agreement. All grievances and all correspondence regarding grievances should be filed directly with me.

I will have limited availability Monday, July 11 and Tuesday, July 12. Please have the appropriate person(s) contact me to schedule any grievances the Association wishes to be heard.

Francis
**Francis Henderson**
Director, Labor Relations
14201 Dallas Parkway
Dallas, TX 75254
O: 469.893.6625
C: 214.773.1092
Francis.Henderson@tenethealth.com

This email is for the sole use of the intended recipient and may contain material that is confidential. Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies

1

**Exhibit 15**