# PART THREE OF EXHIBITS TO COMPLAINT

# EXHIBITS 28-31

AMERICAN ARBITRATION ASSOCIATION
BEFORE ARBITRATOR MICHAEL LOCONTO

<table>
<tr><td>In the matter of<br><br>Massachusetts Nurses Association,<br><br>and<br><br>St. Vincent Hospital<br><br>Gr.   Instructed LRC to Cease Purported 'Administration' of Pending Matters</td><td>AAA # 01-24-0000-7400</td></tr>
</table>

**POST-HEARING BRIEF ON BEHALF OF
MASSACHUSETTS NURSES ASSOCIATION**

## I.  INTRODUCTION

The Massachusetts Nurses Association ("MNA") represents a bargaining unit of non-supervisory registered nurses ("RNs") employed by St. Vincent Hospital ("Hospital") in Worcester, Massachusetts.  Ux-7;[1] Tr. at 24.[2]  The subject bargaining unit was certified in 1998 and the first collective bargaining agreement (contract) between the parties took effect in 2000.  MNA and the Hospital are currently parties to a collective bargaining agreement ("CBA" or "Agreement") that sets forth the terms and conditions of employment covering the period of January 3, 2022, through December 31, 2025.  Ux-7.  Prior to the ratification of the parties' current CBA, there was a strike by the RNs lasting

---

[1]  In this brief, MNA will cite to MNA exhibits as Ux-__.

[2]  In this brief, MNA will cite to the transcript as Tr. at __.

**Exhibit 28**

approximately 300 days from March 2021 until the CBA was ratified on January 3, 2022.  Tr. at 27.

A dispute arose between the parties on September 20, 2023, when a Hospital representative informed MNA that it would cease to acknowledge the Labor Relations Connection ("LRC") as the administrator of arbitration cases between the parties.  Ux-9.  Resultantly, on October 20, 2023, MNA initiated the subject grievance at Step 1 of the grievance process.  Ux-1.  MNA then advanced the grievance through each step of the grievance procedure.  Ux-3; Ux-5.

A hearing was held before Arbitrator Michael Loconto, Esq. ("Arbitrator") regarding the subject grievance on March 17, 2025 at the Hilton Garden Inn in Worcester, Massachusetts.  Tr. at 1.  The Hospital was made aware of the date and location of the hearing, but it refused to appear or participate at the hearing.  Tr. at 6.  At the arbitration hearing, MNA called Attorney Jack Canzoneri as a witness.

Over objection of MNA, the Hospital was provided an opportunity to show cause for a second date of hearing so that it could present its case.  Attachment C (April 1, 2025, email from the Arbitrator ordering the hearing record close).  The Hospital defaulted to show good cause and no second date occurred.  Id.  The Arbitrator declared the record closed on April 1, 2025 via email to the case administrator, Patrick Kimm.  Id.  This matter is now before the Arbitrator for final and binding determination pursuant to Article XXI of the CBA.  Ux-7 at 67 (Grievance and Arbitration, Step 4).

**Exhibit 28**

## II.   FACTS

In Section "A" MNA outlines the facts regarding the processing of arbitrations through the services of LRC, which is the issue of the subject grievance.  In Section "B" MNA outlines the facts regarding several subpoenas submitted by the parties, which are relevant to MNA's requests for an adverse inference regarding several topics.

### A.   <u>Case Administration of Arbitrations.</u>

The grievance and arbitration procedure for disputes arising under the CBA between the parties is outlined in Article XXI.  Ux-7 at 66-67.  Likewise, each of the prior contracts between the parties, from 2000 to present, contained a similar provision on the grievance and arbitration procedure.  Tr. at 25; Ux-8 (excerpts of the grievance and arbitration provision from prior contracts).  In every contract from 2000 to present, the CBA included the process for advancing a grievance to arbitration, which is Step 4 of the grievance process.  Tr. at 29-30; Ux-8.  In those provisions, the arbitration agencies for which the parties shall submit a demand for arbitration has always been identified.  <u>Id.</u>

Initially, only the American Arbitration Association ("AAA") was identified in the contracts.  <u>Id.</u>  That remained the case until the contract between the parties effective on January 1, 2010.  Ux-8.  As of that contract, the LRC began to be included in addition to AAA as an agency through which a demand for arbitration could be filed.  Ux-8 (prior CBAs); Ux-7 (current CBA); Tr. at 31-33.

3

**Exhibit 28**

From January 2010 to present, both AAA and LRC have been identified in each contract.  Id.

Both LRC and AAA have rules regarding the processing of arbitrations through their agencies.  Ux-10 (AAA rules); Ux-11 (LRC rules).  One such rule shared by each agency is the default requirement that all correspondence be directed through the agency, rather than directly with any arbitrator.  Rule 8 of LRC's rules of labor arbitration states:

> The Labor Relations Connection functions as a liaison and facilitator between the parties and the Arbitrator. It is essential that there be no direct communication by the parties to the Arbitrator on substantive matters. **Any necessary communication to the Arbitrator shall be conveyed through the Labor Relations Connection**.

Ux-11 (emphasis added).  That LRC rule has remained substantially the same from 2000 to present.  Tr. at 31.

The parties have used both AAA and LRC to process arbitrations.  From the period of 2000 to 2013 approximately 26 demands for arbitration were filed pertaining to MNA and the Hospital, all of which were filed with AAA.  Tr. at 33; Ux-27 (binder of documents from all arbitrations between MNA and the Hospital filed prior to September 20, 2023).  Between 2013 and January 2022, when the current CBA was ratified, there were only approximately nine demands for arbitration filed regarding MNA and the Hospital.  Id.  All of the arbitrations in that period were filed with LRC.  Id.  In sum, approximately 35 demands for arbitration regarding MNA and the Hospital were filed in the period of 2000 until January 2022.  All 35 of those arbitrations were

4

**Exhibit 28**

administered from the demand to arbitration to the conclusion of the case by AAA or LRC.  Tr. at 38-39.

Beginning in January 2022, when the RNs returned to work after the approximately 300-day strike, there was an escalation in the frequency of arbitration demands.  In the period of January 2022 until September 2023, about 77 demands for arbitration were filed.  All of those demands were filed with LRC.  Ux-27; Tr. at 38-39.  Until September 20, 2023, all of those arbitrations were administered by LRC from the demand to arbitration, throughout the entire case, and to the conclusion of the case.  Tr. at 38-39.

Attorney Canzoneri testified regarding the processing of arbitrations through LRC and AAA.[3]  As he testified, the first step in engaging an arbitration agency is through filing a demand for arbitration.  Id.  Next, MNA will outline the facts regarding the processing of an arbitration after a demand has been filed with the LRC.  That process is nearly identical for AAA, but MNA focuses on LRC where that is the agency at issue in the subject grievance.  Tr. at 36.

Once a case has been initiated via a demand for arbitration, there are several possible ways in which it may come to a conclusion.  The first scenario is that a case goes to a hearing and there is an award issued by the arbitrator.  Tr. at 39.  Other cases are placed in abeyance and are eventually either

---

[3]  Attorney Canzoneri works for McDonald Lamond Canzoneri, a union-side labor law firm.  Tr. at 22-23.  He has over 30 years of experience in labor arbitration and has represented MNA since he began working at the firm in 1993.  Id.  Attorney Canzoneri is keenly familiar with the processing of arbitrations with AAA and LRC not only with MNA, but with the approximately 60,000 employees his firm represents from numerous client unions.  Tr. at 32.

5

**Exhibit 28**

withdrawn or scheduled for a hearing.  Id.  Cases may also settle at any stage of the process, including prior to the scheduled hearing, on the day of the hearing, or even after the hearing and prior to the issuing of an award.  Id. Regardless of which avenue a particular case takes, from 2000 to September 2023, LRC always administered each arbitration between MNA and the Hospital from the demand being filed and through the case's conclusion.  Tr. at 38-39.

After the demand is filed, LRC coordinates the selection of an arbitrator. Tr. at 37.  The selection of an arbitrator involves several steps coordinated by LRC, which includes:

- LRC emailing the parties separately a list of potential arbitrators. The parties strike names from that list and rank the remaining arbitrators.  Tr. at 37.  The parties then send that list back to LRC, without including the other party.  Id.

- If there is a mutually selected arbitrator from the first ranked lists, LRC will notify the parties and the arbitrator that has been appointed.  Tr. at 37.

- If no arbitrator is mutual from the first ranked lists, LRC will send the parties a second list and the process is repeated.  Tr. at 37.

- If there is still no mutually selected arbitrator, there is a final process the parties engage in that will result in a selection.

**Exhibit 28**

After the selection of an arbitrator, and prior to any arbitration hearing, LRC may engage in several administrative acts prior to the closing of the case. Those include:

- Communicating with the arbitrator for potential hearing dates, and sending those dates to the parties.  Tr. at 38.

- If there is difficulty in finding a mutually acceptable date, LRC may coordinate a conference call.  LRC sets up the call information and communicates the information to the parties and the arbitrator. LRC then initiates and attends the call.  After the call, LRC emails the potential dates to the parties.  The parties confirm those dates with their clients and witnesses.  Once a date is confirmed, LRC communicates that to the parties and the arbitrator.  Tr. at 39-41.

- Issuing a Notice of Hearing once a date has been selected.  Tr. at 38.

- Communicating with the parties to determine a mutually acceptable location for the hearing, and communicating that location in a revised Notice of Hearing to the parties and the arbitrator.  Tr. at 42.

- If the hearing is virtual, coordinating video conferencing and sending the information to the parties.  Tr. at 42.

- Assisting in coordinating a court reporter.  Tr. at 42.

- Transmitting communication to the arbitrator from the parties, such as subpoenas, motions, objections, or other disputes.  When

7

**Exhibit 28**

a party sends such communication to the LRC, then LRC will ask whether the other party has any response. Once LRC has exhausted the process of responses from the parties, which may include several responses, LRC will send the entire "package" of responses to the arbitrator to consider and provide a ruling if necessary. LRC will then forward the arbitrator's response to the parties. Tr. at 43-46.

- Placing the case in abeyance, if requested by the parties. Tr. at 49.
- Withdrawing a case, if requested by the parties, and closing the case by sending a letter of withdrawal. Tr. at 49.
- Postponing or rescheduling hearing dates. Tr. at 49.

If a case proceeds to an arbitration hearing, LRC is still involved in administering the hearing after the conclusion of the hearing, including:

- Collection of each parties post-hearing briefs, send separately by each party. Tr. at 48.
- Exchanging the briefs sent individually by each party. Id.
- Forwarding the briefs to the arbitrator. Id.
- Distributing the arbitrator's award to the parties. Id.

From the ratification of the first contract in 2000 until September 2023, the parties always permitted AAA or LRC to be the administrator of each arbitration from the demand through the conclusion of the case. Tr. at 38-39. That included following the rules of the arbitration agencies regarding having no direct communication with arbitrators. Id.; Ux-27. Prior to September

8

**Exhibit 28**

2023, no objections were ever raised by the Hospital regarding the administration of cases by AAA or the LRC.  Tr. at 46; Ux-27.

That practice changed, however, in September 2023, when Hospital unilaterally declared a change in the processing of the parties' arbitrations. Specifically, on September 20, 2023, the Hospital's representative, Christopher Borruso, sent an email to the CEO of LRC, Jan Teehan.  Ux-9.  Several individuals were also copied on that email, including attorneys from Ford Harrison (a law firm that represents the Hospital in labor relations) and several attorneys from McDonald Lamond Canzoneri (the law firm that represents MNA).  That email states:

> Ms. Teehan,
>
> Please be advised that the collective bargaining agreement between Saint Vincent Hospital ("Hospital") and the Massachusetts Nursing Association ("MNA") provides for the selection of arbitrators pursuant to the Voluntary Labor Arbitration Rules of the American Arbitration Association or the applicable procedures of the Labor Relations Connection.  It does not provide for the application of either agency's rules or for the "administration" of any matters by either agency.
>
> Accordingly, **effective as of the date and time of this email, you are instructed to cease any purported "administration" of, or any other participation of any kind in, any of the Hospital's currently pending matters.**  Please provide me the arbitrator's contact information in each of the Hospital's currently pending cases at your absolute earliest convenience, but by no later than the close of business tomorrow, September 21, 2023.

Ux-9 (emphasis added).

9

**Exhibit 28**

After the Hospital sent that email on September 20, 2023, the LRC refused to accept any demands for arbitration regarding disputes between the Hospital and MNA.  Tr. at 35.  Resultantly, no demands were filed with LRC after the date of Borruso's email to LRC.  Id.  From September 20, 2023, to present, MNA has filed all demands from arbitration with AAA.  LRC continued to be involved in arbitrations between the parties, however, as a result of ongoing demands filed prior to September 20, 2023.  Tr. at 47.  Regarding those cases, the Hospital began to communicate with arbitrators directly, rather than through the administrative services of the LRC.  Id.  In each instance where the Hospital communicated directly with an arbitrator, MNA would file a motion requesting the arbitrator to rule on the issue of direct communication with the arbitrator.  Id.  MNA sent those motions to the LRC, as usual, which was forwarded to the arbitrators in each case.  Id.  After September 20, 2023, there were fifteen (15) rulings from arbitrators on that topic.  Tr. at 50.  In all of those rulings the arbitrator concluded that communication **must** be directed through the LRC rather than directly to the arbitrator.[4]

---

[4]  Ux-12 (Arbitrator Cooper's ruling); Ux-13 (second Arbitrator Cooper ruling); Ux-14 (Arbitrator Boulanger); Ux-15 (Arbitrator Greenbaum); Ux-16 (Arbitrator O'Brien); Ux-17 (Arbitrator Overton); Ux-18 (Arbitrator Tower); Ux-19 (second Arbitrator O'Brien ruling); Ux-20 (Arbitrator Buckalew); Ux-21 (Arbitrator Buckalew clarifying ruling to extend to all cases before him between the parties); Ux-22 (Arbitrator Cenci); Ux-23 (Arbitrator Garraty); Ux-24 (Arbitrator Grossman); Ux-25 (Arbitrator Saylor); and Ux-26 (Arbitrator Marra).  One arbitrator declined to rule on the issue.

**Exhibit 28**

**B.** **Subpoenas.**

The Hospital and MNA each sent subpoenas to the Arbitrator for execution. The Hospital submitted a subpoena duces tecum for documents of the MNA on July 25, 2024. Attachment A (Arbitrator's December 23, 2024, Ruling on MNA's Motion to Quash) at 1. MNA objected to that subpoena, a telephone conference was held, and MNA submitted a Motion to Quash per the direction of the Arbitrator. Id. Ultimately, the Arbitrator struck most of the Hospital's subpoena, with the exception of a small subset of documents (which MNA did not object to producing) and set a deadline for production. Id. at 14-15. MNA timely produced all documents that it was required under the Arbitrator's ruling. Tr. at 51; Ux-27. That production was admitted at the arbitration hearing as Union Exhibit 27. Id.

MNA also submitted a subpoena duces tecum for documents of the Hospital. Ux-6. The Hospital objected to MNA's entire subpoena. The Arbitrator heard those objects in a telephone conference on January 24, 2025, and every objection was either withdrawn or overruled by the Arbitrator. Attachment D (Email from Arbitrator outlining his rulings in the January 24, 2025, telephone conference). The Hospital to date has not produced any documents responsive to the subpoena. Tr. at 54. The Arbitrator indicated in an email to the parties that an adverse inference would be drawn from the Hospital's failure to produce the subpoenaed documents. He reiterated that on the record at the hearing:

> I will also note, just for the record, that the
> correspondence that occurred with employer's counsel

11

**Exhibit 28**

over the weekend did repeat that **an adverse inference would be in play with respect to the failure to respond**.

Tr. at 64 (emphasis added).

On March 21, 2025, **<u>after the arbitration hearing</u>**, the Hospital submitted ten subpoenas to the Arbitrator.  Attachment B (Arbitrator's March 28, 2025, Ruling on MNA's Motion to Quash).  Among those were subpoenas ad testificandum and subpoenas duces tecum, and the Hospital requested those documents be produced or those individuals appear at a potential second date of hearing.  <u>Id.</u>  MNA objected to each of those subpoenas.  <u>Id.</u>  All of the Hospital's post-hearing subpoenas were either struck or the Arbitrator ordered the Hospital to submit an offer of proof to substantiate the basis for the subpoena.  <u>Id.</u>  The Hospital declined to submit any such offer of proof and no second hearing date was held.  Attachment C (April 1, 2025, email from the Arbitrator ordering the hearing record close).

### III.    STIPULATED ISSUES

At the arbitration hearing, MNA presented proposed issues.  Tr. at 8. The Arbitrator set the issues as MNA proposed.  Tr. at 8.  No objection was raised by the Hospital either at the hearing, which it refused to attend, or anytime thereafter, such as when it obtained access to the transcript of the hearing.  The issues before the Arbitrator in this matter are:

1.     Did the Employer violate the CBA as alleged in MNA's October 20, 2023, grievance?

2.     If so, what shall be the remedy?

12

**Exhibit 28**

Regarding the second issue, MNA proposes if the Arbitrator issues a remedy in this matter, the Arbitrator shall retain jurisdiction to be invoked by a party in the event of disagreement about implementation of such remedy.

## IV.   ARGUMENT

Article XXI of the parties' CBA establishes the process for advancing grievances to arbitration.  As described in that provision, that process is initiated through the filing of a demand for arbitration with one of the identified arbitration agencies, LRC or AAA.  After the filing of the demand, the CBA and the rules of LRC and AAA requires that the case be administered by the arbitration agency, including directing all communication to the agency rather than directly to any arbitrator.  For over 23 years, that process remained unchanged.  On September 20, 2023, the Hospital in violation of the CBA attempted to unilaterally change that process by announcing that it would cease to permit LRC—which was the agency exclusively administering cases between the parties at the time—to administer any cases between the parties. MNA submits that action violated the plain and unambiguous language of the CBA, and that the Hospital continues to violate the CBA in each case where it refuses to allow LRC to administer the arbitration.

This case is fundamentally a contract interpretation case of whether the Hospital violated the terms of the CBA when it unilaterally acted to refuse the arbitration services of LRC.  The standards for contract interpretation are reviewed in Section "A" below.  In Section "B," MNA demonstrates that the CBA

13

**Exhibit 28**

plainly and unambiguously states that the parties must use the administration services of the arbitration agencies throughout the full span of any arbitration case, which the Hospital did not rebut at arbitration. On those grounds alone, the grievance can be sustained.

Even assuming arguendo that the language of the CBA is ambiguous regarding case administration—and MNA in no way concedes that it is— MNA demonstrates in Section "C" below that any ambiguity is clarified by application of the rules of contract construction, including reading the document as a whole and harmonizing its parts.

Even assuming arguendo any ambiguity exists after application of the rules of contract construction, then the Arbitrator may consider extrinsic evidence, the chief of which is the past implementation of the contract by the parties. MNA demonstrates in Section "D" below that the implementation over twenty-three years of the contract provisions regarding arbitration administration has been to have the arbitration agencies administer each case from the demand to arbitration to the conclusion of the case. That past practice is unrebutted. Therefore, the Arbitrator should find that past practice clarifies any potential ambiguity in favor of MNA's proffered interpretation of the CBA. MNA bolsters that practice in Section "E" where it outlines 15 arbitration awards by arbitrators in cases between the parties. Those awards all support the conclusion that Article XXI requires administration of an arbitration by LRC or AAA from inception to its conclusion.

14

**Exhibit 28**

Finally, in Sections "F" and "G" MNA addresses the meritless objections it anticipates the Hospital will argue. Section "F" demonstrates that any argument regarding the issuance of an award after an ex parte arbitration hearing should be rejected where, as here, the Hospital had notice and opportunity to appear and refused to do so. In Section "G" MNA demonstrates that any objections to the processing of the arbitration are irrelevant and meritless.

For each of the aforementioned reasons, and the forthcoming argument, the Arbitrator should sustain the grievance, finding that the Hospital violated the CBA when on September 20, 2023, it unilaterally declared it would cease to permit LRC from serving as the case administrator in arbitrations between the parties, and continues to violate the CBA in its efforts to enforce that unilateral policy in each arbitration between the parties, including direct communication with arbitrators.[5]

### A.  **Contract Interpretation Standards.**

Below MNA reviews standards relating to interpreting a contract. First, MNA reviews standards that relates to plain and unambiguous language being dispositive. Second, MNA reviews the rules of contract construction which are appropriate to apply where a contract is ambiguous. And then third, MNA

---

[5] As for the question regarding the remedy, including damages which the Arbitrator requested be included in the brief, MNA addresses that in the Part V, Conclusion, and demonstrates that in sustaining the grievance MNA should be granted damages, including attorney's fees, which were the direct result of the Hospital's breach of the CBA.

15

**Exhibit 28**

addresses the standards relating to the use of extrinsic evidence, specifically past practice, as a final step in clarifying contract language that remains ambiguous even after application of the rules of contract construction.

### 1.    <u>Plain and Unambiguous Language.</u>

In resolving a dispute between parties, arbitrators should first look to the dispositive provision and determine if its plain and unambiguous language shows the parties' intent.  <u>The Plain Dealer Publishing Co.</u>, 1992 BNA LA Supp. 107654; <u>Consolidated Aluminum Corp.</u>, 66 BNA LA 938, 940 (Mann, 1976). Contractual language "is unambiguous if the arbitrator can determine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends." <u>Consolidated Aluminum Corp.</u>, 66 BNA LA at 940.  Contrastingly, arbitrators find contractual language ambiguous when a "credible argument can be made for conflicting interpretations of a provision."  <u>The Plain Dealer Publishing Co.</u>, 1992 BNA LA Supp. 107654; <u>see also</u>, Elkouri & Elkouri, <u>How Arbitration Works</u>, 8th ed at 9-8 (Bloomberg BNA, 2016) ("A contract term is said to be ambiguous if it is susceptible to more than one meaning, that is, if 'plausible contentions may be made for conflicting interpretations.'") (footnote omitted).

In explaining the plain language rule of arbitration, Elkouri states:

> This is the so-called "plain meaning rule," which states
> if the words are plain and clear, conveying a distinct
> idea, there is no occasion to resort to interpretation,
> and their meaning is to be derived entirely from the
> nature of the language used.

**Exhibit 28**

Elkouri, supra, 8th ed at 9-8 (citing inter alia Ralphs Grocery Co., 109 LA 33, 35-36 (Kaufman, 1997) and Nat'l Linen Serv., 95 LA 829, 834 (Abrams, 1990)); see also, Consolidated Aluminum Corp., 66 LA at 940; Clean Coverall Supply Co., 47 BNA LA 272, 277 (Witney, 1966) ("the authority of an arbitrator is limited to the construction of contractual language as agreed to by the parties."). When analyzing the plain language of a contract, arbitrators consider the "ordinary meaning" of the words used by the parties. ARMCO Steel Corp., 59 BNA LA 1058, 1059 (Lugar, 1972) ("it is a well-established principle of contract interpretation that words shall be given their ordinary meaning"); International Paper, 137 BNA LA 373, 375 (Van Kalker, 2017) ("A fundamental rule of contract interpretation is that clear and unambiguous language needs be given its plain meaning.").

### 2. **Rules of Contract Construction.**

If it is found that the dispositive language is ambiguous, then arbitrators apply the rules of contract construction as the next step in attempting to clarify the parties' intent. The rules of particular significance in this case include: (a) that the contract should be read as a whole, harmonizing its parts; (b) arbitrators should not reach conclusions regarding one provision that would effectively nullify another; and (c) arbitrators should ascertain the intent of the parties to avoid harsh or absurd results. Each of these rules will be described in greater detail below.

When deciding an issue of contract interpretation, arbitrators must read the "disputed portions '. . . in light of the entire agreement.'" Elkouri, supra

**Exhibit 28**

8th ed. at 9-35 (quoting Hemlock Pub. Sch. Bd. of Educ., 83 LA 474, 477 (Dobry, 1984)).  This means that "[e]ach paragraph must be determined in relationship to the contract as a whole."  City of Highland Park, 76 BNA LA 811, 815 (McDonald, 1981) (holding "a section of a contract cannot be isolated from the rest of the agreement and given free standing construction."); see also, International Paper, 137 LA at 375.  Likewise, "an interpretation in tune with the purpose of a provision is to be favored over one that conflicts with it." Elkouri, supra at 9-34 (citing Louisiana-Pacific Corp., 86 LA 301, 304 (Michelstetter, 1986)); see also, Associated Fur Manufacturers, 85 BNA LA 810, 811 (Kramer, 1985) (holding that in interpreting a contract, parties cannot "put a wholly unnatural premium upon excessive technicality and . . . ignore the manifest intent of the [parties].").

When determining the meaning of ambiguous language, arbitrators should avoid interpretations that would nullify another condition of the contract.  Elkouri on this topic states:

> It is axiomatic in contract construction that an interpretation that tends to nullify or render meaningless any part of the contract should be avoided because of the general presumption that the parties do not carefully write into a solemnly negotiated agreement words intended to have no effect . . . .  Ordinarily, all words used in an agreement should be given effect.  The fact that a word is used indicates that the parties intended it to have some meaning and it will not be declared surplusage if a reasonable meaning can be given to it consistent with the rest of the agreement.

Elkouri, supra at 9-35 (internal quotation omitted).  "Thus, if an arbitrator finds that two provisions in an agreement conflict, he will seek a meaning, if

18

**Exhibit 28**

possible, that will give some *substantial* effect to each of them." Schoonhoven, ed., <u>Fairweather's Practice & Procedure in Labor Arbitration</u> 176 (4th ed. 1999) (emphasis added) (<u>citing</u> <u>Kaiser Permanente</u>, 76 LA 635, 637–38 (Richman, 1981); <u>Kansas City Power & Light Co.</u>, 71 LA 381, 395 (Elkouri, 1978)).

As a general principle, arbitrators should also avoid interpretations of a parties' agreement that would lead to harsh or absurd results, especially when "an alternative, equally plausible, [interpretation] would lead to just and reasonable results." Elkouri, <u>supra</u> at 9-42 (<u>citing</u> <u>Restatement (Second) of Contracts</u> 203 cmt. e (1981)); <u>see also</u>, <u>Schalmont Cent. Sch. Dist.</u>, 87 BNA LA 151, 152 (Babiskin, 1986) (cited in Elkouri, <u>supra</u> at 9-42) ("Contracts are to be given a reasonable construction, so as to avoid harsh, illogical, or absurd results") (citations omitted); <u>Charley Bros. Co.</u>, 84 BNA LA 655, 658 (Probst, 1985) (cited in Elkouri, <u>supra</u> at 9-42) (holding "it is a well established principle of contract construction that language should not be interpreted in such a way as to render harsh, absurd or nonsensical results.").

Elkouri highlights the arbitrator's finding in <u>Consolidation Coal Co.</u> as a key example of this principle. In describing that case, Elkouri states:

> [A]n arbitrator illustrated the absurdity of a company's policy regarding "doctor's" excuses for sick days. In that case, the company rejected an excuse from a chiropractor on the ground that a "physician's" note was required. Carrying this policy out to its potential limits, the arbitrator described the "genuine predicament" of an employee experiencing the "painful symptoms of a physical condition, such as an aching abscessed tooth . . . ." Under a strict interpretation of the company's policy of accepting only a physicians note, the employee "would be compelled to go through the pro forma gesture of having a physician certify that

19

**Exhibit 28**

perhaps only a dentist would truly know about his or
her condition."

Elkouri, supra at 9-43 (citing Consolidation Coal Co., 83 LA 1158 (Duff, 1984))
(internal citations omitted).

### 3.    Past Practice.

After considering the plain language of a contract provision and
attempting to ascertain meaning from the rules of contract construction, if an
arbitrator is still unable to determine the meaning of a contractual provision,
then extrinsic evidence may be considered.  Of specific importance in this case
is extrinsic evidence showing the past implementation ("past practice") of that
contract provision.  The Plain Dealer Publishing Co., 1992 BNA LA Supp.
107654; see also, Elkouri, supra at 12-21 ("The custom or past practice of the
parties is the most widely used standard to interpret ambiguous and unclear
contract language," given that "the parties' intent is most often manifested in
their actions.").  See also, Richard Mittenthal, Past Practice and the
Administration of Collective Bargaining Agreements, 59 MICH. L. REV. 1017,
1023 (1961) ("language may be given a clear and practical construction . . .
through managerial action which is acquiesced in by the employees.").

Past practice is established as binding when it "[becomes] the mutually
understood manner of conduct accepted by both parties over a lengthy period
of time."  FOP Lodge and County, 2019 BNA LA Supp. 4659183 (Metzler, 2019);
The Plain Dealer Publishing Co., 1992 BNA LA Supp. 107654 ("consistency
over a period as long as 25 years gives rise to an implication of full knowledge

20

**Exhibit 28**

and acceptance by both parties."). Said differently, past practice is binding when it exemplifies a mutual understanding of agreed-upon conduct by the parties. <u>Barwin v. Village of Oak Park</u>, 54 F. 4th 443, 460 (7th Cir. 2022) (finding the practice of the parties will "supplement the written agreement with implied but nonetheless binding term."). Even so, binding past practice cannot contradict an express or implied term of the contract between the parties. <u>Merck & Co., Inc., United Steel Workers of America, Local 4-575</u>, 2021 WL 1171637, at *4 (D.N.J. Mar. 29, 2021) (<u>citing</u> <u>Armstrong Cnty. Memorial Hosp. v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union</u>, 419 F. App'x 217 (3d Cir. 2011)).

**B.      The Grievance May Be Sustained Alone Based Upon The <u>Plain And Unambiguous Language Of The Contract.</u>**

The issue in this case is whether the Hospital violated the CBA on or about September 20, 2023, and thereafter, by declaring that the LRC shall cease administration of any arbitration pending at the LRC involving the Hospital and MNA after appointment of an arbitrator. Ux-9. There is or should be no dispute that the Hospital made this declaration by email dated and sent on September 20, 2023, to the LRC and MNA representatives. Ux-9. Therefore, the analysis in this case hinges entirely on whether this undisputed declaration of the Hospital on September 20, 2023, violated the parties' agreement.

Turning to the parties' different positions about the meaning of the CBA, for its part the Hospital alleges that the arbitration provision (Step 4) of Article

<div align="center">21</div>

<div align="right"><b>Exhibit 28</b></div>

XXI of the Agreement, Grievance and Arbitration, only specifies the use of the labor agency (LRC or AAA) *through selection of the arbitrator*; and that all further administration of the arbitration by the labor agency (LRC or AAA) is not required.  Based upon this the Hospital contends it was entitled to notify the LRC to cease administration of arbitrations after the arbitrator was appointed and that the grievance should be denied.  In opposition to this, MNA contends that the CBA requires the labor agencies referenced in its Article XXI (LRC and AAA) to administer an arbitration from inception through the selection and appointment of the arbitrator and thereafter to the conclusion of the arbitration.  Based upon this proffered interpretation of the parties' Agreement, MNA contends the Arbitrator should find the Hospital violated the CBA by declaring that the LRC should cease administration after selection of the arbitrator and sustain the grievance.  For the reasons set forth below the Arbitrator may sustain the grievance, without more, based upon the plain and unambiguous language of the Agreement.[6]

The starting point for the analysis is the contract language.  The dispositive provision is located at Article XXI, Grievance and Arbitration, Step 4 regarding arbitration, which reads:

> If the grievance is not adjusted in Step 3, the MNA
> may file a demand for arbitration under Step 4 with
> AAA or LRC with simultaneous written notice to the
> Hospital's Chief Human Resources Officer not later

---

[6]  In this section—Section "A"—MNA argues that the contract clearly supports its position.  Thereafter, in three sections that follow (Sections "B," "C," and "D"), MNA further argues in the alternative that even assuming <u>arguendo</u> the Agreement was ambiguous, still the Arbitrator may sustain the grievance based upon any of those three further grounds.

**Exhibit 28**

> than 30 working days after the written answer in Step 3 was received.
>
> **Step 4**:  Should the MNA request arbitration in accordance with the time limits specified herein, an arbitrator <u>shall be selected pursuant to the Voluntary Labor Arbitration Rules of the American Arbitration Association or the applicable procedures of the Labor Relations Connection</u>.  The decision of the arbitrator shall be final and binding.  The arbitrator shall be requested to issue a written decision within 30 days after the conclusion of the hearing.  The arbitrator shall have no authority to add to, subtract from, modify, alter or disregard any of the provisions of this Agreement.  Costs of the arbitrator and the American Arbitration Association or the Labor Relations Connection shall be borne equally by the Hospital and the MNA.

Ux-7 at 67 (underline emphasis added, bold in original).

The above-quoted language clearly and unambiguously requires submission of a grievance to arbitration by filing an arbitration demand with one of the two labor agencies listed—LRC or AAA.  And, significantly in stating this, the contract declares that the submission shall be "pursuant to" that agency's rules.  The Hospital claims that the language only references the selection of the arbitrator, and based upon this claims that this means that the agency is excluded from the procedure after appointment of the arbitrator.[7] But this is a fallacy because it ignores that the language <u>incorporates by reference</u> each of the arbitration agency's rules.

---

[7] As shown below, even assuming <u>arguendo</u> that the contract was silent, this does not mean a prohibition, but rather at most leaves the issue open for determination by past practice and other arbitration awards issued under this Agreement.

**Exhibit 28**

Because the Agreement incorporates by reference the rules of the LRC and AAA, an analysis of the Agreement must include a review of those rules to determine whether they in turn are plain and unambiguous regarding the dispositive issue.  The Arbitrator may easily find that the LRC and AAA the rules plainly and unambiguously require use of the LRC and AAA after the selection of the arbitration.  In this regard, as shown in the next two paragraphs, the rules for the LRC and AAA both (A) require adherence to the rules of that agency as a condition for its receiving and processing the demand for arbitration; (B) require all communication to the arbitrator must be sent though the agency; and (C) prohibit direct communication with the arbitrator.

The LRC rules plainly and unambiguously express the interpretation points "A" "B" and "C" described in the prior paragraph at Rules 1 and 8:

> 1. <u>Application of Rules</u>.  The parties must mutually agree to use The Labor Relations Connection to administer their Grievance Arbitration, Mediation, Fact Finding and/or Interest Arbitration cases.  Parties may do so either during the collective bargaining process or by memorandum of agreement.  The parties may, by written agreement, amend the procedures outlined in the Labor Arbitration rules.

> 8. <u>Contact with the Arbitrator</u>.  The Labor Relations Connection functions as a liaison and facilitator between the parties and the Arbitrator.  It is essential that there be no direct communication by the parties to the Arbitrator on substantive matters.  Any necessary communication to the Arbitrator shall be conveyed through the Labor Relations Connection.

Ux-11 at Rule 1 and Rule 8.

Likewise, the AAA Rules are plain and unambiguous in supporting MNA's

<div align="center">24</div>

<div align="right"><b>Exhibit 28</b></div>

interpretation at Rules 1, Rule 2, and 46:

> 1. <u>Agreement of Parties</u>.  The parties shall be deemed to have made these rules a part of their arbitration agreement whenever, in a collective bargaining agreement or submission, they have provided for arbitration by the American Arbitration Association (hereinafter the AAA) or under its rules.  These rules and any amendment of them shall apply in the form in effect at the time the administrative requirements are met for a demand for arbitration or submission agreement received by the AAA.  The parties, by written agreement, may vary the procedures set forth in these rules.

> 2. <u>AAA and Delegation of Duties</u>.  When parties agree to arbitrate under these rules or when they provide for arbitration by the AAA and an arbitration is initiated under these rules, they **thereby authorize the AAA to administer the arbitration**.  The authority and duties of the AAA are prescribed in the agreement of the parties and in these rules, and may be carried out through such of the AAA's representatives as it may direct.  The AAA may, in its discretion, assign the administration of an arbitration to any of its offices.

> 46. <u>Communication with Arbitrator</u>.  There shall be no direct communication between the parties and a neutral arbitrator on substantive matters relating to the case other than at oral hearings, unless the parties and the arbitrator agree otherwise.  Any other oral or written communication from the parties to the arbitrator shall be directed to the AAA for transmittal to the arbitrator.  This rule does not prohibit communications on non-substantive matters such as travel arrangements and driving directions, nor does it prohibit direct communications in special circumstances (such as emergency delays) when the AAA is unavailable.

Ux-10 at Rule 1, Rule 2, and Rule 46 (pages 8 and 19, emphasis added).[8]

---

[8]  Note that the headings in the exhibits are very darkly shaded such that it is difficult to see the headings for each rule.  However, the Table of Contents

**Exhibit 28**

Nor can there be any doubt that the parties have clearly shown their intent in the Agreement to not only acknowledge the agency rules, but to incorporate by reference the rules of those agencies. In particular, the Article XXI of the CBA states, "an arbitrator shall be selected <u>pursuant to</u> the Voluntary Labor Arbitration Rules of the American Arbitration Association or the applicable procedures of the Labor Relations Connection"; in the same paragraph, the Agreement addresses the costs of the arbitrator in connection with the services of the arbitration agencies. Ux-7 at 67 (emphasis added). By expressly referencing the rules of each of the two labor agencies in identifying the manner in which the arbitrator is to be selected and the arbitration procedures to be conducted, the parties have unambiguously shown their intent to incorporate the terms of the LRC and AAA rules in the Agreement concerning the arbitration provisions in Article XXI.

Further, there can be no question that the rules mandate that the agency shall administer the process from beginning to end (not just to the selection of the arbitrator). That is clear because the rules state that all communications must be through the labor agency and not directly with the Arbitrator. By clear implication, this must mean that the agency remains involved in administering throughout the course of the entire arbitration; otherwise, the agency would not be able to execute the rule that requires that all communications be through the arbitrator. For example, if the LRC or AAA

---

shows the Rule headings and page numbers, and the exhibit contains clear references to internal page numbers which confirm the rules referenced.

26

**Exhibit 28**

ceased administration after the selection of the arbitrator, then there would be no way to communicate about dates of hearing, any pre-hearing disputes or subpoenas, submission of post-hearing briefs—without directly contacting the arbitrator. Where all communication must be through the labor agency, therefore, this means that the labor agency administers the arbitration until its conclusion. This meaning is unambiguous because there is no other reasonable way to construe the rule requiring all communication with the arbitrator be through the agency, and expressly prohibiting direct communication with the arbitrator.

In summary, because the Agreement unambiguously incorporates the AAA and LRC Rules, the Agreement unambiguously demands the parties abide by the arbitration agency's rules in selecting an arbitrator. Those rules in turn plainly and unambiguously make compliance with the agency's rules a condition for using the labor agency services. One such rule unambiguously establishes that all communications must be through the labor agency, and unambiguously prohibits direct communication with the arbitrator. This means that the agency remains involved in administration not just to selection, but to the conclusion of the arbitration since communication is required to the end. Therefore, the Arbitrator should find that, by incorporating the rules of the LRC and AAA, the Agreement itself requires the use of the agencies to communicate with the arbitrators regarding case administration from inception to the conclusion of the case, not just for arbitrator selection.

27

**Exhibit 28**

Though MNA strenuously argues that the contract language is unambiguous in support of its position regarding LRC administration, it is expected that the Hospital will claim the opposite:  falsely claiming that this same language unambiguously requires LRC or AAA administration <u>only</u> through the selection of the arbitrator.  Any such argument by the Hospital should be rejected.  Though MNA contends the language unambiguously supports MNA's position, if the language is not unambiguous in favor of MNA's position, then at most it is ambiguous and susceptible to clarification by application of the rules of contract construction, past practice, and other extrinsic evidence.[9]  The following points support that conclusion.

First, it is important to review the entire phrase in question in evaluating whether it is ambiguous—"an arbitrator shall be <u>selected pursuant to</u> the Voluntary Labor Arbitration Rules of the American Arbitration Association or the applicable procedures of the Labor Relations Connection."  Ux-7 at 67 (emphasis added).  In claiming that this language is unambiguous in providing for administration *only through* selection of the arbitrator, the Hospital hinges its entire argument on the word "selected"; it says that this word makes it clear that the contract imposes an obligation only through selection.  However, the Hospital fashions this argument **by the expedient of ignoring** the next two words—"pursuant to"—and ignoring the reference immediately thereafter (in the same clause) to the AAA and LRC rules.  At a minimum, the words

---

[9]  As shown in the subsequent sections, past practice and other arbitrator decisions under this Agreement confirm MNA's position on the issue of LRC administration to the conclusion of the case.

28

**Exhibit 28**

"pursuant to" and the reference to the LRC and AAA rules, introduce ambiguity (if not clarity in favor of MNA, as MNA contends).  Specifically, where the LRC and AAA rules are not quoted, but only incorporated by reference, there could be ambiguity as to the content of the rules and whether they require that a party filing a demand submits to rules which require LRC or AAA administration to the conclusion of the arbitration.

Second, the Hospital may claim that the last sentence of LRC Rule 1 provides for the potential that the parties may agree to modify the LRC rules, and that the contract language in question makes such modification.  In this regard the last sentence of LRC Rule 1 reads:  "The parties may, by written agreement, amend the procedures outlined in the Labor Arbitration rules." Exh-11 at LRC Rule 1.  However, this does not resolve ambiguity or show that the word "selected" is controlling as to the scope of the LRC's administration. Rather, the arbitration language is at most ambiguous because of two plausible interpretations (assuming <u>arguendo</u> the Hospital's argument is even plausible, which it is not):

(A)   <u>as MNA contends</u>, the word "selected" is used solely as a verb to show the start of the process; it is used in conjunction with the parties' expressing their intent that the rules of the LRC and AAA rules are incorporated and govern the process; the word "selected" therefore is not used to limit or amend the rules at all because it is not styled as an amendment but rather to express the start of the process; or,

29

**Exhibit 28**

(B) <u>as the Hospital contends</u>, the word "selected" is used to express an amendment to the rules, to limit the scope of the rules to selection of the arbitrator only, even though the arbitration provision does not state such limitation or say it is an amendment of the rules of the LRC.

For these reasons, assuming <u>arguendo</u> the provision is not clear in favor of MNA's position, then at most it is ambiguous and does not clearly support either party's position and it is appropriate to proceed to an application of the rules of contract construction as discussed next in section "C."

### C. Even Assuming <u>Arguendo</u> The Contract Is Not Clear, The Grievance May Be Sustained By Application Of The Rules Of Contract Construction.

Where the language does not plainly and unambiguously resolve a dispute about the meaning of a contract, then it is appropriate to proceed to the next step and attempt to resolve such ambiguity by applying the rules of contract construction. The specific rules that are pertinent to the contract construction analysis are those that require reading the agreement as a whole, harmonizing sections, and avoiding an interpretation that results in one provision nullifying or rendering meaningless another provision. In this case, because the Agreement incorporates by reference the AAA and LRC rules, it is appropriate to review not only the Agreement itself, but also the entire AAA and LRC rules in an attempt to clarify the parties' intent. For the reasons which follow the Arbitrator may find that an application of the rules of contract construction clarifies any potential ambiguity in favor of MNA's proffered interpretation of the Agreement.

30

**Exhibit 28**

Turning first to the LRC rules, MNA has already reviewed the rules that are directly dispositive above (Rule 1 and Rule 8), but there are other rules that are relevant and clarify potential ambiguity in MNA's favor, as follows:

- Rule 2 provides that the LRC may modify its rules. Where there is no showing that the parties by contract modified the rules (under Rule 1 as discussed above <u>supra</u> at section "A"), this reinforces that the parties' intentions are reflected by the rules as written.

- Rule 6, Appointing an Arbitrator, shows that there are instances when the rules acknowledge the administration may proceed among various options. In this instance, Rule 6 provides various method for selecting the arbitrator, including the LRC's default two-list procedure and other procedures that the parties may specify. This shows that the LRC knows how to specify when there is room for variation. However, this rule nor any of the other rules provides for the right of a party to disregard the rules absent agreement of the parties. And the rule provides no exception to the requirement that all communications be through the LRC, and no exception to the prohibition on direct communication with the arbitrator outside of the hearing without first obtaining permission from the arbitrator in special circumstances. Thus, Rule 6 reinforces that the rules should not be permitted to allow deviation from the rules, and even where variation is permitted, it is only by arbitrator order, not a party's individual insistence.

31

**Exhibit 28**

- Rule 7, Notice to Arbitrator of Appointment, reinforces that LRC administration continues after the arbitrator is appointed because it not only references the administrative act of the LRC appointing the arbitrator, but also that the LRC "contact the Arbitrator and obtain dates to offer the parties for scheduling the hearing(s)."  This shows that the LRC rules explicitly reference the further involvement of the LRC after the arbitrator is appointed; if that was not the case then Rule 7 would not provide for the LRC to handle communications relating to obtaining dates and scheduling.  MNA's proffered interpretation is consistent with this rule, and the Hospital interpretation is disfavored because it would nullify this rule and function.

- Rule 10, Disclosure and Disqualification Procedure, provides that after the selection of the arbitrator, the LRC functions to receive disclosures from the arbitrator that may impact the arbitrator's "impartiality, including any bias," and then administers a post-selection process relating to deciding whether the arbitrator shall be disqualified.  The Hospital position would nullify the LRC's role in this regard and require the arbitrator to rule on this, whereas MNA's proffered interpretation is consistent with this rule and retains LRC's function in this regard.

- Rule 11, Vacancies, provides for the function of the LRC after the section of the arbitrator in the event the arbitrator vacates the appointment.  The Hospital position would nullify this rule; the MNA position is consistent with this rule.

32

**Exhibit 28**

- Rule 12, Scheduling of Hearings, this rule provides for LRC's function after selection of the arbitrator regarding selecting a date of hearing, venue, and starting time. The Hospital position would nullify this rule as the LRC would not be involved in scheduling and other logistics; MNA's position is consistent with the rule as LRC would continue to function as required by Rule 12.

- Rule 14, Subpoenas, provides that subpoena must be "submitted through the [LRC] at least seven (7) days prior to the day of hearing, with a copy of the requested subpoena served on the other side." The rule places LRC in the position of administering whether there are objections, and that the LRC transmits such materials to the arbitrator. The Hospital position would nullify this rule as parties instead would directly submit subpoenas to the arbitrator. The Hospital in this case violated that rule (the same rule of AAA) by directly and unilaterally sending its subpoena of MNA for records to the Arbitrator unilaterally, <u>without even copying MNA counsel</u>,[10] and thus the Hospital would have had the arbitrator sign that subpoena without MNA even having a chance to review it or make objections. As the proceedings thereafter showed in this case, there can be extensive objections. The Hospital's interpretation of the rules would nullify this rule, and in so doing allow one party to introduce chaos and unilateral action to the process. MNA's

---

[10] By email from AAA on July 26, 2024 (3:46 PM) the AAA advised of this unilateral submission of a subpoena to the arbitrator in this case.

33

**Exhibit 28**

position in this matter is consistent with the rule, as the LRC would be involved in the processing of subpoenas from the start.

- Rule 15, Stenographic Documentation, provides that LRC shall function to find a stenographer if a party seeks to have one transcribe the proceedings and other rules relating to stenographer. This is post-arbitrator-selection activity. The Hospital position would nullify this rule; MNA's position is consistent with the rule.

- Rule 20 and Rule 21, Filing of Documents and Filing of Briefs, provide that documents and briefs "must be delivered to the [LRC] for transmittal to the Arbitrator and to the other party" (same language for both Rule 20 and Rule 21). This is post-arbitrator-selection activity. The Hospital position would nullify this rule; MNA's position is consistent with the rule.

- Rule 22, Postponements, provides that, where a party seeks postponement, "the request should be made through the [LRC], who will contact the other party to determine whether or not they will agree to the request." This is post-arbitrator-selection activity. The Hospital position would nullify this rule; MNA's position is consistent with the rule.

- Rule 24, Submission of Arbitrator's Award, provides that the LRC distributes the arbitration award to the parties: "The Arbitrator will submit the Award to the [LRC] for distribution to the parties." This is post-arbitrator-selection activity. The Hospital position would nullify this rule; MNA's position is consistent with the rule.

**Exhibit 28**

- Rule 25, Modification of Award, provides for either party to request correction of "alleged errors in the Award," and that such request is may by the party "through the [LRC]" not directly with the arbitrator. This shows that the LRC Rules contemplate administration by the LRC to the very end of the arbitration process—even after the issuance of an award if there was a request for correction of an "error." This is not just post-arbitrator-selection activity, but activity that is at the very end of the process even after an award is issued. The Hospital position would nullify this rule; MNA's position is consistent with the rule.

- Rule 28, Costs Associated with Arbitration, reflects the various courses of an arbitration, including a grievance being placed "into abeyance, is withdrawn, or settled after the submission of the Demand for Arbitration." The rule provides for no reimbursement of the Administrative Fee regardless of whether the case ends with an award, or any of the alternatives noted. This in turn shows that the parties pay the LRC for all actions of the LRC from beginning to end, regardless of the extent of the LRC's administrative action (e.g., regardless of whether a notice of hearing is sent by LRC and subpoenas processed by LRC, but then the case is settled or goes into abeyance). The fact that the fee is for all such activity and is not prorated or with a schedule for arbitration selection "list only" reinforces MNA's position, and shows that the Hospital position is refuted by the rules.

35

**Exhibit 28**

- Expedited Labor Arbitration Rules provide for a course for hearing that is expedited where there are not briefs filed, and a two-page arbitration award, but still includes the application of the LRC rules including LRC administration for expedited arbitration "that is not in conflict" with the other rules. Thus, for example, the LRC may issue a notice of hearing and will provide the two-page award to the parties. This shows that the drafters of the LRC rules knew how to provide for an exception, and in so doing show that the absence of an exception for LRC administration as the Hospital contends is significant: It means there is no such exception. This detracts from the Hospital position, reinforces MNA's position.

Ux-11.

With respect to the AAA rules all of the same arguments as shown above regarding the LRC apply to the AAA as the following analysis demonstrates:

- Rule 8, Fixing the Local (page 9), this rule provides that, absent agreement, the AAA "may initially" establish the location of the hearing, subject to the power of the arbitrator to make a final determination. The Hospital position would nullify this rule; MNA's position is consistent with the rule.

- Rule 9, Qualifications of Arbitrator (page 10) and Rule 15, Disclosure and Challenge Procedure (page 12)—same topic as the LRC Rule 10. The Hospital position would nullify these rules; MNA's position is consistent with the rules.

36

**Exhibit 28**

- Rules 16 (vacancies), 17 (Date, Time, Place of hearing), 19 (stenographic record) (page 12-13)—same topics as LRC rules. The Hospital position would nullify these rules; MNA's position is consistent with the rules.

- Rule 27, Evidence and Filing of Documents (page 14-15), provides a procedure for AAA to distribute documents not filed with the arbitrator at the hearing, "but arranged at the hearing or subsequently by agreement of the parties to be submitted, shall be filed with the AAA for transmission to the arbitrator or transmitted directly to the arbitrator if the parties agree." This rule also strongly supports MNA's position for at least two reasons. One is that, the process of the AAA distributing exhibits after the hearing shows the continued administration by the AAA. Second is that this shows that the drafters of the AAA Rules knew how to make an exception to the default rule prohibiting directly contact with the arbitrator, yet there is no exception of the nature the Hospital claims. This means the AAA rules intended to foreclose the Hospital position of no administration after selection of the arbitrator. The Hospital position would nullify this rule; MNA's position is consistent with the rule.

- Rule 34, Extensions of Time (page 16), provides for a function of AAA to extend the timeframes in the rules, and that AAA shall notify the parties of such extension. The Hospital position would nullify this rule; MNA's position is consistent with the rule.

**Exhibit 28**

- Rule 40, Modification of Award (page 17), this is the same as LRC Rule 25 as discussed above. The Hospital position would nullify this rule; MNA's position is consistent with the rule.

- Rule 41, Release of Documents for Judicial Proceedings (page 18), provides for the role of the AAA in providing material in connection with court or agency cases. The Hospital position would nullify this rule; MNA's position is consistent with the rule.

- Rule 43 (Administrative Fees, page 18), Rule 44 (Expenses, page 18), Rule 45 (Suspension for Non-Payment, page 18); and topic entitled "Administrative Fees" (page 20)—same principle as LRC Rule 28. The Hospital position would nullify these rules and the topic regarding administrative fees; MNA's position is consistent with these rules and topic.

- The topic—"Optional Services" (page 24)—includes a menu of options that are different than the full services of the AAA. One such menu item is "list only" where AAA is only involved in providing a list but does not further administer; another such menu item is where AAA receives production of documents. This topic, Optional Services, shows that the default is the full service of the AAA, and there must be specific action for optional service. If the parties intended for there to be an "optional service" then they had the opportunity when negotiating the contract to state—"List Only"—then their intent to use AAA only for the list and selection, but not thereafter would be indicated. Where they did not do

38

**Exhibit 28**

that, but had the option to do that, shows they did not intend the Agreement to establish a "List Only" use of AAA.[11]

Based upon an application of the rules of contract construction, therefore, the Arbitrator may find any supposed ambiguity in the Agreement about the subject LRC administration issue is clarified in favor of MNA, and against the Hospital's proffered interpretation. On this further basis the Arbitrator may sustain the grievance.

> **D.** **Even Assuming <u>Arguendo</u> Extrinsic Evidence Is Considered, Past Implementation Of The Contract Conclusively Confirms The Grievance Should Be <u>Sustained.</u>**

Even assuming <u>arguendo</u> that the language of the CBA is not plain and unambiguous, or is not clarified by application of the rules of contract construction as MNA contends above—and MNA in no way concedes that point—still the Arbitrator may sustain MNA's proffered interpretation of the Agreement based upon unrebutted evidence of past practice. Such evidence is overwhelming, directly relevant, and conclusive in supporting MNA's position

---

[11] Part "E" below is relevant to this as well. In that section MNA reviews arbitration awards under this contract about the same issue presented here, and argues that they further support MNA's position. One such award was issued by Professor Marc Greenbaum. Ux-15. In that decision, Arbitrator Greenbaum finds that the parties' in Article XXI intended that the LRC administer arbitrations to conclusion (same interpretation presented here). In making that finding he notes the "list only" option of AAA, and reasons that the failure to include that in the contract here signifies that it was not intended: "<u>In my experience where the parties have sought to limit the arbitrator's role to the arbitrator selection process, a so-called **'list only'** process, that intention has been made clear</u>." (Ux-15 at ¶3, emphasis added.)

**Exhibit 28**

regarding the meaning of the Agreement, and refuting the Hospital's contrary position.

### 1.     <u>Application of Adverse Inference.</u>

The first aspect of evidence in support of MNA's position arises from the Adverse Inference Doctrine.  There are three aspects to this discussed below, one relating to failing to call a witness to refute testimony, one relating to a party's failure to produce documents to contradict those produced by the other party, and one relating to a party refusing to produce documents in response to a subpoena.

### a.     <u>Failure to Call Witnesses.</u>

Arbitrators and courts hold that a party's failure to call an available witness creates a presumption that the witness' testimony would have been adverse to such party.  <u>Southern Cal. Permanente Medical Group</u>, 92 BNA LA 41, 45 (Richman, 1989); <u>Auto Workers v. NLRB</u>, 459 F.2d 1329 (D.C. Cir. 1982).[12]  <u>See also</u>, <u>Tower Automotive Products Co.</u>, 115 BNA LA 1077, 108-86 (Wolff 2001), where the arbitrator cited the above rule and held that a party's

---

[12]  In <u>Auto Workers</u>, the Court held in this regard:

> "[A]ll other things being equal, a party will of his own volition introduce the strongest evidence available to prove his case.  If evidence within the party's control would in fact strengthen his case, he can be expected to introduce it. . . .   Conversely, if such evidence is not introduced, it may be inferred that the evidence is unfavorable to the party suppressing it.

<u>Id.</u>

40

**Exhibit 28**

failure to call an available witness on a material issue, where such testimony would <u>not</u> be cumulative, triggered an adverse inference that the facts were at odds to the position advanced by such party.

Other examples of cases in this regard include the following:

- <u>Granite Construction Co.</u>, 114 BNA LA 1115, 1119 (Riker, 2000) (adverse inference applied where employer failed to call foreman to rebut testimony of grievant on key element of charge, even where the burden was imply preponderance of the evidence);

- <u>Metro Washington Airports Authority</u>, 111 BNA LA 712, 717 (Simmelkjaer, 1998) (applying adverse inference for failure to call material available witness);

- <u>Quemetco Inc.</u>, 2004 BNA LA Supp. 110724 (Kilroy, 2004) ("It has long been held by Arbitrators that an adverse inference can be drawn from a parties' failure to call a material witness, particularly if that witness could corroborate facts or rebut allegations against him.");

- <u>U.S. Department of Labor</u>, 98 BNA LA 1129, 1133 (Barnett, 1992) ("Finally, I draw an adverse inference against Management from its failure to produce C to testify at the hearing to deny that he conducted himself as grievant testified or to otherwise explain his behavior. The adverse inference rule which I am applying as the result of Management's failure to produce C to testify is well established in law and arbitral proceedings, and I have applied it in prior arbitrator decisions. . . .  The rule holds that, when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him. No credible proof was offered that C was too sick to attend the hearing or that there was any other good reason for the omission of this testimony. C was apparently still on sick leave at the time of the hearing, had not severed the employment relationship with the Department of Labor, and therefore was under Management's control.") (internal citations omitted).

### b.    <u>Failure To Produce Documents.</u>

When a document or electronic recording is not admitted that goes to a material issue in the case, then an adverse inference may be drawn.  <u>United</u>

<p style="text-align:center">41</p>

<p style="text-align:right"><b>Exhibit 28</b></p>

Parcel Service, 121 BNA LA 207, 228 and n.48; Engelhard Corp., 100 BNA LA

238, 247 (Duda, 1993) (adverse inference for employer's failure to produce

document substantiating claim); City of Kankakee, 97 BNA LA 564, 571 and

n.17 (Wolff, 1991) (adverse inference for failure to produce documents

requested by union).

> While record evidence shows that coverage for medications under the 2020 and 2021 plans was not comparable, the Union urges that the Arbitrator draw an adverse or negative inference from the Employer's unexplained failure to produce documents setting forth the cost for medications under the 2020 plan.

> Under the "negative inference rule," the Union maintains that "a presumption should be drawn that had the prescription drug plan information been produced it would have supported the Union's claim that this portion of the medical plans was not comparable." Specifically, the Union notes that the Employer failed to produce the Optum formulary and excluded medicine list from 2020. Without the Optum formulary, which was used to set prices for medications under the UHC 2020 plan, it was not possible to conduct an accurate comparison of drug prices between 2020 and 2021.

> It is well-established that "the unexplained failure or refusal of a party to judicial proceedings to produce evidence that would tend to throw light on the issue authorizes, under certain circumstances, an inference or presumption unfavorable to such party." See, Interstate Cir. V. United States, 306 U.S. 208, 226 (1939). See also, Tendler vs Jaffe, 203 F.2d 14, 19 (1953) ("The omission by a party to produce relevant and important evidence of which he has knowledge, and which is peculiarly within his control raises the presumption that if produced the evidence would be unfavorable to his cause.") In the arbitral context, the rule is set forth as follows:

> > "[A]n Arbitrator] may. . . give such weight as he deems appropriate to the failure of a

**Exhibit 28**

> party to produce documents on demand. The degree of weight to be attached to such failure will depend upon the relevancy of the documents requested to the issues at hand.  If the information withheld appears to be strongly pertinent, the withholding of it may be vital in making the decision." *How Arbitration Works*, at 8.4.I. (*citing*, American Tel. & Tel. Co., 6 L.A. 31, 43 (Wallen, 1947)).

UAW Local ____, 2022 BNA LA 69 (Simmekjaer, 2021).  The arbitrator then applied the inference and found that the employer failure to produce contradictory documents warranted an adverse inference that such documents would have supported the union.  Id. ("However, the failure of the Employer to produce documents (e.g., 2020 Optum RX formulary) pursuant to the Union's request for documents warrants an adverse or negative inference that had the information been produced it would not have been beneficial to the Employer. . . .  the Arbitrator draws [a further] adverse inference from the Employer's failure to produce the Schedule of Benefits to go with the Booklet from the 2021 plan.").

### c.    Failure To Comply With Subpoena For Production Of Documents.

In addition, a party's failure to produce documents by a subpoena signed by the arbitrator is an additional, well established basis for drawing an adverse inference.  As stated in the Elkouri & Elkouri labor arbitration treatise, How Arbitration Works—"The party's refusal to comply with an arbitrator's subpoena allows an arbitrator to draw adverse inferences about the party's case.  ABA/Bloomberg Law, Elkouri & Elkouri:  How Arbitration Works,

43

**Exhibit 28**

Chapter 8. Evidence, Section 8.3E Arbitrator's Subpoena Power, p. 13 (citing Niemand Indus., 88-1 ARB ¶8070, 3336–37 (Sergent, 1987); Bornstein & Gosline, Labor and Employment Arbitration §§7.01–7.05 (1989); Grenig & Estes, Labor Arbitration Advocacy 36 (1989); and Hill & Sinicropi, Evidence in Arbitration 285–90 (BNA Books 2d ed. 1987)).

### d.   Applying Adverse Inference In This Matter.

There is a basis to draw an adverse inference based upon each of the foregoing grounds.

#### Witnesses:  Failure To Call

With regard to calling witnesses, the Hospital failed to call any witnesses to rebut the testimony of Attorney Canzoneri.  The binder of arbitration demand material submitted by MNA shows that the Hospital has had counsel throughout the entire period from 2000 to present for arbitrations through at least seven law firms.  Those law firms include[13] Raymond Thomas (AAA 11749 00); Reed Smith, LLP (AAA 02560 03); Butler, Snow, O'Mara, Stevens and Cannada (AAA 02160 04); Ropes & Gray (AAA 01842 0 to AAA 00671 09, plus AAA 01466 08); Littler Mendelson (AAA 00051 10 to AAA 01196 13, plus several others to AAA 00644 13); Jackson, Lewis, Schnitzler & Krupman (AAA 02153 00); Littler Mendelson (LRC 233-16 to LRC 864-22); Ford Harrison (LRC 292-23 to 328-23).

---

[13]  Parenthetical refer to case or range of cases as they appear in the binder, Ux-27.

**Exhibit 28**

An adverse inference should be drawn based upon the Hospital's failure to call any witness—lawyer—from Raymond Thomas; Reed Smith, LLP; Ropes & Gray; Littler Mendelson, Jackson, Lewis, Schnitzler & Krupman; or Ford Harrison to rebut any of the testimony of Attorney Jack Canzoneri about past practice from 2000 to September 20, 2023.  The Hospital has not shown that those firms did not have attorneys available to testify to the past practice of arbitrations involving MNA and the Hospital.  For example, from the firm Ropes & Gray, Robert Gordan appears on nearly every case as the lawyer handling that arbitration for the Hospital; for Littler Mendelson the documents show that attorneys Walter Hunter and Anthony Rizzotti were counsel for almost all of the cases; for Jackson Lewis [] the record shows that Jeffrey Brody was the counsel; for Ford Harrison the record reflect counsel including Cullan Jones and Michael Harrington.  None of those individuals or anyone else from those firms was called.

The specific adverse inference should be that, had any of them testified, their testimony would have fully confirmed:  (1) the past practice of AAA and LRC administration in all aspects outlined by Canzoneri, from inception to conclusion of each of the 112 cases filed form 2000 to September 20, 2023; (2) that prior to September 20, 2023, the Hospital never objected to the AAA or LRC administering the arbitration after the appointment of the arbitrator; (3) though the Arbitrator should not consider the Hospital's potential evidence-free argument about LRC bias, that there was no such bias shown in any one of those 112 cases by the actions of the LRC; and (4) that the Hospital failed and

**Exhibit 28**

refused to produce documents in response to the subpoena that MNA served upon the Hospital, Ux-6.

<div align="center">Documents:  Failure To Produce</div>

With regard to the failure to produce documents, the Hospital had the opportunity to confront and rebut the binder of arbitration demand material that MNA entered into evidence, Ux-27, plus the arbitration awards under this contract where arbitrators ruled on the LRC administration issue in favor of MNA, Ux-12 to Ux-26, but failed to introduce any evidence.  The testimony of Canzoneri showed that all such material was timely provided to the Hospital in mid-February in response to the Hospital subpoena of MNA for documents, and thus the Hospital was fully on notice to such material—yet the Hospital failed to introduce any documents to contradict those documents.  In addition, the Hospital could have contacted its prior counsel to obtain documents to contradict MNA's evidence—including documents from Raymond Thomas; Reed Smith, LLP; Ropes & Gray; Littler Mendelson; and Jackson, Lewis, Schnitzler & Krupman.  However, it failed to produce any documents from any source, including from those firms.  Likewise, its current counsel, Ford Harrison, was counsel for a few months before the September 20, 2023 declaration from Borruso and took over cases and it should be inferred that it had the entire record from all of the prior cases of the prior firms, or at least for all pending cases.  Yet the Hospital produced no documents from Ford Harrison either to rebut MNA's documents.

<div align="center">46</div>

<div align="right">**Exhibit 28**</div>

The foregoing failure to produce documents is especially hypocritical and reveals disingenuousness (and bad faith) because during oral arguments on the subpoenas, the Hospital counsel argued that there could be documents that were relevant beyond six categories that the Arbitrator ruled were relevant and non-cumulative (listed in the subpoenas and the arbitrator's ruling on the objection to subpoenas).  Despite that big show, despite that anger and rhetoric, and tone—the tiger is shown to be made of tissue paper.  If it were true that there were documents that showed that there was no past practice as MNA produced, the Hospital could have produced those—regardless of the fate of its irrelevant subpoenas for testimony that were properly rejected by the Hospital.  Nothing prevented the Hospital from presenting those documents, yet it failed to do so.  An adverse inference should be drawn that all documents in the Hospital's possession fully support the same conclusion as shown by Canzoneri's testimony and related documents about past practice and no prior objections to administration after selection of the arbitrator.

<u>Subpoena Duces Tecum:  Refusal To Produce</u>

Now turning to the Hospital thumbing its nose at the Arbitrator, and refusing to respond to the subpoena which the Arbitrator directly ordered the Hospital to do—there is further basis for an adverse inference.  For each of the following items requested in the subpoena an adverse inference should be drawn (request is underlined, and inference is stated thereafter):

47

**Exhibit 28**

1. the Demand for Arbitration— Demands were filed in the number and nature as shown by testimony of Attorney Canzoneri and the binder (Ux-27);

2. with respect to the subject of the LRC or AAA administering the arbitration process after the selection of the arbitrator ("the Subject"), any objection transmitted by the Hospital to MNA or LRC about the Subject—the Hospital never objected to the LRC or AAA administering an arbitration after the selection of an arbitration as shown by the testimony of Canzoneri, by MNA's own search for documents response to the Hospital subpoena of records from MNA which Canzoneri said showed no such objections, and by the binder (Ux-26) which is the product of MNA's search and shows not a single objection;

3. any exchange of positions about the Subject where the Hospital or MNA presented arguments about the Subject—same as ¶2, there was no objection, and no exchange of communications about the topic of an objection;

4. any rulings by arbitrators resolving any dispute about the Subject— same as ¶2, no arbitrator ruling about any objection challenging LRC's administration of the arbitration after selection of the arbitrator through September 23, 2023;[14]

---

[14] The subpoena limits the timeframe through September 23, 2023.  The record shows that after the Hospital on September 20, 2023 objected for the

**Exhibit 28**

5. <u>one example for each case of LRC and AAA administering the arbitration process after the selection of the arbitrator, such as issuance of a notice of hearing, coordinating communication and issuing notices of arbitrator decisions about any other arbitration issues; and</u>—there were many examples of LRC administration after the arbitrator was appointed, prior to the issuance of an arbitration award or the final letter closing the case, including as testified by Attorney Canzoneri and as reflected by the examples in the binder entered into evidence by MNA (Ux-26);

6. <u>LRC and AAA communication relating to the final disposition of the case, including withdrawal, withdrawal upon report of the matter settled, issuance of an arbitration award, placing in abeyance, closing the case.</u>— in each case the LRC administered the arbitration to the end point of the arbitration and issued a final letter as indicated by the testimony of Canzoneri and the documents in the binder of arbitration material (Ux-26).

### 2. Canzoneri Testimony And Documents Demonstrating Past Practice.

The testimony about past practice included both documentary evidence as well as testimony of MNA's counsel, Jack Canzoneri. The evidence was credible, precise, unwavering, and proves the existence of an unequivocal, longstanding, clear past practice of the AAA and LRC administering

---

first time, that there were at least 15 arbitration rulings on the objection. <u>See</u> Ux-12 through Ux-26.

49

**Exhibit 28**

arbitrations from inception, through selection of arbitrators, and thereafter to the final disposition of the case. That evidence is indisputable in this case by operation of the adverse inference doctrine discussed in the prior section. In that regard, Canzoneri's unrebutted testimony and related documents established the following:

- Canzoneri's foundation of personal knowledge regarding AAA and LRC administration was based upon his involvement as counsel for MNA from the inception of MNA's representation at St. Vincent Hospital after the RN bargaining unit was certified in 1998, and first contract in 2000, to present, and included participation in arbitrations during that period to present, Tr. at 22–24.

- The first collective bargaining agreement ("contract") between MNA and the Hospital covered the period 2000-2003, and there were further, successor contracts typically covering a three-year period to present (excluding the hiatus during the period of the strike in 2021), Tr. at 27; Ux-8 excerpt of contracts from 200-2003 contract through 2017-19 contract; Ux-7 (current contract).

- In all of those contracts there was a grievance and arbitration procedure, and the only significant change in the language relating to arbitration was adding LRC; specifically, the language was amended to expand from AAA being the only option for arbitration administration, to the addition of LRC as an option along with AAA in or about 2010, and continuing to the current contract, Tr. at 29–30; Ux-8 (excerpt of contracts from 2000-

50

**Exhibit 28**

2003 contract through 2017-19 contract; the excerpt of the 2010-13 contract that shows the addition of the LRC to the grievance and arbitration procedure); Ux-7at 66-67 (current contract, grievance and arbitration provision).

- From 2000 until September 20, 2023, MNA filed 112 Demands for Arbitration with the LRC and AAA under the contract with the Hospital (i.e., from inception of first contract to date of Borruso email, Ux-9, declaring LRC shall not administer arbitration).  Tr. at 33–34 (Canzoneri testimony); Ux-27 (binder of arbitration demand material covering this period).

- Specifically, from 2000-2013 MNA filed 26 Arbitration Demands with the AAA; from 2013 to January 2022 MNA filed 9 Arbitration Demands with the LRC (i.e., from date MNA began to file with the LRC to month RNs returned from strike); and from January 2022 to September 20, 2023 MNA filed 77 Arbitrations Demands with the LRC (i.e., from date RNs returned from strike to date of Borruso email, Ux-9).  Tr. at 33–34 (Canzoneri testimony); Ux-27 (binder of arbitration demand material).

⇒ Canzoneri's unrebutted testimony, and the binder of arbitration materials (Ux-27) showed that both LRC and AAA administered the arbitration process for the period 2000 through at least September, 2023, from the point of initial filing of the demand for arbitration through selection of arbitrator, to the final disposition, including for

51

**Exhibit 28**

example—circulating dates for hearings; coordinating and hosting telephone and video conferences;

⇒ acting as the "clerk of the courts" by receiving motions and oppositions from the parties, exhausting the exchange of such pleadings, and then providing a final package with all submissions of the parties to the arbitrator;

⇒ processing communications relating to motions about any disputes before the hearing; issuing notices of hearing; contacting court reporters; facilitating communication among the parties and arbitrator to determine whether a hearing will be in-person or via video conference, other venue issues, and issuing a notice with the outcome;

⇒ receiving post-hearing arbitration briefs from each side separately (without copy to the other side initially), and then circulating all briefs to each party and the arbitrator at the same time once both parties have filed their briefs;

⇒ receiving the arbitration award or other communications from the arbitrator and circulating that to the parties;

⇒ issuing a notice when a case has been withdrawn due to settlement or placed in abeyance; and,

⇒ issuing a notice at the culmination of the case advising that the case is closed.

**Exhibit 28**

Tr. at 36–46, 48–52 (Canzoneri testimony about past practice and binder, Ux-27); Ux-27 (binder of arbitration demand materials).

- During the period of the 112 Arbitration Demands filed with LRC and AAA from 2000 to September 20, 2023 (i.e., from first contract through the Borruso email declaring an end to LRC administration)—at no point did the Hospital raise an objection about LRC or AAA administering the process after the selection of the arbitrator, and this includes the 77 Arbitration Demands that were filed from 2022 to September 2023, many of which were pending at various stages at the time of the Borruso email, Tr. at 46, 52 (Canzoneri testimony).

- However, on September 20, 2023, the first time the Hospital made an objection to LRC administration after selection; the Hospital issued a notice to the LRC and MNA demanding that the LRC cease all administration of the 77 then-pending arbitrations, and demanding that going forward the LRC engage in no administration of arbitration after the selection of the arbitrator, Tr. at 34–35 (regarding Borruso email), 47 (regarding 77 cases pending); Ux-9 (Borruso September 20, 2023 email).

- The fact that the Hospital did not object to LRC or AAA administration after selection of the arbitrator until September 20, 2023 is shown as well by the Hospital's subpoena of records from MNA, which specifically included a request for any documents showing an objection, and Canzoneri testified that there was a search for responsive documents and there was no document showing the Hospital making such an objection

53

**Exhibit 28**

from 2000 until September 20, 2023, Tr. at 52; Ux-27 (binder of arbitration materials responding to subpoena, showing no such objection by the Hospital).

- Additionally, the past practice presented by MNA, and that there were never any objections to LRC (or AAA) administration prior to September 20, 2023 was shown, as well, conclusively by the fact that the Hospital produced no documents in response to the MNA's subpoena for records from the Hospital, nor any documents or witnesses that refute the past practice testimony of Canzoneri and the records MNA produced at Union Exhibit 27, Tr. 54 (Canzoneri, "the hospital never produced any records in response to this, even to this day"); Ux-6 (MNA subpoena of documents from Hospital).

- In addition, Canzoneri testified that, after Borruso declared that LRC should cease administering arbitrations on September 20, 2023, the LRC declined to accept further Arbitration Demands from MNA involving the Hospital, and at that point MNA was forced to resume filing Arbitration Demands (including the subject case) with the AAA from September 2023 onward.  Tr. at 35–36 (Canzoneri testimony).[15]

- Then, after September 20, 2023 onward the Hospital began to send emails and communications directly to the arbitrator, consistently bypassing administration by the LRC, and filing motions directly with the

---

[15]  MNA filed approximately 24 Arbitration Demands with the AAA from September 2023 at least to about November of 2024.  Tr. at 35-36.

**Exhibit 28**

arbitrator with evidence for example, all without LRC involvement, Tr. at 46–47, 50; Ux-12-26 (15 arbitration awards in response to such motions, ordering that LRC administration to continue, and communication with the arbitrator only through the LRC).

- This in turn resulted in MNA's counsel having to countermand the breach of contract and protocol by contacting the LRC administrator, and drafting and filing motions to each such arbitrator for a ruling that administration shall be through the LRC, and without direct communications with the arbitrator, Tr. at 46–47; Ux-12-26 (15 arbitration awards in response to such motions, ordering that LRC administration to continue, and communication with the arbitrator only through the LRC).

- These motions by MNA to countermand the Hospital's repudiation of the contract and longstanding practice, resulted in multiple arbitrator rulings in response to such motions that Article XXI of the Agreement requires that all communications should be through the LRC and not directly with the arbitrator, Tr. at 46–47; Ux-12-26 (15 arbitration awards in response to such motions, ordering that LRC administration to continue, and communication with the arbitrator only through the LRC).

Based upon the foregoing unrebutted evidence and testimony of MNA's counsel, Jack Canzoneri, the Arbitrator should find that there was a longstanding, unequivocal, clear past practice of AAA and LRC administering arbitrations from inception through the selection of the arbitrator to the

**Exhibit 28**

conclusion of each arbitration for a twenty-three-year period from 2000 until September 20, 2023.  To be clear, Attorney Canzoneri's unrebutted testimony, the binder of arbitration demand material produced by MNA (Ux-27), and an adverse inference based upon the reasons set forth above—all show that the practice during that period was not just a handful of cases, but included at least 112 arbitrations filed from 2000 through September 20, 2023; in each case, the labor agency was used for all purposes from beginning to the culmination of the case, with no objections ever before articulated by the Hospital until September 20, 2023 by Borruso's email.  The evidence presented in this regard was not contradicted, was completely unrebutted and should be credited.  Therefore, even if there is any ambiguity in the language, this past implementation of the contract conclusively resolves any such ambiguity in favor of MNA's position—that the contract requires use of the arbitration agency from inception to the conclusion of each arbitration (not just for arbitrator selection).[16]

---

[16]  Nothing argued by the Hospital undermines the foregoing conclusion that the Hospital has repudiated the contract.  In that regard, the Hospital may seek to avoid the foregoing conclusion by frivolously claiming that the LRC had corrupt intent to taint arbitrators against the Hospital and did not act as a neutral.  Even assuming for the sake of discussion this frivolous claim were taken at face value—still the Hospital defense would fail conceptually.  If the Hospital had a concern about the LRC actually not functioning in accordance with past practice and that LRC was biased, this does not change the terms of the Agreement.  The meaning of the contract is determined by considering:  (a) whether the language is plain and unambiguous; (b) if ambiguous, then applying the rules of contract construction in an attempt to clarify such ambiguity; (c) if still ambiguity, then considering extrinsic evidence, including most importantly past implementation (practice) of the contractual provision to discern the parties' intent, and any arbitration awards under the subject contract about the issue.  Based upon these relevant measures, the Agreement

**Exhibit 28**

**E.**  **Fifteen Arbitration Awards Ruling On The Subject Dispute Further Conclusively Confirm The Grievance Should Be Sustained.**

Canzoneri's testimony established that in several pending LRC cases the Hospital counsel after Borruso's September 20, 2023 declaration (Ux-9, email) began to communicate directly with the arbitrators in pending arbitrations and demand that LRC cease administration. In order to enforce its rights under the Agreement to LRC administration, MNA filed motions in such pending LRC cases. MNA entered into evidence Union Exhibits 12 through 25 which show 15 arbitrator rulings in that regard. Ux-12 through Ux-25 (arbitrator rulings on this issue); Tr. at 46–47 (Canzoneri testimony). In each of those 15 cases the arbitrator upheld the standard that all communication must be through the LRC, that direct communication with the arbitrator is prohibited. Those 15 arbitration awards support the conclusion that Article XXI requires LRC and AAA administration of an arbitration from inception to its conclusion. The Hospital defaulted in showing any other ruling, and an adverse inference should be drawn that there was no ruling in favor of the Hospital position that LRC administration is not required.[17]

---

as shown above requires LRC to administer the Agreement. That the Hospital thinks that Jan Teehan of the LRC doesn't like the Hospital and is biased against the Hospital, taints arbitrators against the Hospital—**has zero bearing on the meaning of the contract**. Based upon the foregoing, the Arbitrator should reject any such argument by the Hospital, that any such proffered theory in any event does not change the meaning of the contract, and find that past practice convincingly supports MNA's proffered interpretation and refutes the Hospital's contrary position and sustain the grievance.

[17]  At most the Hospital might point to one arbitrator that declined to rule.

57

**Exhibit 28**

Prior arbitration awards, while not binding per se upon the decision of a present arbitration, when persuasive can be readily used as an authority regarding interpreting the same subject contract language. "Prior labor arbitration awards that interpreted the existing terms of a contract between the same parties are not binding in exactly the same sense that authoritative legal decisions are, yet they may have a force that can be fairly characterized as authoritative." ABA/Bloomberg Law, Elkouri & Elkouri: How Arbitration Works, Chapter 11. Precedential Value of Arbitral Awards (also stating: "in any event, it would seem that whenever either party cites an award, the arbitrator should not ignore it. Respect for the citing party and the integrity of the arbitral process require the arbitrator to consider all the contentions of a party").

The following summarizes those 15 rulings and supports the Arbitrator adopting MNA's proffered interpretation of Article XXI regarding the subject LRC administration issue:

- Ux-12 Arbitrator James Cooper – this ruling incorporates the ruling in Ux-13 which was issued prior (transcript refers to this as the "first" ruling because it was the first ruling of Cooper offered)

- Ux-13 Arbitrator James Cooper – "For all these reasons I will not respond directly to MNA or Employer communications and shall forward all emails sent directly to me by the parties to LRC and shall respond only through the LRC."

- Ux-14 Arbitrator Richard Boulanger – "The Union's motion is upheld. The Hospital is ordered to forthwith comply with Article XXI relative to LRC or

58

**Exhibit 28**

AAA case administration.  The relief requested by the Union in its motion is granted."

- Ux-15 Arbitrator Marc Greenbaum, ruling that he has authority to decide pre-arbitration disputes such as the LRC administration issue, finding that Article XXI requires LRC administration, as follows (emphasis added):

> 3.  Contract provisions like Article XXI of the parties' agreement are generally understood as envisioning the designated administrator conducting the arbitrator appointment process and administering the case in accordance with its rules.  In my experience where the parties have sought to limit the arbitrator's role to the arbitrator selection process, a so-called "list only" process, that intention has been made clear.  My own experience with cases involving the Hospital, prior to the change in its outside counsel, was that the Labor Relation Connection ("LRC") performed all of the administrative and communications functions typically performed by the administrator referenced in a collective bargaining agreement.  **The Hospital has not presented any past practice evidence even suggesting that the parties have administered the article in a manner reflecting the Hospital's present interpretation.  I see no basis for interpreting Article XXI as limiting the LRC's role to the arbitrator selection process.**
>
> 4.  **Because I interpret the agreement as calling for the LRC's administration of the proceeding and application of its rules**, absent the agreement of the parties, the agreement requires me to proceed consistent with that interpretation.  Indeed, I implicitly agreed to abide by those rules when I accepted this appointment.  I am not aware of any contract interpretation principle permitting compliance with a unilateral directive from one party conflicting with the parties' bilateral agreement, not to mention my agreement, to proceed in the manner contemplated by Article XXI.

59

**Exhibit 28**

- Ux-16 Arbitrator Theodore O'Brien (first ruling, May 9, 2024) – "All communication between the arbitrator and the parties must go through LRC. Any procedural matters that require the arbitrator's input must be communicated through the offices of LRC – not directly to the arbitrator." The arbitrator noted the LRC rules in making this ruling. Though the arbitrator does not cite Article XXI, he notes the requirements of the LRC Rules. Where those rules are incorporated by reference in the Agreement, this ruling, and others like it, are rulings in favor of MNA's position regarding the meaning of Article XXI.

- Ux-17 Arbitrator Craig Overton, "I was notified by the LRC that I had been appointed to these cases by the LRC and in my opinion, am bound by the LRC rules and regulations which require that there be no direct contact between the parties and the Arbitrator and that all communication be sent through the LRC. PERIOD END OF DISCUSSION!!!" (emphasis in original). Ruling is applicable as interpretation of Agreement at Article XXI for reasons discussed under Arbitrator O'Brien's ruling noted above, Ux-16.

- Ux-18 Arbitrator Samantha Tower – "I understand that the parties have an ongoing dispute over the involvement of the LRC in the administration of their cases, however, I was appointed to hear this matter through the LRC. Thus, the LRC will serve as the liaison and facilitator between the parties and me for the administration of this case. Please send any

60

**Exhibit 28**

communications to the LRC from this point forward." Ruling is applicable as interpretation of Agreement at Article XXI for reasons discussed under Arbitrator O'Brien's ruling noted above, Ux-16.

- Ux-19 Arbitrator Theodore O'Brien (second ruling, July 12, 2024), ruling in favor of LRC administration, this time without elaboration as he did in his May 9, 2024 ruling, Ux-16, reviewed above.

- Ux-20 Arbitrator Timothy Buckalew (first ruling)—"To my knowledge the Labor Relations Connection continues to operate as the designated neutral agency administering the collective bargaining agreement between the union and employer and therefore, I am bound by the rules of the agency and my professional Code to follow the direction of the agency regarding scheduling, prehearing communications, the place and 0me for the hearing and any other matter conventionally entrusted to the agency in fulfilling its role under the parties' contract." Ruling is applicable as interpretation of Agreement at Article XXI for reasons discussed under Arbitrator O'Brien's ruling noted above, Ux-16.

- Ux-21 Arbitrator Timothy Buckalew (second ruling), reiterating ruling in Ux-20 for five cases.

- Ux-22 Arbitrator Eileen Cenci, relying upon the LRC and the National Academy of Arbitrator's Code and ruling in favor of MNA:

> I have reviewed the correspondence, arguments and positions of the parties, as well as the Code of Professional Responsibility of the National Academy of Arbitrators, and have reached the following conclusion:

61

**Exhibit 28**

> Having accepted appointment to hear the above case through the Labor Relations Connection (LRC), I am ethically required under the NAA Code of Professional Responsibility to observe the policies and rules of the LRC in this or any case referred to me by that agency.
>
> LRC Rule #8 reads: "The Labor Relations Connection functions as a liaison and facilitator between the parties and the Arbitrator. It is essential that there be no direct communication by the parties to the Arbitrator on substantive matters. Any necessary communication to the Arbitrator shall be conveyed through the Labor Relations Connection."
>
> Based upon my understanding of my ethical responsibilities, I will communicate with the parties only through LRC regarding all matters related to the administration of the above case. Any direct communication I receive from either party will be immediately forwarded to LRC, consistent with my ethical obligations.

Ruling is applicable as interpretation of Agreement at Article XXI for reasons discussed under Arbitrator O'Brien's ruling noted above, Ux-16.

- Ux-23 Arbitrator Sarah Kerr Garraty – "With regard to the question of communication with the parties, I accepted this case as an LRC-administered arbitration. Just as I must accept the fee that was applicable when the parties selected me, even if my fee has since increased, I accepted this appointment as one administered by the LRC. Accordingly, I will not communicate directly with either party but will continue direct communication through the LRC in connection with this case, as I have here."

62

**Exhibit 28**

- Ux-24 Arbitrator Mark Grossman, ruling in favor of MNA (emphasis added):

> I was notified of my designation as arbitrator in LRC Case 864-22 by the LRC. **I interpret the parties' CBA as requiring them to follow the rules of the LRC for the administration** of LRC Case 864-22. **Those rules require that there be no direct contact between the parties and the arbitrator and that all such communications be sent through the LRC. Accordingly, I will grant the MNA's motion.** I also note that I have worked with parties in LRC cases for close to **20 years and the practice, consistent with the LRC rules, has always been that the parties communicate to the arbitrator only through the LRC**. Accordingly, I do not intend to communicate directly to the par-es in Case LRC 864-23 and will only communicate to them through the LRC.
>
> The MNA motions is as follows:
>
> 1. There shall be no ex parte communications with the Arbitrator and **all communications must be through LRC rather than directly with the arbitrator**.
>
> 2. When there are multiple communications about an issue, the **LRC shall proceed as it has for decades, which is to collect all communications from inception through all replies and then send as a package to the arbitrator.**

- Ux-25 Arbitrator Marsha Saylor, finding that she has authority to interpret the parties' Agreement, adopting the rationale of Arbitrator Greenbaum, and ruling in favor of MNA. Then finding the contract unambiguous in support of MNA's position as follows (emphasis added):

> As the duly appointed arbitrator, **I have authority to interpret the collective bargaining agreement**. I have considered the arguments presented and find that the **contract language is clear and**

63

**Exhibit 28**

> **unambiguous**. . . . **Article XXI does not limit the
> LRC's role to the arbitrator selection process. The
> LRC's rules must be followed by the parties.**

Based upon that, the arbitrator granted MNA's motion and ordered that "The

Hospital is required to follow the rules promulgated by the LRC. "All

communication shall be transmitted through the LRC which includes the LRC

collecting all communications about an issue and then transmitting it to the

arbitrator as a package."

- Ux-26 Arbitrator John Marra (emphasis in original)—"I accepted this

  case from the LRC. Therefore, I am required to follow the Rules of the

  LRC. The Employer was afforded the opportunity to respond to the

  Union's motion, but did not respond. **The Union's motion for a ruling**

  **is granted. Therefore, all communications in this matter shall be**

  **transmitted through the LRC.**" Ruling is applicable as interpretation of

  Agreement at Article XXI for reasons discussed under Arbitrator

  O'Brien's ruling noted above, Ux-16.

In summary, the foregoing rulings from arbitrators under the subject

collective bargaining agreement between MNA the Hospital clearly establish the

conclusion that the Agreement requires administration by the labor agency

from inception to conclusion of the case, not just through selection of the

arbitrator. The rulings therefore sustain MNA's position regarding the meaning

of the contract, and reject the Hospital's position that the LRC is for selection of

the arbitrator only. There is no basis to reject those rulings and where those

**Exhibit 28**

rulings are persuasive, and issued previously under this contract, they should

be followed.

> Prior labor arbitration awards that interpreted the existing terms of a contract between the same parties are not binding in exactly the same sense that authoritative legal decisions are, yet they may have a force that can be fairly characterized as authoritative. This is true of arbitration awards rendered both by permanent umpires and by temporary or ad hoc arbitrators.

ABA/Bloomberg Law, Elkouri & Elkouri: How Arbitration Works, Chapter 11.

Precedential Value of Arbitral Awards, Section 11.2.  There is room for variation

when an award is not persuasive, but there can be no argument by the

Hospital that the foregoing 15 arbitration decisions are persuasive in showing

that the LRC rules require administration through the end of the case, and that

the contract, by incorporating such rules, requires LRC (and AAA)

administration to the conclusion of a case.

On this further basis, the Arbitrator may find in favor of MNA's position

regarding LRC (and AAA) administration and sustain the grievance.

**F.**     **Any Argument Or Objection By the Hospital To The Ex Parte Proceeding And Subsequent Issuance of An Award On the Merits Would Be Utterly Baseless.**

As both parties and the Arbitrator are well aware, the March 17, 2025

hearing was scheduled 6-months in advance by notice dated September 20,

2024, and was held at a hotel conference room in Worcester, MA (situs of both

the Hospital and Union regional office) and the Hospital willfully failed to

appear at that hearing.  The matter then proceeded *ex parte* before the

65

**Exhibit 28**

Arbitrator. In the event the Hospital makes in its post-hearing brief any argument that proceeding *ex parte* was improper and/or that the Arbitrator should not or cannot issue an Award on the merits that argument would be wholly without support.

MNA's position in that regard is supported by Black Letter arbitration precedent from at least 1947 onward cited in both Elkouri & Elkouri, How Arbitration Works and Fairweather's Practice and Procedure in Arbitration indicating: "A general arbitration clause in a contract would be rendered meaningless if its implementation depended on the willingness of each party to the contract to present its case, as the party desiring no change in relationships could nullify arbitration simply by refusing to make an appearance." Elkouri 8th Ed, supra at 7-39 and Fairweather at 212 (citing Velvet Textile Corp, 7 LA 685, 691 (Pope, 1947)) [additional support citations omitted]. Further both AAA Rules and the Arbitrator's Code of Professional Responsibility plainly indicate that *ex parte* proceedings are allowable and proper. See Ux-10, AAA Labor Arbitration Rule 26 ("Unless the law provides to the contrary, the arbitration may proceed in the absence of any party or representative who, after due notice, fails to be present or fails to obtain a postponement. An award shall not be made solely on the default of a party. The arbitrator shall require the other party to submit such evidence as may be required for the making of an award."); see also Arbitrator's Code of Professional Responsibility at 5(c) ("An arbitrator must be certain before

66

**Exhibit 28**

proceeding *ex parte* that the party refusing or failing to attend the hearing has been given adequate notice of the time, place and purposes of the hearing.").[18]

Accordingly, when a party fails to appear for an arbitration hearing that party must accept the results of its failure to appear, namely that the arbitrator can and will issue a ruling on the evidence presented at hearing without its presence. See Thompson Fuel Service, 42 BNA LA 62 (Kerrison, 1962) where the employer willfully failed to show at hearing and the arbitrator concluded as follows: "While it is true that the Company has not been heard by the arbitrator, it is equally true that **the Company willfully and deliberately defaulted and must accept the consequences of failing to take advantage of its right to present its case**." (emphasis supplied).

Further, when a party willfully fails to appear at a hearing it obviously loses certain rights and arguments it would have had but for its egregious conduct. See e.g., Doe v. Case Western University, 809 Fed. Appx. 276 (6th Cir. 2020). There the court ruled a student's argument that his voluntary failure to select a forum for his Title IX hearing with witnesses and cross-examination defeated his subsequent desire to cross-examine witnesses. The 6th Circuit held as follows:

> And like here, the plaintiff complained that he did not
> get to cross-examine and confront his accusers. But
> that alleged shortcoming was of the plaintiff's own

---

[18] There can be no dispute that the Hospital was well aware of the time, place and purposes of the long-scheduled March 17, 2025 Worcester, MA hearing as it had already been subject to numerous joint pre-hearing emails, motion conferences (telephonic and zoom), information requests, subpoena requests, and arbitrator motion rulings in the months leading up to the hearing date. Any argument to the contrary would be risible.

**Exhibit 28**

making: he failed to "participate meaningfully in the investigatory hearing—he did not attend, and chose not to examine *any* witnesses at all." **With the plaintiff having failed to avail himself of those opportunities, among other reasons, there was no process-related flaw casting doubt over the outcome**. *Id.*

(emphasis added; internal citations omitted)

In another (analogous administrative) hearing before the Massachusetts Labor Relations Commission (now Department of Labor Relations), Commonwealth of Massachusetts/Commissioner of Administration, SUP-3855, SUP-3955, 1997 BNA LA Supp. 111735 (1997) such actions as committed by the Employer here resulted simply in a dismissal of the complaints of the side that failed to appear at hearing**:**

> On August 18, 1997, the Commonwealth's attorney appeared for the scheduled hearing, but neither Edwards nor Attorney Bonsignore appeared. Because of their failure to appear, the Commonwealth has requested that the administrative law judge dismiss the Complaints of Prohibited Practice.
>
> I will grant the Commonwealth's motion to dismiss for the following reasons. Attorney Bonsignore is the attorney of record for Edwards and has not withdrawn his appearance from the case. He received notice of the scheduled hearing dates in February, 1997. In the July 14, 1997 ruling, the hearing dates were again mentioned so there could not be any misunderstanding of when the hearing was scheduled to be held. There has been no request for a postponement from either Edwards or Attorney Bonsignore.

Moreover, in the event the Hospital here raises any argument that after it voluntarily skipped its opportunity to cross-examine the MNA's witness on

68

**Exhibit 28**

March 17 that it was somehow unfairly prejudiced (by its own acts) there is ample case law indicating (as common sense and fair play would suggest) when a party fails to cross examine when it had that opportunity, it has lost or waived that opportunity forever.  This is so in the even more (at times literally) grave arena of constitutional criminal law.  See e.g., Timberlake v. State, 690 N.E.2d 243 (Ind. 1997) (failure to cross-examine a witness when given the opportunity waives that right), cert. denied, 525 U.S. 1073 (1999).

As well, in a labor case, Ritz O'Donnell, 566 F.2d 731, 735 (D.C. Cir. 1977), the D.C. Circuit court ruled that a union member waived his right to cross examination by failing to call witnesses at a prior proceeding.  There, the plaintiff-appellant was an Air Line Pilots Association member that failed to disclose financial reporting information to his union.  As a result, the union conducted a disciplinary hearing against him, which he appealed.  The union found that the plaintiff-appellant willfully refused to report financial information required by law, and levied a $500 fine against him.  The plaintiff-appellant sued in federal court to enjoin the judgment, citing due process concerns under the Labor-Management Reporting and Disclosure Act.  The D.C. Circuit ruled that the plaintiff-appellant had multiple chances to summon and cross examine witnesses at his initial hearing, and "[courts have] uniformly declared that union members who knowingly fail to exercise rights guaranteed or offered them in connection with union disciplinary proceedings have waived those rights."  Id.  Here, it is even more clear that a sophisticated party – a national corporation and its national law firm – rather than an individual union

69

**Exhibit 28**

member would be on notice that a failure to cross examine a witness, or present its own case in chief when that opportunity was readily available to it, is forever prejudiced by its failure to do so.

Finally, despite the Hospital's willful failure to appear on March 17 it was generously given another bite at the apple and an opportunity to present a case on April 2.[19] **It then declined to appear on that date as well**. Attachment C (April 1, 2025, email correspondence between Hospital counsel, Marc Sugerman, and Arbitrator Loconto). In light of the foregoing the Arbitrator should reject any post hoc challenge by the Hospital to issuance of an award on the merits due to the Hospital's own blatant and willful failure to participate in the hearing, including on the first hearing day and then again when the Arbitrator gave it a possibly unprecedented second bite at the apple for April 2, which it also declined. The Arbitrator may therefore properly issue an award on the merits based on the evidence presented at the March 17 hearing and any legal arguments thereat and/or contained within the parties' post-hearing briefs.

---

[19] The parties had long scheduled two hearing dates, March 17 and April 2, 2025. This was so in case a second day of hearing was necessary and to avoid the not uncommon multi-months gap that can occur between an initial hearing date and a second day of hearing if that second day is not scheduled well in advance due to parties' general availability. Because that second day was already scheduled, the Arbitrator—over Union objection—gave the Hospital a chance to present its case-in-chief on that second day despite its willful failure to appear on day one (and MNA's position that the hearing should therefore have closed). **Then, the Hospital declined to appear on the second day as well, rendering any argument it might ever have that it was denied a chance to present its case resoundingly moot.**

**Exhibit 28**

### G.   Any Miscellany, Bald Procedural or Due Process Arguments By the Hospital Are Wholly Without Merit and Irrelevant to This Forum Anyway.

On multiple instances prior to the March 17 hearing day where it failed to appear, and then again between March 17 and April 2—the second scheduled hearing day that the Arbitrator kept on the calendar (though he need not have under precedent described supra) and offered to the Hospital to present a case—when the Hospital again willfully failed to appear, it lodged a variety of bald and nonsensical complaints against the Arbitrator and/or the process generally mostly via email.  While it is not the MNA's job to assemble those arguments in an "organized" fashion (to the extent that is even possible) it understands those to be namely that the arbitrator was "biased" or otherwise possibly not fully impartial; that the physical hearing location was finally set on a date after the arbitrator had previously suggested the parties confer and set a location; and/or that because some of its (blatantly irrelevant) subpoena requests were denied (after extensive briefing by the parties and reasoned analysis by the Arbitrator), that the hearing and/or an Award would be unfair or without merit.  Needless to say, there is no known arbitration precedent to support an argument that such points—even assuming arguendo they are valid which they are plainly not—render an arbitrator unable to issue an award on the merits based on the evidence properly adduced at hearing (*ex parte* or otherwise).

71

**Exhibit 28**

Instead, any such arguments—advanced at a parties' own peril given the possibility of sanctions for frivolous claims—can be made in federal court pursuant to a motion to vacate an arbitration award. The MNA notes that even when such analogous arguments are made, they rarely if ever meet the bedrock principle that labor arbitration awards are not to be disturbed by the courts absent the rarest of circumstances (plainly not present here). See e.g. Kiewit/Atkinson/Kenny v. IBEW Local 103 (USDC-MA, 1999) (the employer raised arguments in its motion to vacate for 'bias of the arbitrator'; 'limitation of the evidence' regarding cross examination; and 'conclusions of the arbitrator"—all of which were roundly rejected as a basis to overturn).

Accordingly, should the Employer choose to argue in its post-hearing arbitration brief any bald accusations of bias by the Arbitrator, or that any procedural rulings against it, somehow make issuance of an Award inappropriate (or even more absurd, that it somehow supports an Award in its favor), those arguments are not properly made in this forum or at this time under any known precedent. The Arbitrator may therefore proceed to issue an Award per usual.

## V.    CONCLUSION

Based upon the foregoing, MNA respectfully requests that the Arbitrator sustain the grievance. In Part "A" below MNA reviews legal standards and precedent that support granting the remedy that MNA seeks regarding the Hospital paying for attorneys' fees incurred by MNA as damages for the

**Exhibit 28**

Hospital's breach of the Agreement, and then in Part "B" sets forth the remedy which MNA requests.

> **A.** **The Hospital's Outrageous, Repeated Breach of the CBA Resulted In Damages to MNA In the Form of Attorneys' Fees—MNA is Fully Entitled Under Arbitral Precedent <u>And Applicable State & Federal Law to Be Made Whole.</u>**

At hearing MNA submitted and the Arbitrator accepted the following formulation of the Issue:  Did the Employer violate the parties' CBA as alleged in the MNA's October 20, 2023 grievance?  If so, what shall be the remedy?  Tr. at 8.  That October 20, 2023 grievance contained the following requested remedy:  "<u>Make whole the bargaining representative of the aggrieved nurses, MNA, **including but not limited to for all expenses incurred in all arbitrations due to this violation**; cease and desist continued failure and refusal to abide by the collective bargaining agreement; all other relief that the arbitrator finds just and appropriate</u>." Ux-1 (emphasis added).  Below, MNA explains why the Hospital's repeated, egregious breach of the CBA when it refused to allow the LRC to administrate cases per usual after September 2023 meets the standard necessary for the Arbitrator to award attorneys' fees as part of his Award.

At the outset—and to be clear—MNA of course understands the 'American Rule' in which each party to litigation (in court or arbitration) is expected to pay its own attorney's fees and absent a contractual or statutory right to fees should one side prevail, that those respective individual costs stand.  This remedial request is **not a request** to buck the American system

73

**Exhibit 28**

and have attorneys' fees paid for the instant case itself <u>but rather a remedy for</u> <u>the damages incurred as a result of the Hospital's willful and repeated</u> <u>collective bargaining agreement breach that lead to the instant grievance and</u> <u>arbitration</u>.  This is in fact fully allowable and proper under traditional labor arbitration principles.  <u>See</u> <u>Remedies In Arbitration</u>, Hill & Sinicropi, 2nd Ed at 474 ("The decisions indicate that attorney's fees are appropriate, not as a matter of course for simply arbitrating a particular case but, rather, as an element of damages resulting from a party's **<u>bad-faith refusal to comply with</u>** **<u>the terms of a collective bargaining agreement</u>** or the mandates of a prior arbitration award.  An award of attorney's fees in a labor dispute as an appropriate amount of damages should not be seen as a punitive remedy, especially **<u>when the arbitrator finds conscious, deliberate, and egregious</u>** **<u>wrongdoing by a party</u>**.") (emphasis added)

Indeed, in one such decision, <u>Leavenworth Times</u>, 71 BNA LA 396, 409 (1978) the arbitrator wrote:

> "The arbitrator believes that an arbitrator does have jurisdiction and authority to award damages, including attorneys' fees, under appropriate circumstances, even though the Agreement contains no language authorizing the arbitrator to award damages.  The award of legal costs and attorneys' fees should not be made in cases where there is evidence of good faith.  It should be pointed out that an award of attorneys' fees is not an award of punitive damages when the damages are limited to the actual expenses incurred in the unnecessary legal proceedings."

**Exhibit 28**

In <u>Synergy Gas Co.</u>, 91 BNA LA 77 (1987), which cite <u>Leavenworth Times</u> and other cases, renowned Arbitrator Simon wrote:

> In pertinent part, the Union urged, as to attorneys' fees, as follows:
>
> " . . . attorneys' fees are not sought for arbitrating the discharge, but as an element of the Union's damages resulting from the Employer's defiant refusal to comply with the Cashen Award, in violation of Section 12(e) of the Agreement.
>
> In such circumstances, arbitrators do routinely award fees. Thus, in *Sonic Knitting Industries, 65 LA 453*, 469 (1975 ), **Arbitrator Helfand stated that while attorneys' fees are not awarded for 'ordinary contract administration,' additional fees going beyond ordinary contract administration will be awarded**. Similarly, in *Leavenworth Times, 71 LA 396*, 408 (1978 ) Arbitrator Wilbur Bothwell stated the general rule as follows:
>
> The arbitrator believes that an arbitrator does have jurisdiction and authority to award damages, including attorneys' fees, under appropriate circumstances, even though the Agreement contains no language authorizing the arbitrator to award damages.
>
> (emphasis added).

In addition, in <u>Litton Unit Handling Systems v. Shopmen's Local Union No. 522</u>, 90 L.R.R.M. 3176, 3177 (S.D. Ohio 1975) the court concluded that an arbitrator had not exceeded his authority in awarding attorney's fees in order to compensate a party "for losses occasioned by obvious attempts to frustrate access to the contractually created arbitration forum." <u>Synergy Gas Co. v. Sasso</u>, 853 F.2d 59, 65 (2d Cir. 1988) (upholding Arbitrator Simon's award as described above).

**Exhibit 28**

Indeed, under Federal law, an arbitrator is fully allowed to award legal fees as part of a labor arbitration award. See e.g. Fortex Mfg. Co. v. Loc. 1065, Amalgamated Clothing Workers of Am., AFL-CIO, No. 77-279-N, 1978 WL 14003, at *2 (M.D. Ala. June 26, 1978):

> The controlling law in this case is clear. If the arbitrator acted within the bounds of his submission in finding defendant liable for the legal fees incurred by plaintiff "in connection with the [November 13] strike," Stipulation, Exhibit 10, p. 15 (arbitrator's opinion), and assessing against defendant the entire costs of the arbitration proceeding, then this Court is duty bound to enforce those parts of his award. E.g., United Steel Workers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 598, 46 LRRM 2423, 34 LA 569 (1970) (arbitrator's award should be enforced as long as arbitrator "stayed within the areas marked out for his consideration" and did not stray "beyond the submission"); Safeway Stores v. American Bakery & Confectionery Workers International Union, Local 111, 390 F.2d 79, 83, 67 LRRM 2646 (5th Cir. 1968) (arbitrator's award should be enforced as long as arbitrator did not act "in excess of the terms of his submission or beyond his powers as an arbitrator").

The Fortex court relied upon the Supreme Court case Alyeska Pipe Line Service Co. v. Wilderness Society, 421 U.S. 240 (1975) writing:

> …the arbitrator had noted two bases for awarding attorneys' fees: first, citing the Supreme Court decision in *Alyeska Pipe Line Service Co. v. Wilderness Society, 421 U.S. 240 [10 FEP Cases 826]* (1975 ), that attorneys' fees are appropriate where the offending party has acted in "bad faith"; second, that attorneys' fees are appropriate **where they are an intrinsic element of the aggrieved party's damages**. (emphasis supplied).

76

**Exhibit 28**

Further, under Massachusetts contract law, if a party breaches a contract the breaching party is responsible for the damages that are natural and direct consequences of the breach. <u>White Spot Const. Corp. v. Jet Spray Cooler, Inc.</u>, 344 Mass. 632, 635 (1962). "It is a well-settled rule that a plaintiff in an action for breach of contract is entitled to damages in an amount sufficient to put him in as good as, but not better than, the financial position he would have been in had there been no breach." <u>Id.</u> If a defendant's violations of a MA statute, including breach of contract, "forces someone to incur legal fees and expenses **that are not simply those incurred in vindicating that person's rights under the statute, those fees may be treated as actual damages in the same way as other losses of money or property**," and not as legal fees expended in litigation (i.e., not subject to the American Rule). <u>Siegel v. Berkshire Life Ins. Co.</u>, 64 Mass. App. Ct. 698, 703 (2005) (emphasis added)

As explained in great detail throughout this brief, the Hospital—in the face of plain contract language, a 20+ year practice involving over 100 arbitration cases, all notions of common sense, and decades upon decades of standard labor relations/arbitral practice—refused to allow the LRC to engage in case administration effective September 2023. Once it announced as such, the MNA was—as a direct consequence—forced to spend money on attorneys' fees in at least 15 active or subsequently filed arbitration cases to date to seek enforcement of the CBA from individual arbitrators.

**Exhibit 28**

Namely, for each arbitration case already active as of September 2023 or filed thereafter, MNA was forced to engage in varying amounts of correspondence, telephonic and/or zoom conferences, document review, research and briefing seeking orders from arbitrators—each and every time—to allow the LRC to engage in its standard "clerk of courts" case administration (and rather than the parties spending hours doing it themselves and/or otherwise creating ethical hazards with direct arbitrator communication, logistical confusion, redundancy and myriad other issues). The Hospital's actions meet plainly meet the "bad faith refusal" and the "conscious, deliberate and egregious wrongdoing" standards as described in Remedies in Arbitration and the various cases above. As well, per case law, the damages requested are not punitive but for those incurred as a direct result of the Hospital's willful, bad faith refusal to allow the case administrator to do its job per the parties' CBA and actual damages incurred as a result of MNA needing to "cure" or mitigate the Hospital's breach of the Agreement. (There is no colorable argument whatsoever that the Hospital's newly announced September 2023 direct communication "policy" was made in good faith. Indeed, the Hospital's failure to appear and present any evidence—as obviously none exists—that it was made in good faith renders any such post hoc argument in its brief utterly without foundation, merit or credence.)

78

**Exhibit 28**

In light of the foregoing the Arbitrator should under arbitral precedent, federal and state law, award as part of remedy attorneys' fees incurred by MNA as a direct result of the Hospital's bad faith, egregious, deliberate breach of the parties' collective bargaining agreement.

### B.  Remedy Requested

Accordingly, MNA respectfully requests as remedy in this matter that the Arbitrator order the Hospital as follows:

1.  Transmit a letter (by hard copy correspondence or email to the LRC, and to AAA to the extent the Hospital has challenged AAA's authority to administer a case after selection of the arbitrator, with copy to MNA counsel) within one week of the award:  (a) rescinding the September 20, 2023, Borruso letter; (b) stating that the Hospital shall not oppose administration of arbitrations between MNA and the Hospital by the LRC (or AAA) from inception to conclusion of any current or pending LRC (or AAA) arbitration involving MNA and the Hospital; and (c) rescinding any currently pending communication to the LRC (or AAA) demanding that it cease administering cases for all currently pending arbitrations where the Hospital and MNA are parties;

2.  Cease and desist from any and all actions that are intended to cause the LRC or AAA to cease administering an arbitration to the conclusion of an arbitration where the Hospital and MNA are parties;

3.  Make whole MNA for all losses suffered due to the Hospital's breach of the contract by claiming that the LRC shall cease administration of

**Exhibit 28**

arbitrations from September 20, 2023[20] (i.e., within 30 days prior to the date the grievance was filed) to present, including reimbursement of MNA for all reasonable attorneys' fees and costs incurred due to the MNA having to take action through its counsel to enforce MNA's right to LRC administration, including but not limited to attorneys' fees in filing motions, oppositions, and other communications about such LRC administration issue.

4.      Any other relief the Arbitrator deems appropriate.

Respectfully submitted,

For the Massachusetts Nurses Association,

By its attorneys,

*/s/ Samantha E. Sinclair*
Samantha E. Sinclair
Jason R. Powalisz
McDonald Lamond Canzoneri LLC
352 Turnpike Road, Suite 210
Southborough, MA 01772-1756
(508) 485-6600
ssinclair@masslaborlawyers.com
jpowalisz@masslaborlawyers.com

Dated:  May 9, 2025

---

[20]  The period, 30 days is the period in the contract for filing a grievance, Ux-7 at 66 (Step 1, 30 calendar days), and thus damages may be claimed up to 30 days prior to the date that the grievance was filed, October 20, 2023, Ux-1.

80

**Exhibit 28**

**Attachment A,**
**Arbitrator's December 23, 2024, Ruling on MNA's Motion to Quash**

**Exhibit 28**



**Michael T. Loconto, Esq.**
Arbitrator
mtl@locontoadr.com

December 23, 2024

**By Electronic Mail Only:  via PatrickKimm@adr.org**

Massachusetts Nurses Association   St. Vincent Hospital
in care of Jack Canzoneri, Esq.      in care of Marc Sugerman, Esq.
Mc Donald Lamond Canzoneri LLC       Ford Harrison, LLP
352 Turnpike Road, Suite 210         300 S. Orange Ave., Suite 1300
Southborough, MA 01772-1756          Orlando, FL  32801

Re:      **Arbitrator's Order on Union Motion to Quash Employer Subpoena**
          *AAA No. 01-23-0000-7400 (LRC case administration; Class Action)*

To the parties:

I have enclosed my Order in the above-referenced matter.

Also enclosed is my interim invoice for services rendered and a copy of my W-9.  Payment terms are 30 days from the receipt of invoice, with checks preferred but payment by credit card, bank transfer or wire transfer also accepted (instructions included on the invoice).  Thank you in advance for assuring timely payment by forwarding these materials to the appropriate party representatives.

As a reminder, and as is stated in the Order, the Union shall fulfill production on or before the close of business on Friday, February 14, 2025.  This matter is scheduled for two days of evidentiary hearings, on March 17 and April 2, 2025.  As a further reminder, my cancellation period is 14 days.

Sincerely,

Arbitrator Michael T. Loconto, Esq.
Loconto ADR

Attachments (3):  Order, Interim Invoice, and W-9

# Exhibit 28

**AMERICAN ARBITRATION ASSOCIATION
BEFORE ARBITRATOR MICHAEL T. LOCONTO**

---

**In the Matter of the Arbitration between**

**MASSACHUSETTS NURSES ASSOCIATION**

**and**

**ST. VINCENT'S HOSPITAL.**

AAA Case No. 01-24-0000-7400.

Issue:  Case Administration
(Class Action).

---

**ORDER ON MOTION TO QUASH
SUBPOENA DUCES TECUM**

St. Vincent Hospital (the "Hospital" or "Employer"), through its representative, requested that the Arbitrator sign and issue two subpoenas duces tecum on July 25, 2024.  The subpoenas were requested for the purpose of obtaining information from the Massachusetts Nurses Association (the "MNA" or "Union") and the Labor Relations Connection (the "LRC"), a third-party provider of case administration services in labor-management disputes.  The underlying grievance challenged the Employer's unilateral demand that the LRC to cease active case administration of grievances submitted for arbitration between the parties.

The Union objected to the issuance of the MNA subpoena and party representatives subsequently attended a telephone conference with the Arbitrator, on August 29, 2024.  A schedule was established during the telephone conference, and the Union submitted a motion to quash the Employer's subpoena on October 21, 2024.  The Employer filed a response to the motion on November 5, 2024, and the Union filed a further reply to the Employer's response on

**Exhibit 28**

November 15, 2024.  The Arbitrator held a remote hearing on the motion via Zoom video conferencing software on November 25, 2024.  Marc Sugerman, Esq. of the Orlando, Florida office of the Ford Harrison, LLP law firm appeared on behalf of the Employer.  Jack Canzoneri, Esq. of the McDonald Lamond Canzoneri LLC law firm in Southborough, Massachusetts appeared on behalf of the Union.

**BACKGROUND**

The Employer and the Union have been engaged in a collective bargaining relationship since 1998 and negotiated their first contract in 2000.  The parties have continued to negotiate successor CBAs since that time.  Beginning with the 2000-2003 CBA, each contract has included a grievance and arbitration procedure for resolving disputes over the interpretation and application of the Agreement's terms.

Initially, Article XXI of the Agreement provided that

> Step 4: Should the MNA request arbitration in accordance with the time limits specified herein, an arbitration shall be selected pursuant to the Voluntary Labor Arbitration Rules of the American Arbitration Association.

The parties have modified Article XXI once, in 2010, adding a second agency to administer arbitrations between the parties:

> Step 4: Should the MNA request arbitration in accordance with the time limits specified herein, an arbitration shall be selected pursuant to the Voluntary Labor Arbitration Rules of the American Arbitration Association or the applicable procedures of the Labor Relations Connection.

Identical language has been carried forward with effect through the term of the current CBA.

On September 20, 2023, the Employer demanded that the LRC cease administration of arbitration cases following the selection of the arbitrator.  The instant grievance was filed with on

2

**Exhibit 28**

October 20, 2023, asserting that the Employer's unilateral demand violated the parties' Agreement. Following unsuccessful attempts to resolve the matter during the initial steps of the grievance process, the Union filed its demand for arbitration with the American Arbitration Association (the "AAA") on February 14, 2024.[1] Arbitrator Michael Loconto was notified of his selection to hear this matter on March 11, 2024.

An evidentiary hearing on the merits of the underlying grievance was initially scheduled for August 12, 2024. The Employer's subpoena requests on July 25, 2024 were followed by a mutual agreement to postpone the evidentiary hearing, which has been rescheduled for two days – March 17 and April 2, 2025 – at the Employer's facility in Worcester, Massachusetts.

**The MNA Subpoena.** The Employer's subpoena seeks the production of a substantial amount of material that is putatively in the Union's possession. Specifically, the subpoena is composed of six requests for documentation, which are summarized as follows:

1. All arbitrations between the Union and the Employer, from 2000 to the present;
2. The Union's use of the LRC, from 2013 to the present;
3. The contractual relationship between the AAA or LRC, the Union, the Employer and arbitrators appointed to disputes involving the parties, from 2000 to present;
4. The Union's use of AAA, from 2000 to the present;
5. Various internal Union correspondence relating to the Union, the LRC, AAA, a specific arbitrator, and the parties' contractual grievance procedure, from 2000 to the present; and
6. Materials relating to various Employer information requests, from 2022 to the present.

I will address the parties' arguments with respect to the relevance of these requests below.

---

[1] In November 2023, the LRC notified the parties that it would no longer accept requests to administer cases involving the Employer.

3

**Exhibit 28**

As an initial matter, a significant portion of the information sought by the Employer is – or was at some point since 2000 – in the possession of the Employer, the Employer's counsel, or the Employer's previous outside counsel.[2]  The Employer represented that it has discovered significant gaps in the materials that it has in its possession relating to the subpoena's target subjects.  These gaps date back to 2012; the Employer has further represented that it does not have access to any related materials prior to that time.

A portion of the information requested has been produced by the Union in response to an Employer's subpoena that was ordered for production in an unfair labor practice (ULP) proceeding before the National Labor Relations Board (NLRB).  The material that was produced covers a discrete period of time – 2020 to 2023 – and involves but is not limited to the past practice elements of the underlying grievance in this matter.

**POSITION OF THE UNION**

The Union has objected to the Employer's subpoena on various grounds, asserting that the subpoena is overly broad, seeks irrelevant evidence and cumulative material, and that production would impose an undue burden on the Union.  Additionally, the subpoena lacks limiting parameters, and implicates the production of materials that are protected by the attorney-client, work product or other privileges, including National Labor Relations Act (NLRA) Section 7 rights of union members to engage in concerted protected activity.  *See Chino Valley Medical*

---

[2] The Union made an offer of proof that, prior to the introduction of the Ford Harrison law firm as its representative in 2023, the Employer has been represented by a succession of outside counsel from Boston-based law firms.  Since the inception of the parties' collective bargaining relationship in or around the year 2000, the Employer's representatives have included counsel from the former Hill & Barlow law firm and, more recently, from Ropes & Gray and Littler Mendelson.  In response, the Employer offered that the Union's attorney of record in these proceedings has represented the Union throughout the term of its bargaining relationship with the Employer; concurrently, the Hospital's ownership has changed hands twice during the intervening period. Tenet Healthcare, the current owner, operated the Hospital when the bargaining unit first organized, then sold the Hospital in the mid-2000s prior to reacquiring the property in the mid-2010s.

4

**Exhibit 28**

*Center*, 362 NLRB 283, fn. 1 (2015) ("The Board has held that employer subpoenas broadly requesting a union's records, including communications between the union and its members, are properly revoked to protect the bargaining process." [*internal citations omitted*]).  The Arbitrator should reject the Employer's request that the Union produce a privilege log.

Specifically, the Union has asserted that Section 1 of the subpoena seeks information that is not relevant to determine the status of case administration in the 111 arbitration demands that have been filed since 2000.  The Employer has conflated the relevance and materiality of the requested information, without considering the cumulative nature of its request.  Rule 401 of the Federal Rules of Evidence defines the relevance of evidence as a two-part test: does the evidence make a fact more or less probable than in its absence; and, is the fact related to the question at hand? Moreover, FRE Rule 403 permits the exclusion of relevant evidence where the probative value of such evidence is outweighed by its cumulative nature or the undue delay associated with its production.

As an alternative, the Union has proposed production of a limited set of non-privileged documents relating to the 111 arbitration demands for the period between the year 2000 and September 20, 2023:

1. the Demand for Arbitration;
2. with respect to the subject of the LRC or AAA administering the arbitration process after the selection of the arbitrator ("the Subject"), any objection transmitted by the Hospital to MNA or LRC about the Subject;
3. any exchange of positions about the Subject where the Hospital or MNA presented arguments about the Subject;
4. any rulings by arbitrators resolving any dispute about the Subject;
5. one example for each case of LRC and AAA administering the arbitration process after the selection of the arbitrator, such as issuance of a notice of hearing, coordinating communication and issuing notices of arbitrator decisions about any other arbitration issues; and,

**Exhibit 28**

     6. LRC and AAA communication relating to the final disposition of the case, including withdrawal, withdrawal upon report of the matter settled, issuance of an arbitration award, placing in abeyance, closing the case.

The Union has further asserted that this limited information is sufficient to demonstrate whether the applicable agency performed case administration tasks following the appointment of the arbitrator, and whether either party lodged an objection to administration. The Union is not aware of any Employer objection to the LRC's administration of arbitration cases prior to September 20, 2023. The remaining information requested in Section 1 of the subpoena is overly broad and not relevant.

Additionally, fulfillment of the request would present an undue burden for the Union, requiring production of hundreds of thousands of pages of documents and hundreds of hours of effort to locate, review and produce materials in compliance with the request. The Union is informed of the likely time and costs associated with compliance given its previous efforts to comply with the Employer's subpoena in the matter before the NLRB. The Administrative Law Judge in the NLRB proceeding ordered partial production of materials covered in section 1 of the instant subpoena for a three-year period from 2020 to 2023, which resulted in the production of approximately 80,000 pages of documents. Reaching back an additional 20 years in response to the Employer's request in this subpoena would require archival searches and exponentially increase the time and expense associated with production.

The Union has also asserted that the Arbitrator should ignore the Employer's claims that the Union has made false representations in previous arbitrations about the extent of the LRC's administration of arbitration cases. The Union has corrected the discrepancies in these proceedings, and the discrepancies do not have any bearing on the question of production in this matter.

**Exhibit 28**

Next, the Union has asserted that Sections 2 and 4 of the subpoena is overly broad and seeks information that is not relevant to the Union's use of the LRC or AAA to administer cases involving the Employer. Moreover, the Employer's assertion that the Union engaged in impermissible *ex parte* communications with the LRC is baseless – as a case administrator, the LRC routine engages in one-on-one correspondence with individual parties and arbitrators, akin to a "clerk of courts." In addition, the Union has asserted that the information sought also contemplates privileged communications between and among internal Union representatives and members. The Union has requested that Sections 2 and 4 be stricken in full.

The Union has asserted that Section 3 of the subpoena is vague and overly broad, and therefore contemplates the production of irrelevant information. Simply, the request for a "contract" is not relevant given the acknowledged relationship among the "four parties" listed. No written contractual relationship exists; rather, contracts are formed between the parties on the basis of services performed in exchange for consideration. The Union has not objected to producing the information requested in subsections b and c of the Employer's request.

The Union has asserted that section 5 of the subpoena seeks largely irrelevant information that was stricken from the Employer's subpoena before the NLRB. The Union further asserted that the subsections seeking the Union's internal, non-privileged deliberations about the use and meaning of the grievance procedure should also be stricken as irrelevant. The Union has requested that Section 5 be stricken in full.

Finally, the Union has asserted that section 6 of the subpoena is overly broad. The information requested is also irrelevant for the purpose of resolving the underlying grievance. The Union has challenged the Employer's unilateral rejection of the LRC as a case administrator in arbitration disputes between the parties. Information relating to satisfaction of vague

7

**Exhibit 28**

Employer requests about past arbitration practices is not relevant for the resolution of the underlying grievance. Additionally, production would pose an undue burden that would require the review of at least 102 arbitration demands covering the request period. The Union has requested that Section 6 be stricken in full.

**POSITION OF THE EMPLOYER**

The Employer has opposed the Union's motion to quash the subpoena. The Employer alleged that the Union and its counsel have engaged in inappropriate *ex parte* communications with the LRC and have made false statements to arbitrators in other matters, without correction. The Employer has also alleged that the LRC failed to act as a neutral when administering disputes between these parties. The information requested in the subpoena is reasonably related to the Employer's attempt to establish these assertions in response to the underlying grievance.

The Employer has asserted that Rule 27 or the AAA Labor Arbitration Rules ("AAA Rules") is controlling on the question before the arbitrator in this motion:

> The parties may offer such evidence as is relevant and material to the dispute and shall produce such evidence as the arbitrator may deem necessary to an understanding and determination of the dispute.

Specifically, the Employer has argued that a full response to Section 1 of the subpoena is necessary in order to test the duration of the past practice asserted – that is, the administration of arbitration cases by the LRC. As an example, the Employer asserted that the Union made a false representation in a previous arbitration about the number of arbitration demands that the LRC has administered between the parties. The requested information is relevant and the request itself is neither overly broad nor unduly burdensome. Additionally, the Employer has asserted that the discovery dispute in the related ULP proceeding should have no effect on the outcome of

8

**Exhibit 28**

this motion.  By comparison, the ULP covers only a three-year period of time.  The Employer has further asserted that the Union must produce a privilege log in declining to produce any material protected by attorney-client, work product, or other legal privileges.

Next, the Employer has argued that full responses to Sections 2 and 4 of the subpoena are necessary in order to test the relationship between the Union and the case administration agencies.  The Employer believes that the plain language of the Agreement limits the role of the AAA and the LRC to arbitrator selection and does not permit further case administration.  By way of example, the AAA provides other limited services for parties that require an arbitrator in a labor-management dispute but do not want full case administration services.[3]  By accessing *ex parte* correspondence between representatives of the Union and the LRC and other related materials, the Employer may ascertain whether there was a lack of a mutual agreement or acquiescence to the asserted past practice.  By the same token, and based on assertions made by the Union in a previous arbitration, the Employer is entitled to test whether the LRC has acted as the exclusive case administrator in prior arbitrations.

The Employer has argued that a full response to Section 3 of the subpoena is necessary given the Union's own past characterization of the "contractual relationship among four parties" – the arbitrator, the case administrator, the Union and the Employer.  The Employer has also argued that a full response to Section 5 of the subpoena is necessary to test whether the Union's assertion that the LRC is entitled to administer arbitrations between the parties is based on an interpretation of the CBA, or some other circumstances.  The ALJ's determination in the related ULP proceeding is neither binding nor persuasive in this matter.  The Employer intends to defend its decision to order cessation of the LRC's administration of pending and future

---

[3] *See* AAA Labor Rules, at 24 ("Optional Labor Services").

**Exhibit 28**

arbitration cases between the parties by investigating whether the Union's use of the LRC is premised on bias against the Employer rather than a purported past practice. The Employer is entitled to defend itself using related evidence. *See Unted Food & Commercial Workers Int'l Union Local No. 576 v. NLRB*, 675 F.2d 346, 354 (D.C. Cir. 1982). By way of example, the Employer has cited one derogatory email between an arbitrator and a representative of the LRC, which was obtained through discovery in the related ULP proceeding. If other such correspondence exists, the Employer is entitled to it.

Finally, the Employer has argued that a full response to Section 6 of the subpoena is necessary in order to compel a full response from the Union on pending information requests.

## DISCUSSION

**Standard of Review.** Rule 27 of the AAA Rules governs evidence in a related labor arbitration proceeding. Relevance is the standard of review. The arbitrator retains the discretion to determine whether evidence is material and necessary to determine the disposition of the dispute. The Rule continues:

> The arbitrator shall determine the admissibility, the relevance, and materiality of the evidence offered and may exclude such evidence deemed by the arbitrator to be cumulative or irrelevant.

Strict adherence to legal rules of evidence are not required.

Other provisions of the AAA Rules are also relevant to the current dispute. Specifically, Rule 25 governs the Order of Proceedings:

> The arbitrator, exercising his or her discretion, shall conduct the proceedings with a view to *expediting the resolution of the dispute* and may direct the order of proof, bifurcate proceedings and *direct the parties to focus their presentations on issues the decision on which could dispose of all or part of the case*.

10

**Exhibit 28**

(*emphasis added*).  Labor arbitration practice does not typically include traditional forms of legal discovery.  Parties have other legal, and possibly contractual, rights or procedures to access information as collective bargaining representatives – which parties may exercise in or outside of the arbitration process.  The AAA Rules are typically invoked during or just prior to an evidentiary hearing, when the parties seek the admission of evidence.  Nevertheless, the AAA Rules remain instructive for resolving the disputed portions of the Employer's subpoena.

**The Grievance.**  The underlying contractual violation alleged by the Union is the appropriate measure for assessing the relevance of the requested information.  Here, the Union's grievance is not about its relationship with one of the third-party case administrators listed in Step 4 of the contractual grievance procedure.  Likewise, the grievance is not about the Union's purported conduct in other arbitration disputes.  Simply, the underlying grievance is not an Employer-initiated complaint; by definition, contractual grievances are initiated by the Union.  Broadly stated, the Employer's purported justifications for seeking information in this matter may or may not form the basis for action under the parties' Agreement or in some other forum – but they are not the subject of the instant grievance.

According to the Union's grievance, the Employer's September 20, 2023 demand that the LRC cease active case administration of the parties' pending labor arbitration disputes

> is in violation of Article XXI, Grievance and Arbitration; any other provisions which MNA may further discern at a later date as is permitted expressly by Article XXI; and in the alternative by unchallenged, binding past practice that is enforceable under the collective bargaining agreement where, as here, there have been over 100 demands for arbitrations under the parties' collective bargaining agreements from 2000 to September 20, 2023 where the arbitration agency administered the process from inception through conclusion.

The parties have asserted competing theories on the past practice of case administration in arbitration disputes.  The existence of a past practice can act as a gap-filler for missing or

<p style="text-align:center">11</p>

**Exhibit 28**

ambiguous contract language.  The applicable contract language in this case – "an arbitration shall be selected pursuant to the" applicable rules of the AAA or the LRC – is silent on the issue of case administration.  In contrast to the Union's assertion, captured above, the Employer has proffered that the parties may have sought to utilize the AAA's "list-only" option to select arbitrators at some point over the past 24 years.  The Union's asserted past practice is the apparent genesis for the Employer's subpoena.

**The Subpoena.**  It is clear that the material that is relevant and necessary to determine whether a past practice has existed in this context is limited.  The Employer's subpoena seeks information that is beyond this scope and is therefore irrelevant to the disposition of the underlying dispute.  AAA Rule 25 reflects an arbitrator's duty to narrow the scope of the dispute.  My Order below is intended to expedite resolution of this dispute by avoiding the introduction of irrelevant or extraneous material and narrowing focus on the issues that will determine the outcome of the case.

*Evidence of a Past Practice, or Lack Thereof.*  Therefore, the Union's formulation of an alternative proposed response to Section 1 of the subpoena constitutes a reasonable requirement for the production of records tending to prove whether, and to what extent, a practice has existed with respect to third-party case administration of the parties' arbitration disputes.  By limiting production to demonstrate *one* example of a case administration function after the appointment of an arbitrator in each case, but requiring production of *any* objections to administration, the record may be sufficiently developed such as to allow the parties to argue whether a past practice has been established.  The remainder of the material sought by the Employer in Section 1 would be cumulative of the material subject to production and is therefore excluded from the Order below.

12

**Exhibit 28**

The Union has also agreed to produce material responsive to Section 3, subsections b and c of the subpoena. These materials are relevant to the obligations of the third-party case administration agencies named in Article XXI, Step 4 of the parties' Agreement, and the obligations of the arbitrators appointed through the operation of that provision. It is apparent that the "contractual relationship among four parties" that formed the basis for the remainder of the Employer's requests in Section 3 was taken out of context, as explained by the Union. If a written agreement existed among the arbitrator, the case administrator and the parties in a given arbitration under Article XXI of the Agreement, it should be produced – but the Union has effectively represented that no such agreements exist.

*Extraneous Material.* As previously noted, the remainder of the information sought by the Employer is not relevant to the issues presented by the underlying grievance in this matter, or otherwise cumulative of materials ordered for production. Specifically, the material sought in Section 6 is not relevant to the disposition of the underlying grievance. Additionally, Sections 2 and 4 of the subpoena sought material related to the Union's use of the AAA and the LRC. To the extent that such information is relevant to this matter, it shall be produced in accordance with my order on Section 1 of the subpoena. The request is otherwise beyond the scope of these proceedings where the Employer has, for example, sought material for the purpose of asserting wrongdoing on the part of the Union.[4]

For similar reasons, Section 5 of the subpoena seeks information that is also beyond the scope of these proceedings. By way of example, the Employer has proffered a communication between an arbitrator and a representative of the LRC to support the assertion that the Union and the LRC are biased against the Employer. In seeking production of correspondence across an

---

[4] This Order does not address the parties' arguments with respect to legal privileges. As noted, production is limited to relevant, non-privileged material.

13

**Exhibit 28**

expansive list of topics, the Employer has premised its request on the development of a theory that one piece of correspondence between non-Union individuals is an indicator of the Union's anti-Employer bias. Simply, whether or not such bias exists is not relevant to the question at hand.

Accordingly, this order requires the production of certain materials requested in Sections 1 and 3 of the subpoena. The Employer's remaining requests have been stricken in full.

## ORDER

**Sections 2, 4, 5 and 6** of the Employer's Subpoena Duces Tecum dated July 25, 2024 are **stricken in full**.

With respect to **Section 1** of the subpoena, **the Union shall produce a limited set of non-privileged documents relating to the 111 arbitration demands for the period between the year 2000 and September 20, 2023**:

1. the Demand for Arbitration;

2. with respect to the subject of the LRC or AAA administering the arbitration process after the selection of the arbitrator ("the Subject"), any objection transmitted by the Hospital to MNA or LRC about the Subject;

3. any exchange of positions about the Subject where the Hospital or MNA presented arguments about the Subject;

4. any rulings by arbitrators resolving any dispute about the Subject;

5. one example for each case of LRC and AAA administering the arbitration process after the selection of the arbitrator, such as issuance of a notice of hearing, coordinating communication and issuing notices of arbitrator decisions about any other arbitration issues; and,

6. LRC and AAA communication relating to the final disposition of the case, including withdrawal, withdrawal upon report of the matter settled, issuance of an arbitration award, placing in abeyance, closing the case.

14

**Exhibit 28**

With respect to **Section 3** of the subpoena, **the Union shall only produce material responsive to subsections b and c** of the Employer's request:

1. the parties' alleged agreement to agree to abide by AAA and/or LRC rules relating to the administration of the case;

2. the parties' alleged agreement to hold arbitrators to the ethical guidelines of the National Academy of Arbitrators.

As the parties have previously agreed, the **deadline for the Union's production of materials responsive to this order shall be the close of business on Friday, February 14, 2025.**

So ordered,

Michael T. Loconto, Esq.
Arbitrator
December 23, 2024

15

**Exhibit 28**

**Attachment B,**
**Arbitrator's March 28, 2025, Ruling on MNA's Motion to Quash**

**Exhibit 28**

## FW: ORDER ON SUBPOENAS: MNA and St. Vincent Hospital, AAA No. 01-24-0000-7400

1 message

**AAA Patrick Kimm** <PatrickKimm@adr.org>                                                Fri, Mar 28, 2025 at 4:31 PM
To: Samantha Sinclair <ssinclair@masslaborlawyers.com>, "Marc A. Sugerman" <msugerman@fordharrison.com>, Jack Canzoneri <jcanzoneri@masslaborlawyers.com>, Jason Powalisz <jpowalisz@masslaborlawyers.com>, "Lenow@masslaborlaw.com" <lenow@masslaborlaw.com>, "Michael J. Spagnola" <MSpagnola@fordharrison.com>
Cc: Frank Binda <BindaF@adr.org>

Hello All,

Please see below from Arbitrator Loconto:

### ORDER

On March 21, 2025, Employer's representative Michael Spagnola, Esq. requested that the Arbitrator sign and issue ten subpoenas. This is the second round of Employer subpoenas in these proceedings. The subpoenas were requested for the purpose of obtaining information from the Union; the American Arbitration Association (the "AAA") and the Labor Relations Connection (the "LRC"), which are non-parties in these proceedings; and the Union's representatives, the law firm of McDonald Lamond Canzoneri LLC ("MLC").

On March 22, 2025, LRC counsel Howard Lenow, Esq. filed an opposition to the Employer's subpoenas.[1] On March 25, 2025, Union counsel Jason Powalisz, Esq., filed a timely motion to quash the Employer's subpoenas.

My Order is as follows:

**1.    AAA Subpoena Requests are Denied**

The material requested from the AAA, and testimony from representatives of the AAA, is irrelevant to the present dispute. As I made clear in my December 23, 2024 ruling on the Employer's previous subpoena requests, Rule 27 of the AAA Labor Rules governs evidence in a related labor arbitration proceeding. Relevance is the standard of review. The arbitrator retains the discretion to determine whether evidence is material and necessary to determine the disposition of the dispute. The Rule continues:

> The arbitrator shall determine the admissibility, the relevance, and materiality of the evidence offered and may exclude such evidence deemed by the arbitrator to be cumulative or irrelevant.

This matter is limited to case administration performed by the LRC. The AAA is neither a subject of nor party to these proceedings. There is nothing to be gained by subjecting AAA employees to testimony in these proceedings or by subjecting to the AAA to the burdensome production of irrelevant materials.

**2.    The Canzoneri Subpoena is Denied**

As the parties are well aware, the Employer failed to appear for the first day of hearing in this matter, March 17, 2025. The Union appeared at the March 17 hearing, presented its case in chief, and rested its case. Accordingly, the Employer is not entitled to call Jack Canzoneri as a witness in this matter. Canzoneri was the Union's sole witness. Had the Employer appeared at the hearing, it would have

**Exhibit 28**

had ample opportunity to cross-examine Canzoneri.  The Employer, however, chose to decline attendance at the first day of hearing.  This is a matter of fundamental fairness, and the Employer's own behavior has dictated this outcome.

**3.  Other Subpoena Requests are Subject to an Employer Offer of Proof and the Presentation of Its Case**

Of course, there is no rule that limits a party from calling adverse parties to testify as witnesses in support of its case.  In addition to the Employer's failure to appear at the March 17 hearing, however, the Employer's previous omissions have resulted in further restrictions on the Employer's defense.  Specifically, the Employer was warned on February 25 and March 15, 2025 that its failure to respond to the previous subpoenas issued on the Union's behalf[2] would permit the Union to request that the Arbitrator draw an adverse inference on the assumption that the material that has not been produced would be damaging to the Employer's position(s) in this matter.  The Union made such a request at the March 17 hearing, which was granted.

Despite the Employer's failure to appear at that hearing, I allowed the Employer to make a good cause showing that the second scheduled date in this matter should proceed.  As I have previously indicated, the Employer is not entitled to a second day of hearing.  The Employer's request to proceed was devoid of any showing of cause that the April 2 hearing should proceed as scheduled.  I determined that the hearing should proceed, over the Union's objection, because my decision on the merits of this grievance will benefit from the Employer's presentation of its defense. Allowing the Employer to proceed with its defense, however, does not relieve it from the restrictions of my previous rulings.

Based on the adverse inference that has been drawn, I am unwilling at this time to order that the MLC staff, MNA representatives or LRC representatives requested appear on April 2 and provide testimony.  This will not affect the Employer's ability to put on its case.  For example, it would be of particular relevance to the merits of this dispute for the Employer to call its own employee(s) to testify about the subject matter contained in the September 20, 2023 electronic mail message that generated the grievance in this matter.  Testimony of this nature would be probative of the Employer's position on this matter.

The parties will take note that arbitrators may direct a party to focus its case on certain issues.  Rule 25 governs the Order of Proceedings:

> The arbitrator, exercising his or her discretion, shall conduct the proceedings with a view to *expediting the resolution of the dispute* and may direct the order of proof, bifurcate proceedings and *direct the parties to focus their presentations on issues the decision on which could dispose of all or part of the case*.

(*emphasis added*).  I am requiring the Employer to make an offer of proof about what will be shown or proven by its case, and the related relevance of the anticipated testimony that has been requested from the aforementioned individuals.  Further instructions are below

**4.  LRC Subpoena Duces Tecum**

Finally, I will reiterate that the Employer's actions in this matter provide sufficient reason to deny the Employer's request for LRC records.  An adverse inference has been drawn, as previously discussed.  In addition, and as the Union and LRC argue in opposition to this subpoena, through its own inaction the Employer has waived its right to the material it has requested from the LRC.  I am inclined to agree.

The Employer initially made a request for LRC records on July 25, 2024, concurrent with the request for Union records that became the subject of my December 23, 2024 ruling.  The parties held a telephone conference about the subpoena for Union records, a briefing schedule was established on the key issues in that request, and oral argument was held prior to my issuance of a ruling.  My ruling followed, and the Union then requested similar records from the Employer in its own subpoena.  The parties continued to address the Union's subpoena through correspondence and a telephone conference prior to my January 24, 2025 ruling, and still more correspondence followed on or around the February 14, 2025 deadline when the Employer failed to provide materials responsive to the Union's subpoena. An additional round of correspondence followed in the days leading up to the first day of hearing, which took place on March 17, 2025.  The Employer asserted that it has had correspondence with the LRC's counsel about this subpoena, on or around October 18, 2024.  However, the Employer's March 21, 2025 request represents the first time that it has requested consideration of the LRC records by the Arbitrator

**Exhibit 28**

over a span of eight months, despite the multiplicity of aforementioned activity on related matters.[3]  On this basis alone, it would be reasonable to conclude the Employer has waived its right to request that a non-party engage in a voluminous document production.

Additionally, and as noted in my March 15, 2025 correspondence, the Employer's sudden renewal of its request at this late date indicates the marginal relevance of the information it seeks.  As also indicated by the LRC's and the Union's opposition memoranda, the LRC has previously responded to the Employer in another forum and provided information that is cumulative or duplicative of the material requested here.  As the Union also noted, the information requested here - absent a proffer from the Employer - appears to be cumulative or duplicative of the information that the Union provided in response to my December 23, 2024 ruling on the Employer's previous subpoena.  As a practical matter, it is also clear to me that the Employer is possession of at least some of the material that has been requested, given the Employer's prior representations in its request to seek my recusal from this matter.

As such, the Employer is required to provide an make an offer of proof about what will be shown or proven by its case, and the related relevance of the materials requested from the LRC.  Further instructions are below.

-----

**Conclusion.**  The Employer shall file the offers of proof that are required by this Order with the AAA case administrator, Mr. Kimm, no later than 5 p.m. ET on Monday, March 31, 2025.  For the avoidance of doubt, the Employer shall make an offer of proof with respect to the testimony for each of the individuals noted in section 3, above, and for each of the categories of materials sought from the LRC in section 4, above.  This is not a request for the Employer to litigate its entire case through its forthcoming submission; a few sentences or paragraphs should be sufficient for each of the aforementioned items.

I will leave my final ruling on these requests open until the conclusion of the Employer's case on April 2, 2025.  Should the Employer's presentation of its case on April 2 make a sufficient showing of support for or otherwise prove the assertions made in its required offers of proof during the presentation of its case on April 2, 2025, I will consider whether any of the testimony or materials requested might be further probative of the truth in this matter and take appropriate action at that time.

This order is entered as of March 28, 2025.

---

[1] The LRC is not a party to these proceedings and Lenow's filing was unsolicited.  The filing indicated that the LRC's counsel was informed of the Employer's subpoena requests by MNA counsel.

[2] The Arbitrator issued signed subpoenas on January 6, 2025, and confirmed the subpoenas on January 24, 2025.  The Employer had a deadline of February 14, 2025 to provide the requested material to the Union.  The Employer has not done so.  By contrast, the Union was ordered on December 23, 2025 to provide information of a similar nature to the Employer, with the same deadline.  The Union made a timely and fulsome response.

[3] Lenow's email and opposition dated March 22, 2025 is the first correspondence that has the Arbitrator has received from representatives of the LRC in these proceedings.

---END MESSAGE TO THE PARTIES---

--

**Exhibit 28**



Michael T. Loconto, Esq.
Labor Arbitrator

(617) 331-2112

mtl@locontoadr.com

https://locontoadr.com

*Based in Boston, Nationwide Practice*

The information contained in this transmission, including any attachments, are intended for the exclusive use of the addressees and may contain confidential or privileged information.  If you are not the intended recipient, please notify Arbitrator Loconto by telephone at 617-331-2112 or by email at mtl@locontoadr.com, and please destroy all copies of this message and any attachments.

Arbitrator Loconto works exclusively as a neutral, offering arbitration, mediation, and other dispute resolution services.  While Arbitrator Loconto is an attorney and a member of the Massachusetts bar, Loconto ADR is not a law practice.  Nothing in this email is intended to offer legal advice, and no attorney-client relationship is formed through any exchange of correspondence related to this email.

Receipt by anyone other than the intended recipient is not a waiver of any arbitrator's, mediator's, attorney-client, or work product immunity, privilege, or other applicable protection.



**AAA Patrick Kimm**
**Case Administrator**

American Arbitration Association
T: 617 695 6014 F: 617 451 0763 E: PatrickKimm@adr.org
200 State Street, 7th Floor, Boston, MA 02109
adr.org | icdr.org | aaaicdrfoundation.org



The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.

# Exhibit 28

**Attachment C,**
**April 1, 2025, email from the Arbitrator ordering the hearing record close**

**Exhibit 28**

---

## RE: ORDER ON SUBPOENAS: MNA and St. Vincent Hospital, AAA No. 01-24-0000-7400
1 message

---

**AAA Patrick Kimm** <PatrickKimm@adr.org>                                    Tue, Apr 1, 2025 at 2:54 PM
To: "Marc A. Sugerman" <msugerman@fordharrison.com>, Jason Powalisz <jpowalisz@masslaborlawyers.com>, Samantha Sinclair <ssinclair@masslaborlawyers.com>, Jack Canzoneri <jcanzoneri@masslaborlawyers.com>, "Michael J. Spagnola" <MSpagnola@fordharrison.com>
Cc: Frank Binda <BindaF@adr.org>

Good Afternoon,

See below from Arbitrator Loconto:

To the parties:

I have received the Employer's correspondence with a timestamp of 11:55 am today.

Briefly, the Employer was given until 2 pm today to answer a simple question: whether it will or will not appear and present its case at the hearing scheduled for tomorrow.  The substance of the Employer's 11:55 am message is non-responsive to this request.  The Employer has indicated that it does not have any witnesses scheduled to appear and give testimony, and the deadline for a clear response to the question that was posed has now expired.  Accordingly, the Employer's failure to submit a timely and adequate response may only be interpreted as a request to cancel tomorrow's hearing.  The Employer's request is granted.  My cancellation fee for tomorrow's hearing is $1,850, as provided in my AAA biography.

In addition, further proceedings in this matter were specifically premised on the Employer's appearance and submission of evidence to substantiate its offers of proof.  The Employer has declined to do so.  As such, the hearing is now closed.

The record reflects that the deadline for the submission of post-hearing briefs in this matter is 5 pm ET on Friday, May 2, 2025.  The parties are reminded to conduct all correspondence on this matter, including the submission of post-hearing briefs, by submission to the AAA case administrator, Mr. Kimm.  As an additional reminder, the parties must submit as attachments to their submissions any non-public authorities (e.g., Bloomberg BNA labor arbitration reporter cases) cited in their post-hearing briefs.

Regards,

Michael Loconto

Arbitrator



**AAA Patrick Kimm**
**Case Administrator**

American Arbitration Association
T: 617 695 6014 F: 617 451 0763 E: PatrickKimm@adr.org
200 State Street, 7th Floor, Boston, MA 02109
adr.org | icdr.org | aaaicdrfoundation.org



The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.

# Exhibit 28

**Attachment D,**
**Email from Arbitrator outlining his rulings in the January 24, 2025,**
**telephone conference**

**Exhibit 28**

On Fri, Jan 24, 2025 at 3:44 PM Michael Loconto <mtl@locontoadr.com> wrote:
Mr. Canzoneri, Mr. Sugerman, and colleagues,

Good afternoon.  Thank you for participating in the call earlier today.  As discussed, I am providing the following written summary of my rulings on the Employer's Objections to the Union's Subpoena Duces Tecum, which I signed and issued on January 6, 2025.  Specifically:

1. Objection to Section A of the subpoena - _overruled_.
2. Objection to Section B - _withdrawn_ by the Employer.
3. Objection to Section C - _overruled_.  The Union confirmed that the request is limited to the processing of the underlying grievance in this matter (01-24-0000-7400).
4. Objection to Section D - _overruled._  The Union confirmed that the request excludes items that may be protected by the Employer's various claimed privileges, and the Employer confirmed that documentation does exist with respect to the subject matter of the request.
5. Objection to Section E - _withdrawn_ by the Employer.
6. Objection to Section F - _overruled._
7. Objection to Section G - _overruled._

The Employer shall produce responsive materials for the Union's review by close of business on Friday, February 14, 2025 as indicated in the underlying subpoena.  Additionally, and as discussed, the matter is not appropriate for summary judgment or a decision on the papers, and remains scheduled for two-days of in-person hearings in Worcester, MA (location TBD) on Monday, March 17, 2025 and Wednesday, April 2, 2025.  Parties: please confirm the exact location of the hearings by no later than one week prior to the first hearing (or, 3/10/25).

Have a nice weekend, and

Regards,

Michael Loconto
Arbitrator

**Exhibit 28**

**Attached Non-Public Authorities**
**(in order of citation in brief)**

**Exhibit 28**

# Arbitration Decisions

## Labor Arbitration Decision, In the Matter of Arbitration between The Plain Dealer Publishing Company, 1992 BNA LA Supp. 107654

**Labor Arbitration Decision, In the Matter of Arbitration between The Plain Dealer Publishing Company, 1992 BNA LA Supp. 107654**

Arbitration Decision

In the Matter of Arbitration between The Plain Dealer Publishing Company and Teamsters Local 473

December 23, 1992

For the Employer: Elliot Azoff, Attorney

For the Union: Frank Consolo, Attorney

Patricia Thomas Bittel

APPEARANCES

BACKGROUND

This matter was heard on September 21, 1992 at the offices of the Plain Dealer in Cleveland, Ohio before neutral arbitrator Patricia Thomas Bittel, mutually selected by the parties in accordance with Article IX, Section 91C of the Collective Bargaining Agreement.

Many of the facts of this case are not disputed by the parties. The Paper Handling Department has two shifts, day and night. During these two shifts employees work a variety of schedules with variable starting and ending times. The normal day shift lasts seven and one half hours and a normal night shift lasts seven hours, both with a half hour unpaid lunch.

On December 13 and 14 the grievance addressed in this case was filed. It states as follows:

"Night employees called into work by the employer for Friday and Saturday (December 13 and 14, 1991) for a 6:30 p.m. start, a day shift. Since these shifts commenced within eight hours of the previous day's shift, all employees should be compensated at the rate of time and one half for the entire time. Re: Section 67 Agreement dated March 1, 1991."

Section 67 of the Collective Bargaining Agreement, entitled "Intermission Between Shifts" states as follows:

"In the event of a regular employe being called for work within eight (8) hours after the previous shift has expired by the Employer, that employe shall be paid at the rate of time

**Exhibit 28**

and one half for that time, but in no event shall the wage paid be less than the regular scale for days' or nights' work."

The grievance in this case was fully processed, culminating in the instant arbitration proceeding. Both parties stipulated to the arbitrability of the case and that the matter was properly before the Arbitrator. The issue to be decided was also stipulated between the parties as follows:

"Whether the employer violated Section 67 by calling in employees to work the nights of Friday, December 13 and Saturday, December 14 at 6:30 p.m. and not paying them time and a half, since the previous day shift had expired."

EVIDENCE PRESENTED

By the Union

Charles J. Garven, superintendent of the Paper Handlers, was called by the Union and explained his responsibility for scheduling shifts through the foremen. He stated the day shift commences between 7 a.m. and 7 p.m., and the night shift commences between 7 p.m. and 7 a.m.

He said that on Friday and Saturday, employees are called in to start between 7:30 and 10 a.m. Some start at about 7:30, he said, and others are called in about 9:30 or 10. He said another group of employees works from 6:30 p.m. to 2:30 a.m. Six-thirty is the end of the last day shift on a Friday, he said, and on Saturday the first day shift starts at 9:00 a.m. with a 5:00 p.m. ending. On Friday, the first night shift starts at 7:00 p.m., he said, with a general starting time of 7:30 and one employee coming in at 6:00 on Friday and Saturday.

By the Company

Mona Patterson testified that she is a Labor Relations Assistant who researched the collective bargaining history of Section 67. She explained it first appeared in the 1967-69 contract. She identified a letter dated November 28, 1966 in which the original union proposal was made for a new section on intermission between shifts:

"In the event of an employe being called back for work within eight (8) hours after his previous shift has expired by the Employer, he shall be paid at the rate of double time for that time, but in no event shall the wage paid be less than the regular scale for day's or night's work."

According to Patterson, the parties negotiated on the proposal and agreed to include the following provision as Section 67 of their 1967-69 Agreement:

"In the event of a regular employe being called for work within eight (8) hours after his previous shift has expired by the Employer, he shall be paid at the rate of time and one-half for that time, but in no event shall the wage paid be less than the regular scale for days' or nights' work."

Patterson maintained that this language remained unchanged until 1978 when the parties mutually agreed to delete references to employees in the masculine gender and to substitute gender-neutral language. She identified a special version of the 1978-81 Agreement where references in the masculine gender had been circled with handwritten changes to make them gender-neutral. In Section 67 the phrase "after his previous shift" was changed to "after the previous shift" and "he shall be paid" was changed to "that employe shall be paid." According to Patterson, Section 67 has not been changed since the "desexing" of the Agreement, and the language of the 1978-81 Agreement matches that of the current Agreement.

**Exhibit 28**

Assistant to the Publisher Leo Ring explained he was chief spokesman for the Company during the 1978 negotiations. He said the Cleveland Plain Dealer had an association with the Cleveland Press whereby they negotiated their collective bargaining Agreements together. According to Ring, an individual from Cleveland Press management, Carl Rapp, served as secretary of the association during the negotiations and was asked to go through the contract and substitute gender-neutral language. Ring definitively asserted there was no discussion of substantively changing the meaning of Section 67 during the 1978 negotiations. He flatly denied any bargaining sessions in 1978 dealing with Section 67.

According to Ring, there have been multiple day shifts with different starting times every week of the year as long as he has been at the Plain Dealer -- since 1967. He claimed the Company has never paid anyone time and a half simply because his or her shift starts within eight hours of someone else's shift. He explained that time and a half is paid when an individual employee is called back within eight hours of his or her particular shift. He said in the years both before and after 1978, neither employees nor the Union has ever asked for time and a half unless the intermission between shifts was less than eight hours for a particular employee.

ARGUMENTS OF THE PARTIES

By the Union

The Union argues the language of the Agreement places no restriction on whether the individual claiming time and a half must have actually worked within eight hours of the preceding shift. In its view, the language gives Grievant the right to be paid time and a half for coming in within eight hours of the preceding shift. It points to Section 91(e) which states as follows:

"The arbitrator shall have no power to change, modify, add to or detract from any terms of this agreement."

It also notes the language of Section 94:

"All agreements and understandings between the parties are set forth herein. No alteration, amendment, enlargement or modification hererof [sic] shall be binding on either party, nor shall any provision, term or condition hereof be waived unless such alteration, amendment, enlargement, modification or waiver is made in writing and signed by the parties respectively."

On the basis of these provisions it concludes that Management's position would warrant a change in the existing language of the Agreement, and contends the Arbitrator has no authority to grant such a change.

By the Company

Management asserts the Union is engaged in a clumsy attempt at contract revisionism. It claims that to prevail, the Union must prove by a preponderance of the evidence that the parties intended to change the substantive meaning of Section 67 when its language was "desexed". The Union has failed to meet this burden, contends the Company, arguing the grievance should be denied.

The Company maintains its position is supported by Section 67's history of administration over the past 25 years. There have been multiple starting times on day shift for many years, it asserts.[91] It points out that neither Ring nor Garven could remember any occasion when time and a half was paid to an employee because his or her shift started within eight hours of someone else's. Despite several contract negotiations even after 1978, the Union never once raised administration of Section 67 as an issue for bargaining, it asserts.

**Exhibit 28**

It references a decision by Arbitrator E. A. Jones in 1957, Fruehoff Trailer Company, 29 LA 372, where it was noted that a course of conduct engaged in by one party and acquiesced in by the other, standing two or more contract terms without any reaction, becomes part of the Agreement and cannot be altered or discontinued except by bilateral negotiations and agreement.

Management argues the only witness able to testify about what happened during the 1978 negotiation was Ring whose testimony was based on first hand knowledge and was unrebutted. It points out also that Patterson's testimony about bargaining history was also unrebutted.

Management finally argues that the Union's interpretation of Section 67 would lead to an absurd and nonsensical result because the Company would be required to pay overtime to all day shift employees. It notes the inconsistency in the Union's position in grieving only Friday and Saturday nights, while the situation it grieves occurs every day on every shift. It argues the Arbitrator, though not having the authority to alter the Agreement, does carry the responsibility to interpret and enforce it.

DISCUSSION

The evidence has clearly shown that Section 67, as originally and mutually drafted by the parties, required an employee to be paid time and a half when called back to work within eight hours of working a prior shift. The parties mutually understood this provision to refer to the individual employee's schedule of work and not to require payment of overtime based on the schedule of another employee. The original language is as clear as it is definitive in expressing the parties' mutual intent that the determining factor be the schedule of the individual employee.

"The primary goal of the 'rights' arbitrator is to determine and carry out the mutual intent of the parties."[aa1] In so doing, the Arbitrator must first look to the words used by the parties to express their intent. If these are ambiguous, then the Arbitrator must look outside the Agreement to such pertinent factors as the negotiations regarding the disputed language and the parties' practice under their chosen provision.

If credible argument can be made for conflicting interpretations of a provision, then the provision must be deemed ambiguous. Article 67, as currently written, gives rise to an ambiguity: it does not explain the term "previous shift," nor does it specify whether "previous shift" means the shift of an employee called back within eight hours, or the shift of employees in general. Indeed, given the variety of shift schedules in the Paper Handling Department, there is no clear point in time when "the previous shift" expires.

This ambiguity is properly resolved by reference to the bargaining history and practice of the parties. There is no evidence whatsoever that the parties intended Section 67 to give time and a half to any employee unless called in within eight hours of personally completing another shift. To the contrary, initial language used by the parties was clear and unequivocal in its limited application to employees called back within eight hours of completing a shift.

In 1978 when the parties set out to "desex" the contract, their mutual purpose and intent was only to make contract language gender-neutral. There is no suggestion anywhere in the record that the parties mutually intended any substantive change in Section 67. Rather, their plain intent was for it to become gender-neutral with its substantive meaning unchanged.

The practice of the parties supports the conclusion that the parties' intended meaning for Section 67 never changed. Their practice endured 25 years without exception, challenge or objection, all the while predictably applying their initial and clearly articulated intent. This consistency over a period as long as 25 years gives rise to an implication of full knowledge

**Exhibit 28**

and acceptance by both parties. The parties shared a mutual expectation that Section 67 rights went to the employee returning to work within eight hours. Their past practice proves a clear, mutual understanding that this interpretation remained unchanged after 1978.

In rendering this interpretation, the Arbitrator is neither modifying, adding to, subtracting from or altering the Agreement in any way. To the contrary, the Arbitrator has determined that the Agreement and its term "the previous shift" refers to the schedule of the particular employee seeking overtime pay. The parties mutually intended such an interpretation and this intent must be given full force and effect.

AWARD

The grievance is denied. Grievants were not shown to have been called back within eight hours of working a shift and therefore did not qualify for time-and-a-half under Section 67.

Respectfully Submitted,

Patricia Thomas Bittel

---

**fn** a1

Patterson produced employees' schedules for the time period immediately prior to ratification of the current collective bargaining Agreement. Schedules for November 4, 1991 showed a crew starting at 8:00 and another crew starting at 10:00 with the 10:00 crew being paid straight time. She also testified about August 8, 1990 where a 7:30 and 10:00 shift existed and the 10:00 shift was paid straight time. She stated that on August 10, 1990 there was a 7:30 shift and a 9:00 shift, and the 9:00 shift was paid straight time. The parties' current agreement went into effect in March of 1991.

**fn** aa1

How Arbitration Works, Elkouri & Elkouri, 4th Ed. 1985, at p. 343.

**Exhibit 28**

# Arbitration Decisions

## Labor Arbitration Decision, CONSOLIDATED ALUMINUM CORP., 76K/07084, 66 BNA LA 938

**Labor Arbitration Decision, CONSOLIDATED ALUMINUM CORP., 76K/07084, 66 BNA LA 938**

Decision of Arbitrator

In re CONSOLIDATED ALUMINUM CORPORATION [Iuka, Miss.] and ALUMINUM WORKERS INTERNATIONAL UNION, LOCAL 206

FMCS Case No. 76K/07084

May 26, 1976

Show Summary

Appearances: For the company - W. M. Jacobi, industrial relations manager; Berlon E. Durham, production supervisor; Donald W. Cowell, plant manager. For the union-A. Q. Harville, international representative; Jimmy M. South, local president.

MANN, Arbitrator:

### LAID-OFF EMPLOYEES

### Statement of the Case

The grievance arose at the Iuka, Mississippi foil laminating plant of Consolidated Aluminum Corporation, which has its headquarters in St. Louis, Missouri. The plant laminates aluminum foil to paper and paperboard.

On February 24, 1975, L. H. Robinson and eleven other employees were laid off from the plant. Six of these employees were recalled to work effective June 9, 1975. Another employee did not return on that date [*939] when called because he was ill. On June 16, 1975, the grievant and two other employees were also recalled to work.

On July 10, 1975, Grievance No. 1-1975 was filed after the grievant and other employees, who had returned to work, did not receive holiday pay for Memorial Day which was on May 26, 1975.

The issue in this case was: "Did the Company violate the labor agreement and past practices when it refused to pay the grievants for the Memorial Day holiday in 1975? " If so, what should be the remedy?

**Exhibit 28**

**Position of the Union**

The Union maintains that the language of Article 20-A of the labor agreement is clear. That article reads, in part, "absent as a result of a short-term layoff or short-term leave of absence in which event the holiday will be paid if he has worked *within* (Union's emphasis) thirty calendar days of the holiday."

The Union maintains that the contract language does not say if he had worked thirty days before the layoff and that the language is plain and simple, if he has worked within thirty calendar days of the holiday.

The Union references Grievance No. 1-1971, filed by the Union and paid by the Company, in which case the Union maintains that the circumstances were identical. The Union notes that since 1971 there has been two contract negotiations and the Company has made no proposal to change the language of the subject article.

The Union contends that, if the Company wanted to change the language, they should have brought the matter up in negotiations and not waited until a later date to try to get something in arbitration which they could not get in contract negotiations.

The Union sums its argument by referencing the contract language in Article 20-A which, it maintains, clearly supports its position.

**Position of the Company**

The Company notes that it was the Union's contention that Grievance No. 1-1971 was filed by the Union and awarded to the Union by the Company in the grievance procedure short of arbitration and that there had been two contract negotiations between the parties since the settlement of this grievance without any attempt by the Company to change the language of Article 20-A.

It is the Company's position that the grievance was not awarded to the Union. Secondly, there was no reason for the Company to propose a change in the present language of Article 20-A during the recent negotiations, since management at the plant was unaware of a specific language dispute in the holiday section of the agreement.

The Company acknowledges that two employees received holiday pay for Christmas Eve, Christmas Day in 1970 and New Year's Day in 1971, but denies that these employees were paid on the basis of the alleged grievance. The Company maintains that the holidays were paid by the then plant manager contrary to the Company's past interpretation and the reason for his action remains a mystery to the Company.

The Company maintains that the holiday language in the Iuka plant's labor agreement was and still is identical to the language of the Jackson, Tennessee plant contract. The language of the Jackson, Tennessee Aluminum Workers Contract, the Company maintains, has never been interpreted by the Company or the Union as meaning an employee would receive holiday pay while he was on short-term layoff if he returned to work within thirty days after the holiday. The Company maintains that it has always considered that an employee who was "absent as the result of a short-term layoff, or short-term leave of absence, in which event the holiday will be paid if he has worked within thirty calendar days of the holiday" as meaning that the employee must work thirty days prior to the holiday. The Company

**Exhibit 28**

maintains that this interpretation has never been challenged by the Aluminum Workers International Representative who serves both the Jackson and Iuka facilities.

The Company notes that Jimmy South, President of the Local, testified on behalf of the Union and intimated that he had knowledge as to the original meaning of the language in question. The Company notes that, on cross examination, South admitted that he was not President of the Local during the first contract negotiations, nor was he a member of the bargaining committee. Also, the Company notes, South states on behalf of the Union that Jack Odom stated or promised that the Company would pay the holiday pay to the employees who were recalled within thirty days following the Memorial Day holiday in 1975. The **[*940]** Company further notes that Odom was the plant superintendent at the time and has sworn before a notary public that "At no time during the conversation with Local 206 representatives and myself did I state a promise that the Company would pay holiday pay to the employees who were recalled within thirty days following the Memorial Day of 1975."

The Company notes that Berlon Durham, present production superintendent and previous member of the Union, testified that the intent of Article 20-A-3 was to prevent the Company from laying off employees just prior to a holiday or holidays, without being liable for payment of such holidays during a short-term layoff. The Company emphasizes that Durham's testimony also maintains that it was not the Union's intention or interpretation, during the initial contract negotiations, that any employee who was recalled to work in thirty days following the holiday would be eligible for holiday pay.

The Company concludes its argument by asserting its position that it interpreted Article 20-A-3 properly and it is not required, per the contract, to compensate employees who have been laid off in excess of thirty days of the holiday if they are returned to work after the holiday. Furthermore, the Company maintains, the employees were not affected by a short-term layoff of thirty days or less but, in fact were on a permanent layoff caused by a lack of work.

### Contract Provisions Involved

### Article 20-Holidays

(A) Ordinarily, employees will not be required to work on the following holidays: New Years Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Friday following Thanksgiving Day, Christmas Eve and Christmas Day.

Each employee who is not:

-1. laid off in a reduction of forces;

-2. still on probationary period;

-3. on leave of absence;

shall be paid the equivalent of his regular base hourly wage rate, exclusive of shift premiums, for eight (8) hours, for the unworked holidays; irrespective of the day of the week on which the holiday may fall. In order to be entitled to pay for such a holiday, the employee must have worked on his last regularly scheduled work

**Exhibit 28**

day preceding, and his first scheduled work day following, the holiday, unless:

> 1. absent for a personal, or industrial illness which confines the employee to his home, or required medical treatment of a licensed M.D.

> 2. absent with prior permission of the Plant Superintendent;

> 3. absent as the result of a short-term layoff or short-term leave of absence, in which event the holiday will be paid if he has worked within thirty (30) calendar days of the holiday.

### Decision and Discussion

The Arbitrator is of the opinion that the grievances included in this case must be sustained for the following reasons:

Where there is a conflict between specific language and general language in an agreement, the specific language will govern ( **48 LA 1005**, 1010, et al). The Arbitrator is of the opinion that the language in Article 20-A-3 is clear and unambiguous in that those employees "absent as the result of a short-term layoff or short-term leave of absence, in which event the holiday will be paid if he has worked within thirty (30) calendar days of the holiday." The Company attempted to maintain that the above quoted section has been interpreted as only requiring them to pay if the employee has worked prior to the holiday. The language of the contract specifically dictates "within". The dictionary definition of the word "within" denotes it to mean: "in or into the limits or compass of; in or into the scope or sphere of; in or into the range of."

An agreement is unambiguous if the arbitrator can determine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.

The primary goal of the "rights" arbitrator is to determine and carry out the mutual intent of the parties. In determining the intent of the parties, inquiry must be made as to what the language meant to the parties when the agreement was written. It is this meaning that governs, and clear and unambiguous language, such as exists in the subject contract leaves little room for doubt within the ordinary usage of the terminology contained therein. It must not be supposed that an attempt should be made to ascertain the actual mental processes of the parties to a particular contract. The law presumes that the parties understood the import of their contract and that they had the intention which its terms manifest.

If the language of an agreement is clear and unequivocal, as is the case in the subject contract, an arbitrator should not give it meaning other than that expressed. As Arbitrator Fred **[*941]** Whitney ( **47 LA 272**, 277) has stated: "an Arbitrator cannot ignore clear cut contractual language and he may not legislate new language, since to do so would usurp the role of the labor organization and employer." Even though the parties to an agreement disagree as to its meaning, an arbitrator who finds the language to be unambiguous will enforce the clear meaning ( **47 LA 661**, 665, et al). Arbitrators apply the principle that parties to a contract are charged with full knowledge of its provisions and of the significance of its language.

Much of the space in the post hearing briefs, both in the Company's and in the Union's, is consumed with discussions of precedent cases: Where the language of the contract is

**Exhibit 28**

equivocal arbitrators do not resort to precedent cases since the clear written word has precedence.

The Company, in its brief, maintains that the layoff in question was a permanent one and does not fall within Article 20-A. The Arbitrator is of the opinion that the situation both in 1971 and in 1975 took place for the purpose of adjusting production and that since the Company did, in fact, recall employees who had been previously on the full-time payroll, that those instances fall within the scope of the language inserted in the contract to cover short-term situations.

## AWARD

Accordingly, the Arbitrator directs the Company to pay the grievants the eight hours holiday pay for the Memorial Holiday in 1975.

**Exhibit 28**

# Arbitration Decisions

## Labor Arbitration Decision, CLEAN COVERALL SUPPLY CO., 47 BNA LA 272

**Labor Arbitration Decision, CLEAN COVERALL SUPPLY CO., 47 BNA LA 272**

Decision of Arbitrator

In re CLEAN COVERALL SUPPLY COMPANY [St. Louis, Mo.] and LAUNDRY WORKERS INTERNATIONAL UNION, LOCAL 108

September 3, 1966

Show Summary

Appearances: For the company-Charles Alan Seigel, attorney. For the union - William M. Nicholls, attorney.

WITNEY, Arbitrator:

### VACATION AFTER PREGNANCY

#### Grievances and Contract Provisions

This dispute involves the vacation rights of female employees who are required to be absent from their jobs for six (6) months because of pregnancy. The Company denied their vacation privileges, and in protest against such Company action, five (5) employees filed grievances.[1] Illustrative of the five (5) grievances is the one filed by Lurlean Brown, dated June 15, 1966.

> "Off October 8 till April 4, 1966 because of pregnancy. They (the Company) told (me) that (I) did not have a vacation coming."

Similar grievances were filed by Frieda Billingsley, Jeanette Rains, Lucy Sanders, and Annie May Fuller.

Having failed to resolve the grievances in the Grievance Procedure, the parties have instituted this arbitration for their final and binding settlement.

Relevant to the dispute are the following provisions of the Labor Agreement:

**ARTICLE VIII**

**Exhibit 28**

Section 1. Employees who have been continuously employed in the Company's plant for a period of one (1) year or more, shall be entitled to receive one (1) week's vacation with pay for forty (40) hours at his or her average straight-time hourly earnings for the last five (5) weekly pay periods preceding his or her vacation. Any employee who has been laid off from work or away from work because of illness and then rehired and who would otherwise have been continuously employed for a period of one (1) year, shall be given the same consideration with respect to such vacation as an employee who has continuously worked for a period of one (1) year or more, and be entitled to a vacation as aforesaid, provided such lay off or absence because of illness does not exceed sixty (60) days during such year. . . .

### ARTICLE IX

Section 2. In case of maternity, a female employee shall have the right to receive a leave of absence for six months without pay, and her seniority rights in such event shall not be impaired. Said employee will be required to vacate her job three months prior to delivery and will not be reinstated until three months after delivery. . . . Temporary lay-offs due to lack of work, illness of the employee or leaves of absence granted by the Company shall not constitute interruption of an employee's continuous service with the Company as such term is used in this Agreement, . . .

### Basic Question

The basic question in this case is framed as follows:

Under the circumstances of this case, did the Company violate the Labor Agreement?

### Background

Of the some 260 employees of the Company, the vast majority are women. For the first time, the parties agreed in the instant Labor Agreement that in the case of pregnancy, the employee shall be required to vacate her job three months prior to the delivery of the infant and shall be required to vacate her job until three months after delivery. This agreement is incorporated in Article IX, Section 2, the so-called "maternity clause."

After the execution of the instant Labor Agreement, one employee, absent because of pregnancy, was denied a vacation by the Company. The denial resulted in a work stoppage, and it terminated only after the Company agreed to pay her under protest with the understanding that the issue involved in this proceeding would be submitted to arbitration.

Hence, this arbitration is sparked by the denial by the Company of vacation benefits when an employee has vacated her job for six (6) months under the "maternity clause" of the Labor Agreement.

**Exhibit 28**

**Parties' Arguments**

On its part, the Union believes that the Company is in violation of the Labor Agreement when it refuses to grant a paid vacation to employees who have vacated their jobs under the maternity clause of the Labor Agreement. It argues that

> "a maternity leave of absence is *not* an absence because of illness within the meaning of Article VIII of the contract. The Union's position (is that a maternity leave of absence) did not constitute an interruption of an employee's continuous service with the Company."

It argues further that when the maternity clause was incorporated in the instant Labor Agreement,

> "it can be assumed with certainty that the effect the Company now urges it should have on Article VIII, Vacations, was not discussed. Had the difficulty [*274] which now arises in the administration of the vacation plan, i.e., the effect interruptions of service had on such privileges, been fully explored, either the difficulty would have been eliminated or the contract would not have been executed."

However, it refers to the testimony of Smith, Secretary-Treasurer of the Union, who declared in the arbitration hearing that it was his understanding when the negotiations were concluded that the

> "required maternity leave of absence would not have this effect on an employee's vacation."

In support of its position, Union Counsel cites Milwaukee Spring Company and American Machine Foundry Company.

On these grounds, the Union requests that the grievances be granted.

In contrast, the Company urges that the grievances be denied. It argues that

> "it is well established that seniority rights have no correlation to vacation rights."

That is, the fact that seniority rights are not impaired because of the maternity leave of absence does not automatically qualify an employee for vacation benefits. Further, the Company argues that

> "the contract here involved is clearly premised on the concept that a vacation is a reward for actual work performed. In this connection it is important to note that in the 'Vacation' clause, Article VIII, it is provided that if an employee is 'laid off from work or away from work because of illness' the employee shall be given the same consideration in determining continuous employment for vacations as an employee who 'continuously worked,' provided such layoff or absence because of illness does not exceed sixty (60) days during the vacation year." (Ibid., p. 6)

In support of the Company's position, Company Counsel cites Berg Metals Corp. and Kelly v. Montour Railroad Company.

**Exhibit 28**

On these grounds, the Company requests that the grievance be denied.

### Evaluation of the Evidence

### Construction of Article VIII

For a sound decision in this case, it is first necessary to understand the basic meaning of Article VIII, Section 1. It is this area of the Labor Agreement which establishes the vacation formula negotiated by the parties. In this provision, the parties stipulated that employees who have been *continuously employed* in the Company's plant for one year or more shall be entitled to a week's vacation with pay. After so agreeing, the parties then tackled the problem of vacation pay eligibility for employees who do not work within the year because of being laid off or absent because of illness. If an exception were not made for these employees, absences of this sort would disqualify them for vacation pay because the first sentence of the provision speaks in terms of a worker being "continuously employed." That is, under the first sentence any break in employment could disqualify an employee if special considerations were not stipulated in the provision.

Therefore, for those employees who are not continuously employed because of illness or because of being laid off, the parties agreed that an exception should be made to the stipulation that workers must be continuously employed for a year to qualify for vacation pay. For these employees - those not continuously employed in the year because of illness or layoff - the provision states that they are to be regarded as continuously employed.

If nothing more were added to the provision, there would be no question that the grievants would be entitled to vacation pay. However, the parties placed a limitation on the duration of absence caused by layoff or illness. In language which is precise and unambiguous, the parties agreed that such absence may not exceed sixty (60) days if employees so absent are to qualify for vacation pay. There is no doubt about the clarity of the language in this respect:

> ". . . provided such layoff or absence does not exceed sixty (60) days during such year."

Thus, what the parties agreed to is this: if an employee is absent for sixty (60) days or less because of illness or layoff within the vacation year, he or she will be regarded as continuously employed for purposes of vacation pay. However, if any such absence is longer than sixty (60) days, the employee will not be regarded as continuously employed, and, therefore, not eligible for vacation pay. Up to this point, there should be no question as to the intent of the parties or the construction of the contractual language. The language is unambiguous and unequivocal.

### Absence Because of Maternity

As stated, when the instant Labor Agreement was executed, the parties stipulated in Article IX, Section 2 that [*275] employees who are pregnant are required to take a six (6) month leave of absence. That is, they will be required to vacate their jobs three months prior to and three months after delivery. This requirement is set forth in the second sentence of Section 2. In the first sentence of Section 2, the parties agreed that in cases of maternity the employees may take

> "a leave of absence for six months."

<div align="right">

**Exhibit 28**

</div>

Apparently, this was incorporated in the previous Labor Agreements, and the innovation of the current contract is that such leaves of absence are compulsory upon the mother.

If we read both sentences together, the absence for maternity is a *leave of absence* for maternity purposes. Though the second sentence speaks in terms of the vacating of the job, the first sentence speaks in terms of a leave of absence; and since the second sentence is the newly adopted language, there is little doubt that what the parties intended was that pregnant women are to be compelled to take a six month leave of absence.

Section 2 also provides that when an employee is laid off due to lack of work, illness of the employee, or leaves of absence granted by the Company, such absences shall not constitute

> "interruption of an employee's continuous service. . ."

That is, there is no break in the employee's seniority. Should an employee be absent for six (6) months, say, because of an approved leave of absence, the employee will still earn seniority credits for the period in which he did not work.

### Is Enforced Six Month Leave a Layoff Under Article VIII?

The preceeding observations provide the framework for the determination of the basic problem involved in this case. Thus, is an employee on an enforced six (6) month leave of absence for maternity purposes eligible for a vacation under the terms of Article VIII? To put it in other terms, is such an employee

> "laid off from work or away from work because of illness"

for longer than sixty (60) days within the vacation year?

The Arbitrator recognizes that the Union argues that maternity is not an illness, and, therefore, the absence of the grievants was not because of illness. Hence, they are entitled to vacation pay. Without prejudice to this Union argument, the Arbitrator will first deal with the issue of whether or not an employee on an enforced six (6) month maternity leave of absence is "laid off" within the meaning of Article VIII? If she is "laid off" within the meaning of Article VIII, she is not entitled to vacation benefits. On the other hand, if she is not "laid off" within the meaning of Article VIII, she would be entitled to vacation pay provided that her six (6) month absence is not due to illness. Therefore, the Arbitrator will hold in abeyance the question of whether or not pregnancy is an illness until he resolves the question of whether or not a maternity leave of absence is a layoff within the meaning of Article VIII. If this question is determined in the affirmative, there would, of course, be no need to reach a decision on whether or not pregnancy and/or maternity is an illness.

In determining whether or not an enforced six (6) month maternity leave amounts to a layoff within the meaning of Article VIII, the Arbitrator is impressed with the first sentence of Article VIII. As stated, what sets the tone for eligibility for vacation pay is that an employee must be *continuously employed* in the company's plant for a period of one year. That is, he or she must be actively employed for a period of one year. This is unambiguous language which must be given full faith and credit. It does not merely state that the employee must be on the seniority roster of the employer for the year, or in a state of *continuous service* of the Company. Frequently, employees are on the seniority roster or in continuous service of an employer but are not on the active payroll or *continuously employed.* In the instant contract, this would be true if employee is on a Company approved leave of absence, laid off because of lack of work, or ill. These employees accumulate seniority credits - there is no break in their continuous service or seniority - but they are not on the active payroll or continuously employed.

**Exhibit 28**

Clearly, the intention of the parties upon the adoption of the first sentence of Article VIII is that vacation benefits will be limited to employees who are on the active payroll of the Company - *continuously employed*-during the vacation year in question. In this light, it follows logically [*276] that employees on an enforced maternity leave of absence for a six (6) month period are not entitled to a vacation. They are not entitled to a vacation because they are not continuously employed. In this sense, an employee on a maternity leave of absence is laid off within the meaning of Article VIII.

In reaching this conclusion, the Arbitrator considered that the words "laid off" as used in Article VIII could mean something different from an absence due to pregnancy. That is, "laid off" might refer to an absence caused by lack of work. Such an interpretation is not possible, however, because the provision does not spell out what "laid off" means. It does not state "laid off" because jobs are not available. Since this is true, and particularly since the first sentence of Article VIII clearly means that vacations are to be limited to those employees who are continuously employed, the Arbitrator would add language to Article VIII if he held that a six (6) month absence because of pregnancy did not disqualify an employee from vacation pay.

After all, the sense of Article VIII is that vacations are to be a reward to the employees for *continuous employment.* In this sense, the employer benefits from the continuous work of the employee, and he, in effect, shares this benefit with the employee in the form of a paid vacation. In all candor, if the Arbitrator did not deny the grievance, there could be discrimination against other employees. Thus, the Union probably would not argue that an employee who takes a six (6) month leave of absence for personal reasons, say, to run a business, political work, union service, attendance in school, would be entitled to a paid vacation. Indeed, if the Union argument is carried to its logical conclusion, such an employee would be entitled to a paid vacation. Certainly, this is not the intent of the language of Article VIII.

### Continuous Service v. Vacation Rights

One of the most important arguments of the Union is that Article VIII provides that approved leaves of absence, illness, or layoffs due to lack of work, do not constitute an interruption of an employee's continuous service. Thus, since the grievants' continuous service is not broken by the maternity leave of absence, they are entitled to a vacation. As stated previously, this argument is not meritorious because there is a vast difference between the protection of an employee's seniority rights under a collective bargaining contract and his eligibility to obtain vacation benefits. True, the grievants' seniority rights are not impaired because of their maternity leave of absence, but it is still true that when they took these leaves of absence they were not *continuously employed* during the vacation year. Suppose an employee is elected to public office, and he obtains an approved leave of absence just short of one year. During this time his seniority is protected as if he were working. However, it would be a most tortuous construction of Article VIII to hold that he is entitled to a paid vacation during this year in which he performed no service to the employer. If he should be denied a paid vacation, it follows logically that the grievants should be likewise denied a paid vacation. Both have their seniority protected, but both were absent from their jobs for longer than the sixty (60) day period specified in Article VIII.

Smith, Secretary-Treasurer of the Union, testified that it was his understanding that employees would not be disqualified from vacations because of the enforced six (6) month maternity leave of absence. He testified that this was his "recollection" of the negotiations. However, as the Arbitrator reads the record in this case, it is quite clear that the basic issue

**Exhibit 28**

involved in this case was not even discussed in the negotiations. Note, Union Counsel argues that

> "had the difficulty which now arises in the administration of the vacation plan, i.e. the effect interruptions of service had on such privileges, been fully explored, either the difficulty would have been eliminated or the contract would not have been executed."

This assertion plus the uncertain testimony of Smith leads this Arbitrator to believe that the parties did not discuss the impact of the maternity leave on vacation rights.

In this light, the Arbitrator must be bound by the written language of the Labor Agreement. If the language as contained in the Labor Agreement is to be followed, the grievancs have no merit. Surely, the Arbitrator has no authority to speculate on what might have occurred if the problem were raised in negotiations. And, surely, he has no power to legislate terms of the Labor Agreement.

## Precedents

On behalf of the grievants, Union Counsel cites American Machine [*277] Foundry ( **38 LA 1085**) and Milwaukee Spring Company ( **39 LA 1270**). The Arbitrator read both of these cases carefully, but finds that these decisions cannot be used effectively to support the basic claim of the Union in the instant case. Indeed, even if these decisions are read in the most favorable light for the grievants the Arbitrator simply does not see how they can support their claim in this proceeding. Even Union Counsel recognizes that in American Machine Foundry.

> "the agreement in that case allowed the Arbitrator to base his decision on the language of the contract, and the custom and practice of the parties." [2]

In the instant case, there is not one scrap of evidence which establishes practice. Therefore, the dispute must be decided on the basis of the contractual language involved. Furthermore, as Union Counsel recognizes with respect to both cases,

> ". . . the labor agreement and the circumstances in the above (cited) cases are different from the one in question . . ." [3]

In short, the Arbitrator cannot possibly find for the grievants on the basis of the precedents cited by Union Counsel, though he recognizes that they were cited in good faith and not represented by him as precedents which are four-square to the instant case. In fact, the candor of Union Counsel in this respect is truly commendable, since he does not attempt to delude the Arbitrator that his cited cases are the same in circumstances and contractual language as those in the instant dispute.

## Conclusion

In the last analysis, the Union requests that the Arbitrator ignore clear-cut contractual language, the intent of the parties, and write a new provision into the Labor Agreement. As we all know, such conduct on the part of the Arbitrator would be indefensible. After all, the authority of an arbitrator is limited to the construction of contractual language as agreed to by the parties. He may not legislate new language, since to do so would usurp the role of the labor organization and employer.

**Exhibit 28**

In the instant case, the Arbitrator finds that the contractual language involved does not support the claim of the grievants. Under these circumstances, he has no choice except to deny the grievances. If the Union believes that denial of vacation benefits to employees who take a maternity leave of absence is inequitable, the proper forum to seek a remedy is at the bargaining table and not in arbitration. Of course, this Arbitrator passes no judgment as to whether the present state of affairs is right or wrong, just or unjust, wise or unwise. He limits his decision to the contractual language involved, and, thereby, attempts to justify the faith and trust of the parties in his integrity and competency when they selected him to serve in this case.

One final observation, however, may be in order. The employees of this Company received a substantial benefit when their Union negotiated the maternity leave clause. What this means is that their jobs are automatically protected while they are pregnant and after the delivery of the infant. The Company *cannot refuse* such leaves of absence, as can other employers under other collective bargaining contracts.[4] By making the leave of absence compulsory, the Union and the Company have taken into consideration the health and safety of the mother and the infant. This is a substantial benefit which this Union has conferred upon their members.

[*278]

What the grievants really attempt in this case is to add to this benefit by requesting vacation pay even though they provide no service to the employer for six (6) month period. Undoubtedly, the grievants believe they are entitled to such vacations and seek this benefit in good faith. Their claim, however, is not justified on the basis of the contractual language involved, and, further, the Arbitrator is somewhat disturbed that they attempt (in good faith) to add a benefit - paid vacations - to a real and substantial benefit, the protection of their jobs during and after pregnancy and the safety and health of the mother and the infant. The Arbitrator trusts that should the grievants read this Opinion, they will share the Arbitrator's judgment that under the contractual language they are not entitled to vacations.

## AWARD

After carefully considering the evidence, including the relevant provisions of the Labor Agreement, and in his best judgment, the Arbitrator makes the following Award:

The grievances involved in this case are denied on the grounds that under the circumstances of this case the Company did not violate the Labor Agreement.

---

**fn** 1

From the record it appears that vacation rights were denied other employees under the same circumstances. The parties stipulated that the decision in this case will serve as the precedent for the disposition of other grievances falling within the same category.

**fn** 2

In American Machine Foundry, the arbitrator based his decision on past practice. He held that the language of the contracts pertaining to the issue of maternity leaves as they relate to forfeiture of vacation eligibility lacked the "necessary clarity," and, therefore, required "resort to custom and practice to determine the meaning intended by the parties." On the review of the evidence, the arbitrator held that the past practice of the parties supported the employees' position.

**Exhibit 28**

**fn** 3

In Milwaukee Spring the arbitrator held that maternity leaves are not to be computed as "time off for illness' as time worked for purposes of vacation eligibility. He held that the parties abrogated a past practice and negotiated new contractual language which "does not provide for computing time off due to pregnancy as time worked for the purpose of determining vacation eligibility." More over, in this case, there was no issue which is basically involved in the instant proceeding in the determination of wether or not an employee on maternity leave is laid off for purposes of vacation eligibility. In addition, the vacation clause in the precedent case is quite different from that involved in the instant Labor Agreement. The former provided a minimum number of hours worked in the vacation year to qualify for employee vacations; in the latter, the formula requires that an ewployee be continuously employed with the exception that 60 days absence for illness or layoff shall not disqualify an employee for vacations.

**fn** 4

See, for example, Texas Company ( **19 LA 709**) where it was held that discharge of an employee who was unable to work because of pregnancy was for "proper cause" within the meaning of the contract. Contention of the employee that employer was required to give employee leave of absence, instead of discharging her, was rejected. It was held that the contract permits the employer to grant leaves of absence at his discretion, and he refused to grant leaves of absence for pregnancy.

**Exhibit 28**

# Arbitration Decisions

## Labor Arbitration Decision, ARMCO STEEL CORP., 59 BNA LA 1058

**Labor Arbitration Decision, ARMCO STEEL CORP., 59 BNA LA 1058**

Decision of Arbitrator

In re ARMCO STEEL CORPORATION, MINE NO. 8 and UNITED MINE WORKERS OF AMERICA, DISTRICT NO. 17, LOCAL 8377

July 3, 1972

Show Summary

Appearances: For the company-Joseph Genovese, Jr., assistant labor commissioner, Kanawha Coal Operators Association. For the union-Elza Johnson, representative.

LUGAR, Arbitrator:

### BEREAVEMENT PAY

#### The Issue

Are the grievants entitled to time and one-half pay for a Saturday (including shift differentials) on which they would have worked except for a death in their family covered by the provisions of Article VII, Section (a), of the Agreement?

#### Pertinent Contract Provisions

**National Bituminous Coal Wage Agreement-1971**

ARTICLE III-HEALTH AND SAFETY, Section (f) Mine Health and Safety Committee

ARTICLE IV-WAGES AND HOURS. Section (b) Basic Work Day; Section (c) Saturday, Sunday and Premium Work; Section (e) Standard Daily Wage Rate

ARTICLE V-SHIFTS AND SHIFT DIFFERENTIALS, Section (c) Shift Differentials

**Exhibit 28**

ARTICLE VII-ALLOWANCES, Section (a) Bereavement Pay; Section (c) Jury Duty

ARTICLE VIII-HOLIDAYS, Section (d) Pay for Holidays Worked; Section (e) Pay for Holidays Not Worked

ARTICLE IX-REGULAR VACATION, Section (d) Qualifying Period and Amount of Payment

ARTICLE X-GRADUATED VACATION, Section (f) Rate of Payment

APPENDIX A-Part III

### Discussion and Decision

It is unnecessary in this case to summarize the testimony since there is no dispute as to the facts in the case. The grievant Miller's brother, also being the grievant Hash's father-in-law, died on Thursday, February 3, 1972, at 3:45 p.m. The grievants did not work on the following Friday, Saturday, and Sunday. The grievants received bereavement pay for Friday and Saturday, both days at straight time, but they seek time and one-half pay for this Saturday.

The Company raises no issue as to the grievants' not having attended the funeral nor as to the grievants' not being scheduled to work on this Saturday, apparently conceding that the grievants would have worked this day except for the death in their family. **[*1059]** Thus, the issue in the present case whether under Article VII-Allowances, Section (a), Bereavement Pay, an employee is entitled to receive premium pay for the excused Saturday shift he would have worked except for the death in his family. More narrowly stated, the issue is whether payment "at his regular rate" for any such excused shift is limited to the employee's straight time rate without any addition thereto even for premium shifts he would have worked except for such death in the family.

The Umpire has been informed of an interpretation of Article VII, Section (a) by the Acting Wage Director, UMWA, dated April 21, 1972, which reads in part as follows:

> "Some companies are interpreting 'regular rate' to mean straight time. This is an erroneous interpretation. Please point out to them that Article VIII, Section (e) regarding 'Pay for Holidays Not Worked' specifically states that 'straight time or straight rate' will be paid for holidays not worked. 'Straight time' means just that and 'regular rate' means what the employee *actually would have earned in the hours that comprise his shift.*" (Emphasis added.)

As this Umpire has heretofore stated, he cannot accept as binding a unilateral interpretation of the Agreement by either of the parties. Perhaps more importantly in the present case, the Umpire cannot accept this unilateral interpretation in that the Umpire has no authority to add to the provisions of the Agreement as does this unilateral interpretation in that it states that "regular rate" means what the employee "actually would have earned in the hours that comprise his shift." The last quoted words are not in the Agreement; accordingly, the Umpire cannot add those words in interpreting the meaning of the words "regular rate." The Umpire must determine the meaning of those words as they are written in Article VII, Section (a). The Umpire can only determine the meaning of the words at his regular rate."

In substance the Union seeks to read Article VII, Section (a), as providing that the employee shall receive pay at his regular rate "for any such excused shifts he would have worked meaning that the employee will receive pay "at the rate he would have received had he

**Exhibit 28**

worked." This language which provides for pay for "shifts he would have worked" means that this condition precedent must be satisfied before the employee is entitled to receive *any pay* for such excused shift; see this Umpire's decision in Clinchfield Coal Company, Mars Mine, and L. U. No. 1334, District No. 31, UMWA, decided February 7, 1972. In the present case the Company has conceded that the grievants *would have worked* the Saturday shift and thus there is no issue related to this matter. However, this means only that under these circumstances, the other conditions in the section having been satisfied, that an employee shall receive pay "at his regular rate" for such excused shift.

In determining what the words "at his regular rate" mean, without adding any words thereto, it is a well-established principle of contract interpretation that words shall be given their ordinary meaning in the absence of some added phrase to modify their ordinary meaning. There are no added modifying words in Article VII, Section (a). If the parties had intended to modify this language to have it include premium pay for the shifts for which an employee would have received premium pay had he worked on the excused shifts, they would have used language comparable to that which is in Article III, Section (f), which provides for payment "at their regular rate of pay (including any applicable premium rates)," as is provided in that Section for the hours spent by members of mine health and safety committees in making or participating in the designated investigation. See also Article VII, Section (c), which provides that an employee called for jury service will be reimbursed "for earnings lost" because of such jury duty. Thus, in the absence of the use of such modifying language as related to "regular rate" for excused shifts as to bereavement pay, the parties must not have intended that the concept of reimbursement be applicable to the pay provided under Article VII, Section (a).

In the absence of any such modifying language, it remains to be determined whether the words "regular rate" may have a meaning, under the ordinary meaning of these words or the meaning of these words as used in the contract, which includes premium pay for Saturday work. It is true that, as stated in the Union unilateral interpretation of Article VII, Section (a), the Agreement does in many instances speak of "straight time" rather than "regular rate" for the work performed by employees. **[*1060]** However, an examination of the instances in which the "straight time" or "straight rate" language is used does not indicate that it has a different meaning than "regular rate." See, for example, Article IV, Section (b), Section (c), and Section (e); Article V, Section (c); Article VIII, Section (d) and Section (e); Article IX, Section (d); Article X, Section (f), and Appendix A-Part III. All of these provisions treat straight time and straight rate as being synonymous. Likewise, Article IX, Section (d) refers to the employee's "day wage rate" as being his "regular rate."

In addition, the provisions of Article IV, Section (b), as well as the footnotes to Appendix A-Part III, recognize that straight time rates shall be determined by using the total daily normal shift earnings divided by the number of hours normally scheduled for the work involved in the particular classification. This clearly recognizes that the term "regular rate" as used in Article VII, Section (a) embodies the meaning generally attributed to the meaning of the words "regular rate." See the definition of "regular rate" in Roberts' Dictionary of Industrial Relations (BNA 1966), wherein these words are defined to be the basic rate of pay of the individual which is used to compute overtime pay, adding that it is established by dividing compensation received by an employee for work done in a certain period of time by the total number of hours worked during that period of time, indicating that this approximates the "straight-time rate" of the individual. See also in the same treatise the definitions of "basic rate of pay" and "overtime."

Accordingly, since the Umpire has no authority to add to or modify in any manner the terms of the contract between the parties, and he cannot find any ambiguity within the contract as to the meaning of the words "regular rate" of pay, he cannot interpret these words as meaning the "rate which the employee would have earned had he worked one of the excused shifts," especially since other provisions in the Agreement indicate that the words

**Exhibit 28**

"regular rate" are used in the same sense as "straight time" or "straight rate," except where additional words have been inserted to indicate that "regular rate" shall include any applicable premium rates. Having added these or similar words in the contract where such additional pay was to be included makes it clear to the Umpire that such premium rate additions were not to be applied to any excused shifts under the Bereavement Pay provisions. There is a well-established principle of contract interpretation known as the theory of "expressio unius est exclusio alterius," which means, as applied to the present case, that since the additional language was used as related to the contract provision at one place and was not used at another place, it was the intention of the parties that such additional language would not be applicable where it was omitted.

Although no issue as to shift differential pay for the days involved was raised by the evidence offered at the hearing, the Union in its brief states that the bereavement rate of pay should "include shift differential." On the basis of the same reasoning as set forth above, the Umpire cannot agree with this contention since Article V, Section (c), provides that shift differential shall be considered "part of the regular rate of pay in the calculation of overtime, premium rates, holidays, vacation and reporting pay." This Section does not provide that shift differential shall be considered part of the regular rate of pay in the calculation of "Bereavement Pay." Thus, the above principle of expressio unius est exclusio alterius applies and shift differentials cannot be considered part of the regular rate of pay in the calculation of "bereavement pay," since the parties named five areas in which shift differentials are to be considered part of the regular rate of pay but did not include their application in determining the regular rate of pay for bereavement pay; therefore, they must have intended that shift differentials not apply in the determination of the regular rate of pay in the calculation of bereavement pay.

### AWARD

Accordingly, for the reasons stated in this opinion, the grievance must be and is hereby denied.

**Exhibit 28**

# Arbitration Decisions

## Labor Arbitration Decision, Int'l Paper, 16/57902, 137 BNA LA 373

**Labor Arbitration Decision, Int'l Paper, 16/57902, 137 BNA LA 373**

Decision of Arbitrator

In re INTERNATIONAL PAPER [Rockford, Ill.] and LOCAL 800 IUE-CWA, INDUSTRIAL DIVISION OF COMMUNICATIONS WORKERS OF AMERICA

FMCS Case No. 16/57902

March 17, 2017

Show Summary

For the employer-Jim Robison, manager labor relations.

Joshua File (Katz, Friedman, Eagle, Eisenstein, Johnson, Bareck), attorney.

Richard A. Van Kalker, Arbitrator.

### I. Introduction

This arbitration arises pursuant to a collective bargaining agreement between International Paper, Rockford, Illinois (the "Company") and Local 800 IUE-CWA, Industrial Division of the Communication Workers of America, AFL-CIO (the "Union") with an effective date of April 15, 2014.

### II. Issue

Did the Company violate the collective bargaining agreement when it mandated that the grievants who worked their respective scheduled eight-hour shifts on Saturday work an additional four-hour shift; if so, what is the appropriate remedy?

### III. Findings of Fact

1. The Company and the Union are parties to a collective bargaining agreement, effective April 15, 2014 to April 15, 2018.

**Exhibit 28**

2. The Company manufactures corrugated boxes on various machines, several of the machines requiring and operator and an assistant operator.

3. This arbitration arises out of two consolidated grievances. The named grievants are ___. The events giving rise to the grievances occurred at the Company's facility in Rockford, Illinois, under the aforementioned collective bargaining agreement. In each of the grievances, the Company mandated that the grievants who worked their respective scheduled eight-hour shifts on Saturday, July 23, 2016, work an additional four-hour shift under the mate relief provision of the collective bargaining agreement.

4. The relevant provisions of the collective bargaining agreement provide as follows:

**Article VII**
**Hours of Work**

*Section 1*. The regular workday shall consist of eight (8) hours a day. A workday for all shifts is **[*374]** defined as the twenty-four (24) hour period commencing at 10:00 p.m. each night until 10:00 p.m. the following night. The regular workweek shall consist of forty (40) hours comprising five (5) consecutive days, Monday through Friday, inclusive. The pay week will be defined when the third shift reports for work at 10:00 p.m. on Sunday and ending at 10:00 p.m. the following Sunday. When third shift reports on Sunday it is considered the Monday shift for pay purposes. (Ref. Article XI, Overtime Section 5). The starting time and quitting time of normal shifts shall be according to published schedules established by Management with the provision that any change in the schedule of hours of work shifts shall be put into effect only after notifying the Union....

*Section 3*. When the work schedule for Saturday is less than eight (8) hours and the work is outside of an employee's shift, said work shall be on a voluntary basis.

*Section 4*. Employees shall be at their respective posts and ready to begin work at the time their pay starts and shall not leave their respective posts until pay stops. In the event that an employee is not going to be relieved at the end of the shift, the Company shall notify the out-going employee at least thirty (30) minutes prior to the end of the shift (provided the incoming employee properly notified the Company at least one (1) hour prior to the end of the shift). Reasonable accommodation shall be made by the Company to find a qualified replacement if requested. Failing to find a qualified replacement shall result in the out-going employee working up to an additional four (4) hours.

**Article XI**
**Overtime**

**Section 6.**

**Exhibit 28**

1. Overtime occurring during the period Monday through Friday that is not scheduled 24 hours in advance of the start of the shift (e.g. unexpected absences, required sorting, order required to be finished prior to machine shutdowns, etc.) will be offered to employees on that given shift as follows: (Note: In case of Mate Relief (a) is required unless a replacement is secured by (b) through (f) below.

a. The employee classified in that position on that machine (is the Mate).

b. The employee doing the job at the time.

c. The employee on that machine by line of progression.

d. The employee in the department by line of progression.

e. The highest senior employee in the plant capable of performing the job.

f. Probationary or temporary employees capable of performing the job.

2. Scheduled overtime occurring during the workweek will be *required* as follows: The employee classified in that position, on that machine will be posted and required to work unless he/she finds capable coverage as listed below. (If a job classification has more than one employee in that position, on that shift, the lowest in plant seniority in that classification will be required to work.)

a. The employee on that machine by line of progression.

b. The employee in that department by line of progression

c. The highest senior employee in the plant capable of performing the job.

3. Overtime occurring on Saturday or Sunday will be offered as follows: (The following does not apply to PM Task Team, see Section 9.)


**Progression Job:**

a. The employee classified in that position on that shift on that machine

b. The highest senior employee in that position on that machine regardless of shift capable of performing the job.

c. The highest senior employee in the plant capable of performing the job.

d. The highest senior employee on the shift in that department capable of performing the job.

e. In a progression job, employees will move up on machine on shift. The lowest senior employee available and capable of

**Exhibit 28**

performing the job will be required to work in the open positions.

**Non-Progression Job:**

a. The employee classified in that position on that shift on that machine

b. The highest senior employee in that position on that machine regardless of shift capable of performing the job.

c. The highest senior employee in the plant capable of performing the job.

d. The highest senior employee on the shift in that department capable of performing the job.

e. The lowest senior employee available and capable of performing the job will be required to work.

Overtime occurring on Saturday or Sunday that is not scheduled in advance of the start of the shift will be offered to employees using #3, a-d, above.

5. There is an established past practice whereby the Company does not force unscheduled **[*375]** overtime on Saturdays and Sundays, see testimony of Darin Davis, Dan Lantz, Mike Blackwell, Evelyn Hopkins, and Doug Nelson.

6. During the last contract negotiations by and between the Company and the Union, the parties bargained over altering certain language in Article 11, Section 6 relating to mate relief on weekends. The governing contractual language relevant to these grievances, however, remained substantially unchanged in the current collective bargaining agreement as compared to the language in the prior collective bargaining agreements.

7. On July 22, 2014, subsequent the adoption of the collective bargaining agreement by and between the Company and the Union, which is effective April 15, 2014 to April 15, 2018, the Union elected to integrate into the International Paper/USW Converting Pension and Master Labor Agreements.

### IV. Discussion

A fundamental rule of contract interpretation is that clear and unambiguous language needs be given its plain meaning. Meaning is inevitably dependent on context; a contract must be read in light of the entire agreement. *Restatement (Second) of Contracts §202* cmt. D (1981). This fundamental contract interpretation premise has been stated by Arbitrator Kelliher as follows: "[s]ections or portions cannot be isolated from the rest of the agreement and given construction independently of the purpose and agreement of the parties as evidenced by the entire document ... the meaning of each paragraph and sentence must be determined in relation to the contract as a whole." Great Lakes Dredge & Dock Co., **5 LA 409**, 410 (Kelliher, 1946). Likewise, as stated by Arbitrator Platt: "[t]he primary rule in construing a

**Exhibit 28**

written instrument is to determine ... from the instrument as a whole, the true intent of the parties. ..." Riley Stoker Corp., **7 LA 764**, 767 (Platt, 1947).

Another important rule of contract interpretation comes from the Latin phrase "*expressio unius est exclusio alterius*," meaning, "The expression of one thing is the exclusion of another." *Farnsworth, Contracts*, §7.11, at 440-471 (3d ed. 1990). "When parties list specific items, without any more general or inclusive term, they intend to exclude unlisted items." *Id.* "Contracts which expressly include some [terms] ... are thought to exclude other [terms]." See Great Atl. & Pac. Tea Co., **46 LA 372**, 374 (Schreiber, 1966).

[1] In the subject grievances, Article VII, Section 4, which establishes the Company's right to utilize mate relief, needs to be read in conjunction with Article VII, Sections 1 and 3, and Article XI, Sections 6.1 and 6.3, which restrict the Company's ability to force mandatory mate relief on Saturdays and Sundays. When read as a whole, the collective bargaining agreement does not grant the Company the right to force mandatory mate relief on Saturdays and Sundays. Article VII, Section 1, defines the workweek as "Monday through Friday, inclusive." It specifically excludes Saturday and Sunday. Article VII, Section 3, then specifies, "[w]hen the work schedule for Saturday is less than eight (8) hours and the work is outside of an employee's shift, said work shall be on a voluntary basis." Mate relief is for a maximum of four (4) hours and is outside of an employee's regular shift. Thus, according to the plain language of Article VII, Section 3, mate relief on Saturday shall be on a *voluntary* basis. Article XI, Section 6, sets forth the procedure for assigning overtime. Article XI, Section 6.1 and Article XI, Section 6.3 differentiate between overtime occurring during the workweek, Monday through Friday, and overtime occurring on Saturday and Sunday. Article XI, Section 6.3 specifically differentiates scheduled Saturday and Sunday overtime from unexpected overtime, i.e., mate relief occurring on Saturdays and Sundays. Therefore, under a fundamental approach to contract interpretation, the collective bargaining agreement does not grant to the Company a right to force mate relief on Saturdays and Sundays.

Although the Arbitrator has found that the language of the collective bargaining agreement does not grant to the Company a right to force mate relief on Saturdays and Sundays, if there was ambiguity on this issue, then the doctrine of custom and past practice would govern the current grievances. In Metal Specialty Co., **39 LA 1265**, 1269 (Volz, 1962), Arbitrator Volz provided, "It is well recognized that the contractual relationship between the parties normally consists of more than the written word. Day-to-day practices mutually accepted by the parties may attain the status of contractual rights and duties, particularly where they are not at variance with any written provision negotiated into the contract by the parties and where they are of long standing and were not changed during contract negotiations." Accordingly, if there was any ambiguity in interpreting the collective bargaining agreement with regard to mandatory mate relief on weekends, the past practice and custom between the parties would aid in interpretation. **[*376]** The Arbitrator has found that there is an established past practice that does not grant to the Company a right to force mate relief on Saturdays and Sundays.

Likewise, a party may not obtain through arbitration what it could not acquire through negotiation. U.S. Postal Serv. v. Postal Workers, **204 F.3d 523**, 530 [ **163 LRRM 2577**] (4*th* Cir. 2000). The Arbitrator has found that during the most recent collective bargaining negotiations, although the Company proposed changes relative to mate relief on Saturdays and Sundays, the parties did not agree to fundamental language revisions in Article XI, Section 6 that would grant to the Company the right to forced mate relief on Saturdays and Sundays.

[2] Finally, the Company has respectfully argued that the Union has agreed to a different mate relief policy due to the Union's election to integrate into the International Paper/USW Converting Pension and Master Labor Agreement. However, the Arbitrator finds that this argument fails. The integration letter of July 22, 2014 states on its face that the "[Union shall]

**Exhibit 28**

continue with local bargaining as in the past, but that the master labor agreement will be the 'overarching agreement.'" The International Paper Converting Master Agreement Memorandum covers the following "overarching" substantive areas: wages, active medical, retiree medical, life/disability insurance, sickness/accident insurance, pension, organizing campaigns, successorship, employment security, health/safety, and enforcement. The International Paper Converting Master Agreement Memorandum is void of any *specific* provisions relative to mate relief. Accordingly, in respect to the mate relief policy, the Master Agreement Memorandum cannot serve as "overarching" the local agreement. Addendum J, "Characteristics Imbedded in Master," to the International Paper Converting Master Agreement Memorandum has an *indistinct* reference that provides: "Standardization across IP ... Partner relief of up to four hours"; however, the Arbitrator finds that such vague reference does not control over the specific mate relief language that was bargained by and agreed to between the parties in the subject collective bargaining agreement. In the case before the Arbitrator, the Union did indeed bargain "locally" in relation to the mate relief policy. The local collective bargaining agreement between the parties hereto has specific language relating to the mate relief policy at the Rockford plant. Such locally bargained and specific language accordingly controls.

[3] In regards to the remedy for the two named grievants, the grievants are to be provided with unpaid leave of a Saturday shift of their choice provided that notice is provided to the Company by 2:00 p.m. on the preceding Wednesday.

### V. AWARD

Having heard and carefully reviewed the evidence and the argumentative materials in this case and in light of the above Discussion, the grievances are sustained; the Arbitrator finds that the Company violated the collective bargaining agreement when it mandated that the grievants who worked their respective scheduled eight-hour shifts on Saturday work an additional four-hour shift. The Arbitrator finds that in the subject collective bargaining agreement the mate relief provision is only applicable during the period of Monday through Friday.

**Exhibit 28**

# Arbitration Decisions

## Labor Arbitration Decision, CITY OF HIGHLAND PARK, 76 BNA LA 811

**Labor Arbitration Decision, CITY OF HIGHLAND PARK, 76 BNA LA 811**

Arbitration

In re CITY OF HIGHLAND PARK and AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, LOCAL 41, MICHIGAN COUNCIL 25

May 7, 1981

Show Summary

**[*812]**

Appearances: For the employer: Martin Jay Galvin and Marla Nelkin Feldman, attorneys; For the union: M. Elizabeth Bunn, attorney.

Patrick A. McDonald

**Decision of Arbitrator**

**REDUCED WORKWEEK**

**Facts**

-- The parties to this dispute are signatories to a collective bargaining contract which has been introduced into evidence. The facts, in this case, under which the dispute arose are basically without great dispute. On or about February 23, 1981 a memorandum was sent to all department heads from Mr. Sam J. Merigian, the personnel director for the employer. In that memo he indicated that effective the work week beginning March 2, 1981 certain business offices including the City Hall, the Community Development Center and the Youth Services building were to be placed on a four day work week. This memorandum was disseminated at Mr. Merigian's direction the same day, to bargaining unit employees of which there were approximately twenty, as well as to other employees and to Union President, Frank Tolson. It announced that such employees would work a Monday through Thursday work week and be paid overtime for time worked over eight hours. The employees working 9 hours a day or a 36 hour work week, would receive an additional 2 hours pay for overtime and in effect be paid for 38 hours. Employees not desiring to work overtime would not be forced to do so. That memorandum further stated that the "Normal work day is still 8 hours and has not been changed," and went on the say that:

**Exhibit 28**

> This action is being undertaken in the City's continued efforts to reduce current operating expenses in order to cope with the cutbacks of State of Michigan and City anticipated revenues. While the current program of City employee layoffs has helped in reducing the deficit impact of the cutbacks and planned revenue, additional cost saving measures must be taken in order to reduce the City's rejected deficit impact in the current fiscal year.
>
> While the above closing of business offices shall incur a savings in energy and other miscellaneous expenses it will not be enough to totally eliminate the estimated current fiscal years deficit. Other cost-saving measures may indeed be adopted in the administrations continual attempt to reduce expenses.

At the arbitration hearing City exhibits and witnesses indicated that the City anticipated a 1.3 million dollar deficit in its budget for fiscal year 1981-82. This was due to a 21% reduction in their population and a resulting state reduction of monies in the amount of $600,000. This amount was in addition to the current deficit of $532,000. For the fiscal year 1980 it was estimated that the City would have an additional deficit of $900,000. Both state laws and the city charter obligate the employer to eliminate this deficit.

Non-bargaining unit employees with the City in the City Hall, the community Development Center and Youth Services Building had been placed on a four day work week in November of 1980. The City indicated through testimony that the introduction of the four day work week as of March 2, 1981, along with applications for emergency loans, a 10% reduction in all departments and services and the sale of tax anticipation notes were all designed to help eliminate the deficit.

Growing out of that announcement, the Union on February 27, 1981, filed a class action or "policy" grievance. That grievance in relevant part read as follows:

> Nature of Grievance: Management in Violation of: Purpose & Intent, Mgt's Rights, Article 1, Article 25, Article 31, Article 49 and other parts of the 1978-81 Agreement.
>
> Statement of Fact: The City has unilaterally changed the terms of of the above mentioned Agreement through initiating a reduced work week for employees covered under the Agreement. A letter was sent to all department heads dated February 23, 1981 (attached) advising them of changes in working hours. On the 24th of February, the Union president, Mr. Frank Tolson, was summoned to the personnel office at which time he was handed an envelope which contained the attached letter. The personnel director asked if there were any questions at which time the Union responded discussion with the Union's executive board were necessary prior to any response. The proposed changes in working hours have not been negotiated with the Union.
>
> Disposition Requested: That the City of Highland Park immediately return all employees [*813] to a 40 hour work week, make any and all members whole who suffer any loss due to Management's failure to do so; and, recognize the Union as the exclusive bargaining agent.

By way of further factual background, both the Union and the Employer have had several contracts and a collective bargaining relationship for several years. The present collective bargaining agreement was executed in 1978 and expires June 30, 1981. According to the

**Exhibit 28**

terms of that contract there was a wage reopener for June 30, 1980. During such negotiations the Union had proposed an 85 cents per hour increase. The City proposals included a four day 36 hour work week. The overall pay of such employees however would not have been reduced but would have remained at what they had been receiving for forty hours a week. Thus while their hours would have been reduced, their pay would not. After a considerable number of bargaining sessions a tentative agreement was reached between the parties in early July of 1981. That agreement contained the four day work week proposal. The tentative package was rejected by the Union membership at a meeting ratification. Following such rejection both the Union and the Employer bargaining committees resumed negotiations. A second tentative settlement was reached on or about July 14, 1980. That package again presented the four day work week but with several additional features. The Michigan Employment Relations Commission conducted a mail vote on the proposal. Once again the membership rejected the package. This time the vote was 69 to 36.

Following the second rejection, the Union membership changed the composition of the bargaining committee. Following the resumption of negotiations, the parties, several weeks later, reached a third tentative agreement. This time the proposal did not contain the four day work week feature. The package was ratified and on or about August 23, 1980 that agreement was executed. A work stoppage which had commenced ended and employees returned to work.

The record further indicates that during the first week in November of 1980 Mr. Merigian, as Personnel Director for the City, discussed with Union President Albers the necessity for a meeting with the Union executive board. At a meeting held on November 7, 1980, the City requested that the Union consider converting to a four day work week in order to avoid anticipated lay offs. A discussion of City finances and other matters was held that afternoon. Approximately two weeks later on November 20, 1980 the Union executive board rejected the employer request pertaining to the four day work week. Three days later on the 23rd a special union membership meeting was called and that action ratified. Subsequently Albers, on behalf of the Union, communicated that decision to Merigian of the City.

On January 9, 1981, Frank Tolson took office as local union president. Shortly thereafter personnel director Merigian mentioned to Tolson that the Employer would again like to discuss a possible four day work week proposal. As a result on January 13, 1981, Tolson, along with the Union vice president and chief Union steward, met with Merigian and and a Mr. Boyd who represented the Mayor of the City of Highland Park. At that time a new and more stringent version of prior City proposals was presented. The City proposed a four day 32 hour work week for unit employees for a fifteen week duration. At the union request this proposal was put in writing. On January 23, 1981, at a Union membership meeting, the proposal was presented to the membership. The membership voted to "receive and file" the proposal and directed the executive board of the union to adhere to the collective bargaining contract. The results of the vote and meeting were communicated to Mr. Merigian by letter dated January 28, 1981. Shortly thereafter layoffs of employees, including those in the bargaining unit, followed.

There then followed a distribution of the written memorandum from Mr. Merigian to department heads on February 23, 1981 which announced the four day work week earlier discussed. When such four day work week was implemented the bargaining unit employees in the affected departments had been working 8 hours a day five days a week, Monday through Friday. The grievance of February 27th followed.

In addition, on March 5, 1981, the Union began suit in Wayne County Circuit Court and filed a complaint with the Michigan Employment Relations Commission (MERC). The Union sought a temporary restraining order in the Circuit Court and alleged under the MERC charge a violation of Section 10(1)(e) of the Michigan Public Employment Relations Act. The

**Exhibit 28**

parties did agree, however, to a form of expedited arbitration hearing and decision in order to resolve the contractual aspect of the dispute as soon as possible. To this end a hearing was held on April 23, 1981. Both parties were present, represented**[*814]** by legal counsel and had the full opportunity to present testimony and exhibits. They supplemented this opportunity with post-hearing briefs. This matter is now ready for a decision and award.

<div align="center">

**Relevant Contractual Language**

**Management Rights**

</div>

The Union recognizes the prerogatives of the City to operate and manage its affairs in all respects in accordance with its responsibilities and powers of authority set forth in the Charter and the Home Rule Act.

The City reserves the right to discipline and discharge for just cause. The City shall have the right to determine reasonable schedules of work and to establish the method and processes by which such work is performed, provided they do not conflict with the terms of the agreement. The union shall have the right to grieve on the interpretation and application of these provisions.

Except as specifically abridged, delegated, granted or *modified by* this agreement, or any supplementary agreements that may hereafter be made, all of the rights, powers, and authority the City had prior to the signing of this agreement are retained by the City and remain exclusively and without limitations within the rights of the City.

In the event that in interpreting this agreement, there appears to be a conflict between this agreement and any law that may be applicable to this agreement, then the applicable law shall govern.

<div align="center">

**ARTICLE 20**

**Lay-Off Defined**

</div>

(a) The word "lay-off" is to be interpreted as any reduction in the work force.

(b) If it becomes necessary for a lay-off, the following procedure will be followed. Probationary employees and all temporary provisional employees who are working in classifications subject to the jurisdiction of the Union will be laid off first. Seniority employees will be laid off according to seniority as defined in Article 14.

* * *

<div align="right">

**Exhibit 28**

</div>

## ARTICLE 25

### Maintenance of Conditions

Wages, hours and conditions of employment at the execution of this Agreement shall, except as provided and improved herein, be maintained during the term of this Agreement. Current work practices which are in effect at the execution of this Agreement shall be maintained. Changes must be mutually agreed upon by the City and the Union.

## ARTICLE 31

### Overtime

Overtime within divisions of the City shall be rotated among the regular employees of that division, and the following procedures will be followed:

The Employer will make a list for each division, section or unit, listing the classification titles normally assigned and essential to the efficient operation of the section or unit. The names of the employees, in seniority order, will then be listed under their appropriate classification title.

Overtime assignments will be made in the order listed, with each employee in the classification group and unit being given an opportunity to work overtime before the next rotation is commenced. An employee declining to accept an overtime assignment when called, unless on sick leave or vacation, will not again be called until his name comes up in the next rotation.

* * *

## ARTICLE 9

### Presenting Grievances

* * *

Step 4

* * *

(b) The arbitrator shall be restricted to a strict interpretation of the specific terms of the section of the Agreement alleged to have been violated.

* * *

Issue

**Exhibit 28**

Do the facts as presented demonstrate that the Employer violated the collective bargaining contract?

**Contentions of the Parties**

Normally your Arbitrator would summarize the contentions of the parties concerning the facts and issues in dispute. In this particular case both parties were well represented by experienced labor relations legal counsel. Both parties presented extensive post-hearing briefs which have been carefully read and examined by your arbitrator.[1] Under these circumstances, and[*815] because the parties mandated an expedited procedure so as to receive a decision and award as quickly as possible, your arbitrator feels it is in everyone's best interest not to burden this decision and award unnecessarily by including a repetition of both parties' contentions.

**Discussion and Decision**

The record in this case indicates that for all relevant periods of time prior to the implementation of the shortened or four day work week by the employer, all bargaining unit employees in the affected departments had worked a five day work week (usually Monday through Friday) at 8 hours a day. The only exception to this generally uncontradicted statement was in the City Library. In 1970, the Library went on a seven day operation and every employee was required to work one Sunday per month. However, because Sundays were compensated at double time each employee during his or her following work week was only allowed to work 32 hours. Thus, over a two week period the employees averaged 40 hours pay per week. This schedule was discontinued in 1976 because of the closing of a branch. In all of the examples cited and examined during the arbitration hearing, employees generally remained on an 8 hour a day, five day a week schedule. These were the hours and the conditions of employment when the contract had been executed and renegotiated over the past several years. This fact is important in light of Article 25 "Maintenance of Conditions" language contained in the contract. In that article both parties agreed that "changes must be mutually agreed upon by the City and the Union." This language, among other articles, was also emphasized by the Union throughout its post-hearing brief.

A reading of the labor contract indicates that the parties also agreed upon procedures to follow in the event "any reduction in the work force" becomes necessary. Such procedures are expressly set forth in Article 20 of the contract, and have been followed by the City in other layoffs.

This then is the setting by way of general background surrounding the grievance which complains of the shortened or four day work week change. Such work schedules and practices along with the two contract articles cited demonstrate a prima facie contract violation. The Employer in this case, the City of Highland Park, if it is to succeed must overcome this prima facie showing by demonstrating that it had authority as well as justification to make the changes in the scheduling of hours and work conditions.

In establishing a basis for its arguments in this case, the City of Highland Park convincingly demonstrated that the four day work week is only one of several methods currently being utilized to eliminate the City's financial deficit. Footnote 1 on page 3 of that same brief indicates that the City has already laid off numerous employees in January and February of 1981 in an attempt to decrease expenses. With such a factual background, the Employer

**Exhibit 28**

emphasizes the management rights clause and its express language relating to determining ". . . reasonable schedules of work," as justification for the present 32 hour work week. Such language, if taken apart from the total agreement, would definitely support the Employer's contention in this case. However, a primary rule in construing a written document is to determine the parties' intent not from a single word or phrase or paragraph, but from the instrument as a whole. Each paragraph must be determined in relationship to the contract as a whole. (See Great Lakes Dredge and *Dock Company,* **5 LA 409** and Riley Stoker Corporation, **7 LA 764**). In other words, a section of a contract cannot be isolated from the rest of the agreement and given free standing construction.

The Employer's argument is further weakened by the following considerations:

1. Management twice tried beginning from April 1, 1980 through the end of contract talks on a wage reopener in August to obtain express agreement to commence a four day shortened work week. Such negotiations included a strike or work stoppage.

2. Twice following the execution of the wage reopener agreement the Employer proposed a shortened or four day work week. While recommended to the membership by the local union leadership at special meetings, the membership convincingly rejected the proposed contract modification.

3. The Employer having failed to get explicit approval to implement a four day work week now emphasizes the implicit authority of the new language negotiated within the management rights clause of the collective bargaining contract.

4. The testimony of Mr. Iskander, Finance Director of the City, supports the conclusion that one means of addressing **[*816]** the financial deficit was to continue laying off seniority employees. The Employer rejected this alternative because with traditional layoffs, many of the same City expenses are involved in terms of equipment and operating costs.

5. The seniority language in the collective bargaining contract speaks in terms of express procedures regarding reduction of work force by seniority and not by reduction of hours.

The Employer skillfully argues on pages 25 and 26 of its brief that the "Management Rights" clause expressly gives the City authority to schedule hours and services. It states, "In no way could the City have expressed its right to schedule and provide services more clearly." However, that same "Management Rights" clause contains the phrase ". . . provided they do not conflict with the terms of the agreement." Simply put, this language precludes Employer conduct which is either inconsistent or in conflict with the terms of the total agreement. As aforestated, taken by itself the language of the management rights clause supplanted by recent bargaining history indicating language changes would normally warrant an arbitrator to conclude that the Employer does indeed have the right to "determine reasonable schedules of work." However, such language change did not occur in a vacuum. It occurred and was present during a period of time when management was also expressly trying to obtain the Union's approval for a shortened four day work week. Thus, the Employer argument that it implicitly gained such authority to act while not explicity or expressly being able to get such authority in a wage reopener is far from convincing.

Your arbitrator is well aware of the fact that the Employer has stressed that evidence of proposals made during negotiations is relevant only to resolve ambiguities present in an existing contract. Such evidence is not material where the contract contains nothing relating specifically to the subject matter of the controversy. The Employer cites several cases for this proposition. As has been stated many times, perhaps no function in labor management relations is more important for an arbitrator than that of interpreting a collective bargaining agreement. I agree with the Employer that if words are plain and clear and convey a distinct idea, then there is no need to resort to technical rules of interpretation. Such rules, of course, have logic inherent in them and are utilized when the meaning is not ascertainable

**Exhibit 28**

by an arbitrator. A contract is not ambiguous if an arbitrator can determine its meaning from a general knowledge of the facts of the situation. Language, however, is considered ambiguous if plausible contentions can be made for conflicting interpretations. (See Elkouri and Elkouri, How Arbitration Works, page 296).

In this particular case several articles of the contract appear to be ambiguous or at least provide plausible contradictory arguments. Under these circumstances, your arbitrator is fully justified in examining the bargaining history of the parties as well as the practices and customs of the parties under the contract.

The City also maintains that should it continue laying off employees, it does jeopardize essential services to the community. If it is claiming that it is now at the point where it may not lay off anymore employees without being in violation of its City Charter one must question how it rationalizes operations over a four day work week in comparison to a five day work week. Under either practice the City suffers reduced services. The trade off appears to be one between coverage in a fuller sense for four days as opposed to coverage in a thinner sense over five days using the same personnel.[2]

On page 42 of its brief, the Employer argues that it was not obligated to negotiate any changes of schedule with the Union inasmuch as hours of work had never been mutually agreed to or expressly mentioned in the contract. However, as was earlier mentioned, the City has utilized a Monday through Friday, 8 hour day, five day work week for at least the past decade. While it has changed schedules and working hours for union employees, it has always provided forty hours of work. Thus, the City argument is less convincing in light of this past practice, the limitations expressed in the management rights clause and the most recent bargaining history pertaining to changes in the contract. Moreover, the contract expressly provides procedures to be followed if there is to be a reduction of the work force. (Article 20).[3] Certainly a [*817] very convincing argument can be made that what has occurred is a reduction in work force and that the procedures of Article 20 are to be followed. Under these conditions, the FMC Corp. decision of Arbitrator Mittenthal would support the Union argument in this case rather than undercutting it.

In making a decision in this case, I have attempted to ascertain in good faith, whether there has been compliance with the agreement or whether the actions of the Employer violate the contract. As aforementioned, I make no judgment pertaining to the wisdom or the equity of the four day work week in this case. Moreover, this decision is not meant to restrict the Employer in utilizing other methods to balance its budget and eliminate its deficit. I do, however, conclude that the actions of the Employer do amount to a violation of both Articles 20 and 25 of the collective bargaining contract. In light of the circumstances surrounding negotiations and past practice, the management rights clause does not provide sufficient authority to implicitly give the City the power to change the work week of bargaining unit employees or to reduce the hours of the work force without regard to seniority.

## AWARD

The grievance is sustained. The Employer shall cease and desist from *enforcing* the four day work week as described in the memorandum disseminated to employees and supervisors on February 23, 1981. It shall make the grievants whole for any loss of pay or contractual benefit suffered as a result of this contract violation.[4]

The Union's request for interest and attorneys fees are denied.

fn 1

**Exhibit 28**

Both counsel are to be congratulated on the quality of such briefs prepared under extensive time pressures.

**fn** 2

Your arbitrator makes no value judgments pertaining to the wisdom of having a four day versus a five day work week. Certainly such a scheduling has an appeal, causes less dislocation, and would appear to provide some savings as well as definite advantages, such as a three day weekend.

**fn** 3

See Board of Governors of Wayne State University and UAW Local 179 and 2071, Howard Cole, Arbitrator, February 23, 1981.

**fn** 4

Obviously, as recognized by the Union, one obvious alternative to the four day work week would be layoffs. The record is not presently sufficient to demonstrate which of the grievants would have been laid off. Those grievants who would have been laid off are not entitled to back pay or benefits. Your arbitrator will continue jurisdiction for this limited purpose in the event the parties are unable to agree.

**Exhibit 28**

Case 4:25-cv-00090-RG  Document 137-3  Filed 06/25/26  Page 147 of 417

# Arbitration Decisions

## Labor Arbitration Decision, ASSOCIATED FUR MFG., INC., 85 BNA LA 810

**Labor Arbitration Decision, ASSOCIATED FUR MFG., INC., 85 BNA LA 810**

Arbitration

In re ASSOCIATED FUR MANUFACTURERS, INC., JERRY SORBARA FURS, INC. and FURRIERS JOINT COUNCIL OF NEW YORK

Case No. A9801

October 7, 1985

Show Summary

**[*811]**

Jay Kramer

**Decision of Arbitrator**

**NON-UNION CONTRACTOR**

-- Article XV, Section 1 of the Collective Agreement provides in pertinent part that:

> No employer shall share any loft or other premises, whether as sublessor, sub-or co-tenant, or otherwise, with any other person or firm engaged in the manufacture, production, jobbing, or retailing of fur garments and/or processing of skins for use in such manufacture, production, jobbing, or retailing, or with a designer, unless such person or firm is in contractual relationship with the Union.

The firm leases space on 2 floors of 150 West 30th Street, namely the 15th and 9th floors. The 9th floor space had been occupied by a contractor who was a sub-lessor, sub-or co-tenant, who had a "contractual relationship with the Union". That contractor, Katsanevas, relinquished the premises which are currently occupied by a non-Union contractor, one George Kokkaliaris who is mostly, if not fully, engaged in manufacturing mink garments for Sorbara.

The Furriers Joint Council requests appropriate relief, asserting violation of Article XV, Section 1. Associated Fur Manufacturers, Inc. emphasizing the word "share", contends that the Union's complaint lacks merit primarily because the space occupied by the non-Union contractor is not contiguous to the firm's space, and thus, it says, there is no sharing as it

**Exhibit 28**

understands that word. [1] Further, since Sorbara has the "master lease", Associated, on behalf of its member, contends that the "landlord-tenant" relationship which arises must be given great weight and credence and that "free enterprise" could somehow be unfairly severely impacted by an Award adverse to its contentions.

Associated arguments, however ingenious, must be rejected. A collective bargaining agreement is not a painting in still life. It is a document which tries to portray a living-together relationship of 2 parties who are interested in "mutual survival". Thus, in accord with the National Labor Policy, this collective agreement seeks to outlaw certain evil practices which have long plagued the "needle trades". Comparison is appropriate to Section **8(b)(4)** of the National Labor Relations Act which permits, in the apparel and garment industry, an employer and a union to agree that work to be done on the goods or on the premises of a jobber or manufacturer, or work that is part of "an integrated process of production" can be subcontracted only to an employer who has an agreement with the union. This "exception" unlike the one available to the construction industry, allows a labor organization in the garment industry not only to seek to obtain, but also to enforce, such a restriction on subcontracting.

In this industry it is not uncommon for a firm to be the master lessor of space which is not contiguous. To infer that "touching proximity" is a necessary precondition for the application of Article XV, Section 1 is, I hold, to put a wholly unnatural premium upon excessive technicality and to ignore the manifest intent of the contract's restrictions.

Accord, see my holdings as the Industry Impartial Chairman in Feiger & Scharf, Case Nos. 6809 etc (October 1979) ("destructive threats to the continuing existence and well-being of the industry cannot be permittted"); Sharfstein & Feigen, Inc. Case No. 11005, (September 1976); Hilltop Furs Ltd, Case No. 5951, (emphasizing "the policy instinct in this collective bargaining agreement of prohibiting such relationships and the clear evils which flow therefrom"); H. Maurer & Son, Inc., Case No. 24119, December 1977, (refusing to permit a "real estate obligation" to excuse "the obligations" of the collective bargaining agreement, terming such real estate devices "easy methods to evade" collective obligations,); K.J. Schwartzbaum, Case No. 7200, December 1979, (holding that the "intent and spirit" of the agreement was underminded by a non-union tenant arrangement); Sharfstein & Feigen, Case No. A13764, October 1980,**[*812]** (directing that the firm evict the tenants); and Ben Kaufman Furs, Inc., Case No. A25371, August, 1981.

Quite apart from these precedents, this firm is under a continuing injunction (See Jerry Sorbara, Inc. Case No. A14756, February, 1981) based upon Mr. Sorbara's explicit representations and promises that in the future, he "will work with Union shops which will do his remodeling and manufacturing". As indicated above, the current contractor who does Sorbara's manufacturing as his sub-tenant or sub-lessee is non-Union.

I have written here in somewhat greater length than usual because this case illustrates the emergence of a device which if not stopped at once could easily rise to a flood of similar efforts to circumvent easily and evade the purpose, intent, spirit and indeed the words of the collective agreement in this industry which is "indigenous and needful for the economic health of New York" (Hilltop Furs, Inc. Case No. A5951, November 1977). To be perfectly clear, this opinion holds that the prohibition in Article XV, Section 1, applies equally to a "user" of premises which are contiguous, and also to that "use" which is not in "close proximity".

**AWARD**

# Exhibit 28

As and for a remedy in this matter it is directed that the firm evict within 30 days its non-Union sublessee or sub-tenant or holder-user of its 9th floor premises, or failing that that it itself give up within 30 days all its space held under its lease arrangements in the affected building. Further remedial provisions will await the event, ie if non-compliance occurs. If the user of the 9th floor premises enters into a lawful contractual relationship with the Union, the requirements of the adjudication will self destruct.

So ordered.

---

**fn** 1

The dictionary definitions of the word "share" are not so restrictive.

**Exhibit 28**

# Arbitration Decisions

## Labor Arbitration Decision, SCHALMONT CENTRAL SCHOOL DIST., 87 BNA LA 151

**Labor Arbitration Decision, SCHALMONT CENTRAL SCHOOL DIST., 87 BNA LA 151**

Arbitration

In re SCHALMONT CENTRAL SCHOOL DISTRICT and SCHALMONT NON-INSTRUCTIONAL EMPLOYEES ASSOCIATION

Case No. A-85-326

May 26, 1986

Show Summary

Appearances: For the employer: James Bonaquist, attorney. For the union: Rex Trobridge.

William A. Babiskin

**Decision of Arbitrator**

**PRORATION**

**Arbitrator: William A. Babiskin**

-- At the hearing in Albany, New York, the parties stipulated to submit the following issue to arbitration by me.

"Did the District violate Article XV, Section 3 of the Agreement by prorating Grievant's accumulated sick leave? If so, what shall the remedy be?" [1]

At issue is the propriety of the District's method of computing paid sick leave under the contract. The Union contends the District violated Article XV(3), the text of which is annexed as "Appendix A."

After careful and thorough review of all of the testimony and documentary evidence, including resolution of conflicts in testimony by the credibility of witnesses, I find the following relevant facts.

Grievant, Clarissa Biancosino, is presently employed as a Matron by the District. Grievant's skill and competence are not at issue. By all accounts she is considered an excellent employee.

**Exhibit 28**

Prior to October 3, 1983, grievant worked as a Food Service Helper. She worked three (3) hours a day. On or about October 3, 1983, she took a Matron's position with the District. The Matron works an eight (8) hour day. At the time of the job change, Ms. Biancosino[*152] had accumulated 44.5 "days" of sick leave. When grievant took the new job, the District "pro-rated" the sick leave converting the accumulation into eight (8) hour "days." (44.5 X 3 hours/8 hours = 17 "days")

The Union argues the contract is clear. "Days" means "days." There is nothing in the contract that authorized or permitted the District to pro-rate the leave. It points to a salary notice sent to grievant where it states "Bus drivers and Bus Aide leave time is calculated in hours, all others are in days" in support of its position here. (dated September 14, 1984) [2]

The Union argues that grievant should have carried 44.5 days of accumulated sick leave to the new job, instead of the 17 she was credited with. For its remedy, it seeks restoration of 27.5 days to grievant's sick leave accruals.

The District denies violating the contract and contends its actions were in all respects reasonable and proper. It argues that its computation is supported by the contract language, common sense, and past practice. It points to situations where sick time was pro-rated in the manner challenged here. It requests the grievance be denied.

Contracts are to be given a reasonable construction, so as to avoid harsh, illogical, or absurd results. See ex. *Euclid Electric & Mfg. Co.,* **45 LA 641**, 643; Inspiration Consolidated Cooper, **50 LA 58**, 62; Evening News Ass'n, **50 LA 239**, 245; Goodyear Tire & Rubber Co., **2 LA 367**, 370 ("Contracts are not to be construed to produce absurdities")

The purpose of paid sick leave is to hold employees harmless in cases where they are absent from work due to legitimate illness. [3] (See Article XV(3)(a) and (d)) The employees covered under this contract work a variety of jobs and different work schedules. They have varying work "days." The clericals work a 7 hour "day." The matrons work an 8 hour "day." The nurses normally work a 6 1/2 hour "day." (See Article III(E))

"Days" within the meaning of Article XV(3)(b) clearly means "work days." To hold otherwise would lead to the anomalous and nonsensical result where part-timers would earn more sick leave than full time employees. I decline to do so.

In *Rockwell Spring & Axle,* **23 LA 481**, 486, Arbitrator Dworkin stated:

> "(I)t is an established rule of construction that where one interpretation of the language of the contract would lead to an absurd result, while an alternative interpretation would lead to a just and reasonable result, the latter interpretation will be used."

A similar conclusion is warranted here. The District did not violate Article XV(3). The grievance is denied.

By reason of the foregoing, I issue the following

**AWARD**

The District did not violate Article XV(3) of the contract when it pro-rated Grievant's accumulated sick leave. The grievance is denied.

**Exhibit 28**

**APPENDIX A**

**ARTICLE XV SECTION 3**

3. Sick Leave

a. Sick leave shall be defined as leave with pay due to personal illness or illness of persons in the employee's immediate family or household.

b. All employees working on a 12-month basis will be allowed 18 days of paid sick leave each year. All employees working on a 10-month basis will be allowed 15 days of paid sick leave each year.

c. Employees with 10 months or more of service at the beginning of the school year will be credited with their annual amount of sick leave at the beginning of the school year; if an employee leaves before the end of the year, he will be charged for all used sick leave not earned. First year employees shall earn sick leave at the rate of 1.5 days per month of service completed.

d. Sick leave may be used only for personal illness or illness of persons in the employee's immediate family or household.

e. Sick leave, not used before the end of the year, may be accumulated without limit.

f. At the commencement of the school year, each employee will be advised of the number of days sick leave standing to his credit.

---

**fn** 1

The District raised the threshold issue of timeliness. There is no merit to the argument. Neither grievant nor the Union was aware of the District's calculation method challenged here. Once it was discovered, a grievance was promptly filed. The grievance is timely.

**fn** 2

The parties stipulated that drivers and bus aides have historically been treated differently than other unit employees. There is no dispute about the computation of leave for those employees.

**fn** 3

"Paid sick leave" is generally defined as "a provision in an agreement or company policy which permits employees to take leave without loss of seniority or employment rights, and with pay, for periods of illness." Roberts' Dictionary of Industial Relations, p. 389.

**Exhibit 28**

# Arbitration Decisions

## Labor Arbitration Decision, CHARLEY BROTHERS CO., 84 BNA LA 655

**Labor Arbitration Decision, CHARLEY BROTHERS CO., 84 BNA LA 655**

Arbitration

In re CHARLEY BROTHERS CO. and INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, LOCAL 30

FMCS Case No. 84K/10337

March 1, 1985

Show Summary

Appearances: For the company: J. Mack, III, attorney; W. Washabu, director of distribution; R. Woodward, perishable warehouse manager; N. Kostra, dry grocery warehouse manager. For the union: S. J. Pasquarelli, attorney; G. Meneghini, business representative; M. W. Shumar, chief steward.

Paul F. Probst

### Decision of Arbitrator

### SATURDAY OVERTIME

### Grievance and Question to be Resolved

On December 8, 1983 the following grievance was filed:

> On Nov. 29, 1983, I was issued a five day suspension from Nov. 30, 1983 through Dec. 6, 1983. During this time, on Sat. Dec. 3, overtime, not a regularly scheduled day, was offered to employees with less seniority. The company policy indicates that a suspension period only pertains to the regularly scheduled work days, as my suspension notice was written. So I feel that the overtime on Dec. 3, that was not offered to me with a violation, under our current contract, Article VII, Paragraph 7.17 and ask to be compensated for the 8 hours at one and half times the hourly rate. (sic)

The question to be resolved is whether or not the Grievant and others similarly situated were eligible to be called for a Saturday overtime assignment when under suspension.

**Exhibit 28**

**Cited Portions of the Agreement**

The following provision of the Agreement and the Charley Brothers Company Absentee Program for Warehouse Employees were cited:

\* \* \*

### ARTICLE VI -- Classifications, Hours and Rates of Pay

\* \* \*

6.3 The Employer shall establish weekly work schedules of five (5) consecutive days of eight (8) hours each. This weekly schedule shall be Monday through Friday, and another may be Tuesday through Saturday. No regular employee hired prior to February 1, 1978 shall be required to work a Tuesday through Saturday schedule unless such employee elects to do so. Only employees hired after February 1, 1983 may be assigned any other schedule than those set forth herein, subject only to seniority provisions of this Agreement.

6.4 All regular employees shall be guaranteed forty (40) hours of work per week provided that such employee reports for work for his scheduled weekly workdays. If any employee does not report as scheduled during his scheduled weekly workweek, then the forty (40) hour weekly workweek guarantee shall not apply.

\* \* \*

6.22 Call-in overtime, being overtime worked per location on other than the regularly scheduled workday, shall be assigned to employees working at that location in accordance with their Company seniority, subject to the ability of the employee to perform the particular job. Locations are defined as: Dry Grocery Warehouse (including Youngwood and excluding Repack), General Merchandise, Perishable Warehouse, and Repack.

6.23 Daily overtime, being overtime worked before and after their normal daily schedule of hours, shall be assigned to employees working on that shift in accordance with their Company seniority, subject to the ability of the employee to perform the particular job. An employee scheduled for overtime on another shift shall not replace an employee working on a bid job in any capacity.

\* \* \*

### ARTICLE VII -- Seniority

\* \* \*

**Exhibit 28**

7.6 Any employee awarded a bid who has not previously held such classification shall receive a fifteen (15) day worked trial period. The employee must serve the full fifteen (15) day worked trial period and may not request removal prior to the fifteenth (15th) day worked. The employee must also, on the fifteenth (15th) day worked, inform his supervisor if he wishes to remain in said bid. Failure to do so will be recognized as formal acceptance of the position. On the other hand, the Company may, at its choosing, and prior to the completion of the fifteen (15) day worked trial period, return the employee to the last position held prior to acceptance of this bid.

* * *[*656]

7.10 Schedules may be moved up to two (2) hours during the length of the present contract before having to rebid. However, it is agreed the present starting time of 9:00 p.m. on Sunday night for third shift Greensburg and New Stanton cannot be moved any further back into Sunday. The Company will give a minimum of one (1) week's notice before making schedule changes. All jobs awarded will be posted for fourteen (14) consecutive calendar days.

* * *

7.17 Company seniority shall prevail for the purpose of bidding, vacation selection, and assignment of daily and overtime work.

### ARTICLE VIII -- Holidays

8.1 Regular employees who have completed their probationary period shall be entitled to the following holidays, provided they are otherwise eligible as in hereinafter provided:

Christmas Day

New Year's Day

Memorial Day

Thanksgiving Day

July 4th

Labor Day

Employee's Birthday

Three (3) additional holidays, to be known as "personal days", shall be granted to regular employees. At least one (1) such personal day shall be taken in the first (1st) six (6) months of the calendar year, unless changed by mutual agreement. Employees must give one (1) week's notice of their intention to take a personal day, unless changed by mutual agreement. No more than three (3) employees per shift (two (2) in Repack) shall take their personal day in any workweek. Any personal days not taken by the end of the calendar year, except the personal day required to be taken in the first (1st)

**Exhibit 28**

six (6) months of the calendar year, shall be paid for at the applicable rate of pay.

8.2 In order to be eligible for the above mentioned holidays, an employee must work his last scheduled workday prior to the holiday and his first scheduled workday after the holiday. If the employee is absent on either the last scheduled workday prior to the holiday or the first scheduled workday after the holiday and such absence is covered by a paid sick day or a personal holiday, then such employee shall be eligible for the holiday pay. A personal day and a paid sick day cannot be usd in conjunction to gain holiday pay.

A. Employees who are late on a day required as an eligibility day for a holiday will lose their holiday pay unless excused by management. Management's decision as to whether to excuse or not such lateness shall be reasonable and shall not be arbitrary or capricious. The decision will take into account all factors, including past lateness record, weather, amount of lateness that day, the reason given for the lateness, and any other relevant factors.

B. Employees leaving work before completing their normal scheduled workday for verifiable personal or family emergencies, as determined by the Company, on a day required as an eligibility day for holiday pay could qualify for holiday pay.

* * *

*I. FLAGRANT UNEXCUSED ABSENCE*

A. An employee leaves work without permission.

*Penalties* -- 1. First offense; written warning to remain in effect for 12 months from date of occurrence.

2. Second offense; 14 calendar day suspension to remain in effect for 36 months from date of second occurrence.

3. Third offense within 36 months from date of second occurrence will result in discharge.

B. Employer takes off work without permission (No Call No Show) during scheduled shifts including scheduled overtime. Failure to report off properly will be included in this subparagraph. Notification of inability to report for work must, whenever possible, be received prior to the start of the scheduled work day. Notification must be given directly to a supervisor and the reason for absence must be clearly stated.

*Penalties* -- 1. First offense; written warning to remain in effect for 12 months from date of occurrence.

2. Second offense, 7 calendar day suspension to remain in effect for 24 months from date of second occurrence.

3. Third offense within 24 months from date of second occurrence will result in discharge.

**Exhibit 28**

C. Employee utilizes excuse of being sick to take personal time off.

*Penalties* -- 1. First occurrence; 3 scheduled work day suspension.

2. Second occurrence within 12 months from date of first incident; discharge.

* * *

II. *Absence Because of Chronic Illness or Need to Care For Member Of Employees Family On A Frequent Basis*

* * *

*B. Penalties (Treatment)*

* * *

2. However, where a chronic absentee has lost 25 days of work in any 12 month period for the same reason after his initial return to work from the event causing his first absence under this paragraph, the employee will be given a 2 week leave of absence without pay to attempt to arrange more suitable employment. If the employee returns from the leave, he/she will have 3 months to demonstrate that he/she can be counted on to come to work regularly.

A rare absence will not result in his/her discharge. However, a continuation of a chronic pattern, even though less than at the rate of 25 days on a 12 months basis, will result in the employee's discharge.

III. *OTHER ABSENCES*

* * *

C. *Certain Other Verified Medical Absences*

Absences of 4 or more consecutive scheduled work days due to medical or dental reasons, not qualifying for payment under the Sick and Accident portion of our Health and Welfare Benefit Program, or not qualifying as a paid sick day under the labor agreement, but supported by proof from the treating physician or dentist will be dealt with as follows:

1. The first such absence of 4 or more consecutive scheduled work days will result in a verbal warning.

2. The second such absence of 4 or more consecutive scheduled work days occurring within 12 months of the commencement of [*657] absence descibed in C-1 above will result in a written warning.

3. The third such absence of 4 or more consecutive scheduled work days occurring within 12 months of the commencement of the absence described in C-1 will result in a three working day suspension.

4. The fourth such absence of 4 or more consecutive scheduled work days occurring within 12 months of the commencement of

**Exhibit 28**

the absence described in C-1 above will result in a 14 calendar day suspension.

5. The fifth such absence of 4 or more consecutive scheduled work days occurring within 12 months of the commencement of the absence described in C-1 will result in discharge.

* * *

E. *Penalty Hours -- Amount of Discipline*

1. After an employee's grace days have been exhausted, missed work hours in this category shall be accumulated and result in discipline as follows within a calendar year:

18 hours lost time in calendar year=Verbal warning

35 hours lost time in calendar year=Written warning

52 hours lost time in calendar year=1 scheduled work day suspension

68 hours lost time in calendar year= *3 scheduled* work day suspension

80 hours lost time in calendar year= *5 scheduled* work day suspension

96 hours lost time in calendar year=Discharge

2. As of January 1 of each year, an employee's "hours lost" record shall be reduced to zero.

3. For the year 1981 lost hours will be computed as of June 1, 1981 (Emphasis added.)

* * *

**Factual Background**

The basic facts giving rise to the matter and subsequent appeal to arbitration were stipulated by the Parties.

Charley Brothers Company, hereinafter the Company, operates a wholesale grocery distribution business and operates a number of grocery warehouses and delivery facilities in the area of Greensburg, Pennsylvania. Warehouse employees are now and have been since 1981 represented exclusively for purposes of collective bargaining by the Teamsters, Chauffeurs, Warehousemen and Helpers, Local Union No. 30, hereinafter the Union.

The Company and the Union have entered into a Collective Bargaining Agreement and an Absentee Program for Warehouse Employees.

The Grievant, classified as a Warehouseman, worked a regular schedule and Saturday was not a regular work day. The Grievant was suspended in November and December of 1983 for violation of provisions of the Absentee Program, Section 111-E-1 for a period of five scheduled work days commencing Wednesday, November 30, 1983 and ending Tuesday, December 6, 1983. On December 3, 1983 overtime was made available to employes in

**Exhibit 28**

keeping with applicable terms of the Agreement and the Grievant would ordinarily have been eligible for assignment. The Parties essentially agree that had he not been under suspension, the Grievant would have been offered overtime.

The Grievant was not offered the overtime and perceiving this denial to be unjust, grieved the action. Recourse to contractually mandated remedies failed to resolve the matter and it was appealed to arbitration hereunder.

## Contentions of the Parties

*Union Contentions*: The Union's primary contention is that the language of the Absentee Program, originally promulgated by the Company, allows for the interpretation put forward by the Grievant. "Scheduled work days", "calendar days", "days", "regularly scheduled work days" and other terms have distinct meaning and are not employed interchangeably. As a result, it avers, when the Grievant was suspended for five working days his suspension was calculated to cover only days he was regularly scheduled to work, and that the Grievant was indisputably not suspended for other days in the interim period. The conclusion, it submits, therefore, is clear -- the Grievant would have been able to respond to the overtime call had it come; that it was not offered was a violation of overtime rules as these are set forth in the collective bargaining Agreement. Any other interpretation would establish that the Grievant had really been suspended for six working days -- five that were mandated by the Absentee Program and a sixth, the Saturday for which he should have received the overtime call.

The Union argues any other interpretation of the language forces an unacceptable result on the Grievant -- one that is antithetical to the plain meaning of explicitedly selected language. As the Absentee Program was initially propounded by the Company, any ambiguity in impact of the language adopted by the proponent must be interpreted against the fashioner of the language.

*Company Contentions*: The Company contends that the Grievant was not eligible to be called for overtime on December 3, 1983 based on the fact that he was under a five workday suspension.

In response to the Union's contention that the Grievant was suspended only for scheduled work days and not suspended for the intervening Saturday and Sunday, therefore rendering him eligible for the overtime call, it**[*658]** emphatically asserts that the words of the Agreement could not mean what the Union contends. It argues that to yield the result advanced by the Union is patently absurd and that the concepts of contract interpretation and construction demand that a meaning be found that constitutes reason and avoids absurdities. Further, the Company claims that past practice would not permit such a result and that past practice had been reduced to writing through the process of negotiation. Had the issue evolved in the course of negotiation as the Union presently identifies the issue, a dispute would certainly have ensued. As no dispute occurred, the Company argues that until now no such issue existed. Finally, the Company points to the language of the Absentee Program and the internal inconsistency that would prevail if the Union's interpretation was accepted.

## Discussion and Findings

The facts giving rise to the dispute are not in contention. The language contained in the Absentee Program and of the Agreement also appear clear. The difficulty is presented by the juxtaposition of the literal meaning of the language presented and the probable intent

**Exhibit 28**

of the negotiators in adopting language to provide an effective and rational disciplinary program. The undersigned must establish the appropriate meaning consistent with the language which avoids an obviously absurd result.

The Company contends at the outset that the language involved could not express what the Union claims it means. Basically, it expresses bewilderment in failing to be apprised of this novel interpretation of the Absentee Program until finding of the instant grievances. When negotiations were conducted, this interpretation never surfaced. If it had, the Company claims, a dispute would have arisen inasmuch as the result advanced by the Union is so patently absurd that it could not have been adopted without substantial objection.

These arguments are not dispositive, but contribute a backdrop against which to consider the elements of the dispute.

Analysis of the evidence establishes that the suspension procedure was altered at the request of the Union steward. It is apparent that past practice was to initiate suspensions on the first day of the work week. The steward requested that suspensions take effect immediately. This gave rise to the potential of the weekend's falling in the middle of the employee's suspension period. This circumstances permitted the anomalous result occurring in the instant dispute. The past practice of the Company in administering the Absentee Program caused the suspended employee assessed a five work day suspension to serve five consecutive days as a disciplinary measure. It would appear that this result was fairly representative of the intent of the Parties.

At the same time it is observed that there is no contention that the suspended employes were to be forced to serve their suspensions over the weekend. When weekends bracketed the suspension period, no intention that the employe would not receive or could not answer an overtime call can be discovered. Five working days meant five days from Monday through Friday.

Now that the Union's request that all suspensions be served immediately was acquiesced in, the weekend issue has undoubtedly created a problem. For the first time it would be conceivable that the disciplined employe could be afforded the opportunity to work overtime right in the middle of serving a five day suspension. This being the case, he would be able to substantially erode the financial penalty imposed. By receiving time and one-half for a twelve hour overtime assignment (a not unusual circumstance), the penalty of forty hours pay would be diminished by eighteen hours or some forty-five percent. This is unlikely to have been the intent of or jointly acceptable to negotiators.

The instructive literature suggests that it is appropriate to examine past practice to clarify the intent of ambiguous language:

> "One of the most important standards used by arbitrators in the interpretation of ambiguous contract language is the custom or past practice of the parties. Indeed, use of past practice to give meaning to ambiguous contract language is so common that no citation of authority is necessary."

*Elkouri and Elkouri How Arbitration Works*, page 406

Additionally, the Company points out, it is a well established principle of contract construction that language should not be interpreted in such a way as to render harsh, absurd or nonsensical results. It is at one apparent that such is the case here.

To the undersigned, permitting suspended employee is mitigate the financial penalties assessed against them by working an overtime assignment in the midst of a five day suspension renders an absurd and nonsensical result. The interpretation that the Union

**Exhibit 28**

seeks yields exactly that. For this reason, the grievance must be denied. When an employe is given a five work [*659] day suspension he should obviously not be eligible for overtime until the disciplinary suspension is served. The problem could, of course, be eliminated by having all such suspension revert to the prior practice of commencing on a Monday and ending on a Friday. If the Union continues to desire to have suspensions commence immediately, it must also accept the fact that the disciplinary impact must not be reduced, mitigated or in any sense eroded by the payment of overtime compensation.

**AWARD**

The grievance is denied on the basis set forth hereinabove.

**Exhibit 28**

# Michigan Law Review

Volume 59 | Issue 7

1961

# Past Practice and the Administration of Collective Bargaining Agreements

Richard Mittenthal
*Member, Michigan and New York Bars*

Follow this and additional works at: https://repository.law.umich.edu/mlr

 Part of the Contracts Commons, and the Labor and Employment Law Commons

## Recommended Citation

Richard Mittenthal, *Past Practice and the Administration of Collective Bargaining Agreements*, 59 Mich. L. Rev. 1017 (2020).
Available at: https://repository.law.umich.edu/mlr/vol59/iss7/3

This Article is brought to you for free and open access by the Michigan Law Review at University of Michigan Law School Scholarship Repository. It has been accepted for inclusion in Michigan Law Review by an authorized editor of University of Michigan Law School Scholarship Repository. For more information, please contact mlaw.repository@umich.edu.

**Exhibit 28**

Case 4:24-cv-00090-RG Document 37-3 Filed 06/25/26 Page 163 of 417

# PAST PRACTICE AND THE ADMINISTRATION OF COLLECTIVE BARGAINING AGREEMENTS†

*Richard Mittenthal\**

IN a recent United States Supreme Court decision, Mr. Justice Douglas, speaking for the majority, stated that "the labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it."[1]  When compared to actual management-union experiences in contract administration, this dictum seems unduly broad.  It may be premature as well, for no coherent "rationale of grievance arbitration" has yet been developed.[2]  If such a rationale is to be achieved, far more work must be done in identifying and analyzing the standards which serve to shape arbitral opinions.  The purpose of this paper is to examine in depth one of the more important standards upon which so many of our decisions are based—past practice.  Custom and practice profoundly influence every area of human activity.  Protocol guides the relations between states; etiquette affects an individual's social behavior; habit governs most of our daily actions; and mores help to determine our laws.  It is hardly surprising, therefore, to find that past practice in an industrial plant plays a significant role in the administration of the collective agreement.

Past practice is one of the most useful and hence one of the most commonly used aids in resolving grievance disputes.  It can help the arbitrator in a variety of ways in interpreting the agreement.  It may be used to clarify what is ambiguous, to give substance to what is general, and perhaps even to modify or amend what is seemingly unambiguous.  It may also, apart from any basis in the agreement, be used to establish a separate, enforceable condition of employment.  I have explored each of these functions of past practice in some detail.  And I have sought to describe the nature of a practice as well—that is, its principal characteristics, its duration, and so on.

---

† This paper was delivered at the fourteenth annual meeting of the National Academy of Arbitrators.  The proceedings of that meeting, including this paper, will be published in their entirety by the Bureau of National Affairs, Washington, D.C., later this year.

\* Member, Michigan and New York Bars. — Ed.

[1] United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 581-82 (1960).

[2] See Cox, *Reflections Upon Labor Arbitration in the Light of the Lincoln Mills Case*, NATIONAL ACADEMY OF ARBITRATORS, ARBITRATION AND THE LAW 24, 26 (BNA 1959).

**Exhibit 28**

Case 2:54-cv-00090-RG   Document 37-3   Filed 07/06/25   Page 164 of 417

## I. THE NATURE OF A PRACTICE

The facts in a case may be readily ascertainable but the arbitrator then must determine what their significance is, whether they add up to a practice, and if so, what that practice is. These questions confront us whenever the parties base their argument on a claimed practice. They cannot be answered by generalization. For a practice is ordinarily the unique product of a particular plant's history and tradition, a particular group of employees and supervisors, and a particular set of circumstances which made it viable in the first place. Thus, in deciding the threshold question of whether a practice exists, we must look to the plant setting rather than to theories of contract administration.

Although the conception of what constitutes a practice differs from one employer to another and from one union to another, there are certain characteristics which typify most practices. These characteristics have been noted in many arbitration decisions.[3] For example, in the steel industry, Sylvester Garrett has lucidly defined a practice in these words:

> "A custom or practice is not something which arises simply because a given course of conduct has been pursued by Management or the employees on one or more occasions. A custom or a practice is a usage evolved by men as a normal reaction to a recurring type situation. It must be shown to be the *accepted* course of conduct characteristically repeated in response to the given set of underlying circumstances. This is not to say that the course of conduct must be *accepted* in the sense of both parties having agreed to it, but rather that it must be *accepted* in the sense of being regarded by the men involved as the *normal* and *proper* response to the underlying circumstances presented."[4]

---

[3] See, *e.g.*, Curtis Companies, Inc., 29 Lab. Arb. 434 (1957); Celanese Corp. of America, 24 Lab. Arb. 168 (1954); Sheller Mfg. Corp., 10 Lab. Arb. 617 (1948).

[4] Sylvester Garrett, Chairman, Board of Arbitration, U. S. Steelworkers, Grievance No. NL-453, Docket No. N-146, Jan. 31, 1953. Reported at 2 Steelworkers Arbitration Bull. 1187. A similar definition can be found in some judicial opinions.

In Jarecki Mfg. Co. v. Merriam, 104 Kan. 646, 649, 180 P. 224, 225 (1919), the court stated: "Persons are presumed to contract with reference to a custom or usage which pertains to the subject of the contract. To constitute a custom which tacitly attends the obligation of a contract, the habit, mode, or course of dealing in the particular trade, business, or locality must be definite and certain; must be well settled and established; must be uniformly and universally prevalent and observed; must be of general notoriety; and must have been acquiesced in without contention or dispute so long and so continuously that contracting parties either had it in mind or ought to have had in mind, and consequently contracted, or presumptively contracted, with reference to it." See also McComb v. C. A. Swanson & Sons, 77 F. Supp. 716, 734 (1948).

**Exhibit 28**

Case 25-40090 Document 37-3 Filed 06/25/26 Page 165 of 417

In short, something qualifies as a practice if it is shown to be the understood and accepted way of doing things over an extended period of time.

What qualities must a course of conduct have before it can legitimately be regarded as a practice? First, there should be *clarity* and *consistency*. A course of conduct which is vague and ambiguous or which has been contradicted as often as it has been followed can hardly qualify as a practice. But where those in the plant invariably respond the same way to a particular set of conditions, their conduct may very well ripen into a practice. Second, there should be *longevity* and *repetition*. A period of time has to elapse during which a consistent pattern of behavior emerges. Hence, one or two isolated instances of certain conduct do not ordinarily establish a practice. Just how frequently and over how long a period something must be done before it can be characterized as a practice is a matter of good judgment for which no formula can be devised. Third, there should be *acceptability*. The employees and the supervisors alike must have knowledge of the particular conduct and must regard it as the correct and customary means of handling a situation. Such acceptability may frequently be implied from long acquiescence in a known course of conduct. Where this acquiescence does not exist, that is, where employees constantly protest a particular course of action through complaints and grievances, it is doubtful that any practice will be created.

One must consider too the *underlying circumstances* which give a practice its true dimensions. A practice is no broader than the circumstances out of which it arose, although its scope can always be enlarged in the day-to-day administration of the agreement. No meaningful description of a practice can be made without mention of these circumstances. For instance, a work assignment practice which develops on the afternoon and midnight shifts and which is responsive to the peculiar needs of night work cannot be automatically extended to the day shift as well. The point is that every practice must be carefully related to its origin and purpose. And, finally, the significance to be attributed to a practice may possibly be affected by whether or not it is supported by *mutuality*. Some practices are the product, either in their inception or in their application, of a joint understanding; others develop from choices made by the employer in the exercise of its managerial discretion without any intention of a future commitment.

**Exhibit 28**

Case 2:25-cv-04909-MRG   Document 37-3   Filed 06/25/26   Page 166 of 417

### A. *Subject Matter*

Practices usually relate to some phase of the contractual relationship between the employer and his employees. They may concern such subjects as scheduling, overtime, promotions, and the uses of seniority, all of which are covered to some extent in the typical collective agreement. But practices may also involve extra-contractual considerations—from the giving of Thanksgiving turkeys and Christmas bonuses to the availability of free parking. Still other practices, although this characterization may be arguable, have more to do with managerial discretion in operating a plant than with the employment relationship. For example, the long-time use of inter-department hand trucks for moving material might be regarded as a practice, and the truckers who do this work certainly have an interest in preserving this method of operation. But could it be seriously argued that this practice would prohibit the employer from introducing a conveyor belt to replace the hand trucks? Most agreements provide, usually in a management rights clause, that methods of manufacture are solely within the employer's discretion. There may even be practices which have nothing whatever to do with the employment relationship. The long-time assignment of a certain number of foremen to a given department might be viewed by some as a practice but it could hardly preclude the employer from using fewer foremen. What I am suggesting here is that the mere existence of a practice, without more, has no real significance. Only if the practice clarifies an imperfectly expressed contractual obligation or lends substance to an indefinitely expressed obligation or creates a completely independent obligation will it have some effect on the parties' relationship.

Because practices may relate to any phase of an employer's business, some parties have seen fit to spell out limitations on the kind of subject matter a practice may cover. In the steel industry, for instance, a practice is referred to as a "local working condition" and it is binding only if it provides *"benefits . . .* in excess of or in addition to" those provided in the agreement.[5] And in determining what constitutes a "benefit," steel arbitrators have applied an objective rather than a subjective test. Hence, whether the aggrieved employees like or dislike the practice in dispute is irrelevant. The decisive question, instead, is whether an ordinary employee in the same situation would reasonably regard the prac-

---

[5] Section 2 B-3 of the U. S. Steel-Steelworkers Agreement.

**Exhibit 28**

Case 2:54-cv-00090-RG Document 37-3 Filed 06/25/26 Page 167 of 417

tice as a substantial benefit in relation to his job.   If so, the practice may be an enforceable "local working condition."

The wide variety of possible subjects may make it difficult to decide the exact nature of a practice.   Suppose certain extra work which periodically arises in department $X$ has, as a matter of practice, been performed by $X$'s employees at overtime rates but that this has always occurred when the entire plant was on a 40-hour week.   Suppose too that this kind of practice is enforceable under the agreement.   One day this extra work is made available when the plant is on a 32-hour week and the employer gives the work to employees from other departments as well as from $X$ so as to provide the maximum number of men with 36 hours' work.   How is the practice to be described?   The union says it is a *work assignment* practice, giving $X$'s employees an exclusive claim to the disputed work whenever it is performed.   The employer says it is an *overtime* practice, giving $X$'s employees the disputed work only when it is to be performed at overtime rates.   The problem—the proper scope of the practice—is manifest.   Was it intended that the practice apply without limitation to all levels of operation or was it intended that the practice be restricted to the precise situation in which it had previously been applied?   Some help in formulating an answer may be found in the *purpose* behind the practice.   Hence, if it could be shown that the purpose was to have the work done in department $X$ alone and that it was mere coincidence that the practice had always been applied when the employees were on a 40-hour schedule, the broad interpretation urged by the union would seem to be correct.   Absent such a showing, I would think the narrow interpretation would have to be adopted.

We must also be careful to distinguish between a practice and the results of a practice.   Assume that a plant has two separate electrical crews, one for existing equipment and the other for new installations, and that overtime on a particular job has always been given to the crew which was actually working that job.   Assume too that in implementing this practice over the years there has been a relatively equal distribution of overtime between the crews.   From these facts, it cannot be said that equalization of overtime thereby became a practice.   The equalization was simply one of the consequences, probably unintended, of applying the overtime assignment practice.   If a practice were defined in terms of not only its subject matter but its consequences as well, it would surely develop a breadth far beyond what was originally intended.

**Exhibit 28**

Case 2:54-cv-00090-RG Document 37-3 Filed 10/25/26 Page 168 of 417

### B. *Proof*

To allege the existence of a practice is one thing; to prove it is quite another. The allegation is a common one. But my experience indicates that where past practice is disputed, the party relying upon the practice is often unable to establish it. This is not surprising. For the arbitrator in such a dispute is likely to find himself confronted by irreconcilable claims, sharply conflicting testimony, and incomplete information. Harry Shulman expressed our dilemma in these words:

> "The Union's witnesses remember only the occasions on which the work was done in the manner they urge. Supervision remembers the occasions on which the work was done otherwise. Each remembers details the other does not; each is surprised at the other's perversity; and both forget or omit important circumstances. Rarely is alleged past practice clear, detailed, and undisputed; commonly, inquiry into past practice . . . produces immersion in a bog of contradictions, fragments, doubts, and one-sided views. . . ."[6]

The arbitrator, abandoned in this kind of maze, is almost certain to decide the grievance on some basis other than past practice. The only means of resolving the confusion, short of credibility findings, is through written records of the disputed events. Such records may be the best possible evidence of what took place in the past. Unfortunately, records of scheduling, work assignments, etc., are seldom maintained for any length of time. And even when available, they may be incomplete or it may be difficult and costly to reduce them to some meaningful form. Considering these problems, it is understandable that practices are most often held to exist where the parties are in substantial agreement as to what the established course of conduct has been.

## II.   FUNCTIONS OF PAST PRACTICE

### A. *Clarifying Ambiguous Language*

The danger of ambiguity arises not only from the English language with its immense vocabulary, flexible grammar and loose syntax but also from the nature of the collective bargaining agreement. The agreement is a means of governing "complex, many-sided relations between large numbers of people in a going

---

[6] H. Shulman, Umpire, Ford Motor Co.-United Automobile Workers, Opinion A-278, Sept. 4, 1952. Reported at 19 Lab. Arb. 237, 242 (1952).

**Exhibit 28**

Case 2:54-cv-00090-RG Document 37-3 Filed 06/25/26 Page 169 of 417

concern for very substantial periods of time."[7]   It is seldom written with the kind of precision and detail which characterize other legal instruments.   Although it covers a great variety of subjects, many of which are quite complicated, it must be simply written so that its terms can be understood by the employees and their supervisors.   It is sometimes composed by persons inexperienced in the art of written expression.   Issues are often settled by a general formula because the negotiators recognize they could not possibly foresee or provide for the many contingencies which are bound to occur during the life of the agreement.   Indeed, any attempt to anticipate and dispose of problems before they arise would, I suspect, create new areas of disagreement and thus obstruct negotiations.   Sooner or later the employer and the union must reach agreement if they wish to avoid the economic waste of a strike or lockout.   Because of this pressure, the parties often defer the resolution of their differences—either by ignoring them or by writing a provision which is so vague and uncertain as to leave the underlying issue open.

These characteristics inevitably cause portions of the agreement to be expressed in ambiguous and general terms.   With the passage of time, however, this language may be given a clear and practical construction, either through managerial action which is acquiesced in by the employees (or, conceivably, employee action which is acquiesced in by management) or through the resolution of disputes on a case-by-case basis.   This accumulation of plant experience results in the development of practices and procedures of varying degrees of consistency and force.   Those responsible for the administration of the agreement can no more overlook these practices than they can the express provisions of the agreement.   For the established way of doing things is usually the contractually correct way of doing things.   And what has become a mutually acceptable interpretation of the agreement is likely to remain so.   Hence, the full meaning of the agreement may frequently depend upon how it has been applied in the past.

Consider, for example, an agreement which provides for premium pay for "any work over eight hours in a day."   An employee works his regular 8 a.m. to 4 p.m. shift on Monday but works from 6 a.m. to 2 p.m. on Tuesday pursuant to a request by supervision.   He asks for overtime for his first two hours (6 a.m. to 8 a.m.) on Tuesday.   Whether his claim has merit depends upon how you

[7] Cox, *The Legal Nature of Collective Bargaining Agreements*, 57 Mich. L. Rev. 1, 22 (1958).

**Exhibit 28**

Case 5:25-cv-04090-JWRG Document 37-3 Filed 06/25/26 Page 170 of 417

construe the term "day." Did the parties mean a "calendar day" as the employer argues, or did they mean a "work day," that is, a 24-hour period beginning with the time an employee regularly starts work, as the union argues? It may be possible to resolve this ambiguity through resort to practice. How the parties act under an agreement may be just as important as what they say in it. To borrow a well-known adage, "actions speak louder than words." From the conflict and accommodation which are daily occurrences in plant life, there arises "a context of practices, usages, and rule-of-thumb interpretations" which gradually give substance to the ambiguous language of the agreement.[8] A practice, once developed, is the best evidence of what the language meant to those who wrote it.

By relying upon practice, the onus for the decision may be shifted from the arbitrator back to the parties. For to the extent to which the arbitrator adopts the interpretation given by the parties themselves as shown by their acts, he minimizes his own role in the construction process. The real significance of practice as an interpretative aid lies in the fact that the arbitrator is responsive to the values and standards of the parties. A decision based on past practice emphasizes not the personal viewpoint of the arbitrator but rather the parties' own history, what they have found to be proper and agreeable over the years. Because such a decision is bound to reflect the parties' concept of rightness, it is more likely to resolve the underlying dispute and more likely to be acceptable. A solution created from within is always preferable to one which is imposed from without.[9]

## B. *Implementing General Contract Language*

Practice is also a means of implementing general contract language. In areas which cannot be made specific, the parties are often satisfied to state a general rule and to allow the precise meaning of the rule to develop through the day-to-day administration of the agreement. For instance, the right to discipline and discharge is usually conditioned upon the existence of "just cause." Similarly, the right to deviate from a contract requirement may be conditioned upon the existence of "circumstances beyond the employer's control." General expressions of this kind are rarely defined. For no definition, however detailed, could anticipate all

---

[8] Eastern Stainless Steel Corp., 12 Lab. Arb. 709, 713 (1949).

[9] See Seward, *Arbitration in the World Today*, NATIONAL ACADEMY OF ARBITRATORS, THE PROFESSION OF LABOR ARBITRATION 66, 72-73 (BNA 1957).

Exhibit 28

Case 4:25-cv-00090-RG Document 37-3 Filed 06/25/26 Page 171 of 417

the possibilities which might take place during the term of the agreement. But, in time, this kind of general language does tend to become more concrete. As the parties respond to the many different situations confronting them—approving certain principles and procedures, disputing others, and resolving their disputes in the grievance procedure—they find mutually acceptable ways of doing things which serve to guide them in future cases. Instead of rearguing every matter without regard to their earlier experiences, acceptable principles and procedures are applied again and again. And, thus, practices arise which represent the reasonable expectations of the parties. These practices provide a sound basis for interpreting and applying general contract language. They can be used to help determine whether a particular condition was actually "beyond the employer's control" or whether a particular employee's behavior was "just cause" for discipline.

Suppose, for example, that tardiness of less than five minutes has always been overlooked but that after it becomes extremely widespread management disciplines a few employees without any advance notice of its change in policy. In view of this long toleration of tardiness, it is doubtful that there would be "just cause" for discipline. Plant practice thus injects something tangible into the "just cause" provision, giving employees a clear notion of what is acceptable and unacceptable in plant behavior. Of course, once the men are notified that tardiness will no longer be ignored the employer would be free to take reasonable disciplinary action.

Although, as I have just shown, discipline which is completely inconsistent with past practice is likely to lack "just cause," it does not follow that discipline must be perfectly consistent with past practice in order to establish "just cause." Suppose that fighting in the plant has in the past resulted in disciplinary suspensions of two to five weeks and that those who have been so disciplined were all men with considerable seniority. Then, a recently-hired employee starts a fight with no justification whatever and is discharged. The union may argue that because others had received suspensions, the discharge was too severe a penalty. But one must remember that there are degrees of culpability and that discharge is hardly the same penalty when applied to an employee with one year's seniority and to another with twenty years' seniority. The employer should not be precluded from discharging this man merely because on earlier occasions it had good reason to be lenient. The point is that "it is not the fact of seeming inconsistency in past practice, but the cause of it, that ought to engage

**Exhibit 28**

Case 2:54-cv-00090-RG Document 37-3 Filed 06/25/26 Page 172 of 417

the arbitrator's attention."[10]   Hence, what seems on the surface to be capricious administration of a disciplinary rule "may prove on closer inspection to be a flexible and humane application of a sound principle to essentially different situations."[11]

## C.  *Modifying or Amending Apparently Unambiguous Language*

What an agreement says is one thing; how it is carried out may be quite another.  A recent study at the University of Illinois revealed that differences between contract provisions and actual practice are not at all unusual.[12]   Thus, an arbitrator occasionally finds himself confronted with a situation where an established practice conflicts with a seemingly clear and unambiguous contract provision.  Which is to prevail?  The answer in many cases has been to disregard the practice and affirm the plain meaning of the contract language.[13]

At the National Academy of Arbitrators' meeting in 1955, Ben Aaron forcefully argued that sometimes practice should prevail.[14] He posed a hypothetical situation which was based upon this contract provision:

> "Where skill and physical capacity are substantially equal, seniority shall govern in the following situations only: promotions, downgrading, layoffs, and transfers."

He assumed that the consistent practice for five years immediately preceding the dispute has been to treat seniority as the controlling consideration in the assignment of overtime work and that a grievance has arisen out of the employer's sudden abandonment of that practice.  He assumed further that the agreement vests in management the right to direct the working forces subject only to qualifications or restrictions set forth elsewhere in the agreement and that the parties have expressly forbidden the arbitrator to add to, subtract from, or modify any provision of the agreement.

---

[10] Aaron, *The Uses of the Past in Arbitration*, NATIONAL ACADEMY OF ARBITRATORS, ARBITRATION TODAY, 6, 11 (BNA 1955). Also found in Reprint No. 50 (Los Angeles: Institute of Industrial Relations, UCLA, 1955).

[11] *Ibid.*

[12] Derber, Chalmers & Stagner, *The Labor Contract: Provision and Practice*, PERSONNEL MAGAZINE (American Management Ass'n, Jan.-Feb. 1958). Also found in Reprint No. 58 (Institute of Labor & Industrial Relations, Univ. of Illinois, 1958).

[13] See, *e.g.*, Sun Rubber Co., 228 Lab. Arb. 362, 368 (1957); Price-Pfister Brass Mfg. Co., 25 Lab. Arb. 398, 404 (1955); Bethlehem Steel Co., 21 Lab. Arb. 579, 582 (1953); Tide Water Oil Co., 17 Lab. Arb. 829, 833 (1952). See also the celebrated case of Western Union Telegraph Co. v. American Communications Assn., 299 N.Y. 177, 86 N.E.2d 162 (1949).

[14] Aaron, *supra* note 10, at 3-7.

**Exhibit 28**

Case 2:54-cv-00090-RG Document 37-3 Filed 06/25/26 Page 173 of 417

The conventional analysis of the problem begins with the proposition that the contract should be construed according to the parties' original intention. And the best evidence of their intention is generally found in the contract itself, that is, in the words which the parties themselves employed to express their intent. If these words are free from ambiguity and if their meaning is plain, there is no need to resort to interpretative aids such as past practice. This reasoning is well established in the law of contracts.[15] In the hypothetical case, the contract asserts that seniority is controlling "in the following situations only: promotions, downgrading, layoffs, and transfers." On its face, this language contains no ambiguity whatever. By using the word "only," a more exclusive term would be hard to imagine, the parties evidently intended seniority to apply in the four situations mentioned but in no others. Hence, pursuant to the plain meaning of this clause, seniority would not govern overtime assignments and any practice to the contrary would have to be ignored.

Aaron, however, says this may be too rigid an approach to the problem because it borrows principles from the law of contracts without giving adequate consideration to the unique characteristics of the collective bargaining contract and the relative flexibility with which even commercial contracts are construed today. He argues persuasively that no matter how clear the language of the collective bargaining contract seems to be, it does not always tell the full story of the parties' intentions. Suppose, in our hypothetical case, the testimony reveals that the matter of overtime assignments was never considered during the negotiation of the seniority clause—either because the parties overlooked it under the mistaken impression that they had covered all possible contingencies or because the parties concerned themselves only with those situations they had previously experienced. Or suppose the parties simply found this seniority clause in some other agreement and adopted it without discussion. Anyone familiar with collective bargaining knows this sort of thing does happen. And the contract itself is not usually written by people trained in semantics.

---

[15] See the following excerpt from 55 Am. Jur. *Usages and Customs* § 31 (1946): "Perhaps the most fundamental of the rules which limit the introduction of a custom or usage . . . is that which denies the admissibility of such evidence where its purpose or effect is to contradict the plain, unambiguous terms . . . expressed in the contract itself, or to vary or qualify terms which are free from ambiguity. . . . It [custom or usage] may explain what is ambiguous but it cannot vary or contradict what is manifest and plain. . . . An express written contract embodying in clear and positive terms the intention of the parties cannot be varied by evidence of usage or custom which either expressly or by necessary implication contradicts the terms of such contract."

**Exhibit 28**

Case 4:24-cv-00910-O   Document 37-3   Filed 06/25/26   Page 174 of 417

It is hardly surprising therefore to find in the typical contract an "inartistic and inaccurate use of words that have a precise and commonly accepted meaning in law."[16]   The word "only" in the hypothetical case may merely be attributable to an inexperienced or over-eager draftsman.   Under these assumed circumstances, it cannot confidently be said that the parties intended to exclude overtime assignments from the scope of the seniority clause.   Absent any original intention with respect to this problem, Aaron concludes that the long-standing practice of making overtime assignments by seniority should be controlling.

This conclusion appears to be supported by two different rationales.   First, the argument seems to be that contract language is no clearer than the underlying intention of the parties.[17]   Hence, where it is shown that their intention was uncertain or incomplete, the language cannot be considered truly unambiguous.   It follows that past practice is being used not to contradict what is plain but rather to add to what is already a part of the agreement.   Second, the argument is that to adopt the overtime assignment practice "does not alter the agreement but merely takes note of a modification that has already been made either by the parties jointly or by the unilateral action of the employer tacitly approved by the union."[18]   The practice, in short, amounts to an amendment of the agreement.

I find much merit in what Aaron says.   And there are several reported decisions which indicate his views are shared by others as well.[19]   The real question, however, is whether as serious a matter as the modification of clear contract language can be based on practice alone.   Some arbitrators have held, I think with good reason, that practice should prevail only if the proofs are sufficiently strong to warrant saying there was in effect *mutual agreement* to the modification.[20]   The parties must, to use the words in one decision, "have evinced a positive acceptance or endorsement" of

---

[16] Aaron, *supra* note 10, at 5.

[17] As Judge Cardozo put it, "few words are so plain that the context or the occasion is without capacity to enlarge or narrow their extension."

[18] Aaron, *supra* note 10, at 6.

[19] See, *e.g.*, Metropolitan Coach Lines, 27 Lab. Arb. 376, 383 (1956); Smith Display Service, 17 Lab. Arb. 524, 526 (1951).

[20] See, *e.g.*, National Lead Co., 28 Lab. Arb. 470, 474 (1957); Gibson Refrigerator Co., 17 Lab. Arb. 313, 318 (1951); Texas-New Mexico Pipe Line Co., 17 Lab. Arb. 90, 91 (1951); Merrill-Stevens Dry Dock & Repair Co., 10 Lab. Arb. 562, 563 (1948); Pittsburgh Plate Glass Co., 8 Lab. Arb. 317, 332 (1947). For still another viewpoint, see Pearce Davis' comments on Aaron's hypothetical case. He stated he too would consider the overtime assignment practice to be enforceable but only if it were established "that the practice had been initiated by actual discussion and agreement of both parties." *Supra* note 10, at 15.

**Exhibit 28**

CaseCase5:154-c25-c4v-000490009RG DocDoccumeent137-3FileFiled10106/25/26Page a1751o5f417417

the practice.[21]   Thus, I believe that the modification is justified not by practice but rather by the parties' agreement, the existence of which may possibly be inferred from a clear and consistent practice.

None of this reasoning is radical.  The notion that the collective bargaining contract is a "living document" has already won wide acceptance.  Those responsible for a contract are free to change it at any time by adding an entirely new provision, by rewriting an existing clause, or by reinterpreting some section to give it a meaning other than that which was originally intended. Grievance settlements often result in "understandings that are as durable, or more so, than the actual terms of the labor contract. . . ."[22]   If a contract is susceptible to change in these ways, why shouldn't it be equally susceptible to change by reason of practice, at least where the practice represents the joint understanding of the parties?  After all, the only ground for recognizing the modification or amendment of a contract is some mutual agreement.  And it can be strongly argued that the *form* the agreement takes is not important.  Whether it be a formal writing, an oral understanding, or a long-standing practice, so long as each is supported by mutuality, the parties have indeed chosen to change their contract.

It is also worth emphasizing that Aaron's hypothetical case just illustrates a situation where practice conflicts with the apparent meaning of a seemingly unambiguous provision.  But what of a situation where practice conflicts with the real meaning of a truly unambiguous provision?  Suppose, for instance, that a contract says "seniority shall not govern the assignment of overtime work," that the parties meant to restrict the application of seniority, that a practice of distributing overtime according to seniority later developed, and that this practice was not initiated until the union had stated in discussions with the employer that it approved of this means of distributing overtime.  On these facts, would the employer's unilateral discontinuance of the practice constitute a contract violation?  Applying the rationale stated in Aaron's paper, I would find no violation on the ground that practice can be decisive only if there is some uncertainty, however slight, with respect to the parties' original intention.  My hypothetical case contains no such uncertainty, the parties' intention being perfectly obvious.  Yet, if the "living document" notion is carried to its

---

[21] Bethlehem Steel Co., 13 Lab. Arb. 556, 560 (1949).

[22] Taylor, *Effectuating the Labor Contract Through Arbitration*, NATIONAL ACADEMY OF ARBITRATORS, THE PROFESSION OF LABOR ARBITRATION 20, 21 (BNA 1957).

**Exhibit 28**

Case 4:24-cv-00090-RG Document 37-3 Filed 06/25/26 Page 176 of 417

logical conclusion, a violation may exist on the ground that the practice, being a product of joint determination, amounts to an amendment of the contract and that thereafter the practice could be changed only by mutual agreement. Some may complain that the contract is so clear and compelling here that no room is left for consideration of past practice. However, as Williston has explained in his famous treatise on contracts, "if the meaning of the contract is plain, the acts of the parties cannot prove an interpretation contrary to the plain meaning" but nevertheless "such conduct of the parties . . . may be evidence of a subsequent modification of their contract."[23]

### D.   *As a Separate, Enforceable Condition of Employment*

Past practice may serve to clarify, implement, and even amend contract language. But these are not its only functions. Sometimes an established practice is regarded as a distinct and binding condition of employment, one which cannot be changed without the mutual consent of the parties. Its binding quality may arise either from a contract provision which specifically requires the continuance of existing practices or, absent such a provision, from the theory that long-standing practices which have been accepted by the parties become an integral part of the agreement with just as much force as any of its written provisions.

There are different kinds of contract provisions regarding past practice. Some merely state that practices shall govern one small phase of the employment relationship. For instance, "bidding on job vacancies shall be in accordance with past practice." Others broadly embrace practices with little or no qualification. For instance, "all practices and conditions not specified in this contract shall remain the same for the duration of the contract."[24] Still others require that practices be continued during the term of the agreement but allow management to change or eliminate a practice upon the occurrence of certain stated conditions.

No discussion of this subject would be complete without some mention of the experiences of the basic steel industry. The typical steel agreement provides that "any local working conditions in effect which have existed regularly over a period of time under the applicable circumstances . . . shall remain in effect for the term of

---

[23] 3 WILLISTON, CONTRACTS § 623 (rev. ed. 1936).
[24] See Reilly, *Labor Law for Practitioners*, 8 LAB. L.J. 19, 23 (1957) for the attitude of many management attorneys to clauses of this kind.

**Exhibit 28**

Case 2:54-cv-00090-RG Document 37-3 Filed 06/25/26 Page 177 of 417

this Agreement. . . ."[25] In this way, there has been incorporated into the steel agreements a wide variety of practices affecting wages, crew sizes, relief time, work assignments, and many other matters.[26] The "local working conditions" clause is thus the source of important rights and obligations, many of which are somewhat obscured by the bustle of daily plant operations. It is this uncertainty as to the nature and extent of the commitment which seems most disturbing to steel management. However, a "local working condition" is not by nature unalterable. It may be changed or eliminated *either* by mutual agreement *or* by the employer if it can establish (1) that it has through the exercise of managerial discretion changed or eliminated "the basis for the existence of the local working condition" and (2) that a reasonable causal relationship exists between the change in the basis for the working condition and the change in the working condition itself. The steel agreements thus seek to balance the employee's interest in preserving benefits which derive from established practices and the manager's interest in being able to alter practices to suit changing industrial circumstances and thereby enhance efficiency. The "local working conditions" clause is, in short, a compromise between stability on the one hand and flexibility on the other.

I would like to illustrate the application of this clause with a hypothetical case. Suppose that certain mill equipment has been run by five men for many years, that this arrangement was originally based upon supervision's evaluation of the amount of work involved, and that the five-man crew has come to be recognized as a "local working condition." If technological improvements are made in the equipment and if these improvements substantially decrease the crew's workload, it has been held that the employer will have changed "the basis for the existence of the local working condition." Hence, it will be free to change the "local working condition" itself, that is, to reduce the crew size. The only proviso is that a reasonable "cause-effect" relationship exist between the change in the basis for the practice and the change in the practice itself.

25 The contract language quoted in this paragraph and in the following footnote can be found in section 2-B of the U.S. Steel-Steelworkers agreement and article one, section 3 of the Republic Steel-Steelworkers Agreement.

26 "Local working conditions" are defined in the steel agreements as "specific practices or customs which reflect detailed application of the subject matter within the scope of wages, hours of work, or other conditions of employment and includes local agreements, written or oral, or such matters."

**Exhibit 28**

Case 2:54-cv-00090-RG Document 37-3 Filed 06/25/26 Page 178 of 417

However, even without technological improvements, the employer may be confident that the operation can be adequately performed with four men instead of five by reassigning duties among the crew members or by eliminating some of their idle time. Or the employer may belatedly discover that the original supervisory estimates of the work involved were completely wrong and that the crew should never have been larger than four men. But these circumstances, it has been held, do not change "the basis for the existence of the local working condition" and hence do not justify a reduction in crew size. Such a reduction must almost always be based upon some technological advance, either in equipment or in manufacturing processes. A "local working condition," in other words, need not yield to greater efficiency alone. Furthermore, the "local working conditions" clause places a premium on prompt and careful judgment in any area affecting conditions of employment. Where, for instance, an improved manufacturing process warrants a crew reduction but management fails to take any action, its failure may ultimately result in a new "local working condition" which will saddle the operation with the old crew. Thus, an employer is forced to live with an error or a mistake in judgment once it becomes embedded in a "local working condition." To this extent, the clause may prevent management from realizing optimum efficiency but management must bear some of the responsibility for this result. This hypothetical case indicates the kind of problems which may arise in the administration of a past practice provision.

Most agreements, however, say nothing about management having to maintain existing conditions. They ordinarily do not even mention the subject of past practice. The question then is whether, apart from any basis in the agreement, an established practice can nevertheless be considered a binding condition of employment. The answer, I think, depends upon one's conception of the collective bargaining agreement. To use Harry Shulman's words, "is the agreement an exclusive statement of rights and privileges or does it subsume continuation of existing conditions?"[27]

Employers tend to argue that the only restrictions placed upon management are those contained in the agreement and that in all other respects management is free to act in what ever way it sees fit. Or to put the argument in the more familiar "reserved rights" terminology, management continues to have the rights it cus-

[27] *Reason, Contract and Law in Labor Relations*, 68 HARV. L. REV. 999, 1011 (1955).

**Exhibit 28**

Case 4:24-cv-00090-RG Document 37-3 Filed 06/25/26 Page 179 of 417

tomarily possessed and which it has not surrendered through collective bargaining. If an agreement does not require the continuance of existing conditions, a practice, being merely an extracontractual consideration, would have no binding force regardless of how well-established it may be. It follows that management may change or eliminate the practice without the union's consent.

Unions take an entirely different view of the problem. They emphasize the unique qualities of the collective bargaining agreement and the background against which the agreement was negotiated, particularly those practices which have come to be accepted by employees and supervisors alike and have thus become an important part of the working environment. The agreement is executed in the light of this working environment and on the assumption that existing practices will remain in effect. Therefore, to the extent that these practices are unchallenged during negotiations, the parties must be held to have adopted them and made them a part of their agreement.[28]

Many arbitrators have, at some time in their careers, been confronted by these arguments. Some have held that the agreement is the exclusive source of rights and privileges;[29] others have held that the agreement may subsume continuation of existing conditions.[30] The latter is the more prevalent view. Those who follow it have prohibited employers from unilaterally changing or eliminating practices with regard to efficiency bonus plans,[31] paid lunch periods,[32] wash-up periods on company time,[33] maternity leaves of absence,[34] free milk,[35] and home electricity at nominal rates.[36] The reasoning behind these decisions begins with the proposition that the parties have not set down on paper the whole of their agreement. "One cannot reduce all the rules governing a commu-

---

[28] See *Management's Reserved Rights: A Labor View*, NATIONAL ACADEMY OF ARBITRATORS, MANAGEMENT RIGHTS AND THE ARBITRATION PROCESS 118, 126 (BNA 1956).

[29] See, *e.g.*, National Distillers Products Corp., 24 Lab. Arb. 500 (1953); Donaldson Co., 20 Lab. Arb. 826 (1953); New York Trap Rock Corp., 19 Lab. Arb. 421 (1952); Byerlite Corp., 12 Lab. Arb. 641 (1949); M. T. Stevens & Sons Co., 7 Lab. Arb. 585 (1947).

[30] See, *e.g.*, Fruehauf Trailer Co., 29 Lab. Arb. 372 (1957); Morris P. Kirk & Son, Inc., 27 Lab. Arb. 6 (1956); E. W. Bliss Co., 24 Lab. Arb. 614 (1955); Phillips Petroleum Co., 24 Lab. Arb. 191 (1955); Northland Greyhound Lines, Inc., 23 Lab. Arb. 277 (1954); International Harvester Co., 20 Lab. Arb. 276 (1953); American Seating Co., 16 Lab. Arb. 115 (1951); California Cotton Mills Co., 14 Lab. Arb. 377 (1950); Franklin Ass'n of Chicago, 7 Lab. Arb. 614 (1947).

[31] Libby, McNeill & Libby, 5 Lab. Arb. 564 (1946); Pullman-Standard Car Mfg. Co., 2 Lab. Arb. 509 (1945).

[32] E. W. Bliss Co., 24 Lab. Arb. 614 (1955).

[33] International Harvester Co., 20 Lab. Arb. 276 (1953).

[34] Northland Greyhound Lines, Inc., 23 Lab. Arb. 277 (1954).

[35] Ryan Aeronautical Co., 17 Lab. Arb. 395 (1951).

[36] Phillips Petroleum Co., 24 Lab. Arb. 191 (1955).

**Exhibit 28**

nity like an industrial plant to fifteen or even fifty pages."[37] Thus, the union-management contract includes not just the written provisions stated therein but also the understandings and mutually acceptable practices which have developed over the years. Because the contract is executed in the context of these understandings and practices, the negotiators must be presumed to be fully aware of them and to have relied upon them in striking their bargain. Hence, if a particular practice is not repudiated during negotiations, it may fairly be said that the contract was entered into upon the assumption that this practice would continue in force. By their silence, the parties have given assent to "existing modes of procedure."[38] In this way, practices may *by implication* become an integral part of the contract.[39]

Archibald Cox not only agrees with this view but states the argument more strongly. In asserting that the words of the contract cannot be the exclusive source of rights and duties, he emphasizes the following point:

> "Within the sphere of collective bargaining, the institutional characteristics and the governmental nature of the collective-bargaining process demand a common law of the shop which implements and furnishes the context of the agreement. We must assume that intelligent negotiators acknowledged so plain a need unless they stated a contrary rule in plain words."[40]

---

[37] Cox, *Reflections Upon Labor Arbitration*, 72 HARV. L. REV. 1482, 1499 (1959).

[38] In this connection, note the analysis made by Douglass V. Brown in *Management Rights and the Collective Agreement*, PROCEEDINGS OF THE FIRST ANNUAL MEETING OF THE INDUSTRIAL RELATIONS RESEARCH ASSOCIATION 145-55 (IRRA, 1949). Brown expressed his argument in these words: "But when all of the provisions are written, it will be found that many matters which affect conditions of employment are not specifically referred to. Does this mean that these matters are of no concern to the parties, or that the agreement has no meaning with respect to them? I think not. On some of these matters, the parties are satisfied with existing modes of procedure, consciously or unconsciously. On others, one party or the other may be dissatisfied but may be unable to devise better modes. On still others, one party may have preferred an alternative but may have been unable to secure agreement from the other party, or may have been unwilling to pay the price necessary for acceptance. In any event, the omission of specific reference is significant. ". . . The agreement, no matter how short, does provide a guide to modes of procedure and to the rights of the parties on *all* matters affecting the conditions of employment. Where explicit provisions are made, the question is relatively simple. But even where the agreement is silent, the parties have, by their silence, given assent to a continuation of the existing modes of procedure."

[39] This implication of course would not be possible if it conflicted with the express language of the contract. For example, if a contract said "the written provisions constitute the entire agreement of the parties," it would be difficult to imply that the parties meant to make practices a part of their contract.

[40] Cox, *supra* note 37.

Exhibit 28

The common law of the shop would include, at the very least, long-standing practices in the plant.

None of this is incompatible with ordinary contract law. Williston says that a usage, in our jargon a practice, is admissible "for the purpose of adding a new element or term or incident, whichever one is pleased to call it, to the expressed terms of the contract" and that "it may be shown that a matter concerning which the written contract is silent, is affected by a usage with which both parties are chargeable."[41] Indeed, some courts have decided that when an employee is hired or an agent appointed, the nature of his duties and his compensation as well may not be stated but may nevertheless be fixed by what is customary and reasonable.[42] In one case, a practice between railroads and their employees was held admissible to establish an implied agreement to pay time and one-half for overtime work.[43]

But this theory, insofar as it relates to the collective bargaining agreement, is open to criticism. To repeat, the majority view is that established practices which were in existence when the agreement was negotiated and which were not discussed during negotiations are binding upon the parties and must be continued for the life of the agreement. This is said to be an implied condition of the agreement. In the courts, implications of this kind are "based on morality, common understanding, social policy, and legal duty expressed in tort or quasi-contract."[44] These considerations, however, are not much help to arbitrators. If we are the servants of the parties alone and not the public, I doubt that "social policy" would be a sound basis for drawing an implication. If our job is to seek out the parties' values and not to impose others' values upon them, I doubt that "morality" would provide the basis for an implication. If our powers arise from the parties' agreement and not from the labor laws, I doubt that a "legal duty" found in such legislation would be relevant. Consider, for instance, the legal duty to bargain under the Labor-Management Relations Act. Apart from the question of whether we may enforce that duty, the real issue is "whether the practice may be changed

41 WILLISTON, CONTRACTS § 652 (rev. ed. 1936).

42 See Vanemburg v. Duffey, 177 Ark. 663, 7 S.W.2d 336 (1928) (broker's commission fixed by practice); Voell v. Klein, 184 Wis. 620, 200 N.W. 364 (1924) (authority of sales agent to accept used car as part payment for new one held established by practice of automobile dealers).

43 McGuire v. Interurban Ry., 199 Iowa 203, 200 N.W. 55 (1924).

44 Shulman, *supra* note 27, at 1012. The analysis made in this paragraph is based upon Shulman's paper.

**Exhibit 28**

Case 4:24-cv-00090-RG   Document 37-3   Filed 06/25/26   Page 182 of 417

without mutual consent when bargaining has failed to achieve consent."[45] Thus, the arbitrator's power to establish implied conditions derives not from the superior authority of the law but rather from the parties' will, from their "common understanding." He may find implications which "may reasonably be inferred from some term of the agreement"[46] or even from the agreement as a whole. The implication here that existing practices must be continued until changed by mutual consent is drawn from the nature of the agreement itself and from the collective bargaining process. It would be justified, I am sure, wherever there is a real or tacit understanding during negotiations that existing practices would be continued. While such an understanding may exist in some relationships, I think Shulman is probably correct in concluding:

> "It is more than doubtful that there is any general understanding among employers and unions as to the viability of existing practices during the term of a collective agreement. . . . I venture to guess that in many enterprises the execution of a collective agreement would be blocked if it were insisted that it contain a broad provision that 'all existing practices, except as modified by this agreement, shall be continued for the life thereof, unless changed by mutual consent.' And I suppose that execution would also be blocked if the converse provision were demanded, namely, that 'the employer shall be free to change any existing practice except as he is restricted by the terms of this agreement.' The reasons for the block would be, of course, the great uncertainty as to the nature and extent of the commitment, and the relentless search for cost-saving changes. . . ."[47]

It is one thing to say, as Shulman suggests, that the implication is warranted where the evidence indicates that the parties had a "common understanding" to continue existing practices; it is quite another to say, as the majority suggest, that the implication is warranted because it may be assumed, unless otherwise stated in negotiations, that the parties had such a "common understanding."[48] The difference in viewpoints is clear. Shulman wants some proof of what the majority ordinarily assumes. Shulman's approach places a heavy burden on anyone who claims that a practice is a

---

[45] *Ibid.*
[46] *Ibid.*
[47] *Ibid.*
[48] Or to take this one step further, as Cox suggests, it may be assumed *unless otherwise stated in the agreement*, that the parties had such a "common understanding." Cox, *supra* note 37.

**Exhibit 28**

binding condition of employment. Think of the difficulty one might encounter in trying to establish that the unstated assumption of the negotiators on both sides of the table was to continue existing practices. The majority approach, on the other hand, comes close to engrafting a "past practice" clause onto the typical collective agreement without regard to the actual assumptions of the negotiators. Their silence at the bargaining table is presumed to constitute assent to existing conditions, whether they thought of this or not.

There are other possibilities too. We may find that the parties had no "common understanding" to continue practices in general but did have a "common understanding" to continue a particular practice. Much of this discussion has related to practices in general. Yet, an arbitration case rarely poses so broad a problem. We are usually asked to decide only whether a specific practice, say, a paid lunch period, must be continued in effect. Where possible, the answer should be as narrow as the question. To the extent to which the answer goes further and seeks to determine whether the agreement subsumes the continuation of existing conditions, the arbitrator risks deciding far more than the parties want him to decide. The dangers are magnified too by the fact that the arbitrator is not likely to elicit a clear picture of the assumptions upon which the agreement was negotiated.

Still another problem exists. Those of us who accept the principle that an agreement may require the continuance of existing practices recognize that this principle cannot be allowed to freeze *all* existing conditions. For instance, the long-time use of hand-controlled grinding machines could hardly be regarded as a practice prohibiting the introduction of automatic grinding machines. Or the long-time use of pastel colors in painting plant interiors could not preclude management from changing to a different color scheme. Plainly, not all practices can be considered binding conditions of employment. Thus, while we are willing to imply that practices are a part of the agreement, we are apprehensive of the breadth of the implication. What seems correct from a theoretical point of view does not always make sense from a practical point of view. Arbitrators, accordingly, have accepted the implication but sought to limit it to just certain kinds of practices. The difficulty is to determine what kind of rational line, if any, can be drawn between those practices which may be incorporated into the agreement and those which may not.

**Exhibit 28**

Case 2:25-cv-04009-MRG Document 37-3 Filed 06/25/26 Page 184 of 417

Some decisions enforce only those practices concerning "major" conditions of employment as contrasted to "minor" conditions.[49] But the test seems inadequate for several reasons. To begin with, it is vague and inexact. What is major to one group of employees may be minor to all the others; what is major from the standpoint of morale may be minor from the standpoint of earnings and job security. There is no logical basis for distinguishing between major and minor conditions, unless the arbitrator is to concern himself only with serious violations of the agreement. More important, this kind of test encourages arbitrators "to commence their thinking with what they consider a desirable decision and then work backward to appropriate premises, devising syllogisms to justify that decision. . . ."[50] That is, if an arbitrator decides to enforce the practice he calls it a major condition, and if he decides otherwise he calls it a minor condition. To this extent, the test provides us with a rationalization rather than a reason for our ruling.

The Elkouris have suggested a comparable test.[51] They would enforce only those practices which involve "employee benefits"; they would not prohibit changes in practices which involve "basic management functions." This test, however, is no more convincing than the major-minor test. It suffers from the same defects. It too encourages the arbitrator to work backward from his decision, thus providing him with a rationalization rather than a reason for his ruling. To enforce a practice all he need say is that it concerns employee benefits. But the fact is that most practices which create such benefits are likely to impinge upon some basic management function. Consider a situation where the employer wishes to reduce a long-established crew size based upon a recent engineering survey of his plant. How is the crew size practice to be characterized? It involves the direction of the working force and the determination of methods of operation, customary management functions, but it also involves the job security of one or more members of the crew, a very real employee benefit. In the closer cases, this

---

[49] See, e.g., Pan Am Southern Corp., 25 Lab. Arb. 611, 613 (1955); Phillips Petroleum Co., 24 Lab. Arb. 191, 194 (1955); Continental Baking Co., 20 Lab. Arb. 309, 311 (1953); General Aniline & Film Corp., 19 Lab. Arb. 628, 629 (1952). Cox and John Dunlop, in an article dealing with national labor policy, urged that "a collective bargaining agreement should be deemed, unless a contrary intention is manifest, to carry forward for its term the major terms and conditions of employment, not covered by the agreement, which prevailed when the agreement was executed." See *The Duty To Bargain Collectively During the Term of an Existing Agreement*, 63 Harv. L. Rev. 1097, 1116-17 (1950).

[50] Frank, *Experimental Jurisprudence and the New Deal*, 78 Cong. Rec. 12412, 12413 (1934).

[51] Elkouri & Elkouri, How Arbitration Works 274-75 (BNA 1960).

**Exhibit 28**

Case 2:54-cv-00090-RG Document 37-3 Filed 06/25/26 Page 185 of 417

test provides no satisfactory guidance. Besides, it seems to me that if the parties have in effect agreed to the continuation of a particular practice, it should be binding regardless of its subject matter.

A few decisions enforce the practice if it involves a "working condition" rather than a "gift" or a "gratuity."[52] This distinction is meaningful only in that class of cases which concern employee bonuses or other extra-contractual employee compensation. Apart from its limited applicability, however, this test does suggest that what is important here is not the subject matter of the practice but rather the extent to which the practice is founded upon the agreement of the parties.

A better test, I think, is suggested by what Shulman said in a decision[53] he made as umpire under the Ford-UAW agreement, an agreement which did not require the continuance of existing practices. He urged that the controlling question in this kind of case is whether or not the practice was supported by "mutual agreement." He explained his position in these words:

> "A practice thus based on mutual agreement may be subject to change only by mutual agreement. Its binding quality is due, however, not to the fact that it is past practice but rather to the agreement in which it is based.
>
> "But there are other practices which are not the result of joint determination at all. They may be mere happenstance, that is, methods that developed without design or deliberation. Or they may be choices by Management in the exercise of managerial discretion as to convenient methods at the time. In such cases there is no thought of obligation or commitment for the future. Such practices are merely present ways, not prescribed ways, of doing things. The relevant item of significance is not the nature of the particular method but the managerial freedom with respect to it. Being the product of managerial determination in its permitted discretion such practices are, in the absence of contractual provision to the contrary, subject to change in the same discretion. . . . But there is no requirement of mutual agreement as a condition precedent to a change of a practice of this character.
>
> "A contrary holding would place past practice on a par with written agreement and create the anomaly that, while

---

[52] See Fawick Airflex Co., 11 Lab. Arb. 666, 668-69 (1948). Bonuses were held to be an integral part of the wage structure in the following cases: Nazareth Mills, Inc., 22 Lab. Arb. 808 (1954); Felsway Shoe Corp., 17 Lab. Arb. 505 (1951). Bonuses were held to be gratuities in the following cases: American Lava Corp., 32 Lab. Arb. 395 (1959); Rockwell-Standard Corp., 32 Lab. Arb. 388 (1959); Bassick Co., 26 Lab. Arb. 627 (1956).

[53] Shulman, *supra* note 6.

Exhibit 28

Case 2:25-cv-04090-MRG Document 37-3 Filed 06/25/26 Page 186 of 417

the parties expend great energy and time in negotiating the details of the Agreement, they unknowingly and unintentionally commit themselves to unstated and perhaps more important matters which in the future may be found to have been past practice."[54]

Under this test, only a practice which is supported by the mutual agreement of the parties would be enforceable. Such a practice would be binding, regardless of how minor it may be and regardless of the extent to which it may affect a traditional management function. Absent this mutuality, however, the practice would be subject to change in management's discretion. Although this seems a sound way of distinguishing between enforceable and non-enforceable practices, one might understandably ask what constitutes "mutual agreement." Is it necessary to establish an express understanding or is it sufficient to show that the practice is of such long standing that the parties may properly be assumed to have agreed to its continuance? In other words, to what extent may the required "mutuality" be implied from the parties' actions or from their mere acquiescence in a given course of conduct? Even the Shulman test does not provide us with a complete answer to this extremely vexing problem. I suspect that we would be far more likely to infer "mutuality" in a practice concerning "employee benefits" than in one concerning "basic management functions." To this extent, Shulman and the Elkouris may well have something in common.

### III. Duration and Termination of a Practice

Once the parties become bound by a practice, they may wonder how long it will be binding and how it can be terminated.

Consider first a practice which is, apart from any basis in the agreement, an enforceable condition of employment on the theory that the agreement subsumes the continuance of existing conditions. Such a practice cannot be unilaterally changed during the life of the agreement. For, as I explained earlier in this paper, if a practice is not discussed during negotiations many of us are likely to infer that the agreement was executed on the assumption that the practice would remain in effect. The inference is based largely on the parties' acquiescence in the practice. If either side should, during the negotiation of a later agreement, object to the continuance of this practice, it could not be inferred from the

---

[54] *Id.* at 241-42. See also International Harvester Co., 20 Lab. Arb. 276 (1953).

Exhibit 28

Case 2:54-cv-00090-RG Document 37-3 Filed 06/25/26 Page 187 of 417

signing of a new agreement that the parties intended the practice to remain in force. Without their acquiescence, the practice would no longer be a binding condition of employment. In face of a timely repudiation of a practice by one party, the other must have the practice written into the agreement if it is to continue to be binding.

Consider next a well-established practice which serves to clarify some ambiguity in the agreement. Because the practice is essential to an understanding of the ambiguous provision, it becomes in effect a part of that provision. As such, it will be binding for the life of the agreement. And the mere repudiation of the practice by one side during the negotiation of a new agreement, unless accompanied by a revision of the ambiguous language, would not be significant. For the repudiation alone would not change the meaning of the ambiguous provision and hence would not detract from the effectiveness of the practice. It is a well-settled principle that where past practice has established a meaning for language that is subsequently used in an agreement, the language will be presumed to have the meaning given it by practice. Thus, this kind of practice can be terminated only by mutual agreement, that is, by the parties rewriting the ambiguous provision to supersede the practice, by eliminating the provision entirely, etc.

Consider finally the effect of changing circumstances on the viability of a practice during the contract term. Where the conditions which give rise to a practice no longer exist, the employer is not obliged to continue to apply the practice. Suppose, for instance, that crane operators who handle extremely hot materials have for years been given a certain amount of relief time during their shift and that after installing an air-conditioning unit in one of the crane cabs the employer refuses to give any more relief time to the operator of that crane. Whether the employer's action is justifiable depends upon the reason behind the relief time practice. If relief was given because of the extreme heat alone, there would be good reason for denying any relief to the operator in the air-conditioned cab. The circumstances underlying the practice would no longer be pertinent to this particular craneman. If, on the other hand, relief was given because of the high degree of concentration and care demanded in running these cranes there would be good reason to continue relief time for this craneman. The circumstances underlying the practice would still be relevant to his situation, even though he now has the benefit of air-conditioning. In other words, a practice must be carefully related to the conditions

**Exhibit 28**

Case 2:54-cv-00091-MRG Document 37-3 Filed 06/25/26 Page 188 of 417

from which it arose. Whenever those conditions substantially change, the practice may be subject to termination.

### CONCLUSION

Through past practice, the arbitrator learns something of the values and standards of the parties and thus gains added insight into the nature of their contractual rights and obligations. Practices tend to disclose the reasonable expectations of the employees and managers alike. And as long as our decision is made within the bounds of these expectations, it has a better chance of being understood and accepted.

The ideas expressed in this paper may be useful as a general guide to the uses of past practice in administering the collective agreement. They do not provide an easy formula for resolving disputes; they are no substitute for a thorough and painstaking analysis of the facts. In the problem areas of past practice, there are so many fine distinctions that the final decision in a case will rest not on any abstract theorizing but rather on the arbitrator's view of the peculiar circumstances of that case. In other words, no matter how successful we may be in systematizing the standards which shape arbitral opinions, we must recognize that considerable room must be left for "art and intuition,"[55] for good judgment.

[55] Cox, *supra* note 37, at 1500.

**Exhibit 28**

# Arbitration Decisions

## Labor Arbitration Decision, 4659183-AAA, [Number redacted], 2019 BNA LA Supp. 4659183

**Labor Arbitration Decision, 4659183-AAA, [Number redacted], 2019 BNA LA Supp. 4659183**

Decision of Arbitrator

In the Matter of the Arbitration Between: __ FOP Lodge __ and __ County.

[Number redacted]

January 16, 2019

September 5, 2018

December 17, 2018

Appearances:

For the Union: Mr. Anthony N. Delcollo, Esq., Offit Kurman, PA.

For the Employer: B __, Esq., Assistant County Attorney, __ County.

Grievance: Contract Interpretation; Violation of Section 66

**American Arbitration Association**

MARY THERESA METZLER, Esquire, Arbitrator.

**OPINION and AWARD**

**Introduction**

This arbitration arises pursuant to the grievance procedure set forth in the Collective Bargaining Agreement ("Agreement") between __ County ("County" or "Employer") and the Fraternal Order of Police, __ County Lodge __ ("Union" or "FOP"). The Agreement, has effective dates from April 1, 2015 through March 31, 2019. The undersigned was designated, per the Agreement and through the auspices of the American Arbitration Association ("AAA"), to arbitrate the instant dispute concerning the County's cessation of deferred compensation contributions to bargaining unit employees who were covered as dependents

**Exhibit 28**

under their spouse's County health insurance plan. A hearing was conducted on September 5, 2018 in __ County, DE at which time the parties were afforded a full opportunity to present testimony and evidence in support of their respective positions. Both parties submitted post-hearing briefs. The Union requested to file a reply brief, with no objection from the Employer, and that request was granted. The Union's reply brief was received by the Arbitrator on December 17, 2018. The record was declared closed by AAA as of that date.

## The Issue

The issue to be determined in this case [1] is as follows:

> Whether, in light of the language of Sections 66 and 79 of the parties' collective bargaining agreement, and the past practice of the parties, the County was permitted to depart from the past practice by discontinuing monthly contributions to deferred compensation plans for bargaining unit employees who were covered as dependents under their spouse's County health insurance plan? If not, what shall be the remedy?

## Relevant Provisions of the Collective Bargaining Agreement

The Agreement includes the following relevant provisions:

### Section 1 - PURPOSE

> It is the purpose of this Agreement to promote and insure harmonious relations, cooperation and understanding between the County Government and the FOP unit covered hereby to insure true collective bargaining under State law, to establish salaries, hours, working conditions, pensions as permitted by applicable law, and other terms of employment, consistent with availability of public funds and with the goals and purposes of the Merit System as established by County Ordinance and Regulation. ... .

### Section 17-Step Four: Appeal to Arbitration

> \* \* \* \* \* \*
>
> (d) The arbitration award shall be in writing and shall set forth the arbitrator's opinion and conclusions on the issue(s) submitted. The arbitrator shall be without power to make any decision contrary to or inconsistent with, or modifying or varying in any way, the terms of this Agreement. The arbitrator shall have no power to establish or change any wage rate or the job content of any classification or modification of any wage schedule.
>
> \* \* \* \* \* \*

**Exhibit 28**

**Section 65 - HEALTH INSURANCE AND PRESCRIPTION DRUG BENEFITS**

(a) The County agrees to assume the full cost of providing Highmark Comprehensive 80 for the employee's applicable coverage (i.e. employee only, employee and children, employee and spouse, or employee and family). The County will also make available a choice of alternative coverage, including an EPO and PPO plan offered by Highmark and a PPO plan offered by Aetna. Effective January 1, 2017, the County shall pay 93% of each employee's monthly premium for health insurance other than Comprehensive 80 coverage which shall be paid at 100%. ...

\* \* \* \* \* \*

**Section 66-Waiver of Health Insurance - Payment to a Deferred Compensation Plan**

If an employee presents proof that the employee has health insurance coverage from a source other than the health insurance provided by the County, and waives the right to receive health insurance coverage from the County, the County will contribute, for the benefit of such an employee, the sum of $250 per month to a deferred compensation plan established pursuant to Section 457 of the Internal Revenue Code. No payment shall be made pursuant to this provision until the employee has established an account with the County's deferred compensation administrator and has been removed from the applicable County health insurance plan. This provision of the agreement shall take effect as soon as possible.

**Section 79 - ALTERATIONS OF AGREEMENT**

No agreement, alteration, understanding, variation, waiver or modification of any of the terms or conditions or covenants contained herein shall be made by an employee or group of employees with the County, and in no case shall it be binding upon the parties hereto unless agreement is made and executed in writing between the parties and same has been ratified by the FOP. The waiver of any breach or condition of this agreement by either party shall not constitute a precedent in the future enforcement of the terms and conditions herein. It is understood and agreed that if any part of this agreement is in conflict with the law, that such part shall be suspended and the appropriate mandatory provision shall prevail, and the remainder of this agreement shall not be affected thereby. ...

**Background**

The Union represents two separate bargaining units at the County. The instant case involves the bargaining unit consisting of all Patrol Officers, Corporals, Senior Corporals, Master Corporals, Sergeants, Senior Sergeants, Lieutenants, and Senior Lieutenants. The County and the FOP have been parties to various collective bargaining agreements since at least 1991.

**Exhibit 28**

The County provides health insurance to bargaining unit members per Section 65 of the Agreement. Employees have a choice of health insurance plans; the County pays the full cost of one plan and 93% of the cost of the other plan options. Section 66 of the Agreement provides, in part, for contributions, in the amount of $250 per month, to a deferred compensation plan for unit employees who obtain health insurance coverage "from a source other than the health insurance provided by the County."

Mr. C __, FOP President, testified concerning health insurance for "Co-County employees." The term, "Co-County employees," refers to two employees who are both employed by the County. It includes situations where one employee is in the instant FOP unit and his/her spouse also works for the County, but outside the FOP unit. The term also includes the scenario where both spouses are employed by the County in the FOP unit. The record is undisputed that, for at least 20 years, unit employees who were covered under their spouses' County health insurance plans as dependents, received $250 per month from the County as contributions to a deferred compensation plan. For example, if Employee A (a unit employee), opted out of her own health plan and instead became a dependent on Employee B's (her spouse and another County employee) health insurance plan with the County, Employee A, received the $250 monthly payment to a deferred compensation plan.[2]

The parties stipulated that in situations where a bargaining unit member was covered as a dependent by a spouse, under a County health insurance plan, the County did not require proof of health insurance coverage from the unit employee. It was undisputed that the bargaining unit member, enrolled as the dependent, received deferred compensation payments from the County. The parties further stipulated that this past practice existed for at least 20 years.

On December 12, 2017, D __, Chief Human Resources ("HR") Officer with the County, sent an email to Mr. C __ stating, in part, as follows:

> "... During our last FOP Lodge # __ Labor Management meeting, we discussed the County's concern in regards to Section 66 of your Collective Bargaining Agreement. Specifically, HR discovered that there are members of Lodge #__ that are receiving a $250 per month contribution to a deferred compensation plan even though the source of their health insurance coverage is New Castle County. As discussed, per the language of the contract, they should not be receiving the contribution.
>
> An audit has revealed that *8 out of 22* of your members should not be receiving the $250 per month contribution because they are covered as a dependent of a __ County employee. Therefore, the source of their health insurance is the County.
>
> The Benefits Section will forward a letter to all 8 members to inform them that the $250 per month contribution they were receiving will end as of December 31, 2017. In addition, please be advised that going forward, we will be enforcing the language of the contract under Section 66. ..." (Emphasis in Original)

Mr. C __ requested the names of the 8 officers who would be impacted. On December 19, 2017, HR sent him an email with the 8 names, as follows: Ms. E __, Ms. F __, Mr. G __, M. H __, Mr. I __, Ms. J __, Ms. K __ and Mr. L __.[3] (U. Ex. 2) According to Mr. C __, the 8 named individuals were Union members and covered as dependents under another County plan. The Employer also sent a Memorandum to the 8 employees, dated December 18, 2017, stating that under the Agreement, in order to receive the $250 contribution, "the employee must present proof of health insurance coverage from a source other than the health insurance provided by __ County." The Memorandum informed the impacted employee that, effective January 1, 2018, the $250 contribution would cease since the employee was

**Exhibit 28**

receiving health insurance "provided by the County." Mr. C __ testified that the deferred compensation contributions actually ended at different times, between January and March 2018. In this regard, the parties stipulated that the $250 deferred compensation benefit was discontinued for all 8 employees named in the December 18, 2017 Memorandum, but that the actual date of cessation varied among the employees.

Mr. M __, a Senior Lieutenant, has been employed at the County since 1994. He testified that his wife, Ms. J __, is also in the unit and has been employed by the County since 1992. Prior to their marriage, each had separate health insurance plans through the County. Mr. M __ testified that around the time of their marriage, in 1998 or 1999, an HR representative recommended that his wife switch to coverage as a dependent under his health plan. The HR representative explained that they both could be under one plan and that his wife would be able to collect the $250 monthly deferred compensation contribution. According to Mr. M __, he and his wife made the change in their health insurance plans based upon the recommendation of the HR representative. Ms. J __ has been collecting the deferred compensation payments for about 20 years. Mr. M __'s understanding is that employees who obtain health insurance coverage in this manner are saving the County money as the County is paying less for the employee to be covered as a dependent, rather than paying for a separate plan. Ms. J __'s deferred compensation benefit of $250 stopped in January or February 2018.

Ms. F __, a Sergeant, married a Police Officer in the unit around 2005. It was Ms. F __'s understanding that if she dropped her own health insurance coverage and went onto her husband's plan that it would financially benefit the County, and her. Shortly after their marriage, she and her husband met with HR. They completed paperwork in order that she would become a dependent on her spouse's health insurance plan. Ms. F __ began receiving the $250 per month contribution to a deferred compensation plan. Ms. F __ testified that her husband fills out a health insurance form on an annual basis and returns it to the County. Ms. F __ received the December 2017 Memorandum stating that her deferred compensation benefit would cease; the contributions ended in January 2018.

On January 10, 2018, the Union filed a system-wide grievance alleging that the County violated the Agreement by stopping the deferred compensation payments during the term of the Agreement. The Union emphasized that this cessation occurred after the open enrollment period had ended. A Step 3 hearing was conducted on April 27, 2018. On May 11, 2018, the 3rd Step Hearing Officer denied the grievance.

### Contentions of the Union

The Union contends that the plain meaning of the language of Section 66 has been modified by the parties based on the past practice initiated by the Employer, and accepted by the Union. In the Union's view this past practice, which has undisputedly existed for multiple decades and over multiple collective bargaining agreements, modified Section 66 to include a "contractual requirement" that monthly deferred compensation benefits would be paid to unit employees who chose to be covered as dependents on the health insurance plans of their spouses who were also County employees.

According to the Union, it has reasonably relied upon the meaning and manner in which Section 66 would be applied and it negotiated the most recent Agreement based on that understanding. If the Union had fair warning from the Employer that the deferred compensation benefit would abruptly be changed mid-contract, it would have negotiated for explicit words to reflect the parties' past practice on this issue. To allow the change mid-contract violates basic principles of fairness and constitutes a violation of Section 66, especially when read in conjunction with Section 1 which promotes collective bargaining.

**Exhibit 28**

The Union further argues that there is no prohibition in the Agreement on the establishment of past practices, nor that the "sole contractual understanding of the parties" is contained within the 4 corners of the Agreement. Insofar as Section 79 is concerned, the Union contends that until the arbitration hearing itself, the Employer made no argument that it viewed the instant situation as a "waiver" under Section 79. The County failed to give the Union fair notice that the County viewed this as a matter of "waiving" a requirement of Section 66.

In reply to the County's brief, the Union argues that the parties' behavior, which was "at odds with what would appear to be the plain language [of] Section 66," demonstrates that the words of the Agreement had taken on a different meaning. The past practice should be utilized by the Arbitrator to clarify the ambiguities in Section 66 which now exist. Alternatively, the Union contends that this is a situation of promissory estoppel whereby the Union and its members relied, to their detriment, on the Employer's conduct. The Union did not attempt to negotiate the language of Section 66 given its reliance on the Employer's policy and conduct; in addition, the FOP members relied upon promises made by the County in changing their health care plans. Further, there was no evidence that the County intentionally waived any right; the County's arguments relying on Section 79 should be rejected.

By changing the past practice in the midst of the Agreement, the County has violated the meaning which the parties' attributed to Section 66. The Union seeks restoration of the deferred compensation benefits and retroactive payments to the impacted employees. The grievance should be granted.

### Contentions of the Employer

Initially, the Employer contends that the past practice of the parties should not be considered since the language of Section 66 is unambiguous. Citing various cases, the County emphasizes that the use of extrinsic evidence should be very limited when interpreting contracts. Extrinsic evidence of past practice should only be utilized to resolve ambiguities "or to show that a contract is ambiguous." According to the County, the wording of Section 66 is straightforward and its meaning is clear and complete.

Further, the past practice conflicts with the language of the Agreement and cannot be used to change the express terms of the Agreement. Although the Union's position is that the proper way to change the past practice is through negotiation, the County rejects that position and asserts that the County is merely seeking to enforce the explicit terms of the Agreement; the County should not be compelled to re-negotiate the terms of the Agreement.

The County also argues that the past practice constituted a "waiver" of the Section 66 condition that employees present proof of insurance from a source other than the County. The County chose not to enforce that provision and the County acknowledges that this waiver was not inadvertent, but intentional. However, the County highlights Section 79 which states that waivers do not constitute precedent. Therefore, the undisputed past practice does not create a precedent against future enforcement. Additionally, the County notes that under Section 79, an alteration of the agreement must be in writing between the parties; as there was no written execution of an agreement concerning payments of deferred compensation to employees in the circumstances at issue, no alteration has occurred. The County requests that the grievance be denied.

**Exhibit 28**

**ANALYSIS and OPINION**

The instant case involves a matter of contract interpretation. In such cases, the burden of proof rests with the union. Based on the reasons set forth below, the Arbitrator concludes that the Union has sustained its burden and that the County violated the Agreement by its cessation of deferred compensation contributions, to the employees at issue, during the term of the Agreement.

The facts in the instant case essentially are not in dispute. Based on the testimony and the positions/stipulations of the parties, the record was clear that a past practice has existed for at least 20 years whereby bargaining unit members, who were enrolled as dependents on their spouses' County health insurance plans, became eligible to receive, *and did in fact receive,* $250 per month in contributions to a deferred compensation plan. The undisputed facts also reveal that the County's HR department informed unit employees, whose spouses were also County employees, that instead of enrolling in their own health insurance plans, the unit employees could become dependents on their spouses' County plan. Per the HR representatives, this would then make the unit employee eligible to receive the deferred compensation payments. Therefore, the record clearly established that based on the recommendation and advice of the HR representatives, the past practice developed and became the mutually understood manner of conduct accepted by both parties over a lengthy period of time. It was undisputed by the parties that the parties' fixed and unequivocal practice in this regard met all the requirements of an established past practice. [4]

While the parties agree on the existence of this past practice, they disagree concerning its relevance. The County strenuously argues that the past practice should not be considered by the Arbitrator since it conflicts with the clear and unambiguous language of Section 66. The Union emphatically argues that although the meaning of Section 66 appears to be plain, the past practice has actually modified the Agreement, and/or that the past practice clarified the ambiguities in Section 66, as the parties' conduct demonstrates that the words of the Agreement have taken on a different meaning.

The Employer correctly states the general proposition that extrinsic evidence, such as past practice, will not be taken into consideration, where the words of the contract are clear and unambiguous. However, there are circumstances which warrant consideration of past practice, even where the contract language initially appears clear. In International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, et al. and Employer __ , 188 F.3d 130, 145 (1999), cited by both parties, the Third Circuit states that the use of extrinsic evidence should be "carefully circumscribed," but acknowledges that it can be relevant in certain situations. Those circumstances include cases where the contract language appears clear but is actually ambiguous, or where there is a void in the language. In a case cited by Union counsel, the Third Circuit has also stated, as follows:

> "[I]f the arbitrator's award has deviated from the plain meaning of a labor contract provision, it must find support in the contract itself *or in prior practices demonstrating relaxation of the literal language.*" Employer __ v. United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Industrial and Service Workers International Union, 717 F.3d 155, 162 (3d Cir. 2013) (citing NF&M Corp. v. United Steelworkers of America, 524 F.2d 756, 759 (3d Cir. 1975) (emphasis added) (further string citation omitted)

Under Section 65 of the Agreement, the County provides health insurance to employees; the employees have a choice of plans and the amount the County pays for the plan varies depending on the plan selected. Section 66, the focus of this case, provides as follows:

**Exhibit 28**

**Section 66-Waiver of Health Insurance - Payment to a Deferred Compensation Plan**

> If an employee presents proof that the employee has health insurance coverage from a source other than the health insurance provided by the County, and waives the right to receive health insurance coverage from the County, the County will contribute, for the benefit of such an employee, the sum of $250 per month to a deferred compensation plan established pursuant to Section 457 of the Internal Revenue Code. No payment shall be made pursuant to this provision until the employee has established an account with the County's deferred compensation administrator and has been removed from the applicable County health insurance plan. This provision of the agreement shall take effect as soon as possible.

In interpreting the language of Section 66, the Arbitrator finds it clear and unambiguous when read in the context of two employees, where one works for the County in this bargaining unit, and the other is employed by a different employer. The first sentence of Section 66 then makes logical sense in that the unit employee would have to present "proof that the employee has health insurance coverage from a source other than the health insurance provided by the County." In those circumstances, the unit employee would then waive his/her right to the "health insurance coverage from the County," as referenced in the first sentence.

However, in the instant circumstance involving Co-County employees, this first sentence of Section 66 is ambiguous and lacks clarity. Thus, there is no language in Section 66 which directly deals with Co-County employees, or clarifies how such employees will be treated with respect to receipt of these deferred compensation payments. In this regard, the Arbitrator finds that the Agreement is incomplete and ambiguous. The parties' clear and consistent past practice filled that void and, in effect, created an amendment to the language to deal with the Co-County employee scenario. The objective fact is that the County encouraged unit employees, who also had spouses employed by the County, to become dependents on their spouses' health insurance policies.[5] As a result, the unit employee waived the right to select his/her own health insurance plan, as the primary policy holder, which right was provided to the employee by virtue of his/her status as a unit employee.

The Arbitrator further finds that the clear and consistent past practice of the parties reflects the parties' interpretation, or relaxation, of the literal language, set forth in the first sentence of Section 66. While that sentence would appear to require proof of health insurance from a source outside the County, the Employer acknowledged that it never requested such proof when dealing with the Co-County employee scenario. This conduct supports the Arbitrator's finding that the parties chose to interpret the somewhat ambiguous language of Section 66 in a different manner when dealing with Co-County employees. The Union came to rely on this understanding and the manner in which the Section 66 benefit would apply. Therefore, the Arbitrator concludes that the past practice is relevant and should be considered in her analysis and determination of the instant matter.

The question then becomes what right, if any, did the Employer have to unilaterally cease that past practice during the term of the Agreement? The evidence clearly shows that the Union and Employer operated for a considerable length of time (at least 20 years) with the mutual understanding discussed above. In December 2017, the Employer announced that it would be discontinuing the past practice at the end of 2017.[6] The Union argues that it relied on the past practice as the parties' interpretation of Section 66. In the numerous contract negotiations over the past 20-25 years, it had no fair warning from the County that the

**Exhibit 28**

County intended to change the practice. If the Union had been put on notice, it would have negotiated for different clarifying language in Section 66.

The Union's contention is supported by the undisputed testimony of Union President, Mr. C __ , that the exact same language set forth in Section 66 of the Agreement, was contained in prior collective bargaining agreements between the parties going back to at least 1991. Portions of those contracts, spanning the timeframe from 1991 to the present were introduced at the hearing. (U. EX. 4) [7] Those prior contracts all set forth the same language as the current Section 66, although the Section numbers within the particular contract may vary.

The Arbitrator finds the Union's arguments persuasive. Thus, mutually accepted customs and past practice may become part of the parties' contract. The parties have pointed to no provision in the Agreement which excludes past practice. Further, there was no evidence that the past practice at issue was repudiated by the County during contract negotiations. Therefore, the Arbitrator concludes that it was reasonable for the Union to enter into a new contract based on the understanding that the past practice, as it existed, would continue in force. That is especially true as the past practice in the instant matter relates to a significant employee benefit.

The County makes several arguments in defense of its discontinuation of the past practice. Initially, the County contends that the past practice amounted to an intentional "waiver" of its right to demand proof from employees that they had health insurance from a source, other than the County. [8] The County points to Section 79 language which provides that the "waiver of any breach or condition of this agreement by either party shall not constitute a precedent in the future enforcement of the terms and conditions herein." In essence, the County argues that the language was clear, but that it intentionally chose not to enforce it. At first glance, this argument is appealing. However, when carefully considered in light of the record, the argument lacks support. Thus, the record clearly established that the County knew the "source" of the employee's health insurance. The Arbitrator credits the testimony of the various Union witnesses that it was the County, which proactively advised unit employees to set up their insurance in this manner. The testimony of these witnesses was not disputed.

Significantly, the County stipulated that Co-County unit employees were not required to present "proof" that they had health insurance coverage from a source, other than the County. The Employer acknowledges that its conduct in this regard was not merely inadvertent, but was "intentional." As the County recommended employees arrange their health insurance in this fashion, and obtained the appropriate paperwork from the employees, the record establishes that the County not only had notice of the conduct, but actively participated in its arrangement. How could the County, under these circumstances, have demanded "proof" of the "source" from the employee, since the County was fully aware of the source of their health insurance coverage? Under the parties' past practice, when dealing with Co-County employees, no such proof was demanded, or required, as a "condition" of receiving the deferred compensation benefit. The Arbitrator does not view this as a "waiver" by the County of a "condition," as no such condition ever existed under the practice.

The County also argues that Section 79 does not allow for alterations of the agreement unless such changes are in writing, executed by both parties, and ratified by the FOP. The first sentence of Section 79 reads:

> No agreement, alteration, understanding, variation, waiver or modification of any of the terms or conditions or covenants contained herein shall be made by an employee or group of employees with the County, and in no case shall it be

**Exhibit 28**

binding upon the parties hereto unless agreement is made and executed in writing between the parties and same has been ratified by the FOP.

While the Arbitrator has seriously considered the County's argument, she finds that it is misplaced in this case. In the Arbitrator's view, and as argued by the Union, this portion of Section 79 focuses on a situation where "an employee or group of employees with the County" make some private agreement with the County. According to the clear language in the first sentence of Section 79, such side agreements or alterations, will not be binding unless the FOP is party to the agreement, or alteration, and has signed off on the change. However, the instant case does not involve a mere side agreement, nor did the County make such a claim. Indeed, as of December 2017, 8 employees were receiving deferred compensation payments pursuant to the past practice; clearly this case does not involve isolated or sporadic side agreements. The length and breadth of the past practice, which undisputedly existed for decades over multiple contracts, supports this conclusion.

Moreover, the past practice was initiated by the Employer and accepted by the Union, and by the very definition of past practice, became the *mutual understanding of the parties* to this Agreement, i.e., the County and the FOP. The County is correct that the past practice was never put in writing, but typically past practices are unwritten. The Arbitrator does not interpret Section 79 as a "zipper clause." There is no language specifically excluding past practices or customs, nor does Section 79 state that the written contract constitutes the "entire agreement" between the parties. Indeed, the County does not argue that Section 79 constitutes a "zipper clause."

Finally, the Employer points to Section 17(d) of the Agreement which states that an arbitrator has no authority to modify or vary the terms of the Agreement. This is an important provision and one which this Arbitrator has reviewed and thoughtfully considered. However, the Arbitrator here is not modifying, nor attempting to modify or vary, the terms of the Agreement. Rather, it is the parties themselves, who through their long-standing past practice have amended or modified Section 66, in terms of its applicability to situations involving Co-County employees.

The Arbitrator has carefully reviewed the record evidence, cases cited by the parties, and their briefs and arguments. Based on the reasons set forth above, the Arbitrator concludes that the County violated the Agreement when it unilaterally discontinued deferred compensation contributions, in the midst of the Agreement, to the 8 employees referenced in its December 12, 2017 email. While the Arbitrator recognizes that there are times and circumstances under which a past practice may be properly ended, this was not one of them.

The Arbitrator will order that the County reinstate the past practice and make the impacted employees whole with respect to the deferred compensation payments which improperly ended. The record disclosed that although the 8 employees were informed that the payments would end as of December 31, 2017/January 1, 2018, some of the payments continued into the early part of 2018. The County will make the $250 per month contribution to an employee's deferred compensation account retroactive to the date that the individual employee's payment actually ceased, which date may vary from employee to employee. The Arbitrator will also retain jurisdiction for a period of ninety (90) calendar days solely with respect to addressing any issues regarding the implementation of this Award.

**AWARD**

The Union's grievance is sustained. Having found that the County violated the parties' Agreement, the Arbitrator orders that the County rescind its' cessation of the past practice

**Exhibit 28**

at issue. The County is hereby ordered to reinstate the monthly contributions to the deferred compensation plans of the 8 employees referenced in its December 12, 2017 email.[9] The County is also ordered to make those employees whole by paying the $250 monthly contribution to the affected employees' deferred compensation accounts, retroactive to the date that the individual employee's payment actually ceased, which date may vary from employee to employee. The Arbitrator will retain jurisdiction for a period of ninety (90) calendar days solely with respect to addressing any issues regarding the implementation of this Award.

January 16, 2019.

---

**fn** 1

The parties were unable to stipulate to the exact issue and therefore, agreed that the Arbitrator would frame the issue in her Award.

**fn** 2

Ms. C __ testified that there are four (4) levels of coverage provided by the County: Single, Employee & Spouse, Employee & Children, and Employee & Family.

**fn** 3

Mr. C __ testified that some of these employees are no longer employed by the County.

**fn** 4

A "past practice" in order to be binding, must be "(1) unequivocal; (2) clearly enunciated and acted upon; (3) readily ascertainable over a reasonable period of time as a fixed, and established practice accepted by both Parties." Elkouri & Elkouri, *How Arbitration Works,* 6th Ed., p. 608.

**fn** 5

There was testimony from both Mr. M __ and Ms. F __ that their "understanding" was that the County saved money when an employee became a dependent on the spouse's plan. While this "understanding" was not disputed by the Employer, the record was insufficient to establish that fact.

**fn** 6

Based on the County's December 12, 2017 email, it appears there had been some prior discussion of the County's concerns at a Labor-Management meeting, but the date of that meeting was not disclosed on the record.

**fn** 7

The Arbitrator notes that U. Ex. 4 did not include a collective bargaining agreement for the 2011-2013 time period. However, this may have just been an oversight. Thus, the County did not dispute the Union's claim that this same language was contained in all the parties' contracts since at least 1991.

**fn** 8

While the Union argued that it heard about the "waiver" argument for the first time at the arbitration hearing, the Arbitrator notes that the 3rd Step grievance reply addresses

**Exhibit 28**

this issue which was apparently raised by the County at the 3rd Step hearing.

**fn** 9

The record revealed the names of 8 affected employees. If the actual number of employees impacted by the County's violation is higher, those additional employees would also be covered by this Award.

**Exhibit 28**

Case 3:25-cv-04009-RG Document 137-3 Filed 06/25/26 Page 201 of 417

Merck & Co., Inc. v. United Steel Workers of America,..., Not Reported in Fed....

2021 WL 1171637
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

MERCK & CO., INC., Plaintiff,
v.
UNITED STEEL WORKERS OF AMERICA, LOCAL 4-575, Defendant.

Civil Action No. 2:16-cv-05459-WJM-MF
|
Signed March 25, 2021
|
Filed 03/29/2021

**Attorneys and Law Firms**

Seth Spiegal, John James Peirano, Jr., McElroy Deutsch Mulvaney & Carpenter, Morristown, NJ, for Plaintiff.

Peter H. Demkovitz, Markowitz & Richman, Philadelphia, PA, for Defendant.

**OPINION**

WILLIAM J. MARTINI, U.S.D.J.

**\*1** Plaintiff Merck & Co., Inc. (the "Company" or "Plaintiff") brings this action against Defendant United Steelworkers of America, Local 4-575 (the "Union" or "Defendant") seeking to vacate an arbitration award sustaining a grievance brought by the Union under the parties' 2012 collective bargaining agreement (the "2012 CBA"). This matter comes before the Court on Plaintiff's motion for summary judgment seeking to vacate the arbitration award, ECF No. 44, and Defendant's own motion for summary judgment on its counterclaim seeking to enforce the arbitration award, ECF No. 45. For the reasons set forth below, the Plaintiff's motion for summary judgment is GRANTED, and Defendant's motion for summary judgment is **DENIED**.

**I. BACKGROUND**

**A. Factual Background**
The material facts of this case are not in dispute. This action arises out of the amount of paid time provided to employees who receive or attend "anniversary lunches" offered by the Company to its employees, including Union members, upon reaching certain specified seniority milestones. Pursuant to the Company's "Service Awards Program Procedures," employees are entitled to an anniversary lunch upon reaching their 25th year of service, and again every five years after that. Service Awards Program Procedures, Decl. of Seth Spiegal, Esq., Ex. D, ECF No. 45-2. The Service Awards Program Procedures do not provide an amount of time for which the lunch recipient and their guests shall be paid in connection with the anniversary lunch. *Id.*

On December 1, 2013, an employee and Union member attended an anniversary lunch and received two (2) hours of paid time in connection therewith. Decl. of Jonathan Beck, Esq., Spiegal Decl., Ex. C, at ¶ 4. Shortly thereafter, on January 14, 2014, the Union filed a grievance under the 2012 CBA contending that the employee was entitled to receive four (4) hours of paid time rather than two. *Id.*

**B. The 2012 CBA**

**Exhibit 28** 1

At all relevant times, the Company and the Union were parties to the 2012 CBA, which was effective from May 1, 2012 through April 30, 2015. *See* 2012 CBA, Spiegal Decl., Ex. A. The 2012 CBA is comprised of two separate agreements: a "Master Agreement" and a "Local Supplemental Agreement." *Id.* The Local Supplemental Agreement contains a number of provisions governing the scope of the 2012 CBA and the procedures for resolving grievances as they relate to the Company's facility in Rahway, New Jersey. Specifically, Article XXI of the Local Supplemental Agreement titled "Effect of Other Agreements and Past Practices" provides, in relevant part:

1. Except for those side letters, written agreements, past practices, verbal agreements, and any other agreement which are set forth in the Side Letter/Other Agreements book, all prior written and verbal agreements, past practices, memoranda of understanding or other agreements shall have no force and effect. Those Agreements set out, or incorporated by reference, in the Side Letter/Other Agreements book shall expire at the same time as this Agreement.

**\*2** 2. The Company and the Union agree that no agreement is binding on the respective parties unless in writing and signed by the representative or representatives designated by that party as having signatory authority. Each Party will provide written notice of the individual(s) that have signatory authority at the time of signing this Agreement. Each Party agrees that it will provide written notice of the individual(s) having such signatory authority if there are any future changes.

CBA, Local Supplemental Agreement, Art. XXI. This section, commonly referred to as a "zipper clause" purports to extinguish contractual reliance on previous formal or informal agreements between the parties unless expressly incorporated into the Side Letters/Other Agreements book in a signed writing.

In addition to the zipper clause, the 2012 CBA provided that the resolution of disputes between the parties arising thereunder would be governed by a detailed grievance process, and that any disputes which could not be resolved through such grievance process could be submitted by either party for arbitration. CBA, Local Supplemental Agreement, Art. XIV(2)(A)(1). In setting forth the precise arbitration procedures to be followed, the CBA provides, in relevant part:

> The arbitrator shall not be governed by legal rules of evidence but may receive any logical evidence which the arbitrator may deem to have probative value. The decision of the arbitrator shall be final and binding on the Company, the Union, and the employees, except that the arbitrator shall have no power to add to, subtract from, or modify any of the terms of this Agreement or any agreements made supplementary hereto. The arbitrator shall be asked to render his decision within fifteen (15) days after the case is presented for arbitration.

CBA, Local Supplemental Agreement, Art. XIV(2)(C).

The 2012 CBA does not contain any references to the Company's Service Awards Program Procedures or anniversary lunches in general. Union Resp. to Merck Stmt. of Undisputed Facts, ¶¶ 3-4, ECF No. 46. Nor was there any signed written agreement between the parties in the Side Letter/Other Agreements book providing for four hours of paid time for anniversary lunches. *Id.* at ¶¶ 21-22.

### C. Procedural History

Pursuant to Article XIV of the Local Supplemental Agreement, the grievance was submitted to arbitration and a hearing was held on September 11, 2015 before Arbitrator John M. Skonier (the "<u>Arbitrator</u>"). Beck Decl., at ¶ 5. During the arbitration proceeding, the Company argued that the 2012 CBA was silent on the subject of anniversary lunches, that no written policy or agreement was in place providing for the length of paid time with respect to anniversary lunches, and that the 2012 CBA's zipper clause precluded the Union from relying on any alleged past practice with respect thereto to bind the Company. Union Resp. to Merck Stmt. of Undisputed Material Facts, ¶¶ 20, 24-26. The Union argued that because the Company had in fact

continued the practice of providing four hours of paid time for anniversary lunches following the May 1, 2012 effective date of the 2012 CBA, the zipper clause was unenforceable with respect thereto., ¶¶ 19, 23.

On June 10, 2016, the Arbitrator issued his award sustaining the Union's grievance and finding that the Company violated the 2012 CBA by failing to provide employees with four hours of paid time off for attending an anniversary lunch. The Arbitrator made three key findings: (1) that prior to November 2013, "if an employee elected to have an anniversary luncheon, he or she would be given four hours of paid time"; (2) that the 2012 CBA did not reference anniversary lunches and that the Service Awards Program Procedures did not specify a length of time for such lunches; and (3) that the practice of offering four hours of paid time per anniversary lunch "continued well after Article 21 was inserted into the contract." Award, Spiegal Decl., Ex. E, at 10-11. Based on these findings, the Arbitrator concluded that the zipper clause therefore did not serve to automatically eliminate the practice of providing four hours of paid time for anniversary lunches and that a change in that practice required the consent of the Union. *Id.*

## II. LEGAL STANDARD

### A. Motion for Summary Judgment

**\*3** Federal Rule of Civil Procedure 56 provides for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party must support its position by citing to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations[,] ... admissions, interrogatory answers, or other materials ...." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The court considers the record in the light most favorable to the non-moving party while drawing all reasonable inferences in that party's favor. *Bowers v. NCAA*, 475 F.3d 524, 535 (3d Cir. 2007). The standard for deciding whether to grant a summary judgment motion is the same even where, as here, the parties files cross-motions. *In re Cooper*, 542 F. Supp. 2d 382, 385-86 (D.N.J. 2008). In ruling on cross-motions for summary judgment, the Court must evaluate the competing motions independently under the applicable standard. *Boardwalk Regency Corp. v. Unite Here Local 54*, No. 08-0016 (JBS), 2009 WL 540675, at \*4 (D.N.J. Mar. 3, 2009)

### B. Review of Arbitration Awards

The Court's review of an arbitration award is "quite narrow" and exceedingly deferential to the findings and conclusions of the arbitrator. *Akers Nat'l Roll Co v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, 712 F.3d 155, 160 (3d Cir. 2013). Arbitration awards are "entitled to a strong presumption of correctness" and, in reviewing such awards, the Court is not free to correct even serious factual or legal errors made by an arbitrator. *Rite Aid of N.J., Inc. v. United Food & Com. Workers Union, Local 1360*, Civ. A. No. 11-00374 (RMB/JS), 2011 WL 5920939, at \*3 (D.N.J. Nov. 28, 2011); *see also Brentwood Med. Assocs. v. United Mine Workers of Am.*, 396 F.3d 237, 240 (3d Cir. 2005). Rather, an arbitration award must be upheld so long as it "draws its essence from the collective bargaining agreement." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987). An award draws its essence from the collective bargaining agreement "if the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention." *Ludwig Honold Mfg. Co v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir. 1969). In other words, "if an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision." *Major League Baseball Players Ass'n v. Garvey*, 432 U.S. 504, 509 (2001) (per curiam).

Despite this deferential standard of review, however, the Court is not a mere rubberstamp of the arbitrator's decision. The Court may properly vacate an arbitration award "if it is entirely unsupported by the record or if it reflects a manifest disregard of the agreement." *Citgo Asphalt Ref Co. v. Paper, Allied-Indus., Chem. & Energy Workers Int'l Union Local No. 2-991*, 385 F.3d 809, 816 (3d Cir. 2004). "Further, an arbitrator must act within the scope of authority conferred [upon] him by the CBA."

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Exhibit 28**

*Monongahela Valley Hosp. Inc. v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, 946 F.3d 195, 199 (3d Cir. 2019). Put differently, an arbitrator is not free to disregard the plain language of a collective bargaining agreement and stray so far from the interpretation and application thereof so as to "effectively 'dispense [their] own brand of industrial justice.' " *Garvey*, 532 U.S. at 509 (quoting *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 596 (I960)).

## III. DISCUSSION

**\*4** The question at the heart of this dispute is simple: did the Arbitrator manifestly disregard the terms of the 2012 CBA in concluding that the Company was required to continue the practice of providing four hours of paid time off for anniversary lunches? The Company urges the Court to answer in the affirmative, arguing that because the CBA was silent on the subject of anniversary lunches and contained a zipper clause that unambiguously rendered all past practices and other agreements of "no force and effect," the Arbitrator improperly considered past practice and effectively added a new term to the CBA by imposing an unwritten condition on the Company beyond the scope of his authority. The Union disagrees and argues that the Arbitrator's determination that the zipper clause did not automatically eliminate the practice of offering four hours of paid time for anniversary lunches because that practice continued after the effective date of the 2012 CBA and did not directly contradict its terms was a rational interpretation thereof based on the evidence in the record which is entitled to substantial deference. For the reasons that follow, the Court concludes that this case presents one of the rare circumstances where it is clear that the Arbitrator exceeded the scope of his authority conferred upon him by the 2012 CBA and manifestly disregarded the terms thereof such that the Award must be vacated.

### A. The Award Manifestly Disregards the Terms of the 2012 CBA

Despite the deference afforded to them, arbitrators "may not ignore the plain language of the contract." *Misco*, 484 U.S. at 38. Nor may an arbitrator look to extrinsic evidence to contradict the plain meaning of the contract or "to introduce ambiguity into an unambiguous CBA." *Bricklayers & Allied Craftworkers Local 5 of N.J. Pension & Annuity Funds v. Chanree Constr. Co.*, No. 12-3897 (FLW)(LHG), 2013 WL 6528776, at \*3 (D.N.J. Dec. 12, 2013) (citing *Akers*, 712 F.3d at 161); *Boardwalk Regency*, 2009 WL 540675, at \*7 ("[T]he Arbitrator could not rely upon extrinsic evidence to reach an interpretation of the CBA that conflicts with the express provisions of the Agreements." (quotations omitted)). Thus, absent "either contractual language on which to hang the label of ambiguous or some yawning void ... that cries out for an implied term," *Akers*, 712 F.3d at 161-62 (quoting *U.A.W. Local 1697 v. Skinner Engine Co.*, 188 F.3d 130, 146 (3d Cir. 1999)), an arbitrator must enforce the agreement as written.

Here, the Arbitrator's conclusion that the zipper clause did not automatically eliminate the practice of providing four hours of paid time for anniversary lunches because that practice continued beyond the effective date of the 2012 CBA and was not otherwise in direct conflict with other provisions of the 2012 CBA ignores the unambiguous plain meaning of the zipper clause. Article XXI(1) of the Local Supplemental Agreement is clear: all past practices and other agreements in existence on the effective date of the 2012 CBA were of "no force and effect" *unless* explicitly set forth in the Side Letter/Other Agreements book. CBA, Local Supplemental Agreement, Art. XXI. In other words, the zipper clause clearly and unambiguously (1) disclaimed any reliance on past practices or extracontractual agreements; *and* (2) established a mechanism by which the parties could continue to bind themselves to certain practices and agreements not covered by the 2012 CBA itself. To that end, the Arbitrator acknowledged, and the parties do not dispute, that the 2012 CBA neither references the Service Awards Program Procedures providing for anniversary lunches nor contains any provision with respect to either anniversary lunches or the appropriate amount of paid time provided therefor. Award, Spiegal Decl., Ex. E, at 10. The Arbitrator further acknowledged, and again the parties do not dispute, that there is no agreement or practice with respect to either anniversary lunches or the appropriate amount of paid time in connection therewith in the Side Letter/Other Agreements book. *Id.* at 11. The Arbitrator was not free to ignore the plain language of the 2012 CBA in finding, despite the clear terms of the zipper clause, that the Company was nonetheless bound to continue the practice of offering four hours of paid time off for anniversary lunches.

**Exhibit 28**

In this respect, it does not matter whether the practice of offering four hours of paid time for anniversary lunches in fact continued after the effective date of the 2012 CBA. Although such evidence could in certain circumstances be used to find a "binding past practice" that would in effect create an additional implied term of the contract, it cannot do so where the express terms of the contract itself either contradict such an implied term or clearly and unambiguously foreclose that result. *Boardwalk Regency*, 2009 WL 540675, at *7. Indeed, the Arbitrator appeared to recognize this principle in stating that the zipper clause only "eliminates automatically" those practices which conflict with the contract's terms. *See* Award, Spiegal Decl., Ex. E, at 10. The Arbitrator's focus, however, was on the wrong object: although nothing in the 2012 CBA conflicted with the practice of providing four hours of paid time (because it was silent on the topic), it was not silent on either the method for binding the parties to agreements and practices not provided for therein or the limitations on the Arbitrator's authority for imposing such terms. Put differently, though the Arbitrator may have been correct in noting that certain practices between parties to a CBA are not necessarily "matters for agreement" that belong in the CBA itself, he incorrectly ignored the zipper clause's creation of the Side Letters/Other Agreements book for precisely that purpose. Because both the 2012 CBA and the Side Letter/Other Agreements book were silent on the subject, even though the Company may have continued to provide four hours of paid time until November 2013, it was not *bound* to do so. *See, e.g.*, *Armstrong Cnty. Memorial Hosp. v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, 419 F. App'x 217 (3d Cir. 2011) (vacating arbitration award where arbitrator found that hospital was bound to honor past practice of permitting smoking at designated locations despite clear CBA provision stating that management rights to make reasonable policies and procedures were not limited by prior or existing practices); *Boardwalk Regency*, 2009 WL 540675, at *6-7; *Dematic Corp. v. Int'l Union, United Auto., Aerospace, & Agr. Implement workers of Am. (UAW)*, 635 F. Sup. 2d 662, 674-75 (W.D. Mich. 2009) (vacating arbitration award finding that company was bound by past practice of paying benefits more than three months following layoffs despite provision in CBA expressly limiting such payments to three months). [1]

**\*5** Similarly, the 2012 CBA's silence on the topic of anniversary lunches is not a "yawning void" in the contract crying out for an implied term. The Third Circuit has repeatedly cautioned that "[e]xtrinsic evidence should not be used to add terms to a contract that is plausibly complete without them." *U.A.W. Local No. 1697 v. Skinner Engine Co.*, 188 F.3d 130, 146 (3d Cir. 1999) (quoting *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 608 (7th Cir. 1993) (en banc); *Cup v. Ampco Pittsburgh Corp.*, 903 F.3d 58, 64 (3d Cir. 2018). To that end, silence, standing alone, is not a justification for the imposition of an additional term into the contract. *See Bricklayers*, 2013 WL 6528776, at *4. This is not a case in which the CBA sets up a procedure, policy, or mechanism, but remains silent on the details necessary to give effect thereto. *See, e.g.*, *Indep. Lab. Emps. Union, Inc. v. ExxonMobil Research & Eng'g Co.*, No. 3:18-cv-10835-BRM-DEA, 2019 WL 3416897, at * 12-13 (D.N.J. July 29, 2019) (confirming arbitration award holding that company could not exercise right in CBA to use independent contractors to permanently replace union employees where CBA was silent as to the permissible duration and purpose of using independent contractors and also required union to be exclusive representative of certain classifications of employees); *Indep. Lab. Emps. Union, Inc. v. ExxonMobil Research & Eng'g Co.*, No. 17-cv-11858 (PGS), 2018 WL 1003272, at *5-6 (D.N.J. Feb. 20, 2018) (upholding arbitration award where arbitrator concluded, based on consistent past practice, that parties to CBA understood United Way Day Off as among unidentified "approved absence[s] with pay by the Company" for purposes of calculating time worked under the CBA). Rather, the 2012 CBA is completely silent on the subject of anniversary lunches and there is simply no reason to believe that this silence renders the 2012 CBA incomplete or ambiguous in some way. To the contrary, the zipper clause anticipates this very issue by extinguishing any binding effect of all practices and agreements that are not specifically recorded in the Side Letters/Other Agreements book. In other words, the express terms of the zipper clause, "far from opening a 'yawning void' in the contract" leaves the question of whether unwritten past practices or other agreements remained binding on the parties "well settled." *Bricklayers*, 2013 WL 6528776, at *4. [2]

The Arbitrator's conclusion that the continuation of the practice of providing four hours of paid time off for anniversary lunches was an exception to, or otherwise outside the scope of, the zipper clause was not based on a rational interpretation of the 2012 CBA. By ignoring the clear language of the zipper clause, the Arbitrator improperly sought to "derive 'not the meaning of the writing, but an intention wholly unexpressed in the writing' " that "in effect erase[d], rather than interpret[ed]" this provision of the 2012 CBA. *Boardwalk Regency*, 2009 WL 540675, at *7 (quoting *Am. Cyanamid Co. v. Fermenta Animal Health Co.*,

Case 2:25-cv-04009-MRG   Document 37-3   Filed 07/16/25   Page 206 of 417

Merck & Co., Inc. v. United Steel Workers of America,..., Not Reported in Fed....

54 F.3d 177, 181 (3d Cir. 1995)). In so doing, the Arbitrator disregarded the plain language of the 2012 CBA and the Award must therefore be vacated.

**B. The Arbitrator Exceeded the Scope of His Authority**

Even assuming that the Arbitrator's decision did not ignore the plain meaning of the zipper clause, it is clear that his decision exceeded the scope of his authority. An arbitrator derives their authority from the terms of the CBA itself. *Monongahela Valley Hosp.*, 946 F.3d at 200. Here, Article XIV(2)(C) makes clear that the Arbitrator has "no power to add to, subtract from, or modify any of the terms of [the 2012 CBA]." CBA, Local Supplemental Agreement, Art. XIV(2)(C). The Arbitrator's decision, however, violates this provision of the 2012 CBA and exceeds his authority in two respects.

 **\*6**  First, by finding that a past or current practice of providing four hours of paid time for anniversary lunches was binding on the Company, the Arbitrator impermissibly erased the terms of the zipper clause from the contract that rendered all unwritten past practices and other agreements not set forth in the Side Letters/Other Agreements book "of no force and effect." Alternatively, the Arbitrator's decision could be seen as an impermissible modification of the terms of the zipper clause by imposing an additional exception to its general disclaimer of any binding effect of past practices or other agreements. As constructed, the zipper clause provides that all past practices, understandings, or other agreements shall be of no force and effect, except for those documented in the Side Letters/Other Agreements book. CBA, Local Supplemental Agreement, Art. XXI. However, the Arbitrator's decision effectively adds a condition to the zipper clause whereby it leaves all past practices, understandings, or other agreements of no force and effect except for those documented in the Side Letters/Other Agreements book, *or those to which the parties may voluntarily continue to adhere and which do not otherwise conflict with the specific terms of the 2012 CBA.* Award at 10-11. By effectively inserting this additional condition into the zipper clause, the Arbitrator exceeded his authority by impermissibly modifying the terms of the 2012 CBA. *See Monongahela Valley Hosp.*, 946 F.3d at 200 (finding arbitrator's decision imposing "operating need" restriction on hospital's exclusive right to schedule vacations under CBA exceeded scope of authority); *Armstrong Cnty. Memorial Hosp.*, 419 F. App'x at 221-22 (vacating arbitration award where arbitrator's decision that policy providing for designated smoking locations was a "protected working condition" that bound hospital despite that term not appearing in the CBA and clear CBA provision stating that management rights to make reasonable policies and procedures were not limited by prior or existing practices "effectively rewrote the parties' agreement").

Second, the Arbitrator's decision in effect fashions an entirely new substantive right into the 2012 CBA out of whole cloth. Where the 2012 CBA is completely silent on the subject of anniversary lunches, the Arbitrator's decision would effectively add to the 2012 CBA's terms by elevating that practice to a mandatory subject of collective bargaining. Because the 2012 CBA was itself complete and unambiguous without any discussion of anniversary lunches, the Arbitrator's decision to include the practice within the purview of the 2012 CBA impermissibly added to the 2012 CBA's terms. *See Bricklayers*, 2013 WL 6528776, at \*4.

**IV. CONCLUSION**

For the reasons set forth above, Plaintiff's motion for summary judgment is **GRANTED** and Defendant's motion is **DENIED**. An appropriate order follows.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1171637

---

**Footnotes**

---

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   **Exhibit 28**

Case 3:25-cv-04009-MRG   Document 37-3   Filed 07/16/25   Page 207 of 417

Merck & Co., Inc. v. United Steel Workers of America,..., Not Reported in Fed....

For this reason, the Union's reliance on *Akers* for the proposition that a past practice may "in effect supersede[ ] a management rights and zipper clause" in a CBA is unpersuasive. Union Mot. at 11. First, in *Akers*, the Third Circuit specifically noted the arbitrator's conclusion that the zipper clause at issue in that case, which only required that agreements had to be in writing and signed by the parties, "d[id] not acknowledge that the written contract constitute[d] the parties' entire agreement, [was] not explicit with regard to a waiver of the right to bargain about other conditions, nor [was] it a specific affirmation that management rights are not limited by prior practices." *Akers*, 712 F.3d at 164. That stands in stark contrast to the zipper clause at issue here, which expressly disclaims future reliance on any past practices or other agreements not set forth in writing in the Side Letters/Other Agreements book. Second, the Third Circuit had determined that the arbitrator reasonably found the substantive management rights clause at issue in that case, which gave management the exclusive right to manage the company's business and "direct the working forces," including the right to hire, suspend, discharge, transfer, or relieve employees from duty, to be ambiguous because it did not specifically mention an exclusive right to schedule employees for work. *Id.* at 161-63. Here, the Court has already concluded that the zipper clause is unambiguous.

Neither can the continuation of the practice of providing four hours of paid time for anniversary lunches demonstrate a "relaxation of the literal language" of the 2012 CBA. *Akers*, 712 F.3d at 163 & n.1. The relevant language in the 2012 CBA is the zipper clause itself, which does not concern anniversary lunches or any specific right or program of the parties. The Arbitrator made no findings, and the record is devoid of any evidence suggesting, that the parties have ever demonstrated a willingness to relax the literal terms of the zipper clause. There is no evidence that the parties understood or intended the zipper clause to allow certain unwritten practices to continue to bind them in the absence of documentation in the Side Letters/Other Agreements book. In other words, there is no indication that the parties have demonstrated a willingness to be bound by anything other than the literal language of the zipper clause that all past practices and other agreements are of no force and effect unless specifically recorded in the Side Letters/Other Agreements book.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. **Exhibit 28**

# Arbitration Decisions

## Labor Arbitration Decision, SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP, 92 BNA LA 41

**Labor Arbitration Decision, SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP, 92 BNA LA 41**

Arbitration

In re SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP and UNITED STEELWORKERS OF AMERICA, LOCAL 7600

March 7, 1989

Show Summary

Appearances: For the employer: Barry V. Anton, attorney. For the union : Michael F. Sgambati, staff representative.

Lionel Richman

### Decision of Arbitrator

**SALE OF DRUGS**

**Issue**

-- [The issue is: -- ]

Was W discharged for proper cause? If not, what is the appropriate remedy?

### Relevant Contract Provisions

**"300 ARTICLE III -- MANAGEMENT**

"301 The management of the Employer's facilities and the direction of the working forces, including the right to hire, discipline, suspend or discharge for proper cause, or transfer, and the right to relieve employee from duty because of lack of work, or for other legitimate reasons, is vested exclusively in the Employer, provided that this will not be used for purposes of discrimination against any employee.

* * *

**Exhibit 28**

**"1200 ARTICLE XII -- DISCHARGE CASES**

"1201 In the exercise of its rights under Article III, the Employer agrees that no employee shall be preemptorily discharged and in all instances in which the Employer may conclude that an employee's conduct justifies discharge, the employee shall first be suspended. Suspension with the intent to discharge shall be for not more than five (5) calendar days. During this period of initial suspension, if the employee believes there has been unjust treatment, shall request a discharge hearing and a statement of the offense by filing a written grievant in Step Two.

* * *

"1205 Additional decisions and appeals may be made in accordance with the remaining steps of the Grievance Procedure. Should it be determined by the Employer in Step Two or Three, or by the Arbitrator at Step Four, that the employee has been discharged without just and sufficient cause, the employee shall be reinstated. Such reinstatement may be with full back pay, no back pay or partial back pay as mutually agreed to by the parties or as determined by the Arbitrator.

* * *

"1207 Notice of Disciplinary Action

"1208 The Employer agrees to remove from an employee's personnel records, or any other file, any Notice of Disciplinary Action and/or memos for incidents of unsatisfactory performance for which there has been no recurrence of the same nature for one (1) year. Said one (1) year period shall commence on the date the Notice of Disciplinary Action and/or memo was issued, and will automatically be extended by any absences of sixty (60) consecutive days or more for a period of time equal to the duration of said absence.**[*42]**

### Statement of Evidence

Prior to his discharge, grievant was employed as a morgue attendant in the pathology department. His date of hire was March 23, 1965.

The Employer maintains a hospital and medical group at its facilities in Fontana, California.

In September, 1987, Edward Callahan, Area Personnel Director for the Employer, trained the supervisors in implementing the Company's drug policy. During this training program of the supervisors, the supervisors were told to communicate the Employer's policy on sale or use of drugs in the work place to the employees, and to advise them that the use or sale of drugs was cause for termination.

At some point in the spring of summer of 1988, the Employer retained the services of Narcorp, a private investigation firm, to conduct an undercover investigation at the Fontana facility. Harold Phenix, the principal in the corporation, also supervised the investigation. Prior to establishing Narcorp, Phenix had a substantial law enforcement background, including investigation of narcotics cases.

A number of Narcorp agents were introduced into the work place as undercover agents.

A list was prepared of employees who were believed to be either users or sellers of drugs. This list changed from time to time as new names surfaced during the undercover

**Exhibit 28**

operation, and those names were added to the list.

The investigation reached its climax on or about July 15, 1988. Closing interviews were conducted with a number of employees. Where the evidence which had been gathered reflected that the employee was a seller, the information was turned over to law enforcement authorities; six employees were arrested and resigned their jobs.

Thirteen employees who admitted to use of drugs were offered and accepted rehabilitation agreements which did not involve any loss of employment. One employee was offered a random testing agreement which did not involve any loss of employment. One employee who was offered a rehabilitation agreement rejected it and instead filed a grievance, which is pending.

Grievant was not arrested, but was terminated.

The evidence against grievant involved two types of transactions. There was the testimonial evidence of Weichelt, an undercover agent, relative to his dealings with grievant, and there was the testimony of Phenix and Casey as to the July 15, 1988, interview with grievant.

Weichelt, who testified that he was known to grievant as "Bobby," approached grievant in the basement in June and asked him if he knew where he could get any speed for sale. Grievant said that he could get it for him. Weichelt further recalled that grievant said that it would cost $125.00 for a sixteenth of an ounce. Nothing further occurred on this occasion; no drugs were produced or sold.

When Weichelt got back to grievant, he was not available until some later date. He then telephoned him again and grievant told him that he was not available and to call him back.

At least a week thereafter, Weichelt approached grievant again in the basement of the hospital. Grievant asked him if he was still interested in the drugs and Weichelt said that he was. Grievant gave him his phone number and said he would set up a time and a meet to take care of the transaction.

Subsequently, he called grievant again and grievant referred him to D, another employee. Weichelt then went to D from whom he made a purchase of drugs.

He was told by another employee, Sally Holm, that grievant was a heavy drug user who had sold drugs for some time.

Grievant's testimony with regard to his conversations with Weichelt was different. It was his testimony that Weichelt approached him and asked him if he could get drugs for him and grievant said that he could. However, he put Weichelt off and did not arrange any drug transaction with him. Approximately ten days later, Weichelt approached him again, and again he indicated that he could either obtain the drugs or direct him to someone who could furnish it to him. Again, when Weichelt pressed him to deliver, he put him off.

In all, there were four different occasions when Weichelt approached him for drugs when he said that he could get them for him but that he did not deliver.

Finally, grievant told Weichelt to "get it from D." He knew that D was a user, he did not know if she was a dealer but he knew that she was a user. He did not call D and does not know what the arrangements were between Weichelt and D. (D was D.)

Grievant testified that the use of drugs at the hospital was commonplace. He himself had used amphetamines at work over the past two to three years. He had cut back substantially in his usage several months before because he felt that the cost and the benefit were inconsistent. He had used drugs approximately once per week. He had started and stopped on a number of occasions.[*43]

**Exhibit 28**

Neither D nor Holm were called as witnesses.

On July 15, 1988, Phenix and Casey conducted an interview with grievant. Casey made some written notes during the course of the interview. Following the direct questioning of grievant by Phenix and Casey, grievant was asked to write a statement which he did. Following the completion of the handwritten statement, a tape recorded interview was conducted.

During the course of the untaped interview, Phenix had available to him the list of names that had been prepared by the Employer of possible users or sellers of drugs. He commenced the substantive portion of the interview by asking all witnesses interviewed, including grievant, "Have you used drugs? Have you used any speed with" and then went down the list of names which was before him. He also asked if each interviewee had "purchased" or "given" drugs to each name on the list.

Grievant said that he had used speed with C maybe four times, the last time being approximately three weeks before, and that he gave him drugs one time.

Phenix asked him about L and he said he sold 1/4 gram several years ago. This occurred in the janitors' lounge and he sold him methamphetamine. He asked him about S (S) and grievant indicated that he had used drugs with S approximately six times and that was a couple of years ago and they had traded drugs back and forth with one another on hospital grounds and that he sold three times to S and purchased about the same amount from him. He had used methamphetamine with M on the hospital grounds about six times.

Phenix could not recall whether on each occasion the term "methamphetamine" was used or the term "speed" was used; from time to time both were used. Grievant last used methamphetamine with M approximately six months before.

The notes made during the interview by Casey bear the following entries:

> "L (janitor) Sold 1/4 G meth 2 years ago (Janitors Lounge).

> "S, Transportation. Used with him (6) times 2 years. Traded off--on hospital grounds. (3) Sold to and purchased from.

> "M (Storeroom, day shift). Used with M grounds (6) times six months ago last time. Gave him -- got some -- once used together in morgue.

> "J (storeroom swing shift) Usualy (sic) went out to W auto.

> "C (transportation) Used Drugs with C (4) times in the Morgue. Last time 3 weeks ago -- (1) time W furnished Drugs."

Phenix met with Callahan and advised him of the results of the interview. Callahan then went into the room with grievant and closed the door behind him and Phenix and Casey proceeded to write out their report. Callahan placed grievant on an investigatory suspension and thereafter participated in the decision to terminate grievant.

### Positions of the Parties

For the Employer: The evidence is clear and convincing that grievant did sell methamphetamine on the Employer's premises. He arranged to sell it to Weichelt, an undercover investigator. He admitted sales to L and S and based upon the Employer's established policy, the sale of drugs in the work place is grounds for discharge. While grievant is a twenty-three year employee, he is a twenty-three year employee who sold

**Exhibit 28**

drugs. The Employer's policy has been uniformly applied; drugs sellers will not be tolerated in the work place, grievant is a drug seller, grievant was properly terminated.

For the Union: The Employer conducted a massive witch hunt looking for suspected users of drugs. They hired a firm that deals in narcotic undercover operations and it is to the advantage of this firm to show results in finding guilty people. This raises questions about the impartiality of the investigation. Weichelt, the undercover agent, was never trained in police procedure, and taking his testimony at its best, he admitted that grievant had never sold him drugs.

The Employer's policy was that the users were offered rehabilitation and the sellers were terminated. There is no evidence that grievant was a seller and he has been treated differently from other users and has thereby been discriminated against.

## Discussion

In cases involving employee discipline the burden lies with an employer to sustain its allegation of cause. Impliedly, the Employer, in its brief, recognizes that the burden which it carries in this type of proceeding is to establish its case by clear and convincing evidence.

The appropriate analysis of the burden of proof and its application in a case involving a discharge for engaging in a narcotics transaction is best exemplified by the decision of Arbitrator Fredric Richman [1] in *Utility Trailer Manufacturing Company,* **83 LA 680**. **[*44]**

In opting for the clear and convincing evidence standard, Arbitrator Richman noted that the misconduct charged was of a form which will permanently affect the grievant's work record and is likely to seriously damage future work opportunities. He quoted, with approval, from *Kroger Company,* **25 LA 906** at 908, as follows:

> ". . .it seems reasonable and proper to hold that alleged misconduct of a kind which carries the stigma of general social disapproval as well as disapproval under accepted canons of plant discipline should be clear and convincingly established by the evidence."

Both Utility Trailer and Kroger emphasize that grievant comes into the proceeding cloaked with the presumption of innocence.

" 'Reasonable doubts raised by the proofs should be resolved in favor of the accused.' This may mean that the employer will at times be required for want of sufficient proof to withhold or rescind disciplinary action which in fact is fully deserved, but this kind of result is inherent in any civilized system of justice." (Kroger at 908; Utility Trailer at 684.)

It may be well to deal with two issues raised by the Union which it contends should either bar a portion of the testimony or at least color the testimony.

The Union claims that grievant was not warned that the answers that he might give could be used against him. There is no requirement in the civil law for an employer or an employer's agent to give an employee a statement of his Miranda rights prior to questioning the employee.

Even if there were, grievant's handwritten statement acknowledged that the interviewer was a private investigator from Narcorp. No threats or promises had been made to him to induce him to make the declaration which he acknowledged was made of his own free will. The Arbitrator finds there was no over-reaching, either of a Constitutional dimension or of a

**Exhibit 28**

civil dimension under established industrial policy. Grievant did not ask for a Union representative to be present and there is no indication such representation would have been refused. To the contrary, there is evidence that Union stewards were advised that the interrogation of employees was taking place and they were invited to sit in but declined.

The second point raised by the Union is that Narcorp and its witnesses had a pecuniary interest in producing evidence of narcotics use or sale in order to enhance their Company's reputation and enable it to sell its services to other employers. No evidence was offered to support this contention. Therefore, there is no basis for viewing the testimony of the three investigative witnesses with suspicion based upon pecuniary interest.

The Arbitrator must then decide if the Employer has proved by clear and convincing evidence that grievant was engaged in the sale of methamphetamine on the Employer's premises.

The evidence reflects that the Employer, like many other employers, has found the development of a drug culture in its work place. While no expert testimony was offered on the impact which such a problem has in a medical facility, it is obviously an even less tolerable arrangement in a medical facility than it might be in a facility not involved in the delivery of health services.

A health provider has a number of problems which are unique. There is the problem of security involved in protecting its necessary store of narcotics in the face of an underlying employee problem involving the use of narcotics. It is engaged in the delivery of health services to patients and a narcotics-free environment is clearly in the best interests of those patients.

Therefore, it is reasonable for the Employer, recognizing the existence of an on-going problem, to take steps to control the problem. Evidence tendered indicates that as early as 1987, the Employer recognized the existence of the underlying problem. Callahan met with the supervisors to remind them of Employer policy relative to use or sale of drugs in the work place. However, no evidence was offered that any of those supervisors transmitted to the employees the Employer's message that the use or sale of drugs was cause for termination.

Similarly, some reference is made to the Kaiser Permanente employee handbook dealing with controlled substances and indicating that use, possession or sale might lead to disciplinary action, including termination.

However, the Kaiser Permanente employee handbook was not introduced in evidence in these proceedings. There is no evidence that the handbook was furnished to any of the employees. The Employer's failure to show the existence of a rule which calls for discharge and the employees' knowledge of the rule is a significant factor in considering a discharge of a long-term employee. ( *Southwestern Bell Telephone Company,* **59 LA 709**.)

This Arbitrator is not unaware of the substantial body of arbitral opinion that even in the absence of a specific company rule, the narcotics trade is, upon its face, such a wholly unacceptable course of conduct that it takes no articulated rule for any reasonable employee to know that engaging **[*45]** in the narcotics trade is inappropriate.

However, an employee takes the work place as he finds it. The Employer has the power to establish the tone of the work place and the standards which will be acceptable conduct and the standards of unacceptable conduct. An employer, by tolerating what would otherwise be unacceptable behavior in the work place, may lead employees to the conclusion that the conduct is being sanctioned. ( *Coleman Company, Inc.,* **54 LA 281**, 286.)

**Exhibit 28**

If we accept the evidence of grievant's purported admissions as testified to by Casey and disregarding, for the moment, the Weichelt transaction, we have evidence that grievant "traded off" with S and at some unspecified time sold to or bought drugs from S. At some unspecified time, in dealing with M, he "gave him some, got some." At one unspecified time, he furnished some to C.

The only transaction which is in any way fixed in time is the sale of one-quarter gram to L two years ago.

These incidents dealing with either furnishing or purchasing at some unspecified time in the past, or at a specific remote time in the past, even if the testimony of Casey is credited, has to be measured by Section 1208 of the Contract which erases disciplinary actions more than one year old. While no disciplinary action was taken by reason of the L incident, at least the Contract recognizes that discipline should be predicated upon activities which are fresh and not which are remote in time.

Grievant, of course, has denied a good part of the testimony of Weichelt. We are then faced with making a credibility determination between grievant and Weichelt as to whether or not grievant arranged a sale of drugs to Weichelt through D. If he did, then the fact that he did not personally make a delivery of the drugs and personally receive the money would not be important in the context of the entire transaction. If D acted as his agent in the sale of drugs, the sale is chargeable to grievant.

D was not called as a witness and the Company offered no evidence as to why she was not called as a witness. Clearly, the conversation between D and Weichelt is hearsay insofar as grievant is concerned, unless there is satisfactory evidence that D was acting as his agent. The only evidence of that agency is the conversation between Weichelt and D.

The Employer attempts to support this by the conversation between Weichelt and Holm that grievant was a dealer. This, of course, is at best hearsay and at worst hearsay evidence of an opinion and conclusion.

Further, Holm was not called as a witness. It is a well-established rule of evidence that the failure to call a witness who is available to a party gives rise to a presumption that the testimony of the witness would be adverse to the position of the party having the ability to call that witness.

Since grievant was under no obligation to call witnesses, being cloaked with the presumption of innocence, the failure of the Company to call either D or Holm must give rise to the presumption that their testimony would not have supported the testimony of Weichelt.

While I consider that based upon these evidentiary rulings the Employer has failed to carry its burden by clear and convincing evidence, I would also point out that the procedure used by Phenix in his taping of part of the interview is puzzling, to say the least.

Phenix testified that he did not tape the entire interview because taping it would be "intimidating." However, he apparently did not consider it intimidating when he proceeded to tape what he called a "memorializing" of the interview. At that time, he had in his possession the notes which he and Casey had made of the oral interview and he had the handwritten statement of the grievant. For some inexplicable reason, Phenix proceeded to question grievant on the recording using grievant's handwritten declaration, but at no point did he ask a single question which purportedly was contained in Casey's interview notes relative to the sale of drugs.

The only reference to what could be considered furnishing of drugs is as follows:

**Exhibit 28**

> "Mr. Phenix: I guess the individual that you used drugs with then, you and him had a relationship. So you exchanged drugs for a short period of time?"
>
> "Mr. W: Yeah, we'd trade each other back."

This is the sum and substance of the "memorializing."

If, as the witness claimed, the tape recording was limited to memorializing the applicant's handwritten statement, the short answer to that is that the portion quoted above does not appear in the handwritten statement but comes from the original interview notes. Phenix engaged in very selective interrogation of grievant for the purpose of the tape recording.

Under all of the circumstances, then, I find that the Employer has failed to carry its burden of proof that grievant has been engaged in the sale or furnishing of drugs at the work **[*46]** place within any current period of time prior to his discharge.

This is not to suggest that grievant is innocent as the driven snow. While on one occasion he indicated that he kept agreeing to get drugs for Weichelt and then failing to do it just to get Weichelt off his back, his later testimony that he kept telling him, "Yes, I can," when Weichelt importuned him to obtain drugs was done, "for the fun of it..." leads the Arbitrator to believe that this may well be a case where the Employer is required, for want of sufficient proof, to withhold or rescind disciplinary action which in fact is fully deserved, "....but this kind of result is inherent in any civilized system of justice."

I do find, however, from grievant's own testimony, that he is in fact a drug user and was a drug user during the time the investigation was being conducted. He should be treated no better and no worse than any other drug user under the policy adopted by the Employer.

### AWARD

The grievance is sustained. I find that W was not discharged for proper cause. He is ordered reinstated with full back pay less interim earnings of any type or nature, and other benefits which he would have earned had the discharge not taken place.

His reinstatement, however, is conditioned upon his agreeing in writing to the same rehabilitation agreement and the same random testing agreement which were made available to other employees. If either of the aforesaid agreements carries within it any minimum time for the completion of the rehabilitation agreement or for the submission to the random drug testing, that time will commence running with the date of this Award.

In the event the parties are unable to agree on the implementation of this Agreement, the Arbitrator reserves jurisdiction to make specific orders relative to the implementation of this Award, only.

---

**fn** 1

Arbitrator Frederic Richman is not related to this Arbitrator.

**Exhibit 28**

# Arbitration Decisions

## Labor Arbitration Decision, Tower Automotive Products Co., 00/07518, 115 BNA LA 1077

**Labor Arbitration Decision, Tower Automotive Products Co., 00/07518, 115 BNA LA 1077**

Decision of Arbitrators

In re TOWER AUTOMOTIVE PRODUCTS COMPANY, INC. and SMITH STEEL WORKERS, D.A.L.U., LOCAL 19806

FMCS Case No. 00/07518

January 16, 2001

<div>Show Summary</div>

**[*1078]**

Appearances: For the employer-Allyn R. Lebster (Varnum, Riddering, Schmidt & Howlett), attorney. For the union-Jill Hartley (Previant, Goldberg, Uelman, Gratz, Miller & Brueggman), attorney.

FALSE EMPLOYMENT APPLICATION

WOLFF, Arbitrator.

### Background Facts

Tower Automotive Products Company, Inc. [the "Company," "Tower" or "Employer"] and Smith Steel Workers, D.A.L.U., Local 19806, AFL-CIO [the "Union"] submitted to arbitration the grievance of W__ who was given a Notice of Discharge dated "3/24/99." The Notice also states the reason for the discharge was "Falsification of information on Application For Employment" with the Company and that the effective "Date of discharge" is "7/15/98."

The grievance, dated April 1, 1999, requests reinstatement with full seniority, pension credit and all lost wages. The agreed issue is whether the Company had just cause for the discharge and, if not, what is the appropriate remedy? Most of the relevant facts are not in dispute.

Grievant was hired on November 22, 1997 as a material handler. Prior to June 19, 1998, he had accumulated eight [8] "occurrences" under the Company's no-fault attendance control policy [the "ACP"]. Under the ACP the 9th occurrence calls for discharge. On Friday, June 19,

Exhibit 28

1998 grievant did not report to work for his assigned 7 a.m shift. He called the guard station at 6:54 a.m. and reported he had been in a car accident. Grievant testified that while the accident was not serious, he was required by the other driver to wait for the police to come to the scene. At about 7:30 grievant called his wife who told him that Ollie Davis, his lead man, had called because grievant was absent and this was his 9th occurrence. Davis also told grievant's wife that grievant need not worry, because he, Davis, had arranged a "switch" so that grievant could come in later at 11:00 p.m. to work the 3rd shift. [1] Learning this, grievant "relaxed," knowing that he could work the 3rd shift. He and the other driver waited for the police, who never came, and both finally left the scene. Grievant went home and went to sleep. He reported for the 11:00 p.m. shift and worked it even though he had never asked to work that shift. While working that night, the Company asked him if he would be willing to work the 3:00 p.m. shift on Saturday, June 20; and he did so, but only for a few hours.

Grievant also testified that he reported for and worked his 1st shift on Monday, June 22. Near the end of the day he was called into a meeting with R__, Colleagues Growth & Development Leader [Human Resources], and a Union steward, Tony. R__ said that grievant had reached his 9th occurrence on June 19. Tony denied this, stating that grievant had actually worked the 3rd shift on the 19th. R__ said he would investigate further and that grievant could come in to work his 1st shift on June 23. At this meeting there was no discussion of grievant being in jail on June 19. Grievant testified that he never told Ollie Davis that he had been in jail on the 19th.

Grievant reported for work on June 23, but slipped on some oil, hit his head on machinery and was taken to a hospital. There he was[*1079] examined and, after a few hours, told to see his own doctor and report back to the plant nurse's station. He did so, but was then told to see R__. They met in R__'s office with a Union steward. At that time R__ gave grievant a notice of discharge for his 9th occurrence under the ACP.

On the same day, June 23, 1998, grievant and his steward signed a grievance alleging the discharge under the ACP was unjust and sought reinstatement and all lost wages and benefits. Grievant testified that at a grievance meeting on the ACP discharge in about February 1999, R__ told him that if the Company hadn't discharged him under the ACP, it would have done so anyway because he had filed a falsified job application. [2] On or about March 23, 1999, at Step 5A of the grievance procedure [the last one before final and binding arbitration], the ACP grievance was settled on this stated basis: "Due to receiving additional information regarding the ninth occurrence on 6-22-98, W__ will be reinstated as of 6-22-98. W__ will be made whole for the appropriate lost wages and benefits." The settlement was signed by two Company representatives on March 23 & 25, 1999 and by two Union representatives on March 31 & April 1, 1999.

Grievant also testified that on March 23, 1999, R__ called him and asked him to come in to discuss his job application. Grievant declined, telling R__ to talk to the Union, not him. R__ replied, "based on that I'm finding my own decision." [3]

On March 24, 1999 the Company mailed to grievant the Notice of Discharge dated "3/24/99" which stated that the "Date of Discharge" is "7/15/98" and that the reason for the discharge was "Falsification of information on Application For Employment" with the Company. That notice resulted in the instant grievance dated April 1, 1999 seeking reinstatement and all back pay and benefits lost. The latter grievance was amended by the Union on April 26, 1999 by letter stating in pertinent part:

> The prior grievance * * * dated 4/1/99 * * * is amended and/or
> clarified to include the Union's complaints concerning (1) the
> Company's failure to pay W__ all lost wages and benefits owed to
> W__, under the settlement of [the prior ACP] grievance, for the time

**Exhibit 28**

period prior to its issuance of the notice of discharge dated 3/4/99 [sic; should read "3/24/99"], (as well as after the discharge) and (2) the Company's alleged retroactive discharge of W__ almost ten (10) months before the notice of discharge was issued. See Article Vll B and Article VII A.

R__ testified that after he met with grievant and a Union steward on June 22, 1998 concerning grievant's 9th ACP occurrence on June 19, 1998, and the explanation that grievant had worked on the 3rd shift on the 19th, he spoke with grievant's team leader, Ollie Evans. Evans told R__ that grievant told him that he did not come in to work his 1st shift on June 19 "because he was in jail until 5 o'clock." [4] On June 23 R__ and Manufacturing Leader Willie Threats met with grievant and Union steward Tony Gilbert. At that time R__ gave grievant the Notice of Discharge for the 9th occurrence under the ACP. After the grievance over that discharge was filed, R__ requested plant security to investigate whether grievant had been in jail on June 19. Subsequently, Greg Schmitt, Tower's security manager, advised R__ that in his investigation he could find no evidence that grievant had been in jail on June 19, but that court records indicated that grievant had prior convictions. R__ was then prompted to review grievant's job application to see if prior convictions were disclosed. He also reviewed other aspects of the application and decided to make some other checks on it. He called Washington High School and was told that grievant did not attend on the dates shown in his application and that he had not received a diploma. [5]

On May 22, 1997 grievant signed an "Application for Employment" with Tower which**[*1080]** contained an admonition to "Read this Entire Statement" and this certification:

> I certify that the information contained in this application is a true statement of facts.
>
> I understand that falsification of this application in any detail is ground for disqualification from further consideration or for termination of my employment.

In the first main box on the application this question was posed in this manner:

> HAVE YOU EVER BEEN CONVICTED OF A CRIME OTHER THAN TRAFFIC, GAME LAW OR OTHER MINOR VIOLATIONS?
>
> [ ] YES [ ] NO IF YES EXPLAIN

Grievant checked "No." He testified that he had interpreted the question as asking if he had "ever been convicted of anything other than a misdemeanor" and wasn't "trying to hide [his 1997] misdemeanor convictions."

Grievant also testified:

> Q. Let me back up. Regarding your criminal convictions, you stated that you did not disclose your prior convictions because you understood the question to only apply to misdemeanors; correct?
>
> A. I understood the question to be asking me have I ever been arrested for a misdemeanor or a felony.
>
> Q. So you misunderstood the question; correct?
>
> A. That's the way I comprehended it asking me that.
>
> Q. You had a third step meeting in July-it was actually July 23, 1999?
>
> * * *

**Exhibit 28**

Q. Now, you testified that at the time you filled out this application, these two 1997 convictions, you did not disclose those and that those were your two convictions at that time: correct?

A. That's correct.

Q. But it's true that you had three prior convictions to that, isn't it?

A. Maybe. I mean, I'm not sure; but if there was-Could I just answer it like-I'm saying, whatever convictions I ever had, the only thing that paper led me to believe it was asking one thing and one thing only: Have I ever been convicted of a felony or a misdemeanor. I have never been convicted of a felony, so I would still answer any question any way in life to this date the same way, no. If it's not asking-Because the only thing I know about the law, is one or the other thing, either you're a misdemeanor or you're a felon.

Q. Okay. You need to listen to my question. You testified when Ms. Hartley was asking you questions that at the time you filled out the application you had only two prior convictions?

A. At the time I filled that out?

Q. Yes, that you had two prior convictions; is that true?

A. I don't understand what you're saying.

Q. You just testified that at the time you filled out the application you had two prior misdemeanor convictions?

A. Well, the question is not asking me that, so I would still-

Q. You have to listen to my question. You testified in response to Ms. Hartley's question that when you filled this out you had these two '97 convictions?

A. Uh-huh

Q. And you felt they were misdemeanors so you didn't need to disclose them; correct?

A. Right.

Q. But it's true that when you filled out the application you had at least three other prior convictions; is that not true?

THE ARBITRATOR: For misdemeanors?

THE WITNESS: Yeah, probably did.

BY MS. LEBSTER:

Q. And you were convicted in 1983 of battery and resisting an officer; correct?

A. I can't recall. Maybe.

Q. And in 1994-or 1984, rather, you were convicted of reckless use of a weapon?

**Exhibit 28**

A. I wasn't convicted of that. I was charged with that. I was charged with that, but that was-that was somebody who came after me, and I was-Really, they kicked that out of court for self-defense.

Q. And you were also convicted in 1988 of reckless use of a weapon; correct?

A. Not that I recall.

Q. Since your discharge have you been found guilty of any other crimes?

A. No, ma'am. I have never been guilty of any felonies.

Q. Any other crimes.

A. Since my discharge-

Q. Misdemeanor or felony.[*1081]

A. Since my discharge from Tower?

Q. Yes.

A. No, not that I know of.

Q. Did you not enter a plea of guilty to possession of a switchblade knife just a month ago on July 27?

A. Oh, yeah, I did.

Q. You just forgot about that today?

A. Yeah. That just recently happened, though.

In the next main box on the job application form, headed "EDUCATION," there was a column to indicate the time of attendance at schools by month and year and a column for "DIPLOMA OR DEGREE." On it, grievant stated that he attended Washington High School from "9-75" to "6-79" and that he received a "Diploma."

Grievant testified he "messed up" on the dates he attended high school, 20 years earlier, and that he received a GED in 1980 which he considered an "equivalent" of a "diploma." [6] Nonetheless, he believed that he attended Washington High school for four years, 1975-79, as stated on his job application. Asked if the dates of enrollment, June 16, 1976 to August 29, 1997 shown on the document Tower received from the high school were accurate, he replied:

A. Yeah. It's inaccurate to me, yes, ma'am, because I know.

Q. Accurate?

A. Inaccurate, because I know I was there in '78. I was there in-I know I was there in '75, and I left there and came back there in '78. I think I left again in '78.

Q. Do you have any reason to believe that Washington High School would falsity, this document?

A. No.

<div align="right">

**Exhibit 28**

</div>

On July 7, 1998, Tower security manager Greg Schmitt sent an "e-mail" to R__ stating that grievant "has a criminal misdemeanor conviction" on January 22, 1997 on two counts: [1] disorderly conduct for which he was given 90 days in the House of Correction with work release privileges; and [2] endangering safety-use of a dangerous weapon while intoxicated, for which he was given two [2] years' probation. [7]

On July 15, 1998 R__ sent an "e-mail" to Union representatives Percy Butt and Bill Krueger which states:

> This memo formally makes you aware that in the [e]nsuing investigation of the ninth occurr[e]nce discharge of W__, it was identified on July 7, 1998 that he falsified his application. Had W__ not have been released on June 23, 1998, he would have been released for falsification of his application. If you have any questions, please feel free to call me.

R__ also testified that in "ongoing conversations" with Mr. Butt, he advised him that information on grievant's job application was not correct, but R__ did not specify the particulars.

R__ also testified that based on the backdating of the discharge [for falsification of the application] to July 15, 1998, grievant did not receive any back pay after his reinstatement on June 22, 1998 for the 9th occurrence discharge. But this, he added, was due to grievant's receiving worker's compensation benefits for a period beyond July 15, 1998.

R__ also testified that sometime between the 4th step meeting on the ACP grievance [which would have been held prior to November 9, 1998] and the Step 5A meeting where the grievance was settled on or about March 23, 1999, he told Union grievance committee chairman Krueger that grievant's information on his job application were dischargeable offenses. But prior to sending the second notice of discharge on March 24, 1999, R__ did not advise Mr. Krueger or the Union, or say anything to lead them to the belief, that Tower was going to discharge grievant again on March 24, 1999, the day after the ACP grievance was settled on March 23, 1999.

## Discussion

In its post-hearing brief the Company offers these arguments: First, by falsely stating on[*1082] his job application that he was not convicted of a crime, and that he had a high school education and diploma, grievant provided the Company with just cause for discharging him. His misrepresentation was deliberate or willful, material to his employment when made and at the time of discharge, and the Company acted promptly and in good faith. [8]

Second, grievant committed perjury at the arbitration hearing by presenting a "fake GED" and testifying to its authenticity. Given his "clear perjury, his entire [self-serving] testimony should be given no weight."

Finally, Tower contends that "grievant is not entitled to either back pay or reinstatement under any circumstances because (1) he waived his right in signing the application [9] and (2) he failed to mitigate his damages by obtaining and maintaining interim employment." [10]

In its post-hearing brief the Union contends, first, that "The Company bears the burden of proving beyond a reasonable doubt that [grievant] falsified his employment application." Noting that discharge "has been described as economic capital punishment", the Union holds that "given the serious nature of the charge and the severe impact that discharge has

**Exhibit 28**

had and will continue to have on the grievant here, the Arbitrator should hold the Company to a standard of proof beyond a reasonable doubt." [11]

Next, the Union contends that the Company failed to prove that grievant intentionally falsified his employment application or that the incorrect information was material and, therefore, just cause for discharge is lacking. Its entire argument in this respect is as follows:

> In order to sustain its burden of proving just cause for W__'s termination, the Company must prove that he intended by his answers on his employment application to defraud or deceive the Company. "[I]f falsification is established, implicit therein is the requisite improper intent." *Carbide Corp.*, **100 LA 763**, 765 (Felice 1993).

> To prove dishonesty, not only must the Company establish a misrepresentation; the general rule is that there also "must be a willful, deliberate attempt to defraud the company..." *Firestone Tire & Rubber Co.*, **93 LA 381**, 384 (Cohen, 1989). In *Wine Cellar*, **81 LA 158** (Ray, 1983), and *Utility Trailer Mfg. Co.*, **85 LA 643** -645 (Brisco, 1985), the arbitrators both stated that, in analyzing the propriety of termination for falsification, there is a requirement that the misrepresentation must be deliberate or willful. Similarly, in *Schafer Bakeries*, **95 LA 759**, 766-767 (Brown, 1990), the arbitrator held that termination for filing false insurance claims was improper. Even though the grievant was "grossly careless and negligent," the employer faded to show that she intentionally lied to secure medical insurance for her ex-husband.

> Because the Company did not establish that W__ intended to defraud the Company by completing his application as he did, there was no just cause for discharge.

> A. *Criminal History*

> Tower discharged W__ in part, because in response to the question whether he had ever been convicted of a crime other than traffic, game law, or other minor violations, W__ answered "No." While W__ had misdemeanor convictions in his past at the time he completed the application and answered no to the criminal history question, this fact does not establish that W__ is guilty of falsifying his application.

> W__ testified that he understood the question to be asking whether he had ever been convicted of a felony. This was certainly a reasonable interpretation. The question does not specify misdemeanors or felonies; it simply references "minor violations." In effect, the ambiguous language of the application forces the applicant to make his or her own judgment or interpretation of what the question is asking. W__ reasonably interpreted the question to be asking only whether he had been convicted of a felony. Because he had not, he properly answered no. There was clearly no **[*1083]** intent to deceive the Company, and Tower failed to establish any such intent. [fn. omitted].

> Simply because W__ interpreted the question differently than does the Company, does not lead to the conclusion that he falsified his application. W__ testified that he was not attempting to hide his

**Exhibit 28**

misdemeanor convictions from the Company by answering the question the way he did. The Company failed to present any evidence to the contrary and thus failed to establish the requisite intent for falsification by proof beyond a reasonable doubt. While the Company may claim that W__ should have checked "Yes" and explained his answer in the space provided below, hindsight is always 20/20. W__ believed he understood the question and believed that since he had no felony convictions he had answered it properly. W__ was terminated without just cause; he must be reinstated and made whole.

B. *Educational History*

In addition to the criminal history portion, the Company further contends that W__ falsified the educational history section of the application. On his application W__ stated that he had attended Washington High School from 1975 through 1979. While these dates were later revealed to be incorrect, this evidence falls short of proof that W__ purposely intended to mislead the Company regarding his education. To the contrary, W__ testified that he had simply made a mistake in recordings, the dates of his time at Washington because he did not have a record of the actual dates with him when he completed the application.

W__ never intended to apply for employment with Tower on the day that he did. He only completed the application in order to be allowed to wait inside the building for his brother while he applied for employment. His mistake in recording the dates of his high school attendance, while careless, does not rise to the level of intentional misrepresentation necessary to justify termination for falsification.

"The element of the offense that makes deliberate falsification of Company records dischargeable is the dishonest intent to deceive by doing so. If that element is lacking, as might be the case by reason of having made a mistake or error, the offense is not so seriously regarded. In the absence of intent to deceive, the element of trust is not destroyed and it is not unreasonable to continue the employment relationship after one occurrence, notwithstanding that after progressive and corrective discipline, the Company may certainly discharge an employee who is chronically negligent or error prone." *Carbidie Corp.*, **100 LA 763**, 766 (Felice 1993).

The Company failed to prove beyond a reasonable doubt that W__ intended to deceive the Company by misstating the dates he attended Washington High School. The grievance must be sustained and W__ must be reinstated and made whole.

The Company further alleges that W__ falsified his application when he stated that he had received a diploma from Washington High School. W__ did not in fact receive a diploma from Washington High School; however, at hearing he testified that he had received his GED. Documentation received after the close of the hearing suggests that W__ did not pass his GED exams in 1980 as he testified. While the Company will presumably construe this additional information as evidence that W__ falsified his GED

**Exhibit 28**

results, there is no evidence to establish this assumption and it is unfair to so conclude.

In any event, the Company failed to present evidence that the issue of whether W__ had a high school diploma or a GED was material to his hiring. Without such evidence, Tower failed to prove the required elements of falsification. In cases involving falsification of an employment application, the falsification "must be willful or deliberate, and the matter or matters involved in the question must be material." *Dayton Malleable Iron Co.*, **54 LA 1192**, 1194 (Howlett, 1970).

R__ testified that he was not in charge of determining which applicants would be offered positions at the time W__ was hired. There is no evidence to suggest that W__ would not have been hired regardless of the way he answered the educational history portion of the application. The Company failed to prove the answer was material and therefore failed to prove just cause for discharge. W__ must be reinstated and made whole.

Third, the Union contends that in any event, even if some punishment to grievant was in order, "discharge was too harsh a penalty under the circumstances." [12]

Finally, the Union argues that "the Company violated the settlement agreement when it back dated the discharge notice and failed to pay [grievant] his lost wages and benefits due and owing from his termination for reaching the ninth occurrence level." In this respect, the Union also points to Article VIII(A) of the Contract which requires that at the time of discharge[*1084] "an employee will be furnished with a copy of the notice of discipline * * *", and that this was not done here, i.e., not done at the time the Company purported to make the discharge effective retroactive to July 15, 1998.

For the reasons set forth below, the Arbitrator finds that Tower had just cause to discharge grievant for falsifying his employment application, but that it could not make the discharge retroactive. Therefore, the grievance is denied in part and sustained in part.

[1] At the outset, let me make clear what I believe most arbitrators consider to be the appropriate standard of proof in a case of this character. [13] There are three possibilities; whether the party with the burden of proof must establish it: [1] by a preponderance of the evidence, [2] by clear and convincing evidence, or [3] beyond a reasonable doubt. While there are still some arbitrators who apply the strictest standard of "beyond a reasonable doubt" [or "BARD"], this arbitrator and the vast majority of others, apply the "clear and convincing" standard [or "C&C"], which is strict enough. My views, reasoning and extensive research on this issue are set forth in prior published awards and need not be repeated extensively here. See, *City of Kankakee*, **97 LA 564** at 568-570 (1991) and *Chicago Transit Authority*, **110 LA 403**, 408-10 (1997), also published in 98-1 ARB ¶5084, pp. 5487-89. In the 1991 *City of Kankakee* case I noted that ten arbitrators, all members of the National Academy of Arbitrators, heard ten separate discharge cases involving the same employer who alleged the ten employees stole company property. In each case the arbitrator applied the C&C standard of proof. In the 1997 *CTA* case I observed [ **110 LA at 409** -10; 98-1 ARB at pp. 5488-9]:

In my recent experience, I find that parties seldom, if ever, cite any recent cases to support application of BARD. In a pending case involving a large food chain, e.g., a party cited a 1992 award by Arbitrator Byron Yaffe (also an NAA member) who wrote (FMCS No. 91-25490 at p. 9): "... since the allegations involve an issue of moral

**Exhibit 28**

turpitude and since the discipline is discharge, . . . . the appropriate evidentiary standard to apply is the [C&C] standard, which requires somewhat more proof than the [P of E] standard normally utilized in arbitration proceedings involving just cause issues, but which does not require the Employer to prove the validity of the allegations it has made beyond a reasonable doubt, the standard utilized in criminal proceedings."

To test my own knowledge and experience, I have reviewed the cases or case notes contained in Labor Arbitration Reports Cumulative Digest and Index [CDI] for volumes 81 through 105 LA, which covers the period from September 1983 through March 1996 (the key number for "burden of proof" in CDI 81-90 is 118.315 while in the later CDI's it is 94.60509). For the 1983-88 period there are 17 reported relevant cases of which 2 opted for P of E, 5 for BARD and 10 for C&C.* For the 1988-93 period there are 12 reported cases: 1 applied P of E, 2 applied BARD and 10 applied C&C. During the 1993-96 period there are 10 reported relevant cases: 3 use P of E, 1 uses BARD and 6 apply C&C. The trend is clear; it is away from BARD and toward C&C.**

Fn.*The citations for all the cases referred to in the CDI's are set forth in the Appendix hereto. [The Appendix is set forth as an Appendix to this Award.]

Fn.**Indeed, a decade ago it was observed that: "Regardless of the nature of the conduct at issue, the body of arbitral case law appears to be leaning toward a clear and convincing standard rather than [BARD or P of E]." M. Hill, Jr. & A. Sinicropi, *Evidence in Arbitration* (BNA, 2nd Ed. 1987), pp. 37-38. [The foregoing footnotes are footnotes 18 & 19 to the *Chicago Transit* award].

Turning to the merits of this case, I find, by clear and convincing evidence, that grievant knowingly falsified his employment application and that there was just cause for his discharge.

The key question posed on the job application was:

HAVE YOU EVER BEEN CONVICTED OF A CRIME OTHER THAN TRAFFIC, GAME LAW OR OTHER MINOR VIOLATIONS?

[ ] YES [ ] NO IF YES EXPLAIN

Although grievant stated that it was his interpretation that the question asked if he "had ever been convicted of anything other than a misdemeanor", he later contradicted himself several times. At T. 139 he said: "I understood the question to be asking me have I ever been arrested for a misdemeanor or a felony." Also, on the next page, T. 140, he said: " * * * the only thing that paper [application] led me to believe it was asking one thing and one thing only: Have I ever been convicted of a felony or a misdemeanor." Accordingly, by grievant's **[*1085]** own testimony, he understood the question to be asking whether he had been convicted for felonies *or* misdemeanors.

[2] Grievant also stated that "Every application I ever filled out it specifically says misdemeanor or, felony * * *." In fact, the question on the application here does not mention the words "felony" or "misdemeanor." Rather, it asked whether the person has "ever been convicted of a *crime* other than traffic, game law or other minor violations." The plain meaning of the question to a reasonable person is whether he [or she] was ever

**Exhibit 28**

convicted of a crime other than a certain class of crimes, viz., "traffic, game law or other minor violation." Fairly construed, the "other minor violations" being inquired about are in the same type or class mentioned in the prior phrase, "traffic, game law or [other minor violations.]" [14] The crimes of which grievant were convicted were not of such minor types such as traffic or game law violations. The complaint on which the convictions were based alleged, among other things, that the defendant [grievant] fired a pistol grip shotgun into the floor of an apartment. The shotgun slug entered the ceiling of a bedroom below where five children were sleeping in beds. The bullet made a hole in the floor about three feet from the beds. The defendant was intoxicated when he fired the gun. Based on this record, whether the "crime" for which he was convicted was a felony or a misdemeanor, it was not "minor" and therefore he should have answered the question affirmatively.

Even if grievant had not admitted in arbitration that he understood the question called for revelation of misdemeanors or felonies, grievant's general incredibility was such that it is not possible to believe his claim that he really thought that the question excluded misdemeanors. First, he knowingly misstated that he attended high school for four years and received a diploma when in fact he did not. Second, he admitted in arbitration that he "probably had" more than two prior misdemeanor convictions at the time of his job application. Further, after denying that he had been convicted of any crime, felony or misdemeanor, subsequent to his discharge, he admitted that he had pled guilty to possession of a switchblade knife on July 27, 2000, just one month prior to the arbitration hearing.

As to his ACP grievance, he reported to the plant guard that he had a car accident on Friday, June 19, 1998 and could not report for his 7 a.m. shift. Grievant said the accident was at Sherman [later changed to Roosevelt] and Capitol Drive, about 1 $^{1}/_{2}$ to 2 miles from the plant and that he drove away from the accident scene by about 7:45 a.m. He also denied telling the guard, when he called in shortly before 7 a.m., that he would return to work on Monday, June 22. He started to claim that he would never have told the guard that because he knew he was going to work later on June 19 on the third shift at 11 p.m., but then caught himself when he remembered that he didn't know he was going to work the 3rd shift until he spoke to his wife at 7:30 a.m., after he had spoken to the guard.

As to his claim that his wife told him that "Ollie Davis" had called her and said that grievant could work the 3rd shift that night, it is notable that Ollie Davis, a Union member was not called as a witness and his absence was not explained. This gives rise to the "adverse inference" rule. Under this rule: [15]

> "When a potential witness is available and appears to have special information relevant to the case, so that his testimony would not merely be cumulative and where his relationship with one of the parties is such that the witness would ordinarily be expected to favor him, then if such party does not produce his testimony, the inference arises that it would have been unfavorable."

Arbitrators also often follow this rule. [16] The same rule would apply to "Ollie Evans" who R__ testified told him that grievant reported to Evans that he was in jail on June 19. Grievant denied telling that to Evans, but Evans, also a bargaining unit member, was not called as a witness and his absence was not explained. Accordingly, an adverse inference may be, and is, drawn that grievant did tell Evans he was in jail on June 19.[*1086]

Based on the above record and conclusions, the Arbitrator cannot accept grievant's claim that he understood the question as to past convictions to exclude misdemeanors. [17]

[3] Submitting a knowingly false job application, especially in such important particulars as prior convictions and education, is a dischargeable offense, one that is for just cause. The

**Exhibit 28**

record indicates that since 1964 and prior to this case, the Company has discharged 17 employees for falsification of employment applications. The record does not show the nature of all of the falsifications and six of those discharged were in unions other than Local 19806. Nine of the discharges were not grieved, six were grieved but the discharges upheld at various steps in the grievance procedure and two grievances went to arbitration, but were denied. While the Union objected to the relevance of this evidence [other than the cases that went to arbitration], the record does show that the Company considers falsification of employment applications a dischargeable offense and one that is for just cause. [18] Also, as to the false information given on the application as to grievant's high school education, while the Union contends that the Company failed to show that this "was material to his hiring," the record shows that the initial screening body for Tower's applicants, Olsten Staffing, for whom R__ worked at the time, was given the "direction * * * to look for individuals with a high-school diploma or equivalent."

Finally, I have not overlooked the Union's argument that discharge was "too harsh a penalty under the circumstances." Rather, I find that under all the circumstances of this case, the Company's decision to discharge grievant was neither unreasonable, arbitrary nor capricious. Therefore, under all the circumstances of this case the Arbitrator ought not to substitute his judgment for the Company's as to the discipline imposed.

Although there was just cause to discharge the grievant for falsification of his employment application, there remains the question of whether the discharge, notice of which was not given to grievant until March 24, 1999, could be made retroactive to July 15, 1998, as the Company did here. For several reasons, the question must be answered in the negative.

[4] Grievant's original discharge for the ACP violations was on June 23, 1998. His grievance on that discharge remained pending until it was settled on March 23, 1999. Under that settlement, grievant was reinstated as of June 22, 1998 and was to "be made whole for the appropriate lost wages and benefits." Prior to March 23, 1999, the Union had been made aware by the Company that if grievant had not**[*1087]** been discharged on June 23, 1998, he would have been discharged because of a false job application. However, there is no evidence that, on or prior to the March 23, 1999 settlement of the ACP discharge grievance, that Tower advised the Union or grievant that it was going to turn around the next day and discharge grievant again retroactively to July 15, 1998. The effect of such retroactive discharge apparently would deprive grievant of some of the benefits he was to receive under the March 23, 1999 settlement. For example, grievant would have been entitled to insurance benefits and wages between June 22, 1998 and March 24, 1999, although some or all of his wages might not have been paid while grievant was receiving worker's compensation benefits from his injury on June 23, 1998. It seems unlikely that the Union and grievant would have entered into the March 23, 1999 settlement agreement had it been made clear that the Company would discharge him again the next day retroactive to July 15, 1998. Did Tower have an obligation, to be consistent with fairness, due process and concepts of just cause, to have made its intentions known prior to the settlement? I think so.

[5] Further, the Company knew at least since July 1998 that grievant had falsified the application. At such time Tower could have amended its earlier notice of discharge to add these grounds, just as the Union amended on April 26, 1999 its April 1, 1999 grievance as to the second discharge to include its claim that the retroactive discharge deprived grievant of rights and benefits received under the March 23, 1999 settlement. Had Tower done so, all issues on all grounds for discharge and settlement could have been resolved in the grievance procedure, or that failing all issues on both grievances resolved in arbitration. [19] But, in this Arbitrator's opinion, it was fundamentally unfair for the Company to settle the first grievance and then attempt to reduce the benefits afforded under that settlement by making the second discharge retroactive.

**Exhibit 28**

[6] Even if the retroactive discharge could be squared with principles of fairness and just cause, there is also another express contractual impediment to a retroactive discharge. Under the grievance procedure, Article VIII A requires that "At the time of * * * discharge, an employee will be furnished a copy of the notice of discipline and advised of his right to file a grievance." Grievant was not furnished with such a notice on July 15, 1998, the purported date of his retroactive discharge. He was not given a notice of discharge for filing a false job application until March 24, 1999 and, therefore, his discharge could not become effective on such grounds prior to March 24, 1999.

In sum, the retroactive aspect of the second discharge lacks just cause. There was just cause for the second discharge on March 24, 1999, but only if it is deemed effective on the actual date of that discharge, March 24, 1999. It would lack just cause if it were deemed effective prior to that date.

## AWARD

For the reasons set forth in the Opinion, which Opinion is incorporated by reference in this Award, the grievance is denied in part and sustained in part. The discharge is upheld as of the date of the discharge, March 24, 1999. The discharge would lack just cause if made retroactive to July 15, 1998. The grievant is entitled to receive whatever retroactive benefits were available to him under the March 23, 1999 settlement of his ACP grievance, **[*1088]** which benefits shall cease upon the date of his second discharge on March 24, 1999.

The Arbitrator will retain jurisdiction for sixty (60) days to resolve any dispute, now unforeseen, as to the remedy.

## APPENDIX

| P of E Standard | BARD Standard | Clear & Convincing Standard |
|---|---|---|
| From CDI Volumes 81-90 (1983-88) | | |
| 87 LA 224 | 81 LA 974 | 83 LA 680 |
| 89 LA 587 | 85 LA 435 | 86 LA 1 |
| | 85 LA 827 | 86 LA 540 |
| | 89 LA 688 | 86 LA 1017 |
| | 89 LA 1138 | 87 LA 313 |
| | | 87 LA 729 |
| | | 87 LA 953 |

**Exhibit 28**

87 LA 1145

88 LA 463

88 LA 131

*From CDI Volumes 91-100 (1988-93)*

| | | |
|---|---|---|
| 94 LA 1083 | 95 LA 1037 | 92 LA 41 |
| | | 92 LA 592 |
| | | 93 LA 145 |
| | | 94 LA 745 |
| | | 95 LA 148 |
| | | 97 LA 30 |
| | | 97 LA 705 |
| | | 98 LA 134 |
| | | LA 100 316 |

*From CDI Volumes 101-105 (1993-96)*

| | | |
|---|---|---|
| 101 LA 1101 | 103 LA 731 | 101 LA 515 |
| 103 LA 609 | | 101 LA 777 |
| 104 LA 596 | | 102 LA 555 |
| | | 103 LA 865 |
| | | 103 LA 891 |
| | | 104 LA 818 [*1089] |

**fn** 1

**Exhibit 28**

Mr. Davis, who is in the bargaining unit, was not called as a witness and his absence was not explained. See also, fn. 4, *infra*.

**fn** 2

R__ testified that this discussion was between the Step 4 & 5A meetings which would have been between 6/24/98 and 3/23/99.

**fn** 3

R__ testified that when he phoned grievant on March 23, 1999 he asked him to come in with his Union steward to discuss the information on his job application. When grievant declined, R__ told him that he needed to make his determination from the information that he had.

**fn** 4

Team leaders are in the bargaining unit, but Ollie Evans was not called as a witness and his absence was not explained. The record indicates that "Ollie Davis" [*supra*, fn.1] and "Ollie Evans" are the same person.

**fn** 5

In a subsequent written request from Tower dated October 26, 1998, the High School wrote back that grievant attended from Tower dated October 26, 1998, the High School wrote back that grievant attended from 6-16-76 to 8-29-77 and that he did not graduate.

**fn** 6

As to the falsity of UX 1, see fn. 17, *infra*.

**fn** 7

Attached are copies of the court records of the convictions, including the "Criminal Complaint" on which the charges were made. The court records show that the convictions on both counts were "misdemeanors" and that on count two grievant was given a nine [9] month sentence which was stayed while he was on probation. Grievant acknowledged these convictions and sentences and that he was ordered to seek [but never did seek] drug and alcohol treatment; and he did not recall being ordered to submit to random drug tests as indicated in one of the court documents.

**fn** 8

In support, the Company cites: *Tiffany Metal Products Mfg. Co.*, **56 LA 135** (1971); two prior awards between the Union and *A. O. Smith* [Tower's predecessor]: FMCS 85K 14603 (decided by Arbitrator James L. Reynolds in 1986) and FMCS 85K 15944 (decided by Arbitrator George R. Fleischli in 1985); *United Parcel Service*, **112 LA 813** (1999); *Sugar Creek Packing Co.*, **110 LA 733** (1998); *St. Marie Gopher News*, **93 LA 738** (1989); and *American Commercial Vehicles*, **107 LA 1** (1996).

**fn** 9

Tower notes in this respect that the application signed by grievant states that Tower "will not be liable if my employment is terminated because of the falsity of statements or answers given by me on this application."

**fn** 10

**Exhibit 28**

On the failure to mitigate damages, Tower cites: *Atlantic Southeast Airlines, Inc.*, **103 LA 1179** (1994); *Orlando Transit*, **71 LA 897** (1978); *Gase Baking Co.*, **86 LA 206** (1985); *and Love Bros.*, **45 LA 751** (1965).

**fn** 11

In support of this standard, the Union cites: *Progressive Transp.*, **80 LA 546**, 547 (1983); *Daystrom Furniture Co.*, **65 LA 1157**, 1163 (c. 1975); *Houston Metro Trans. Authority*, **79 LA 1103**, 1106 (1982); *International Harvester Co.*, **11 LA 1007** (1948); and *Chrysler Corp.*, **12 LA 699** (1949).

**fn** 12

Citing: Rothschild, Merrifield and Edwards, *Collective Bargaining & Labor Arbitration* 544 (2nd Ed. 1979); *Kaiser Sand & Gravel*, **49 LA 150** (1967); *Barcalo Mfg. Co.*, **28 LA 65**, 69 (1956); *Riley Stoker Corp.*, **7 LA 764** (1947); *Fruehauf Trailer Co.*, **16 LA 666**, 670 (1951); *Mississippi Valley Gas Co.*, **41 LA 745**, 750 (1963); *Trailmobile Trailer*, **112 LA 1108** (1999); *Ohio Dept. of Rehabilitation*, **110 LA 844** (1998); and *Plymouth Tube Co.*, **108 LA 1016** (1997).

**fn** 13

There is no doubt among arbitrators or among labor/management generally that in a discharge case, the employer has the burden of proof.

**fn** 14

This is also consistent with the frequently used rule of contract construction known as "*Ejusdem Generis*:" that "where general words follow an enumeration of specific terms the general words will be interpreted to include or cover only things of the same general nature or class as those enumerated * * *." F. & E. Elkouri, *How Arbitration Works*, (5th Ed. 1997, Volz & Goggin, Editors), pp. 497-98.

**fn** 15

R. Hunter, *Trial Handbook for Illinois Lawyers* (4th Ed. 1972), §69.17.

**fn** 16

*See*, F. & E. Elkouri, *How Arbitration Works*, (5th Ed. 1997; Volz & Goggin, Editors), pp. 432-3); see also, *Bill Kay Chevrolet*, **107 LA 302** at 309, fns. 6 & 7 (1996) and authorities therein cited.

**fn** 17

Moreover, there is additional evidence showing not only that grievant lacked credibility, but also that he gave false testimony and knowingly falsified his employment application. As noted above, grievant stated that he received a GED in 1980 and offered as evidence a copy of the "Official Report of Test Results" showing that in 1980 he "passed" the "Tests of General Educational Development." The Company did not accept the "authenticity" of the GED document and asked to see the original which grievant said he had at home. The Arbitrator received the document in evidence subject to the Company's right to see the original at a subsequent time. By letter dated October 13, 2000, with copy to the Union, the Company advised the Arbitrator that grievant had failed to furnish a signed release authorizing the school which issued the test results for the GED, Waukesha County Technical College ["WCTC"], to confirm the test results, and

**Exhibit 28**

therefore, the Company requested the Arbitrator to issue a subpoena *duces tecum* to secure such information. The subpoena was issued to WCTC, without objection by the Union. On October 27, 2000, the Arbitrator received the response from WCTC. It shows that grievant received a lower score than shown on UX 1 and that he "Failed" the test. Therefore, the record shows without doubt that grievant: [1] submitted a false job application to the Company as to the education questions, [2] tried to cover it up and [3] failed to give truthful testimony at the arbitration hearing.

**fn** 18

The two cases that went to arbitration involved Local 19806 and A. O. Smith Automotive Products Company, Tower's predecessor. In one case [FMCS#85K-14603, decided March 24, 1986], Arbitrator James L. Reynolds upheld the discharge of an employee who failed to state on his employment application that he had been discharged by two prior employers and also gave false answers as to his medical history on his pre-employment medical history form. In the other case [FMCS # 85K/15944, decided December 21, 1985], Arbitrator George R. Fleischli upheld the discharge of an employee who was hired on March 28, 1983 and fired on November 14, 1984. On January 17, 1983 that employee signed an application form on which he answered "no" to the question of whether he had ever been convicted of a crime other than traffic, game law or other minor violations, the same question as in the instant application. In fact he had been convicted of a felony, burglary, in 1977 [5-year suspended sentence and 3 years' probation], of a misdemeanor, disorderly conduct, in 1979 [1 years' probation] and another misdemeanor, criminal damage to property and party to crime, in 1980 [1 year probation]. The job application in that case, similar to this one, also stated that false answers "will constitute sufficient grounds for discharge."

**fn** 19

The testimonial assertion by one of Tower's witnesses that it could not discharge grievant on the false job application grounds because it had already discharged grievant is not well taken. The first grievance was still pending in the grievance procedure and a settlement of it was still being negotiated in March 1999. But the Company was aware as of July 1998 that there were alternative grounds for discharge. Nothing precluded the Company from serving another discharge notice on grievant after July 1998 advising that his discharge was also being based on the additional ground of a false job application. While grievant was not an active employee after his ACP discharge, he was still an employee for purposes of exercising his rights under the grievance procedure. The Company had the right, indeed the duty, to defend itself by raising this additional ground for discharge. The Company could, and should, have resisted settling the first grievance and put all its cards on the table. Settling the first grievance only to discharge the employee again *retroactively* served only to exalt form over substance.

Alternatively, in July 1998, when Tower had absolute proof that grievant had falsified his application by failing to report his prior convictions, it could have granted the ACP grievance at that time and concurrently issued its second discharge notice for job application falsification. It would then have been in the same position it found itself in March 1999 when it settled the prior grievance on the same terms as granting it, except that it would not have had to attempt to make the second discharge retroactive to July 1998.

**Exhibit 28**

# Arbitration Decisions

## Labor Arbitration Decision, GRANITE CONSTRUCTION CO. --, 114 BNA LA 1115

**Labor Arbitration Decision, GRANITE CONSTRUCTION CO. --, 114 BNA LA 1115**

Arbitration

In re GRANITE CONSTRUCTION COMPANY [Las Vegas, Nev.] *and* INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 12

June 24, 2000

Show Summary

Appearances: For the employer -- Thomas T. Rolleri, Jr., labor relations manager. For the union -- David P. Koppelman, house counsel.

Arbitrator: RIKER

### *DISCHARGE*

### *Issue*

[The issue is: -- ] **[\*1116]**

> Was the termination of S_ in accordance with the Agreement? If not, what is the appropriate remedy?

### *Relevant Provisions of the Collective Bargaining Agreement*

### *ARTICLE XVI WORKING RULES*

R.

12. *Safety*

g. No employee shall be discharged for refusing to work under conditions injurious to his health or safety as determined under any rule and regulation of the State of Nevada, or any political subdivision. Such determination shall be made in writing by a responsible agent of the State of Nevada or any of its political

**Exhibit 28**

subdivisions or by a safety inspector from the applicable insurance carrier.

***Relevant Provisions of the Southern Nevada Water Authority SNWS Improvement Project Labor Agreement***

***ARTICLE XIII SAFETY, PROTECTION OF PERSONS AND PROPERTY***

*Section 1.*

(a) It shall be the responsibility of each contractor to ensure safe working conditions and employee compliance with any safety rules contained herein or established by the owner, PCI or the contractor. It is understood that the employees have an individual obligation to use diligent care to perform their work in a safe manner and protect themselves and the property of the contractor and the owner.

(b) Employees shall be bound by the safety . . . established by the contractor, PCI or owner. . . . An employee's failure to satisfy his obligations under this section will subject him to discipline including discharge.

***Granite Construction Company Booklet Titled: Job Safety and You***

**(** *CODE OF SAFE WORK PRACTICES***)**

**INTRODUCTION**

. . . . As an employee you will be required to follow safe work practices and procedures and take an active part in protecting yourself, your fellow workers, the public and the environment. . . .

**YOUR RESPONSIBILITY**

It is your responsibility to observe all safety rules established for your protection and guidance. You must use the safety equipment and devices provided or required and always work in a way that safeguards you and your fellow workers. . . .

**SAFE WORK PRACTICES**

*General--All Operations*

6. Look for hazards, unsafe conditions or practices and report them immediately to your supervisor unless you can correct the condition safely yourself and then report.

**Exhibit 28**

15. Disregard of safe work practices or other safety instruction could result in discipline.

*Machinery and Equipment*

6. If you operate equipment, you are responsible for its safe operation. You must know and follow the safety practices that apply to your equipment and its operation. If in doubt, ask your supervisor before proceeding.

9. Equipment must never be operated within 10 feet of energized high voltage electrical lines of up to 50,000 volts. Higher voltage requires greater distances according to State and Federal regulations.

### Background

The grievant is a member of Local 12 with over 34 years of operating experience. While he has operated a number of different kinds of moving equipment his craft specialty is as an operator of large cranes. Over his history of working experience he has been dispatched to a multiple number of employers engaged in the construction of large projects throughout the 50 states. According to the grievant's testimony, which was not refuted, he has never in his 34 years as an operating engineer been terminated for cause.

The Company is one of the major heavy highway contractors in the United States and is noted for their emphasis on *enforcing* safety on the job. All workers are required to attend a safety introduction prior to commencing work on the assigned job site and are also required to participate in periodic "tool box" meetings.

The Company, in addition to being signatory to the Collective Bargaining Agreement with Local 12, is also a participant in the project labor agreement with all the applicable international construction unions for the various construction projects undertaken by the Southern Nevada Water Authority.

On August 3, 1998 the Union dispatched S_ to the Company to operate a 4000 Manitowac crane. The assignment was to support, and is a part of the pipe-laying crew on one phase of the project.

On the morning of September 11, 1998 it was raining in and around the Las Vegas area and there was thunder and lightning. The grievant, according to his testimony, was concerned with operating the crane in support of the crew that morning because of the proximity of overhead power lines and **[*1117]** the necessity to make picks of the pipe with the crane that could be unsafe and a danger to himself and others.

The grievant advised the foreman of his concern and reluctance to operate the crane under such adverse weather conditions. The foreman's instructions to him was to operate the crane or he would be off the job. However, The grievant continued to refuse because of what he considered to be a hazardous situation. After the discussion, S_ was advised to park the crane, which he did, and then he reported to the project office.

The superintendent subsequently told S_ that he had to let him go because he couldn't get along with the foreman and that his arguments and dispute with the foreman was undermining the foreman's authority with the rest of the crew. The termination slip S_ was given had the "Laid Off" box checked as the reason for termination.

**Exhibit 28**

Several days later, on September 16, the Company placed an order for another crane operator and requested, by name, another individual to report to the job-site to operate the 4000 Manitowac.

On September 22, 1998 a grievance was filed claiming that S_ was terminated because of his concern regarding his refusal to work under conditions he considered unsafe. "For not setting crane up unsafe, for not making unsafe picks, refusing to operate in rain, lightning and next to power lines."

The remedy sought is for S_ to receive all monies owed to him for the hours the crane was worked while he was off which includes straight time and overtime hours plus reinstatement. (It was noted for the arbitrator that the work has been completed so the union no longer seeks a remedy for reinstatement). The time period that is in question is approximately one month.

The parties have, in accordance with the applicable section of the Collective Bargaining Agreement, processed the grievance. However, they have not been able to resolve their differences and the issue before the arbitrator for a final and binding decision is the same that gave rise to the grievance.

### *Positions of the Parties*

#### *UNION*

The case is not about whether the Company as a general rule complies with all applicable safety rules and practices. It is about what happened on the construction job-site on September 11, 1998 when the grievant repeatedly complained that the foreman was not working the pipe-laying crew in a safe manner. The Company's safety manager testified that the crane operator, when in the cab and operating the crane, has more authority than anyone else and can shut the job down for safety reasons.

According to the evidence, it is clear that the grievant was terminated not because of a reduction in force but because he refused to operate a crane under hazardous conditions. The testimony of the grievant, which was not refuted, is that the superintendent told him he was being let go because he couldn't get along with the foreman and that his criticism regarding the foreman's knowledge of safely working around operating equipment and, in particular, the unsafe practices, was undermining the foreman's authority with the crew.

The Company could have brought the foreman in to testify but, for whatever reason, elected not to do so. There's a general principle that when one party has the ability to control the evidence and for whatever reason fails to do so, there is the inference that if the foreman is brought in it would be adverse to the Company's case.

The Company's claim that S_'s termination was a reduction in force does not wash with the evidence. Joint Exhibit 4, which is the Company's termination notice form, identifies the reason for termination. There is a box identifying the reason was lack of work but that box was not checked. Instead, the box that was checked by the Company shows S_ was laid off.

The evidence brings out the uncontroverted facts that after one hour of the grievant's refusal to operate the crane because of the thunder, lightning and rain, and the proximity of the power lines, he was terminated. The reason was not due to a lack of work, but because he couldn't get along with his boss and because of the controversy regarding a safe operation.

**Exhibit 28**

The evidence is so compelling that on one hand there is the grievant, an experienced operator with 34 years of experience, in conflict over a safe crane operation with a foreman that has no experience in the crane business. The evidence is undisputed that shortly after the incident the foreman and superintendent were both let go by the Company for poor performance. It hardly seems legitimate to place the blame of poor production at the doorstep of an experienced operator, an operator [*1118] who was quite vocal regarding the safety of the operation and, who under extremely adverse conditions, refused to operate the crane.

The weight of the evidence establishes that the reason for the grievant's termination was not because of a lack of work but that the grievant was not getting along with the foreman because he refused the foreman's orders to make a pick in a thunder and lightning storm.

The Union asks the arbitrator to uphold the grievance and order the Company to pay full back pay and benefits for the period of time the second operator was dispatched to the project site.

*COMPANY*

The Company has the right under the CBA and the project agreement to determine the competency of all its employees and the right to select the employees to be laid off. The decision to terminate S_ was directly related to the reduction in the work and a subsequent selection to hire another experienced operator rather than the grievant when the work resumed. The decision to hire one operator versus another was based on performance and the recommendation of supervision.

There is direct testimony from the safety engineer that the Company has never terminated anyone for raising concerns regarding safety issues, and the evidence is also clear that when other operators who worked for the Company raised issues and/or refused to operate because of unsafe conditions they were not penalized or discriminated against in any way. The Company's programs and practices clearly espouse a demand that safety is of foremost concern throughout the organization.

The clear reason for S_'s layoff was lack of work. The rationale for rehiring operator Green instead of S_ was based on the right of the Company to select one operator over another. There is no probation or restriction on the Company's part to either moving employees from one operation to another or having those who are qualified operate the necessary equipment. The decisions about who was going to be laid off and who was going to be rehired were made long before the incident that occurred on September 11th.

The incidents pertaining to layoffs and rehires have no relationship to the issues raised by the grievant. There wasn't any evidence indicating a grand plot to discriminate against the grievant because of his concern to operate the crane on September 11th, but merely a series of coincidences.

The Company is well versed in handling and dealing with difficult employees and under such circumstances will pursue the disciplinary route in accordance with the applicable labor agreements. "We are capable of terminating individuals for just cause and have done so in the past. There is, however, no support that we have treated S_ in any negative manner because of any safety issue. The action to lay off S_ and rehire Green was based solely on the quality and quantity of production."

It was in the best interests of the Company to lay off S_ and Mr. Hennessey acted within his purview to make the decision regarding the layoff. The Union has raised bogus issues and

**Exhibit 28**

the Company asks the arbitrator to deny the grievance.

There is a basic premise for those who elect to pursue the career of construction worker and that premise is that danger is an inherent part of the job. Everyone connected with a construction project must be cognizant of this fact and remain vigilant at all times in order to avoid danger to themselves and their fellow workers.

Both the Union and the Company, who are engaged in this dispute, have a very long history of being at the forefront of the crusade to have a construction work site which is a "safe and healthful place of employment, and to control the recognizable hazards of a construction project". The Southern Nevada Water Authority has joined with them by incorporating provisions in the project agreement regarding the demand that all contractors and workers adhere to the principle of operating a safe project that protects workers and property. They also proclaim a worker's right to refuse to perform work which would endanger him or his fellow workers' health or safety.

The issue in this grievance, as *argued* by the parties, is whether the termination of the grievant for refusing to operate the crane on September 11th was a protected right recognized by all parties or, as contended by the Company, a bogus effort to stretch a legitimate layoff into an action that was a contract violation.

The arbitrator has considered the evidence which includes the testimony of the witnesses and the exhibits that were received and moved into the record. **[*1119]**

S_, the grievant in this matter, was the primary witness as to the incidents that occurred up to and including his final work day with the Company on September 11, 1998. His testimony of having several differences with the foreman over the safe operations of the utilization of the crane in the pipe laying project was credible. The grievant's conversation with the superintendent on September 11th after he parked the rig and as to the reason for his termination, was not refuted by any direct evidence.

[1] The Union's insertion that an inference must be drawn against the Company for failing to offer rebuttal testimony by the foreman is a valid argument. There was no dispute that the foreman was working in the area and could have testified. Whether he was available or not on the day of the arbitration hearing is frankly not germane because the parties, on two different occasions, had rescheduled the hearing for a day on which he would be available, or continue the hearing to a second day. As an alternative, the Company and Union could have agreed to take his deposition prior to the arbitration.

In this arbitration issue the level of proof does not rise to the criminal requirement of beyond a shadow of doubt, nor clear and convincing. All that is required by the Union in order to establish its prima facie case is a slight tipping of the scale to change the balance of the pendulum in their favor.

The burden then, of overcoming the preponderance of the evidence, shifts to the Company to prove to the arbitrator that the events relating to the dispute over crane safety and the termination of shutting down the operation and terminating S_ were merely coincidental to the legitimate interests of the Company in reducing its work force.

There is no dispute that the crane operator had previously complained about whether the crane was appropriate for the job assigned. The grievant and at least one other person raised that issue shortly after he became employed in August of 1998. That concern was evaluated by at least two or three Company personnel specialists in job-site safety and equipment operation. It was determined that the 4000 Manitowac was capable of performing the assignment.

**Exhibit 28**

Once the Company determined the Manitowac was a piece of equipment that could safely perform the work assigned the pipe laying job continued. However, S_'s complaints questioning whether the operation was safe did not decrease. He raised a concern over the competency of the foreman regarding his knowledge of operating the crane within close proximity of power lines, being too close to the open trench, and the truckload of pipe being placed under the power lines. Mr. Hennessey testified that he discussed S_'s concerns with him and communicated those concerns to the foreman and superintendent. He testified that he expected them to resolve legitimate safety issues that were raised by S_.

[2] Unfortunately for all parties concerned, there was no resolvement of S_'s fears that picking the pipe off the flatbed of the truck, which was directly under the power lines, was going to get someone seriously injured or even killed. Grievant S_ is an experienced operator of large cranes who has worked his trade for over 34 years and was never terminated for cause. Relating to the opinion of the foreman, he may have appeared to be somewhat of a complainer, or just plain ornery. However, all the parties recognize that the crane operator calls the shots and, under hazardous conditions, had the right and indeed the obligation to refuse to work.

What was not clear to the satisfaction of the arbitrator is whether S_, while employed and making the picks, knew or was even advised of whether the power was on or off. Perhaps, as the oiler testified, the assumption by both he and the operator was that the power was on at all times and therefore the crane operator and oiler acted with legitimate concern.

In any case, there is no dispute that on September 11th there was a severe thunderstorm with lightning and that most of the construction projects in Las Vegas ceased work on that day.

On the morning of September 11th, after S_ made one pick of the pipe, he became concerned over the hazardous conditions and refused to work with the storm overhead. The foreman however insisted on his continuing to work, and that it was "either his way or the highway." The result, was that after S_ continued with his refusal to operate he was directed to park the crane. After the crane was parked he had the conversation with the superintendent, as noted above, and after waiting three hours for his final paycheck he left the work site.

When there is a confrontation over a refusal to work because of hazardous conditions that could result in a worker's injury or death and there was failure in addressing that issue, then the Company becomes subject to scrutiny when there is recognition that the person making a complaint has authority [*1120] to raise the issue. The matter cannot summarily be dismissed by means of a reduction in force. The issue raised by the crane operator was serious enough for the foreman and superintendent to advise the safety coordinator for the Company and before any layoff resolve the crane operator's concern.

To reiterate, the testimony and exhibits make it abundantly clear that all parties involved recognize the responsibility of the crane operator at a job site. According to the testimony of the Company's safety coordinator, "The crane operator has more authority than anyone when he gets into the cab. He has the right and obligation to shut down the operation if he believes it is hazardous to work."

The fact is that the crane was parked after the confrontation. The testimony is that the superintendent told S_ his termination was not because of a reduction in force but because he couldn't get along with the foreman.

Apparently, after September 18th when operator Green replaced the grievant significant changes were made relating to the pipe laying operation. One of which was the termination of the foreman and, shortly thereafter, the superintendent in charge of the work site. The

**Exhibit 28**

change of supervision may well have had a positive effect on the quality and quantity of the crew's production regardless of whether Green or S_ were the crane operators.

Mr. Hennessey was quite candid about the basis for his decision as to why he terminated the two individuals when he stated, "they didn't have any idea about what they were doing tomorrow." Also, there was the unresolved question of whether, during the time of S_'s tenure, the power was ever shut down. What was evident, is that neither S_ or the oiler knew if that was so and therefore acted as if the lines were energized. A fact that was brought out in the testimony was that over $50,000 was charged to the Company when the power was turned off for some period of time.

What well may have been another factor relating to improved performance is that if Green, during his tenure, was aware that he did not have to take the extra precaution when working under energized lines. There is, however, no reason to doubt the testimony of the Company that subsequent to September 11th, when work resumed production increased. In any case, it is the considered opinion of the arbitrator that the Company cannot base the quantity or quality of production at the doorstep of the grievant.

It does not satisfy the unrefuted evidence that the crane operator raised legitimate concerns over hazardous conditions and the immediate result was his termination. The Company failed to rebut the testimony of S_ as to the reported statements made by the foreman and superintendent on the day of his refusal to operate the crane and his termination some three hours later.

The Union has presented a valid case in that there was a nexus between the complaints of the grievant and his being terminated. Therefore, based upon the particular facts of this case, it is the decision of the arbitrator that there is merit to the grievance and the complaint by S_ is sustained.

### *Decision*

The grievance is sustained.

### *AWARD*

S_ is to receive back pay and benefits for all hours worked by Operator Danny Green, from the time of Green's dispatch until October 18, 1998.

**Exhibit 28**

# Arbitration Decisions

## Labor Arbitration Decision, METRO WASHINGTON AIRPORTS AUTHORITY --, 97/12158-3, 111 BNA LA 712

**Labor Arbitration Decision, METRO WASHINGTON AIRPORTS AUTHORITY --, 97/12158-3, 111 BNA LA 712**

Arbitration

In re METROPOLITAN WASHINGTON AIRPORTS AUTHORITY *and* MWAA PROFESSIONAL FIRE FIGHTERS ASSOCIATION, IAFF, LOCAL 3217

FMCS Case No. 97/12158-3

May 15, 1998

Show Summary

**[*713]**

Appearances: For the employer -- John M. Tapajcik, labor relations specialist; Patricia E. Steven, manager, labor relations. For the union -- Anton G. Hajjar and Melinda K. Holmes (O'Donnell, Schwartz and Anderson, P.C.), attorneys; Charles M. Burroughs, local president; George A. Harms, vice president.

Arbitrator: SIMMELKJAER

### *DRUG DEPENDENCY*

The Arbitrator derives his authority from Article 25-- *GRIEVANCE AND ARBITRATION*, which in Section 3--General Provisions states:

> (d) Both parties to this Agreement recognize and agree that the Arbitrator's decision(s), unless contrary to law, shall be binding. The Arbitrator shall have no authority to add or to modify any terms of this Agreement and will confine the hearing to the specified issue(s) in dispute . . .

At the hearing, the parties were given the opportunity to present testimonial and documentary evidence regarding the matter in dispute. The parties were represented, (the Grievant by counsel,) throughout the proceeding and the two (2) days of hearing were transcribed. The record consists of thirty-five (35) Joint Exhibits, thirteen (13) Authority Exhibits and ten (10) Union Exhibits. In addition, the parties submitted post-hearing briefs

**Exhibit 28**

on March 9, 1998. Subsequently, on March 16, 1998, the parties submitted reply briefs. The evidence so submitted as well as the arguments of the parties has been carefully considered in the preparation of this award and its accompanying opinion.

*ISSUE:* Whether the Airports Authority removed the Grievant, W_, from his position as Firefighter/EMT for just cause?

And, if not, what shall be the appropriate remedy?

### Relevant Contract Language

### Article 24--Discipline Procedures

*Section--Principles*

(a) In the administration of this Article, a basic principle shall be that discipline should be corrective in nature, rather than punitive. No employee may be disciplined or discharged except for just cause. Any such discipline or discharge shall be subject to the grievance/arbitration procedure provided for in this Agreement. Disciplinary actions consist of oral reprimands, written warnings, written reprimands, suspensions, demotions, and removals.

(b) The Employer will normally issue proposed disciplinary action(s) within 30 days of the date of the incident or date the Employer becomes aware of the incident giving rise to the proposed action, unless there are mitigating circumstances, i.e., when there is an accident review board ongoing or an in-depth investigation is necessary. The Employer will advise the involved employee(s) and/or his/her representative of the investigation status at the end of the original 30-day timeframe and every 10 days thereafter. Disciplinary actions will not be instituted until after the final submission of the investigation findings.

*Section 6*

(a) In the case of terminations/removals, any employee shall be entitled to an advance written notice proposing the charges against him/her and shall have 30 days in which to respond to the notice. The employee will receive a written decision. If he/she is dissatisfied with the decision, he/she may, within 10 days of receipt of the letter, file a written grievance with the DO. The grievance would then proceed according to the remaining Steps of the negotiated grievance procedure.

### Statement of the Case

By letter dated March 20, 1997, Elmer H. Tippett, Jr., Manager, Public Safety Division, proposed the removal of W_ from his position of Firefighter/EMT-A-F-60 in the Fire and Rescue Department, Public Safety Division, Washington Dulles International Airport, Metropolitan Washington Airports Authority. Reason #1 for Grievant's proposed removal states:

# Exhibit 28

*CRIMINAL AND DISHONEST MISCONDUCT*

> You were convicted of a misdemeanor, attempting to obtain prescription drugs on October 3, 1996 by false pretenses.
>
> Under your job description, you are responsible for responding to fire alarms, aircraft emergencies, and medical emergencies. Under the direction of superior officers, you are responsible for using emergency equipment and professional techniques to bring these emergencies under control. your position requires having direct access to the Airport Operating Area, a high security area. Further, as an EMT-A, you are responsible for performing basic medical procedures and techniques. During emergency operations or at the fire station, you may have access to the prescription drugs carried in the medic units. To effectively perform your important public safety duties, you must have the trust and confidence of your superior officers and the public.
>
> . . . your criminal and fraudulent scheme to obtain prescription drugs was premeditated and intentional. That you plead [sic] guilty to a misdemeanor rather than a felony does not mitigate the serious nature of the underlying fraudulent misconduct.
>
> I have carefully reviewed the administrative investigation of this case dated February 21, 1997. The serious nature of your criminal misconduct and your dishonesty has destroyed the Fire Chief's and my trust in you. Therefore, I have determined that you can no longer effectively perform your important public safety duties. Accordingly, I am proposing the termination of your employment. **[\*714]**

Grievant was given thirty (30) days to reply to this proposal.

On Grievant's behalf, the Union responded to the proposed removal in writing on April 25, 1997, citing the following elements/reasons:

> (1) Firefighter W_ is a "Qualified Handicapped Employee" under the Americans with Disabilities Act, caused by his dependency on percocet.
>
> (2) Firefighter W_ has been rehabilitated.
>
> (3) Drug dependency resulted from Job-Related Injury. Although initially charged with a felony, he pled guilty to the misdemeanor of obtaining prescription drugs by false pretenses.
>
> (4) No nexus to job.
>
> (5) Disparate Treatment
>
> (6) Value to Authority
>
> (7) Trust and Confidence. Prior to the instant disciplinary action, Grievant "had a clean disciplinary record with the Authority."

**Exhibit 28**

(8) Management's Actions are untimely. Grievant was placed on administrative leave with pay on December 11, 1996, pending, the results of an administrative investigation and the adjudication of criminal charges. Although Article 24, Section 1(b) of the Negotiated Agreement requires that an employee be issued discipline or advised that an investigation is underway, within 30 days of the incident or the date the Employer becomes aware of the incident giving rise to the proposed action, Grievant's placement on administrative leave occurred 60 days after the Authority was notified of Grievant's arrest.

By letter dated June 3, 1997, the Authority removed W_ from his position, effective June 12, 1997. On June 23, 1997, the Union President filed a Step 3 grievance with the Authority, alleging that W_'s removal was "without just cause, contrary to established procedures, disparate and discriminatory". On June 30, 1997, the Public Safety Manager denied the grievance. Subsequently, on July 3, 1997, the Union timely requested arbitration on July 3, 1997.

### *Statement of Facts*

1) The Grievant, W_, was hired as a Firefighter/EMT in July, 1985 by the Airports Authority's predecessor, the Federal Aviation Administration (FAA).

2) At time of his employment Grievant included on his employment application that he had a prior conviction for "possession with intent to distribute a controlled substance (i.e. cocaine)."

3) Commencing in 1991, W_ suffered a series of on-the-job injuries that caused or exacerbated serious back pain. W_'s physician prescribed pain killers and muscle relaxers for his condition. After years of prescriptions, "W_ ran out of pills in the summer, 1996".

4) While accompanying his sister to a doctor's office in the fall, 1996, he took two prescription forms from the medical office of Dr. Stephen Guinta in Alexandria, Va.

5) Later, on October 3, 1996, he forged the name of Dr. Guinta requesting 30 percocet tablets and 30 amoxil tablets. Also, on 10/3/96, he presented the forged prescriptions at the Safeway Pharmacy on Maple Avenue in Vienna, Va. attempting to obtain the amoxil and percocet--the latter of which is similar to Tylenol #3, a codeine based pain killer.

6) A pharmacy employee, believing that the prescriptions were fraudulent, contacted Dr. Guinta's office before filling the prescriptions and subsequently called the Vienna police.

7) Meanwhile, W_ became nervous, left the store and ran down Maple Avenue, leaving his car in the Safeway parking lot. With three police officers in pursuit, Grievant was arrested on the bike path, approximately .3 miles from the Safeway. Officer Marsh handcuffed him and transported him to the pharmacy for positive identification by M_--the pharmacy employee.

A search of W_'s car produced a pill bottle from a Rite-Aid pharmacy with the name H_, the name Grievant had used on his forged prescriptions.

8) Grievant was charged with four (4) felony charges under the code of Virginia §18.2-258.1, two (2) charges of attempting to obtain percocet and amoxil by fraud and two (2) charges of [*715] making or uttering the forged prescriptions.

**Exhibit 28**

9) One week later, following communication with Union President Burroughs, Grievant's criminal attorney and an attorney group representing Fairfax County firefighters, Grievant advised Fire Chief Cherry that he was dependent on prescription drugs. As a result, the Fire Chief continued Grievant on sick leave and referred him to Dr. Holland, MWAA's Medical Director, for his annual physical and drug screening.

On October 25, 1996, Dr. Holland "medically interviewed and examined W_" and recommended that "W_ return to work in a 'light duty' capacity pending my final medical recommendation." Following further medical evaluation on October 27, 1996, including an "expanded profile" drug screening, Dr. Holland reported the results of the drug screening were negative. On November 11, 1996, Dr. Holland, based on discussions with Grievant's physician Dr. Levinstone and his drug counselor, Katherine Jones, recommended extensive outpatient drug dependency counseling, continuation on light duty through 1996 (approximately another 6 weeks) "so that he will have every opportunity to focus on his therapy".

10) Chief Cherry ordered W_ back to work, on *modified* duty, responding to emergency calls in the watch room.

11) Several days after advising the Chief of his purported drug dependency, Grievant informed the Chief that he had been arrested for prescription drug fraud. On December 11, 1996, Grievant was placed on Administrative Leave and advised that the Authority was initiating an internal investigation, which could result in disciplinary action, for off-duty misconduct. According to Tippett, "[t]he criminal charges against you, viewed in the context of your prior felony conviction . . . raise serious questions whether you are ready, willing and able to perform official duties".

By letter dated January 31, 1997, First Deputy Chief Cooper pursuant to his administrative investigation, requested a statement from Grievant, which "at minimum," would address the following:

> 1. The action(s) on your part which resulted in your arrest on
> October 3, 1996.
>
> 2. The circumstances surrounding your arrest on that date.
>
> 3. If you are being treated for an addition to prescription drugs. If
> so, describe.

12) On January 29, 1997, W_ pleaded guilty to one misdemeanor count of obtaining property by false pretenses and received a suspended 180 day sentence.

13) After reviewing the report of the investigation, Chief Cherry recommended by memorandum dated February 27, 1997 that W_ be terminated from his position.

14) On March 20, 1997, Tippett issued the proposed Notice of Removal for "Criminal and Dishonest Conduct". On June 12, 1997, Grievant was removed from his position as Firefighter/EMT. Tippett stated his reason for removing W_ was as follows:

> As a firefighter and EMT-A, you must respond to fire alarms aircraft
> emergencies, and medical emergencies which may involve access
> to controlled substances. You must be counted on to assist in
> controlling these critical emergencies. At times, you may work at
> emergency incident scenes without direct supervision. Attempting
> to obtain prescription drugs through fraud constituted "moral
> turpitude" and reflected very negatively on your fitness to continue
> public service as a firefighter. Because of your serious criminal and
> dishonest conduct, the Fire Chief and I have lost confidence and

**Exhibit 28**

trust in you to perform your public safety duties honestly, faithfully, and effectively.

### I. W_'s Drug Dependency

#### Authority Position

In its letter of termination, dated, June 3, 1997, the Authority charged W_ with "misconduct generally; criminal . . . dishonest . . . conduct." According to the Authority, "the essence of your misconduct was criminal fraud to unlawfully obtain controlled prescription drugs". As a further basis for Grievant's removal, the Authority maintained:

> Attempting to obtain prescription drugs through fraud constituted 'moral turpitude' and reflected very negatively, on your fitness to continue public service as a firefighter. Your critical emergency response duties require the highest standards of personal responsibility and accountability . . . (id).

The Authority also rejected Grievant's claim that he was an "otherwise qualified employee with a disability" and distinguished his situation as excluding "an individual who is currently engaging in the illegal use of drugs." As the Authority indicated, "your bold assertion of drug dependency, without more, would not establish that you have a disability." Moreover, the Authority noted that "[o]n May 29, 1997, the Authority's Medical Director reviewed the medical treatment and prescription records provided by you and determined that those records would not support a dependency on percocet or any other codeine-based prescription drug" (id).

In the course of its investigation, specifically the Union's defense that [*716] Grievant's removal was unwarranted because he was addicted to Tylenol #3 resulting from treatment for a work-related injury, the Authority acquired Grievant's treatment records back to 1988 and prescription records back to 1993 in order that its medical experts could evaluate the claim. Dr. Holland and Dr. Ruby of the Industrial Medical Services Department independently reviewed the Grievant's treatment and prescription records and each concluded that neither "the treatment regimen [nor] the nature and levels of the drugs prescribed" would establish chemical dependency on Tylenol #3, absent other sources of supply".

The Authority further noted that Grievant had been hired as a firefighter despite a prior conviction for "possession with the intent to distribute a controlled substance," namely cocaine--a fact which he cited on his employment application. With respect to the instant case, the Authority dismissed Grievant's contention that he had an uncontrollable drug dependency when he was arrested for forging a prescription. In its brief, the authority described W_'s drug use as follows:

> For several years, W_ abused prescription drugs on a recreational basis, taking several types of prescription narcotics, including Tylenol #3 and propoxy (a very mild synthetic narcotic) with alcohol. W_ described how this made him feel: " "hey made me feel really good. It was like an escape and I enjoyed it." " As well, he described the feeling as a " 'vacation.' " Without exception, W_ restricted "getting-high" to his off-duty days on his rotational schedule. He never tested positive for drugs. Apparently, W_ was in full control of his drug usage. W_ never sought assistance or advice from his medical doctors regarding his drug usage. Since his arrest,

**Exhibit 28**

W_ has been totally drug free. W_'s characterization of his recreational drug use as a drug dependency or addiction is not supported by the facts.

Based on the foregoing analysis, the Authority "did not consider W_'s drug abuse to be a mitigating factor for his criminal conduct" inasmuch as "no nexus between his criminal conduct and the drug usage was established." (id.)

### *Union Position*

The Union, on the other hand, finds fault with the Authority's investigation of W_'s purported drug dependency. In Grievant's defense, Ms. Katherine Jones, a licensed professional counselor who diagnosed and counseled W_ for his drug dependency testified that she diagnosed W_ as "opiate dependent." Referring to the Diagnostic and Statistical Manual ("DSM"), Ms. Jones testified that W_ met five of the seven DSM criteria for being classified as substance dependent which are:

> (3) the substance is often taken in larger amounts or over a longer period than was intended

> (4) there is a persistent desire or unsuccessful efforts to cut down or control substance use

> (5) a great deal of time is spent in activities necessary to obtain the substance (e.g., visiting multiple doctors or driving long distances) use the substance (e.g., chain-smoker), or recover from its effects

> (6) important social, occupational, or recreational activities are given up or reduced because of substance use

> (7) the substance use is continued despite knowledge of having a persistent or recurrent physical or psychological problem that is likely to have been caused or exacerbated by the substance (e.g., current cocaine use despite recognition of cocaine-induced depression, or continued drinking despite recognition that an ulcer was made worse by alcohol consumption).

She acknowledged that W_ was classifiable as drug dependent even though he did not meet either the "tolerance" or "withdrawal" criteria which are defined as "just needing more of the substance in order to get the effect, or if you don't take more, you get a lesser effect, withdrawal symptoms". Having satisfied three (3) of the seven (7) DSM criteria, Ms. Jones concluded that Wahl could be clinically diagnosed as drug dependent.

In evaluating the medical reports of Dr. Holland and Dr. Ruby, Ms. Jones testified that their conclusions that W_ was not drug dependent erroneously relied only on the one criterion of tolerance whereas the present or absence of tolerance is not a dispositive diagnosis. Pursuant to the request of Fire Chief Cherry, Dr. Holland reviewed W_'s medical and prescription records to render an opinion "about W_'s statement that he became addicted to narcotic medications due to the repetitive use of narcotic medications legitimately prescribed by his physicians".

To ascertain whether W_ could be diagnosed as drug dependent, Dr. Holland counted the number of pills prescribed to W_, extrapolated the number of days the pills, if used as prescribed, would have covered, and concluded that "the small amounts of low potency narcotic medications with large gaps in time between prescriptions, with no evidence of

**Exhibit 28**

increasing use or the need for more potent narcotics argues against the conclusion that the above described history resulted in a chemically dependent condition". Utilizing a similar methodology, Dr. Ruby concluded that there was no evidence of addiction because "[i]n [*717] order to prove addiction, he would have to demonstrate daily usage with increasing tolerance to the medication".

In terms of her treatment of Grievant's drug dependency, Ms. Jones testified that during his individual counseling Grievant appeared "open, honest, serious" and ready to change. She considered his prognosis as excellent and reiterated his diagnosis as a "sustained full remission". Grievant had commenced his individual counseling 4-5 times per week with Jones after his arrest in October, 1996 and had previously attended group therapy with Narcotics Anonymous. Following the conclusion of his individual counseling in January 1997, Grievant continued to participate in group therapy while regularly attending Narcotics Anonymous.

In the letter Ms. Jones provided for First Deputy Cooper's investigative report she said that W_ had "made a lifetime commitment to inform his doctors about his status regarding medications" and concluded "that in her decade for working with substance abuse issues W_'s plan is . . . one of the most solid I have seen and his motivation to stay on track is among the highest . . .

### Discussion

[1] Considering the evidence in its entirety, the Arbitrator is persuaded that the Authority improperly excluded evidence that Grievant had a drug dependency, specifically an addiction to prescription drugs. To the extent that the Authority's decision relied on his arrest for attempting to illegally obtain prescription drugs by forging a prescription, this ground for removal should have been mitigated by evidence of his drug dependency. Moreover, there is persuasive arbitral authority that in cases involving "moral turpitude" and social stigma, the Employer's burden of proof should be elevated to a clear and convincing standard in order to establish just cause for the disciplinary action. As the Union correctly observes, "the just cause in this case requires the Airports Authority to consider evidence of a mitigating factor that nullified the just cause." See *Lakeside Jubilee Foods,* **95 LA 358**, 365 (Berquist, 1990).

[2] Although there is no consensus on the degree of proof required in cases involving substance abuse, the emerging trend of both increasing the quantum of proof required when the disciplinary consequence is termination or the charge entails moral turpitude, as here, would, in this Arbitrator's opinion, warrant, at minimum, a clear and convincing standard. However, even if the lower preponderance of the evidence standard is applied, the Authority's failure to acknowledge Grievant's drug dependence in its disciplinary decision making would warrant mitigation of penalty.

Notwithstanding the gravity of Grievant's misconduct, his arrest and guilty plea to forging a prescription to obtain prescription drugs, the Authority's omission of drug dependency as a mitigating factor was a pivotal decision. Given evidence which, in the Arbitrator's judgment, establishes that but for the Grievant's addition to prescription pills he would not have attempted to obtain drugs illegally, upon his documented recovery from this addiction the misconduct which led to his discipline is largely negated. Needless to say, the nature of his criminal offense could, standing alone, warrant his removal for off-duty conduct injurious to the Employer's business, however, this matter will be addressed separately.

The record indicates that despite some evidence provided by Grievant's supervisor, Elmer Tippett, that he had a "drug problem," the Authority relied exclusively on the medical

**Exhibit 28**

opinion of Dr. Holland to reach its mistaken conclusion that W_ was not drug dependent. In the course of the Authority's investigation conducted by First Deputy Chief Cooper, the Authority endorsed the unscientific and erroneous analysis conducted by its Medical Director, Dr. Holland, that the quantity of prescribed pills taken by W_, assuming he did not abuse the prescription protocol, could not result in addiction. Imbedded in this mathematical approach to diagnosing drug dependency were several unproven assumptions and over-reliance on one criterion indicative of drug dependence--namely tolerance.

Absent the testimony of Dr. Holland, for which an adverse inference can be drawn pursuant to the "missing witness" doctrine, the testimony of Ms. Jones, a licensed drug counselor, must be credited. She testified credibly that a professional diagnosis of clinical drug dependency requires evaluation of seven criteria only one of which is tolerance and such diagnosis cannot be derived exclusively from a review and extrapolation of medical and pharmacy records.

The documentary evidence further reveals that Dr. Holland was inconsistent in his diagnosis of Grievant's medical condition. On November 11, 1996, Dr. Holland had recommended "intensive outpatient treatment," including group therapy and attending [*718] Narcotics Anonymous to assist with his "drug problem". However, once the Authority was informed of Grievant's arrest, in May, 1997, Dr. Holland argues against "a chemically dependent condition." While diagnosis could change based upon probative medical evidence, the Authority did not meet its burden of establishing the medical accuracy of the latter diagnosis which constituted a key element in its discipline of Grievant.

Even in its reply brief, the Authority continued to juxtapose the number of Tylenol #3 pills prescribed by Grievant's physicians from 1993 to August 1996 "(the time period when W_ failed to take his pills as prescribed)" against the 140 four day breaks he had during this period to conclude that the pills vs. breaks analysis could not support his excessive drug use and resulting dependence.

The Arbitrator acknowledges several cogent points made by the Authority with respect to Grievant's pattern of drug dependency *vis a' vis* the DSM evidence noting, for example, that "W_ did not *frequently* take Tylenol #3 in larger amounts; there was no evidence that W_ made persistent, unsuccessful efforts to cut his use; he did not spend a *great deal of time* in activities to obtain the Tylenol #3; did not give up any *important social or occupational activities*; and did not *experience problems* as a result of his extended use" (emphasis Authority). Despite the ambiguity identified in Grievant's satisfaction of various DSM criteria, the Arbitrator is persuaded, particularly in the absence of countervailing medical testimony, that, in the aggregate, Grievant had a drug dependency. Clearly, at the point of his arrest, his need to take codeine-based pain medications had increased, he had devoted additional time to obtaining the prescription drug (albeit illegal activity) and had experienced job-related and criminal justice problems as a result of such extended use.

As the party with the burden of proof in a disciplinary case, the Authority cannot sustain its burden of establishing just cause for Grievant's removal if it erroneously omitted mitigating evidence which would wholly or partially negate the principal charge. Since Grievant was removed for general misconduct entailing moral turpitude in "attempting to obtain prescription drugs through fraud," evidence of Grievant's bona fide drug dependency would lessen the gravity of that charge.

Moreover, the Authority's failure to fully consider the mitigatory impact of the documentary evidence it obtained during the course of its investigation must be construed against the charging party. Rather than credit the documentation obtained from professional drug counselors who were treating W_ such as Ms. Jones, the American Day Treatment Centers and CSAC Theodore (NA), the letters from co-workers attesting to his recovery progress or

**Exhibit 28**

the initial perspectives of Mr. Tippett and Dr. Holland that Grievant had a drug problem, the Authority focused its investigation on the criminal dimensions of his problem as a basis for termination.

In the final analysis, the Authority has to sustain its burden for the discipline imposed--a burden which cannot be satisfied if it erroneously omits mitigating evidence during its investigation. As the Union correctly observes, even if the Authority relied in good faith on the inaccurate diagnosis of its physicians to propose the discipline, this decision must redound to the detriment of the Authority. [1]

Assuming *arguendo* that the Authority had established a *prima facie* case of Grievant's removal and the burden shifted to Grievant to establish his mitigating defense, this burden also was satisfied in that the unrebutted testimony of Ms. Jones coupled with the erroneous methodology employed by Dr. Holland upon which the Authority relied established W_'s drug dependence at the time he engaged in the misconduct leading to his arrest.

[3] The Authority's investigation was also flawed in its failure to contact any of the counselors treating W_ for his drug dependence and identified in the investigatory report. In the Arbitrator's opinion, the investigation lacked objectivity in that Dr. Holland's dual diagnoses were not reconciled and evidence of mitigation was excluded from the decision making process. Although the Authority was cognizant that Grievant's dependence on medications could mitigate the penalty of removal, it gave significant weight to the opinions of his supervisors that they could never trust him again, their doubt that he was "ready, willing and able" to perform official duties and substantial weight to Dr. Holland's revised diagnosis.

On balance, the Arbitrator is compelled to conclude that insofar as the Authority had ample evidence available establishing Grievant's drug dependency which could have mitigated the general misconduct associated **[*719]** with his fraudulent attempt to obtain prescription drugs, the Authority did not conduct an impartial investigation and consequently its decision to terminate Grievant's employment on this basis was not for just cause.

### II. Off-Duty Misconduct

#### Authority Position

The second ground advanced by the Authority for W_'s removal is that he violated the current standards for off-duty conduct as set forth in the Conduct and Discipline (C&D) Directive at paragraph 51. In essence, this code requires firefighters "to conduct themselves while off-duty in a manner which will not reflect unfavorably upon the Authority or the public safety employees as a group." In addition, "firefighters must conduct themselves while off-duty in such a manner that doubt will not be raised about their reliability and trustworthiness". Moreover, the Office of Personnel Management (OPM) from which the C&D Directive was derived espouses" " '[t]he maintenance of unusually high standards of honesty, integrity, impartiality and conduct' " as essential to the proper performance of operations and the maintenance of citizen's confidence.

The Authority further notes that employees are explicitly prohibited from engaging in "criminal, infamous, dishonest or notoriously disgraceful conduct, or other conduct prejudicial to the Government". Finally, the Authority indicates that "W_ had clear notice of the penalties for dishonest or criminal misconduct. Under the C&D Directive's Table of Penalties, criminal or dishonest misconduct supports removal.

Inextricably connected to the Authority's assertion that Grievant violated its off-duty conduct standards for firefighters is its view that "firefighters must be held to higher

**Exhibit 28**

standards of accountability that most other Authority employees." Given W_'s role on the public safety team which, *inter alia,* requires him to assist "victims in the throes of personal tragedies," entering homes on mutual aid calls and obtaining "unsupervised access to citizen's homes or to their personal property or medications," the Authority considered W_ "dishonest and criminal conduct" a disqualification for being a firefighter and grounds for his removal.

According to the Authority, not only had W_'s arrest and guilty plea to attempted larceny of prescription drugs cast doubt on his veracity and trustworthiness, it also reflected "his unwillingness to accept responsibility for his actions and a lack of potential for rehabilitation."

While recognizing that "criminal conduct does not automatically justify discharge," the Authority contends that despite the arrangement Grievant made with the Assistant Chief to have his "stated reason for his *modified* duty be a back injury," it cannot "continue in its employ a firefighter who commits misconduct involving moral turpitude, especially where a conviction is involved." In terms of harm to the Authority's business, the Authority argues that Grievant's retention "would be injurious to the Authority's public safety reputation among its customers, the local community (for emergency medical services) and the traveling public" (Authority brief p.8).

### Union Position

The Union, on the other hand, maintains that "[t]here was no relation between the misconduct and W_'s abilities as a firefighter." According to the Union, the evidence in the record establishes that prior to his arrest W_ was an excellent employee as evidenced by his annual performance ratings since 1989 as either "fully successful (met)" or in 1996 "fully successful (exceeded)." Various excerpts from these evaluations convince the Union that he performed as a Firefighter/EMT with professionalism and skill during the same period he was plagued by substance abuse initially limited to a weekend phenomenon.

As further evidence that W_'s drug dependence did not interfere with his job performance, the Union cites the six week period following his arrest and the period the Authority had knowledge of his arrest where Fire Chief Cherry returned W_ to work on light duty. That Grievant was placed on administrative leave on December 11th, 1997 cannot, in the Union's view, be attributed to any deficiencies in his performance.

Finally, the Union discounts Tippett's testimony that access to the Airports Authority's drug box or the public's property as factors in his removal since without a drug dependence W_ has no motivation to acquire drugs illicitly or otherwise. In the Union's view, "Chief Cherry's earlier action of returning W_ to work for six weeks strongly suggests that the Fire Chief had a trust in W_'s abilities and performance as a firefighter--even after his arrest and drug dependency--that **[*720]** was diminished only at the insistent of Tippett".

### Discussion

[4] The analytic framework for evaluating whether the Employer's interests are sufficient for regulating the employee's off-duty conduct have been categorized as a set of exceptions to the general rule that the employee's off-duty conduct is private. In order to constitute a recognized exception to the general rule, the conduct must either:

      1) harm the employer's business;

**Exhibit 28**

2) adversely affect the employee's ability to perform his or her job; or

3) lead other employees to refuse to work.

[5] In this connection, despite the Authority's generalized projection of harm to its public image should Grievant remain a firefighter, the arbitrator finds insufficient evidence of actual harm. Despite Grievant's pursuit and arrest in a public area and his subsequent arraignment in criminal court for attempted larceny and forgery, there is no evidence that the Authority's public image was adversely impacted. In the absence of negative publicity, adverse public reaction or any other indicia that Grievant's continued employment would be counterproductive, this arbitrator cannot conclude that Grievant's off-duty conduct was injurious to the Authority's business. As distinguished from Fire Chief's Tippett's position and Authority speculation that the Public Safety Division's "high profile and service orientation" would be tarnished by Grievant's retention, the Authority failed to prove by a preponderance of the credible evidence that the harm to its business was actual or that Grievant's misconduct would inevitably harm the management of the Division. Similarly, neither Grievant's plea-bargained conviction for attempted larceny of prescription drugs nor his potential interaction with members of the public were established as unacceptable risk factors should he be retained as a firefighter.

With respect to his ability to perform his job or causing other employees not to perform their jobs, no tangible evidence was offered in support of these off-duty conduct criteria sufficient to establish the nexus which could warrant removal. Grievant's continued performance during the six week period combined with the supportive letters received from co-workers is indicative not only of confidence in his firefighter abilities and ongoing rehabilitation but also dispositive of criteria two and three.

Although the courts have established a higher standard for off-duty misconduct in the public sector which breaches the particular trust or relationship accorded a safety officer, such as a firefighter, particularly if the employee's actions were rationally related to potential disruption of the employer's operations, (See Hawkins v. Dept. of Public Safety and Correction Service, 325 Md.621-602 a-2d 712, *60 USLW 2584* (Md. March 10, 1992 ), in no case extant has mere speculation of harm sufficed to meet this standard.

Finally, the Union has effectively challenged the Authority's contention that W_, as a firefighter, was subject to a higher standard in terms of off-duty conduct than other Authority employees.

### *III. Procedural Issue*

### *Union Position*

The Union refers to Article 24, Section (1)(b) of the parties' agreement which states:

> The Employer will advise the involved employee(s) and/or his/her representative of the investigation status at the end of the original 30-day time frame and every 10 days thereafter.

According to the Union, W_ informed Chief Cherry of his arrest in October, 1996 and "the only action Chief Cherry took at that time was to order W_ to submit to a physical and drug test." Despite this information, the Union contends that "it was not until January 31, 1997, over three months after reporting his arrest and two days after the final disposition in the court case, that W_ was notified that First Deputy Cooper was beginning the internal investigation". The Union further contends that a month elapsed before the initial

**Exhibit 28**

investigation was finished and another month ensued before W_ was notified regarding the recommendation for his removal.

Since the Authority did not comply with the notice provision of Article 24, the Union argues that the arbitrator should find in favor of the Grievant irrespective of whether the Employer has met its just cause burden of proof. Finally, the Union disputes the Employer's claim that the Union, having waived notice in another grievance, similarly waived such notice in the instant case.

### *Authority Position*

The Authority in asserting that the removal notice was timely cites Article 24(b) which states that "[t]he Employer [*721] will normally issue proposed disciplinary action(s) within 30 days of the date of the incident or date the Employer becomes aware of the incident given rise to the proposed action, unless there are mitigating circumstances, i.e., when there is an accident review board ongoing or an in-depth investigation is necessary." According to the Authority, the Agreement does not require that discipline be proposed within 30 days. Rather, it mandates that " 'disciplinary actions will not be instituted until after the final submissions of the investigation findings.' The complexity of W_'s case and the need to investigate thoroughly caused the delay in proposing his removal."

In addition, the Authority indicates that Dr. Holland's November 11th recommendation to return W_ to work on light duty was not tantamount to discipline but rather a medical determination under the EAP process. And, even after the Authority was informed that W_ had been arrested, it "carefully reviewed and considered the available evidence prior to determining the appropriate status for W_."

Finally, the Authority notes that the criminal/court records were not available until January 29, 1997. W_ did not provide a statement until February 18, 1997 and Cooper did not complete his administrative investigation until 23 days after W_'s criminal conviction. Subsequently, "Tippett proposed W_'s removal 27 days after the completion of the investigation."

### *Discussion*

[6] Clearly, there were mitigating circumstances which precluded the Authority from issuing disciplinary action within 30 days after Grievant's delayed notification of the Authority that he had been arrested in October, 1996. The fact that Grievant had initially disclosed a drug dependency initiated the EAP process which resulted in his return to work after November 11, 1996. Moreover, information regarding the disposition of W_'s court case was an essential element in the investigatory process; therefore, the Authority's conduct of an in-depth investigation constituted a mitigating circumstance. To some extent the delay in the commencement of the investigation can be attributed to Grievant's sequential communications to the Authority, necessitating further inquiry into his criminal and medical situation.

Notwithstanding the understandable delay in commencing the administrative investigation, there is evidence that on December 11, 1996, Mr. Tippett "convened an administrative investigation to determine the nature of criminal charges against Firefighter W_". Therefore, it would appear that the investigation was well underway when Grievant was notified, on January 31, 1997, that the internal investigation had begun. Given the fact the investigation began on or about December 11, 1996, Grievant/Union should have been notified around

**Exhibit 28**

January 11, 1997 of the status of the investigation rather than January 31, 1997, and every ten (10) days thereafter.

The Union President was apprised of the investigation status by letter dated February 10, 1997, and although this information was within ten (10) days of January 31, 1997 it was not within ten days of January 11, 1997. The completion of the investigation process on February 21, 1997 obviated further notification under Article 24(b).

Absent convincing evidence of Union waiver, the Employer, while justified in delaying the issuance of the discipline, did not strictly comply with the investigation status reporting requirements. Since the Employer acknowledged in its reply brief that the Union received notice of the investigation on 12/11/96, it had a corresponding obligation to report the investigation status within 30 days or on January 11, 1997 and every 10 days thereafter. Needless to say, violating the initial time frame necessarily caused all subsequent reporting periods to be untimely.

Despite the technical, procedural violations of Article 24(b), the Arbitrator discerns no resulting harm to Grievant. Given the Arbitrator's findings on the merits, the matter is also moot.

### IV. Disparate Treatment

#### Union Position

The Union alleges that the Authority has disciplined W_ more harshly than it had another similarly situated employee. According to the Union, Assistant Fire Chief Lasher who had made several misrepresentations to management regarding a required certification examination, namely allowing the certification to lapse while falsely claiming he had taken the examination, received a two week suspension. Although Lasher held a supervisory position which required "discretion and trust," W_'s alleged breach of trust resulted in removal.

#### Authority Position

The Authority equates Lasher's misleading the Chief regarding the status **[*722]** of his Instructor III certification with W_'s misleading request for "assistance for drug dependency on a 'self-identified' basis" and failure to disclose that he had been arrested for felony fraud. However, unlike Grievant, the Authority distinguishes the *Lasher* case because he did not commit felony fraud.

#### Discussion

[7] The Arbitrator considers the limited comparison of the *Lasher* case to the instant case an insufficient sample to prove disparate treatment. Moreover, the cases constitute a distinction with a difference. Whereas Grievant was charged with felony fraud and pleaded guilty to a misdemeanor, Lasher's situation did not involve criminality nor was it established that he cheated on the examination. Although both cases entail trustworthiness as an element, the underlying criminal behavior in the instant case should warrant a disciplinary distinction.

**Exhibit 28**

### *V. Conclusion*

The Arbitrator finds that the Authority has not met its burden of proof by a preponderance of the credible evidence. The removal of Grievant was predicated upon the absence of a mitigating defense, namely his drug dependency, which if given proper weight would have reduced the removal penalty.

Although there is substantial evidence in the record that Grievant's rehabilitation has been successful and ongoing, the seriousness and duration of his drug problem, the criminal activity he engaged in off-duty to alleviate his problem culminating in a guilty plea to a misdemeanor, his delay in reporting the drug related arrest and his prior history of drug use, warrant continuous monitoring of his medical condition. As a firefighter, responsible for the safety of others, the Authority needs periodic assurance that he is drug free.

In the Arbitrator's opinion, a suspension without pay along with an effective substance abuse procedure should reinforce Grievant's understanding that he is receiving one last chance to comply with Authority rules and regulations. He should be further advised that a relapse in his treatment or adherence to his recovery plan could result in termination. Consistent with Ms. Jones' letter dated January 17, 1997, random urine testing shall be an integral component of the procedure. While the mitigating factor of his drug dependency has been pivotal in the instant case, a repetition may have diminishing returns.

NOW THEREFORE, as the duly selected Arbitrator, after having reviewed the evidence presented, I issue the following:

### *AWARD*

1) The Grievant, W_, was not removed for just cause.

2) The appropriate penalty is a suspension without pay.

3) The Grievant shall be reinstated immediately, following a fitness for duty examination, without back pay but with no loss in seniority or fringe benefits he accumulated prior to the removal action.

4) Grievant is reinstated on a last chance basis and shall be subject to random drug screenings, without notice, at the Authority's discretion.

5) Grievant's failure to submit to two (2) consecutive requests for a drug screening, without a valid non-substance abuse related medical excuse, shall constitute evidence of failure of the drug test.

6) Grievant's medical condition/recovery program shall be monitored by the Authority's Employee Assistance Program to the extent permitted by the parties' agreement.

---

fn 1

It is noteworthy that Dr. Ruby's memorandum, dated June 13, 1997 was issued after W_ was removed on June 12, 1997.

**Exhibit 28**

# Arbitration Decisions

## Labor Arbitration Decision, U.S. DEPARTMENT OF LABOR, ARB-N-PWBA-89-72, 98 BNA LA 1129

**Labor Arbitration Decision, U.S. DEPARTMENT OF LABOR, ARB-N-PWBA-89-72, 98 BNA LA 1129**

Arbitration

In re U.S. DEPARTMENT OF LABOR [Washington, D.C.] and AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, LOCAL 12

OLMR Case No. ARB-N-PWBA-89-72

March 4, 1992

Show Summary

Appearances: For the employer: Mark R. Malecki, attorney. For the union: Joanne Bothwell, union steward.

Edith Barnett --

### Decision of Arbitrator

### SEXUAL HARASSMENT

### I. Statement of the Case

The grievance in this matter was filed on February 22, 1989, by R, a 36-year old female employed as a Computer Assistant GS-335-5 in the Division of Management, Information, Policy and Operations (DMIPO) (now Applications Support), Office of Information Management (OIM), Pension and Welfare Benefits Administration (PWBA) charging violations of Article 27 and Article 12, Section 1 of the DOL-LOCAL 12, AFGE collective bargaining agreement. Grievant asserts that she was sexually harassed and subject to disparate treatment as a result by C, her former supervisor and former chief of DMIPO. The disparate treatment included, most significantly, his failure to promote or reassign her, as he did other Computer Assistants whom he did not harass, from the position of Computer Assistant GS-335-5 into the professional Computer Programmer position GS-334, a career ladder position with promotion potential to GS-11. After arbitration was invoked, hearings were held on December 6 and 7, 1991 at the Department of Labor in Washington, D.C. A verbatim transcript was made. The parties have filed post-hearing briefs.

**Exhibit 28**

## II. Issues Presented

Based on my review of the positions of the parties and the evidence of record, I find that the following issues are presented for resolution:

(1) Was grievant R sexually harassed by her supervisor C in violation of Article 27 of the collective bargaining agreement between Local 12 and DOL?

(2) If so, what is the appropriate remedy?

The Union contends that a separate claim of discrimination, that grievant received unequal pay for equal work, should also be resolved. I agree with Management that this claim is not within the scope of the grievance. The issue of equal pay for equal work was not sufficiently raised by the union below to be resolved here. The Union would have had to at least make an allegation prior to arbitration that grievant was discriminatorily underpaid because she was performing substantially equal work to employees at higher grade levels, which it did not. I find that the references made to the grievant's performance of higher level work relate solely to her argument that she was eligible for placement in the professional Computer Programmer career ladder like other Computer Assistants under C's supervision who were not sexually harassed.

## III. Relevant Provisions of the Collective Bargaining Agreement

The relevant provisions of the collective bargaining agreement are as follows:

## ARTICLE 12 -- EMPLOYEE RIGHTS

### Section 1. Respect in the Workplace

It is the intent of the Department of Labor that all employees shall be treated [*1130] with fairness and dignity. It is recognized that employees covered by this Agreement are not without reciprocal obligations.

## ARTICLE 27 -- EQUAL EMPLOYMENT OPPORTUNITY

### Section 3. Sexual Harassment

The Department and the Union recognize that sexual harassment is a form of misconduct which undermines the integrity of the employment relationship and adversely affects employee opportunity. All employees must be allowed to work in an environment free from unsolicited and unwelcome sexual overtures. Therefore, the parties mutually agree to identify and work to eliminate such occurrences.

Sexual harassment is defined as deliberate or repeated unsolicited verbal comments, gestures, or physical contact of a sexual nature which are unwelcome. Use of implicit and explicit coercive sexual behavior to control, influence or affect the career, salary or job of an employee is sexual harassment.

The criteria for determining whether an action constitutes unlawful sexual harassment are as follows:

-- The employee's submission is an explicit or implicit condition of employment;

**Exhibit 28**

-- The employee's response becomes a basis for an employment decision; or

-- The advances interfere with worker's performance, creating a hostile or offensive environment.

### IV. Factual Background

The alleged harasser, C, was the Chief of the Division of Management Information Policy and Operations in the Office of Information Management (OIM) of the Pension and Welfare Benefits Administration (PWBA). He was the grievant's supervisor until May 17, 1990, when, as a result of a reorganization, he was relieved of his supervisory duties and reclassified as a staff assistant. He then went on extended sick leave. His former supervisor, Mervyn Schvedt, Director of the Office of Information Management, testified that the psychiatric and medical information they have received suggest that he is not going to return from sick leave. C did not appear at the hearing.

The Office of Information Management provides data processing support to the PWBA. It was established in 1984 when PWBA, which had been part of LMSA (Labor Management Services Administration), became an independent agency. In order to accomplish the computer work generated by the establishment of OIM, a special training program was undertaken to train certain current Labor Department clerical employees inherited as a result of the change in organizational structure for the target para-professional position of Computer Assistant GS-335. These employees were initially classified as Computer Assistant Trainees and were transferred into OIM at the same GS-5,-6, and -7 levels they already held.

During the period from 1985-1986, ten persons classified as Computer Assistant Trainees under this program, including the grievant, transferred into OIM. Five of them, including the grievant, Hill, Mary Bryant, Mark Harris, and Karen Putnam, were assigned to the division supervised by C. All five successfully completed the training and were reclassified as Computer Assistants. With the exception of grievant, all five were subsequently reassigned or promoted into the professional Computer Programmer career ladder, which started at GS-5/7 and had promotion potential to GS-11. As indicated by Agency Exhibits 1 - 3, the Form 50s (Notifications of Personnel Action), Harris was approved for a promotion by C from GS-5 Computer Assistant to GS-7 Computer Programmer in July 1987 and is now at GS-11; Bryant and Hill were laterally reassigned by C in January 1988 from GS-7 and GS-5 Computer Assistant positions to GS-7 and GS-5 Computer Programmer positions respectively, and are now both at the GS-11 level; and Putnam, who left in 1989 as a GS-6, became a Computer Programmer elsewhere in the Department of Labor and is now GS-11 step 2.

Management argues that, because grievant did not specifically apply through merit staffing procedures for the vacancies in the professional Computer Programmer positions filled by Harris, Bryant and Hill, she is precluded from complaining about the failure to place her in a Computer Programmer position. This argument proceeds from the premise, which I find to be erroneous, that a formal application was necessary to be reassigned or promoted to the Computer Programmer career ladder for the Computer Assistants supervised by C. Because of his hostility to the grievant, as discussed below, I do not credit Mervyn Schvedt's testimony that all Computer Programmer vacancies were posted and there were multiple applications for all of them.

As indicated by Agency Exhibits 1-3, the notification of personnel action form-50s for Harris, Hill and Bryant, only Mark Harris received a promotion to the position; Bryant and Hill were simply reassigned to the Computer Programmer career ladder at the same grade level they held as Computer Assistants. AX 4, the merit staffing certificate for the GS-7 Computer

**Exhibit 28**

Programmer position to which Harris was promoted is, as counsel for Management **[*1131]** described it at the hearing, "the only fragment that exists of any of the merit staffing files." The form 50s for Hill and Bryant state (erroneously, as Management points out), that their reassignments constituted an exception to competition under **5 C.F.R. Section 335.102**. I conclude that, because of this erroneous reasoning and because of C's pre-selections of Bryant and Hill for Computer Programmer vacancies under his supervision, there was no competition and management was therefore unable to produce their merit staffing files because they did not exist.

Hill testified without contradiction that C promised her the position of Computer Programmer prior to any announcement of vacancies for the position and that all she did then was follow his instructions to type up a form SF-52, request for personnel action. He then allowed her to switch over to the GS-5 Computer Programmer position in December 1988. In keeping with normal practice for promotions in career ladders, Hill was then promoted non-competitively to GS-7 step 1 in April 1988, and yearly thereafter to the top grade of the ladder, to GS-9 step 1 in May 1989, and to GS-11 step 1 in May 1990. At the time of the hearing, she was being paid at GS-11 step 2.

Management concedes that C was the selecting official for every Computer Programmer vacancy position in his Division. Schvedt testified that vacancies for the position of Computer Programmer were announced as C came to him and told him that the increased volume of the work or its technical requirements exceeded his existing resources. C then instructed the people he wished to become Computer Programmers to fill out certain paper work necessary for the vacancies, first Harris, then Bryant and Hill, and then recommended them for the vacancies he had engineered. Schvedt acknowledged that he accepted all of C's recommendations as the selecting official for selection from Computer Assistant to Computer Programmer. Thus, at the point where C intended to place certain Computer Assistants in the Computer Programmer career ladder, he did so by recommending their selection to Schvedt, who essentially rubber-stamped his recommendations.

Grievant did not make a specific application for vacancies in the Computer Programmer position because she believed that C had already selected the persons he intended for those positions. Further, C had failed to give her a current performance appraisal and she believed that she could not be considered for a promotion to the Computer Programmer position without a current appraisal. In fact, according to Personnel Specialist Fay Boone, a witness for Management, applicants for promotion need not submit current performance appraisals. I find that the grievant's failure to make a specific application for a vacancy in the position of Computer Programmer is irrelevant here, however, because C pre-selected his choices for these positions and then arranged for them to fill out any necessary paper work so that he could select them.

I find that, as Union vice-president Linda Copening testified, promotions or reassignments of Computer Assistants who worked for C to the position of Computer Programmer were "greased," i.e. persons to be promoted or reassigned were pre-selected, but they "ran out of grease when they got to Rill." He told her that she was going to get her promotion, had her prepare and submit to him the SF-52, request for personnel action and related materials, and then took no action to request a vacancy from Schvedt and recommend her for promotion or reassignment as he had for Hill, Bryant and Harris during the 1987-1988 period. In this regard, I do not accept Management's argument that the Union should have grieved any pre-selection of Hill, Bryant and Harris, because it is not supported by any references to the Collective Bargaining Agreement or other authority.

After grievant filed her grievance in February, 1989, no further computer programmer vacancies were announced. Schvedt testified that this occurred because the delay in the delivery of a new computer system originally planned for July 1989 aborted his original plans to conduct additional merit staffing for people to operate that system. I do not credit

**Exhibit 28**

his explanation, and conclude that the real reason why computer programmer vacancies stopped occurring was the filing of the grievance in this case. The vacancies generated for Hill, Bryant and Harris in 1987 and 1988 had nothing to do with a new computer system but rather, according to Schvedt, were triggered by C's expressed belief that the current work load in the office at the time required an additional Computer Programmer GS-334. I conclude that, if grievant, instead of resisting his advances and grieving in February of 1989, had responded more favorably to C, he would have found additional higher level work to justify the creation of a Computer Programmer[*1132] GS-334 vacancy for her as he did for Hill, Bryant and Harris during this time period, regardless of the pending installation of a new computer system.

C began making sexually oriented remarks to R in late 1987. He continually called her into his private office to talk about their relationship. Although he never expressly told her that, in order to move into the Computer Programmer ladder, she had to submit to his advances, he repeatedly told her, when she asked what did he mean, that she was no "dummy." He stated that he was "not trying to get into her underwear," because he was "an old man" and "there's nothing I can do for you." He stated that she was "a very attractive woman," and "we got to get things right between us." He put his hand on her thigh once. About a week later he told her he knew she would not say anything about the touching.

Hill confirmed his treatment of the grievant. She testified that grievant told her about the sexually harassing remarks C made to her in his office immediately after coming out of his office. She stated that it seemed C made such remarks to grievant every time she went in his office. C also made sexual remarks to Hill. He told her that he would never sexually harass her because he would be afraid that her husband might come after him, and because she was like a daughter to him. Based on these remarks, I conclude that, at least part of the motivation for his harassment of grievant was C's belief that, although Hill was not available sexually to him because she was married, grievant was, because she was not married.

When grievant did not respond to C's sexual overtures, he simply took no action on the papers he had instructed her to prepare and file with him to secure a Computer Programmer position. He also initiated a campaign of punitive conduct against her. Hill testified that, after the grievance was filed, C took grievant's programming assignments away and gave them to her, and told her not to associate with the grievant. C gave the grievant official warnings dated February 17, 1989, February 28, 1989 and March 1, 1989, accusing her of unsatisfactory performance, and barraged her with critical notes and memoranda, many of which were scrawled in heavy ink and taped to her desk, chair or telephone in plain view of her co-workers and were clearly intended to embarrass her.

C also treated her unreasonably and arbitrarily with respect to a work-related injury. On February 7, 1989, after R left work because she had hurt her back lifting computer tapes, C listed her as AWOL, accused her in writing, by memo of February 16, 1989, of deliberately hurting herself, restricted her use of leave, and refused to compensate her for time off to recover from her back injuries. (After she filed her grievance he *reversed* his position and compensated her for the time off). According to R, it was impossible for her to do her job without routinely lifting tapes, unless she was assigned an assistant to do the lifting. Her requests for such an assistant were unsuccessful. C refused to believe even that she had actually injured herself, and rejected a report that she was injured from a Group Health Association orthopedist, demanding verification instead from a "bone, muscle, or nerve specialist." Nevertheless, on May 9, 1989, a claims examiner for the Office of Workers' Compensation found R fully eligible for compensation and pay continuation. C also transferred her to typing duties, accusing her of not wanting to and not being physically capable of doing her work in programming, although it was uncontradicted that her only restrictions after her injury were that she was not supposed to lift over 25 pounds. None of the other programmers were given secretarial duties.

**Exhibit 28**

On May 23, 1988, C had given her a highly effective performance rating. Barely nine months later he was accusing her of inadequate performance. I find that, if grievant's performance really did deteriorate, it occurred because of C's campaign of punishment of the grievant for failure to respond to his sexual overtures, not because of any inherent defect in R's abilities. For example, on February 2, 1989, C criticized her on her alleged failure to timely prepare work. Only eight months earlier, in the May 23, 1988 rating, before his restrictions on her leave and criticisms of her work, C had found that she exceeded the standards set for her in such critical elements as timely responses to program assignments. It is simply implausible that, if treated properly, grievant would not have continued to perform her work in a satisfactory manner.

Schvedt also admitted on cross-examination that the training program was designed to get rid of people and therefore those computer assistants who did not pass the training courses for computer programmer were to be outplaced. Grievant passed her courses and was not outplaced. She received a within grade increase in November, 1989, which may only be[*1133] granted to employees performing at an acceptable level of competence. Indeed, Schvedt testified that, based on the training the grievant has received and her time in grade, he believed she would be a viable competitor for a Computer Programmer position.

As C's supervisor, Schvedt claimed that, as far as he could see, C had always treated grievant in a respectful manner, and that C's concerns about her performance were genuine. Schvedt testified that he had never seen C proposition his subordinates or make sexual remarks. I do not credit Schvedt's testimony for the following reasons. First of all, he was not in a position to see how C treated grievant. He had a separate private office with walls and a door that could close where he concededly spent 50% of his time. C's office was also separate and private and it was uncontradicted that C's harassment of grievant took place mostly in C's private office. Secondly, Schvedt was responsible for a staff of over 20 people in addition to grievant and his actions in this matter indicate that he did not take R's complaints about C seriously and did not want to acknowledge or deal with a serious and ongoing personnel problem. After grievant went to Schvedt informally to say that she was having a problem with C, Schvedt had meetings with her and C and readily accepted C's dismissal of the situation as a "communications problem." Schvedt also told grievant and C to work out the problem themselves, although the situation clearly called for his intervention as their supervisor, given C's superior position over grievant. It was uncontradicted that Schvedt said to her, in reference to a discussion about her leave: "R, I don't need this shit." I find no justification for this abusive and disrespectful treatment of grievant, and conclude that it demonstrates bias against her personally as well as impatience with personnel problems in his office in general.

Finally, I draw an adverse inference against Management from its failure to produce C to testify at the hearing to deny that he conducted himself as grievant testified or to otherwise explain his behavior. The adverse inference rule which I am applying as the result of Management's failure to produce C to testify is well established in law and arbitral proceedings, and I have applied it in prior arbitrator decisions. See International Union ( *UAW) v. NLRB,* **459 F.2d 1329**, 1335-1339 [ **79 LRRM 2332** ] (D.C. Cir. 1970 ); Elkouri and Elkorui, 4th Ed., How Arbitration Works, pp. 310-311 (1985); AFGE Local 12, Abraham Kooiman, Grievant and United States Department of Labor, Agency, OLMR Case No. ARB-N-OSHA-85-93, decided March 13, 1987. The rule holds that, when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him. No credible proof was offered that C was too sick to attend the hearing or that there was any other good reason for the omission of this testimony. C was apparently still on sick leave at the time of the hearing, had not severed the employment relationship with the Department of Labor, and therefore was under Management's control.

**Exhibit 28**

I note that C could not credibly have denied his sexual overtures toward R, because during the grievance fact-finding process, he acknowledged making the sexually-oriented comments to which she testified, although he tried to explain them away as "complimentary comments" made by "a supervisor trying to improve an employee's attitude." I conclude that his testimony would have been unfavorable to Management in all respects, and that he could not have credibly denied pre-selecting the Computer Assistants whom he favored for placement in the Computer Programmer career ladder and punishing grievant for not responding to him sexually by declining to secure a similar placement for her.

## V. Was Grievant Sexually Harassed?

Sexual harassment is defined in considerable detail in Article 27 Section 3 of the Agreement. An essential element is sexual behavior which is implicitly or explicitly coercive, and which is used to control, influence, or affect the career, salary or job of an employee. Such sexual behavior includes repeated, unsolicited and unwelcome verbal comments, gestures or physical contact of a sexual nature. An action constitutes sexual harassment under the collective bargaining agreement if it meets one of three criteria:

(1) The employee's submission is an explicit or implicit condition of employment; or

(2) The employee's response becomes a basis for an employment decision; or

(3) The advances interfere with worker's performance, creating a hostile or offensive environment.

Management argues that there could not have been actionable sexual harassment against grievant, because C never explicitly asked grievant to go out with him, or to engage in sex acts with him, or promised that he[*1134] would promote her in return for sexual favors. This ignores the language of the Article 27 Section 3, which is clearly not so limited. The section prohibits "implicit" as well as "explicit" coercive sexual behavior of the type suggested by Management. I also find that C's conduct toward R was coercive sexual behavior, certainly implicit and, in my view, fairly explicit as well. Management does concede that C's statements, if I credit grievant's testimony, as I do, are objectionable and improper.

I find that C's conduct in this case meets all three criteria for sexual harassment within the meaning of the Agreement. Grievant's submission to C's repeated unsolicited verbal comments of a sexual nature about her appearance, her attractiveness, their personal relationship and her underwear and his touching her thigh became an implicit condition of her employment under his supervision, because she was subject to them whenever she went in his office. Her resistance to this implicitly coercive behavior became the basis for his decision not to move her into the Computer Programmer career ladder, thus depriving her of the opportunity to be paid at higher than a GS-5 level and to enjoy the yearly grade promotions to the top of the ladder which, assuming satisfactory performance, are an attractive feature of career ladder positions. Her response also became the basis for his unilateral changing of her employment duties to include typing, and his refusal to compensate her for sick leave incurred as a result of a work-related injury. The advances also interfered with her performance by creating an offensive environment. In conclusion, I find that Article 27 Section 3 of the collective bargaining agreement has been violated.

## VI. What is the Appropriate Remedy?

**Exhibit 28**

In determining an appropriate make-whole remedy, I look to the treatment afforded by Management to employees similarly situated to grievant who were not sexually harassed. Hill was similarly situated to grievant but was not harassed and, after placement in the Computer Programmer career ladder, was promoted at yearly intervals to GS-11, the top of the ladder. I conclude that grievant is entitled to back pay under the Back Pay Act because, but for sexual harassment in violation of the Agreement, she would have had a promotion pattern like Hill's. Based on the record, it is fair to assume that she would have performed satisfactorily in the position at each grade level and her yearly promotions to the top of the ladder would therefore have been essentially a ministerial act by the Department. (See my decision in Luckett et al. and U.S. Department of Labor, Case No. ARB-OLMS-85-35 (86-2 ARB Para.8514 (CCH)) (February 14, 1986), *aff'd* 24 FLRA No. 46 (December 15, 1986). I conclude that, absent sexual harassment in violation of the collective bargaining agreement, grievant would have been placed in the Computer Programmer career ladder by no later than December 31, 1988 at a GS-5, would have been promoted to GS-7 by April 30, 1989, to GS-9 by April 30, 1990, and to GS-11 by April 30, 1991, that the appropriate remedy here is to effectuate these personnel actions retroactively and that she is entitled to appropriate back pay.

## AWARD

The grievance is SUSTAINED. The grievant is to be placed in the Computer Programmer GS-334 or its equivalent and promoted retroactively as discussed above. She is to receive back pay in the amount of the difference between what she actually earned and what she should have earned, taking appropriate step increases into account, from December 31, 1988 to the date of implementation of this Award, in accordance with the Back Pay Act.

**Exhibit 28**

**LABOR & EMPLOYMENT**

## Arbitration Decisions

# Labor Arbitration Decision, United Parcel Service, 51-300-00065-04, 121 BNA LA 207

**Labor Arbitration Decision, United Parcel Service, 51-300-00065-04, 121 BNA LA 207**

Decision of Arbitrator

In re UNITED PARCEL SERVICE, INC. [Chicago, Ill.] and INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 705

AAA Case No. 51-300-00065-04

February 28, 2005

Show Summary

**[\*208]**

Appearances: For the employer-John A. Klages (Quarles & Brady, LLP), attorney. For the union-Marilyn Brassil, attorney.

VIDEO TAPE EVIDENCE

Aaron S. Wolff, Arbitrator.

**Background Facts**

United Parcel Service, Inc. [the "Company," "Employer" or "UPS"] and Teamsters Local 705 [the "Union" or "IBT"] submitted to arbitration a grievance dated June 11, 2003 on behalf of D__ who, on that day, was discharged. Grievant was not given a letter of termination, but was given at the time of his discharge a "Separation Form" which is dated and states: "TERMINATION Action Reason-Falsification of Company Documents" and, just below that, "Separation Reason Description: Violation of Article 54-Dishonesty."

The agreed issue is whether UPS had just cause to discharge grievant and, if not, what is the appropriate remedy? Some of the material facts are in dispute.

The collective bargaining agreement [the "Contract"] provides in Article 54, "Discharge and Suspension" that an employee shall not be suspended or discharged without first being verbally warned and documented "except for the following offenses: [a] Dishonesty." Article 54 also states that warning notices or file write-ups will have "no force or effect" after nine months from their date.

Grievant, who worked for UPS for thirty years, was a Package Car Driver [a "driver" or "PCD"] out of Chicago's mid-north loop center where he held the same route for at least 25 years. His route covered an area in or near what is known in Chicago as "Wrigleyville" and included both residential and commercial customers. PCDs, in brown uniforms drive the familiar brown vehicles seen on streets everywhere to deliver and pick up packages. At grievant's work center, drivers report at about 8:00 a.m., attend about a 10 minute meeting for drivers, load any special packages not pre-loaded by the Loaders, sort packages in the truck

**Exhibit 28**

that must be delivered by 10:30 a.m., check for any special messages and check their truck for safety. On the four days in issue here, May 27, 28, 30 and June 3, grievant reported at about 8:00 a.m. with a scheduled start [on the clock time] of about 8:30 and pulled out of the garage at about 9:00 a.m. Drivers have a 50 minute unpaid lunch period and a 10 minute paid break, all of which is referred to as a one-hour lunch break. [1] On May 27 grievant returned to the work center garage at 5:29 and finished work there at 6:00 p.m. On May 28 he returned to the work center garage at 6:40 and finished work at 7:06 p.m. On May 30 he returned to the work center garage at 7:43 and finished work at 8:09 p.m. On June 3 he returned to the work center garage at 6:32 and finished work at 6:53 p.m. The work of drivers after returning to the garage includes various paperwork, unloading and giving to clerks any time sensitive packages picked up during the day or packages that were refused or undeliverable, checking for messages, locking up their two-wheeler hand delivery carts, noting any vehicle problems for repair, washing or fueling the truck [2] and parking it in the right place.

For the past 8 or 9 years drivers have carried a small, hand held computer, technically known as a Digital Information Acquisition [*209] Device or "DIAD." Drivers use the DIAD to record all their package information. This information is important so that customers and UPS can track the status of a package at any point during the delivery process such as where a package is, whether it was delivered, and the time of delivery or attempted delivery. It is important, therefore, that drivers record information as to their disposition of a package accurately in their DIADs. [3] Grievant understood this.

UPS supervisors, including security supervisor Earl Dawson, operations supervisor Mario Diaz, on-car supervisor Don Herman, and former package operations supervisor Chris Medic, as well as Union Steward Mike Moore, testified that once a driver arrives at a stop he is supposed to check the street address on the door with the address on the package. As the driver walks up to the business or residence, the driver is supposed to use the DIAD to scan the package's bar code and then key enter in the address for the package. While scanning the package and entering the address, the driver either rings the doorbell and waits to obtain a signature or simply leaves the package at the door if it is a "driver release" package that does not require a customer's signature. After obtaining a signature, or entering some other code signifying that an attempt to deliver the package was made, or leaving the parcel in the case of a "driver release" package, the driver is supposed to enter the disposition of the stop in his DIAD and hit the "stop complete" button on the DIAD either at the customer's door or while returning to his vehicle so that the time of delivery or attempted delivery is accurately recorded into the computer. Mr. Ron Wong, who has been with UPS for 22 years and became manager of the mid-north loop center in February, four months before grievant's discharge, testified in rebuttal that UPS trains its drivers to stop complete at the time of delivery or prior to getting back into their vehicle.

UPS Supervisors also testified that they do not want drivers "prerecording" or "presheeting" packages, the terms used when a driver spends time in the morning either in his center or out on the street not delivering but rather is in the back of his vehicle going through packages and entering address and tracking code information into the DIAD's memory for packages intended to be delivered later in the day. Management wants its drivers to scan a package and enter the address information into the DIAD as the driver is walking to the customer's door and waiting for the customer to answer. By scanning the package as the driver walks to the door-rather than in the back of the vehicle all at once-the recording of information into the DIAD is not separate from the physical delivery of the package and, it is claimed, may result in additional time to the driver's work day. However, there is a button on the DIAD for prerecording and there are some exceptions for using it, e.g., when drivers have "down time" such as when waiting for an elevator or a loading dock.

Mr. Medic, who was one of grievant's supervisors in 2001 and until February 2002, testified that he had supervised grievant by riding with him, [4] but never observed him prerecording or entering stop complete other than at the time of delivery or attempted delivery. In late 2001 or early 2002 some unnamed drivers "voiced a concern [to him] that they felt that [grievant] might have been prerecording his packages before he left the building." Medic asked grievant about that, but grievant said he wasn't doing it. [5]

Security supervisor Earl Dawson testified that in May 2003 they received a phone call from a woman who worked on Lincoln Avenue who reported that she was concerned about a package car that was parked for extended periods of time throughout the day. He reported this to district labor manager Gary Landem who told him to do a surveillance to see what's happening. Mr. Dawson and security representative Dave Nolimal did so with a video

**Exhibit 28**

camera on May 27, 28, 30 and June 3. [6] After grievant downloaded his DIAD they compared it with what they saw him do on the [*210] street and filed a report thereon. Based on their observations and comparison of the information grievant recorded in his DIAD, Mr. Dawson concluded that grievant was:

> * * * masking his time. He was sitting on the clock for that time period instead of going in at the end of the day; and he had to show some type of activity, so he was putting in these stops at that time.

The report that he and Mr. Nolimal prepared is dated June 9 and states as follows:

> On 5/27/03 Dave Nolimal and Earl Dawson observed and video taped ML Service Provider D__. We taped D__ at 10:28-11:02 (34 minutes) parked at Damen and Irving Park. He did not leave the car. His delivery records indicated that he completed 8 stops in this time frame. He was not near the stops he recorded.

> Later we taped D__ parked in a parking lot at Bernice and Lincoln. He walked across the street and entered a home at 1923 Bernice. [7] He was there from 12:31-13:24 (53 minutes). He recorded no stops. He then returned to this same parking lot at 16:48-17:22 (34 minutes). He exited the car and entered the same house as above. His delivery records indicated that he completed 25 stops in the above time period. He was not near the stops he completed. D__ falsified a total of 33 stops and extended his lunch/break by 61 minutes.

> All packages were tracked for this day. We discovered that D__ took double deliveries on 6 packages. This is a total of 6 extra stops. [8]

> On 5/28/03 Dave Nolimal and Earl Dawson observed and video taped ML Service Provider D__. We taped D__ at 10:49-11:39 (50 minutes) parked at Damen and Irving Park. He did not leave the car. His delivery records indicated that he completed 14 stops in this time frame. He was not near these stops.

> Later we observed D__ parked in the parking lot at Bernice and Lincoln. He was in the same house. This occurred from 12:08-12:47 (39 minutes). He then returned to this same parking lot and went to the home on Bernice. This was from 17:42-18:28 (46 minutes). His delivery records indicated that he completed 49 stops in this period. He was not near these stops. D__ falsified a total of 63 stops and extended his lunch/break by 75 minutes. [9]

> All packages were tracked for this day. We discovered that D__ took double deliveries on 5 packages. This is 5 extra stops.

> On 5/30/03 Dave Nolimal and Earl Dawson observed and video taped ML Service Provider D__. We observed D__ driving the wrong way on a one way street on Bernice. D__ drove into the parking lot on Bernice, exited the car and carried an object into the home on Bernice. This appeared to be a pizza. D__ stayed in the home from 12:36-13:29 (53 minutes). He recorded no stops.

> Later we observed D__ park his vehicle in the same lot and enter the home on Bernice. This was 19:09-19:36. He recorded 3 stops. He was not near these stops. D__ falsified a total of 3 stops and extended his lunch/break by 20 minutes.

> All packages were tracked for this day. We discovered that D__ took extra stops for the same packages. He took 4 extra stops.

> On 6/3/03 Dave Nolimal and Earl Dawson observed and video taped ML Service provider D__. We observed D__ park his vehicle at 3757 N Lincoln. (Crate & Barrel dock) He was at this stop from

**Exhibit 28**

11:18-11:59 (41 minutes). He made a total of 15 stops during this period. He was not near these stops.

He then made a stop in the Bernice and Lincoln parking lot. This was at 12:47-13:58 (71 minutes).

He exited his car and entered the house on Bernice. He recorded no stops.

D__ then stopped at the parking lot on Bernice and Lincoln at 17:38-18:25. (47 minutes) He exited the car and entered the house on Bernice. He recorded a total of 82 stops in this time period.

He was not near these stops. D__ falsified a total 97 stops and extended his lunch/break by 99 minutes.

All packages were tracked for this date. We discovered that D__ took an additional 6 stops on the same packages.

After obtaining this information, Mr. Dawson reviewed it with labor manager Gary Landem who "took it from there."

Mr. Landem, who has been employed by UPS for 27 years, testified that he "was involved in the decision to" discharge grievant and that the decision was:

Based on the facts that were brought to me by the security department, being Earl Dawson, David Nolimal. The evidence that was presented to me showed that there was a masking of time in the gain of him making more hours than what he deserved. [*211]

Mr. Landem also testified that he knew that grievant was discharged twice before for "dishonesty" but reinstated after serving suspensions; and he testified to them at some length. Mr. Landem stated that he made the decision to discharge grievant in June 2003 and that in doing so he also took into account the prior discharges. [10] Mr. Landem stated that after one of the prior discharges in 2002 he told grievant that it was not allowable to prerecord packages. [11] Mr. Landem testified, the "dishonesty" that lead him to conclude to discharge grievant was: "Exceeding personal time, taking extra stops, prerecording. He was falsifying his delivery time, There [were] many things that played into the part. It wasn't just the inputting of those stops." [12] Before reaching his decision, he did not speak with grievant to get his explanation of his actions that security had reported to Landem. After making the decision to terminate grievant, Mr. Landem passed it on to center manager Ron Wong and Mr. Nolimal to carry it out. They did so at a meeting on June 11 during which Landem was not present. The memorandum of that meeting, written by Mr. Nolimal on June 12, states:

On 6/11/03 a meeting was held in the ML Center. Present were D__, [steward] Mike Moore, Ron Wong and Dave Nolimal. We discussed how D__ could have several stops while parked in one position. D__ stated that it is faster to prerecord stops and complete them at a later time. He also acknowledged that he sat in a resident's home on Bernice the days we surveyed him and completed several stops. He did not respond to the extra stops he made using the same tracking number. Ron Wong terminated D__ for dishonesty, falsification of delivery records. Security walked D__ out of the building.

Mr. Landem also testified that if Mr. Wong heard something in the meeting with grievant that he thought "worthy to take back" to Landem before conveying the decision to discharge grievant, Mr. Wong could do so.

Manager Wong, [13] testifying in rebuttal, stated that he received a recommendation from Mr. Landem to proceed with the termination of grievant, that this was the usual way of terminating employees involved in security issues: to sit down with the employee, Union steward and a security investigator and "hear the employee's side of the story." Continuing, he said:

And what happens after that is depending on what is said, if there's anything said that would warrant me going back to Gary [Landem],

**Exhibit 28**

I would go back to Gary. If it's something that isn't said that isn't satisfactory, then we would proceed with the termination.

Regarding the meeting, Mr. Wong said that Mr. Nolimal was present, as were grievant and Union representative Mike Moore. As to what transpired, Mr. Wong said:

> Dave Nolimal went through the delivery records and talked about stops that were completed while he was on videotape at a person's place of residence and they occurred during that time when the vehicle was sitting in one spot. And we asked for an explanation at that point, and Wayne's response was that-he said it was faster to prerecord the stops and to complete the stops at a later time.

To that explanation, Mr. Wong said he replied:

> I just said that I don't believe that's true because of the fact that it takes longer, actually, to prerecord a stop and then complete it at a later time versus stop completing when the time of delivery or the delivery attempt is made. [14]

Mr. Wong also testified that the June 11 meeting lasted about 15-20 minutes and that during it, Mr. Nolimal [who didn't testify] did as follows:

> A. He just went over the stops that were shown completed after he stopped at that place of residence.
>
> Q. He pulled out the documents and went through the stops one by one?
>
> A. Right here. He went through the stops. [*212]
>
> THE ARBITRATOR: "Right here" you're referring to Company Exhibit 18.
>
> BY MS. BRASSIL:
>
> Q. So this was the only document that he brought?
>
> A. This is a summary of the stops. This pulls out and shows you the actual stops that were completed at those times.
>
> THE ARBITRATOR: On that day?
>
> THE WITNESS: That's correct, on this specific date. Obviously, he went through each one of the four days, but this is what he concentrated on because it summarizes it in easy terms.
>
> BY MS. BRASSIL:
>
> Q. Other than this sheet-
>
> A. There were delivery records that were there, timecards that are there.
>
> Q. And all of that was gone through?
>
> A. All of that stuff was gone through.
>
> Q. When you have, say, 80 prerecorded stops or-I don't know what to call them-prerecorded addresses in the DIAD board that when you do one you can't go to the next one automatically, you have to pull every one up separately?
>
> A. You have to scroll to the next stop. It shows all the stops. It doesn't show on one screen. It might show on several screens, but you have to scroll down to that stop, that address, and push "Enter" to pull up that stop.
>
> Q. So if you went to the first stop and pulled it up and stop completed it, it wouldn't automatically go to the second stop? You

**Exhibit 28**

would have to scroll to the next stop?

A. You would have to go to the next stop, whatever stop that it was. I don't know how he prerecorded the stops, but you would have to make sure you scroll to the right stop and push on it.

Q. But you're saying scroll to the next stop. I'm asking if the person went through them in the order that they were in the board instead of looking for a specific address.

A. You would have to scroll to the proper stop. You have to pull up the address. That's the address on there. You have to go down to the stop that he's looking to stop complete, and you have to push "Enter."

Q. And it's your testimony it would save at least four minutes for each?

A. They asked me for an estimate if there were 80 stops in there how long per stop it would take.

Q. And you're saying a minimum of four minutes per stop?

A. That's what I'm thinking it would be considering you have to scroll.

Even after it was pointed out to Mr. Wong that the Company's own investigation record for June 3 shows that grievant entered 82 stops complete in 24 minutes, he stood fast on his estimate that it should take 4 minutes to enter each stop complete. Mr. Wong added, however, that the decision to discharge was not based on this estimate, but rather on grievant's falsification of records that showed him working [making deliveries] when he's sitting in a place of residence. Continuing he said:

BY MS. BRASSIL:

Q. So the basis for the termination was falsifying records, correct?

A. Dishonesty, falsifying records.

Q. And not the amount of time it took to do the work?

A. Him falsifying records created extra overtime for himself. That's why we terminated him.

THE ARBITRATOR: At that meeting in June, did you or anybody on behalf of the company tell the grievant that the result is that he was getting excess overtime?

THE WITNESS: No. We said that if you-

THE ARBITRATOR: Or just because of falsification of records?

THE WITNESS: Dishonesty, falsifying of records.

THE ARBITRATOR: But you didn't specifically tell him as a result he was getting more overtime than he should have?

THE WITNESS: No.

Mr. Wong also testified that if grievant completed 82 stops in 24 minutes as shown in CX 18, that would still have resulted in 24 minutes of excess overtime. He also testified:

THE ARBITRATOR: * * * Was the company's concern or view that it was a falsification of records because the time of the actual delivery was not what was reflected in the documents he was turning in?

THE WITNESS: That's correct. It was not-one of the things regarding the DIAD is that, you know, we commit to our customers that we're going to give accurate and timely information. And for him to prerecord and stop complete it at a later time not only destroys

**Exhibit 28**

that, but also, like I said in my previous testimony, it generates this extra time frame he wouldn't be getting if he stop completed like he was supposed to. [*213]

Regarding the meeting on June 11, grievant testified that after he was called into the office with Mr. Wong and Mr. Nolimal, he asked for Union steward Mike Moore. When Moore came in, they told grievant that they had been following him around and that he was terminated for alleged dishonesty for packages. He never offered an explanation; they didn't give him a chance. The meeting lasted 10 to 15 minutes. Later, he testified:

> Q. And at that meeting it was discussed how you could have several stops while parked and inside the house at Berenice and Lincoln?
>
> A. They might have said that, yes.
>
> Q. You admitted that you were in the house on those days, that you did stop complete several stops?
>
> A. Yes, I said that. That's what happened.
>
> Q. You did express that?
>
> A. I didn't say that, I don't think. I admitted to being in the house.
>
> Q. Right. And stop completing while you were in the house?
>
> A. And stop completing my stops, yes.
>
> Q. And you were given the opportunity to explain why you were recording stops in that manner?
>
> A. No.
>
> Q. Isn't true you said it was faster to prerecord stops and complete them at a later time by stop completing them?
>
> A. I didn't have a chance. It was a ten-minute meeting. Then he took my I.D. and told me to leave the premises.
>
> Q. Did you say that?
>
> A. I didn't say that. They said that to me.
>
> Q. Did you say it?
>
> A. I don't recall stating that, no.
>
> Q. Is it possible you said that?
>
> A. Possible but not likely.
>
> Q. What did Mr. Wong tell you?
>
> A. He just said that-Dave Nolimal came down with a bunch of papers stacked that high and told me I'm terminated for alleged dishonesty.
>
> Q. And the papers were there in the room?
>
> A. No. We didn't get to look at them. Like I said, they took my I.D., they wanted my I.D., and escorted me out of the building.
>
> Q. And you were told you were terminated, correct?
>
> A. Correct.

Grievant also testified at length as to his "daily routine" as a PCD. In the morning he checked his truck for safety of operation. Most of the time the trucks are already loaded, but at times there are some packages on the dock he has to load. He also sorted packages in the truck to determine which ones are time-sensitive and must be delivered before 10:30 a.m. UPS sends a message every day to every driver "to stop your vehicle, go through your truck, and

**Exhibit 28**

make sure that * * * time-sensitive packages" are delivered on time. After those are delivered, he makes the "dump stops" which are those to which he may deliver 10, 20, 30 or 40 packages. The dump stops take from 30 to 45 minutes. This makes more room in his truck to sort remaining packages in better order. He lines the packages up so that he can deliver them by going down a street only once; sometimes back on the other side depending on the number of packages. After lunch he makes pickups and the remaining deliveries. At day's end he stops to do the required variety of paperwork at Ed Keating's house and then calls the office to see if there are any other customer requests. Next, he drives to the center where there is other work to do, such as to unload and give to clerks any time-sensitive packages or packages that were refused by consignees. He also checks for notes in his "pigeonhole" regarding possible customer requests for delivery of a package to a different address and then re-loads the package on the truck or gives it a clerk. He may also wash and fuel his truck. He also tabulates any checks collected for COD's and balances them against the number of packages covered by them and locks up the two-wheelers used in deliveries. He believed that this daily procedure makes it efficient for him and the Company.

Regarding the post-dump stop sorting process before lunch, grievant testified

A. * * * I prerecord packages in the truck. That means, I guess, tabulating, tracking the packages so that they're recorded with the documents that I have in front of me from my customers that's been okayed by the United Parcel Service as far as I recall and this ring of keys that I have. My customers have authorized me or okayed me to leave their packages.

They entrusted me with the keys to their houses, their foyers, their garages. I have door **[*214]** codes. Again, I said I've been doing this for 30 years, basically 25 years the same route, 27 years the same route. So they trust me with this stuff. So anyway, when I put these packages in and I know these people, I know I'm going to deliver the package, I know they're going to get their package the same day.

So I put the package in the [DIAD] board and occasionally, not all the packages at the beginning of the day, I might put a stop complete which means the package has been recorded, has not been delivered but has been recorded and put down that the stop is going to be completed.

Q. So you prerecord-do you prerecord all of the packages in the truck at that time?

A. Not all, no, not all the packages. A number of packages depending on the day.

THE ARBITRATOR: Those are for whom? Those are who authorize you to go into their house?

THE WITNESS: Those, yes, and then others to run down a certain street. Like I deliver Lincoln Avenue. It's kind of a busy commercial street. So I have them in the board ready to go. So when I get to the delivery, it's-if a customer has four or five boxes, I put them in and it's just here, sign here and you sign for five boxes. The gentleman counts the packages. I count the packages, make sure there's nothing missing and he knows what he's getting. But they're in the board for ready delivery.

THE ARBITRATOR: Those people sign for them?

THE WITNESS: Well, not everyone. But the record will show later, I mean, there's signatures for people that are not my regular customers and my regular people that authorize me. I don't leave anything without them authorizing a signature which is in this book. [15] These are all documented signatures from people.

* * *

**Exhibit 28**

BY MS. BRASSIL:

Q. So you say that you prerecord a bunch of packages, not all?

A. Right.

Q. And you stop complete some of them but not all of them. So when you prerecord, that's putting the address in the book, correct?

A. Correct.

Q. Or in the DIAD board?

A. Address and the tracking numbers.

Q. But when you stop complete, that's when it shows as having been basically delivered, correct?

A. Correct.

Q. Give me examples of the types of packages that you might stop complete and why.

A. Well, again, I say the people that are in this board are the people I have keys for that have authorized me to leave their package. Those are the ones that I do that to.

Grievant testified that the customers as to whom he prerecords and stop completes at a time other than the actual time of delivery are customers who have authorized him to "driver release" the packages, i.e., leave them even when the designated recipient is not at home or place of business. [16] These are customers who have given him signed authorizations and/or keys to their homes or building door codes so that he can access large buildings and leave packages. That is why the times shown on his DIAD for some stop completes are times when he is parked somewhere and not making any deliveries. The written authorizations are contained in one of two notebooks which were available during the arbitration hearings and which UPS made exhibits. [17] [*215]

There is no dispute that during the four days he was surveilled, grievant parked his truck at several locations and, among other things, recorded on his DIAD stop completes [signifying deliveries or other dispositions of packages] even though it was impossible for him to have made such deliveries while parked. The record shows that on May 27 grievant was parked at Damen and Irving Park from 10:28 to 11:02 [34 minutes] and that he made 8 stop completes between 10:38 and 10:57 [19 minutes]. His truck was also parked in a parking lot at Berenice and Lincoln from 12:31 to 13:24 [53 minutes] when no stops were recorded in his DIAD. [18] Grievant returned to that parking lot from 16:48 to 17:22 [34 minutes] during which he recorded 25 stop completes between 16:59 and 17:12 [13 minutes].

On May 28, the record shows that grievant was parked at Damen and Irving Park from 10:49 to 11:39 [50 minutes] and that he made 14 stop completes between 11:10 and 11:33 [23 minutes]. He parked in the parking lot at Berenice and Lincoln from 12:08 to 12:47 [39 minutes], making no stop completes when, the investigators also noted, he was at "lunch." He parked in that lot again from 17:42 to 18:28 during which he made 49 stop completes between 17:50 and 18:11 [21 minutes].

On May 30, the investigators' record shows that grievant did not park in the Berenice & Lincoln parking lot until "lunch" from 12:36 to 13:29 [53 minutes] where he made no stop completes; and that he parked there again from 19:09 until 19:36 [27 minutes] during which he entered three stop completes in two minutes between 19:09 and 19:11.

On the last day, June 3, the investigators' record shows that grievant parked on Lincoln Ave. at Crate & Barrel's lot from 11:18 to 11:59 [41 minutes] where he made 15 stop completes in 27 minutes from 11:26 to 11:53. [19] He parked in the lot at Berenice & Lincoln from 12:47 to 13:58 [71 minutes] where he entered no stop completes and the investigators noted "lunch." He returned to that lot at 17:38 and remained until 18:25 [47 minutes] where he entered 82 stop completes in 24 minutes from 17:52 to 18:16.

Grievant explained why he parked his package car once or twice a day near Lincoln and Berenice. A man who had become a friend of his, Mr. Edward Keating [sometimes referred

**Exhibit 28**

to as "Ed"], lived in a house near that intersection. They had met through Ed's sister who had worked in several neighborhood businesses where grievant made deliveries and after they had become friendly, Ed invited him for lunch. Thereafter, for a couple of years, grievant went to Ed's house on his lunch break for 30 or 40 minutes. [20] He also returned there at the end of the day for 30 or 40 minutes. Continuing, he testified :

> Q. What do you do there at the end of the day?
>
> A. I tabulate all the things I did during the day. Clear out the DIAD board with the stops that I prerecorded, do all kinds of-different variety of paperwork which I already stated earlier. I can repeat it if you'd like. Then * * * I use his bathroom there. I wash my hands or I clean myself up a little bit.
>
> And then the last thing I do is use his phone and call the office to make sure they don't need me for any re-deliveries, pickups, or to help a driver, whatever the case may be. I call the office from his house. That's the last thing I do.
>
> Q. And where do you do this paperwork?
>
> A. In his house. He has a little desk in the office, dining room.
>
> Q. Where is Mr. Keating when you're doing your paperwork?
>
> A. Either in the living room or kitchen either eating dinner or watching TV.
>
> Q. He's not in the room with you?
>
> A. No.
>
> Q. Do you ever leave that room?
>
> A. No.

He further explained what he meant by clearing out the DIAD board:

> A. All of the packages that I have prerecorded during the course of the day I clear out which means I put their name in. If I know it's Mr. D__ [*216] has the package and he's in the book or he had authorized me to leave a package in a variety of ways with the keys, the door codes, signed notices, all that stuff, I print his name in the remarks column and stop complete.
>
> Q. When would you have delivered those packages, though?
>
> A. Prior during the day.
>
> Q. So you prerecorded them, delivered them, and then stop completed them at the end of the day?
>
> A. Right.

Mr. Keating's testimony as to how and when he and grievant met and became friends paralleled grievant's. He said that grievant came in with his "computer" at lunch time for 30 or 45 minutes. Grievant worked with the computer, made phone calls and also ate lunch. Grievant returned to his house at the end of the day for "probably half hour, 45 minutes, same time roughly;" and did "paperwork" or used the telephone in a room with a desk. While grievant did this work, Keating was either outside on the front porch or, in wintertime, in his living room watching TV. He believed, but wasn't sure, that grievant phoned the Company every night. [21] Mr. Keating and his sister and mother who also lived in the house talked very little to grievant while he was working there. Grievant did not eat anything when he returned at the end of the day. While working at a desk grievant had a "pile of papers," some of which he left at the house, but some of which he "could have taken with him." Mr. Keating also testified that he asked grievant several times as to the reason for his termination and grievant "just said somebody had a bug * * * [s]omebody was just after him or something. He really didn't understand why."

**Exhibit 28**

Grievant testified that his practice of prerecording some packages and stop completing them during the middle and end of the day did not result in additional pay for him. He said that UPS was well aware of his practice for at least $1^1/_2$ years prior to his termination, during which time he had four successive managers. [22] Grievant had been discharged previously, in January 2002, for dishonesty in allegedly forging customers' signatures on his DIAD. Grievant then explained to management that he had authorizations and keys from these customers to leave packages in their absence and that in order to move to the next entry on the DIAD he had to draw a straight line with his fingernail where the customer would sign for the package. After UPS learned that "almost every" driver carried customers' keys for purposes of making deliveries without signatures, grievant was reinstated.

After that discharge and reinstatement, grievant said that he asked Mr. Landem if he should continue using the keys and Landem replied: "It's fine if you use the ring of keys as long as you take it up with the manager." [23] Continuing, grievant said that he met with and told each successive manager over a $1^1/_2$ year period what he was doing and showed them the keys and book with authorizations, such as shown in UX 7. [24] He also presented to and asked those managers to sign a statement which he had prepared. That statement recites:

> To: United Parcel Service Management
>
> This file compiled by D__ is in full compliance with United Parcel Service policies and procedures. The use of keys, door codes, and delivery notices are also in full compliance with United Parcel Service policies and procedures as per our discussion in a meeting with Labor Relations, United Parcel Service Management, Local 705 union representative and D__ on January 24th, 2002.
>
> I, D__ assume no responsibility for the delivery and pickup procedures of any personnel, (management or non-management), assigned to assist me by United Parcel Service.
>
> I, D__ respectfully request that I be notified immediately of any changes in company policy [*217] regarding the delivery releases and notices, keys and door codes.

The form is signed by grievant and has a line for "Labor" to sign but it is not signed.

Grievant testified that every manager [25] refused to sign this document but each told him he could continue to do what he was doing which was to use the keys, door codes and book of authorizations to make deliveries. Union steward Moore testified that he was with grievant when he met with each of the managers [other than Landem] and that grievant told each one what he was doing and explained the keys, door codes and book of authorizations and that while each manager refused to sign the form they presented, each of them said that grievant could continue to do what he said he was doing. [26]

Grievant further testified to his belief that, "for years" prior to his instant discharge in June 2003, UPS was aware of his practice of prerecording and stop completing at a different time than actual delivery or other disposition of packages. To illustrate, the Union introduced UX 13, a printout from the DIAD computer on May 15, 2003 showing grievant's delivery record for that day. UX 13, pp. 9-10 indicates that in eight [8] minutes [18:25 to 18:33] grievant made 41 stop completes at 24 different addresses and that would mean that grievant was not entering stop completes at the time of actual delivery or other disposition of the packages. A similar record for grievant's deliveries on October 24, 2002 shows that he made three [3] stop completes at three [3] different addresses in one [1] minute and a total of 31 stop completes between 7:04 p.m. and 7:21 p.m. or just 14 minutes at 24 different addresses.

There is no evidence that any customer has complained about the manner or quality of grievant's services as a driver. They never complained that packages were missing or delivered late. Grievant said he could recall one or two complaints in the last 20 years. [27] One customer wanted him to make deliveries earlier in the morning even though the customer had not paid UPS the premium for early deliveries. He refused to do so. The record further shows that grievant was deemed honest and trustworthy by UPS's customers on the route he held for over 25 years. Hundreds of customers gave him written authorizations to leave packages without their signature or gave him keys or door codes for

**Exhibit 28**

their residences or businesses so he could make deliveries without having to come back a second or third time. [28]

After his discharge and failure to be reinstated, grievant asked customers to write something on his behalf in their own words. The Union offered about 44 such letters which UPS objected to as hearsay. [29] The letters were received subject to the objection and were to be given what weight, if any, they are worth. I have read all 44 letters in UX 11 and find them entitled to some weight. On the whole they tell a tale of a very dedicated, helpful person, an ambassador for UPS, who constantly went out of his way to be sure customers got their packages on time. Here are some samples from UX 11:

> It is so difficult in this day and age to get through a day at work without a million little frustrations caused by people that are hired for a job that do not care about how they are affecting us whether it's by phone or in person. It's truly a shame that we have to 'get used to' constant errors that are made by employees for which we have to pay the consequences costing us our time and money plus putting up with the rude attitudes of those who truly don't want to be working at their jobs at all. **[*218]**

> In our non-profit small business here we have to deal with many of these people just as you and everyone else does. The worst of our 'terrors' being the United States Postal Service. We are literally at their mercy constantly while we are doing our bulk mailing with them, picking up our mail daily at our caller service and getting our regular mail delivery (if you can call it that).

> If there is someone dependable 'out there' you are lucky! Most of these frustrating people keep going on and on in their jobs. D__ our former UPS man, was one of those dependable people. We never had to 'track' our packages on the internet, just knew it would be here, on time, and he even knew our hours and the days we'd be here at work. We always felt good seeing his friendly smile and his warm and happy manner. He's no longer with us and that is so sad. You'll never understand that.

> Please consider all that he has done for those of us on his route not only in his dependable service but in extra caring about the people he served. Please consider how it is for us to lose this.

> * * *

> My Law Office has been located at * * * North Lincoln Avenue since January 1986. During most of this time D__ was the delivery route driver for United Parcel Service. During his tenure our office never experienced any difficulty with the receipt of packages. On rare occasions when our office was closed during the day, D__ would leave our package, with our advance knowledge and approval, with our neighboring business, Martinez Press, located at * * * North Lincoln Avenue. Somewhat more often Martinez Press was closed and D__ would leave their package with our office as was our arrangement with Martinez Press who is both our neighbor and stationary printer.

> Again to reiterate, during D__'s tenure we never experienced any difficulty with our deliveries and D__ always conducted himself in a sincere professional manner.

> * * *

> We at Community Home Supply are very pleased with the UPS service provided by D__. Deliveries are made on time and pickups are also. We have had D__ as a driver for over 20 years that I have worked here. We are extremely pleased with his prompt, courteous manner. He always goes the extra mile to be sure our deliveries are complete. We look forward to a continued relationship in the future.

**Exhibit 28**

\* \* \*

This letter is in regards to D__. D__ has been delivering packages to our company for over 20 years. He has provided us the best of service. He is always helpful and knowledgeable about his job and how he can better serve his customers. Out of all the UPS delivery people we have dealt with D__ has been without a doubt the most professional and pleasant to deal with. It has been our experience that some of your delivery people have been unprofessional or have a bad attitude in our opinion. D__ has always been hardworking, efficient and helpful.

In closing D__ is an asset to your company. We hope to see D__ back to work and delivering packages to our company.

\* \* \*

This letter is to inform you of the service I received from D__ in the performance of his duties as a driver/delivery person for UPS. He was always prompt, and his attitude was cheerful and courteous. He also did little things in order to make sure the packages were delivered. Then he did some follow up to make sure I was satisfied. Since he's the one that represents UPS to my company, I've always preferred to do business with UPS. He has been missed, and I would like him to be returned to his route.

\* \* \*

I am writing on behalf \* \* \* [of] D__. D__ has been the UPS driver to our State Farm office since I started my business here in 1999.

I was very disappointed to hear of his current situation with UPS and wanted to let you know that both me and my office staff have been very appreciated of the service D__ has provided our office.

He is professional, courteous, and reliable. We sincerely hope the 30 years of hard work and dedication he has given UPS will be rewarded.

\* \* \*

I have been in business at \* \* \* N. Lincoln Ave. in Chicago for ten years. The nature of my business requires me to receive numerous packages from UPS and various other delivery services. D__ has always been very courteous & friendly to me & my family & staff. He paid special attention to our hours of operation. Other delivery services show up once, leave a note & send packages back to the warehouse. D__ knew my schedule & schedules of other business owners on our block & made sure we got our deliveries. It's essential to be able to rely on companies with whom I do business. D__ is an important member of our business community here. I hope to see him back at work soon. Feel free to contact me at any time regarding this matter.

\* \* \*

I have been at my current place of business at the above address for 17 years. D__ has diligently helped my office with deliveries and pick **[\*219]** ups. He has handled authorizations for services after business hours. D__ has always been very professional and very courteous to me, and my staff over the years.

Since D__ has been on leave, my U.P.S. service has declined. I have had to open an account with Federal Express in an effort to improve pick up and delivery services. I hope that you reconsider putting D__ back on his regular route. This way I can reconsider my account with Federal Express, as I have never had cause to have an

**Exhibit 28**

account with them before. As a previously loyal U.P.S. customer, I thank you in advance for your consideration in this matter.

* * *

I am writing on behalf of D__, who was our UPS driver and UPS contact for the period beginning October, 2001, and ending June, 2003. During this period, D__ served our firm and UPS in an outstanding manner. He received and delivered our UPS packages in a timely manner, and often worked far beyond normal business hours to assure the highest levels of customer satisfaction.

During infrequent periods when our two-person office was not open, D__ made an extra effort to assure that one of our neighboring businesses received UPS packages on our behalf, avoiding further delay in their receipt.

I am saddened that D__ is now experiencing any difficulties with UPS but I want to assure you that his performance, attitude and customer service levels always demonstrated extremely high standards in all of our interactions with him.

### Contentions of the Parties

*The Company's Contentions*: Initially UPS asserts that grievant's testimony and his self interest cast doubt on his credibility. [30] UPS holds that there is no evidence of ill-will by UPS's witnesses or any reason for them to lie, while grievant's incentive to regain his job gave him motivation to be less than candid. Continuing, UPS states:

> It cannot be ignored that UPS's supervisors (including one who isn't even employed by the company anymore) testified that D__ would neither prerecord packages nor stop complete them at his friend's house on days in which he was accompanied on his route during on-the-job supervisions ("OJS"). D__ tried to downplay this evidence by suggesting that there was no need for him to engage in this type of recordkeeping because he was given lighter loads on days when supervisors accompanied him. Notably though, the UPS supervisors all testified this was absolutely false and that UPS does not lighten the loads on days they perform OJS rides because they want to observe drivers on a typical day. Clearly, someone is telling the truth here and someone isn't.

> District Labor Manager Landem testified that D__ was previously terminated for instructing helper Carolyn Dull to prerecord packages. Mr. Landem stated that when he agreed to bring D__ back to work with a 30-day suspension he told D__ that there was to be no more prerecording of packages. D__ testified he was never told he could not prerecord packages. Again, someone is telling the truth here and someone isn't.

> Former supervisor Chris Medic testified that he had previously approached D__ after a number of drivers in his Center had complained to him that they believed D__ was prerecording packages. Mr. Medic testified that he confronted D__ about this and he denied it. At the arbitration hearing, D__ never disputed Mr. Medic's testimony specifically but did testify generally that he was never told he could not prerecord packages. [31] No doubt, this is an important credibility dispute which must be resolved given that D__'s entire justification for recording packages in the manner that he does is based on his supposed ignorance of the Company's expectations with respect to prerecording.

> Center Manager Wong testified (and Security Representative Nolimal's write up corroborates) that on June 10, [32] 2003 D__ was

**Exhibit 28**

given the chance to explain his actions before he was terminated and specifically stated that he engaged in this type of recordkeeping because it was faster to prerecord stops and stop complete them at a later time. D__ testified that he was *never* given the opportunity to tell his side of the story at the June 10, 2003 termination meeting and that he did *not* say in the termination meeting that he engaged in this type of recordkeeping because it was faster. Significantly, one would have expected Union Steward Mike Moore who accompanied D__ in this meeting to have corroborated that D__ was not given an opportunity to tell his [*220] side of the story, but Moore never did. [Emphasis in original]

Next, UPS contends that grievant's explanations are "simply unreasonable." In this respect UPS says that grievant testified repeatedly that the reason he prerecorded packages and stop completed them later at his friend's house, not contemporaneously with the deliveries, was because his customers gave him permission to leave packages and grievant knew he needed such consents to deliver without getting signatures. UPS also notes that when it pointed out to grievant during the hearings that one or two addresses grievant delivered to without signatures did not have consents in his book, grievant replied that he might have missed one or two but believed that he had signed consents 99.9 percent of the time. UPS also observes that grievant's book of consents was not offered into evidence by the Union, but rather by the Company near the end of the hearings. It then notes in its brief nineteen [19] specific addresses to which grievant made deliveries without signatures that did not have consent forms in his large notebook of consents. Therefore, UPS concludes that grievant's claim that it was okay to record packages in this manner because he had customer consents "just doesn't fly."

UPS also suggests that grievant's excuse is "frivolous" since UPS finds four examples of addresses where grievant obtained signatures but still stop completed them non-contemporaneously. UPS also finds grievant's testimony inconsistent with Mike Moore, his Union Steward and a PCD for 18 years, who testified that the proper procedure is to make stop completes at the time of delivery and the customer signs for it or even if the package is released without a signature.

The Company also argues that some of grievant's testimony was inconsistent with two of his prior statements. First, it notes that grievant did not dispute in arbitration Mr. Landem's testimony that during the grievance procedure panel hearing grievant stated that he "worked on his books in the building that he went into." However, the tapes played during the arbitration hearings showed that grievant did not carry any books into his friend's house. But when grievant testified he "backed off" his previous testimony at the panel, stating that he left the books in his truck on the four days he was videoed.

As a second example of inconsistency, UPS states that Manager Wong testified in arbitration that during the "June 10" termination meeting [33] grievant said that it was "faster" to prerecord and stop complete them later in his friend's house while grievant denied making this statement. UPS then asserts that grievant "backed off his excuse" made "at the termination hearing because he finally realized how absurd it was to suggest it is faster" to do so.

Finally, on the credibility issue, UPS points to answers of grievant to several questions on cross-examination which it considered were "evasive and non-responsive." For example, it cites this Q & A:

> Q: Do you understand that you could be terminated for falsification of records, that that's a dischargeable offense at UPS?
>
> A: I'm really not aware of it. There's a lot of things-
>
> Q: You're not aware of it?
>
> A: I'm not aware that you could be-I guess you could. I don't know what you could be terminated for. Article 54, I haven't read it. I know there's a bunch of them.

UPS next argues that the "evidence establishes [grievant's] dishonest acts were intentional." The Company's position in this respect is summed up at CB 31:

**Exhibit 28**

In addition to D__'s credibility issues, extensive evidence established that D__ was properly discharged under the labor contract for dishonesty. D__'s acts of dishonesty included stealing time by manipulating the recording of packages in a way that enabled him to receive additional overtime pay all while at a friend's house washing up or enjoying a beverage instead of back in the Center and off the clock. D__'s dishonest acts were intentional, as demonstrated by (1) the egregious discrepancies in the times in which he indicated he was making deliveries and the uncontroverted videotapes which proved otherwise; (2) D__'s ignoring directives on several occasions to not prerecord packages; and, (3) D__'s incentive to make as much money as he could by getting paid at an overtime rate while being at a friend's house at the end of the day instead of back in the Center. With the overwhelming evidence that D__'s actions were intentional, D__ was properly discharged. **[\*221]**

Continuing, UPS argues that grievant's practices of parking to prerecord and stop complete later were designed to steal time. For example, it says:

> The evidence demonstrated that on May 27, 2003, * * * he spent 34 minutes in the morning parked at the intersection of Damen and Irving Park Road. That same day he spent 34 minutes at the end of his day at his friend's house stop completing delivery information for some 25 stops. And, although the evidence was that it took him 13 minutes to stop complete these stops he remained in the house for 21 more minutes. And even more egregious was the following day, May 28, 2003, when he sat at the side of the road prerecording packages at Damen & Irving Park Road for 50 minutes. Then, later in the day after his last delivery, he drove 40 minutes back to his friend's house instead of heading back to the Center. He stayed in the house for 46 minutes, 21 minutes of which he spent stop completing inaccurate package delivery information. Likewise, on June 3, 2003, he spent 41 minutes in the morning parked in the Crate & Barrel parking lot prerecording packages. Then, at almost 6:00 p.m., when all the other drivers were heading back to the Center, he drove 26 minutes back to his friend's house during rush hour where he stayed for 47 minutes, 24 minutes of which he spent stop completing some 82 stops. Clearly, D__ was not delivering the packages at the times his records said he was. The false recordkeeping was so blatantly obvious that D__ conceded that he was not making the deliveries during the times indicated.

UPS also argues that the evidence clearly shows that grievant understood its "recordkeeping expectations." Both Mr. Medic and Mr. Landem had advised grievant not to prerecord. When grievant was OJS'd by supervisors, he followed the correct procedure of not prerecording and made his stop completes at the time of delivery. "Arbitrators," UPS says, "have not hesitated upholding discharges when the grievant demonstrates that he knows the correct way to record his work." *34*

UPS further argues that grievant had a motive for following his method of operation rather than UPS's: to work longer hours and receive more overtime pay:

> Not surprisingly, he ended up getting significantly more minutes a day of overtime pay (between 30 and 90 minutes) than the other drivers. One need not be a genius to figure out how he was managing to get paid at least a portion of this extra amount. *No doubt, one reason he was getting paid more than everyone else was because he separated out as compensable work the DIAD recordkeeping part of his job from the actual delivery of the packages. This added time to his day which would not have been added on if he recorded the DIAD information contemporaneously with the delivery of the package.* In fact, just the 20-30 minutes alone that he was inside his friend's house each day stop completing deliveries in his DIAD comes out to almost $5,000 more a year than any other driver. It was for this inaccurate recordkeeping that D__ managed to steal

**Exhibit 28**

time and led UPS to conclude he was being dishonest. [Emphasis in original]

Next, UPS argues that, having established that grievant was guilty of dishonesty, "discharge was the appropriate remedy." [35] The Company further contends that no mitigating circumstances have been shown to reduce or reverse its decision to discharge grievant. In this respect, UPS states at CB 44:

> Unlike these other drivers who never received a prior warning and were immediately discharged, D__ had actually been terminated for instructing helper Carolyn Dull to prerecord stop information. On September 11, 2002-exactly 9 months prior to his current termination-a decision was made to reinstate D__ with all time off serving as a suspension. D__ even admitted that this was a "serious" incident resulting in his being off work for some 30 days. Accordingly, D__'s prior incident cannot be ignored and demonstrates that, if anything, he was treated better than anyone else the Union may put forth because he was given a second chance. [36]

**[*222]**

Finally, UPS argues that grievant was not denied due process, stating at CB 46-48:

> The Union may also attempt to argue that D__ was deprived of due process in that he was *allegedly* never given the opportunity to tell his side of the story prior to being terminated. Any such argument would be frivolous and would once again ignore the record evidence. The testimony was clear that District Labor Manager Landem received information from UPS Security regarding the four days of surveillance that was conducted on D__. Security's investigation was quite detailed and involved both videotape and documentary evidence. After reviewing the evidence, Mr. Landem recommended that D__ should be terminated since Landem knew he had previously instructed D__ that there would be no more prerecording. He conveyed his sentiments on to Center Manager Wong who, as D__'s immediate manager, was obligated to meet with D__ to hear his side of the story before making any final decision. If, after meeting with D__, Manager Wong learned something that he felt justified going back to Mr. Landem on he could certainly do that.

> On June 11, 2003, Manager Wong met with D__, UPS Security Representative Dave Nolimal, D__ and Union Steward Mike Moore in order to allow D__ the opportunity to review the evidence and present his position. During this meeting, UPS presented the evidence it had obtained from its investigation of D__. UPS management inquired of D__ exactly how he could have several stops while parked in one position. Mr. Wong testified that during this meeting D__ admitted to prerecording stops and then stop completing them later because in his view it was *faster* to do it this way.

> After listening to D__, the testimony was undisputed that Mr. Wong, as D__'s immediate manager, concluded there was nothing convincing that D__ said. Upon hearing D__'s explanation, Mr. Wong determined that D__'s excuse did not hold water and there was no need to review anything further with Mr. Landem. Mr. Wong testified that he was not persuaded at all by D__'s explanation and found it implausible because, if anything, D__'s recording of packages in a manner that was not contemporaneous with the actual delivery would have clearly added time to his day rather than making him go faster.

> Mr. Wong decided to terminate D__. He completed the paperwork which officially separated his employment as of June 11, 2003 for

**Exhibit 28**

dishonesty. Mr. Wong explained that what D__ did constituted record falsification in that it provided inaccurate information for customers while at the same time generated extra time for him which was paid at an overtime rate. [37]

*The Union's Contentions*: The Union's argument runs seven pages as follows:

### A. The Overwhelming Weight of the Evidence Proves that the Company Lacks Cause to Discharge the Grievant.

The Company has failed to present any credible evidence to support its determination to discharge the Grievant. The evidence the Company relied on in discharging the Grievant is questionable; the Company denied the Grievant his industrial due process rights; and the Company did not show why, if any discipline was required, corrective discipline would not be appropriate.

### (1) The Company Bears a Weighty Burden of Proof

It is well established that the Employer bears the burden of proof in a discharge case. *See How Arbitration Works*, 905 (5th Ed. 1997) (*and cases cited*); *Sears Manufacturing*, **70 LA 719** (1978). Normally, an employer must prove its claim by a preponderance of the evidence. This is because, as has often been stated, "discharge is recognized to be the extreme industrial penalty since the employee's job, seniority, and other contractual benefits, and reputation are at stake." *Id*. (*and cases cited*). In other words, discharge is the capital punishment of industrial relations-the employer can exact no greater penalty, and has the social obligation of justifying its action. *Hussman Refrigerator Co.*, **68 LA 565** (1977).

This standard is raised even higher when dealing with allegations of theft, dishonesty or other accusations of moral turpitude. The rationale for imposing this higher standard is that the employer is doing more than simply terminating an employee; it is branding them as a "thief," "liar," or "crook." These accusations can be devastating to a dischargee seeking new employment. An employer must have rock solid proof that its accusations are correct; the social obligation in these types of cases is tenfold, because so is the harm. Arbitrators have routinely concluded that they must be "absolutely convinced" that the improper conduct took place in order to substantiate the discharge decision. *See Columbia Presbyterian* [*223] *Hosp.*, **79 LA 24** (1982); *Yellow Freight Systems*, **106 LA 1062** (1996).

The evidence introduced by the Company at the hearing in this matter falls far short of meeting this standard. It provided no evidence that D__ intentionally falsified company records. Contrary to what the employer charges, this is not a case of dishonesty. The Grievant worked for UPS for over 30 years before he was summarily discharged without any progressive discipline or corrective action haven been taken against him. He spent his last 27 years as a package car driver on the same route. He was very familiar with his customers, many of whom entrusted D__ with keys to their homes and businesses so that he could deliver packages to them in their absence. He was certainly not an untrustworthy individual as far as the customers were concerned.

D__ knew many of his customers' routines or schedules. For instance, he knew that a certain bank was closed every Wednesday. He knew that other customers did not like to be disturbed and he

**Exhibit 28**

would leave them notices to sign so he could deliver their package the next day. He knew a great many details about this route because he had worked it for so long.

There is no one established method for delivering packages that is used by every driver. D__ developed a system that was efficient and effective for him and he had used it for many years. No one had ever instructed him to discontinue this system despite the fact that daily logs were maintained by the company and, upon review, it was obvious what D__ was doing for these many years.

The evidence shows that, when given specific instructions in the past concerning his delivery methods, D__ was willing, ready, and able to comply. The Company had previously terminated D__ for alleged dishonesty-specifically D__ was fired for forging signatures in January 2002. Then, as now, the Company had summarily discharged D__ without fully investigating the matter. D__ and his Union representatives had to do the investigation for the Company and proved, indeed, that D__ was not guilty of dishonesty as the Company had alleged. D__ produced a ring of keys that had been given to him by various customers. D__ had these keys so that he could leave packages in the customers' absence. The DIAD board, however, requires something to be put on the signature line before moving to the next page in the DIAD board. Since he had keys and authorization to leave packages, what he would do is put a straight line in the signature box so that he could move to the next page in the DIAD board. He never tried to make it look like an actual signature.

The evidence at that time also showed that many drivers had keys and, after being informed of all of this, the Company returned D__ to work. When asked by D__ whether he should keep the keys or return them to the customers, he was told by the Company's management to keep the keys and keep doing what he had been doing. Had they told him at that time to return the keys and change his ways, he would have done so.

D__ took time after this [and] put together a written memorandum and sat down with each subsequent manager-he has been there for over 30 years so there have been more than one-and explained the situation and asked them to let him know if they ever had a problem with any of his methods. The reason that he did this is because he values his job greatly and did not want to risk losing it.

The Company did not fully investigate the present case as they had not the earlier termination of D__. Further, the Company did not treat D__ consistently with other employees. As a matter of fact, very recently a supervisor was caught entering into a DIAD board that he was attempting to deliver next-day air packages and would put in "not in 1" without having even gone to the stop. Next-day air packages are supposed to be delivered by 10:30 a.m. so he would put in this entry to make it look like he had made an attempt during the time they were supposed to be delivered and then he would deliver them later. Nothing was done to that supervisor. He continues to work despite the fact that the Union brought this information to the Company's attention.

D__, despite what the Company claims, was indeed working at the times the Company claims he was not working. The Company alleges that D__ took a break mid-morning and sat in his truck doing nothing. The evidence shows instead that D__ was sorting in his truck during this period. D__ would arrange the packages that he was about to deliver in order so that he could be efficient and deliver them quickly. He also would prerecord some packages and stop complete some during this time. He was indeed working during that time.

**Exhibit 28**

D__ was also working at the end of the day when he was stopped at his customer Edward Keating's house. He had been stopping by Keating's house for a couple of years to complete his end of the day paperwork and tasks. At the end of the day, drivers are expected to do quite a bit of paperwork. Instead of going into the Company's terminal to do this work, he would stop at Keating's house, complete his end of the day tasks, and then go into the Company's terminal to check out at the end of the day. D__ is not the only driver who does his end of the day paperwork offsite. There are many drivers who complete their paperwork before returning to the terminal **[*224]** so that when they get to the terminal, they can go in and finish up more quickly instead of trying to fight for space there to do their paperwork.

Before doing his paperwork at the end of the day at Keating's house, D__ had for many years done it at Appollo's, another customer on his route, which is a business he had keys to allow him access.

Instead of making any effort to discuss their concerns with D__ and to advise him if they thought his methods were inappropriate, the Company summarily discharged D__, an employee with over 30 years service.

D__ never had any intention to deceive the Company. He simply developed a method that was efficient and effective for him and the Company never received any complaints from his customers concerning his delivery methods. The Company has failed to sustain its burden.

The Company bears a substantial burden, one that it can only meet with credible, direct evidence. The Company has failed to meet that burden.

### (2) The Company Failed to Meet the Requirements of Industrial Due Process

In order to insure that employees are treated fairly in discharge cases, arbitrators developed the "industrial due process doctrine." "To satisfy industrial due process, an employee must be given an adequate opportunity to present his or her side of the case *before being discharged* by the employer." *Elkouri & Elkouri: How Arbitration Works* (6th Ed. 2003) p. 967 (emphasis supplied) (citations omitted). D__ was never given an adequate opportunity to present his side of the case before he was discharged. Landem testified that he made the final determination to discharge D__. He asserts that he based his decision on his review of the information and films provided by Dawson and Nolimal. He admits that he never even spoke with D__ before deciding to terminate him.

"Industrial due process also requires management to conduct a reasonable inquiry or investigation before assessing punishment." *Elkouri & Elkouri: How Arbitration Works* (6th Ed. 2003) p. 967 (emphasis supplied) (citations omitted).

Procedural fairness requires an employer to conduct a full and fair investigation of the circumstances surrounding an employee's conduct and to provide an opportunity for him to offer denials, explanations, or justifications that are relevant before the employer makes its final decision, before its position becomes polarized.

*Id*. quoting *Shaefer's Ambulance Serv.*, **104 LA 481**, 486 (1995).

**Exhibit 28**

It is evident that there was no full and fair investigation of the circumstances in the present case. Indeed, Landem, who made the final determination to discharge D__, testified that he made the decision based on the films and did not ask D__ for an explanation of his actions.

### (3) If any Discipline Was Warranted, Corrective Action Would Have Sufficed.

Discharge is viewed as a last resort in labor arbitrations and should only be used when corrective action would have no affect. The Grievant has shown in the past that he is amenable to change and, when given specific instructions, will comply with them in the future. For example, when the Company made an issue of D__'s using keys in January 2002, he offered to stop using the keys. The Company did not want him to do so. If the Company had a problem with what D__ was doing, they should have explained that to him and given him a chance to correct the problem.

### B. Neither the Contract, Nor the Company's Policy, Mandates Discharge for Dishonesty.

The Company will likely argue that it has an "Honesty in Employment" policy mandating discharge for dishonesty. However, the Company failed to show that D__ was ever given a copy of the policy.

The Company will also argue that "dishonesty" is a cardinal infraction and, therefore, an automatically terminable offense per the contract. This is also a meritless argument. First, the contract does not anywhere dictate discipline. It does not state that an employee *must* be discharged in certain circumstances. However, it does contain the following language: "The Employer shall not discharge or suspend any employee without just cause." Accordingly, the Company must show that it has just cause to terminate an employee.

Indeed, the Company has admitted that it has disciplined employees short of discharge for alleged dishonesty in the past and has taken into consideration factors such as length of service among other things. It cannot treat the Grievant differently than other employees.

### Discussion

[1] For the reasons set forth below, I find that UPS did not have just cause to discharge grievant. First, since the discharge was predicated on "dishonesty," the Employer is required to prove its case by clear and convincing evidence. [38] "Dishonesty" is not defined in **[*225]** Article 54 of the Contract, but it has a commonly understood meaning. As defined in Webster's Dictionary it is: "1. The quality of being dishonest; dishonest behavior; deceiving, stealing, etc., 2. * * * a dishonest act or statement; fraud, lie, etc." "Dishonest" is also there defined as: "not honest; lying; cheating, etc." Such described conduct, if proven, would mark an employee's discharge for conduct that was opprobrious or shameful, and make it very difficult for such employee to find other employment. It is for this reason that arbitrators require employers to prove "dishonesty" by clear and convincing evidence, evidence I do not find here.

[2] Second, I also find that the manner in which grievant was terminated otherwise violated the Contract and denied him due process. A discharge arrived at without due process is, in

**Exhibit 28**

itself, a discharge without just cause. Mr. Landem acknowledged that he made the decision to discharge grievant, even though it was carried out by Mr. Wong. In reaching his decision, Mr. Landem admitted that he took into account grievant's two prior discharges and reinstatements. However, Mr. Landem was barred under the Contract from doing so. The most recent prior discharge that he took into account was on August 10, 2002, more than nine months prior to the instant discharge. Even if, as UPS contends, the date grievant was reinstated after that discharge was converted to a suspension is the measuring date, that date was September 11, 2002 and it is more than nine months prior to the instant discharge on June 11, 2003. Nine months from September 11, 2002 would be, and is, June 10, 2003. Accordingly, the current discharge is nine months and one day after September 11, 2002. Under Article 54 of the Contract warning notices or file write-ups shall have no force or effect for more than nine months and will not be considered in the grievance procedure. Mr. Landem's decision to discharge grievant, which was based in part on the prior discharge/suspension, was made in violation of the Contract. [39] A discharge made in violation of an employee's contractual right cannot be considered as a discharge made for just cause.

[3] The discharge is also unsustainable since it was made in violation of due process. Although Mr. Landem did not meet with or hand grievant his separation notice on June 11, there is no doubt that the decision to discharge grievant was made by him. His decision was based entirely on the investigators' reports, tapes and documents. He never spoke to grievant to find out what explanation he had, if any, for what the investigators reported. Making a decision to discharge before the decision maker has heard the employee's explanation or side of the story is a denial of due process and due process is an essential element of a just cause discharge. See, *Kohl's Food Stores, Inc.*, **117 LA 660** at 671-672 (2002) and authorities therein cited. [40]

Mr. Landem's oversight was not cured by having Mr. Wong interview grievant before giving him his separation notice. Apart from the fact that the decision was Mr. Landem's, the discharge was based on alleged "Dishonesty Falsification of Company Documents." At no time did Mr. Landem or Mr. Wong advise grievant that UPS's underlying complaint included the allegation that the falsification of documents allegedly allowed grievant to increase his work time and obtain more overtime than the Company believed he was entitled to and that such excess and improper overtime was a significant reason for the discharge. Since grievant was never advised as to a fundamental basis for the discharge he could not respond to it even if he were given time to do so. Failure to reveal the true reasons for a discharge is also a due process violation. See, *Norem Buick Company*, 82-1 ARB ¶8200 at pp. 3920-21.

While some might consider the foregoing reasons for overturning this discharge to be "technical," they are important and due process is an essential ingredient of a discharge for just cause. In any event I would, and do reach, the same result after considering the case on its merits: the discharge still lacks just cause. UPS has not proven by clear and convincing evidence that grievant acted "dishonestly," within the commonly understood meaning of that word. It has not proven that **[*226]** grievant cheated, stole from or defrauded the Company.

There is no doubt, of course, that grievant did not keep completely accurate records in his DIAD. He entered some stop completes at times other than when he made the deliveries. Grievant knew, or reasonably must have known that that was contrary to UPS policy. Significantly, whenever he was OJS'd, he did his stop completes at the time of delivery. Nor can there be any doubt that grievant's actions in prerecording packages were contrary to UPS policy. Mr. Landem had so advised him in connection with his prior discharge. [41]

But there is no credible evidence that grievant was padding or "masking" time in order to secure additional overtime. The Company put in no records to show how much overtime grievant received in relation to other drivers in his center or with drivers on comparable routes. [42] The only Employer evidence on overtime is Mr. Wong's testimony, which was not based on any written records as to overtime, that in his center the average driver overtime is 30 minutes [presumably a day]. But no written overtime records were produced and Mr. Wong's ability to estimate time is open to serious question. He testified repeatedly, even when UPS counsel offered to stipulate to what the record otherwise shows, that it would take about four [4] minutes to enter each stop complete if they were all entered seriatim at the end of the day as D__ had done on the four days in question. But, as shown above, grievant, e.g., was able to enter 82 stop completes in 24 minutes on June 3. According to Mr. Wong's estimate, those 82 stops should have taken about 328 minutes or 5 hours and 28

**Exhibit 28**

minutes! Given Mr. Wong's inability to estimate the time needed to enter stop completes of prerecorded packages as grievant did them, his testimony as to average overtime of his drivers is entitled to little, if any, weight; and certainly does not amount to clear and convincing evidence that grievant was deliberately spending more work time in order to obtain more overtime.

For the same reason I cannot give much, if any, weight to Mr. Wong's testimony/estimate that the average driver in his center spends only 15 minutes between the time the driver returns to the center at day's end and when he punches out and off the clock. [43] Only hard record evidence would be sufficient in that respect. It offered none as to other drivers. UPS did supply such evidence as to grievant and it shows only that on the four days in question grievant spent an average of about 25 minutes between his return to the center and his punching out, only 10 minutes a day longer than what Mr. Wong claimed was average. [44]

Mr. Wong also offered his opinion that even if, as noted above, it took grievant only 24 minutes to enter the 82 stop completes on June 3, that 24 minutes "would have been excess overtime." But would it?

On the record before me, I find no convincing evidence that it would. Grievant has held the same route for at least 25 years. He knew his customers and they knew him. Not only do they know him, but many of them trusted him with keys to their houses, garages or businesses or gave him door codes so he could gain access even if no one was available to receive or sign for packages; and the customers had given him express written permission to leave packages when no one is home. He maintained a book with over 350 authorizations [or about half of his customers] signed by residential and business customers. Accordingly, as he testified, he could line up packages for delivery in his truck and deliver them even if no one was home or an office was closed. If no one was at home or an office was not open and he was not so authorized to leave a package without a signature, he would have to return again that day or the next. How much time did grievant save by following his practice instead of the one desired or required by UPS? We really don't know because no investigation was made in that respect. But there is reasonable basis to believe that the 24 minutes grievant spent in stop completing at the end of the day on June 3 was less than the amount of time he saved by delivering and [*227] stop completing as he did and without having to make second deliveries. In any event, it was up to the Employer to prove that the 24 minutes spent in stop completing exceeded the time saved by grievant's not having to make return deliveries for consignees who were not available to sign for packages. [45]

I have not overlooked UPS's argument that grievant's explanation for his non-contemporaneous stop completes was "simply unreasonable" because UPS found at least 19 deliveries on three of the four days in question that were made without written consents in his book. This finding by UPS, however, does not convince me that his explanation was unreasonable. Even if grievant exaggerated somewhat by saying, in the transcript references cited by UPS where he was asked if he ever left packages without releases to do so, that he "might have made a mistake and left a couple" but was "99.9%" accurate, this does not make his explanation unreasonable. First, grievant testified that he had not only the written consents, but also keys and door codes for some customers. [46] Second, even if he lacked written consents from 19 customers to whom he mistakenly left packages without consents or signatures, that is only 5% of the 355 written consents in his book; and is hardly enough to make his explanation "simply unreasonable." It is also significant to note that on the fourth day in question, May 30, UPS did not claim that grievant made driver releases without consents, even though on that day he made 102 driver releases. [47]

[4] The Company also suggested that grievant wasted time on two of the four days surveilled by taking 30 and 26 minutes on May 28 and June 3, respectively, to drive in "rush hour traffic" from his last delivery to Mr. Keating's house, located at 1923 W. Berenice Ave. The impression left by UPS's security investigator, Mr. Dawson, was that they "followed behind" grievant and video taped his movements and UPS states that they watched grievant "throughout the day." But the tapes do not show grievant's movements throughout the day. They obviously were edited. Mostly, they show when he was parked. For example, on none of the days do they show what grievant did from the time he left the center until he parked for the first time after 10:30 a.m. During the time he parked in the morning, the investigators acknowledged, as grievant testified, that he was, among other things, sorting packages. This was after he made time sensitive deliveries required to be made by 10:30 a.m. Nor do the tapes show all that grievant did in the afternoons. Thus, on May 28, when UPS claims that grievant took 30 minutes in rush hour traffic to drive from his last delivery

**Exhibit 28**

at 3947 N. Hermitage, made at 5:11 p.m., to Ed Keating's house at 5:42 p.m., the last action shown on the tapes, before his arrival at Ed's house, was at 2:48. The tape skips over whatever grievant did between 2:48 and 5:42. The tape does not show grievant driving for 30 minutes between those two places. Certainly if that is what grievant did, UPS would have shown it on the tape. According to my research on *Mapquest*, the distance between the two addresses is only .62 of a mile and the estimated driving time is only two minutes. The failure to show on the tapes that grievant spent 30 minutes to drive less than one mile certainly undermines the fact and argument that he did so and leads to the conclusion that during the gap period grievant was making some of the deliveries that he **[*228]** later stop completed at Keating's house and was not padding his time. [48]

[5] Having found that UPS, for any or all of the multiple reasons set forth above, did not have just cause to discharge grievant on June 11, 2003, the question remains as to the appropriate remedy. While UPS did not prove that grievant was guilty of "dishonesty," the record does show that he, knowingly, was not following UPS procedures which did not permit prerecording except in limited circumstances and did not permit stop completes at times other than the actual delivery or other disposition of packages. Therefore, UPS did have some basis for disciplining him and grievant could have avoided his discharge by following proper procedures of which he was aware. Granted, grievant did establish that he told his several managers that he was making stop completes for consignees without signatures because he had keys or authorizations from them to do so and the managers allowed him to do it. *But, grievant did not tell management verbally or in writing that he was prerecording packages and stop completing them after or before the fact of delivery or other disposition*. Grievant knew, or reasonably must have known that this was contrary to UPS procedures. Accordingly, the remedy will be as follows: Grievant shall be reinstated promptly and, if he chooses, restored to the route he held for a quarter century [assuming his 30+ years' seniority still entitles him to it], with full seniority and all other contract benefits to which he would have been entitled had he not been discharged, including insurance and pension benefits. He shall also receive back pay, but only to the extent of forty percent [40%] of what he would have earned from UPS had he not been discharged. Not more than forty percent [40%] of grievant's interim earnings, if any, may be deducted from UPS's back pay liability.

## AWARD

For the reasons set forth in the Opinion, which Opinion is incorporated by reference in this Award, the grievance is sustained. Grievant shall be reinstated promptly and, if he chooses, restored to the route he held for a quarter century [assuming his 30+ years' seniority still entitles him to it], with full seniority and all other contract benefits to which he would have been entitled had he not been discharged, including insurance and pension benefits. He shall also receive back pay, but only to the extent of forty percent [40%] of what he would have earned from UPS had he not been discharged. Not more than forty percent [40%] of grievant's interim earnings, if any, may be deducted from UPS's back pay liability.

The Arbitrator will retain jurisdiction for ninety (90) days to resolve any dispute, now unforeseen, as to the remedy.

---

**fn** 1

This may be the practice, but Article 49 of the Contract actually states that the lunch period "shall be one (1) hour," without mentioning if it is paid. It also provides for a 10 minute "paid break."

**fn** 2

On the four dates in question, grievant did not wash or fuel his truck, except once on June 3 when he fueled it.

**fn** 3

There is no evidence as to how deliveries were made and recorded prior to the DIAD.

**fn** 4

**Exhibit 28**

Supervisors periodically ride with all drivers to observe their work. This on-the-job supervision is commonly referred to as "OJS."

**fn** 5

There is no evidence that grievant was prerecording packages before leaving the center in the morning, but there is no dispute that he did so later in the day.

**fn** 6

The video tapes, which are also on disks, are in evidence and portions of them were played during the arbitration hearings. The Arbitrator also reviewed the disks completely in preparing this Award. They show that the security team did not follow grievant all day on his route. They mostly cover the times when grievant was parked and not making deliveries.

**fn** 7

As noted later, the home belonged to grievant's friend, Edward Keating.

**fn** 8

Mr. Dawson also testified that he did not know if grievant actually made "multiple stops * * * on packages."

**fn** 9

As noted earlier in this paragraph, grievant took only 39 minutes for lunch.

**fn** 10

The Union objected to this testimony and exhibits on the grounds of hearsay and also that it was barred under contractual time limits as to prior disciplinary actions. The evidence was received subject to the objections. As noted below, p. 34, the objections were well founded and the fact that grievant had been discharged twice previously for alleged "dishonesty" cannot be considered by the Arbitrator. More importantly, that evidence should not have been, but was considered by UPS in its decision to discharge grievant.

**fn** 11

Grievant denied this and said no one ever told him not to prerecord.

**fn** 12

But prior to or on the date of discharge, no one told grievant that his discharge was based in part on alleged "masking" of time and allegedly improperly obtaining extra overtime.

**fn** 13

Mr. Wong did not become grievant's manager until February, about four months before the discharge on June 11.

**fn** 14

Mr. Wong further testified that it would take about four [4] minutes to enter a stop complete as to packages which had been prerecorded and that to enter 80 stop completes at a later time for 80 prerecorded packages would take 320 minutes.

**fn** 15

The books are further described in footnote 17.

**fn** 16

**Exhibit 28**

Prior to his discharge, grievant's route was not designated as a "driver release" route, meaning that he needed a signature to leave a package unless he had a prior authorization from the customer to leave packages without a signature. He testified that more than 50% of the customers on his route had given him authority to leave packages without their signatures.

**fn** 17

CX 35 contains over 350 statements signed by grievant's residential and business customers, with their addresses, stating: "To United Parcel Service Management: I authorize D__, United Parcel Service Driver, to release ALL parcels bearing our address." Many of the customers have their business cards attached. The other book contains the listings of hundreds of customers showing their names, original delivery addresses and phone numbers in the left column and, in the right column, alternate delivery addresses and phone numbers for those customers. Grievant also described the nature, purpose and use of the documents contained in the latter book. When grievant learned from UPS that a customer wanted a package delivered to a different address, he recorded the information in a notebook. Later, when he got a package for that customer he would call to find out to which address the customer wanted it delivered. If feasible, grievant would deliver it to that address or re-address it and return it to a clerk for delivery the next day on someone else's route. This way the package would not be lost or delayed. He also would call customers later to see if they got their package.

**fn** 18

During this stop, the UPS investigator concluded that grievant was at lunch.

**fn** 19

Actually, the tape shows, and its narrator states, that grievant was parked in Crate & Barrel's "dock." Can a delivery truck park at a retailer's loading dock and not make any deliveries or pickups?

**fn** 20

Prior to using Ed's house, grievant did his paperwork for 20 years at a business called "Apollo Punch & Oval" run by friends of his who had given him keys to the place. When being OJS'd with a supervisor, he did his ending paperwork with the supervisor while stopped some place over coffee or back at the center. Other drivers also do that paperwork at restaurants or other places before returning to the center.

**fn** 21

He estimated that over a two-year period, grievant stopped by at lunch time about three times a week, but it seemed that at the end of the day he came every night, although there were some nights when he didn't.

**fn** 22

The managers included his last one, Mr. Wong, and others named "Dennis," "Moon" and "Rakow," all of whom are still employed by UPS.

**fn** 23

Grievant also testified that after the Company learned that many drivers left packages by using these keys, the Company collected the key rings, tabulated the keys and told the drivers to enter the word "key" on the DIAD when delivering a package by use of a key.

**fn** 24

UX 7 is addressed "To: United Parcel Management," states "I authorize D__, United Parcel Service Driver, to release ALL parcels bearing our address" and contains a space for signature, printed name and address.

**fn** 25

**Exhibit 28**

Including labor relations manager Landem, but Mr. Landem said, as grievant also testified above, that grievant could continue what he was doing if his center manager OK'd it.

**fn** 26

On UX 8 someone has written "Refused to sign." Mr. Moore's signature appears on the bottom of this form as "Witness" dated "7-12-02." The form is signed by grievant.

It should be noted that the testimony of grievant and Mr. Moore as to these meetings with Mr. Landem and the managers was not denied by Mr. Landem or by Mr. Wong, the only other manager who testified and he did so in rebuttal. *On the other hand, the documents and testimony by grievant and Mr. Moore did not specifically include any reference to grievant's practice of prerecording and stop completing at times not contemporaneous with the deliveries.*

**fn** 27

Mr. Wong could recall one customer who had a "problem" with a delivery, but Mr. Wong did not say what it was about.

**fn** 28

Second deliveries cost UPS time and money. Soon after grievant's termination, UPS made his route "driver release" so that drivers could leave packages with no one being there to receive or sign for them. Apparently, UPS concluded it was cost efficient to avoid the cost of multiple deliveries even if it resulted in UPS having to pay for lost or stolen packages.

**fn** 29

Letters were sent to the Union and UPS. More letters were received between the first and second day of hearings, but the Union did not offer them.

**fn** 30

It cites, generally, at CB 20: *Safeway Stores*, **96 LA 304**, 310 (1990); and as to grievant's self interest it cites [CB 21-22]: *Furr's Inc.*, **72 LA 960**, 965 (1979), *Lake Orion Community Schools*, **73 LA 707**, 710 (1979), *Huron Forge & Machine Co.*, **75 LA 83**, 90 (1980), and *AMF Lawn & Garden Division*, **64 LA 988**, 991 (1975).

**fn** 31

The alleged complaint and question Mr. Medic said he put to grievant was whether he was "prerecording his packages *before* he left the building." [emphasis added] There is no evidence that grievant was doing so.

**fn** 32

In fact, this meeting was on June 11. See fn. 33, *infra*.

**fn** 33

It is undisputed that that meeting was held on June *11*, not June *10*. UPS admits it. As noted below, the fact that the discharge meeting and termination were on June *11* is a fact of significant importance in this case.

**fn** 34

Citing: *Madison Furniture Industries*, **88 LA 805** (1987) and *UPS & Local 705* (R. Pettis), FMCS No. 95-19754 (Goldstein, 1996) (attached to CB).

**fn** 35

In this respect, it cites numerous cases, including: *Dominick's Finer Foods*, **88 LA 847** (1987); *Stockham Pipe Fittings Co.*, **1 LA 160**, 162 (1945); *Merchants Fast Motor Lines, Inc.*,

**Exhibit 28**

88-1 ARB ¶8080; *Seaway Food Town, Inc.*, **78 LA 208** (1982); *American Steel Foundries*, 81-1 ARB ¶8144; *Interstate Brands Corp.*, 96-2 ARB ¶6429; and *J. R. Simplot Co.*, 92-2 ARB ¶8410.

**fn** 36

CB 44, fn. 7, reads as follows: "The Union attorney tried to claim that this discipline was outside of the nine (9)-month window set forth in Article 54. This argument fails for several reasons. First, the parties, including D__, signed off on the discipline on September 11, 2002 which was within the 9 month period. Mr. Landem testified, without contradiction from the Union, that the effective date of the discipline was September 11, 2002. Second, even if the Arbitrator was to (incorrectly) measure the nine months from the date of termination, as opposed to the date the grievance was resolved with the parties agreeing to reduce the termination to a suspension, the fact that D__ had served a prior suspension demonstrates he was put on notice of the seriousness of his actions. And really, the most important thing from this prior incident is not so much the prior discipline but the fact that D__ had to have known that prerecording of packages was not accepted. This is especially so given that as part of his suspension District Labor Manager Landem spoke to D__ and told him that there was not to be any more prerecording of packages. Finally, dishonesty is a cardinal sin under Article 54 for which UPS need not even give a prior warning."

**fn** 37

In its "Common Sense Conclusion", UPS sets forth fifteen "Common Sense Questions" and "Answers" which are interesting but, given the length of this Award, are omitted here.

**fn** 38

See generally, F. & E. Elkouri, *How Arbitration Works*, (6th Ed. 2003; A. Ruben, Editor in Chief), pp. 949-952. See also my well known views and research on this issue in *Tower Automotive Products Co.*, **115 LA 1077** at 1084 & 1088 (2001).

**fn** 39

Even if the discharge/suspension in August-September 2002 was less than 9 months before the current discharge, Mr. Landem also took into account a discharge/suspension that occurred in January 2002 and that was undisputedly more than 9 months prior to June 11, 2003 and, therefore, also was a violation of the Contract.

**fn** 40

*Kohl's* is also reported in 02-2 ARB ¶3235.

**fn** 41

Although Mr. Landem improperly considered grievant's prior discharge in making the instant decision to discharge him, Mr. Landem's testimony that he told grievant in 2002 not to prerecord is admissible and credible.

**fn** 42

There is no evidence to support UPS's assertion that grievant "was getting paid more than everyone else."

**fn** 43

The mid-loop center he manages has 63 full-time drivers.

**fn** 44

Nor did UPS offer any evidence as to how much time drivers, with routes like grievant had, averaged in doing necessary paperwork at the end of the day, whether done at the center or elsewhere before returning there.

**fn** 45

**Exhibit 28**

It is also notable that on June 3, e.g., grievant delivered 194 packages, had 111 "net stops" and 62 driver release stops; and, in addition, picked up 162 packages in 21 stops. UPS offered no evidence to compare the work load of grievant with drivers on other comparable routes or how long other drivers took to complete their routes. Nor is there any credible evidence that grievant's overtime differed, significantly or at all, from the average of other drivers.

After grievant's discharge, UPS made his route "driver release" allowing the driver to leave packages without receipt or putting packages into the customer's hands. UPS decided that even though it might have to pay for lost, stolen or misplaced packages, it was more cost efficient than requiring signatures or consents from customers. So in one sense, grievant's system was ahead of its time. But that does not excuse grievant from following completely UPS's then existing procedures of which he was aware.

**fn** 46

And UPS was aware from a prior discharge and reinstatement that grievant did have a large ring of customer keys. It is also significant that UPS did not cite one instance of a customer complaint about lost or missing packages or about grievant leaving a package without permission or a signature.

**fn** 47

During cross-examination, UPS suggested to grievant that his book did not contain authorizations for two of his deliveries [to Chio and Martinez] and grievant said he might have missed some and agreed that there was none for Chio. But, as the Union observes, grievant's book does have authorizations from both.

**fn** 48

This tape gap is akin to that of a failure of a party to present a material witness without explanation for the absence, resulting in application of the adverse inference rule. *See, Elkouri*, *supra*, at pp. 381-82. The same result and conclusion follows as to the tape's gap on June 3 where, according to UPS, grievant took 26 minutes to drive a few blocks from 1623 W. Byron to Keating's house, a distance of .55 miles and should take "2 minutes" according to Mapquest.

**Exhibit 28**

## Arbitration Decisions

# Labor Arbitration Decision, ENGELHARD CORP., 92/13663, Grievance No. 91-E-66, Arbitrator's File No. ND 1277, 100 BNA LA 238

**Labor Arbitration Decision, ENGELHARD CORP., 92/13663, Grievance No. 91-E-66, Arbitrator's File No. ND 1277, 100 BNA LA 238**

Arbitrator

In re ENGELHARD CORPORATION [Elyria, Ohio ] and INTERNATIONAL CHEMICAL WORKERS UNION, LOCAL 73

FMCS File No. 92/13663, Grievance No. 91-E-66, Arbitrator's File No. ND 1277

January 14, 1993

Show Summary

[*239]

Appearances: For the employer: Stanford G. Wilson, attorney; Arthur D. DePompei and Bob Buchanan, human resources managers; Ronald Oser, maintenance manager; Samuel F. Narvartte, colors superintendent. For the union: Jim Bealer Jr., international representative; Robert Vincent, local chief steward.

Nicholas Duda Jr.

**Decision of Arbitrator**

**EPILEPSY**

**Background**

After answering questions on a medical form and being examined by a Company doctor, Grievant was hired on July 15, 1987. Four years later, on November 21, 1991 the Company's Manager of Human Resources told Grievant he was discharged for violating Plant Rule 26.

**12/9/91 Step 2 Grievance**

Nature of Grievance: I believe my termination is unfair and unjust.

Adjustment Desired: I be reinstated to my job without loss of seniority. I be made whole for all losses incurred to me because of the Company's action, monetary or otherwise.

**Exhibit 28**

**12/17/91 Step 2 and 2/4/92 Step 3 Answers by Supervision**

. . . the termination was proper and justifiable. There was no contractual violation. In view of the above, this grievance must be denied.

Not satisfied with the Company denial, the Union appealed to Arbitration. The Parties selected the undersigned Arbitrator to hear the case from a list provided by the FMCS. After submission of the case on September 15, 1992 the Parties waived the provisions of Step 4(e) and agreed to submit post hearing briefs as requested by the Company.

### Positions of the Parties at Arbitration

### COMPANY POSITION

. . . on November 21, 1991, the Grievant was informed . . . that Engelhard had decided to terminate his employment for intentionally misrepresenting information and falsifying documents requested by the Company in violation of Plant Rule 26.

A. The Grievant Admitted That He Falsified The Report of Medical Examination: . . . the Grievant . . . admitted that he intentionally falsified his report of medical examination and that he certified the truth of the information given on that document. That certification states: "I certify that the information given by me is true and complete and I authorize the examiner to furnish the results of this examination to the Harshaw Chemical Company and its affiliates." The Grievant signed that certification after checking "no" in response to a series of epilepsy related symptoms and a specific reference to epilepsy. . . .

. . . he should have checked "yes" to the question on "Convulsions (Epilepsy)". . . . the Grievant falsified the document because he thought he would not get hired and even if he did get hired, he did not want to contend with the stigma associated with epilepsy. . . . the Grievant made a conscious, premeditated decision to falsify this document. . . .

Plant Rule 26 mandates dismissal where a falsification has occurred. Where there is an admission of falsification and an admission that the falsification was knowing, management has no choice but to terminate the employee. See Timken Co., 88-1 ARB [Paragraph ] 8056 (Duda, 1987); *Laclede Gas Co.,* **86 LA 480** (Mikrut, 1986); Pringle Transit Co., **81 LA 393** (Duda, 1983); United States Steel Corp., **74 LA 354** (Simpkins, 1980). **[*240]**

B. As A Result of the Grievant's Falsification He Created A Potential Hazard For Himself and His Co-workers: The Grievant's failure to be truthful on his medical questionnaire caused hazards at the facility because the doctor relied on false information in certifying the Grievant's ability to work safely and the Company relied on false information in hiring and assigning the Grievant. . . . The precise reason for Plant Rule 26, . . . is to avoid situations such as the instant one which arise when management does not know all the facts. The certification on the medical form serves the same purpose. . . .

**Exhibit 28**

This hazardous situation was exacerbated by the nature of the Grievant's job as a floater, in which he performed an assortment of tasks in different locations around the facility. . . .

That the Grievant was aware of the hazards created by his condition in his working environment at Engelhard is supported by his testimony that he had instructed two co-workers on how to assist him if he became ill at work. These instructions did not cure the problem because he frequently worked alone in the plant. . . .

C. The Application of Plant Rule 26 Reasonable In This Case: . . . Plant Rule 26 has been consistently applied. Mr. DePompei testified regarding five other instances of falsifications, all of which resulted in termination. . . .

* * *

D. No Circumstances Mitigate The Falsification: . . . It is well-established that the determination of proper discipline is initially for management to decide and, unless there is evidence that management has acted in an arbitrary and capricious manner, the arbitrator should not substitute his judgment for that of the company. Mid Atlantic Canners Ass'n, Inc., 85-2 ARB [Paragraph ] 8531 at p. 5191 (Duda, 1985). . . .

In analyzing the Company's decision, the Arbitrator should consider the Grievant's total employment record. . . . Grievant had a poor work history during his entire tenure of employment. . . . In fact, Mr. Buchanan stated that the next step in the Grievant's disciplinary progression would have been discharge. Further, the Grievant was considered unreliable throughout his employment with Engelhard as testified by his supervisor, Mr. Oser.

E. The Grievant Was Discharged For Just Cause

* * *

## UNION POSITION

. . . the company terminated the employment of [Grievant ] after he revealed to the Company he has epilepsy.

* * *

. . . Although [Grievant's ] attendance record at the end of his employment was not unblemished, for the most part . . . the record shows he was not that bad of an employee. The Company produced no testimony or exhibits to poor work habits. In other words, other than his short period of attendance problems, we consider [Grievant ] to be the average employee.

. . . when Bob Buchanan the Human Resource person was told about a similar circumstance, [An ] Employee with epilepsy who failed to disclose on employment application, nothing was done about it as far as an investigation was concerned.

. . . Art DePompei . . . testified; That in fact there was another employee who has epilepsy and failed to put it on his employment application and . . . when that employee completed company exhibit #5 he disclosed his epilepsy on that form.

**Exhibit 28**

. . . The company put exhibits company #8 thru 15 to support their position with respect to falsifying reports and records. . . . those decisions were based only upon the facts of those cases alone and should not be used as an absolute determination of the penalty. General Plant Rules page 2 . . . says . . .

"The following violations are subject to immediate dismissal." Union does not consider that language to be so absolute that consideration could not be given under some circumstances. . . .

Some of the company's testimony through either Ron Oser or Art DePompei dealt with company's liability as to what could have happened, that is clearly not the case in this grievance, because [Grievant ] approached the company with the epilepsy problem before any incidents occurred. The same arguments could be made with respect to the other employee whose circumstances were similar, but yet no termination took place in that example. . . .

* * *

Whether discharge of employee for falsification of employment application is justified under unilateral company rule depends on substantive nature of falsification, the kind of job the employee holds, and his length of service.

* * *

Several views have been expressed by Arbitrators regarding the nature of their function in reviewing disciplinary penalties imposed by management.

* * *

## The Issue

Whether there was just cause to discharge Grievant? If not, what remedy is appropriate?

## Relevant Labor Agreement Provisions

## PURPOSE OF AGREEMENT

. . . The Company shall retain its inherent right to control and supervise all operations and direct all working force. . . except as *modified by* a provision of this Agreement. The Company, in the exercise of its rights, shall observe the provisions of this Agreement. . . .

## ARTICLE II -- Grievances and Manner of Adjustment
### Section 3. GRIEVANCE PROCEDURE
### Step 4. ARBITRATION

(a) The Union may refer the matter to Arbitration within forty (40) calendar days of the receipt of the Company's Step 3 answer. . . .

**Exhibit 28**

\* \* \* [*241]

(c) If no agreement can be reached on a single arbitrator within ten (10) calendar days of submission to Arbitration by the Union, the parties shall jointly request a panel of arbitrators from the FMCS. . . . the parties will alternately strike names from this panel until only one name remains. This person shall be designated as the mutually chosen Arbitrator.

(d) The issue or issues shall be submitted to the Arbitrator at a hearing to be conducted at a mutually agreeable time and place.

(e) The Arbitrator shall make a decision within twenty (20) calendar days after submission of the case.

(f) The Arbitrator shall not have the authority to change or amend the Agreement and shall confine his/her decision to the issues submitted, but in such respects his/her decision shall be final and binding on the Company and the Union.

\* \* \*

### ARTICLE III

### Section 4. TERMINATION OF SENIORITY

An employee's seniority shall be terminated when:

(a) The employee is discharged for just cause;

**Relevant Provisions of the Company's "General Plant Rules" Issued November 20, 1990**

\* \* \*

AN EMPLOYEE WHO VIOLATES ANY OF THESE RULES OR FAILS TO MAINTAIN PROPER STANDARD OF CONDUCT IS SUBJECT TO DISCIPLINARY ACTION.

\* \* \*

2. Employees must be at their assigned work places, ready to work, at the regular starting time--and shall remain at such work places and at work, unless excused, until the regular quitting time.

\* \* \*

6. Employees who are going to be absent or late must notify supervision in advance by calling the plant. . . .

\* \* \*

THE FOLLOWING VIOLATIONS ARE SUBJECT TO IMMEDIATE DISMISSAL:

26. Falsifying any reports or records.

\* \* \*

32. Violation of Substance Abuse Policy and Program. (See Policy for details)

**Exhibit 28**

**Relevant Provisions of 1990 Agreement by Company and Union on
"Substance Abuse Policy and Program"**

**I. JOINT POLICY STATEMENT**

A. The Parties recognize their mutual interest in a safe and efficient work place and a work force free from substance abuse. This is in the best interest of the Company, the Union and all employees.

* * *

E. All problems, information, and medical records handled through this program will be treated in a strictly confidential manner.

**II. POSSESSION OR USE OF ALCOHOL OR DRUGS ON COMPANY PROPERTY**

A. The . . . improper or unauthorized use of prescription drugs on Company property will result in disciplinary action up to and including termination.

* * *

**IV. DRUG AND ALCOHOL TESTING**

A. The Company may for reasonable cause request any employee who is suspected of reporting to work, working, or being present on Company property under the influence of alcohol or drugs to submit, at Company expense, to an alcohol or drug test. . . .

B. An employee involved in, or causing a lost time accident or significant damage to company property, may be required to submit to a drug/alcohol test. . . .

* * *

**C. Disclosure of Medication Prior to Drug Test.**

. . . medically proper and authorized use of certain prescription and over-the-counter medications may cause positive results for certain of the substances covered by the testing program. Accordingly, prior to the administration of any drug test under this policy, employees will be allowed to identify all prescription and over-the-counter medications which they have taken within the preceding thirty (30) days. An employee may also have his or her physician provide a certified statement setting forth the prescriptions or medication which the employee has taken during the preceding thirty (30) days; this certified statement must be provided to the Company within three (3) working days of the drug test, . . . . Failure to disclose the taking of any prescription or over-the-counter medications as set forth above shall bar the employee from later asserting the taking of such medications as a defense to a positive test result.

**Exhibit 28**

**Findings of Fact**

Born in 1963, Grievant grew up and went to school in Hammond, Indiana. When he was about 21 years old he moved to the Cleveland, Ohio area.

Grievant testified at arbitration that during his childhood he occasionally experienced dizziness, headaches, nausea and what he later came to consider "seizures." When he was 15 years old (1978), he was told he was "epileptic" but might "out grow it" as he grew older. During the next two years Grievant took medication a doctor prescribed and no symptoms recurred. At 17 years he discontinued use of the medication. That was about 1980.

According to Grievant he did not experience any "epilepsy" symptoms during the 12 years after being told he was epileptic.

Grievant's first job after graduating from high school was at Long John Silver's, a restaurant chain. He worked for the restaurant from 1980 to 1983, traveling among several cities in connection with start-up of new stores. Then in 1984 he was hired at **[*242]** Metakato Corporation in North Ridgeville, Ohio. This company was involved in the plastic coatings business. His employment with Metakato involved various labor work including operation of tow motors, overhead cranes, machinery processes and degreasers.

During the seven years Grievant worked at the plastic coating firm and the restaurant he did not have any seizures, dizziness, nausea, headaches, etc. Based on the information received in 1978 Grievant concluded he had "outgrown" the epilepsy.

In 1987 Grievant was looking for work. He was referred by the State Employment Office to the Plant in Elyria, Ohio operated by the Harshaw/Filtrol partnership. This plant manufactures ceramic pigments and industrial catalysts. On June 8, 1987 Grievant came to the Elyria Plant and filled out a form entitled "Confidential Employment Application." At the top of that form is the following statement:

**Confidential Employment Application**

> Harshaw/Filtrol Partnership is an Equal Opportunity Employer.
> Facts relating to your race, age, sex, religion, color, marital status,
> national origin, *or any handicaps are not requested by this
> application, nor are they considered in determining your qualifications
> for employment.* (Emphasis supplied by Arbitrator.)

On the Employment Application Grievant filled in requested information such as his education and business experience. Under business experience he listed his employment at the Metakato Corporation and at Long John Silver's. One block was entitled "Physical Data." Instructions for that block stated:

> Explain any physical or mental limitations which would affect your
> work performance.

Grievant did not make any entry in that block. At the bottom of the second page Grievant signed his name in the space provided. Just above his signature is the following statement:

> I understand that I must meet the necessary physical and mental
> qualifications as a condition of employment. I hereby waive
> privilege and authorize the examining physician to disclose the
> results of such examination to the company. I understand that a
> copy of the company's standard form of agreement relating to
> inventions, patents and confidential information is available to me
> for review on my request. I agree that if I am employed, I will sign
> said agreement in consideration of my employment by the

**Exhibit 28**

company. *I authorize you to refer to any former employers or others to verify the statements made in this application and I understand that misrepresentation or material omissions made by me will be considered sufficient cause for discharge or refusal of employment.* (Emphasis supplied.)

Several days after making the application Grievant was told to report for a physical examination by a doctor employed by Harshaw/Filtrol. When he appeared for the examination at "F.B. Leano, M.D., Inc.," Grievant was told to complete page 1 of a form entitled "Report of Medical Examination."

A heading in question 4 was "Personal History and Review of Systems." Under that heading were the following categories: Respiratory, Genitourinary, Special Senses, Habits, Cardiovascular, Musculoskeletal, Neurological, Female, Gastrointestinal, Allergies, Miscellaneous, Occupational Exposures. In turn each of the twelve categories had subcategories. Under Neurological were six items, each of which could be checked in columns marked "yes" or "no." The six items were: "headache," "dizzy spells," "convulsions (epilepsy)," "paralysis," "numbness or tingling," "mental breakdown," "unconsciousness." Grievant checked "no" for every neurological item. Grievant signed his name at the bottom of page one after the following statement: "I certify that the information given by me is true and complete and I authorize the examiner to furnish the results of this examination to the Harshaw Company and its affiliates."

After making the entries on the "Report of Medical Examination" form Grievant was given a physical examination and urinalysis test. The consulting physician, F.B. Leano, M.D. may also have interviewed Grievant but there was no testimony about any interview. Dr. Leano checked "no" to the following question: "Do you find any physical or psychological limitations"? There is no evidence that Dr. Leano had been advised of any specific job for which Grievant was being considered at the time or might be considered in the future.

Grievant was hired by Harshaw effective July 15, 1987. Thereafter he performed various labor type duties such as cleaning, painting, (sometimes working from a ladder), operating machinery and equipment (e.g. lift trucks, tow motors, hydraulic trash compactors).

In 1985 Harshaw/Fitrol had issued "General Plant Rules." Those rules prohibited tardiness (Rule #2) and failure to give advance notice of tardiness (Rule #6), violations for which subjected an employee to progressive discipline culminating in discharge. Violation of Rule #26, "Falsifying any reports or records" made an employee "subject to immediate dismissal."
[*243]

Sometimes after Grievant's employment, the Elyria Plant became owned by Engelhard Corporation.

After Engelhard acquired the plant it adopted plant rules on November 20, 1990 very similar to the Harshaw/Filtrol rules. Engelhard also made a Substance Abuse agreement with the Union in 1990. Relevant provisions of the Engelhard Plant Rules and the agreed Substance Abuse Program are quoted above.

For over two years Grievant's employment was relatively uneventful and without problems. He did his job and his record for the period does not show formal discipline. However during the third year he started to be late frequently, sometimes without having called in advance. On November 21, 1990 more than three years after being hired Grievant was issued a written warning because he:

> . . . did not show up for work at 7:00 a.m. on November 21, 1990. . . . did not call the Guard Station in advance of this absence or of him being late. . . . did violate company General Rule 6. Any further violations of plant General Rules will result in other disciplinary action.

Four months later he received a one day suspension based on the following allegation which was not challenged by the Grievant:

**Exhibit 28**

> No call, no show at 7 a.m. 3/26/91. Received call from Guard at 7:12
> a.m. 3/26/91 that he was going to be late. He was in violation of
> Plant Rule No. 6.

Three months later Grievant received a three day suspension for:

> Failure to notify supervision in advance of the start of his shift by
> calling the Plant Guard House (Rule No. 6).

A month later Grievant received a one day suspension for violation of Plant Rules 25 and 2. Then on October 29 Grievant was again issued a suspension for violation for Plant Rule No. 6. This suspension was for five days.

Under the progressive discipline system used by the Company, Grievant would be subject to discharge for a subsequent violation of Rule 6.

In late 1990 Grievant had begun to have occasional headaches and dizziness. These conditions occurred at night or early morning, but not at work. However there was an indirect impact on his employment because he was sometimes late for work because he waited to come in until the headache or nausea passed.

The instances of dizziness/nausea and related tardiness increased progressively until by October 1991 he was at the last discipline level before discharge. Perhaps even more important he had come to suspect he might be experiencing a recurrence of the neurological problem he thought he had "outgrown" over 13 years earlier. Although he had not yet experienced an incident at work he suspected one might occur. Also in October 1991 the Company asked employees to disclose any "known allergies or medical conditions" and the person to contact in the event of an emergency.

Grievant did several things. One, he made an appointment to see Hershel Goren, M.D., a Neurological Specialist at the Cleveland Clinic. Grievant fully expected that Dr. Goren would prescribe drugs to prevent dizziness, "spells" etc. Grievant anticipated submitting the doctor's bill, which might cause his condition to be revealed to the Company. Two, he notified several fellow employees about his condition and the handling he should be given if he had a "seizure" at work.

Grievant believed if he had a problem at work, he might be tested for drugs pursuant to the Drug Substance Program and the drugs expected to be prescribed by Dr. Goren would be discovered. Grievant had never disclosed to the Company his history of neurological symptoms but he felt reassured about making the disclosure in October 1991 because he knew another employee who disclosed an epileptic condition in response to the medical condition request had not been disciplined. For these various reasons, Grievant decided to step forward and notify the Company of his possible epilepsy. He requested a meeting with Robert Buchanan, Superintendent of Human Resources.

On November 1, Grievant and his mother came to the plant and met with Mr. Buchanan. The manager had been employed at the plant in Human Resources about a year earlier when the Harshaw Plant became part of Engelhard Corporation. Grievant told Mr. Buchanan the history recounted above about the epilepsy diagnosis at age 15, not having epileptic symptoms for the next 12 years but then recently having experiences which caused his lateness at work. Grievant said he had scheduled an appointment with Dr. Goren for a diagnosis and treatment if necessary. Grievant also said he was concerned for his job because he had not volunteered the information when he applied for employment in 1987 although at the time he had long since ceased having symptoms. In discussion with Buchanan, Grievant said "at his employment he had felt the old history was not important so he had not mentioned it because he feared any mention of the word 'epilepsy' would result in disqualification."

Mr. Buchanan asked for the date of the appointment with Dr. Goren. **[\*244]** After Grievant gave the date Mr. Buchanan asked Grievant to release to the Company all medical information from Dr. Goren; Grievant granted the requested permission. Buchanan placed

**Exhibit 28**

Grievant on Medical Leave of absence until his medical appointment scheduled for November 4, 1991.

Grievant saw Dr. Goren on November 4, 1991. On November 6, Mr. Buchanan talked with Neurologist Goren. The Doctor stated he had given Grievant medication which would not take effect for a few days so he scheduled a follow up examination. Dr. Goren recommended that Grievant be placed on leave until that time and promised to complete an evaluation informing the Company of the Grievant's medical status.

Dr. Goren faxed a letter to the Company on November 7, 1991. That letter stated as follows:

> I am writing about my November 6 conversation with Mr. Robert Buchanan. [Grievant ] has a seizure disorder. He has just started taking Dilantin to try to get the seizures under control. I think that it is too early to decide whether or not the Dilantin is working. I would like to ask that [Grievant ] be put on medical leave until I next meet with him at the Cleveland Clinic. After I talked to Mr. Buchanan, I checked on [Grievant's ] schedule, and I found out that I am scheduled to meet with [Grievant ] on November 19. I shall send you a report by FAX and by mail after that.

Based on Dr. Goren's recommendation Grievant was placed on medical leave. Before the November 19 examination Mr. Buchanan called a meeting with Grievant and the Union concerning Grievant's entries on the medical examination form dated June 12, 1987, four years earlier. Buchanan said Grievant had intentionally falsified Company documents so he was subject to immediate dismissal under Company Rule No. 26.

On November 19 Dr. Goren had another letter faxed and mailed to the Company stating as follows:

> Dear Mr. Depompei [Manager, Human Resources ]:
>
> I am writing about my November 19 visit with [Grievant ].
>
> His electroencephalogram was normal. He is now taking Dilantin to prevent further spells.
>
> In my opinion [Grievant ] may return to work as long as he doesn't climb heights for now.
>
> Sincerely yours,

With that letter Dr. Goren sent his case notes dated November 19, 1991:

> [Grievant's ] electroencephalogram was normal. I discussed this with him. I told him that I remain concerned about his climbing heights, given his history of passing out. When he asked, I told him that I have no objection to his returning to work as long as he doesn't climb heights for now, and I told him that I would send out a letter about this.
>
> He is now taking Dilantin 100 mg, three capsules at bedtime. He is getting over the nausea that he had initially. He has had no spells since I last saw him.
>
> We'll get a blood phenytoin, and I'll write to him.
>
> I dictated a letter.

On November 21, 1991 Grievant was told by the Human Resource Management that the Engelhard Company had decided to terminate his employment "for intentionally misrepresenting information and falsifying documents requested by the Company in violation of Plant Rule 26."

**Exhibit 28**

## Evaluation and Conclusions

### I. Framework of the Case

Two different employee relations processes are involved in this arbitration--hiring and employment. In both processes the Employer's actions are limited by external forces, including law. The employment relationship is also limited by the terms and conditions of employment for bargaining unit employees negotiated with the Union.

Grievant entered an employment relationship with Harshaw after the 1987 application and examination. Several years later Grievant was in an employment relationship with Engelhard. Whether that relationship was the same begun with Harshaw or was a successor relationship as a result of change of ownership is not clear from the record. More clear is the fact that contemporary contractual responsibilities and rights at the time of Grievant's discharge were as provided in the contract between the Union and Engelhard. One of the terms of that contract permits Engelhard to discharge for just cause. Of course, a discharge is subject to the grievance and arbitration procedure.

It is well established that an Employer may reasonably promulgate and enforce rules of conduct for its employees. In this case Grievant was discharged for violation of one such rule.

### II. Summary of the Company's Contentions

The Company asserts the existence of "just cause" for the discharge based on Grievant's alleged "misrepresenting information and falsifying documents requested by the Company in violation of Plant Rule 26." The Company argument has four premises:

> A. ". . . Grievant admitted that he falsified the Report of Medical Examination." **[*245]**
>
> B. "As a result of the. . . falsification he created a potential hazard for himself and his coworkers."
>
> C. "The application of Plant Rule 26 was reasonable in this case."
>
> D. "No circumstances mitigate the falsification."

The Company had the burden of proving the contentions critical to its claim of just cause.

### III. As explained below the Company's basic argument and the premises supporting it have not been shown.

a. The alleged violation of rule 26: Engelhard's General Rules were issued on November 20, 1990. Rule 26 prohibits any employee from falsifying an Engelhard report or record. An employee who does violate the prohibition is "subject to immediate dismissal." The specific action by Grievant on which the Company relies are entries written by him on the physical examination form he was required to submit on June 12, 1987 before he became an employee. Those entries were made on a Harshaw form--not on an Engelhard report or form--two years before Engelhard acquired the Elyria Plant and more than three years before Engelhard issued the General Plant Rules which included Rule No. 26. When Grievant wrote the entries in 1987 he was not an employee of either Harshaw or Engelhard. For these practical, albeit technical reasons, Grievant could not be held to have violated Rule 26 of Engelhard Plant rules for Employees or of the Harshaw Rules for its Employees.

**Exhibit 28**

b. The Company did not have a reasonable basis to discharge Grievant for falsifying a report or form: Before considering the specific facts in this case it is relevant to review briefly the five discharge situations cited in the Company's brief. In two of those situations the Company discharged employees for giving false report of an injury at work. There was no question they were employees and had violated Harshaw's Rule 26. One of the employees submitted a case claiming discharge was too severe. The Arbitrator did not accept the employee's contention that discharge was too severe for the admitted violation of Rule 26.

In 1987 Arbitrator Teple found that Harshaw had just cause to discharge an employee who made a dishonest report so as to obtain seven hours pay to which he was not entitled.

One case cited by the Company did involve Engelhard. In a 1990 case Arbitrator Cohen found just cause but not on the basis of Rule 26. Arbitrator Cohen found that the Grievant in that case failed to fulfill a duty stemming from Article 8, Section 4 of the Labor Agreement to cooperate in a Workmen's Compensation case by failing to provide a release of his medical file.

The last case cited by the Company involved an employee discharged by Harshaw in 1981 for fighting. Initially the Company suspended the employee five days ending June 15, 1981. On June 18, 1981 Grievant was told that he was discharged for "fighting which is in violation of Plant Rule 27." The Union filed a grievance arguing that the Company did not have just cause to discharge because the Grievant had already been punished for the incident. In the third step of the grievance procedure the Company changed the reason for discharge to falsifying his Harshaw Employment Application, not for violation of Rule 26. Arbitrator Cohen found the employee had stated falsely that he had not been convicted of any crimes whereas in fact he had been convicted of several felonies, incarcerated in a state penitentiary, convicted and sentenced for numerous serious traffic offenses and had misrepresented his work history. The Company based the discharge on a statement signed by the employee on the Harshaw employment form which stated, "Misrepresentation or material omissions made by me will be considered sufficient cause for discharge."

In the 1981 case the Company did not rely on the Harshaw equivalent of Rule 26 in the Engelhard General Plant Rules. At arbitration the Union *argued* no just cause solely on the basis of the "double jeopardy" argument which the Arbitrator declined to accept. In any event, the decision was not based on Rule 26. In the case before the undersigned Arbitrator the Company relied on Rule 26, not on a certification statement on the 1987 Harshaw employment application.

Even if the Company had relied on the employment application statement the Company has not shown a reasonable basis to discharge Grievant for falsification. Falsify is "to make false as by lying or altering." There are two aspects. The person acting must state an untruth knowingly and with the intention of misleading the observer. The involved section of the physical examination form is headed "personal history and review of systems." Under each category a number of symptoms and/or problems are listed. For each the Grievant was to check "yes" or "no." The form did not provide instructions, explanation, definitions, clarifications, etc. about how to make entries. In particular there was no specification about the length or duration **[*246]** of the history. For these reasons the form was ambiguous and unclear. The Arbitrator takes notice that such forms commonly specify a period (e.g. "the last five years," and/or ask whether a diagnosis had been made by a doctor).

When the Company discharged Grievant the only evidence it had tending to show in any way that Grievant had "falsified" the entries under neurological was his statement that he had been told about 1978 that he was "epileptic" but "might outgrow it." The Company had no information about the person who had issued the statement, the basis of a determination, its reasonableness, reliability etc. Yet the Company used that account of a statement made 13 years earlier to conclude ". . . He should have checked 'yes' to the question on 'convulsions (epilepsy)'." That conclusion does not logically follow. Furthermore, the voluntary statement was too slender a reed; it was not clear and convincing evidence that Grievant had falsified.

Also, and contrary to the Company's statement in its brief, prior to his discharge Grievant did not admit any falsification on the physical examination form. Mr. Buchanan made that

**Exhibit 28**

conclusion or assumption based simply on the account of what Grievant had been told in 1978. Of course Grievant knew in 1987 that he had once experienced headaches, dizziness, etc. but not after 1978. He truly believed that he had "outgrown" such problems, in other words, that he had no longer had a condition which he believed many employers relied on to disqualify applicants. Under these circumstances his negative answers to ambiguous, imprecise questions were not clear and convincing evidence that he falsified with the intention of lying.

At most Grievant did not volunteer information which he considered irrelevant and subject to prejudicial use. He thought his answers within rigid lines were not lies although he avoided volunteering what he considered irrelevant information which might be used prejudicially to his disadvantage.

c. There is no persuasive evidence that Grievant created a potential hazard when he checked "no" for the neurological items: As indicated above, there was no evidence that during the period 1987 through 1991, Grievant endangered himself or anyone else. It is true that three years after his employment, Grievant developed an illness which could be a hazard if not treated. The same would be true of another employee that develops a heart condition, eye cataract, etc. But Grievant sought treatment and disclosed.

d. Mitigating circumstances: As stated above, in view of the ambiguity of the physical examination form, it is not clear that Grievant made a material misrepresentation or omission. At the same time, his action was not completely forthcoming. He frankly said he was suspicious that he would be disqualified if there was any mention of epilepsy, even though he had completely outgrown it, and thus he was careful to construe the questions narrowly within a recent time frame and give a minimal answer. Frankly, this Arbitrator believes a person who intends to begin an employment relationship should be completely honest if he is to merit a trusted situation. From that standpoint, this Arbitrator does not condone even the type of reluctance to be completely candid displayed by Grievant in this situation in 1987. However, the Arbitrator does believe that there are mitigating circumstances in this case.

The Company does not confront job applicants with questions as Harshaw did in 1987, possibly became of the impact and requirements of the Americans with Disabilities Act which became effective a few months after the Company acted in this case. The ADA now impinges on the kind and timing of such questions. This ADA challenge to such employer conduct reflects the widespread and oft documented practice of many employers to disqualify applicants who report any history of epilepsy and similar handicaps. In light of this history, Grievant's reply even if his "cure" had not been permanent as he believed, is understandable.

As already stated, in 1987, Grievant had a reasonable basis for believing that the "diagnosis" of epilepsy was something in his past without relevancy or true significance to his future employment. That belief seemed to be born out by his actual experience at Harshaw and Engelhard, where he did not have any physical problems in the nature of seizures, convulsions, etc. Grievant worked for three years after being hired without any demonstrable impact from the subject about which he had avoided revealing information.

Only after more than three years of employment did he "become sick." The new symptoms related to headaches and dizziness. When the symptoms appeared, Grievant behaved responsibly by making an appointment with a specialist by alerting his coworkers as to possible problems and how to handle them and by voluntarily coming to see the Manager of Human Resources to explain the problem. Shortly before, [*247] the Company had asked for persons to reveal any medical problems they might have. Grievant had held back pending discovery of reception given to disclosure by "John Doe" who had epilepsy. When Doe, who presumably had answered "no" on the medical form, was not disciplined, Grievant stepped forward.

The Company certainly became aware in 1991 that John Doe may have falsified his employment originally. Records of John Doe's employment application were available to the Company, and the situation had been brought to the Company's attention during the processing of the subject grievance, but the Company which had the records did not make

**Exhibit 28**

them available at arbitration. If the facts of the John Doe case were truly different the Company could have shown the evidence. In the absence of such production, the Union suggests an adverse inference should be accepted; the Arbitrator agrees. To discharge Grievant would be disparate treatment.

Several years ago, the Union and Company negotiated an agreement for drug and alcohol abuse. Quite possibly, an employee who comes forth voluntarily to disclose an illness is immune from discipline despite having failed to disclose the condition earlier during his employment application. It would indeed be ironic and disparate that employees such as Grievant who disclose past illnesses after working for years without apparent problems would be treated as subject to discharge.

Under the circumstances, the discharge of Grievant was without just cause and was arbitrary, unreasonable, discriminatory and excessive.

## Conclusion

The Company did not have just cause to discharge Grievant and should make him whole.

## AWARD

The grievance is sustained. The Company is directed to take the following action:

rescind Grievant's discharge;

correct Grievant's personnel records and make him whole for lost wages less monies Grievant may have received that he would not have received but for the improper discharge;

reimburse Grievant for expenditures for health insurance and/or medical expenses that would have been covered by Company paid insurance; and

consider Grievant for active employment subject to the availability of work consistent with Grievant's current medical limitations, if any, as established by neurological experts with due regard for reasonable accommodation.

The Arbitrator retains jurisdiction until March 1, 1993 solely to decide any disputes concerning compliance with this award.

**Exhibit 28**

R & EMPLOYMENT

# Arbitration Decisions

## Labor Arbitration Decision, CITY OF KANKAKEE, 51-390-0522-90B, 97 BNA LA 564

**Labor Arbitration Decision, CITY OF KANKAKEE, 51-390-0522-90B, 97 BNA LA 564**

Arbitration

In re CITY OF KANKAKEE [Ill. ] and INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 705,

AAA Case No. 51-390-0522-90B

June 10, 1991

Show Summary

Appearances: For the employer: Duane J. O'Connor, assistant corporation counsel. For the union: Martin Barr (Carmell, Charone, Widmer, Mathews & Moss), attorney.

Aaron S. Wolff

**Decision of Arbitrator**

**DRIVING UNDER INFLUENCE**

**Background Facts**

Grievant, G, was suspended on February 26 and discharged on February 27, 1990 by the City of Kankakee, Illinois (the "City" or "Employer") for allegedly driving a City snow plow while intoxicated. More specifically, the City's disciplinary letter states:[*565]

> "You were observed by Bob Larson and Gary Hammond to be driving a city vehicle in an erratic manner on February 24, 1990 at approximately 8:25 a.m. This was very dangerous to all traffic.

> "You were told to return to the shop immediately and Kankakee Police Officer Lt. Whitehead was there to test you for DUI. You were declared legally drunk."

A timely grievance was filed on March 5, 1990 which alleges in pertinent part:

> "I, G, am filing a grievance against the City of Kankakee in the unfair treatment in the incident that occurred to me on February 24, 1990. On this day, Bob Larson had assigned me to work.

> "There have been several other incidents that have happened to employees of the Department of Public Works, including management personnel drinking on the job, and also coming into

**Exhibit 28**

work intoxicated. These employees have never been suspended or fired.

"I feel my termination is unjustifiable and I should be put back to work in my proper seniority status with no loss of pay or fringe benefits. I also have made the appropriate arrangements to be admitted to a resolve center for treatment."

The grievance was duly advanced through the grievance procedure by the International Brotherhood of Teamsters, Local No. 705 (the "Union") and is properly before the Arbitrator.

The parties agreed that the issue is framed correctly as follows: "Whether the Grievant, G, was discharged for just cause [and ] if not, what should the remedy be?"

There are substantial disputes of material fact.

For the last 12 or 13 years of his 24 years of employment with the City's Department of Public Works, Grievant was an operator of sweepers, endloaders, backhoes, and trucks. He operated trucks primarily for snow removal duties. His supervisors at the time of his discharge were Bob Larson, Superintendent of the Public Works Department ("PWD") and Gary Hammond, Assistant Superintendent.

Mr. Hammond testified that on Friday, February 23, due to the special scheduling arrangements under the City's snow removal program dubbed "operation ROSE", Grievant and certain other employees were given the option of working for four hours on Saturday, February 24 in order to complete a full 40-hour week. Hammond did not remember Grievant's response to the offer but Grievant did report for work on Saturday.[1]

Hammond further testified that customarily Grievant and others reported to him for assignments at 8 a.m. but on February 24 he (Hammond) was on the streets in a City car headed in to the garage at about 8:15 when Larson advised by radio that he had just "pulled [Grievant ] over".[2] Hammond proceeded to Grievant's truck which was parked in the 400 block of North Entrance Street, arriving at about 8:30. Hammond got up on the running board and asked Grievant if he had been drinking and if he was "okay." Grievant answered "no" and "yes", respectively. But Hammond thought that Grievant was drunk and "asked" him repeatedly to get out of the truck, offering to driver him home without any (disciplinary) problems. Grievant replied that Hammond was "picking on him" and that he was "fine" and had not been drinking. Although Hammond thought that Grievant was drunk and was concerned about Grievant driving a 10-ton truck, he finally told Grievant to proceed to "Section 5", an area on the opposite side of town. Grievant said he would.

Hammond also testified that during this running board conservation, Superintendent Larson was parked in his car behind the truck. As Hammond proceeded to tell Larson about his conservation with Grievant, Grievant "floored" the truck, swerved into the southbound lane of traffic and then back to the northbound lane erratically. Hammond then ran to his own car, called Grievant by radio and said "10-19", meaning return to the garage.[3] Grievant obeyed and Hammond followed him in to the garage which was three blocks away. On his way in, Hammond called for a policeman to meet him at the DPW garage.

While Hammond and Grievant were in the garage office,[4] Lt. Whitehead entered. Hammond told the Lieutenant that he thought Grievant had[*566] been drinking and that he was trying to get him off the truck and asked the Lieutenant if he could do anything about it. The Lieutenant gave Grievant a "field sobriety test" but Grievant couldn't stand on one leg and was arrested and taken away in "handcuffs" after Hammond agreed to sign a complaint.

Hammond further testified that Grievant returned from the police station between 9:30 and 10:00 a.m., upset because he had to post a bond. Larson told Grievant he was in "big trouble" and should contact the Union.[5] Grievant replied that Hammond was prejudiced and always picking on him. At about 10:30, Hammond offered to drive Grievant home but Grievant declined.

Grievant testified that the incident on North Entrance Street on February 24 as alleged by Hammond never occurred. His truck was not pulled over on North Entrance by Larson and

**Exhibit 28**

Hammond never got up on his running board. Instead, as Larson directed him at about 8:00 a.m., Grievant checked out a truck and proceeded on his regular snow route. He drove north on Entrance Road to Brookmont, then across Highway 50 to Grinnell Road. His truck contained a functional radio which was switched on, but the volume was turned down. After 15-20 minutes he turned up the radio and heard Hammond direct him to report to the garage.

Grievant drove to the garage and walked inside where he met Lieutenant Whitehead of the Kankakee Police Department. Whitehead told him he had received a call that he had been drinking and was taking him to the station to be tested. Whitehead performed no field test for sobriety such as asking him to stand on one foot. At the station Grievant was given a breathalyzer test. The test printout indicated a blood alcohol concentration ("BAC") reading of .27, nearly three times the legal limit of .10.[6]

Police Officer James Vickery, a qualified breathalyzer operator, testified that he administered the breathalyzer test to Grievant at about 9:45 a.m. on February 24, 1990 in the presence of Lieutenant Whitehead. Prior to giving the test, Vickery observed Grievant for about 20 minutes and then was of the opinion that Grievant was intoxicated due to his "very slurred" speech, his being "very confused" at times, and because his breath smelled "heavily of alcohol".

Officer Vickery also testified that there are limits on the accuracy of breathalyzers although he did not know what those limits were. They're also "not perfectly reliable" and occasionally "give false readings". Grievant's test result, .27, was "high". The highest reading on the breathalyzer is .34 and at that point the person tested is "very close to death". A person with a reading of .27 is "very intoxicated" and intoxication at that level should be detectable by a "layman". In Vickery's opinion, Grievant's test result was not a false reading but wholly apart from the breathalyzer test it was his opinion, based on his experience and observations, that Grievant was under the influence of alcohol.

Based on the breathalyzer test and his own observations and conclusions, Lt. Whitehead issued a sworn report that he had "reasonable grounds to believe" that Grievant was driving under the influence of alcohol ("DUI") in violation of the Illinois vehicle code (Section 11-501.1) and accordingly issued a complaint and citation to Grievant whose license was summarily suspended on March 9, 1990, effective April 11, 1990.

Grievant was never tried or found guilty on the DUI charges which were eventually dismissed. On March 19, Grievant petitioned a court to rescind the statutory summary suspension of his license on all of the following grounds:

> "I was not properly placed under arrest for an offense as defined in Section 11-501 of The Illinois Vehicle Code * * *, as evidenced by the issuance of a Uniform Traffic Ticket or other form of charge;

> "The arresting officer did not have reasonable grounds to believe that I was driving or in actual physical control of a motor vehicle while under the influence of alcohol, * * *;

> "I was not properly warned by the arresting officer as provided in Section 11-501.1 of The Illinois Vehicle Code;

> "I did not refuse to submit to and/or complete the required chemical test or tests, pursuant to Section 11-501.1 of The Illinois Vehicle Code, upon the request of the arresting officer;

> "I submitted to the requested test(s) but such test(s) did not indicate a blood alcohol concentration of 0.10 or more."

On April 30, the State "confessed" Grievant's petition and on May 29, 1990 the court dismissed the case, making this notation and order:

> "5-29-90 Case called. Defendant present with Counsel. People by Herzog. Defendant's Attorney moves to dismiss on the grounds the

**Exhibit 28**

> State confessed the petition to rescind Statutory Summary
> Suspension, and grounds no probable cause among others. State
> objects. Motion allowed. Cause dismissed. Bond ordered returned
> to defendant * * *."[*567]

The State's motion for *reconsideration* was also denied on June 25, 1990. The reason(s) for the State's "confession" of the petition is (are) not disclosed in the arbitration record.

After being terminated, Grievant sought and obtained treatment for alcoholism from the Parkside facility located in Manteno, Illinois. There, he underwent intensive 28-day in-house counseling until his release on April 4. Afterwards, he continued for 90 days to receive weekly counseling at Riverside Medical Center in Kankakee. For 90 days after that he attended Alcoholics Anonymous ("AA") meetings about once a week. He still attends AA "once in a while".

The record also shows, based on his own testimony, that he has been a consumer of alcohol for several decades and apparently had one prior DUI arrest in 1978 which he did not remember. On the night of February 23, 1990 he was drinking at a card party at his house but slept from about 1:00 to 5:30 a.m. before he decided to report for work on Saturday, February 24, 1990. [7] He last consumed alcohol (1 or 2 beers) about two weeks before the arbitration hearing. He is aware that experts say that: (1) "there is no cure for alcohol addiction" and that (2) "you have to continuously attend Alcoholics Anonymous" although that has not been recommended to him. It was his decision not to attend AA anymore on a regular basis, believing that he "could control it" himself. He now attends AA once or twice a month.

There is also evidence in the record concerning other PWD employees who allegedly have had alcohol problems and the manner in which the City treated or disciplined them. This evidence and the issue to which it relates -- alleged disparate treatment of Grievant -- will be elaborated on in the "Discussion" which follows.

### Discussion

In its post-hearing brief the City contends that:

> " * * *, little direct evidence was presented by the Grievant relating
> to rebutting or contradicting the City's reason for [his ] discharge *
> * *, namely the operation, while on duty, of a City owned vehicle on
> a public street while under the influence of alcohol.

> "Rather * * *, Grievant instead presented most of his evidence on
> the alleged existence of other employees whom he believed,
> speculated or guessed to be under the influence while on duty in
> the employ of [DPW ]. Even assuming the accuracy and relevance of
> this evidence, there was absolutely no credible evidence that the
> Employer ever knew or should have known, that any of these other
> employees ever operated a motor vehicle on a public road while
> under the influence of alcohol. Grievant also apparently believes
> that there is some mitigation or redemption in his having
> voluntarily enrolled himself in a alcohol abuse/cure program. The
> testimony established that subsequent to enrollment in the
> program, the Grievant has maintained minimal involvement in the
> program and has continued to consume alcohol.

> "At hearing, the City proved by a preponderance of evidence, the
> standard of proof in this cause, that the Grievant operated a motor
> vehicle with blood alcohol concentration substantially in excess of
> .10 while on duty in violation of Illinois Revised Statutes 1989,
> Chapter 95 1/2, Section 11-501, et. seq. Any other claimed issue by
> the Grievant is simply a smoke screen, and a distraction from the

**Exhibit 28**

simple point of the case. That simple point is, that the Grievant chose, keeping in mind that he was under no obligation to work on the relevant date, to report for duty while under the influence of alcohol and then proceeded to operate a ten-ton truck on City streets, which were presumably in a hazardous condition following a snow storm. It is patently obvious that the Grievant had no concern either for his own safety or that of other motorists. Whether the City had a policy requiring discharge, when an employee reported for duty while under the influence, is really of no consequence so far as this individual is concerned, as he violated a quasi-criminal State Statute while on duty.

"If the Grievant [claims ] that he should be accorded a second chance or some rehabilitative process, that * * * places the City in a untenable situation. If the Grievant is placed back on the job and a second similar incident occurs, this time with an injury to a third party, the City would then have absolutely no credible defense to the injured parties claim that the City knew or should have known that the Grievant had a proclivity to operate motor vehicles while under the influence and on duty.

"Regardless of the implied claim for rehabilitation, the evidence conclusively indicated that the City had no rehabilitation program or policy in effect at the time of occurrence. In fact Grievant's belief that the City had paid for his in-patient alcohol treatment, upon close inspection established that his own Union Local 705 had in fact paid for same."

The Union's post-hearing brief makes these contentions:

(1) Since Grievant was charged with conduct which also constitutes a criminal offense, the City must prove its case "beyond a reasonable doubt". [8]

(2) The City failed to prove (beyond a reasonable doubt) that Grievant was [*568] under the influence on February 24, 1990.

(3) Even if Grievant was under the influence on February 24, the City's discharge of him amounts to "disparate treatment" since other DPW employees have reported for work under the influence and none was discharged or even suspended. In elaborating on this point, the Union observes:

"Yet, A, H, and C, unit employees who all had driving duties, all had lengthy absences from duty in order to correct drinking problems. The Union acknowledges there is no direct evidence that the City was aware any of these men had operated a City vehicle during work hours while under the influence. However, while a unit employee, Hammond suspected that A at times operated a vehicle while under the influence. A also was caught at least once when reporting for duty under the influence. On that occasion he was sent home, and probably received a written warning. H slept off his drinking bouts in the City garage, causing great concern to superintendent Schneider. * * *. It strains credulity to suggest that these men, whose duties involved the regular operation of motor vehicles, never operated a vehicle under the influence, or that when it happened, the City was unaware of it."

In this respect the Union also urges the Arbitrator to draw inferences adverse to the City because of the latter's refusal to produce its records concerning those three employees and to conclude that "the records, if produced, would have supported the Union's claims that the City does not have a policy of discharging employees who report to work under the influence or operate a City vehicle under the influence and has treated other employees more leniently than [Grievant ]." [9]

**Exhibit 28**

The Union further suggests that:

> "The City treated [Grievant] more harshly as a result of the personal differences between [him] and Hammond * * *. The record is replete with references to their conflict, which arose soon after Hammond became a supervisor. Indeed, Hammond showed his animus toward [Grievant] by calling the police even though he knew [Grievant] was complying with his order to return to the garage and by asking Whitehead for help getting [Grievant] off the truck even though [Grievant] was already off he truck and standing in the office with Hammond."

(4) The Union also contends that considering Grievant's "long service and clean record", discharge was too severe and not for just cause, observing:[10]

> "The Union does not dispute that operation of a motor vehicle while under the influence of alcohol is a serious offense. However, in circumstances such as these, where the grievant has a record of long service (24 years), satisfactory work performance, and virtually spotless disciplinary and attendance records, arbitrators historically hold that discharge for a first offense of working while under the influence is not for just cause. [sup 1] [sup 0] " [sup 1] [sup 0] [Grievant's] recent warnings for overstaying his breaks were so insignificant the City didn't bother to introduce any details concerning them. There is no evidence of any other discipline of [Grievant] in his 24 years of employment."

Finally, the Union urges the arbitrator to take note of Grievant's "post-discharge rehabilitation".[11]

For the reasons set forth below, it is my opinion that the City did not have just cause to discharge Grievant. However, Grievant's reinstatement poses special problems and must be conditional.

First, in my view, neither party has stated correctly the standard of proof required of the City to establish that Grievant was under the influence of alcohol while driving the truck on February 24th. This is an important and recurring issue in arbitration on which I have expressed my views in a 1984 published award [12] and more recently and extensively in a 1990 unpublished award. The latter award involved numerous employees of a public utility who were discharged for theft of company property. About ten cases resulted in arbitration awards with ten different arbitrators (all NAA members) and all reached the same conclusion as did I on this issue. With slight modification this is what I said in that unpublished award (pp. 31-4):

> "Before setting forth my reasoning as to the merits, there is another important issue to be resolved: the standard or quantum of proof by which the Company must establish the alleged wrongdoing in a case of this character--discharge for acts which also would be criminal and which carry such opprobrium that an employee's prospects for future employment may be seriously diminished. In order of strictness, there are three possibilities:
>
> Proof of guilt--
>
> 1) beyond a reasonable doubt,
>
> 2) by clear and convincing evidence, or
>
> 3) by a preponderance of the evidence.*
>
> "When the degree of proof issue was mentioned during the hearing, the Arbitrator stated that he follows the 'clear and convincing' standard.** Understandably, the[*569] Union has

**Exhibit 28**

striven in its post-hearing brief to change my view on this issue, citing authorities and cases to support its position that the proof here must establish the alleged theft and similar serious misconduct 'beyond a reasonable doubt'.*** "* The Illinois courts consider the meaning of the first standard so clear as to not warrant a jury instruction. See Illinois Pattern Jury Instructions--Criminal 2.05. The second standard seems just as clear. Under the third, least strict standard, the party having the burden of proof must show that his position is more probably true than not true. Illinois Pattern Jury Instructions--Civil 21.06. As to all three standards, see generally, McCormick, On Evidence (2nd Ed. 1972), Sections 339-341.

"** My views on this issue are set forth in Chicago Transit Authority, 84-1 ARB Para.8074, p. 3338, fn. 5 cited, of course, by the Company, along with other cases following that view: General Telephone of *California,* **73 LA 531**, 533 (1979 ); Olin Corp., **63 LA 492** (1974 ); Flintkote Co., **49 LA 810** (1967 ); Southern Greyhound Lines, Inc., **43 LA 113** (1964 ); Service Trucking Co., **41 LA 377** (1963 ); and Kroger Co., **79 LA 468**, 472 (1982).

"*** General Refractories Company, **24 LA 470**, 481 (1955 ); [ National Electric Coil, **46 LA 756**, 760 (1966 ) ]; Owens-Corning Fiberglass Corp., **48 LA 1089** (1967 ); Grocers Supply Company, Inc., **59 LA 1281**, 1283 (1972 ); Dunlop Tire and Rubber Corporation, **64 LA 1099**, 1102 (1975 ); Daystrom Furniture Company, **65 LA 1157**, 1163 (1975 ); Eastern Associated Coal Co., **66 LA 1063**, 1064 (1976 ); Elkouri, How Arbitration Works, (4th Ed., 1985), p. 663; Continental-Indianapolis, Inc., **78 LA 409**, 415 (1982 ); [ Todd Pacific Shipyards Corp., **72 LA 1022** (1979 ]; and [ Armour-Dial, **76 LA 96**, 99 (1981 ) ]. Actually, three of the above cases that I have bracketed indicate that the test is 'clear and convincing evidence' or do not require proof beyond a reasonable doubt.

"I have reviewed the pertinent authorities and reconsidered my long-held, published views, but remain convinced that the 'clear and convincing' standard is the appropriate one here.

"The genesis of the 'beyond a reasonable doubt' ("BARD") standard in arbitration is murky. Benjamin Aaron, a distinguished professor and arbitrator, wrote 33 years ago in Some Procedural Problems in Arbitration, 10 Vanderbilt Law Rev. 733, 740 (1957):

'The origins of this artificial dilemma are obscure, but a good case can be made for the theory that it results from the historic conquest of common sense by rhetoric. On some occasion in the faraway past an arbitrator, momentarily intoxicated by his own eloquence, referred to the discharge of an employee as "economic capital punishment." Unfortunately, the phrase stuck and is now one of the most honored entries in the Arbitrator's Handy Compendium of Cliches. A sentence of death is, of course, almost invariable associated in people's minds with a verdict of guilty beyond a reasonable doubt, a fact that has been systematically exploited in arbitration cases arising out of alleged wrongful discharges of employees. Indeed, the criminal-law analogy, of somewhat dubious applicability even in this restricted form, has been argumentatively extended in some cases far beyond the reaches of logical thinking. The contention is occasionally made, for example, that since discharge equals economic capital punishment, it follows that: (1) the employee must be deemed innocent until proved guilty; (2) the employer must prove his guilt beyond a

**Exhibit 28**

reasonable doubt; and (3) all doubts must be resolved in favor of the employee. Sometimes the argument goes one step further: (4) the same reasoning should apply to all disciplinary actions of the employer because these may ultimately lead to discharge.'

While he considered some of this 'pure drivel' (Ibid), he then believed that the BARD standard should apply in cases of 'moral turpitude' such as 'stealing', 'aberrant sexual practices' or 'subversive activities' (Id. at 741-2).

"However, in more recent times, Arbitrator Aaron has *modified* his view even as to theft cases. Thus, in *Armour-Dial, Inc.,* **76 LA 96**, 99 (1981 ), he wrote:

'I agree with the Union that a discharge for theft has such catastrophic economic and social consequences to the accused that it should not be sustained unless supported by the overwhelming weight of evidence. Proof beyond any reasonable doubt, even in cases of this type, may sometimes be too strict a standard to impose on an employer; but the accused must always be given the benefit of substantial doubts. Such doubts are present in this case--on both sides of the question.'

"While there are still respectable arbitrators who apply BARD in moral turpitude cases, by my reckoning in 1984, the better and more prevalent view of arbitrators was that 'clear and convincing' evidence was sufficient in any case.

"Significantly, not one of the other six arbitrators who rendered awards in these theft cases [four other awards were rendered after mine and they too used the 'clear and convincing' standard of proof ] required proof beyond a reasonable doubt. Perhaps even more significant is the fact that in five of those six cases, the arbitrators (even though one 'suspected' the guilt of the grievant) could not sustain the discharge under the 'clear and convincing' standard of proof. This clearly suggests that the latter measure is strict enough and a fair, reasonable and evenhanded measure as to all parties concerned with the arbitration process.

"Finally, it must be remembered that while an employee may lose his job and have difficulty in finding another as the result of being discharged for theft or other serious criminal conduct and in that economic sense receives 'capital punishment', it is not the same kind of 'capital punishment' that a criminal receives where his very life and liberty may be taken away. The basic justification for the BARD standard in criminal cases is that our civilized society it is better that on occasion a wrongdoer may go free rather than an innocent person be deprived of life or liberty.* Since an employer who discharges an employee is not depriving him of life or liberty, there is no comparable reason to require the strictest standard of proof. The analogy of 'economic capital punishment' is thus faulty and carried too far.[*570]

"Moreover, while the guilty criminal wrongdoer who escapes conviction under the BARD standard, returns to 'society' generally, here the wrongdoer would have to be returned to a specific, private employer-employee relationship. That relationship, it must be noted, is one in which the employer also has rights under a collective bargaining agreement which must also be weighed. If the parties want a stricter (or more lenient) standard of proof in certain kinds of discharge or discipline cases, they should so state in their contract." [13]

**Exhibit 28**

"* McCormick, On Evidence (2nd Ed. 1972), Section 341, pp. 798-9.

Applying the clear and convincing standard of proof, I find that Grievant did report for work and drive the City's truck on February 24, 1990 while under the influence of alcohol. The Union's contrary argument must be rejected for these reasons, among others:

1) Grievant admitted drinking five or six beers from 9:00 p.m. to midnight on February 23 before reporting to work.

2) Grievant's testimony that he was not pulled over by Larson or have a "running board" conversation with Hammond on North Entrance Street is either unbelievable or evidence that he was so intoxicated that he did not remember the events or both.

3) Most importantly, I find credible the testimony of Mr. Hammond, Lt. Whitehead and Officer Vickery, that Grievant gave numerous symptoms of being intoxicated: he smelled of alcohol, he couldn't stand on one foot, his speech was slurred and confused. The police officers in particular, from their job experience, have more than a layman's ability to detect persons under the influence and I have no reason to doubt their testimony or second guess their opinions, based on their personal observations, that Grievant was intoxicated. The Union does not suggest, and there is not the slightest evidence, that the police officers were engaged in any conspiracy with the City and against Grievant.

4) The results of the breathalyzer test showed that Grievant, at about 9:45 a.m. on February 24, 1990, had a BAC (Blood Alcohol Concentration) of .27. That is almost triple the .10 BAC considered under state law sufficient to presume the subject is under the influence of alcohol. Ill. Rev. Stat. ch. 95-1/2, Para.11-501.2. At a reading of .34, the highest reading the City's breathalyzer can yield, the person tested is "close to death" according to Officer Vickery who also said that at Grievant's reading of .27 his intoxication "should be fairly detectable by even a layman."

The City's breathalyzer machine was duly tested on a regular basis and the Union has offered no meaningful evidence that the test given to Grievant was unreliable or inaccurate. [14]

As already indicated, I am not persuaded by Grievant's self-serving testimony that he was not intoxicated on February 24, 1990.

In short, I am "clearly convinced", on the entire record before me, that Grievant was under the influence of alcohol when he reported for work and drove the City's truck on February 24, 1990.

Although I find that Grievant reported to work and drove a snowplow while under the influence of alcohol, I am not persuaded that there was just cause to discharge him.

The City's own testimony establishes that when Grievant reported for work on February 24, it should have been obvious even to a layman that Grievant was intoxicated. Yet Supt. Larson sent him out on the street in a snow plow. Almost 15 minutes later, Assistant Supt. Hammond made radio contact with Grievant and promptly suspected from Grievant's brief but slurred response that there was a problem. Larson and Hammond then went looking for him.

Shortly thereafter, Hammond had the "running board" conversation with Grievant. This was the first time that morning that Hammond saw Grievant. As a result of that conversation, Hammond thought that Grievant was "drunk" and "under the influence." While Hammond was "worried about [Grievant ] being in a ten ton City truck being drunk" and "wanted him off the street", what did Mr. Hammond do? He told him to go to work in Section 5, an area which would require Grievant to drive to the opposite side of town ] When Grievant drove off -- into the opposing traffic land -- Hammond told Grievant to drive to the garage only a few blocks away, and Grievant complied promptly where he was arrested and then discharged for driving while under the influence.

It strikes me as fundamentally unfair to discharge Grievant for driving a City vehicle when his supervisor had just directed him to so so even though the supervisor believed that the

**Exhibit 28**

employee was drunk. This is especially so since Mr. Hammond also testified that if Grievant had not driven the truck[*571] further and went home, there would have been no disciplinary problem.

Nor I am persuaded by Mr. Hammond's implied testimony that there were no reasonable alternatives available such as his getting in the truck and driving it to the garage which was only about a block away, or removing the key from the ignition, or using his car and Larson's to block the truck. But why Hammond told Grievant to drive across town instead of to the garage only a block away is mystifying. I believe that Mr. Hammond could have prevented Grievant from driving off in the truck after their "running board" conversation, and that Hammond's order to drive across town, and then arrest and discharge him for doing so while intoxicated, prevents me from finding that such event provides just cause for discharging Grievant. While the defense of "entrapment" would not have been available to Grievant on a criminal DUI charge, [15]

still there is a similar element of entrapment here since Hammond not only "induced' Grievant to drive while believing him to be intoxicated, but directed him to do so. The underlying injustice that gives rise to the defense of entrapment also supports my gut feeling that some injustice was done here and my ultimate conclusion that the discharge lacked "just cause."

Also militating against finding just cause for discharge is the fact that Grievant had 24 years of virtually unblemished service. He had never been suspended before for any reason. He had accumulated a sick day balance of thirty-two (32) days at the time of his discharge, which was above average, and had never been warned or disciplined for his attendance.[16]

The only discipline Grievant received prior to his discharge concerned several oral or written warnings issued by Hammond during Grievant's last year of employment, Hammond's first year as supervisor, for allegedly overstaying rest/lunch breaks. There is no contention or evidence that his work was deficient in any way.

In this respect, it is also important to note that the record does not contain the "rules or guidelines" relating to the reason for the discharge, even though such rules apparently exist. Nor does the record reveal any rule, guideline or practice under which the City may discharge or has discharged any employee for the first or subsequent offense of reporting or working while under the influence of alcohol.

On the other hand, there is some evidence in the record suggesting that since 1983 or 1984, several employees have displayed alcoholic problems at work, that they were not discharged or disciplined and some were allowed leaves of absence for rehabilitation. Even though there is no evidence that management actually observed any of those employees driving City vehicles while under the influence, I do not regard those cases as differing in substantial degree from this one since Grievant was observed driving under the influence only after his supervisor, believing Grievant to be intoxicated, directed him to drive.

Therefore, it is not inappropriate to consider Grievant's case in the same light of other City employees who apparently have reported for work while under the influence of alcohol but who were never observed by management operating equipment while in such condition. The undisputed testimony of former Union Steward Lake Keys shows that at least three other employees had alcohol problems displayed on the job and they were not disciplined but instead allowed to seek alcohol rehabilitation. Thus, H, was allowed to sleep in a truck because he had been drinking. A was sent home from the garage by a supervisor who believed A was under the influence of alcohol and would be dangerous if allowed to operate his grading equipment. Mr. Keys also related how he and Hammond (who was then in the bargaining unit) complained in 1989 to management about a supervisor (Douglas) who was under the influence, driving a City vehicle, and harassing employees but no discipline was taken against the supervisor.

Grievant also testified that the had observed H several times sleeping in a truck before going on duty because H had been drinking. Grievant also said he observed employees C, H, A and G working while under the influence. It appears that none of these employees was suspended or discharged and some took time from work for treatment and rehabilitation. [17]

**Exhibit 28**

Mr. Hammond's rebuttal testimony basically was that none of the persons mentioned by Keys or Grievant was [*572] observed by management driving equipment while intoxicated. On this record, there does seem to be some disparity in disciplinary treatment of employees suffering from alcoholism. This factor, along with the others discussed above, compel my finding that Grievant's discharge lacked just cause.

Finally, there is the question of the appropriate remedy.

Immediately after his discharge, Grievant obtained treatment and counseling for his drinking problem, a problem which appears to be a long-term one even though it did not seem to manifest itself before in the work place by attendance, poor workmanship or related problems which are frequently associated with alcoholism.

While Grievant has taken an important first step in the alcohol rehabilitation process by seeking guidance and counselling, as recently as two weeks before the arbitration hearing, Grievant was still drinking. His attendance at Alcoholics Anonymous had dropped from weekly to once or twice a month. Clearly, Grievant still has drinking problems. While he may never be cured of the disease of alcoholism, he may learn to bring it better under control. Indeed, he must do so in order to return to work and keep his job.

Under his job with the City, he operates heavy equipment. The City, very understandably, is concerned that Grievant could repeat the events of February 24, 1990 and next time injure himself or some fellow employee or member of the public and expose the City to liability for injuries.

Accordingly, Grievant's reinstatement shall be subject to the following conditions:

1) Grievant shall promptly present a copy of this Award to the Parkside Clinic and consult with them. If Parkside finds that Grievant should have further treatment or counselling there or at Riverside, Grievant shall freely and fully participate in it.

2) If either Parkside or Riverside recommend that Grievant should attend Alcoholics Anonymous (or any other support group) on a regular basis (whether weekly, twice a week, twice a month or otherwise) for a specific or indeterminate period of time, Grievant shall do so.

3) At the City's request Grievant shall furnish evidence periodically that he has been attending all counselling, treatment and support group sessions as required or recommended by Parkside or Riverside.

4) Grievant shall be reinstated immediately after he presents a certificate or release from either Parkside or Riverside which states that he is able to return to work.

5) Grievant's reinstatement shall be with all Contract benefits and seniority rights but without back pay. However, this Award shall not be deemed a limitation on Grievant's right to past Vacation or Sick pay under Articles VIII and X of the Contract.

6) The City, at any time or times, may require the Grievant to report, at the start of each shift he works, either to a designated supervisor or any other employee it designates in order to reassure itself that Grievant is reporting in condition fit to work. If, at any time, the City has reasonable grounds to believe that Grievant is under the influence of alcohol while at work, it may also advise him in the presence of a Union representative and require him, in the presence of a Union representative, to take a breathalyzer test.

7) If Grievant fails to comply with the conditions of his reinstatement or permits his alcoholism to reflect itself while on the job, the City may impose appropriate discipline, including discharge.

8) Unless either party objects in writing within 30 days from the date of this Award, the Arbitrator will retain jurisdiction for 180 days from the date of this Award to resolve any unforeseen issues as to the remedy.

**Exhibit 28**

**AWARD**

For the reasons set forth in the Opinion the grievance is sustained in part and denied in part. Grievant shall be offered reinstatement under the terms and conditions specified in the Opinion which terms and conditions are incorporated in this Award as if specifically set forth herein.

Unless either party objects in writing within 30 days from the date of this Award, the Arbitrator will retain jurisdiction for 180 days to resolve any unforeseen issues as to the remedy.

---

**fn** 1

Grievant testified that on Saturday at 8 a.m. he reported to Superintendent Larson who told him to get a truck and go on "the snow removal route" and that "when Hammond comes in, to report back to the garage, that [Hammond] would give [him his] assignments." Grievant then went out on his "regular snow route." There is no dispute that Saturday was not a regularly scheduled work day and Grievant was not required to work it.

**fn** 2

Hammond also said that after arriving at the garage at about 8:15 a.m., he had a brief conversation with Supt. Larson during which Larson said nothing as to Grievant's condition. Between 8:15 and 8:30, Hammond called Grievant by radio and told him to proceed to Section 5 to meet another truck being driven by Shawn. Hammond became a little suspicious of Grievant because Grievant seemed confused as to where Area 5 was and his speech sounded slurred. When the other driver (Shawn) reported that Grievant failed to meet him in Section 5, Hammond then advised Larson about his suspicions and they went looking for Grievant. Larson found him on Entrance Avenue, only a block away from the garage, and called Hammond to come over.

**fn** 3

Hammond also stated that it was Larson who gave Grievant the "10-19" to return to the garage.

**fn** 4

Hammond did not remember seeing Grievant walk from his truck to the office.

**fn** 5

Superintendent Larson was discharged by the City in May, 1990 (for reasons that do not appear of record) and he was not called as a witness.

**fn** 6

Ill. Rev. Stat. ch. 95-1/2, Section 11-501(a)1.

**fn** 7

The City points to the "findings" of an unemployment compensation referee that Grievant "had been drinking at an all night party he held which ended only three hours before he came in to work at 8:00 a.m.

**fn** 8

On this point it cites: F. & E. Elkouri, How Arbitration Works, pp. 662-3, (4th Ed. 1985); Dobbs Houses, Inc., **78 LA 749** (1982 ); Air Force Logistics Command, **75 LA 597** (1980 ); Holiday Markets, Inc., **77 LA 649** (1981 ); and The Holliston Mills, Incorporated, 73-1 ARB Para.8177 (1973).

**Exhibit 28**

**fn** 9

In this respect the Union cites How Arbitration Works at 310, which quotes Arbitrator Saul Wallen in *American Tel. & Tel. Co.,* **6 LA 31**, 43 (1947 ); and also Piscataway Township Board of Education, **74 LA 1107**, 1110 (1980 ), Vickers Petroleum Corporation, **73 LA 623**, 625 (1979 ) and Pettibone Corp., **70 LA 383**, 387 (1978).

**fn** 10

In this respect the Union cites: *Signal Delivery Service, Inc.,* **86 LA 75**, 80 (1985 ); Evansville State Hospital, 69-2 ARB Para.8585; Delta Refining Company, 82-2 ARB Para.8395; and Charleston Naval Shipyard, 70-1 ARB Para.8301.

**fn** 11

Citing Ohio River Company, 84-2 ARB Para.8393.

**fn** 12

Chicago Transit Authority, 84-1 ARB Para.8074.

**fn** 13

Such contract provisions do exist. See State University of *New York,* **74 LA 299**, 300 (1980).

**fn** 14

The fact that the DUI charges were dismissed in court, after the City confessed Grievant's petition to vacate the suspension of his license, does not establish the invalidity of the test.

**fn** 15

See R. Hunter, Trial Handbook for Illinois Lawyers (4th Ed. 1972), Section 15:2.

**fn** 16

Under the Contract employees are allowed twelve (12) sick days per year and permitted to accumulate up to 120 calendar days.

**fn** 17

The City was requested by the Union to produce documents regarding the discipline records of these specific employees concerning their being under the influence of alcohol or drugs while on duty. The City declined. The City thus had an opportunity to shed further light on this disparity issue but chose not to do so. An adverse inference could be drawn from this refusal, but the Arbitrator need not do so since there is affirmative, unchallenged evidence as to disparity of treatment.

**Exhibit 28**

R & EMPLOYMENT

# Arbitration Decisions

Labor Arbitration Decision, 4672251-AAA, 2022 BL 155931, 2022 BNA LA 69

**Labor Arbitration Decision, 4672251-AAA, 2022 BL 155931, 2022 BNA LA 69**

**ARBITRATION ASSOCIATION**

**Voluntary Labor Arbitration Tribunal**

IN THE MATTER OF ARBITRATION

between

UAW, LOCAL___

Union

and

__Employer,

Employer

Re: Employer's Decision to Implement its New Medical and Dental Plans, effective January 1, 2021

Case No. [Redacted text]

**OPINION AND AWARD**

Before: Prof. Robert T. Simmelkjaer, Esq.
Arbitrator

**APPEARANCES**

FOR THE UNION

Carl J. Levine, Esq., Levy Ratner, PC

FOR THE EMPLOYER

A__, Esq., Deputy General Counsel

ALSO PRESENT

B__, Director of Labor Relations
C__, President, UAW, Local___
D__, Unit Chair, UAW, Local___
E__, Executive Board Representative, Part-time Faculty Unit
F__, International Servicing Representative

**BACKGROUND**

Pursuant to the procedure for Arbitration contained in the collective bargaining agreement ("CBA") between __Employer (hereinafter the "Employer," "__Employer" or the "University") and UAW, LOCAL___ and the International Union, UAW (hereinafter the

**Exhibit 28**

"Union"), covering the period September 1, 2014 through August 31, 2019 (Jt. Ex. #1), a pre-hearing teleconference was held on August 18, 2021 and a hearing was held remotely via Zoom Video on September 22nd and October 13, 2021. The purpose of the hearing was to arbitrate the grievance of the Union concerning the Employer's decision to change its Healthcare Providers/Plan, effective January 1, 2021.

The Arbitrator derives his jurisdiction from <u>ARTICLE XXVI, DISPUTE, GRIEVANCE AND ARBITRATION PROCEDURE</u>.

At the hearing, the parties were given ample opportunity to present their respective positions, including the submission of testimonial and documentary evidence, to directly examine and cross-examine the witnesses. The record consists of eight (8) Joint Exhibits, eighty-eight (88) Union Exhibits and ten (10) Employer Exhibits. In addition, the parties submitted post-hearing briefs dated December 21, 2021. The evidence so submitted as well as the arguments of the parties has been considered by the Arbitrator in the preparation of his Opinion and Award.

### **<u>Preliminary Matter</u>**

The parties could not agree on the issue. While there is agreement between the parties that the issue to be resolved is whether the Employer violated the CBA when it implemented a new healthcare plan, they disagree as to whether the Union's grievance should also encompass the Employer's concurrent change in its Dental HMO ("DHMO"). The parties agreed to allow the Arbitrator to resolve this dispute.

The Union acknowledges that its grievance as written challenged the Employer's decision to change "healthcare providers," alleging that this change resulted in a plan that was "not comparable." (Jt. Ex. #3). The Union notes that "the parties' most recent agreement, the COVID MOA, which extended and modified the CBA, explicitly defines <u>healthcare benefits</u>, as encompassing both 'the University's Medical and Dental Plans.'" (Jt. Ex. #2 @ §12).

The Union further acknowledges, as set forth in the Employer's procedural claim disputing the arbitrability of the change in dental plans, that "the grievance refers to the change of providers as being from United Healthcare to Aetna." (Jt. Ex. #3). "While Aetna is in fact the administrator of the new dental plan, the former administrator was Delta not United Healthcare." (U. Ex. #77).

The Union maintains that the Employer was put on notice that the Union was challenging changes in both the Employer's medical and dental plans. According to the Union, it "raised the issue of changes in the dental plan during the first grievance hearing, and specifically asserted that the new plan was not comparable to the old plan. Whereas the Employer disputed this claim at the grievance hearing, the Union recalls that it "never asserted that the dental plans were not covered by the grievance." (Tr. @ 46, 199).

Moreover, the Union notes that the Employer specifically referenced the dental plan in its Grievance Answer, writing "[a]s stated in both meetings, the health and dental plans are university-wide and applied uniformly to all covered individuals..." (Jt. Ex. #4).

"In addition, the evidence shows that in pursuing this grievance, and preparing for the arbitration, the Union repeatedly requested documents addressing both the Employer's medical and dental plans. Finally, the Arbitration Demand referenced the 'decision to change healthcare providers,' generally, removing any reference to the specific companies administering the plan."

Notwithstanding its "inadvertent failure to include the proper name of the company administering the 2020 dental plan," the Union asserts that "the Employer was on notice, at least as of November 18, 2020, more than ten (10) months before the arbitration commenced, that the dental plans were also at issue. In light of these facts it cannot fairly be claimed that that the Employer was prejudiced by any failure to explicitly name the dental plan in the grievance document." In support of its position, the Union contends that "the lack of prejudice to the Employer weighs in favor of a finding of arbitrability on this issue." *See*, Regional Transportation Dist., 107 L.A. 813, 819 (Finston, 1996). *See also*, Florida Gulf Coast University, 2019 LA 46 (Whelan, 2019) ("finding grievance arbitrable where union provided adequate notice of facts and circumstances").

**Exhibit 28**

For its part, the Employer has argued that "the UAW has attempted to belatedly introduce challenges to both changes to the medical and dental plans, and thus, sought to have both medical and dental plans subject to scrutiny in this arbitration." In its post-hearing brief, the Employer did not elaborate on its position regarding the proposed exclusion of the dental plan from the issues to be decided by the arbitrator.

The Arbitrator is persuaded that the issue to be arbitrated should include alleged changes to the Employer's dental plan as well as to its healthcare plan. Although the Union, in its grievance dated November 11, 2020, did not specifically identify the change in dental care providers from Delta to Aetna at the time it challenged the change in healthcare providers from United Healthcare to Aetna, the Union did raise the claim at the grievance hearing that the dental plans also were not comparable. The testimony of Ms. L, who attended the First Grievance Meeting and heard the Union raise the issue of the dental plan, without the Employer's objection to "whether the dental plans were encompassed by the grievance," is deemed credible by the Arbitrator. (Tr. @ 46). It is noteworthy that the Employer, while addressing the dental plan in its Grievance Answer, never disputed the inclusion of the dental plan in the grievance.

The Employer received additional notice that the dental plan change was being grieved by the Union in the Union's request for documents pertaining to both the Employer's medical and dental plans. In this regard, the Employer's counsel elicited from Union witness, E__ that the Union had been provided with the Delta Dental Plan document from 2016, which the Employer represented to be the only available document in its possession. (Tr. @ 261).

Given the information exchanged at the grievance hearing, particularly the ten months advanced notice the Employer received on November 18, 2020 that the dental plan would be an issue at the arbitration hearing as well as the Union's document request, the Arbitrator concurs with the Union in finding the dental plan to be an arbitrable issue. In the Arbitrator's opinion, the Employer has not been prejudiced by the inclusion of the dental plan in the Union's grievance and accordingly it is an issue to be arbitrated.

Therefore, the Arbitrator has determined the issue to be as follows:

### ISSUE:

Did the Employer violate the CBA when it implemented its new medical and dental plans effective January 1, 2021? If so, what shall be the remedy?

### RELEVANT CONTRACT PROVISIONS

Article X: Management Rights

Management of the University is vested exclusively in the University. Except as otherwise provided in this Agreement, the Union agrees that the University has the right to establish, plan, direct and control the University's missions, programs, objectives, activities, resources, and priorities; to establish and administer procedures, rules and regulations, and direct and control University operations; to alter, extend or discontinue existing equipment facilities, and location of operations and programs; to determine and modify the number, qualifications, scheduling, responsibilities and assignment of Faculty; to establish, maintain, modify or enforce standards of performance, conduct, order and safety; to evaluate, to determine the content of evaluations, and to determine the processes and criteria by the [sic] which the performance of Faculty is evaluated; to establish and require Faculty to observe University rules and regulations; to discipline or dismiss Faculty; to establish or modify the academic calendars, including holidays and holiday scheduling; to assign work locations; to schedule hours of work; to recruit, hire or transfer; to determine how and when and by whom instruction is delivered; to determine all matters relating to Faculty hiring, reappointment, promotion, and retention; to determine all matters related to prospective and current student and alumni; to introduce new methods or instruction; or to subcontract all or any portion of

**Exhibit 28**

any operations; and to exercise sole authority on all decisions involving academic matters.

The above enumeration of management rights is not exhaustive and does not exclude other management rights not specified, nor shall the exercise or non-exercise of rights constitute a waiver of any such rights by the University. The University will not exercise its management rights in an arbitrary or capricious manner.

No action taken by the University with respect to a management right shall be subject to the grievance or arbitration procedure or a collateral suit unless the exercise thereof violates an express written provision of this Agreement.

Article XXIX: Medical and Dental Benefits

A. A Faculty member may elect to participate in the University's medical and dental plans if he or she meets the following criteria:
> 1. Faculty must have worked at the University for at least one academic year to be considered Health and Dental eligible.
> 2. Faculty must have taught a minimum of 90 contact hours for two or more courses or the equivalent in teaching activities; or have taught two or more courses or the equivalent in teaching activities and earn a minimum in wage equivalent to 90 hours at the non-credit minimum under this Agreement. Faculty must be scheduled to teach in the upcoming Fall or Spring, combined, a minimum of 90 contact hours for two or more courses or the equivalent in teaching activities; or two or more courses or the equivalent in teaching activities and earn a minimum in wages equivalent to 90 hours at the non-credit minimum under this Agreement....
> 3. Faculty scheduled to teach in either the Spring or Fall semester and who are Health and Dental eligible must pay their full share of the premiums (post-tax). Faculty who do not pre-pay for their coverage must earn enough in wages to cover the cost of the premium share of the plan they select.

B. Effective January 1, 2015 through December 31, 2016: Eligible faculty may participate in the health care plans currently offered by the University, to the extent they continue to be offered. Faculty who were Grandfathered in the 500 plan (Grandfathered 500 faculty) may remain in that plan so long as the plan is being offered by the University. If and when the 500 plan is eliminated, Grandfathered 500 faculty shall move to the plan(s) available to faculty covered by the Agreement at that time.

C. Effective January 1, 2017 through August 31, 2019: Faculty who meet the eligibility criteria may participate in an EPO plan that will be offered by the University. Faculty will no longer be able to participate in any other University-sponsored health care plan.

D. Premium co-pays for the EPO (or comparable benefit plans) are as follows: (no change to current rates until January 1, 2016)
> 1. Faculty scheduled to teach two classes or the equivalent in an academic year shall pay for the EPO coverage effective January 1, 2016:
>
>> For Individual Medical Coverage — 20% of premium
>>
>> For Family Medical Coverage — 28% of premium
>
> 2. Faculty scheduled to teach three or more classes or the equivalent in an academic year shall pay for the EPO coverage effective January 1, 2016:
>
>> For Individual Medical Coverage — 16% of premium
>>
>> For Family Medical Coverage — 24% of premium

**Exhibit 28**

E. Premium co-pays for the Charter 1000 plan and Delta Dental DHMO/DPPO (or comparable benefit plans) are as follows:

1. Faculty scheduled to teach two classes or the equivalent in an academic year shall pay effective January 1, 2016

For Individual Medical Coverage — 27% of premium

For Family Dental Coverage — 54% of premium

2. Faculty scheduled to teach three or more classes or the equivalent in an academic year shall pay effective January 1, 2016:

For Individual Medical Coverage — 22% of premium

For Individual Dental Coverage — 37% of premium

3. Faculty scheduled to teach two classes or the equivalent in an academic year shall pay effective January 1, 2016

For Family Medical Coverage — 34% of premium

For Family Dental Coverage — 53% of premium

4. Faculty scheduled to teach three or more classes or the equivalent in an academic year shall pay effective January 1, 2016:

For Family Medical Coverage — 30% of premium

For Family Dental Coverage — 48% of premium

F. Eligible Faculty shall be offered the opportunity to participate in the United Healthcare and Delta Dental DHMO or DPPO Insurance plans as of January 1, 2016 or to comparable benefits plans thereafter. The percentages of premium outlined in this article will be applied each year of the contract term to the premium costs negotiated with the carriers of the plans discussed herein.

H. "Cancelled classes" shall be equivalent to "classes taught" unless the classes are cancelled because the faculty member chooses not to teach the classes.

K. Faculty in the former Grandfathered and Great-Grandfathered (herein referred to as Grandfathered) benefit status will pay premiums as follows effective January 1, 2010:

1. Faculty grandfathered into medical plans with a $500 deductible will pay the same annual premium as Full Time Faculty/Staff at the highest employee premium contribution, with the same increases to premium as applied to full time faculty and staff, if applicable, each year. Grandfathered faculty may choose to move to another medical plan offered to part time faculty. Grandfathered faculty who move to another medical plan offered to part time faculty will lose their Grandfathered status and will pay the same premium as all other part time faculty as outlined herein.

2. Through December 31, 2015, faculty grandfathered into the PPO (or similar) dental plan will pay the same annual premium as Full Time Faculty/Staff at the highest employee premium contribution, with the same increases to premium as applied to full time faculty and staff, if applicable. Effective January 1, 2016, eligible faculty may participate in the PPO (or similar) dental plans at the rate in E above.

3. Faculty Grandfathered into either the medical plan with a $1000 deductible and/or dental DHMO will, effective 2010 pay the same as similarly situated part

**Exhibit 28**

time faculty with the same increases from year to year and will no longer be designated as benefit Grandfathered.

L. Premium Increase Caps
Effective January 1, 2017 and each year thereafter a 10% premium cap will be applied as follows:

1. If either the health or dental insurance companies impose a premium rate increase in excess of the total premium in the prior year, the employee will pay his/her share of the increase up to 10% in the first year.

2. If the rate increase is less than 10%, any unused difference between the new annual rate and 10% will be carried forward, on an aggregate basis, to add to, and be utilized for, the subsequent 10% annual caps in succeeding contract years.

3. If the rate increase in a succeeding calendar year is greater than 10%, the University will pay the additional premium over 10% in the year the increase is imposed. In the following year, if the increase is less than 10% (0% to 9.9%), the aggregate premium percentage increase in excess of 10% from the previous year will be added to the following (or succeeding) year's employee premium percentage cap if the annual increase in that or a succeeding year is below 10%.

Article XXXVIII: Maintenance of Benefits

All benefits to employees, attributable to the part-time faculty positions held and which are set forth in written University policy heretofore existing, shall be continued unless discontinued or modified by terms of this Agreement or by other written agreements between the University and the Union.

Any prior benefit not the subject of a written University policy shall be treated as written if such prior benefit has been:

1. A consistent and ascertainable course of conduct.
2. Engaged in for some reasonable length of time.
3. Of which both parties are aware.
4. Which does not vary the express, written terms of this Agreement.
5. Which is in respect to a given set of specific circumstances and conditions.

### *STATEMENT OF FACTS / HISTORY OF PROCEEDINGS*

**A. Healthcare Plan**

The Union represents three bargaining units at the __Employer. Since 2005, UAW has represented the part-time teaching staff and hourly faculty ("PTF") employed by the University. The PTF, the largest unit, comprises 80% of the University's teaching staff. The PTF unit has approximately 2600 members, six hundred (600) of whom are enrolled in the University's healthcare plan. Health insurance, both medical and dental, have been provided to unit members who qualify for such benefits, and who agree to pay a negotiated percentage of the premium cost.

The University has a longstanding commitment to providing PTF with healthcare benefits that are traditionally not extended to adjunct instructors at other higher education institutions. Indeed, in 2015, the University expanded the eligibility criteria for PTF to gain access to health care benefits, such that PTF no longer had to teach in two semesters in order to meet the eligibility criteria.(Jt. Ex. #8) (Tr. @t 384-386:3- B__). As a result of this expansion, more PTF were eligible to participate in the University's medical plans.

Pursuant to Article XXIX of the Agreement, eligible PTF may elect to enroll in specific health and dental plans provided by the University. (Jt. Ex. #1). Right now, PTF who meet the eligibility criteria (which is based on the PTF's length of service and teaching hours) may opt into an EPO plan or "comparable" health and dental plans. Up until 2017, the University's

**Exhibit 28**

PPO and EPO plans were offered to eligible PTF; however, the parties agreed that going forward, only the EPO plan would be offered to UAW bargaining unit members. (E. Ex. #1).

Article XXIX, Sections D and E of the Contract outline how much of a premium co-pay may be charged to a given PTF for health and dental plans, based on the PTF's teaching load.

Article XXIX, Section L, imposes a ten (10) percent cap on premium increases, with specific parameters outlined for the University to follow in the event that health or dental insurance companies impose a premium rate increase that exceeds the total premium in the prior year.

Since the first CBA was executed in 2005, the parties' agreements have always set forth, in detail, eligibility requirements for insurance coverage (*i.e.*, the number of hours a unit member needs to teach, over what period of time), the portion of the premium a unit member is responsible for, and the amount a unit member's premium share can increase each year. (Jt. Exs. #1, 6, 7, 8) Changes to these provisions have been negotiated in each contract. Whereas the 2005 CBA, set for specific dollar amounts that eligible members were required to contribute towards the healthcare premium (Jt. Ex. #6 @ Article XVIII.C), the 2009 Agreement defined member contributions as a percentage of total premium cost, with a dollar equivalent provided for the first year (Jt. Ex.#7), and the 2014 CBA defined contributions by percentages alone. (Jt. Ex. #1 @ Article XXIX.D and E). In addition, the parties negotiated changes over time in the amount that premiums could increase from year to year. Thus, in the first CBA annual increases of 2-4% in faculty premiums were allowed if the cost of premiums increased for the Employer. (Jt. Ex. #6 @ Article XXVIII.F. In the second CBA this was increased to 9% (Jt. Ex. #7), and finally to 10% in the 2014-2019 CBA. (Jt. Ex. #1 at Article XXIX.L). The allowable premium increase went up to 2015 CBA despite the Union's efforts to stop this increase. (Tr. @ 2).

Each CBA also listed the specific plans that were being made available to unit members as of the beginning of the contract term. In each case, however, the Employer was given flexibility to switch carriers and/or plans, as long as the result provided comparable benefits.[1] Thus, the 2005 CBA states:

> Faculty shall receive the Healthnet Medical Insurance and Delta Dental insurance plans <u>or comparable benefits</u> in effect as of January 1, 2010.

J-6 at XXVIII.B (emphasis added). Similarly, the 2009 CBA states:

> Faculty may enroll in the Aetna EPO plan, Aetna 1000 plan, Delta Dental DHMO plan, <u>or comparable benefits</u> in effect as of January 1, 2010.

J-7 at Article XXIX.B (emphasis added), and also:

> Eligible Faculty shall be offered the opportunity to participate in the Aetna Medical Insurance and Delta Dental DHMO Insurance plans as of January 1, 2010 <u>or to comparable benefit plans</u> thereafter.

J-7 at Article XXIX.E (emphasis added). The 2009 CBA also makes it clear that the premiums listed are for either the named plans or "comparable benefit plans." (J-7 at Article XXIX.C and D).

The 2014 CBA, under which the present case arises, limits the medical insurance options available to members. As of 2017 members have only had the option of participating in "an EPO plan that will be offered by the University." (Jt. Ex. # 1 at Article XXIX.C)(Tr. @ 314). However, the language concerning comparability remains essentially unchanged.

> Eligible Faculty shall be offered the opportunity to participate in the United Healthcare and Delta Dental DHMO or DPPO Insurance plans as of January 1, 2016 <u>or to comparable benefits plans</u> thereafter.

(Jt. Ex. #1 at Article XXIX.F). As with the 2009 Agreement, the contract language makes clear that the premiums listed are for either the named plans or "comparable benefit plans." (Jt. Ex. #1 at Article XXIX.D and E).

**Exhibit 28**

Since the first CBA became effective, the Union has afforded the Employer the flexibility to make certain limited changes in the medical and dental plans it offers within the framework of the negotiated agreement. Thus, for example, it has not objected to the Employer changing insurance carriers, something specifically contemplated by the language of comparability, as long as the resulting plan was comparable. It has also not objected when small adjustments to existing co-pays, minimal set fees associated with doctors' visits and certain other services, were implemented. Similarly, the Union did not object when in 2016 the Employer implemented a small annual deductible for the EPO, $100 for individuals and $200 for families.

## B. Comparable Definition/Description

The Union recognizes that comparable does not mean identical and has given the Employer some flexibility in managing plan design.

Comparable is a term that is frequently utilized in Article XXIX of the Agreement. See, e.g. Art. XXIX, Sects. D ("Premium co-pays for the EPO [or comparable benefit plans] are as follows..."); E ("Premium co-pays for the Charter 1000 plan and the Delta Dental DHMO/DPPO [or comparable benefit plans] are as follows...") or F ("Eligible Faculty shall be offered the opportunity to participate in the UHC ("UHC") and Delta Dental DHMO or DPPO Insurance plans as of January 1, 2016 or to comparable benefit plans thereafter."). Section K uses "similar" in two instances.

"With fully-insured policies, an employer purchases an insurance contract with an insurer (e.g. Aetna) and that insurer provides insurance benefits to the employer's employees. Under a fully insured plan, the insurer sets premiums because they are assuming all the financial risks of paying claims that are associated with that employer group. Thus, the insurer projects how much it will cost to pay the employee's claims, and, thus uses those (claims) to project premium costs." (Tr. @ 279).

Within the premium structure are the costs associated with the payment of claims, the administrative fee to run the plan, "a buffer for the claims experience exceeding what they expect, and a profit margin." (Tr. @ 279-H__).

Conversely, in a self-insured plan, the employer is paying all of the claims as they are billed out by a TPA (e.g. Aetna). Therefore, the employer assumes all of the financial risks and the employer determines premium costs based on projected claim costs for the upcoming year, plus administrative costs that are paid to the TPA. (Tr. @280-281- H__). In a self-insured environment, a premium is the monthly cost for coverage. (Tr. @ 282-H__). Under a self-insured plan, the employer determines plan design. (Tr. @ 286 -H__).

It is undisputed that historically, __Employer has implemented a number of plan design changes to health insurance plans accessible to PTF since 2010, all of which Ms. H__ summarized in Exs. E-1, and are highlighted below:

- In 2010, __Employer moved to Aetna as its insurer.
- In 2011, __Employer moved to Oxford as its insurer.
- In 2013, __Employer moved to a self-insured model and changed its insurer carrier to UHC.
- In 2015, __Employer increased the hospital copay[2] from $100 to $200 under its PPO plan and from $0 to $125 under its EPO plan. Both plans were available to eligible PTF at that time.
- In 2016, __Employer added in-network deductibles[3] of $100 for individual coverage, and $200 for family coverage to both PPO and EPO plans. Both plans were available to eligible PTF at that time.
- In 2017, the parties agreed to only offer the EPO plan to eligible PTF.
- Effective January 1, 2021, a ten-percent co-insurance[4] provision was added to cover many non-preventative services under the EPO plan;
- This addition mirrored changes that were made to the University's PPO plan the prior year.
- Also in 2021, the University switched TPAs from UHC to Aetna for health insurance coverage, and moved from Optum to Express Scripts to administer its prescription plan.[4] (Tr.@ 299-317)(H__) (E. E-1)
- Under the CBA, PTF pay different levels of contribution toward their premiums based on their level of coverage (single or family) and also depending on the number

**Exhibit 28**

of courses they teach.
• The design changes implemented for 2021 did not change the EPO plan's out-of-pocket maximums, which have remained at $3,500 for individual coverage and $7,000 for family coverage.[5]

In determining the plan design for 2021, the Employer reviewed the claims data over the last twenty-four (24) month period. It noted that employee claims were increasing. As such, the Employer sought a different TPA to provide better discounted rates. For the last several years, the Employer has worked with its consultant Mercer to renegotiate contracts with TPAs and prescription benefit managers. (Tr. @ 291-92).

Subsequently, the Employer initiated a request for proposals ("REPs"). In response thereto, Aetna provided the best discounted rates vis-à-vis proposals submitted by UHC and others. Similarly, Express Scripts offered the best rates in comparison to Optum and other prescription benefits. The Employer decided to contract with Aetna and Express Scripts commencing January 1, 2021.

Accordingly, on October 14, 2020, the University announced to its employees that effective January 1, 2021, its medical, vision, and dental plans would be administered by Aetna, replacing UHC and Delta Dental, and that prescription coverage would be administered by Express Scripts. (U. Ex. #1a). Those changes, along with the plan design changes that took effect for 2021, were applied in the exact same way to both union and non-union employees of the University. (Tr. @320-321-H__).

## C. **The Grievance**

In response to the Employer's announcement, on November 11, 2020, the Union filed a grievance alleging that the Employer had violated Articles X, XXIX and XXXVIII by its decision to change healthcare providers from UHC to Aetna, resulting in a plan that is not comparable. In challenging the new medical plan as not comparable, the Union cited numerous charges, including the new 10% co-insurance, changes in the network and additional changes, including the elimination of coverage for certain services. The Union also argued that "it was arbitrary and capricious to make these changes during a pandemic."

The parties held two grievance meetings on November 18th and December 9, 2020. The grievance challenged the Employer's decision to change "healthcare providers contending that the change effectuated January 1, 2021 resulted in a plan that was "not comparable." (Jt. Ex. #3). In its Grievance Answer on January 2, 2021, the Employer acknowledged that the Union claimed that the Aetna EPO is not comparable based on increased costs, "most significantly the 10% co-insurance obligation" and the fact that the plan "provides different or fewer services." (Jt. Ex. #34). The Union filed a Demand for Arbitration on May 28, 2021.

For its part, the "Employer maintained that it had not violated the Agreement because it was still providing access to an EPO-level plan, thereby rendering the Aetna plan comparable to the UHC plan." (Tr. @ 391-392) (B__). During the grievance meetings, the Employer expressed its intent as "always to mirror services that were previously covered by UHC and to bring those services under the Aetna EPO plan" and to engage in an "ongoing effort to work with Aetna to restore such coverage." (Tr. @ 392-93).

## D. **COVID/MOA**

At the time the pandemic began, the most current CBA had expired. The parties negotiated a MOA that explicitly extended the current CBA. The Union made concessions in the MOA, including a change in the eligibility criteria for PTF to continue their health insurance despite a reduction in student enrollment and a corresponding reduction in course offerings. The eligibility requirements were expanded "such that any PTF who did not receive any teaching assignments at all were allowed to remain enrolled in the EPO Plan when previously under the Agreement they would have been unable to remain enrolled."

In addition, the Employer allowed PTF with tentative assignments to count those assignments towards their eligibility for healthcare benefits." (Tr. @ 394-398). As a result, roughly 100 PTFs, who would have lost coverage due to lower enrollment, were able to benefit from COVID-19 MOU's expanded eligibility criteria.

**Exhibit 28**

<div align="center"><strong><em><u>CONTENTIONS OF THE PARTIES</u></em></strong></div>

**<u>Union Position</u>**

The Union, which has the burden of proof in a contract interpretation grievance, maintains that the "__Employer violated the CBA between the parties when it unilaterally implemented healthcare benefits plans that were not 'comparable' to the pre-existing plans." According to the Union, the amounts that eligible part-time faculty employees must contribute to their healthcare is predicated on the premise "that these contributions are for specified healthcare plans or 'comparable benefit plans.'" From the Union's perspective, the medical and dental policies implemented by the Employer for the 2021 calendar year "are not comparable to the 2020 plans they replaced."

**A. <u>Definition of "Comparable Benefit Plan"</u>**

As an initial matter, the Union argues that based on the plain text of the parties' Agreement, interpreting the Agreement as a whole, and applying ordinary meaning of the term "comparable benefit plan" derived from the dictionary definition of "comparable," there must be "a degree of similarity" between the 2020 and 2021 plans.

Given the fact that the term "comparable benefit plan" has been included in every agreement since 2005, with the phrase specifically articulated in Articles XXIX.D, XXIX.E and XXIX.F, definition of this term is pivotal in adjudicating the instant grievance. In the absence of an ambiguity created by the contract language utilized by the parties in their CBA, the ordinary and plain meaning of the term should prevail, irrespective of the subjective intent of one party or meanings not communicated during negotiations. In equating the definition of comparable to similar, an EPO Plan that "limits covered services to those provided by in-network providers" and reduces "a critical set of commonly used services (e.g., diagnostic tests, home care, ambulance services, etc.) to coverage of 50% or less of the pre-existing 2020 EPO Plan," no comparability or similarity can be discerned.

Conversely, the Union rejects the Employer's definition of a "comparable benefit plan" as one that "only requires it to offer <u>some</u> exclusive provider plan, a plan that limits coverage to in-network providers." In the Employer's interpretation of "comparable benefit plan," absent specific contract language limiting the amounts that it can increase other costs to the plan so long as such increases do not include the premium increases established by the CBA," it essentially has an unlimited prerogative to craft a plan that offers services at any price. Under its theory, as a self-insured entity, it has the unilateral right to design a plan that charges members the same premium, while vastly increasing their costs for routine and emergency medical care."

The Union relies on the interpretations that arbitrators have given similar language requiring that employers, in designing new healthcare plans, ensure that they are comparable to pre-existing plans. For example, in *Joy Mining Machinery*, **114 LA 1097** (Coyne, 2000), involving CBA language that allowed an employer to make changes in the healthcare plans so long as the new plans were "comparable," Arbitrator Coyne found that "comparable" means having enough like characteristics and qualities to warrant comparison. He found that the employer's failure to adopt a new plan that continued to allow participants to choose their own doctors meant that the new plan was not comparable and that the employer had violated the CBA. ***Id.* At 1103**.

Similarly, in *Celina City Schools*, *94 LA 1001* (Dworkin, 1990), where a contract allowing the employer to switch medical and dental plans so long as the resulting plans were "at least comparable," found that while the plans did not have to be "equal" or "the same," it did require benefits to be "reasonably similar and reasonably consistent." While "on paper" the two plans at issue were "comparable," the arbitrator agreed with the union that the plans were administered in a way that led to increased costs and found, as a result, that the plans were not comparable." *Id. @1003*.

In *Wilkes-Barre Housing Authority*, **123 LA 481** (Zirkel, 2006), "another case where the contract allowed for the employer to change plans as long as the new plan provided comparable coverage, the arbitrator found that the new plan did not provide comparable coverage when co-pays for medication were increased by 25-50%." The Arbitrator in *In re*

<div align="right"><span style="font-size:2em"><strong>Exhibit 28</strong></span></div>

*AFSCME District Council 88*, **1992 LA Supp 116887** (Dilauro, 1992) found that a "new health plan was 'substantially comparable' where most (though not all) of the changes were beneficial, rather than detrimental, to participants, and an analysis should that they actually resulted in a net financial benefit to employees."

Given the Union's acknowledgement that negotiated increases that can be charged for premiums since the certification of the Union have risen from 2% to 10%, the Union poses the question: "Why would the parties negotiate in such detail over the price of coverage on the premium side if there was a mutual understanding that the Employer was free to implement essentially unlimited increases in the price of coverage for services actually received?" Ultimately, the Union disputes the contention that there was "ever, a mutual understanding that the term 'comparable benefits plan' in the current CBA means only that the Employer had to continue offering a plan that restricts benefits to in-network services...

"Even if the use of the term in the parties' CBA was found to be ambiguous, and it is not, there is no basis for adopting the Employer's strained definition of the term. There is no bargaining history in the record, other than the evidence cited above concerning the apparently adversarial negotiations over premium rates, and the parties' consistent inclusion of the phrase 'comparable benefit plans' in connection with those premiums."

B. <u>**Past Practice**</u>

The Union further finds the Employer's claim of past practice insofar as the contested changes in the 2021 EPO Healthcare Plan "without merit." The Union rejects the assertion of the Employer that its "apparent acquiescence to previous changes in plan design such as the introduction of a small deductible and a hospital co-pay (i.e., the Union did not grieve these changes)" is tantamount to "allowing for any and all changes in plan design, no matter how substantial."

Whereas the Union argues that it "may have believed that previous changes were not sufficiently substantial to violate the CBA's requirement of comparability," it asserts that this prior conduct "does not constitute a permanent waiver by the Union of any and all claims involving plan changes no matter how substantial." Although the Union neither grieved the implementation of a $125 co-pay for in-patient hospitalization in 2015 and a $100 deductible ($200 for family coverage) in 2016, it denies that these two events could establish a past practice and "would at most apply to the Employer's right to make minor adjustments in its healthcare plans without rendering the resulting plans not comparable." In support of its position, the Union cites <u>How Arbitration Works</u>, Elkouri and Elkouri, as follows:

> The scope of a practice, however, is confined to the specific situation out of which it arose and does not control the outcome of even a similar, but factually distinguishable, issue.

In contrast, the broad changes implemented by the Employer are deemed factually distinguishable, "particularly when viewed through the lens of the language of comparability. Further, even if these two changes were somehow viewed as equivalent, and they are not, the Union's decision not to grieve them would not result in a waiver of its right to challenge subsequent changes. It further cites Elkouri and Elkouri:

> If a right is explicitly provided for in a collective bargaining agreement, then the non-exercise of that right does not amount to a "negative past practice" and thus become a forfeiture of it when challenged. Even if a party has not done so in the past, the party retains the right to police the agreement at any point. <u>How Arbitration Works</u> at 12.2.

*See also*, *City of Cincinnati*, **122 LA 622, 628** (Imundo, 2006) (finding union's prior failure to demand negotiations over work rules did not result in forfeiture of its right to demand such negotiations); *Girard School District*, 119 LA 1476 (Franckiewicz, 2004). <u>See Also</u>, *City of Fresno*, **138 LA 361** (Scholtz, 2018).

C. <u>**Employer's Claims Concerning Financial Hardship**</u>

<div align="right">

**Exhibit 28**

</div>

The Union considers the Employer's claim of financial hardship irrelevant, absent evidence in the record substantiating a financial need to make changes to the plan design. Even so, given the parties' negotiation regarding the scope of permissible increases, including the agreement that premiums could increase up to 10% a year for the then-existing plan or "comparable benefit plans, "the Employer is not privileged to simply impose greater costs than what was agreed to without negotiating with the Union." Rather than negotiate additional plan modifications, over and above the COVID MOA, the Employer opted to unilaterally make changes in violation of the CBA.

The Union takes issue with the Employer's reliance on its imposition of plan changes equivalent to those challenged in the instant grievance based on the plans it has made available to its non-union employees. The imposition of comparable changes on these employees not covered by binding CBAs is deemed irrelevant when the instant parties "contemplated the possibility of rising costs and negotiated the extent to which such costs could be passed on to members," namely, "the allowance for premiums to go up 10% but no more than 10% per year."

Moreover, non-union employees, unlike PTF employees, have access to a choice of plans (i.e., EPO and PPO). "Further, the cost of coverage, as measured by a percentage of Employer-derived income, was and remains higher for members of the Union." (U. Exs. #87, #88). It is noteworthy that Ms. H__ testified that in 2020 when co-insurance was added to its PPO, PTF members were no longer eligible to participate in that plan. (Tr. @ 314-315).

The magnitude of the changes imposed by the Employer is manifest in the implementation of the 10% co-insurance on a wide variety of services. "Whereas prior to 2021 there had never been co-insurance for in-network services under any plan available to unit members, now unit members are charged 10% of the total cost for all diagnostic tests (*e.g.*, x-rays, MRIs, CAT scans, blood work, etc.), ambulance services, durable medical equipment, outpatient and inpatient physician/surgeon fees, home healthcare, and hospice care, all of which were 100% covered under the 2020 plan. In addition, 10% co-insurance was implemented for professional services in connection with childbirth and infertility services, services previously only subject to a fixed co-pay, as well as "all [other] expenses unless otherwise stated."

While the out-of-pocket maximum has remained $3500 for individuals and $7000 for families since 2004, the Union contends that the scope of the changes implemented in 2021 has had a substantial impact on its members whose salaries for teaching two non-credit courses is approximately $8000-$9000 before taxes and who pay $2421 of that in premiums for medical insurance before any additional charges. "If, because of changes in the plan, they now have to pay the full $3500, they are now paying nearly $6000 for coverage, as much as 75% of their pre-tax salary."

The evidence adduced by the Union shows that there were significant increases in the costs of prescriptions. For one employee, "the cost of medication for her and her husband increased by over $3000 per year, despite evidence that only one new medication had been added to their regimen in 2021, which only cost $150 per year.

### D. Negative Inference Rule

"While record evidence shows that coverage for medications under the 2020 and 2021 plans was not comparable," the Union urges that the Arbitrator draw an adverse or "negative inference from the Employer's unexplained failure to produce documents setting forth the cost for medications under the 2020 plan."

Under the "negative inference rule," the Union maintains that "a presumption should be drawn that had the prescription drug plan information been produced it would have supported the Union's claim that this portion of the medical plans was not comparable." Specifically, the Union notes that the Employer failed to produce the Optum formulary and excluded medicine list from 2020. Without the Optum formulary, which was used to set prices for medications under the UHC 2020 plan, it was not possible to conduct an accurate comparison of drug prices between 2020 and 2021.

It is well-established that "the unexplained failure or refusal of a party to judicial proceedings to produce evidence that would tend to throw light on the issue authorizes, under certain circumstances, an inference or presumption unfavorable to such party." See, *Interstate Cir. V. United States*, **306 U.S. 208, 226** (1939). See also, *Tendler vs Jaffe*, **203 F.2d 14, 19** (1953) ("The omission by a party to produce relevant and important evidence of which he

**Exhibit 28**

has knowledge, and which is peculiarly within his control raises the presumption that if produced the evidence would be unfavorable to his cause.") In the arbitral context, the rule is set forth as follows:

> "[A]n Arbitrator] may...give such weight as he deems appropriate to the failure of a party to produce documents on demand. The degree of weight to be attached to such failure will depend upon the relevancy of the documents requested to the issues at hand. If the information withheld appears to be strongly pertinent, the withholding of it may be vital in making the decision." How Arbitration Works, at 8.4.I. (*citing*, American Tel. & Tel. Co., 6 L.A. 31, 43 (Wallen, 1947)).

Considering the fact that the Employer is self-insured and is directly responsible for paying the costs of healthcare, including prescription drugs, and given the Union's unrebutted evidence showing an increase in the cost of prescription drugs, the Union contends that the Employer's failure to produce the requested evidence permits drawing a negative inference that the missing evidence "would have supported the Union position that the Employer's change in plans resulted in a substantial increase in the price of prescription medication."

**E. The 2021 Dental DHMO is not Comparable to the 2020 Plan**

Having addressed the arbitrability of the DHMO Plan, the Union argues that the Aetna DHMO implemented in 2021 is not comparable to the Delta DHMO in place in 2020. In support of this claim, the Union has offered evidence showing that "co-pays for over 100 procedures have increased by $100 or more under the new plan, many by far more than that." See, Fact Section C, supra. The co-pay for partial dentures has increased from $240 to over $700. A partial list of other significant increases include increases of $285-$479 for dentures (codes D5110, D5130, D5223, D5225), increases of $293-$310 for crowns (codes D2712, D2751) and increases of $328-$418 for inlays and onlays (D2510, D2650, D6612, D6613, D6614). (U. Ex. #10, #78).

Mr. E__ ("E__") compared the 2021 Aetna Dental Plan Benefit Summaries (U. Exs. #10, #11) and the DHMO Booklet for the Aetna Plan (U. Ex. #72) with the 2016 Delta DHMO Summary (U. Ex. #78) (Tr. @ 230, 231). The Union requested, but did not receive, the SPD for the 2020 Delta dental plan. (U. Exs. 64, 68, 75). The Union requested but did not receive the Schedule of Benefits to go with the Booklet from the 2021 plan. (U-64) (August 25, 2021 email) (U. Exs. #64, 68, 75).

**F. Remedial Efforts**

The Union takes issue with the Employer's claim that it rolled back two changes in the 2021 Aetna Plan: a $15 per session increase in mental health visit co-pays and an increase in co-pays for hearing aids. (U. Ex. #63). The Union disputes that it has "received any definitive confirmation of any remedial action concerning these services and it has no specific knowledge concerning communications about corrective actions sent to members by the Employer or by Aetna...Nor did the Employer put any evidence into the record showing it had reimbursed members by the time of the arbitration hearing..." (Tr. @ 221-223, 254).

**G. Remedy**

As a remedy, the Union requests that "the Employer be ordered to implement new benefit plans that are comparable to the plans that were in place in 2020. We further ask that you direct the parties to negotiate a claims procedure that provides for unit members to be reimbursed for costs that they would not have incurred but for the implementation of non-comparable plans, and that you retain jurisdiction to resolve any disputes concerning the creation of such a claims process, and/or any disputes that may arise concerning claims under that process."

**Testimony**

**Exhibit 28**

### 1. C.S.

C.S. has taught at the __Employer since 2004 and has been covered by Employer health insurance since the first CBA in 2005. He is an amputee who has used a prosthesis for his leg and ankle since 2013. He must see a prosthetist a couple of times a year. Prior to 2021 he never had to pay for any of the medical equipment he must use in connection with his prosthesis. (Tr. @ 64-65, 70-71).

"In connection with his prosthesis C.S. needs a liner or sleeve, special socks, and a sheath, all of which need to be replaced periodically. The liner alone costs approximately $3500. C.S. needs a new liner but, because he is concerned about the implications of new co-insurance on durable medical equipment, he called his prosthetist with his new insurance information. They confirmed that there would be co-insurance on things he needs that go with his prosthesis including the liner. He did not get a new liner because he was concerned about the cost and hoped that the cost would be covered by insurance that he is hoping to be eligible for through the Writers Guild."

"Prior to 2021 C.S. felt as though his insurance was 'seamless.' He has never had any charges connected with his prosthesis. C.S. testified that he is a cancer survivor who underwent a "tremendous medical ordeal" between 2012 and 2014, but says he never had to worry about costs and coverage prior to this year. He does not believe that he was ever previously subjected to co-insurance." (Tr. @ 64-65, 70-73).

### 2. J.E.

J.E. has taught at the __Employer since 1989, has been part of the unit since it was formed, and she has been covered by health insurance since 2006. J.E. pays for family coverage.

"In January of this year her husband had an ablation to correct electrical currents in his heart. She was charged $807 in co-insurance for costs associated with that surgery. (U. Exs. #12, #14). More recently she had a biopsy and a sonogram, diagnostic procedures now subject to co-insurance, for which she had not yet been billed.[6] She has never previously been charged co-insurance." (Tr. @ 76).

"But for J.E. the most dramatic change was not the additional costs brought about by co-insurance, as significant as they were. Rather, they were in the cost of medication for her and her husband — which went from $800 a year to between $4,000 and $4,500 a year. This was not the result of new medications. There is only one new medication which they need, and this medication costs about $150/year.[7] (Tr. @ 86, 89).

On cross-examination, J.E. was asked about whether her family's increased cost of medication could have been due to factors other than the new insurer and plan. She pointed out that the price of insulin, one of the drugs her family needs, which had been provided to them *free of charge* last year, now cost them $125 for a 75-day supply." On further cross-examination, J.E. was asked whether these huge increases could have reflected normal price fluctuations J.E. responded: "in December it cost one amount and in January it cost another amount. I don't see how that would be possible." She added that she called Aetna to ask about the increases and was told: "that's what it cost on our plan." J.E. testified that she did not remember previous increases in medication costs over her 15 years covered by Employer healthcare insurance. (Tr. @ 92-93, 95-96).

When asked about other plan changes over her years of coverage, J.E. testified that she was neither aware of the changes of providers in 2010, 2011 and 2013 nor changes in co-pays or deductibles. As of August 16, 2021, she had been charged $4884.47 towards her family's $7000 out-of-pocket maximum. (U. Ex. # 21) (Tr. @ 94-95).

### 3. L.C.

L.C. has taught at the __Employer since 1995 and has been covered by Employer health insurance since 2005.

"In August of 2020 L.C. was diagnosed with breast cancer. Her treatment began under the previous plan and continued under the new plan, which provided a unique opportunity to compare coverage under the two plans. In 2020 she had multiple diagnostic tests, followed by surgery, and then started chemotherapy. She underwent her first three rounds of chemotherapy in 2020. In 2020 she was charged nothing for her cancer related diagnostic and treatment services, including surgery and chemotherapy, other than

**Exhibit 28**

standard co-pays. (Tr. @ 99-100) (U. Exs. 23, 24, 25, 26). That is because previously there were no co-pays or any other charges for diagnostic testing."

"L.C. had dense breast tissue, so she requires an annual ultrasound in addition to a mammogram. Her cancer was discovered last year because she had such an ultrasound. These ultrasounds were covered 100% under the previous policy but are subject to co-insurance under the new plan. She had an ultrasound and 3-D mammography done this year for which she was charged co-insurance. She had similar but more extensive tests done last year for which there was no charge. (Tr. @ 111-112) (U. Exs. #23, 34). The Employer conceded that co-insurance now applies to this important screening procedure. L.C. testified that "United Healthcare possibly saved [her] life because it [her breast cancer] was discovered early and I — it would not have been discovered under Aetna."

"In contrast to her experience in 2020, under the previous policy, in 2021 L.C. had five additional rounds of chemotherapy and was charged at least $776 for each session, easily amassing charges in excess of the plan's $3500 out of pocket maximum. (Tr. @ 103) (U. Exs. 31, 32, 33). This was the first time in 16 years that L.C. reached the out of pocket maximum, notwithstanding having had two previous surgeries including a hysterectomy necessitated by uterine fibroids, and an abdominal myomectomy." (Tr. @ 99, 111-112, 114).

"When L.C. began treatment after her surgery, she was prescribed a medication called Neulasta, to increase her white blood cell count between chemotherapy sessions. The first time she used this medication was in December 2020, under the previous insurance policy. She was charged nothing for it. (Tr. @ 103-104). Under the new policy Aetna initially told her that it would not be covered at all, but when she appealed this determination Aetna agreed to cover it as an in-network drug under its continuation of coverage policy. She assumed she would be assessed a negligible charge for this previously free medication, but this was not the case. (Tr. @ 104-105) (U-27). When she found out how much she would actually be charged she appealed to Aetna again. The appeal was denied. (Tr. @ 106) (U-28). She next appealed to NYU. This appeal is not based on a claim that the plan was incorrectly implemented; it is based on financial hardship. While L.C. has not yet been billed for all of her charges, due to her pending appeal, she expects to have to pay them all off over time. In any event, even if she wins the appeal she expects to be charged the $3500 out of pocket maximum." (Tr. @ 107-108, 116-118).

L.C. testified that she earned $17,000 before taxes for the spring 2021 semester. Her earnings were reduced $8000 due to the pandemic. According to E__, L.C.'s insurance premiums for individual coverage under the 2-course rate would be $2421, which is 20% of total premium costs. Therefore, even if L.C. qualified for individual coverage under the 3-course rate, which is 16% of premium cost, she would have been charged $1937. When the $3500 deductible is factored in L.C. testified that these costs represent "a substantial amount for me." (Tr. @ 102). L.C. described the impact that the increases were implemented in the middle of a pandemic as follows:

> Well, financially I've been hit. I was under tremendous stress just having cancer and trying to teach and not knowing if I could finish my courses and on top of that having the stress of Aetna and, honestly, stress makes cancer multiply. (Tr. @ 113).

**4. P.C.**

"P.C. has taught at the __Employer since 2005 and has had health insurance coverage since she was eligible within a few years of 2005. P.C. began getting mammograms in 2019, when she turned 40, in accordance with standard medical practice. Since she had dense breasts, a sonogram was also indicated. Prior to 2021 there was no charge for this procedure. Under the new plan she was charged coinsurance. Thinking she had been billed in error, P.C. called Aetna who informed her that the Employer had chosen not to cover this procedure. As a result of the misinformation she was initially given by Aetna and the resulting delay, her bill was sent to a collection agency." (Tr. @ 130-131, 137, 147, 149) (U. Exs. 43-44).

"P.C. also has a fibroid in her uterus which requires twice annual screening. In the past she has never been charged for these screenings. (Tr. @ 141-149) (U-45-47). Aetna informed her, in response to her inquiry, that she would have to pay a portion of the costs for this procedure, but could not tell her how much that would be. She has not had the

**Exhibit 28**

screening done this year because she does not want to be surprised by another bill." (Tr. @ 142, 145).

**5. A.C.**

A.C. began at the __Employer in 1991 and has been covered by Employer health insurance since 2005. "In 2021, A.C. was diagnosed with uterine cancer, requiring her to have a hysterectomy. She was charged over $1000 in co-insurance in connection with her surgery. (Tr. @ 155). Prior to 2021, she was never charged co-insurance for surgery. For her hip replacement surgeries in 2015 and 2020 and for surgery to remove an ovary at some point prior to 2021 she was charged only doctors' co-pays." (Tr. @ 153-154).

"A.C. also needs biopsies of her thyroid, referred to as aspirates. These were done several times prior to 2021. Each time prior to 2021, she was charged only an office visit co-pay in connection with the procedure. When she had it done in 2021, she was charged $300." (Tr. @ 154-155, 158-159) (U. Exs. 49, 51, 54).

**6. A.F.**

"A.F. began at the __Employer in 2014 and has been on its health insurance since that time. On January 3rd, she had an MRI on her pelvis and abdomen. In the past, she was not charged for these procedures; however, under the new plan she was charged $100 for her annual deductible and $460 for co-insurance. (Tr. @ 162, 164-166) (U. Exs. 55, 56, 57). A.F. testified that on average she makes about $35,000 a year and pays $153 a month in insurance premiums."

"A.F. testified that she has had to discontinue family therapy because the co-pays for individual and family therapy went up from $25 to $40. (Tr. @ 172-174) (U-59). She was never informed by the Employer (or Aetna) that the co-pay for therapy had reverted to $25." (Tr. @ 167-169).

Ms. D__ ("D__"), the part-time faculty chair for the Union, testified that the Union was not notified by the Employer of the changes in the 2021 healthcare plan prior to its announcement to the University community on October 14, 2020. In a subsequent email on October 19, 2020, the details of some of the changes were provided. (U. Exs. 2A, 2B and 2C). Once the new plan went into effect, members complained that "they were experiencing increased costs...and in some cases were choosing to forego treatment..." (Tr. @ 42).

D__ attended the grievance meetings. She recalled the Employer stating that the co-insurance would have been introduced under UHC. She recalled the issue of the dental plan being raised and the Union's request for the Aetna 2021 plan and other documents. (Tr. @ 46-47).

Mr. E__ ("E__"), Officer on the Union's Executive Board and faculty member teaching fashion studies at Parson, testified that he has taken the lead on analyzing plan documents and "looking for textual comparisons between 2020 and 2021. He also attended the grievance meetings discussed supra.

He recalled the Employer's representative (K.T.) stating that the University was in a "financial crunch," the cost of insurance was going up and they had made the switch motivated by cost savings." (Tr. @ 200). Pursuant to his analysis of the UHC 2020 plan, he used the SBC and SPD. For Aetna, he used four documents — their SBC, a document entitled Plan Description and Benefits, and two documents, one entitled a booklet and one entitled Schedule of Benefits. For prescriptions, he used the formularies for the 2021 prescription provider (Express Scripts) and for 2020 the provider was Optum RX and "we did not have any of the SPDs or formularies for that provider." (Tr. @ 201).

E__ testified that the Union requested but did not receive SPDs related to the 2020 Delta dental plans.

According to E__, the major difference between the 2020 and 2021 plans has to do with services that were previously covered but now have a 10% co-insurance charge on them. He enumerated several of the services under Aetna that are now subject to co-insurance such as diagnostic testing and imaging, the administration of anesthesia, out-patient care, durable medical equipment, et al. (Tr. @ 219).

E__ testified that the out-of-pocket maximum expense of $3500 for an individual and $7000 for a family plus the premium, plus the deductible of $3500 or $7000 can be a financial burden. (Tr. @ 228). Previously, members had benefits that were covered and "so they didn't have any out-of-pocket costs."

**Exhibit 28**

On cross-examination, E__ testified that in connection with the 2020 Delta dental plan, the Employer had informed him that there had been no changes since the 2016 Delta plan and therefore it could be used for comparative purposes with the 2021 Aetna dental benefits. The Union requested but did not receive the SPD for the 2020 Delta dental plan.

With respect to "how much of an increase in out-of-pocket costs to PTF make a successor healthcare plan not comparable, E__ testified:

Q. So help me understand, how much of an increase in out-of-pocket costs to part-time faculty members make a successor health care plan lack comparability? Is it $100 more, $1,000 more? I mean, what's the metric?

A. I think that this is — that's too subjective for me to pin it down to a dollar amount, but I think we've demonstrated that there's been a wide range and significant changes that have real impacts on the lives of our members.

So both from an impact standpoint and then just if we — if we just sort of think about it holistically, yeah, there's been just an increase that reaches a new level. (Tr. @ 265)

...........................................................................

Q. When you were asked about the nature of the changes experienced between 2020 and 2021, I think you refer to — you used the word scale when talking about costs or increases in costs. To what extent were the changes, did they involve the scale of costs and to what extent did they involve the types of changes?

A. So when we're talking about the coinsurance in some ways it's both; so for many of the services in which coinsurance is now applied they were previously 100 percent covered. So members didn't need to worry about them; they had no out-of-pocket costs associated with them.

Now that they do have the out-of-pocket costs associated with the, these convenient as we've seen in testimony, thousands of dollars because they're often applied to very high-budget things or recurrent things. I mentioned hospice care, which can go on for an indeterminant amount of time. Home health care, things that are connected to chronic and undone conditions like prosthetic limb maintenance with durable medical equipment.

So these which were previously covered, there was no stress or anxiety from our members, they're now having to endure the uncertainty of high-tickets and the uncertainty of what the final bills will actually be. And it gets them very, very much closer to their out-of-pocket maximum than they ever have been under previous plans.

We also see if we're just talking on sort of sheer scale or impact of this, we're seeing that it has led members to delay or defer or completely withhold care from themselves, and we got very powerful testimony from P.C. that if she had to have thought about her own breast cancer exam and the cost of that, which it now clearly costs coinsurance, she may not have had timely due course to her chemotherapy in 2020.

So I think there are like strict comparing documents, textual analysis, this is a change. This was 100 percent covered, now it's 10 percent. There are things where we claim the copay was one and now it has changed. There are other things where there was a service that was covered and now it's no longer, and those are just textual analysis. And I think this is also a need to understand that the implications of what to these changes are and how they have or have the ripple effects and the large impact they had after the fact is so unprecedented compared to what was happening in 2020 and before. (Tr. @ 269-270)

**Employer Position**

The Employer has argued that "Article XXIX gives the University broad discretion to implement unilateral plan design changes." According to the Employer, since "the Agreement's terms are clear and unambiguous" the words of the agreement fully express the parties' intent irrespective of any party's "uncommunicated or subject intent." In this regard, "a union cannot obtain in arbitration what it failed to obtain in negotiations." See, *White Rock Quarry, LLC and Int'l Union of Operating Engineers, Local 18*, **121 BNA LA 897, 900** (Cohen, 2005).

With respect to health insurance plans, the Employer cites *Whayne Supply Co. — Ashland Kentucky and United Steelworkers of America Local 9106*, **111 BNA LA 940** (Imundo,

**Exhibit 28**

1998) where the contract language indicated that "the employer shall have the right to change insurance carriers or self-insure any of the group insurance programs at any time so long as the group insurance coverage remains 'substantially similar.'" In noting that "employees' experiences under any insurance program will 'vary widely,' the arbitrator ultimately determined that the employer did not violate the parties' agreement because the Union failed to provide 'sufficient credible evidence to prove that the insurance coverage under the new program was substantially dissimilar from what was provided under the old program.'"

In upholding the Employer's unilateral plan changes, "the arbitrator noted that 'accurate and complete information pertaining to the quality of coverage, and dollar value to employees under the new program will ultimately show whether the new program is better, substantially similar, or substantially dissimilar to the old coverage."

The Employer further cites *Friedrich Air Conditioning Co. and Int'l Union of Electrical, Salaried, Machine and Furniture Workers, Local 780*, **112 BNA LA 907** (Halter, 1999) where the contract language provided that "the Company may change the healthcare plan from 'time to time at its sole discretion so long as the features outlined in Schedule A are maintained.'" Since Schedule A contained provisions to follow regarding deductibles, the Company's implementation of a co-pay for prescription drugs was deemed contractual allowable "because the deductible remained constant."

Similarly, in *Village of Oak Lawn and IL Fraternal Order of Police Labor Council*, **127 BNA LA 1279** (Wolff, 2010), "an arbitrator held that changes a village made to its health plan that increased co-pays in order to achieve a lower premium increase from the insurer did not violate the CBA, which provided that the village may not 'substantially' change the health plan." In his decision, "the Arbitrator noted the importance of viewing a health plan 'in its entirety' when determining when a 'substantial change' has occurred."

"Moreover, [t]he determination of whether benefits are 'substantially similar' involves an equation that balances what employees get against what they must give." (Quoting *Scioto Co. Sheriff's Dep't*, *2002 WL 32502091* (Reuben, 2002). Despite a 43% increase in the costs of a prescription, and the 100% increase from the doubling of a co-pay, the Arbitrator noted that "the issue of whether there has been a substantial change cannot be determined on the basis of a single benefit change." Although Section 6.1 of the CBA stated, "the plans for the medical, dental, vision and prescription drug benefits may not be substantially changed by the Employer without agreement of the Union," the Arbitrator noted, "I understand this to mean that the benefit changes in a plan must be considered as a whole and not piecemeal as depicted in the worst case example stated in this paragraph."

In *The Rockford District of Browning-Ferris of Illinois and Teamsters Union Local 325*, **114 BNA LA 1424** (Briggs, 2000) where the contract language was silent regarding health insurance changes, "the employer unilaterally implemented two other plans as choices for employees with different levels of coverage resulting in increased monthly out-of-pocket expenses for employees." In finding no contract violation, the Arbitrator noted the CBA contained "no guarantee, either express or implied, concerning monthly contributions from employees." He added that "If the Union wanted such a specific guarantee, the prudent course of action would have been to negotiate contract language to confirm it."

Lastly, in *Associated Milk Producers, Inc. and Int'l Brotherhood of Teamsters, Local 695*, **137 BNA LA 868** (Fitzsimmons, 2016) where the contract language required the employer to provide "coverage similar to the benefits provided in the current plan, a new plan provided by the insurer which included a 7.5 percent premium increase as well as higher deductibles and drug co-pays" was deemed "similar to the old plan because the employer offered the same benefits (such as annual deductibles, office services, prescription coverage, medical supplies, diagnostic services, hospital services and hearing and vision services). In denying the Union's grievance, the arbitrator noted that "nothing in the contract barred the employer from reducing benefit levels and the only way to stave off larger premium increases was to make certain deductible and co-payment charges."

Applying the foregoing case law to the instant grievance, the Employer maintains that its 2021 plan design changes did not violate Article XXIX. Since the contract language provides for "only one explicit limitation," namely, the ten (10) percent premium increase CAP located in Article XXIX, Section L "so long as the University continued to provide a 'comparable' or 'similar' health care plan to bargaining unit members (i.e., an EPO-level

**Exhibit 28**

plan), then it is otherwise free to implement whatever plan design changes it wants as has been the case historically."

Given contract language which shows that 'comparable' and 'similar' always appear immediately after a reference to EPO (or DHMO/DPPO where applicable for certain legacy plans)," the Employer contends that "the parties intended for 'comparable or 'similar' to modify EPO (or DHMO/DPPO) and to signal that EPO-level plans must always be provided to bargaining unit employees. They were never intended to be decoupled from one another." From this language, the Employer concludes that "comparable and similar relate to the level of plan coverage (i.e., EPO, as opposed to offering a PPO or high-deductible plan, both of which have very different plan terms)."

According to the Employer, had the parties intended to impose additional limitations when "rolling out new healthcare plans, then they would have negotiated for such language to be included in the agreement just as they did with the premium cap." Outside explicit limitations contained in the Agreement, the Employer maintains that "there [is] nothing otherwise preventing the employer from enacting any number of plan design changes." The Employer continues:

> "Why would the parties go to such lengths to, on one hand, specify the precise premium cap it wanted to be adhered to, yet, on the other hand, agree that the comparable plan meant there was an unspecified fixed dollar amount threshold that capped how much bargaining unit members could contribute towards health benefits? If that outcome were the parties' intent, then why not explicitly state in the Agreement that __Employer can only impose changes that result in no more than x dollars in additional costs for bargaining unit members? Such a paradox belies common sense, and basic contract interpretation."

From the Employer's perspective, the Union is seeking the Arbitrator's endorsement of its subjective reading of the Agreement and putting in place a "specific guarantee that bargaining unit members would never pay more than x dollars out of pocket towards healthcare costs"; however, when the healthcare plan is considered in the aggregate, particularly the Employer's continual provision of an EPO-level plan to PTF, with access to the same services and providers in a consistent manner and access to in-network providers at a negotiated rate, the Employer has fulfilled its contractual obligations. Inasmuch as the Employer intended "at all times for the same services that were previously covered by UHC to be covered by Aetna," absent evidence that bargaining unit members have experienced a reduction in benefits or a reduction in the quality of coverage, level of care or value of coverage, no contract violation can be found.

In the Employer's view, the Union has not sustained its burden of proof. Rather than provide data on "the sum-total impact of the __Employer healthcare changes on bargaining unit members…it has proffered testimony from six bargaining unit members (out of over 2600) whom the University cherry-picked to testify after soliciting members for their experiences, no doubt because their respective narratives about their health struggles are compelling and certainly sympathetic." The Employer argues that "it would not be appropriate for the Arbitrator to speculate that because six bargaining unit members indicated that their healthcare costs have increased in such a manner based on their unique health conditions and circumstances, the Arbitrator can then conclude that the entirety of the plan design changes similarly impacted all other bargaining unit members."

Referring to the testimony of H__, the Employer notes that "a given employee may be paying less for prescription drugs, or any number of other services. Just because the Union did not take time to locate such testimonials does not mean such evidence does not exist." Here again, it cites the Arbitrator's opinion in Whayne Supply that employees' "experiences under a given insurance program will vary widely."

The Employer also faults the Union's reliance on testimony comparing an employee's out-of-pocket expenses under UHC with his/her expenses under Aetna. "Comparing prior unrelated surgeries to treatments for an aggressive form of cancer, as L.M.C. did, is essentially comparing apples to oranges." Since each treatment "has its own costs, follow-up regiments, medications, etc. direct comparisons are not feasible. It is not reasonable to rely on the cost of treatments from years ago as a predictor of what such

**Exhibit 28**

treatments would currently cost, particularly during the Covid pandemic era where healthcare costs are on the rise."

**B. Past Practice Supports the University's Interpretation of "Comparable"**

The Employer notes that "proof of custom and past practice may be introduced for any of the following major purposes: (1) to provide the basis of rules governing matters not included in the written contract; (2) to indicate the proper interpretation of contract language; or (3) to support allegations that the 'clear language' of the written contract has been amended by mutual agreement to express the intention of the parties to make their written language consistent with what they regularly do in practice in the administration of their labor agreement."

Reiterating the Arbitrator's finding in IBEW, supra, the Employer notes that the practice of the parties of allowing the Employer to unilaterally implement a number of unilateral plan design changes without objection from the Union was pivotal. Since the Employer had previously reduced benefits on a "much greater scale," the Arbitrator rejected the Union's claim that "these prior changes were just procedural and not significant." The finding of a past practice supported the Employer's position in IBEW in that the contract was not interpreted as "necessarily guarantee[ing] the continuance of all benefits for the duration of an Agreement."

Similarly, in White Rock Quarry, the Employer's implementation of several changes in its health insurance plan over the years, "including increasing deductibles and co-pays, minimum charges for prescription drugs, eliminating an annual maximum and replacing it with a percentage allocation, and reducing coverage for certain services from 100 percent to 80 percent, without the objection of the Union," were deemed evidence of the union's and the employees' mutual acceptance of these unilaterally adopted changes to the group plan.

Analogizing these examples of past practice to the instant case, the Employer argues that it has exercised "wide latitude to unilaterally implement any number of plan design changes since 2005. It is undisputed that in response to skyrocketing healthcare costs, the University has gradually passed along those cost increases to bargaining unit members by increasing co-pays, adding deductibles, and now co-insurance. Not once has the Union grieved those changes."

Notwithstanding the Union's argument that it did not grieve the prior plan design changes because they were smaller in scale, the Employer asserts "the scale of the changes is irrelevant when determining whether the parties had a demonstrable past practice that dictated the Union's acquiescence to unilateral plan changes...Rather, the past practice unequivocally indicates that the Union has been on notice that the University has been implementing a myriad of plan design changes, with no objections."

At this juncture, as the Employer has continued to rely on past practice to expand upon prior plan design charges, "the Union cannot now attempt to undermine the parties' past practice by placing qualifiers and limitations on that history."

**C. The Union's Subjective View of the Contract would lead to an Inequitable Result**

According to the Employer, were the Union to prevail, the "University would have very few options at its disposal to offset the astronomically rising costs of health insurance." Since the Employer has no control over the costs and is "at the mercy of providers and insurance companies," the Employer must pass rising costs on to its employees.

According to the Employer, its continued payment of the "lion's share of the premium costs and greatly subsidizing of a sizable portion of the bargaining member unit's health insurance costs," it would be unreasonable for it to "encumber itself from being able to introduce co-insurance provisions and similar plan design" as implemented on January 1, 2021, without explicitly agreeing to do so." As such, the Union should be precluded from "manufacturing definitions of key terms in the Agreement that simply does not match reality."

**D. Management Rights Provision**

In the Employer's reading of Article X, its right to direct and control University operations include the prerogative to control health costs. Having deliberated for many

**Exhibit 28**

months in consultation with its stakeholders prior to introducing co-insurance into the EPO Plan, the Employer denies that its decision was arbitrary and capricious.

**E. There is No Violation of Article XXXVIII — Maintenance of Benefits**

In continuing to provide PTF with health insurance access through their EPO as well as 100 PTFs who would otherwise have been ineligible due to reduced enrollment pursuant to the Covid-19 MOU, the Employer has fulfilled its contractual obligations.

**Testimony**

Ms. H__, ("H__"), Assistant Vice President for Benefits since 2018, distinguished the difference between a self-insured policy versus a fully-insured policy as one of financial risk. The University, in a self-insured environment, pays 100% of the claims as well as an administrative fee to a third party administrator. However, unlike a fully insured plan, the Employer is not paying a profit to itself. Being self-insured gives the Employer flexibility in plan design and "a little bit more control over the expenses and planning purposes." (Tr. @ 281).

H__ defined the terms co-pay, deductible, out-of-pocket maximum and coinsurance. "An out-of-pocket maximum is the maximum liability that a member would pay in a given year before the plan would pick up 100 percent. The __Employer's EPO out-of-pocket maximum provides a $3500 for individual coverage and $7,000 for family coverage. A deductible is what you're paying before the plan covers a particular service. The current EPO deductible is $100 for individual coverage and $200 for family coverage.

H__ reviewed a spreadsheet showing the healthcare plan history and MOUs negotiated by the parties for contract periods from 2010 to 2021. (E. Ex. #1). In summarizing the changes through the years, Summary Plan Documents (SPDs) were reviewed. In 2010, the Employer changed to Aetna, in 2011 changed to Oxford, with both EPO and PPO plans and in January 2013 it moved to United Healthcare "in the self-insured environment." (Tr. @ 306) (E. Ex. #2). The SPD, the __Employer Choice Plus 1000 Plan was offered to PTF in 2013. (E. Ex. #3). Pursuant to the EPO/PPO dated January 1, 2015, the UHC hospital co-pay increased from $100 to $200, thereby increasing out-of-pocket costs for PTFs. (E. Ex. #5). In 2016, the University added in-network deductibles of $100 for individual coverage and $200 for family coverage for both EPO and PPO Plans. (E. Ex. #7). The 2021 Aetna EPO Schedule of Benefits introduced co-insurance which is at issue in the instant case. (E. Ex. #8). The co-insurance applies to certain services: labs, x-ray, MRI, surgery fees, etc., but not to preventative services.

H__ further testified that EPO premiums for 2021 were not increased above the 10% provided for in the CBA. Prescription coverage was changed when the Employer switched vendors from Optum to Express Scripts.

H__ acknowledged that PTF members had experienced claim denials due to coding errors vis-à-vis Aetna and UHC mental health. Reprocessing issues arose concerning hearing aids and mental health co-pays. H__ sent an email to "out account management team at Aetna as a follow-up for the reprocessing of claims..." (Tr. @ 331) (E. Ex. #10).

On cross-examination, H__ testified that any service, including out of network services, that are not covered, would not count toward the out-of-pocket maximum.

The __Employer applied the term "comparable" to mean "any EPO Plan that covered a variety of services, doctor's visits, lab work, testing, hospitalization, prescription coverage — the major elements of a plan." (Tr. @ 341). In H__'s view, there is no limit to plan design changes such as increasing the deductible to $1000 or somewhere between $1000 and $5000 — so long as it didn't become a high deductible plan. She testified that the co-insurance could be increased 25% or 50% pursuant to the University's plan design flexibility. (Tr. @ 342).

H__ testified that the co-pay is a fixed cost and the co-insurance is a percentage set by the Employer, but the base cost to which the co-insurance percentage is applied is set by the providers. For prescriptions, there is a co-payment for medications in each tier determined by the formulary of every pharmacy benefits manager. (Tr. @ 346). Prescription

**Exhibit 28**

costs can vary based upon the change in formulary tiers. H__ determined that prescription co-pays did not change during the switch from Optum to Express Scripts because the medications remained in the same tiers, (i.e., Tier 1, 2, or 3). (Tr. @ 352-353).

Finally, H__ testified that in terms of "cost increase mitigation," the Employer determined that "the Aetna ESI combination was the best alternative."

Ms. B__ ("B___"), Director of Labor Relations since 2016, reviewed the healthcare provisions in CBAs since the 2005-2009 CBA, including PTF eligibility to participate and have access to the medical and dental benefits. Article 29(e) of the 2009 MOA increased premium caps from 5% to 9%. The 2015 MOA allowed PTF to meet the eligibility criteria by teaching 90 hours in one semester.

With respect to the 2014 to 2019 CBA, Article 29(d), B__ testified that labor relations has interpreted "comparable benefit plans" as "providing access to an EPO, an exclusive provider organization that provides in-network services for medical services." (Tr. @ 387-388). In Sections E and F, the term "comparable benefit plan" has been interpreted as "providing access for PTF to the DHMO or DPPO Plan."

Other than the limitation cap placed on the increase in the premium of 10 percent each year, B___ was unaware of any other limitations on how much the University can charge eligible UAW members for insurance. (Tr. @ 388-389). B__ was aware of unilateral plan design charges made by the Employer without negotiating with the Union. Prior to the instant grievance, she was unaware of any grievances filed by the Union regarding plan design changes.

During the grievance meetings, the Union raised concerns about durable medical equipment, rehab services and home and health services. She reviewed the provisions in the COVID MOA that allowed about 80 faculty to remain eligible for coverage.

With respect to document requests, B___ testified that the University had complied unless the information sought was proprietary or outside the scope of the grievance.

On cross-examination, B__ could not recall any specific communication about services that would be restored (or reimbursed) after the second grievance hearing and before the first hearing date on September 21, 2021.

### _DISCUSSION_

### A. Comparability of the 2021 Aetna Plan

Considering the evidence in its entirety, the Arbitrator is persuaded that the Employer violated Articles XXIX.D, XXIX.E and XXIX.F of the 2014-2019 collective bargaining agreement when it implemented its new medical and dental plans effective January 1, 2021. In the Arbitrator's opinion, notwithstanding the parties' contract language providing that "[e]ligible faculty shall be offered the opportunity to participate in the United Healthcare and Delta Dental DHMO or DPPO plans as of January 1, 2016 or the comparable benefits plans thereafter," the Employer, on January 1, 2021, implemented the 2021 Aetna Medical Plan and the 2021 Dental DHMO, which are not comparable to the plans they replaced.

Although the Employer has been given latitude in plan design since the Union was certified in 2005 and has made some unilateral changes such as increasing co-pays and adding deductibles, without Union objection or grievance filing, the cost impact and the scope of the changes implemented by the Employer, effective January 1, 2021, particularly the addition of co-insurance has far exceeded the parties' expressed intent that cost and benefits provided be comparable to that of the pre-existing plans.

The Employer has argued that so long as the part-time faculty (PTF) have access to an Exclusive Provider Organization (EPO) plan, a plan that limits coverage to in-network providers and adheres to the 10% limit on premium increases set forth in Article XXIX, Section L, it has not violated the Agreement because the plans are comparable. In the Arbitrator's opinion, the Employer has exceeded the parameters of a "comparable benefit plan" by its application of co-insurance in the Aetna EPO Schedule of Benefits to several services such as diagnostic testing, durable equipment, X-ray, MRI, CAT-scans, sonograms, et al. — services which Union members credibly testified that used to be free of charge or subject only to a co-pay.

The crux of the instant case focuses on the definition of the term comparable. Given the wide disparity between the parties on the appropriate definition of comparable, with the Employer asserting that the provision of an EPO-level plan is sufficient for plans to

**Exhibit 28**

be comparable and the Union relying on the dictionary definition, the Arbitrator is inclined to accept as the default definition of comparable as "similar in size, amount or quality to something else." See, The Cambridge Dictionary.

The case law cited by the parties is largely supportive of a definition of comparable requiring the plans at issue being "substantially similar" or as in **Whayne Supply** ("having enough like characteristics and qualities to warrant comparison"). Although the benefits or services provided to members in the new Aetna plan were not dissimilar to the benefits provided in the old UHC plan, the evidence established that the plans were not comparable when entirety of their costs and financial impact on the employees were considered.

There is case law holding that in contract language where a comparable benefits standard has been utilized in the health insurance plan the Employer's latitude to change the plan can be limited. Such factors include the adoption of a new plan that did not allow participants to choose their own doctors, **Joy Mining Machinery**, plan administration that led to increased employee costs, _Celina Schools_, or significant increases in co-pays for medication ,**Wilkes-Barre Housing Authority**. These factors have been found sufficient to render a new plan not comparable to its predecessor,

There is a consensus in the case law that to be deemed comparable, the plans need not be identical. To declare the new plan not comparable, a cost-benefit analysis should be conducted to ascertain whether the net result of the employees' experiences under the new plan are similar to their experiences under the old plan acknowledging at the same time that cost increases in one component or feature of the new plan can be offset by cost reductions or increased benefits in other components of coverage. In analyzing the 2021 EPO Plan as a whole, it is reasonable to balance what benefits "the employees may get against what they must give." _Scioto County Sheriff's Dept_.

Unlike the Employer, which has restricted its definition of comparable to the provision of an EPO-level plan that limits coverage to in-network providers and one that does not exceed the 10% contractual CAP on premium increases, the Arbitrator finds that the comparability criterion further imposes a limit on changes to plan design to the extent that Employer does not have _carte blanche_ to introduce and increase coinsurance _ad infinitum_ as Employer witness H__ testified.

The Arbitrator is not convinced that previous plan design changes to health insurance plans to which the Union acquiesced or did not grieve such as the 2015 increase of the hospital co-pay from $0 to $125 under its EPO Plan or the 2016 addition of in-network deductibles from $100 for individual coverage and $200 for family coverage constituted a blanket waiver of the Union's right to ever challenge elements of policies and plans that it deemed not comparable to the prior healthcare plan. The foregoing limited changes, which the Employer has implemented under the applicable 2014-2019 CBA, have not negated the requirement set forth in contract language that plan design changes must meet the "comparable benefits" standard.

Clearly, the parties have negotiated major cost provisions in their current CBA. Previous contracts have set specific dollar amounts that eligible PTF members have to contribute to the healthcare premium. Subsequent contracts specified the amounts that premiums could increase for either named plans or "comparable benefit plans." Article XXIX, Medical and Dental Benefits, Section F not only states that "[e]ligible faculty shall be offered the opportunity to participate in the UHC and Delta Dental DHMO or DPPO Insurance Plans as of January 1, 2016 or to comparable benefit plans thereafter," it specifies that "[t]he percentages of premium outlined in this article will be applied each year of the contract term to the premium negotiated with the carriers of the plan discussed herein."

Furthermore, the parties have established premium increase caps, limiting the employee's contribution to the annual premium increase imposed by either the health or dental companies to 10%. Whereas the Employer correctly notes that Article XXIX, Section L of the CBA "is the only section of the contract that places limitations on how much the University can charge eligible PTF for health and dental insurance," this statement is only true in a quantitative sense because the requirement that new plans must provide benefits comparable to the old plan can be reasonably construed as a cost limitation.

The parties also engaged in negotiations in July 2020 to effectuate a COVID-19 Recovery Plan (MOA) wherein the terms of the 2014-2019 CBA were extended with each side making concessions due to the pandemic. Although the MOA made changes to the eligibility

**Exhibit 28**

requirements for PTF healthcare participation, the requirement that any new healthcare plan be comparable to the plan it replaced remained intact.

In the Arbitrator's opinion, it strains credulity to infer that the Union, which has negotiated all changes in the healthcare plans since 2005 that have had a significant or major impact on benefits and costs to members, would relinquish that bargaining right when the University changed its third- party administrator from UHC to Aetna for its 2021 health insurance coverage.

It is undisputed that in switching from UHC to Aetna, the plan design changes implemented by the Employer did not increase the out-of-pocket maximums, which have remained at $3500 for individual coverage and $7000 for family coverage for at least the past five years, or the deductibles; however, the testimonial and documentary evidence established that the unilateral addition of co-insurance has dramatically increased the out-of-pocket costs for many members.

In the Arbitrator's opinion, the parties' use of the term "comparable benefit plans" was not intended solely as a modifier or descriptor of the term EPO (or DHMO/DPPO) in order to equate the term "comparable benefits" as being synonymous with any EPO level plan it replaced, irrespective of the plan's content or level of coverage. This would be a superficial interpretation of the term "comparable." Rather, it use was intended to ensure that any successor EPO or healthcare plan would be similar or comparable to the EPO plan it replaced with respect to benefits and costs.

In Article XXIX, Section F, PTF are offered the opportunity to participate in the UHC and Delta Dental DHMO plans as of January 1, 2016 "or comparable benefit plans thereafter." In the Arbitrator's opinion, the plain meaning of this language indicates that whatever new plan the University designs must be similar or comparable to the plan it replaced not just in the name or level of the plan but, more significantly, in its substantive content and benefits.

Moreover, unlike the University, the Arbitrator maintains that the scale of the change implemented matters because at some point the increased costs or reduction in benefits can transform the new healthcare plan into one that no longer resembles the plan it replaced, rendering it no longer comparable in costs or benefits.

### B. <u>Testimony</u>

Although the Arbitrator acknowledges that the testimony of six Union witnesses regarding the cost impact of the Aetna plan administration may not be representative of the entire PTF, but rather constitutes evidence of the more compelling experiences of unit members, to the extent they are relevant in evaluating the impact of the coinsurance, the Arbitrator, in the absence of countervailing evidence, credits their accounts. In this regard, the testimony of the Union witnesses established that certain services, which were formerly covered by a standard co-pay, at no cost, or at a very low cost such as durable equipment (e.g., prosthesis), mammograms, diagnostic testing (i.e., biopsy, sonogram), imaging (e.g., MRI, Cat-Scan) and treatment services (e.g., surgery and chemotherapy), have been subject to co-insurance, thereby substantially increasing costs toward the out-of-pocket maximums. In some cases, the co-insurance has served to compound co-pays that previously had been the only amounts members paid for these services.

There is also evidence that the cost of prescriptions have increased. The testimony of L.C. that a medication she required between chemotherapy sessions, named Neulasta, which was fully covered under the UHC insurance policy in December 2020, was initially denied coverage under the new 2021 Aetna policy. A back and forth ensued between Aetna and the employee, with the employee ultimately appealing her case to the NYU hospital for coverage based on financial hardship. Even if she succeeds in her appeal L.C. expects to be charged the full $3500 out-of-pocket maximum.

J.E. also experienced increased costs for her and her husband's medication. J.E. testified that the cost of their medication went from $800 a year to between $4,000 and $4,500 a year. She attributes the increase to the cost of insulin, which had been provided free of charge in 2020, but now costs $125 for a 75-day supply.

The Arbitrator acknowledges that the medication experiences of L.C. and J.E. could be atypical, or that similar increases could have occurred under the Optum RX prescription plan. Moreover, these increased costs may not be directly attributable to the Employer because, as H__ testified, "the prescription drug costs are not determined by drug

**Exhibit 28**

companies who contract with prescription benefit managers (e.g., Express Scripts)." However, the failure of the Employer to produce documents (e.g., 2020 Optum RX formulary) pursuant to the Union's request for documents warrants an adverse or negative inference that had the information been produced it would not have been beneficial to the Employer.

Absent the requested information, H__'s testimony that "the University maintained the same co-payments and medication tiers (Tiers 1-3) for prescriptions when converting from Optum RX to Express Scripts" cannot be confirmed. The need for the formulary was established given H__'s testimony that when "benefits managers change formularies one or two times a year...a particular drug might move from one tier to another, impacting costs." Without the requisite documents, the Union was precluded from conducting a detailed analysis of how much medication costs increased from 2020 to 2021.

The impact on the Union membership has been compounded when these costs are compared to the salaries earned by the average PTF. For a PTF earning a salary of $8000-$9000 before taxes and paying a premium of $2421 for teaching two non-credit courses, the addition of the co-insurance, limited only by the out-of-pocket maximum of $3500 for an individual, can constitute as much as 75% of their pre-tax salary. As Union representative E__ testified, "For many of our members $3,500 can be really — it's a lot of money. And we've already seen testimony where people are delaying care or withholding care because they're concerned that their out of pocket is something they financially can't handle." Accordingly, the Arbitrator discerns credible evidence that even though the new plan retains the same out-of-pocket caps of $3500 or $7000 per year, the application of co-insurance for numerous services that were previously covered renders the new Aetna plan not comparable to the prior UHC plan.

## C. **Past Practice**

The Arbitrator is not persuaded that the Employer's unilateral implementation of co-insurance is supported by a past practice established by the Union's acquiescence to previous plan design changes and its acceptance of increases in deductibles and co-pays. These limited concessions did not become tantamount to an implied contract term whereby open-ended increases in costs, predominately the addition of co-insurance, circumvented the express contract language requiring "comparable benefits."

The two instances cited by the Employer where the Union failed to object or file a grievance, the $125 co-pay for hospitalization in 2015 and an increase in the deductibles in 2016, lack both the consistency and longstanding mutual acceptance needed to establish a past practice binding on the Union with respect to more substantial changes. As the Union correctly notes, the Employer's right to make minor adjustments in its healthcare plans while retaining the comparability requirement of the overall plan does not extend to major changes in the healthcare plan that are substantively distinguishable.

It is well-established in arbitral law that "the scope of a practice is confined to the specific situation out of which it arose and does not control the outcome of a similar, but factually distinguishable issue." In a similar vein, "the non-exercise of the Union's right to grieve a particular change does not negate its right to grieve a subsequent change" nor create a "negative past practice." See, How Arbitration works.

## D. **Case Law Analysis**

The **White Rock Quarry** case relied upon by the Employer is distinguishable from the instant case. First, the relevant contract provision, which permitted the Employer to change the health insurance program of the group employees "from time to time as the Company deems appropriate," did not include the requirement that as a result of the changes the health insurance program had to remain comparable to the prior program.

Second, the changes implemented by the Employer were made in their existing categories rather than pursuant to a new coverage category or cost factor. For example, when there was previously 100% coverage under past policies for certain basic services, "the plan reduced such coverage to 80%." Also, the co-pays "were increased from 10% or $10 to 10% or $5 which is greater." In both cases, the Union acquiesced to changes in the healthcare plan that were within the existing parameters or focused on specific elements of

**Exhibit 28**

the existing plan, unlike the 2021 __Employer plan herein which introduced co-insurance, a new, costly and distinguishable healthcare provision.

Similarly distinguishable is the IBEW case where, unlike the comparable benefits language set forth in the instant parties' CBA, it states:

> The Company and Local 611, I.B.E.W. have a mutual concern as to the benefits available to employees under these various plans as well as the costs of providing these benefits. Also, both Local 611 and the Company are mutually interested in continuing these plans, with the level of benefits as presently provided, but both parties recognize and agree that the Company cannot guarantee their continuance in perpetuity. If it is the desire of Local 311 to negotiate with the Company for the benefits available under the plans for employees covered by the Agreement with Local 611, the Company recognizes that Local 611 may be accorded this right. However, it is understood that the Company does not surrender any rights of consideration of the costs of the plans outlined above as part of any adjustment in any wage negotiation."

The Arbitrator does not read this language as requiring the Employer to ensure that new benefits following any changes implemented remain comparable to the benefits previously provided. While the Union is given the right to negotiate with the Company for the benefits available under the plans, the Company is under no obligation to ensure their comparability once changes are made. Since the Union in IBEW had acquiesced to the Employer's "unilateral and frequent changes to the medical plan, including benefit levels," and had consented when the Employer's "instituted a 'reasonable and customary' assessment to all covered charges within the health plan," the Arbitrator was led to conclude that the "ambiguous language...permits the Company to decrease as well as increase benefits in the medical plan...so long as the entire cost of the insurance is borne by the company."

In Village of Elk Grove, the issue for the Arbitrator was whether the language "'substantially similar' applies to each benefit individually or whether it addresses the benefit package as a whole." Village of Elk Grove is distinguishable from the instant case not only by the fact that the medical plan itself was separate and distinct from the CBA whereas the parties herein have specified in contract language that "[e]ligible faculty shall be offered the opportunity to participate in the UHC and Delta DHMO Insurance Plans..." but also in the fact that co-insurance was a cost factor explicitly included in the contract language. The Arbitrator reasonably concluded that the "substantially similar" language was a limitation that applied to the entire benefit package. Significantly, he found that the Union failed to show that "the bargaining unit as a whole was significantly affected by the change...Rather, the evidence indicated that the impact of the changes on the bargaining unit as a whole is minimal..."

Similarly, the Employer, in alluding to *Village of Oak Lawn*, **supra**, correctly observes that "the more reasonable interpretation is that the limitation [the plans for medical, dental, vision and prescription drug benefits may not be substantially changed by the Employer without the agreement of the Union] applies to the benefit package as a whole."

More germane to the instant case are the cases of Joy Mining Machinery and *Celina City Schools* where the Employer was allowed to change health insurance plans so long as the plans were "comparable" or "at least comparable" to the prior plan. In each case, the Employer's unilateral change in a fundamental benefit (i.e., denying participants the right to choose their own doctors or administer the plans in a way that resulted in increased costs) rendered the plans not comparable. In the Arbitrator's opinion, the addition of co-insurance impacting a range of services, as distinguished from increasing or decreasing the cost of an existing benefit, constitutes a fundamental and untenable change in the plan, rendering it not comparable.

Considering the case law in the aggregate, pivotal factors emerge in determining whether a change in a hospital plan's costs and benefits permit a plan to remain comparable among which are: the relation of the change(s) to prior changes in costs and benefits, the financial impact of the change on the employees, and the Union's acquiescence to similar changes of comparable magnitude in the past. Since the comparability criterion requires that the net result of plan changes must produce a plan that is similar or comparable in costs and benefits to the plan it replaced, the magnitude of

**Exhibit 28**

the change must be within the parameters previously acceded to by the Union, and the change should not introduce unique elements unbeknownst to the parties during their negotiations. Changes in co-pays and deductibles have allowed plans to be deemed comparable so long as the increases in costs or reduction in benefits are within the ranges previously sanctioned by the Union or pursuant to its decision not to grieve the changes. Only when a new dimension is introduced to a plan or a substantial change in a benefit or cost occurs that significantly deviates from the pre-existing plan, as in the instant case, is the change likely to constitute a contract violation.

Ideally, analyzing the costs and benefits to the entire bargaining unit are the best measure of whether the Aetna plan is comparable to the UHC plan. Where feasible, plan changes should be evaluated in their entirety to ascertain whether they are comparable to prior plans. The comparable benefits requirement obviates the need to include an explicit item by item restriction on plan design changes. However, when relevant documents requested by the Union that are required to conduct the analysis are not produced by the Employer alternative means can suffice.

**E. 2021 Dental Plan**

Having found that the comparability of the 2021 Dental DHMO is properly before the Arbitrator because it was an issue addressed by the parties during the grievance process, the Arbitrator further finds that the record evidence supports a finding that the Aetna DHMO implemented in 2021 is not comparable to the Delta DHMO which preceded it.

E__, in his credible testimony, compared the 2021 Aetna Dental Benefits Summaries (U. Exs. #10, #11) and the DHMO Booklet for the Aetna Plan (U. Ex. #77) with the 2016 Delta DHMO Summary (U. Ex. #77) and concluded that "co-pays have increased by over $100 on over 100 procedures." For example, the co-pay for partial dentures increased from $240 to over $700. Significant increases for other dental procedures were identified, supra.

The Arbitrator draws an adverse inference from the Employer's failure to produce the Schedule of Benefits to go with the Booklet from the 2021 plan. (U. Ex. #64 — August 25, 2021 email). It is noteworthy that "the night before the arbitration hearing began on September 21, 2021 the Employer informed the Union that the 2016 document was the most recent document available and was applicable to 2020."

**F. Management Rights**

The Management Rights' provision of the parties' CBA does not support the University's actions. It is well-established that a management rights provision is subject to specific contract provisions or a binding past practice that restricts those rights. Here, several articles in the parties' CBA require that changes in the healthcare plan result in a plan that is comparable in benefits and costs to the pre-existing plan.

The Arbitrator is not convinced that the parties' negotiation of a new healthcare plan would necessarily lead to an inequitable result. Clearly, the parties negotiated 2020 COVID-MOA without adversely impacting their respective positions. The University's concerns about the rising costs of health insurance as well as the Union's interest in ensuring that coverage continue for its members, whose eligibility was affected by the pandemic, were equitably addressed.

**G. Maintenance of Benefits**

The Union has not raised the issue of whether the University violated Article XXXVIII: Maintenance of Benefits in its post-hearing brief. On the one hand, the Employer has argued that all healthcare benefits have been continued in the Aetna 2021 plan. As it contends, "the evidentiary record unequivocally proves that at all times __Employer has continued to provide eligible bargaining members with health insurance access..." On the other hand, the Union has focused on the provisions that require the continuation of comparable benefit plans. This issue may be moot because new plans, which significantly increased costs through co-insurance and higher co-pays, that are no longer comparable, can also reduce benefits, particularly if these increased costs cause employees to forego treatment.

**Exhibit 28**

## Conclusion

The Union here has shown not only through the credible testimony of six witnesses whose experiences with the new plan were documented but also through the testimony of Union Representative E__, who analyzed the plan documents and compared the provisions of the 2020 and 2021 plans, concluding that the 2021 Aetna Plan was not comparable to the 2020 UHC Plan. E__'s review of the medical plans, including the 2020 UHC Summary of Benefits and Coverage (SBC), UHC Summary Plan Description, the 2021 Aetna SBC, the Aetna Plan Design and Benefits, and two additional documents — the Aetna Booklet and the Schedule of Benefits — reinforced his testimony that there were "substantial differences" between the 2020 and 2021 plans. The most substantial difference focused on the addition of co-insurance — an open-ended charge limited only by the out-of-pocket maximum.

From the evidence adduced from the testimony of six Union members, standing alone, it cannot be ascertained with a high degree of certainty that their experiences represent the bargaining unit as a whole. However, the credible testimony of the six witnesses, supported by Explanation of Benefits (EOB) and other documentary evidence, E__'s analysis of the plan documents, and his hearsay testimony that the Union leadership had received multiple complaints at a Town Hall meeting and collected 850 signatures on a petition about reduced benefits and increased costs in the 2021 plan constitute, in the Arbitrator's opinion, preponderant evidence that a contract violation has occurred.

The evidence further indicates that co-insurance alone has led to thousands of dollars in extra medical expenses for PTF members. The testimony of six (6) Union witnesses combined with E__'s testimony based on his analysis of the relevant medical plan documents, absent refutation of these cost increases by the Employer, persuade the Arbitrator that a contract violation has occurred.

The Employer's witness, Ms. H__, acknowledged that the added plan design feature of co-insurance could be increased 25% or 50% and that it was currently being applied to the range of services identified by the Union witnesses. In fact, H__ testified that the University selected Aetna as its third party administrator because, in terms of "cost increase mitigation, the Aetna ESI combination was the best alternative."

The Union has further shown that the 2021 Aetna Dental Plan was not comparable to the 2020 Delta Dental plan. The credible testimony of E__ and his comparison of the 2021 Aetna Dental Benefits Summaries and the DHMO Booklet for the Aetna Plan with the 2016 Delta DHMO Summary established that the plans were not comparable. As discussed above, the information was not available to compare the prescription plans.

Considering the evidence in its aggregate, the Arbitrator is persuaded that the Union has provided preponderant evidence tantamount to a *prima facie* case to which the Employer was obligated to respond, showing that the bargaining unit, in its entirety, notwithstanding the testimonial and documentary evidence adduced by the Union, received a totality of benefits at a cost which offset the Union's claim that the 2021 plan was not comparable. In this regard, the Employer did not provide evidence sufficient to rebut the Union's *prima facie* case that the 2021 Aetna Plan was not comparable to the 2020 UHC Plan, thereby violating the CBA.

Moreover, since the Employer has withheld documents in its possession, which would have facilitated the Union's ability to supplement its case-in-chief, the Arbitrator maintains that it cannot benefit from this non-compliance.

## Remedy

The Arbitrator is mindful of the difficulty of fashioning a remedy in this case. Ascertaining the extent to which PTF costs would have increased under the UHC healthcare and Delta DHMO plans had the University not switched to the Aetna Medical and Dental will be a daunting task. In awarding the remedy sought by the Union, the Arbitrator anticipates that the parties will undoubtedly address the co-insurance provision introduced in conjunction with the 20021 Aetna Plan.

NOW THEREFORE, as the duly selected Arbitrator, having reviewed the evidence presented, I hereby issue the following:

**Exhibit 28**

### *AWARD*

(1) The University violated the collective bargaining agreement when it implemented its new medical and dental plans, effective January 1, 2021.
(2) As a remedy, the Employer is ordered to implement new medical and dental benefit plans that are comparable to the plans that were in place in 2020.
(3) The parties are directed to negotiate a claims procedure that provides for unit members to be reimbursed for costs that they would not have incurred but for the implementation of non-comparable plans.
(4) The Arbitrator shall retain jurisdiction *sine die* to address any issues that may arise in the interpretation or implementation of the remedy portion of this award.

January 20, 2022                    Robert T. Simmelkjaer

STATE OF NEW YORK}
COUNTY OF NEW YORK}

I hereby affirm upon my oath as Arbitrator that I am the person who executed the foregoing instrument which is my award.

January 20, 2022                    Robert T. Simmelkjaer

---

fn 1 The Employer has switched insurance carriers on multiple occasions since 2010. (Tr. @304-308, 313-314) (E. Ex. #2).

fn 2 A co-pay is a set fee for a particular service that a patient pays regardless of the cost of the visit. (H__ 282:21-283:17).

fn 3 A deductible is the amount an insured pays prior to coverage kicking in; it is the amount a patient pays before a TPA/insurance covers a particular service. (H__ 284:3-18).

fn 4 Co-insurance is a fee structure whereby a patient pays for a portion of the actual costs of a given service. For example, if an MRI costs $1000 and there is a ten (10) percent coinsurance, the patient pays ten dollars, and the employer pays $900. (H__ 282-21-283:8).

fn 5 An out-of-pocket maximum is the maximum liability that a member would pay in a given year for the sum total of deductibles, co-insurance and co-payments before the plan covers 100% of the costs.

fn 6 Based on the current 10% co-insurance for diagnostic procedures, and the experience of other witnesses, J.E. can expect to be billed for these procedures, procedures which were free under previous policies.

fn 7 These increases resulted notwithstanding her extensive use of manufacturer coupons to reduce costs. (Tr.@87-88)

**Exhibit 28**

R & EMPLOYMENT

## Arbitration Decisions

Labor Arbitration Decision, THOMPSON FUEL SERVICE, 63-ILHK-136, 42 BNA LA 62

**Labor Arbitration Decision, THOMPSON FUEL SERVICE, 63-ILHK-136, 42 BNA LA 62**

Decision of Arbitrator

In re THOMPSON FUEL SERVICE [Lakewood, N.J.] and INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS, LOCAL 866

Case No. 63-ILHK-136

January 15, 1964

Show Summary

Appearances: For the union-Howard A. Goldberger, attorney; Andrew C. Contaldi, secretary-treasurer; Grievant.

KERRISON, Arbitrator:

**EX PARTE HEARING**

**The Issue**

The issue submitted was the following:

> "Was X- discharged for just cause under the terms of the contract between the parties? If not, what is the relief?"
>
> X-was discharged on September 9, 1963.

**Discussion and Findings**

Despite the arbitration clause in the contract between the parties, formal designation of an arbitrator in and formal notice of the time, date and place set for hearing on the instant case, neither the employer nor his representative appeared.

The arbitrator thus was confronted with an ex parte situation, and some background discussion is in order.

Arbitrators long have held that the failure of a party to take advantage of its right to present its case in hearing does not invalidate the arbitration proceeding. In cases where one party willfully or deliberately defaults, they have heard testimony and rendered awards as if both parties had been present.

**Exhibit 28**

Arbitrators reason that a general arbitration clause in a contract would be meaningless if its implementation depend on the willingness of each party to present its case. Obviously, the party not desiring arbitration could nullify the contractual obligation to accept it simply by refusing to make an appearance. Such action or lack of it cannot be tolerated.

Arbitrators consistently have held that, unless the law provides to the contrary, an arbitration shall proceed in the absence of any party who, after due notice, fails to be present or fails to obtain an adjournment.

This was the decision of the arbitrator in the instant case.

Normal procedure in New Jersey is for the party challenging arbitration either to refuse to submit or to seek a temporary injunction or "stay of arbitration". The party seeking arbitration then goes to court to compel the challenging party to submit.

The extent of court participation usually depends upon the prevailing law and the language of an arbitration clause. It is clear, however, that the courts are reluctant to deal with substantive issues. Further, New Jersey has a modern arbitration statute under which the courts do require a recalcitrant party to proceed with arbitration in accordance with the arbitration clause in the contract to which it is a party.

In addition, Section 301 of the National Labor Relations Act requires federal courts to compel arbitration in all instances except those where it is clear that the parties did not intend to commit their disputes to that procedure. Lincoln Mills and the steel trilogy (American Manufacturing, Warrior and Gulf, Enterprise Wheel and Car) are illustrative of its application.

It follows that settlement by means of arbitration mechanisms established in collective bargaining contracts is [*63] highly favored by the courts, and experience supports this opinion.

The plain and simple fact is that failure to live up to an arbitration clause is the exception. For example, a study reported in the January, 1951 issue of Industrial and Labor Relations Review (Vol. 4, No. 2) shows that in only 51 of 16,819 arbitrations conducted in 1949-50 did the losing party refuse to abide by the award.

Enough of background; let us return to the instant case.

Article X of the contract between the parties reads, in part, as follows:

> "Section 1. The Employer may discharge an employee for just cause.

> "Section 2. Should any dispute arise between the Employer and the Union, including discharge, which cannot be adjusted by representatives of Local 866 and the Employer the dispute shall be submitted to arbitration within five (5) days through the NEW JERSEY STATE BOARD OF MEDIATION. The decision of the arbitrator shall be final and binding on all parties. . . ."

The Company clearly is obligated to arbitrate the discharge of X- under this clause and to abide by the decision rendered.

A check of the NJSBM office and file on the instant case and hearing testimony indicates that, when the Board contacted C. Antrim Thompson, the employer, regarding a Union request for arbitration of the X- discharge, it was directed to "set things up" with Company counsel, Tepper and Verney, Newark.

After the usual preliminaries, a hearing was scheduled for January 7, 1964 and both Company and Union counsel were so notified by Board letter dated December 6, 1963.

When the Company failed to appear on January 7, the arbitrator telephoned Tepper and was informed that he had had no instructions from the Company as to either proceeding or

**Exhibit 28**

requesting an adjournment, despite the lapse of almost a month and repeated attempts to get an answer from Thompson, and could not act.

Under the circumstances, the arbitrator honored the request of Union counsel to proceed ex parte.

The Union contends that X- (classification-driver: seniority-approximately 6 years), shop steward for 4 years, was discharged on September 9, 1963 without just cause.

On that date, according to sworn hearing testimony, Thompson called X- into the office and told him that he was ". . . going to get rid of the Union, and I am going to start with you . . ." The former then discharged the latter on the spot, later gratuitously sending him a check in the amount of $75.00.

Sworn hearing testimony also disclosed that X- never had been suspended, discharged nor disciplined in any other way during his approximately six years with the Company.

While it is true that the Company has not been heard by the arbitrator, it is equally true that the Company willfully and deliberately defaulted and must accept the consequences of failing to take advantage of its right to present its case.

The Company was fully aware of the X- grievance, it authorized counsel to arrange an arbitration hearing and then it attempted to nullify its contractual obligation by refusing to make an appearance. Apparently the Company realized its error after the fact, since the arbitrator, on January 10, received a letter dated January 7 requesting rescheduling of a hearing ". . . at the earliest convenient date possible . . ." For the reasons outlined above, that letter came too late.

Where the language of a contract is plain and unambiguous, its plain and manifest meaning must be adopted. The contracting parties are presumed to have understood the import of the terms used, and there can be no relief to one merely because he failed to realize the full implication of the language used or to anticipate the results. In the instant case, the arbitration clause is clear and unequivocal.

The Union contends that the Company breached the contract in failing to appear at the arbitration hearing scheduled with the concurrence of representatives of both parties, asks the arbitrator so to find, and to reinstate X- in his position with full back pay, less any wages or compensation that may have accrued to him during the period September 10, 1963 to the effective date of this award inclusive, and with no less of seniority or fringes. The arbitrator concurs.

Clear and unequivocal from the contract are the following facts:

1. Under Exhibit A, X- is entitled to the driver's rate of $2.15 per hour.

2. Under Article IV, X- is entitled to:

a. A normal work week of 40 hours for September, 1963.

b. A normal work week of 44 hours for the period October 1, 1963 to the effective date of this award inclusive.

Pay envelopes covering work performed by X- since his discharge for Bradley Fuel Co. of Bradley Beach and **[*64]** Thompson Fuel Co. of Neptune show an aggregate sum of $863.11 accruing to him. He received no unemployment compensation following his discharge.

Had X- continued in the employ of the Company, his aggregate straight time pay under the contract would have been $1,573.80 for the period September 10, 1963 to January 3, 1964 inclusive, a difference of $710.69.

Having carefully considered all of the above, the arbitrator rules as follows:

**Exhibit 28**

**AWARD**

X- was not discharged for just cause under the terms of the contract between the parties. He shall be returned to his position with full back pay (less any wages or compensation that accrued to him) for the period September 10, 1963 to the effective date of this award inclusive, and with no loss of seniority or fringes. Back pay shall be computed as follows:

1. For the period September 10, 1963 to January 3, 1964 inclusive: $710.69

2. For the period January 6, 1964 to the effective date of this award inclusive, a sum computed at the rate of $18.92 per work day, less any wages or compensation that may have accrued to him.

**Exhibit 28**

R & EMPLOYMENT

# Arbitration Decisions

Labor Arbitration Decision, In the matter of COMMONWEALTH OF MASSACHUSETTS/COMMISSIONER OF ADMINISTRATION, SUP-3855,...

**Labor Arbitration Decision, In the matter of COMMONWEALTH OF MASSACHUSETTS/COMMISSIONER OF ADMINISTRATION, SUP-3855, SUP-3955, 1997 BNA LA Supp. 111735**

Arbitration Decision

In the matter of COMMONWEALTH OF MASSACHUSETTS/COMMISSIONER OF ADMINISTRATION AND FINANCE and GEORGE EDWARDS

Case Nos. SUP-3855, SUP-3955

Date Issued: August 18, 1997

John Driscoll, Esq.

Diane M. Drapeau

Administrative Law Judge:

Appearance:

RULING ON THE COMMONWEALTH'S MOTION TO DISMISS

Statement of the Case

George Edwards (Edwards) filed several charges of prohibited practice with the Labor Relations Commission (Commission) alleging that the Commonwealth of Massachusetts (Commonwealth) had violated Sections 10(a)(1), (3), and (4) of Massachusetts General Laws, Chapter 150E (the Law). After investigation, the Commission issued Complaints of Prohibited Practice in Case Nos. SUP-3855 and SUP-3955 and consolidated the cases for hearing. On February 21, 1997, John Driscoll, the Commonwealth's attorney, and Robert Bonsignore, Edwards' attorney, were notified that a hearing on the Complaints of Prohibited Practice was scheduled for August 18, 19, 20, 21, and 22, 1997 at 10:00 a.m. each day.

On July 14, 1997, I issued a ruling based on the Commonwealth's motion to quash previously-issued subpoenas. That ruling modified Edwards' subpoena requests and ordered the Commonwealth to produce certain documents on or before August 8, 1997. In addition, that ruling determined that the testimony of certain witnesses who had been subpoenaed was relevant to the pending proceeding. However, I requested that Edwards serve new subpoenas on the witnesses named in the ruling so that they may have timely notice of the hearing scheduled for August 18 through August 22, 1997. Furthermore, I requested that the parties consult with each other regarding the schedule of the witnesses.

On August 8, 1997, the Commonwealth notified the administrative law judge that it had complied with the July 14, 1997 subpoena order. Furthermore, in an effort to save the Commonwealth the costs of reproduction, the Commonwealth's attorney offered Attorney

**Exhibit 28**

Bonsignore an opportunity to review the documents at their offices prior to the Commonwealth's reproduction of the documents. However, Attorney Bonsignore did not respond to the Commonwealth's offer. The Commonwealth then proceeded to reproduce the documents and notified Attorney Bonsignore that copies of the documents were available to him if he would pay for the costs of the reproduction. Again, Attorney Bonsignore failed to respond to the Commonwealth's offer. Neither Edwards nor Attorney Bonsignore had contacted the administrative law judge to request new subpoenas for witnesses, as ordered in the July 14, 1997 ruling; nor did they request a postponement of the scheduled hearing.

On August 18, 1997, the Commonwealth's attorney appeared for the scheduled hearing, but neither Edwards nor Attorney Bonsignore appeared. Because of their failure to appear, the Commonwealth has requested that the administrative law judge dismiss the Complaints of Prohibited Practice.

I will grant the Commonwealth's motion to dismiss for the following reasons. Attorney Bonsignore is the attorney of record for Edwards and has not withdrawn his appearance from the case. He received notice of the scheduled hearing dates in February, 1997. In the July 14, 1997 ruling, the hearing dates were again mentioned so there could not be any misunderstanding of when the hearing was scheduled to be held. There has been no request for a postponement from either Edwards or Attorney Bonsignore. Furthermore, neither Edwards nor his attorney requested new subpoenas, nor contacted the Commonwealth to arrange a schedule of witnesses, as they were ordered to do in the July 14 ruling. In addition, neither Edwards nor his attorney has made any attempt to review or obtain the documents produced by the Commonwealth in accordance with the July 14 subpoena ruling.

Therefore, because of Edwards failure to comply with the July 14, 1997 ruling, and his failure to appear at the hearing on August 18, 1997, I will grant the Commonwealth's motion to dismiss. Accordingly, the Complaints of Prohibited Practice are dismissed.

SO ORDERED.

APPEAL RIGHTS

The parties are advised of their rights, pursuant to M.G. L. c.150E, Section 11 and 456 CMR 13.13, to request a review of this decision by the full Commission by filing a notice of appeal with the Executive Secretary within ten (10) days after receiving notice of this decision. If a notice of appeal is not filed within ten (10) days, this decision shall become final and binding ont he parties.

**Exhibit 28**

Exhibit 28

# REMEDIES IN ARBITRATION

## Second Edition

**MARVIN F. HILL, JR.**
*Professor of Industrial Relations*
*Northern Illinois University*

**ANTHONY V. SINICROPI**
*John F. Murray Professor of Industrial Relations*
*University of Iowa*

BNA BOOKS

such perversion of the process has been subjected to unnecessary costs that have no reasonable connection with the underlying controversy.

In the Court's Conclusions, reference is made to "awarding damages in the nature of punitive damages." Perhaps a clarification of our intent would be helpful. We directed payment of only those damages necessary to compensate the Company for its actual expenses incurred in those preliminary proceedings where the Union conducted its vigorous and unsuccessful campaign to defeat the exercise of the Company's contractual right to seek relief in the proper contractual forum. Any other claims for damages, either punitive in nature, or amount, or, having any causal connection with the adjudication of the basic dispute, were rejected. The bedrock of our authority is *Section 20* which establishes arbitration and in order to keep the arbitral process a viable institution for the resolution of disputes, we deemed it both reasonable and appropriate to award compensatory damages for conduct that went a vast distance beyond mere foot dragging and produced direct and demonstrable losses.[57]

## 5. Assignment of Costs Where Hearing Untimely Postponed

Unless the collective bargaining agreement or past practice provides otherwise, where a party has acknowledged responsibility for an untimely postponement of a hearing, that party should be assessed any postponement fee. Indeed, such fees are sometimes assessed against the postponing party even when the contract provides that costs are equally shared.[58]

## 6. Awarding Costs for Successful Court Actions

Courts are increasingly awarding costs of defending an arbitrator's award against a party asserting frivolous arguments for overturning the award.[59] Similarly, arbitrators have awarded damages represented by a party's actual expendi-

---

[57]Id. at 3179–3180.
[58]Florida Staff Org., 91 LA 1094 (Mase, 1988) (holding that employer should bear expense of arbitrator's cancellation fee where continuance granted); Denver Pub. Schools, 88 LA 507 (Watkins, 1986).
[59]See, e.g., Posadas de P.R. Assocs. v. Asociacion de Empleados de Casino de P.R., 821 F.2d 60, 125 LRRM 3137 (1st Cir. 1987) (awarding double costs to union contesting employer's action to vacate award).

tures incurred over the years to secure an employer's compliance with the agreement.[60]

## 7. Summary

Absent specific contractual authority, the better rule in grievance arbitration is to reserve awarding of costs for those situations where extreme bad faith is shown. (The better test may be "brazen," or "palpably without merit.") In this regard, such an award should not be made on the arbitrator's own motion, nor should it be granted if not alleged in the lower steps of the grievance procedure. Further, in view of the consequences of a union breaching its duty to fairly represent bargaining-unit employees, there is good reason to refrain from awarding costs against a union, even though the grievance may be considered frivolous. As stated by one arbitrator, "[h]indsight may provide the parties with many reasons for contending that resort to arbitration in a particular case was unwarranted and without justification,"[61] but rarely does a union have the benefit of such clairvoyance.

## C. Attorney's Fees

## 1. Background

Under the prevailing American rule, in a federal action, attorney's fees may not be recovered absent contractual or statutory authorization. The justification for this rule is that "since litigation is at best uncertain one should not be pen-

---

[60]Service Employees Local 722 v. Children's Hosp. Nat'l Medical Center, 117 LRRM 2488, 2490 (D.D.C. 1984) (union entitled to recover expenses incurred in effort to compel employer to comply with court order enforcing award; employer's failure to reinstate grievant pending appeal was "without justification," "without a basis," "vexatious" and, as to the employee, "oppressive"; Wayne County Bd. of Comm'rs v. Police Officer Local 502-M, 254 N.W.2d 896, 95 LRRM 3396, 3397 (Mich. Ct. App. 1977) (upholding arbitrator's award of $27,816 representing arbitration costs borne by union during contract years 1972–1974 to secure contractual compliance by employer, attorney's fees incident to grievance arbitration, and "unusual and excessive administration costs incurred by the union to process and appeal grievances through arbitration to the courts.").
[61]See, e.g., Chattanooga Gas Co., 83 LA 48, 51 (Mullin, 1984) (refusing to assess costs of arbitrating last-chance agreement on union, reasoning that violation of duty of fair representation may result in dire consequences for union's failure to pursue matter to arbitration).

Exhibit 28

alized for merely defending or prosecuting a lawsuit, and that the poor might be unjustly discouraged from instituting actions to vindicate their rights if the penalty for losing included the fees of their opponents' counsel."[62] In *Alyeska Pipeline Co. v. Wilderness Society*,[63] the Supreme Court reaffirmed the American tradition, but recognized that the general rule is subject to certain narrow exceptions. Thus, a court may "permit the trustee of a fund or property, or a party preserving or recovering a fund for the benefit of others in addition to himself, to recover his costs, including his attorneys' fees, from the fund or property itself or directly from the other parties enjoying the benefit" (common benefit exception).[64] The Court also stated that attorney's fees may be assessed "for the 'willful disobedience of a court order . . .' or when the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons . . . .' "[65]

While the exceptions are firmly established, the limits of the bad-faith exception are unclear, especially when applied to arbitration. Generally, three types of cases fall within the bad-faith exception: (1) bad faith occurring during the litigation, (2) bad faith in bringing the action or in causing an action to be brought, and (3) bad faith in the acts giving rise to the substantive claim.[66] The Fourth Circuit has ruled that "[i]n an appropriate case attorneys' fees should be awarded against a party who, without justification, refuses to abide by the award of an arbitrator."[67] The Court of Appeals for the District of Columbia has stated that an "action 'without justification' may be 'vexatious' within the meaning of *Alyeska*, thereby drawing the case within the equitable exception recognized by the Court in that case."[68] The Ninth Circuit discussed the policy reasons for allowing an award of attorney's fees against an employer who refuses to comply with an arbitration award:

[62]Fleishmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 718 (1967).
[63]421 U.S. 240, 10 FEP Cases 826 (1975).
[64]Id. at 257.
[65]Id. at 258–259.
[66]Shimman v. Operating Eng'rs Local 18, 744 F.2d 1226, 117 LRRM 2579, 2582 (6th Cir. 1984).
[67]Automobile Workers Local 149 v. American Brake Shoe Co., 298 F.2d 212, 49 LRRM 2480, 2482 (4th Cir.), cert. denied, 369 U.S. 873, 50 LRRM 2170 (1962).
[68]Letter Carriers v. Postal Serv., 590 F.2d 1171, 100 LRRM 2008, 2013 n.11 (D.C. Cir. 1978).

It is generally recognized that labor arbitration advances the goal of industrial stabilization. . . . Engaging in frivolous dilatory tactics not only denies the individual prompt redress, it threatens the goal of industrial peace. Therefore, the deter[r]ence aspect of an award of attorneys' fees is particularly served where a party, without justification, refuses to abide by an arbitrator's award.[69]

In another case the Ninth Circuit stated that the policy concerns raised by frivolous or bad-faith refusals to arbitrate or appeals of district court orders compelling arbitration are the same as those raised by frivolous or bad-faith refusals to comply with an award.[70]

Case law suggests that courts, applying the "vexatiousness" standard of *Alyeska*, will not award attorney's fees simply because it is subsequently determined that a party was incorrect in refusing to abide by an arbitrator's award. To come within the "equitable" exception of *Alyeska*, a party must show that the refusal to abide by an arbitral order amounted to "acts taken 'in bad faith, vexatiously, wantonly, or for oppressive reasons.' "[71] It is an action without any foundation in law that will give rise to an award of attorney's fees. There is some indication, however, that in light of the federal policy favoring labor arbitration, a more relaxed standard for fee requests is operative. As observed by Judge Richard Posner of the Seventh Circuit, "because there are so few grounds for attacking arbitration awards, it is easy to pronounce most such attacks utterly groundless."[72]

[69]Petroleum & Indus. Workers v. Western Indus. Maintenance, 707 F.2d 425, 428, 113 LRRM 3010, 3012 (9th Cir. 1983).
[70]Food & Commercial Workers Local 197 v. Alpha Beta Co., 117 LRRM 2326, 2335 (9th Cir. 1984) (upholding district court's denial of attorney's fees, stating that employer's arbitrability defense was not frivolous).
[71]Letter Carriers v. Postal Serv., 590 F.2d 1171, 100 LRRM 2008, 2012 (D.C. Cir. 1978). See also Washington Hosp. Center v. Service Employees Local 722, 241 App.DC 186, 746 F.2d 1503, 117 LRRM 2887 (D.C. Cir. 1984); Boston Univ. Trustees v. American Ass'n of Univ. Professors, 746 F.2d 924, 117 LRRM 2885 (1st Cir. 1984) (assessing double costs but no attorney's fees); Manhattan Coffee Co. v. Teamsters Local 688, 571 F. Supp. 347, 117 LRRM 3129, 3133 (E.D. Mo. 1983) (denying attorney's fees, concluding that employer's contentions were "essentially meritless but not quite frivolous"); Fabricut, Inc. v. Teamsters Local 523, 597 F.2d 227, 101 LRRM 2148 (10th Cir. 1979); Nursing Home & Hosp. Employees Local 1115 Joint Bd. v. Krest View Nursing Home, 100 LRRM 2174 (S.D.N.Y. 1978).
[72]Miller Brewing Co. v. Brewery Workers Local 9, 739 F.2d 1159, 1168, 116 LRRM 3130, 3137 (7th Cir. 1984), cert. denied, 469 U.S. 1160, 118 LRRM 2192 (1985) ("some courts have applied what appears to be a less demanding standard to fee requests in labor arbitration cases than in other cases, by giving the party successfully defending the award his attorney's fees if the opposition was 'without justification' "). See also

## 2. Arbitral Response

As a general proposition, arbitrators, like the courts, do not award attorney's fees for a simple breach of the collective bargaining agreement. For example, in *Montgomery County Community Action Agency*,[73] Arbitrator Harry Dworkin, denying the union's request for attorney's fees, stated:

The instant arbitrator therefore concludes that he is prohibited from considering attorney fees as an element of damages and a form of relief inasmuch as, 1) the instrument providing for the arbitration of employee grievances contains no language that expressly, or by clear implication grants such authority; 2) the submission of the grievance to arbitration does not encompass attorney fees as an element of relief; 3) the authority of an arbitrator to award costs against either party, does not extend to attorney fees; 4) the "common law" of labor arbitration, as enunciated by arbitrators in their reported decisions is to the effect that exemplary damages including attorney fees will not be awarded by way of relief; 5) an arbitrator is without authority to award attorney fees absent express language empowering him to consider such, even where there is a finding that the employer's actions were tainted by fraud, malice, wantonness, or caprice, since arbitrators may not award punitive damages against the wrongdoer.[74]

Some arbitrators, however, have held that jurisdiction does exist for awarding attorney's fees. In support of this view, Arbitrator Wilbur Bothwell has held:

The arbitrator believes that an arbitrator does have jurisdiction and authority to award damages, including attorneys' fees, under appropriate circumstances, even though the Agreement contains no language authorizing the arbitrator to award damages. The award of legal costs and attorneys' fees should not be made in cases where there is evidence of good faith. It should be pointed out that an award of attorneys' fees is not an award of punitive damages when the damages are limited to

---

Automobile Workers Local 1165 v. United States Farm Tools, 762 F.2d 76, 119 LRRM 2559 (8th Cir. 1985) (questioning employer's honest disagreement as to validity of award where employer did not act to have award set aside).

[73]62 LA 1278 (1974).

[74]Id. at 1281. Accord City of San Antonio, 69 LA 541 (Caraway, 1977); George Ellis Co., 68 LA 261 (Sacks, 1977); Westinghouse Transp. Leasing Corp., 69 LA 1210 (Sergent, 1977); Farmer Bros., 65 LA 884 (Jones, 1975); Hampton Corp., 39 LA 177 (Davis, 1962).

---

the actual expenses incurred in the unnecessary legal proceedings.[75]

Where one arbitrator awarded $200 in attorney's fees for an employer's simple breach involving payment of holiday pay, the First Circuit affirmed a lower court's determination that the remedy was improper. The court pointed out that arbitrator cited no provision in the agreement authorizing such an award and did not provide any rationale for the remedy. The court further reasoned that there was no showing that the union made a claim for such damages, or alleged willful, wanton, or bad faith conduct that could justify such an award of attorney's fees.[76]

In cases where the employer is claiming monetary damages for breach of the no-strike clause, arbitrators have frequently awarded attorney's fees.[77] Thus, in *Fortex Manufacturing Co. v. Clothing Workers Local 1065*,[78] a federal district court upheld an arbitrator's award of attorney's fees because the parties stipulated that the arbitrator was to base his decision upon federal law as if the action were brought in federal court. Since the employer voluntarily withdrew its Section 301 suit from district court and agreed to submit the dispute over damages to arbitration, and because the arbitrator did not stray from the scope of the submission (e.g., the arbitrator's powers would equal the court's powers), the court deferred to the arbitrator's grant of legal fees based upon his conclusion that the union failed to undertake every reasonable means to end the strike.

Arbitrators have also come down hard on unions that engage in deliberate dilatory tactics aimed at frustrating the grievance procedure. In *Litton Systems v. Shopmen Local 522*,[79]

---

[75]Leavenworth Times, 71 LA 396, 409 (1978). Other cases awarding attorney's fees include, Synergy Gas Co., 91 LA 77 (Simons, 1987); Basic Vegetable Prods., 64 LA 620 (Gould, 1975); Sonic Knitting Indus., 65 LA 453, 469 (Helfand, 1975); Sunshine Convalescent Hosp., 62 LA 276 (Lennard, 1974).

[76]Bacardi Corp. v. Congreso de Uniones Indus. de P.R., 692 F.2d 210, 111 LRRM 2923 (1st Cir. 1982).

[77]See Chapter 11, *Employers' Remedies for Breach of No-Strike Clause*. For a comprehensive review of the issue of attorney's fees and recent litigation, see Sterling Gravure Co., Div. of Sterling Regal, 79-2 ARB ¶8325 (Kaplan, 1979). See also Rust Eng'g Co., 77 LA 488 (Williams 1981); Fortex Mfg. Co., 67 LA 934 (Bryan, 1976), enf'd, Fortex Mfg. Co. v. Clothing Workers Local 1065, 99 LRRM 2303 (M.D. Ala. 1978).

[78]99 LRRM 2303 (M.D. Ala. 1978).

[79]90 LRRM 3176 (S.D. Ohio 1975).

Case 4:15-cv-04010-KES   Document 37-7   Filed 06/25/26   Page 358 of 417

Exhibit 28

a federal district court upheld an award by Arbitrator Clair V. Duff of attorney's fees and expenses to the employer caused by a union's unjustified delay in proceeding through arbitration. The court concluded that the award drew its essence from the contract because it agreed with the arbitrator's supplemental decision. In the supplemental decision the arbitrator had found that the grievance arbitration procedure was totally frustrated and essentially abandoned by the union's deliberate dilatory tactics aimed at avoiding the speedy and efficient dispute resolution procedure provided for in the contract. The arbitrator reasoned that if no compensatory damages could be awarded for losses occasioned by attempts to frustrate the grievance procedure, an arbitrator would be unable to fulfill his obligation to conduct a fair trial of the issue in dispute.

## 3. Sanctions Under Federal Rule 11

Rule 11 of the Federal Rules of Civil Procedure provides for sanctions (including reasonable attorney's fees) against pleadings that do not reflect the signing attorney's "belief formed after reasonable inquiry [that the pleading] is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law."[80]

## 4. Summary

The decisions indicate that attorney's fees are appropriate, not as a matter of course for simply arbitrating a particular case but, rather, as an element of damages resulting from a party's bad-faith refusal to comply with the terms of a collective bargaining agreement or the mandates of a prior arbitration award. An award of attorney's fees in a labor dispute as an appropriate amount of damages should not be seen as a punitive remedy, especially when the arbitrator finds conscious, deliberate, and egregious wrongdoing by a party.

---

[80]Dreis & Krump Mfg. Co. v. Machinists Dist. 8, 802 F.2d 247, 255, 123 LRRM 2654 (7th Cir. 1986) (holding union entitled to attorney's fees in employer's unsuccessful action to vacate).

## D. Attorney's Fees in Federal-Sector Arbitration[81]

Two separate provisions for awarding attorney's fees are included in the Civil Service Reform Act (CSRA) of 1978: first, an amendment to Section 702 of the Back Pay Act and, second, 5 U.S.C. Section 7701(g) establishing standards for awarding fees by the Merit System Protection Board (MSPB). Both provisions are relevant since the amendments of the Back Pay Act incorporate by reference the standards established by the MSPB.

The Back Pay Act Amendment,[82] of the CSRA outlines the threshold requirement for any award of attorney's fees. In relevant part the Act provides:

(b)(1) An employee of an agency who, on the basis of a timely appeal or an administrative determination (including a decision relating to an unfair labor practice or a grievance) is found by appropriate authority under applicable law, rule, regulation, or collective bargaining agreement, to have been affected by an unjustified or unwarranted personnel action which has resulted in the withdrawal or reduction of all or part of the pay, allowances, or differentials of the employee—

(A) is entitled, on correction of the personnel action, to receive for the period for which the personnel action was in effect—

. . .

(ii) reasonable attorney fees related to the personnel action which, with respect to any decision relating to an unfair labor practice or a grievance processed under a procedure negotiated in accordance with chapter 71 of this title, . . . shall be awarded in accordance with standards established under section 7701(g) of this title; . . .

. . .

(3) This subsection does not apply to any reclassification action nor authorize the setting aside of an otherwise proper promotion by a selecting official from a group of properly ranked and certified candidates.

In brief, the amendment provides that when an "appro-

---

[81]See generally Reischl, *Attorney Fees in Arbitration: Law and Practice*, in Grievance Arbitration in the Federal Service (Federal Personnel Mgmt. Inst., 1987); Bufe and Ferris, *A Second View of Awarding Attorney's Fees in Federal Sector Arbitration*, 38 Arb. J. 21 (1983); Moore, *Awarding Attorney's Fees in Federal Sector Arbitration*, 37 Arb. J. 38 (1982); Kagel, *Grievance Arbitration in the Federal Service: Still Hardly Final and Binding?*, in Arbitration Issues for the 1980s, Proceedings of the 34th Annual Meeting, National Academy of Arbitrators, 178–206 (BNA Books, 1982).
[82]5 U.S.C. §5596 (Supp. II 1979).

priate authority" (the arbitrator) determines that an employee has been affected by an "unjustified or unwarranted personnel action" resulting in the "withdrawal or reduction" of pay, the employee is entitled to back pay and, in certain circumstances, attorneys' fees. An "unjustified or unwarranted personnel action" is defined as "an act of commission or an act of omission" that is "unjustified or unwarranted under applicable law, Executive Order, rule, regulation, or mandatory personnel policy established by an agency, or through a collective bargaining agreement." Absent a finding that "pay, allowances, or differentials" were improperly withdrawn or withheld, there can be no entitlement to attorney's fees, regardless of whether there has been any other violation.

## 1. Entitlement Under 5 U.S.C. Section 7701(g)

Satisfying the criteria of the Back Pay Act is the first step in securing an award of attorney's fees in a federal-sector arbitration. The second set of criteria governing an arbitral award of fees is outlined in 5 U.S.C. Section 7701(g). That section provides that the MSPB may award attorney's fees when it determines that (1) an agency has discriminated on the basis of race, color, religion, sex, national origin, age, handicapping condition, marital status, or political affiliation; or (2) the grievant is a "prevailing party" in a nondiscrimination appeal and attorney's fees are warranted "in the interest of justice." In the latter case, the party requesting such fees must satisfy both conditions. Attorney's fees do not automatically accompany success on the merits. A fee award is discretionary.

Who is a "prevailing party?" A "prevailing party" is a grievant who obtains all or a significant part of the relief sought. It is not necessary that the grievant obtain 100 percent of the relief he or she seeks in order to qualify as a prevailing party. For example, a discharge that is later reduced to a suspension by an arbitrator may, under certain circumstances, qualify for attorney's fees.[83] Moreover, an individual grievant

---

[83]Hines Veterans Admin. Hosp., 85 LA 239 (Wolff, 1985) (discharge reduced to suspension); Customs Serv., 79 LA 284, 287 (Rocha, 1982) ("significant result was reinstatement with about $22,000 in back pay; this remedy was substantially all the relief sought").

may be awarded fees as a "prevailing party" even though he is represented by a union.[84]

The leading case on the meaning of the term "in the interest of justice" is *Allen v. Postal Service*,[85] where in 1980 the MSPB formulated the following circumstances for determining when "justice" warrants an award of fees:

1. Where the agency engaged in a "prohibited personnel practice";

2. Where the agency's action was "clearly without merit," or was "wholly unfounded" or the employee is "substantially innocent" of the charges brought by the agency.

3. Where the agency initiated the action against an employee in "bad faith," including:

a. Where the agency's action was brought to "harass" the employee;

b. Where the agency's action was brought in "exert improper pressure on the employee to act in certain ways";

4. Where the agency committed a "gross procedural error" which "prolonged the proceeding" or "severely prejudiced" the employee;

5. Where the agency "knew or should have known that it would not prevail on the merits" when it brought the proceeding.[86]

The MSPB in *Allen* emphasized that the list was not exhaustive, but illustrative and "should serve primarily as directional markers toward the 'interest of justice.'"

More recently, *Naval Air Development Center and Government Employees (AFGE) Local 1968*,[87] cites six instances in which the "interest of justice" requirement may be served:

"a. Instances where the agency presents little or no evidence to support its actions or demonstrates either a lack of or negligent preparation of the case. This includes instances where the agency's action lacks substantial justification or is totally unfounded and clearly without merit. For example, a situation where the agency's careful reading of the relevant statutes and regulations would have promptly shown that its interpretation was erroneous.

"b. Instances where agency ill will, or negligence, tainted

---

[84]Veterans Admin., 88 LA 554, 563 (Byars, 1986) ("multiplicity and complexity of issues involved in this case establishes the Grievant's need to employ outside legal counsel").

[85]2 MSPB 582, 80 FMSR 7015 (1980).

[86]Id. at 587.

[87]21 FLRA 131 (1986), cited in Williams Air Force Base, 89 LA 671 (Smith, 1987).

Exhibit 28

the action against the employee to an unconscionable degree. This may be inferred from agency action or inaction throughout the proceedings.

"c. Instances where the agency initiated action against any employee in disregard of prevailing law, regulations, or negotiated agreement provisions on federal policy. Examples include actions based on improper denial of overtime, environmental differential pay, shift differentials, hazardous duty pay, annual leave, administrative leave, or official time for representational functions.

"d. Instances where the employee is ultimately found to be substantially innocent of the charges brought by the agency. This determination is made on the basis of the result of the appeal rather than on the evidence and information available to the agency at the time the agency effected the action. This standard is not met, however, where the employee believes that he or she is substantially innocent, can prove his or her innocence, and deliberately does not communicate all of the facts to the agency deciding official where the employee's disclosure would reasonably have caused the agency official to modify or overturn the action. Such an employee deliberately and improperly prolongs the agency's legal proceedings and cannot be regarded as an innocent victim who is entitled to attorney fees in the interest of justice.

"e. Instances where the agency fails to inquire into facts presented by the employee or fails to conduct a prudent inquiry into the employee's contradictory facts presented by the employee, the agency would or should have ascertained at the outset that the charges against the employee were without merit or that the grievance should have been sustained.

"f. Instances where there is either a service rendered to the federal work force or there is a benefit to the public derived from maintaining the action. For example, situations where an employee's grievance leads to correction of workplace problems affecting a segment of the workforce, as in the instant case."[88]

One arbitrator, interpreting the "interest of justice" standard, noted that "[d]etermining whether conduct is 'clearly without merit' or 'tainted . . . to an unconscionable degree' or 'totally unfounded' requires the arbitrator to establish the point separating fault from extreme fault in agency performance."[89] The arbitrator went on to note that in considering problems of employer fault, the neutral must be mindful of

---

[88]89 LA at 674.
[89]Williams Air Force Base, supra note 87, at 674.

the purpose of fee awards: "to minimize the burden upon the employee—not to punish the agency."[90]

Finally, any fee that is awarded must actually have been incurred by an attorney or someone working under the direction of an attorney,[91] and the amount must be "reasonable."[92] In *Federal Correctional Institution*,[93] Arbitrator Harold White concluded that costs for photocopying, court reporters, transcripts, and the fees and costs of the arbitrator could not be awarded under the Back Pay Act and section 7701. As correctly stated by the arbitrator, under federal law "attorney fees are not synonymous with "all expenses."

---

[90]Id. at 675.
[91]See the discussion in Reischl, supra note 81, at 186–188.
[92]The MSPB has adopted a substantial body of law from the federal courts to define a "reasonable fee." See the discussion by Moore, supra note 81 at 45–47.
[93]90 LA 942 (1987).

Exhibit 28

# Arbitration Decisions

## Labor Arbitration Decision, LEAVENWORTH TIMES, 71 BNA LA 396

**Labor Arbitration Decision, LEAVENWORTH TIMES, 71 BNA LA 396**

Decision of Arbitrator

In re LEAVENWORTH TIMES [Leavenworth, Kans.] and INTERNATIONAL TYPOGRAPHICAL UNION, LOCAL 45

August 7, 1978

<div style="border:1px solid #ccc; display:inline-block; padding:10px;">Show Summary</div>

Appearances: For the company - C. Dale Stout, attorney; Donan Berg, Thomson Newspapers; John H. Johnston, III, general manager. For the union - Samuel C. McKnight, attorney; James N. Wood, business representative; Paul French, local president.

BOTHWELL, Arbitrator:

### CHANGE IN PRINTING PROCESS

#### Facts

The Leavenworth Times is one of about eighty newspapers in the Thomson newspaper group. For many years the Times has used hot metal typesetting processes. In early 1975 it was decided that the Times would convert from hot metal to cold type. On January 17, 1975 General Manager J. H. Johnston III wrote the following letter announcing the conversion:

> "To members of Leavenworth Typographical Union No. 45:
>
> You will recall that the Agreement between the Leavenworth Typographical Union No. 45 at Leavenworth, Kansas and The Leavenworth Times calls for advance notice of the introduction of a new process which replaces or substitutes for a present process. Please accept this letter as formal notice of our intention to introduce the cold type and offset processes in our composing room and press room operations.
>
> As well as various positions for which training will be required, it should be emphasized that composing room employees must be able to demonstrate typing competency. The specific minimum number of such qualified employees will be indicated to you shortly.
>
> It is my intention to keep all employees fully informed of the steps involved in the conversion. I am sure that we all look forward to

**Exhibit 28**

meeting this challenge in a spirit of cooperation. Sincerely yours, J. H. Johnston III General Manager."

Originally the training was to take place during the months of June and July, but this did not work out. After the equipment had arrived and been installed, an orientation session was held on July 9, 1975 and training commenced [*398] on July 14, 1975. The conversion to cold type was on August 25, 1975.

The training program began July 14, 1975. The new equipment was installed in an upstairs training room. The equipment included the Compugraphic 9000 which is a computerized keyboard machine used for photo composition. The training time was concentrated on this machine because it was regarded as the most difficult to learn. The equipment also included the Computape 1 and Computape 2 which are tape processing machines and the 7200 which is a keyboard machine used for setting headlines. Waxers, Exacto knives, and straight edges were available for paste-up work. On the Compugraphic 9000 the employees worked in pairs, one at the keyboard working out an exercise on the machine, and the other observing. Each employee was scheduled for two two-hour sessions per week on company time. Additionally employees could sign up for voluntary sessions in the evenings. Instruction was provided by a production consultant for Thomson Newspapers, Marvin Poel, and to a limited extent by composing room foreman Peters.

On August 1, 1975 the company announced a typing proficiency test for all composing room personnel who could not furnish evidence otherwise of a minimum speed of 35 words per minute. This notice was posted at that time:

> "To: Composing Room personnel
>
> From: J. H. Johnston III
>
> Subject: Keyboarding skill
>
> At the time of formal notification of plans to convert to cold type and offset production, and on other occasions, the absolute necessity of typing proficiency has been stressed.
>
> Toward such determination, we have arranged for a public school faculty member to give typing tests on Monday and Tuesday mornings, Aug. 4 and 5, in our cold type training room on the second floor.
>
> Tests will be given to all Composing Room personnel with the following exceptions:
>
> TTS operators, apprentices, or anyone who furnishes evidence of completion of a typing course in the form of a certificate attesting to a minimum speed of 35 WPM. After that time no paid training will be offered to anyone not meeting this minimum.
>
> Practice time will continue for all employees after regular working hours.
>
> I want to thank you all for your cooperation in this transition period.
>
> I have arranged for both electric and standard (manual) typewriters for the test, and anyone so desiring can take the test on the TTS equipment in our shop."

On August 4 and 5, seven employees took the typing test. Each employee was tested three times. Six failed all three tests, while Don Fraser passed one of the three tests.

On August 20, 1975 the Company posted the composing room situations to be open after the conversion. The company posted the following notice announcing these situations:

**Exhibit 28**

"Leavenworth Times Chapel August 20, 1975
Local 45
The following composing room situations will be open as of August
25, 1975:
Typing/Pasteup/Markup
Mon. Tue. Wed. Thur. Fri. Sat.
1. _____ off day day shift
2. _____ off day day shift
3. _____ off day day shift
4. _____ off day day shift
5. _____ off day nite shift
Pasteup/Typing/Markup
Mon. Tue. Wed. Thur. Fri. Sat.
1. _____ off day nite shift
2. _____ off day day shift
3. _____ off day day shift
Monitor/Maintenance/Pasteup/Typing
Mon. Tue. Wed. Thur. Fri. Sat.
1. _____ off day nite shift
Apprentices
1. _____
2. _____

Effective at 6 a.m. Monday, August 25, 1975, all hot metal situations
in the composing room will be closed. All situations must be
claimed in writing on the above schedule by Friday noon, August
22, 1975. J. H. Johnson III, General Manager."

After the conversion there were twelve situations, including two apprentices and Foreman Woody Peters. Prior to the conversion there had been fifteen situations, including two apprentices and the foreman. This represented a net reduction of three situations.

On August 25, 1975 the Leavenworth Times converted from hot metal to cold type and printed the first edition in this [*399] new process on that day. There were two discharges during this week. H__ worked on Monday, Wednesday and Thursday (Tuesday being an off day) and was discharged for incompetency by Foreman Peters on Friday, August 29, 1975. T__ worked on Monday, Tuesday and Wednesday (Thursday being his day off) and was discharged for incompetence on Friday, August 29, 1975.

Besides the discharges the Union and the employees were dissatisfied with a number of the actions taken by the Company in connection with the conversion from hot metal to cold type photo composition. During 1975 and early 1976 the Union filed numerous grievances, the majority of which dealt with the conversion. The Union summarized and stated twenty of these grievances in a letter to the Publisher's general manager on April 20, 1976. These twenty grievances were stated to be as follows:

1. Company's closing of summer months to vacations;

2. Discontinued long practice of telephone use by bargaining unit employees;

3. Unilaterally establishing typing standards;

4. Refusal to provide keyboard training;

5. Training program not adequate;

6. Changed Saturday, August 23, 1975 night shift without proper notice;

7. Unilaterally changed job classifications and their make-up;

8. Improperly closing out all situations;

9. Improperly ordered employees to claim unilaterally constituted situations;

**Exhibit 28**

10. Removed jurisdiction from composing room - such as stripping pages, storage of materials, getting out pickups;

11. Ad pasteup being performed by persons not covered by contract;

12. Type being handled by person not covered by contract;

13. Refusal to recognize reproduction of ads as provided by contract;

14. Using news columns not set by composing room employees;

15. Reduction of force not according to contract provisions;

16. Unjustly discharged H__ and T__ on August 29, 1975;

17. Refused to allow continuance of long practice of setting type for union notices etc. on Company equipment;

18. Refused to continue training program after cold type conversion;

19. Failure of the foreman to hire all overtime through the chairman as previously agreed;

20. Granting of super-seniority to the foreman for the selection of vacation periods.

Some of these grievances were discussed in meetings of the Joint Standing Committee provided for in Article I, Section 10 of the Agreement. The Company challenged the arbitrability of some of these grievances. The parties were in disagreement as to how these grievances should be heard in arbitration. The Union wanted to hear all or most of these grievances in a single proceeding before the same arbitrator, since most of them dealt with the problems of conversion. The Company wanted to hear the discharge separately. The Union claimed that the Company was effectively frustrating the contractual procedure for resolving disputes.

The Union filed a complaint in the United States District Court for the District of Kansas and obtained an order of that court to show cause why an order should not be issued compelling the Company to proceed to arbitrate all outstanding grievances as prayed for in the complaint. A hearing on the Order To Show Cause was set for 1:30 p.m. on Tuesday, July 27, 1976. At this hearing on July 27 a number of the grievances were resolved. Fourteen grievances remained to be decided, and it was the decision of the court that all of these grievances, with the exception of number twenty, should be submitted jointly to final and binding arbitration. The court also decided that the arbitrator should decide the procedure for hearing these grievances in arbitration.

The following order was entered on July 29, 1976, signed by United States District Judge Earl E. O'Connor:

> "Upon hearing pursuant to an Order To Show Cause in the above entitled and numbered cause, and after argument by counsel for the respective parties; IT IS HEREBY ORDERED that the above Defendant, The Leavenworth Times, submit jointly to final and binding arbitration, as provided in Article I, Section 10 of the collective bargaining agreement dated February 1, 1974 to January 31, 1977, between the Plaintiff and Defendant, all outstanding grievances as set forth in Plaintiff's Exhibit B to the Complaint as items 3, 4, 5, 7, 8, 9, 10, 11, 13, 14, 15, 16, 18, to-wit:
>
> 3. Unilaterally establishing typing standards;
>
> 4. Refusal to provide keyboard training;
>
> 5. Training program not adequate;
>
> 7. Unilaterally changed job classifications and their makeup;
>
> 8. Improperly closing out all situations;

**Exhibit 28**

9. Improperly ordered employees to claim unilaterally constituted situations;

[*400]

10. Removed jurisdiction from composing room - such as stripping pages, storage of materials, getting out pickups;

11. Ad pasteup being performed by persons not covered by contract;

13. Refusal to recognize reproduction of ads as provided by contract;

14. Using news columns not set by composing room employees;

15. Reduction of force not according to contract provisions;

16. Unjustly discharged H__ and T__ on August 29, 1975;

18. Refused to continue training program after cold type conversion;

IT IS FURTHER ORDERED that the Court shall retain jurisdiction of the issue of whether Defendant shall be ordered to submit to final and binding arbitration, as provided in Article I, Section 10 of the collective bargaining agreement dated February 1, 1974 to January 31, 1977, between the Plaintiff and Defendant; the outstanding grievance set forth as item 20 in Plaintiff's Exhibit B, to-wit:

20. Granting of super-seniority to the foreman for the selection of vacation periods.

Defendant The Leavenworth Times shall submit on said issue a memorandum of law to the Court and Plaintiff's counsel at or before ten (10) days from the date of the July 27, 1976 hearing resulting from the Order To Show Cause. Plaintiff Leavenwroth Typographical Union No. 45, International Typographical Union shall submit a reply memorandum of law to the Court and Defendant's counsel at or before five (5) days after its receipt of Defendant's memorandum. ORDER ENTERED this 29th day of July, 1976."

With respect to item 20, the court retained jurisdiction to determine the question of arbitrability. In a memorandum and order of September 20, 1976 Judge O'Connor decided that the item number twenty was arbitrable and directed that the parties proceed to final and binding arbitration on this item.

## Issues

United States District Judge O'Connor suggested orally that the parties should submit to an arbitrator the question as to whether each grievance should be heard in a separate proceeding, or whether all of the grievances should be consolidated in one proceeding, or whether they should be grouped for hearing in several proceedings. However, this was not included in the order of the court on July 29, 1976. The parties agreed to submit all of these grievances to the present arbitrator in a consolidated proceeding. Therefore, at the beginning of the hearing there were fourteen grievances before the arbitrator. On the last day of the hearing the Union withdrew items number 13 and 20.

The arbitrator will group the remaining grievances for purposes of discussion, although he will rule on each of the grievances. Grievances number 3, 4, 5 and 18 all deal with the

**Exhibit 28**

training program instituted to enable the employees to acquire proficiency in the new cold type process. The discharges of H__ and T__ on August 28, 1975 are so related to the problems involved in the training program that these discharges will be discussed along with these questions regarding the training program.

The arbitrator will first take up grievance number 5 which states, "training program not adequate". The evidence shows rather clearly that the training program was quite adequate for some employees and very inadequate for other employees. There were great differences in the amount of training which composing room employees had already had in the cold type process before the Leavenworth Times training program was begun. There were also differences in the work experience of composing room employees under the hot metal process. Seven of the composing room employees attended courses at the International Typographical Union Training School in Colorado. Mary K. Johnson and Don Fraser attended a paste make-up course at this Colorado training facility. Leo Visocsky took a camera course. Francis Wayman took a dark room course. John Dorssom and Bob Chaffee and the composing room foreman Woody Peters took the course on the Compugraphic 9000 equipment. These courses were taken by these employees during the period April, May, and June of 1975. Prior to these courses at the I.T.U. School, employees took courses in the general Kansas City area which were designed to prepare them for the cold type process of printing. The foreman, Woody Peters, took a paste make-up course in Kansas City, Missouri put on by Local 80 of the Typographical Union in Kansas City, Missouri. Peters also took a camera course and an offset press course at the Area VoTec School in Kansas City, Kansas. Other employees also took some of these courses. The first offset press course was taken by Don Fraser, Leo Visocsky, John Dorssom, Bob Chaffee, and Francis Wayman, as well as Peters. The camera course at Vo-Tec was taken by Don Fraser, Leo Visocsky, Bob Chaffee, John Dorssom, Frank Borden and Jim Thompson. Some employees took a six weeks course at the Vo-Tec meeting two nights a week in paste make-up.

There was no effort to appraise the work experience and prior training of each composing room employee in order to determine the training needs of the individual. The evidence does not show that the two employees who were discharged, H__ and T__, had taken any prior courses. The work experience of T__ was highly specialized. During the **[*401]** three year period from 1972 to 1975 T__ did proofreading exclusively under the hot metal process. The management was aware that approximately half of the employees in the composing room were familiar and proficient on the linotype keyboard, but not familiar nor proficient with the typewriter keyboard used on the new type of equipment.

Article I, Section 4 of the Agreement provides that in the event of the introduction of new equipment, machinery or process that the employer is obligated to provide training to journeymen and apprentices to enable them to become proficient. This section states in part,

> "The employer agrees to give the Union at least three months advance notice of such introduction and further agrees to provide journeymen and apprentices with adequate equipment and opportunity to become proficient on all such equipment, machinery or processes."

This obligation to provide training extends to all apprentices and journeymen. The arbitrator concludes that the training program was not adequate for the grievants, T__ and H__.

Grievance number 3 states, "unilaterally establishing typing standards". The typing test and the standard of 35 words per minute were designed only to eliminate paid training for composing room employees on the Compugraphic 9000 for those who failed to meet the standard. However, the arbitrator finds that the elimination of any paid training for employees based on failing the typing test was improper. The Company had the same obligation to provide training under the Agreement to all employees in the composing room. The typing test should have been given in February or March for the purpose of acquainting employees with their training needs. This would have made it clear to the employees long prior to August 1 that the Company's goal was to have all composing room employees achieve proficiency in typing. Seven composing room employees took the typing

**Exhibit 28**

test and failed it. The evidence does not indicate that any employee was terminated for failure to pass the typing test. Therefore, the arbitrator finds that the Company did not unilaterally establish typing standards.

Grievance number 4 states, "refusal to provide keyboard training". It would have been difficult for the Company to have provided basic instruction in typing. Such instruction is readily available in most communities. However, in view of the importance placed upon typing proficiency by the Company it would have been well if the Company had placed a couple of typewriters in the training room together with some instructional materials, and perhaps allotted some training time for this practice.

Grievance number 18 states, "refused to continue training program after cold type conversion". The arbitrator finds that the training program did continue after the conversion date, but it then became "on the job training". By no means were most of these composing room employees fully proficient on all of this equipment immediately after the conversion. It would have been impossible to carry on the training program on the same basis because of the need to use the equipment for actual production of the newspaper. The arbitrator finds this grievance has no merit.

Grievance number 16 states, "unjustly discharged H__ and T__ on August 29, 1975". T__ was first hired by the Leavenworth Times in August, 1950. He had served an apprenticeship on his father's newspaper at Parkville, Missouri and was hired by the Leavenworth Times as a straight matter linotype operator. He continued as a journeyman straight matter linotype operator until Memorial Day of 1952. He was then asked to learn the operation of the ad linotype machine. He then continued to work as an ad linotype operator until 1972 when he became a proofreader. During the three years from 1972 to 1975 he performed work as a proofreader on a full-time basis. During this time, a total period of twenty-five years, T__ did not perform any tape perforation, floor work or mark-up work. T__ testified that in May he went to General Manager Johnston's office and asked him whether he should go to Colorado Springs and attend the I.T.U. School there. Johnson replied, "No, you will be given adequate training here."

T__ attended six paid training sessions from July 14 until August 4, 1975. T__ testified that the Company made available to him the hour from five to six p.m. to train on his own time. He testified that he spent about fifteen hours training on his own time, either from five to six p.m. or during the scheduled volunteer time during the evenings. He testified that he had one two-hour session training on ad paste-up on Company paid time.

Early in 1975 T__ had expected to do proofreading after the conversion to cold type. In February he discussed the type of proofreading which he would be doing after the conversion, with Foreman Peters. After Mike Poel arrived in July, T__ asked Poel how much proofreading there would be under the new cold type process. Poel replied that there would be from four and one-half to five hours per day of proofreading to be done. However, after three days at **[*402]** work after the conversion, T__ realized that the proofreading would no longer be done by one person, but would be performed by most of the composing room employees. There was no proofreading job among those posted for the composing room employees after the conversion.

T__ signed up for a situation listed as Paste-up/Typing/Mark-up on the Company's August 20, 1975 posting. T__ signed up for Paste-up/Typing/Mark-up because, "I had to apply for something." The situations posted all contained the terms Paste-up/Typing/Mark-up except one, which was listed as Monitor/Maintenance/Pasteup/Typing. The one which T__ signed listed paste-up first, and he believed believed that this could be done with less training probably. Actually, the grievant, T, did not believe himself qualified in any of these categories.

T__ worked Monday, Tuesday and Wednesday, August 25, 26 and 27, 1975 after the conversion, and was assigned primarily ad paste-up work. The evidence is clear that he did not perform this work satisfactorily. He was slow, made mistakes, and had to be shown how to perform certain work. Foreman Peters testified that T__ was very nervous and he was afraid that T__ might cut himself with the Exacto knife.

**Exhibit 28**

Management took the position that T__ had claimed competency in Pasteup/Typing/Mark-up, and that he had failed to perform this work satisfactorily. But, this is not a realistic view of the matter. T__ had no choice but to apply for one of these posted situations, or to quit. The problem was not one of competency, but of training. He had been a competent journeyman over a period of some twenty-five years. His work under the hot metal process was quite specialized. T__ had not had sufficient training in any of these categories of Pasteup/Typing/Mark-up. All that is certain is that T__ had one, two-hour session on paste-up. Even at the Kansas Vo-Tec School the paste-up course was two nights a week for some six weeks. The paste-up course at the I.T.U. School in Denver was more comprehensive.

T__ had spent almost all of his paid training time on the Compugraphic 9000 equipment. He had also spent most of his voluntary time on the 9000 because he understood this was desired. T__ was somewhat handicapped by his lack of typing proficiency in acquiring proficiency on the 9000. T__ had been a linotype operator for many years and such an individual has special problems in developing a touch typing proficiency. T__ testified that after he realized the importance of typing proficiency he practiced on a typewriter at home. T__ was not assigned any duties on the 9000 during the three days he worked after the conversion. The grievant's training in mark-up consisted of a part of one two-hour session on the Compugraphic 9000.

The arbitrator believes that the grievant, T__ was not given proper advice and counsel by management with regard to training. T__ testified that Mr. Johnston told him that he did not need to attend any of the courses at the I. T. U. School in Colorado Springs because he would be given adequate training in the Leavenworth Times program. In fact this was the advice given generally by the Company that there was no need for outside training as the Company program would be quite adequate. But, this reflected the lack of appraisal of individual employees and their training needs. T__ had not received any outside training as had most of the other composing room employees. His work over many years had been highly specialized. T__ should have been advised to have attended the I. T. U. School in Colorado Springs because of his extremely limited background in the new cold type process. Part of his problem also was extreme nervousness due undoubtedly to his lack of confidence because of inadequate training. The arbitrator finds that T__ was improperly discharged for incompetency. The evidence indicates that T__ could have been a satisfactory employee with more training.

Grievant H__ was first hired as a composing room employee at Leavenworth Times on September 1, 1950. She served an apprenticeship at a newspaper in northcentral Missouri, and came to the Leavenworth Times as a journeyman. She served as a linotype operator on both the straight matter linotype machine and on the ad machine for a time, and then was transferred to monitoring two of the linotype machines. This was her job for most of the twenty-five years with the Leavenworth Times. Monitoring consists of feeding tape into the automatic units which then operated the linotype machines by tape automatically. The grievant then used a keyboard on these linotype machines for making corrections and adjustments. She took care of all of the Associated Press tape. She did a small amount of proofreading under the hot metal process, but did no ad make-up, page make-up, nor mark-up. She never worked as a perforator operator, but made minor adjustments on the linotype machines.

Grievant H__ testified that during the three weeks of training prior to the August 4 typing test she had four paid training sessions for a total of seven and **[*403]** one-half hours of training. She explained that she had been unable to attend two training sessions because she was needed on the floor to put out the newspaper. She trained during these four sessions on the Compugraphic 9000. H__ testified that she attended at least four sessions on her own time during the period July 14 to August 25. She was scheduled for others, but could not attend because she had to work overtime. The overtime records showed that she worked nearly fifty hours overtime during August. She testified that she had a one-hour and three-quarter session on paste-up, which was on Company time. She also had one and three-quarter hours paid training time on floor type work, including page makeup and mark-up.

**Exhibit 28**

The grievant testified that on two occasions she asked Foreman Peters if he thought that she should go to the I. T. U. center in Colorado Springs for courses. She testified that he replied that she would get sufficient training on the job. Foreman Peters testified that he discouraged her from attending these courses because her typing was poor. This she denied. H__ bought an electric typewriter about a month before the conversion date so that she could practice typing at home. The grievant testified that Foreman Peters suggested that she sign up for monitoring, that she had more experience with handling the tapes than anyone else. After the new situations were posted on August 20, 1975 the grievant did sign up for the situation of Monitor/Maintenance/Paste-up/Typing.

Grievant H__ worked on Monday, August 25, and Wednesday and Thuesday, August 27 and 28, after the conversion. Tuesday was her day off. During these three days she was assigned to monitoring the Computape machine most of the time. She set one headline on the 7200 machine, and Foreman Peters testified that her keyboarding was extremely slow. She also failed to lock in the film box and lost her headline. However, she had never operated the 7200 machine during the training period. Foreman Peters made notes on various employees during the week beginning August 25, and his notes on H__ indicate that her paste-up was very, very poor. However, at the hearing he testified that she did no paste-up during the three days of her employment after the conversion. Foreman Peters was undoubtedly confused on this point. The grievant's testimony indicates that she did no paste-up. Foreman Peters' notes also indicate that she can do no maintenance. However, the evidence indicates that she did no maintenance on the new equipment during these three days, and that she had received no training on maintenance on this new equipment. The evidence indicates that she required considerable instruction and assistance in monitoring the new Computape equipment, but this was new equipment to her.

The arbitrator finds that grievant H__ was not incompetent, but that her work was less satisfactory than other employees during these three days she worked in the week of August 25, 1975, because of inadequate training. Again, this reflects the failure to appraise the training needs of each employee in the composing room in the light of the conversion to cold type. H__'s work had been for many years rather highly specialized, and she should have been advised to seek outside training.

This grievant does not wish reinstatement. She was sixty-nine years of age at the time of the hearing. Her plans were to retire when she completed twenty-five years as a union member, which would have been in October, 1976. She has received both Social Security benefits and unemployment compensation benefits since her discharge.

The evidence indicates that the work performance of T__ and H__ was less satisfactory than that of the other composing room employees during the three days they worked after the conversion. Foreman Peters selected the employees who demonstrated the best performance and discharged the two grievants. But this is not the issue. The grievants were discharged for incompetency after twenty-five years of satisfactory service. The question is whether this was for proper cause. The Company has the burden of proof. The arbitrator finds that the performance of the two grievants was the result of lack of training which the Publisher was obligated to provide. The arbitrator believes that Mr. Johnston was quite sincere in his belief that the Leavenworth Times training program would be adequate for all employees.

## Management Rights and Work Assignments

Grievances numbers 7, 8 and 9 together with 15 are related to the problem of manning of the composing room and the work assignments to employees in the composing room. Grievance number 7 states, "unilaterally changed job classifications and their make-up". Grievance number 8 states, "improperly closing out all situations". Grievance number 9 states, "improperly ordered employees to claim unilaterally constituted situations." Finally, grievance number 15 states, [*404] "reduction of force not according to contract provisions."

**Exhibit 28**

A study of the language of the Agreement indicates that there are technically only two job classifications, journeyman and apprentices. Theoretically, the journeyman printer is qualified to perform all of the work performed in a composing room. In pracrice this is rarely true. Specialization of task normally develops in the composing room, particularly if it is a large newspaper operation. However, journeymen may be able to perform a variety of work assignments, but not all the job duties performed in the composing room. Nowhere in this Agreement is there any list of negotiated job classifications such as is found in a typical industrial labor agreement. The only reference to the word classification is found in Article I, Section 3 of the Agreement which defines the jurisdiction of the Union and the appropriate unit for collective bargaining. Article I, Section 3 states as follows:

> "Section 3. Jurisdiction of the Union and the appropriate unit for collective bargaining is defined as including all composing room work and includes classifications such as hand compositors; typesetting machine operators, make-up men, bank men, proof-press operators, proofreaders, machinists for typesetting machines, operators and machinists on all devices which cast or compose type or slugs, or film, operators of tape perforating machines and recutter units for use in composing or producing type, operators of all phototypesetting machines (such as Fotosetter, Photon, Linofilm, Monophoto, Coxhead, Liner, Filmotype, Typre and Hagego) and employes engaged in proofing, waxing, and paste makeup with reproduction proofs, processing the product of phototypesetting machines, including development and waxing; paste makeup of all type, hand lettered, illustrative, border and decorative material constituting a part of the copy; ruling; photoproofing; correction, alteration, and imposition of the paste makeup process; camera work (excluding camera work used exclusively for editorial photographs); post camera work; offset plate-making (including all plates such as Dycril plates) and any work serving as a substitute for any of the foregoing. Paste makeup for the camera as used in this paragraph includes all photostats and prints used in offset or letterpress work and includes all photostats and positive proofs of illustrations (such as Velox) where positive proofs can be supplied without sacrifice of quality or duplication of efforts. The Employer shall make no other contract covering work as described above, especially no contract using the word 'stripping' to cover any of the work above mentioned.
>
> The jurisdiction of the Union also includes all press and stereotype work."

Article I, Section 3 really is a statement of the work coming within the jurisdiction of the Union rather than a list of job classifications at the Leavenworth Times. Under the hot metal process there was a considerable amount of specialization of task. Grievant T__ performed only proofreading. Grievant H__ performed monitoring work of tape operated linotype machines. Other employees performed as linotype operators, or as a floor man. A situation in the composing room may be defined as a set of regular work assignments together with a regular full time work schedule.

When the change was made from the hot metal process to the cold type process, the equipment and procedures were substantially changed in the composing room. New work assignments had to be made. Some of these work assignments were similar to those under the older process, but different equipment was used. The Company closed out all of the former situations and set up a new list of situations with corresponding job assignments. This new list of composing room situations was much broader than the situations under the hot metal process. Five of the situations were described as including Typing/Paste-up/Mark-up. Three additional situations were described as Paste-up/Typing/Mark-up. The ninth journeyman situation was described as Monitor/Maintenance/Paste-up/Typing. It would be presumed that the first item named would be the most important work assignment for the

**Exhibit 28**

situation. Undoubtedly more specialization of task will develop in practice under these composing room situations.

However, the question here is the right of the Company to close out the old situations and to establish new situations unilaterally. Arbitrators have quite generally held that in the absence of contractual limitations the making of work assignments was a proper function of management and within the discretion of management. Even when there are formal job classifications with corresponding wage rates in the agreement, arbitrators have generally held that the employer may make changes in the job content of these classifications during the term of the agreement. Management has the right to make changes in job duties, to create new job classifications, to eliminate jobs, and to combine jobs by unilateral action, providing it is acting in good faith in exercising its management functions of improving the efficiency of operations and making adjustments to technological changes, unless it is limited by specific contract provisions. Laclede Gas Company, **39 LA 833**, 847 (1962).

There is no provision in this agreement imposing any limitation on the Publisher in making changes in the job content of situations in the composing **[*405]** room. There is no provision in the Agreement regarding any procedure for making changes in these situations. Therefore, grievances numbers 7, 8 and 9 are found to be without merit and are dismissed.

Grievance number 15 deals with the manning of the composing room. Prior to the conversion there were fifteen situations in the composing room, including the foreman and the two apprentices. On August 20, 1975, a few days prior to the conversion, the Company posted nine journeyman situations and two apprentice situations, which counting the foreman, represented a reduction of three situations in the composing room. Arbitrators have quite generally held that the manning of an operation is within the discretion of management in the absence of specific contract limitations. There is nothing in this agreement which constitutes a limitation on the right of the Company to determine the number of employees needed in the composing room. Further, there is a contract provision in Article I, Section 4 which states, "provided, however, the employer need not train more journeymen than may be required to meet the needs of the operation." This is in a section which deals with the introduction of any new equipment, machinery or process which replaces or is a substitute for present equipment, machinery or process. Grievance number 15 is found not to have merit, and is dismissed.

### Work Preservation Grievances

Two of the grievances deal with the question whether the publisher has transferred the composing room work to non-bargaining unit employees in the Advertising Department. Grievance number 10 states, "removed jurisdiction from composing room - such as stripping pages, storage of materials, getting out pick-ups." Grievance number 11 states, "ad paste-up being performed by persons not covered by contract."

We are dealing here with display advertising. Display ads may be classified under a number of different categories, such as service account ads, speculative ads, etc. Some ads originate with the customer himself in which the ad is laid out in whole or principal part by the customer, or an ad may be one in which the layout is principally done by the newspaper. Layout is a function of employees in the Advertising Department. On the other hand, ad make-up for the purpose of putting a plate on the printing press is composing room work. The conversion from hot metal to cold type has affected the work of the Advertising Department in relation to the work of the composing room.

In some cases the advertising customer decides what it is going to spend, how it wants the ad made up, and actually lays out the ad. The Advertising Department picks up the ad and insures that it is processed properly for the composing room. With other customers the Advertising Department draws up the ad and frequently shows the layout of the ad to the customer. If the Advertising Department lays out an ad and attempts to sell the ad to a customer, this is known as a speculative ad.

**Exhibit 28**

In the hot metal process the line between the layout work of the Advertising Department and the composing room functions was pretty clearly established. Under the hot metal process the advertising salesman would execute the layout by sizing the ad, securing an illustration either from the customer or from an illustration service to which the Times subscribed, which included a corresponding mat for each illustration, and a picture of the logo of the customer together with a mat for the logo. He would write the date that the ad was to be inserted in the paper, schedule the ad on the run sheet for that day, type the copy, staple the copy to the layout and send the layout to the composing room with all of the mats. The position of illustrations in the ad would be indicated on the layout sheet. Sometimes the illustrations were pasted on the layout in the exact position where the Advertising Department wanted it. Sometimes there would already be in the composing room a cut produced from a mat of a logo or from the mat from an illustration. The advertising salesman might then simply write in the appropriate place to "pickup" the logo or illustration, which was stored in the composing room. If a mat accompanied the layout the composing room employee would take the mat to the press room where a flat metal cut would be cast. Sometimes, the customer would furnish a full page mat for a completed ad. In such a case the full page mat went directly to the press room to be cast in a curved plate for the press.

Under the hot metal process the composing room employee built the ad by assembling all of the components and putting them in their proper spot in a galley. A proof of the galley would be pulled and necessary corrections made. The ad would then be stored until the day it was scheduled to run and then would go to page make-up. The page make-up, performed by a composing room employee, would repeat the process of building, using components consisting of ads and straight matter in what was known as a "chase". **[\*406]** Subsequently, this page would go to the press room where a mat of the page would be made by a pressman, which in turn would be used to cast a curved metal printing plate.

After the mat of the page had been rolled the page of hot metal came back to a composing room employee who would remove and store certain standard headlines, ads marked for run on another day, parts of ads such as logos or illustrations which might be used repeatedly. Some ads were stored if there was a substantial possibility that they would be run again. These items were placed in cabinets in the composing room from which they would be "picked up" upon direction by the Advertising Department. The break up and storage of ads, logos, illustrations and other ad components was a function of the composing room because such employees had the skills to handle the metal components. The composing room employees were skilled in working with the metal castings and metal type in galleys. The Advertising Department employees had no such skills.

All mats were returned to the Advertising Department where they were either stored in the customer's file or returned to the customer. This was true of both mats for logos and mats for illustrations.

After the conversion at the Leaven-worth Times on August 25, 1974 the advertising employees were provided with a waxer, an Exacto knife and a straight edge. These were the same tools used by composing room employees in paste make-up after the conversion. Layouts are now generally prepared on what is known as a "grid sheet". Dimensions are shown on the grid sheet in blue, which does not photograph, so that the layout can contain the exact dimensions for the ad. The grid sheets normally utilized for layout are grid sheets which have already been used by the composing room. The advertising employees were also provided with blue pencils which were used to write directions on the grid sheet as to column, width and depth. Illustrations were frequently waxed and affixed to the grid sheet in the precise location needed. Also the logo and printed matter from the customer's file might also be affixed after waxing in the proper position on the grid sheet. It was now possible for the advertising employee to make up an ad ready for page make-up in the composing room with the exception of some copy which needed to be set in cold type on the Compugraphic 9000.

After the conversion the layout usually arrived in the composing room with the various illustrations and other components such as logos and borders affixed by wax to the grid sheet in the exact location desired by the Advertising Department. In the composing room

**Exhibit 28**

the mark-up man would mark-up the ad and send it to the 9000 operator to keyboard and type. The film from the 9000 machine would be taken to the developing unit and the developer produces cold type which is pasted on the ad along with the other components. Since the illustrations and other components are affixed to the grid sheet by wax they can be lifted from the layout and repositioned, or placed upon a new grid sheet by the paste-up man in the composing room.

The evidence indicates that after the conversion on August 25, 1975 Foreman Peters instructed the composing room employees not to lift illustrations and other components from the grid sheet if placed there in the proper place by the advertising employees, nor to affix the components to a new grid sheet, but to use the same grid sheet for pasting up the remainder of the ad. If there were errors or the components needed trimming presumably the composing room employees would make up the ad anew.

On the first day of hearing, December 9, 1976, the arbitrator visited the newspaper plant and observed the operation in the composing room. The arbitrator at this time questioned Foreman Peters with regard to the paste-up of ads. He was told by Foreman Peters that the composing room employees invariably affixed the ad components on a new grid sheet, that the Advertising Department employees were not sufficiently skilled and accurate to do the ad pasteup work. The testimony indicates that after December 9 until late March of 1977 ad paste-up was done exclusively by composing room employees. The testimony since that time indicates that a substantial amount of ad paste-up is done by advertising employees.

It is apparent that after the conversion the line between layout and ad make-up was substantially blurred, or that overlap between the two functions occurred. The question to be decided is whether composing room employees should perform ad paste-up work exclusively, or whether both composing room employees and advertising employees should perform the ad paste-up work. In most instances the advertising employee could not do the complete paste-up work to produce an ad ready for page paste-up and the camera, because the ad usually requires some copy to be keyboarded on the 9000 unit and developed into cold type for the ad.

The arbitrator finds that the composing room employees have a clear **[*407]** contractual right to the ad paste-up work. Article I, Section 3 contains the following language:

> "Jurisdiction of the Union and the appropriate unit for collective bargaining is defined as including all composing room work and includes classifications such as hand compositors, * * and employees engaged in proofing, waxing, and paste make-up with reproduction proofs, processing the product of photo typesetting machines, including development and waxing; paste make-up of all type, hand lettered, illustrative, borders and decorative material constituting a part of the copy; ruling; photo proofing; correction, alteration, and imposition of the paste makeup serving as the completed copy for the camera used in the plate making process; * *."

In addition, Article I, Section 4 states as follows:

> "In the event of the introduction of any new equipment, machinery or process which replaces or is a substitute for or evolution of present equipment, machinery or process, journeymen and apprentices covered by this Agreement will perform all work within the jurisdiction of the Union regardless of the method, equipment or materials used in the performance of such work and regardless of where the work is to be performed."

It seems quite clear that ad paste-up for the camera is a substitute for and replaces the ad make-up which was done by composing room employees in connection with the hot metal process.

**Exhibit 28**

The arbitrator does not find merit in the argument of the Publisher that ad paste-up is not the exclusive jurisdiction of the composing room employees because advertising employees have always done paste-up work. In the hot metal process the advertising employees did paste on the layout sheets, often a piece of news print, illustrations to show the position for the illustrations, but this was accompanied by a mat to make a cut which was then used in the ad make-up. This work of pasting down an illustration has no connection at all with the ad paste-up work now being done under the cold type process resulting in a camera ready ad.

The layout of advertisements which is a proper function of the Advertising Department, under the cold type process includes the design of the ad together with the gathering of materials for the ad from the customer's file or from the customer, or from a service. It does not include the pasting up of a camera ready ad. This is composing room work.

Grievance 10 complains of removing work from the composing room such as stripping pages, storage of materials, getting out pick ups. The principal problem here is the storage of materials, such as cold type illustrations, logos, and other ad components of a cold type character. Under the hot metal type process the Advertising Department had illustrations received from a service together with corresponding mats. The Advertising Department also received mats from customers. Under the cold type process there are no mats, only illustrations suitable for paste-up in ads. Such illustrations may come from many sources. The Advertising Department keeps a file on every customer.

Technology has changed the relationship between the composing room and the Advertising Department with regard to break up, filing and storage. In the hot metal process the break up and storage of ad components was done by composing room employees because they were qualified and skilled in working with the metal castings. Metal castings of illustrations and logos were filed and stored in the composing room to be reused later in future ads without the need of making a new casting from the mat. The composing room employee could then pick up these ad components in accord with directions from the Advertising Department contained in the layout. In the cold type process the Advertising Department no longer has the mats and corresponding illustrations. The ads are sent from the composing room back to the Advertising Department where they are broken up and the components are placed in each customer's file. In place of a mat the customer's file now contains a cold type illustration. Instead of a mat of the logo the customer's file now contains a cold type logo. The change in the break up, filing and storage from the composing room to the Advertising Department is the result of the change in the materials. The Advertising Department could not do an effective job of layout of ads or selling ads without such a customer file. There are now no metal ad components to store in the composing room.

The contract in Article I, Section 3 and 4 contains no reference to break up, filing, or storage of ad components. Therefore, composing room employees have no explicit contract right to such work. The filing and storage of cold type ad components in the Advertising Department is not a substitute for the break up, filing and storage of hot metal components in the composing room. In a sense the cold type illustration or cold type logo is a substitute for the mat of such illustration or logo formerly filed and stored in the Advertising Department.

Grievance number 10 is found to be without merit and is denied.

[*408]

**Work Preservation - Syndicated Material**

Grievance number 14 states, "using news columns not set by composing room employees".

For many years the Leavenworth Times has contracted with N.E.A. (Newspaper Enterprise Association) and other suppliers of syndicated features to purchase syndicated news columns, comics and cartoons. Prior to the conversion comics and editorial cartoons were received in the form of a slick (camera ready material) and a mat. The slick was used to

**Exhibit 28**

facilitate identification of the mat, but the hot metal process did not permit its use in producing the matter. The mats were sent to the Stereotype Department where they were flat casted and sent to page make-up. With respect to syndicated columns, no mats were received. These columns were received only in camera ready form. Prior to the conversion composing room employees keyboarded each column on a TTS machine to produce an unjustified perforated tape. The tape was processed through a computer to produce a justified tape. The justified tape was used to drive a linotype machine to produce the hot metal.

After the conversion the syndicated material for the most part was in a form suitable for production. The comics and cartoons went directly to page make-up. There is no dispute with regard to the comics. Most of the news columns were already keyboarded, justified, proofread, and corrected by the companys from which they were purchased, and received by the Leavenworth Times in the form of slicks. The columns of cold type were sent directly to page paste-up. The only work performed by the Times employees was the photographic enlargement or reduction of some columns to match the column size of the Leavenworth Times. Some syndicated material is received in the form of "hard copy" which is then processed into cold type by composing room employees.

The syndicated materials are negotiated, primarily as a group. N.E.A. gives a comprehensive range of features including comic panels or cartoons, filler features, editorial page columns, editorial cartoons, and certain photo illustrations. The newspaper uses whatever it wants of the syndicated material. There is no dispute that the syndicated material received in camera ready form has had the composing room functions performed prior to its receipt by the newspaper.

The issue here concerns the syndicated news columns or columns of comment received in the form of camera ready slicks. The Union claims the right to reproduce such syndicated feature columns.

The Company relies upon the so-called reproduction clause which is Article II, Section 6. This section states as follows:

> "The interchanging, exchanging, borrowing, lending or buying of matter, either in the form of type or matrices, between newspapers, between job offices, or between newspaper and job offices, or vice versa, not owned by the same individual, firm or corporation, and published in the same establishment, shall not be allowed unless such type or matrices are reset as nearly like the original as possible, made up, read and corrected and proof submitted to the chairman of the office. Transfer of matter between a newspaper office and a job office, or a job office and a newspaper office, where conducted as separate institutions and from spearate composing rooms, owned by the same individual, firm or corporation is not permissible unless such matter is reset as nearly like the original as possible, made up, read and corrected and a proof submitted to the chairman of the office. Provided, that where the interchange of matter from an English publication to a foreign language publication or vice versa, is desired, under the provisions of this section, such exchange shall be regulated by agreement between the Employer and the local Unions interested. The time limit within which borrowed or purchased matter, or matrices, are to be reset shall be seven days from date of use. If matter is not reproduced within the limit specified, it shall be reproduced as soon as help is available.
>
> This section shall not apply to original commercial composition purchased from commercial trade composition plans or other composing rooms when such composition is an integral part of production of a particular commercial job.

**Exhibit 28**

Matrices, plates, cuts or type of local advertisements, or other local matter, furnished to newspaper offices, may be used by such offices, provided such matter shall be reproduced as nearly like the original as possible within the time limit specified herein. It is understood this rule does not apply to national advertising, or printed supplements and magazines, or syndicate and other feature news matter in matrices, cuts or plates.

A local advertisement is: Any advertisement originally set with the jurisdiction of the Union; any advertisement, wherever set, advertising the business of any concern that is in the local field. The addition of names and addresses of local selling agents to national advertisements does not make them local advertisements."

The key provision in this section is the following, "it is understood this rule does not apply to national advertising, or printed supplements and magazines, or syndicate and other feature news matter in matrices, cuts or plates". The arbitrator believes that this sentence eliminates the right to reproduction of syndicated feature news matter.

**[*409]**

The Union relies upon the following sentence in Article I, Section 3 which is the jurisdiction section in the Agreement: "The employer shall make no other contract covering work as described above, especially no contract using the word 'stripping' to cover any of the work above mentioned." The Union believes that his provision prohibits the subcontracting of work of composing room personnel to outside agencies by means of the purchase of syndicate features from such companies as N.E.A. In other words, this sentence prohibits subcontracting of composing room work. The arbitrator does not believe that it is the intent of this language in the jurisdiction section of Article I to deal with or to limit subcontracting. The arbitrator thinks that the intent of this language was to prohibit the employer from making another collective bargaining agreement with another union covering the work described in this jurisdiction section.

Grievance number 14 is denied. The arbitrator finds that the Publisher did not violate the contract by using syndicated columns received in camera ready form without reproducing this syndicated material in the composing room.

### Costs and Attorneys' Fees

The Union requests that it be awarded its actual costs and attorneys' fees incurred as the result of what it regards as the Publisher's violation of the grievance and arbitration provisions of the Agreement. The Union charged that the Publisher sought to frustrate the grievance and arbitration procedure with delaying tactics and introducing frivolous questions as to procedural arbitrability, and refused to arbitrate multiple grievances in the same proceeding. The Union argues that it was forced to bring an action in the Federal District Court to compel the Publisher to arbitrate because the Publisher adamantly refused to proceed to arbitration. In its brief the Union states, "not withstanding the Publisher's self-serving affidavit testimony of good faith, the record documents unrelenting bad faith and frivolous opposition to arbitration." Further, the Union states in its brief, "the Union is entitled to its costs and attorneys' fees, not as punitive damages but as compensation for losses caused by the Publisher's violation of the grievance and arbitration machinery in the Agreement."

The Company makes three points in opposition to the request of the Union for costs and attorneys' fees. First the Company states that it is axiomatic that for any party to receive damages, including attorneys' fees, from the adverse party, the party seeking such extraordinary relief must first prevail on the merits of the dispute, in whole or in part. The Publisher urges that the arbitrator should find all of these grievances to be without merit and that all must be denied. Thus there is no need to consider the request for attorneys'

**Exhibit 28**

fees. Second, the Company takes the position that the arbitrator has neither the jurisdiction or the authority to grant this request for costs and attorneys' fees and that even if he did have such authority or jurisdiction the issue is not properly before him for consideration. Third, the Publisher argues that in any event the grant of costs and attorneys' fees would be inappropriate in this case because the. Union was as responsible for any delays as any Company representative. The Company argues that the evidence shows that the "shot-gun" blast of twenty issues, of varying importance, diverse factual situations, and frequently of doubtful relevance to the contract created a procedural morass. The Company's efforts were designed to consolidate items into related groups and groupings. The Union was adamant in its position that all issues should be treated together in one proceeding.

With regard to the Publisher's first point; the arbitrator did find certain grievances to have merit and sustained these grievances. However, not necessarily does the party seeking to receive costs and attorneys' fees need to prevail on the merits of the dispute. A party might under certain circumstances lose on the merits before an arbitrator, and yet be entitled to his costs and attorneys' fees made necessary by his efforts to bring a recalcitrant party to the arbitration table. An example of such a situation is to be found in Litton Systems vs. Local 522, **90 LRRM 3176** (D. C. Southern District of Ohio, 1975) which will be discussed later.

The arbitrator believes that an arbitrator does have jurisdiction and authority to award damages, including attorneys' fees, under appropriate circumstances, even though the Agreement contains no language authorizing the arbitrator to award damages. The award of legal costs and attorneys' fees should not be made in cases where there is evidence of good faith. It should be pointed out that an award of attorneys' fees is not an award of punitive damages when the damages are limited to the actual expenses incurred in the unnecessary legal proceedings.

An excellent analysis of the reasons justifying an arbitrator in awarding damages in the form of costs and attorneys' fees is found in the **[*410]** supplementary award of the arbitrator which is an appendix to the opinion of the court in Litton Systems vs. Local 522, **90 LRRM 3176** (D. C. Southern District of Ohio, 1975). An employer's grievance was involved in this case. Although the employer did not prevail in the arbitration on the merits of the grievance, the arbitrator awarded to the employer the sum of $5,000 as damages. These damages were awarded in reimbursement for legal services, arbitration fees and expenses incurred in connection with the cost of hearings and briefs. The damages were awarded because of the willful delay in the proceedings caused by the Union's authorized representatives in their persistent attempts to frustrate the arbitration of the grievance. The United States District Court for the Southern District of Ohio upheld the arbitrator's award of such damages. Arbitrator Clair V. Duff stated in his supplementary award as follows:

> "Upon mutual selection and appointment of the arbitrator to preside at the arbitration hearing it becomes incumbent on him to assure that the negotiated arbitration tribunal affords each party full and complete opportunity for a fair hearing. It is directly contrary to the parties' joint promise to resolve disputes by arbitration for one side to flout the whole arbitration process by deliberately engaging in dilatory tactics antithetical to dispute resolution in the orderly fashion bargained for. The contractual grievance machinery is designed to provide an appropriate remedy for all the various types of contractual violations that may occur. An arbitrator would be rendered powerless to redress clear contractual violations if he would be denied the power to fashion an appropriate and reasonable monetary remedy. Likewise, if no compensatory damages could be awarded for losses occasioned by obvious attempts to frustrate access to the contractually created arbitration forum, an arbitrator would simply be unable to fulfill his obligation to conduct a fair trial of the issue in dispute. If arbitration is to provide an alternative to lockouts and strikes it must remain effective in the face of novel challenges. We believe it is a necessary correlary that where mockery is openly made of the

**Exhibit 28**

arbitration process it is implied from the creation of the arbitration tribunal and the authorization of the arbitrator to make a binding decision that he has the power of compensating the party who by such perversion of the process has been subjected to unnecessary costs that have no reasonable connection with the underlying controversy. * * We are mindful of the fact that at numerous arbitration hearings serious questions in regard to arbitrability must be entertained. The sham proceedings in this case bear no analogy to genuine, bonifide contests over proceedural and arbitrability issues. Interjection of the patently spurious defense of nonarbitrability required the Company to expend a substantial sum of money merely to obtain the opportunity to have a dispute resolved by arbitration, which was a right of the labor agreement clearly granted. The very contractual provision guaranteeing arbitration is that portion of the collective bargaining agreement from which we draw the authority to award compensatory damages."

The present arbitrator has awarded attorneys' fees and certain other legal costs in one case, Jacuzzi Brothers, Inc., **49 LA 760**. This was a discharge case for insubordination, clearly arbitrable from a substantive point of view. The Company refused to arbitrate forcing the Union to file suit to compel arbitration. The Company filed an answer basing its refusal to arbitrate on the alleged settlement of the grievance during negotiations.

The Company agreed to arbitrate, the Union filed a motion to dismiss, and the order of dismissal approved by the court stated that the defendant had agreed to submit all the contractual issues in dispute to arbitration. At the arbitration hearing the Company brought forward no evidence to support the alleged settlement.

In his opinion the arbitrator stated, "the arbitrator believes that the dismissal order determines that the matters placed in dispute by the plaintiffs are to be submitted by agreement to arbitration. The question of costs, including a reasonable attorney's fee is one of these matters placed in dispute by the pleadings. The arbitrator therefore has jurisdiction to determine this matter of costs. * * There is no question here about the subject matter being appropriate for arbitration. The subject matter of the dispute is clearly subject to arbitration under the Agreement. The question as to whether or not a grievance has been settled or withdrawn is one of those proceedural and related matters which the courts have indicated must be submitted to the arbitrator. See John Wiley and Sons, Inc., vs. Livingston 376 U.S. 543, **55 LRRM 2769** (1964). The Company's defense for its refusal to arbitrate appears from its answer filed with the court to be that an agreement had been made during negotiations to withdraw or settle this grievance. However, no competent evidence was introduced at the arbitration hearing to support the conclusion that there was such an oral agreement. * * The arbitrator has studied the record and finds that the refusal to arbitrate was a delaying tactic for which the Company should pay the costs, including a reasonable attorney's fee."

Turning to the merits of the Union's request the arbitrator finds that the Union has not shown bad faith on the part of the Company. The Union has the burden of proving bad faith. The dispute between the Publisher and the Union over procedure centered in the question of multiple versus single issue arbitration. The Union over a short **[*411]** period filed twenty grievances, fifteen of them arising directly or indirectly out of the conversion from hot metal to cold type. Five grievances had nothing to do with the conversion. Others of the fifteen grievances had only an incidental relationship - Grievance No. 14 had no real relationship to Grievance No. 16, for instance. The Union desired that all of these grievances be considered together, even at the Joint Standing Committee step in the grievance procedure. The Union wanted to consolidate all these grievances in a single proceeding before a single arbitrator. The Company on the other hand wanted to consider each grievance separately. In particular the Company wanted to arbitrate the discharge grievances separately. Later the Company indicated that it would like to group the grievances in a logical arrangement for arbitration, and indicated willingness to leave the question of procedure to an arbitrator. Six grievances were settled at the court hearing.

**Exhibit 28**

The present arbitrator has considered the question of single versus multiple grievance arbitration in Hess Oil and Chemical Corporation, **52 LA 1035**, (1969). The arbitrator stated in that case, "The rule which has been developed and supported in numerous arbitration awards is that, in the absence of an express provision in the agreement prohibiting multiple grievance arbitration, the Union is entitled to submit several grievances, which have been processed through the grievance procedure and have been appealed to arbitration at approximately the same time, to a single arbitrator in a single proceeding." There are exceptions to this rule: If the practice of the parties has been single grievance arbitration; the Company is not required to arbitrate an unreasonable number of grievances in a single proceeding. Some arbitration cases require special qualifications of the arbitrator.

The arbitrator finds that the Company raised reasonable questions of procedural and substantive arbitrability. This is not a case in which spurious questions of procedural arbitrability are raised to delay and frustrate the grievance procedure. The Publisher wished to process each grievance singly in the steps of the grievance procedure prior to arbitration. This is not an unreasonable position. The Union withdrew grievance No. 20, which occasioned considerable legal expenses.

The request of the Union for costs and attorney's fees is denied.

### Grievances Nos. 13 and 20

The Union moved to withdraw Grievances 13 and 20 at the hearing on June 23, 1977. Since these two grievances were properly before the arbitrator for decision by reason of the two court orders, the grievances are dismissed with prejudice.

### REMEDY

1. The discharge of T__ was not for just cause, and he shall be reinstated as soon as possible after receipt of this award. Immediately upon reinstatement he shall be placed on unpaid leave of absence to secure training at the International Typographical Union Training School in Colorado Springs, Colorado. He shall take the Compugraphic 9000 course and the ad paste-up course. He is awarded back pay from August 29, 1975 to the date of his reinstatement at straight time rates of pay for a journeyman, less any earnings from other employment, and unemployment compensation benefits received, but earnings from his work as a "stringer sports writer" for the Leavenworth Times shall not be deducted.

2. The discharge of H__ was not for just cause. She does not desire reinstatement. She has received Social Security benefits and unemployment compensation benefits during the time since her discharge. The Publisher's records shall be amended to show that H__ retired on August 29, 1975. As a measure of damages for unjust discharge she is awarded the difference between her wages at straight time rates for one year from August 29, 1975 to September 1, 1976, and the sum of Social Security benefits and unemployment compensation benefits received during this period.

3. Ad paste-up is composing room work. The Publisher is directed to assign such work to composing room employees.

4. Composing room employees lost ten hours of work opportunity per week in ad past-up because this work was assigned to non-unit advertising employees, from August 25, 1975 to December 9, 1976, and from March 26, 1977 to the date of this award. The Publisher shall compensate composing room employees for this lost work at straight time hourly rates, being divided among these employees in accord with service with the Publisher during these periods.

5. The arbitrator retains jurisdiction to interpret this award, and to determine any amounts due.

**Exhibit 28**



**Exhibit 28**

R & EMPLOYMENT

# Arbitration Decisions

## Labor Arbitration Decision, SYNERGY GAS CO., 1330-1154-85, 91 BNA LA 77

**Labor Arbitration Decision, SYNERGY GAS CO., 1330-1154-85, 91 BNA LA 77**

Arbitration*[ED. NOTE ]: This award was upheld in Synergy Gas Co. v. Sasso, 129 LRRM 2041 (CA 2, 1988).

In re GLOVER BOTTLED GAS CORP./SYNERGY GAS CORP. and INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 282

AAA Case No. 1330-1154-85

June 15, 1987

Show Summary

**[*78]**

Appearances: For the company: Peter A. Schneider and Lewis Goldberg, attorneys. For the union: Franklin Moss and Sophia Davis, attorneys.

Jesse Simons

Jesse Simons

### Decision of Arbitrator

#### ENFORCEMENT OF AWARD

-- The Parties stipulated that the Arbitrator was to adjudicate the following:

"What relief, if any, is B entitled to pursuant to the Arbitration Award of James Cashen dated October 5, 1981?" [1] **[*79]**

### The Background

Grievant was born on November 27, 1920. Sometime in 1976 [2] or 1977, he was employed by Glover Bottled Gas Corp. [3] as a truck driver. On October 20, 1980, Grievant was terminated.

Subsequently, pursuant to a collective bargaining agreement between Glover Bottled Gas Corp. and Local 282, I.B.T., the propriety of Grievant's discharge was submitted to arbitration (Case No. 1330-0323-81) under the Voluntary Labor Rules of the AAA.

On May 19, 1981, James A. Cashen, Esq. was appointed as Arbitrator by the AAA to hear and render an Award on the dispute concerning Grievant's discharge. On August 31, 1981,

**Exhibit 28**

Arbitrator Cashen conducted a hearing and after receiving post-hearing briefs, rendered an Award, dated October 9, 1981, as follows:

> "The Glover Bottled Gas Corp. failed to show just cause for its discharge of grievant B . The Employer is directed to reinstate grievant retroactive to the date of discharge and is directed to provide grievant with a lump sum back pay award equal to the difference between what grievant would have received in full employment with Glover during the period in question minus any amounts actually earned from other employment or received as unemployment insurance during the period."

Thereafter, in October 1981, Grievant was informed by Local Union 282 Business Agent Boggia that his grievance had been sustained by the Arbitrator and that he was to report to Glover for work. Grievant talked to his immediate foreman at MKB where he then worked and told him that he was to report to work at Glover. The MKB foreman told Grievant that "if things don't work out at Glover [he ] cannot come back to MKB." On the Monday following his conversation with Boggia, Grievant reported to the Patchogue facility of Glover and was told that he would not be employed. After being denied reinstatement and after returning home, he found a letter from Glover stating he was to return to work.

Subsequently, Glover moved in State Supreme Court to vacate the Cashen Award and Local 282 moved to confirm it. After many years of protracted litigation, the Cashen Award was confirmed in 1983. The Employer thereafter obtained a stay of the order confirming the Award.

On July 12, 1985, Local 282 filed a Demand For Arbitration with AAA because Glover had not responded to its request for Grievant's reinstatement and back pay. The AAA declined to process the Demand because of the 1983 stay still in effect.

On April 21, 1986, the Appellate Division found that:

> "After reviewing the record, we agree with Special Term that the petitioner failed to meet its burden of establishing misconduct on the part of the arbitrator. We further find no merit to the petitioner's various claims of erroneous evidentiary rulings by Special Term . . . therefore . . . we affirm the judgment of Special Term based on insufficiency of evidence before it of any misconduct on the part of the arbitrator."

The Court denied the Employer's motion to vacate the Award and granted the Union's motion to confirm.

Subsequently, AAA resumed administration of the Union's Demand For Arbitration and, as noted previously, the Undersigned was designated as Arbitrator on May 28, 1986, to ascertain what relief, if any, the Grievant is entitled to pursuant to the 1981 arbitration Award.

The Union summarized the Award it seeks as follows:

> "1. Award B back pay plus accrued interest through March 31, 1987 in the amount of $89,540.
>
> 2. Award B additional interest on his back pay of $25 per day from April 1, 1987 until the date of payment.
>
> 3. Award the Local 282 Pension Trust Fund contributions plus accrued interest through March 31, 1987 in the amount of $11,231.
>
> 4. Award the Local 282 Pension Trust Fund additional interest of $2.68 per day from April 1, 1987 until the date of payment.
>
> 5. Award B $2,640 in lieu of profit sharing plan contributions plus simple interest at 16% (totaling $1.16 per day) from April 1, 1987

**Exhibit 28**

until date of payment, or in the alternative, directing Synergy to contribute $2,640 to Synergy's Profit Sharing Plan on B's behalf.

6. Directing B, as a condition of his Award, to pay dues and accrued interest on his back pay directly to the Union.

7. Awarding Local 282 its reasonable attorneys' fees incurred as a result of Synergy's failure to comply with the Cashen Award, and retaining jurisdiction to determine the amount of those fees."

## The Employer's Position

The Employer has advanced many arguments in support of its view that Grievant is not entitled to the relief requested by the Union, and they are summarized hereafter.

It is the Employer's basic position that:

> ". . . any relief B may be entitled to is limited to monies he would have earned in wages from the Company for the period between his discharge and the Cashen award less interim earnings and unemployment [*80] compensation. Further, no payments of any sort, be it dues, or pension contributions or attorney fees, may be awarded to the Union because, inter alia, to do so exceeds the limited authority ceded to the Arbitrator by the Cashen decision . . . .
>
> If, for argument purposes only, the Arbitrator should find that the period for which an award may be made extends beyond the date of the Cashen decision then the Employer asserts that any relief to which B may be entitled terminates with the expiration of the collective bargaining agreement. Such relief would exclude any claims other than back wages less interim earnings and unemployment compensation."

Following hereafter is a summary of the Employer's arguments:

1. Because Grievant's duties, before his discharge in 1980 were limited to pick up and delivery of 100-pound tanks, and because the Employer changed its delivery of propane via tank truck to this new method of delivery, therefore Grievant's job was eliminated on January 31, 1981 and accordingly, "any claim for relief must terminate as of that date." In support of the proposition "that the back pay for a discharged employee ends . . . with the elimination of their position," the Employer cites *Castleman & Bates* **228 NLRB No. 199** [ **96 LRRM 1104** ] (1977 ) and McDonnell Douglas Corp. **270 NLRB No. 182** [ **117 LRRM 1130** ].

In further support of the above, in a footnote at p. 7 of the Employer Brief, the Employer noted as follows:

> "A class 3 license is required for the bulk trucks. According to B he maintained only a class 4 license while out of work and thereby could not have driven the larger vehicles [used in the new method of deliveries ]."

Based on Grievant's testimony regarding his conversations with his supervisor at MKB (where Grievant was employed when the Cashen Award was promulgated in October 1981), after the Union Business Agent told him of the Award and that he should present himself for work at the Employer's plant, the Employer concludes that Grievant "voluntarily resigned" the job at MKB. In consequence, the Employer argues that such "voluntary resignation" in late October 1981 "cuts off any further claims of relief" by Grievant after that date. In a footnote, the Employer noted that Grievant, though he had an understanding with the MKB manager (as distinct from his immediate foreman) that "if things fell through at

**Exhibit 28**

Glover he would be reemployed, he never spoke to that manager after he was informed that the Company would not reinstate him."

In support of the proposition that resignation from employment constitutes a willful loss of employment and offsets relief to which an individual may otherwise be entitled, the Employer Brief cites *Gary Aircraft Corp.,* **211 NLRB No. 65** [ **87 LRRM 1061** ] (1974 ) and *NLRB v. Hopcroft Art and Stained Glass,* **692 F.2d 63**, **111 LRRM 2831** (8th Cir. 1982).

Grievant's testimony, the Employer urged, justified the statement that Grievant ". . . withdrew from the propane industry" in that after October 1981 he did not seek employment in it. In consequence, the Employer *argued* that such "withdrawal . . . effects a cut- off in any arguable back pay entitlement [Grievant ] might otherwise enjoy." The Employer further *argued* that because Grievant sought machine shop work rather than work in the propane industry, that, therefore, in keeping with *Trident Seafood Corp.,* **275 NLRB No. 3** [ **118 LRRM 1639** ] (1985 ), the Employer "has no back pay obligation . . . where an offer of reemployment would be rejected." The Employer therefore concluded that the "Company has no liability beyond the date of the Cashen decision because Grievant had no interest in employment in the propane industry and would have rejected any offer thereafter."

2. In furtherance of its position, the Employer asserted that ". . . the record evidence establishes that B failed to make reasonable efforts in seeking interim employment after resigning from MKB, [therefore ] B is not entitled to relief as of the date of his resignation from MKB."

In support of the proposition that discharged employees have a duty to mitigate damages "by diligently seeking interim employment," and when it is lacking, back pay entitlement is denied, the Employer cited two arbitration awards.

The Employer *argued* that Grievant "failed in his obligation to seek interim employment after he 'resigned' from MKB." In support of this contention, it repeated its view of Grievant's testimony concerning MKB referred to previously, and urged that Grievant's efforts fall "far short of the diligence required" arguing that the record established that:

> "B did not ask the Union to assist him in finding a job; B did not register with any employment agencies; B only sought positions which were close to where he lived; he withdrew himself from the propane industry; and, he saw a total of only six employers pursuant to employment for the 8 month period from October 1981 through June 1982. No requests for references on B were made to the Company from the date of his discharge to his retirement. B's effort was clearly lackadaisical and geographically limited - he limited himself to the Babylon area and B testified that he would not consider employment at locations which **[\*81]** were closer to his home than the Employer's Patchogue facility."

The Employer also *argued* that:

> " [The ] Record Evidence Establishes That The Company Had Just Cause To Terminate B As Of The Cashen Decision And, Therefore, Any Relief Is Limited to The Date Of The Decision."

In support of this contention, the Employer Brief referred to the testimony of Synergy V.P. Russell that the Employer told Grievant when he appeared in October 1981 for work subsequent to issuance of the Cashen Award, that it was its decision that he would not be permitted to work again because of his "substandard and erratic work performance" which was the cause of his dismissal in 1980.

3. The Employer Brief set forth its calculations of Grievant's back pay entitlement and the methods used in accordance with the various cutoffs dated for back pay eligibility, previously detailed.

Summarized hereafter are the results of the Employer calculations under its various theories:

**Exhibit 28**

A. Assuming Grievant's job was "eliminated" in January 1981, and after deduction for unemployment insurance and MKB earnings . . . . . . $183.27

B. Assuming Grievant "resigned" his job at MKB October 1981, plus the above $183.27, less MKB earnings in 1981 . . . . . . . $1,855.20

C. Assuming back pay to the date of expiration of the Collective Bargaining Agreement including above 1980 and 1981 amounts and 7/12 of 1982 Company earn ings, minus 1982 unemployment insurance and less projected MKB earnings and Union earnings . . . . . . . . . $1,513.43

D. Assuming cutoff of back pay beyond the expiration date of the Collective Bargaining Agreement . . . . . . . -O-

4. The Employer advanced a number of arguments that the scope of the authority of the Undersigned is limited, and they are briefly summarized hereafter.

First, the Employer argues that the Local 282-Glover Agreement, when the Union struck, expired on July 31, 1982. Because no successor agreement was executed, therefore, all Union claims beyond that date cannot be sustained. In support of this assertion, Em.B., pp. 20-21 cites a number of arbitration awards and Circuit Court decisions for the proposition that grievances which arise after contract termination are not arbitrable. Also, at pp. 20-21, the Brief quotes Justice Whittaker's dissent in United Steelworkers of *America v. Enterprise Wheel & Car Corp.*, **46 LRRM 2423** (S.Ct. 1960 ), in which the Court majority found that arbitrators possess the power to award relief after contract termination.

Second, in its Brief, the Employer argues that the authority of the Undersigned is limited to awarding back pay, less interim earnings and unemployment insurance and that all other Union claims are not within the scope of the arbitral authority vested in the Arbitrator in the instant matter.

In support of the above argument, the Employer, in the first instance, *argued* that the authority of the Undersigned "stems exclusively and expressly from [Arbitrator ] Cashen's decision," which, the Employer noted, reinstated Grievant effective on the date of discharge, and directed that the Company was to pay Grievant

". . . a lump sum back pay award equal to the difference between what grievant would have received in full employment in the period in question . . . [October 20, 1980 to October 9, 1981 ]."

The Employer further states that Grievant's "precise date of reinstatement or lack of reinstatement does not affect the instruction and limitation of the Cashen Award. . . ." The language of the Cashen Award, the Employer urged, must be narrowly construed and the Undersigned may not look "elsewhere" for "clarification," because the Award contains no "ambiguity or imprecision." The Employer Brief cites two arbitration awards defining the doctrine of functus officio, asserting that Cashen, having rendered his Award, it is not within the scope of the authority of the Undersigned to alter that Award under that doctrine. Also cited were two arbitration awards for the postulate that where the issue arbitrated is "back pay," the arbitrator may not award any other benefits or interest. Noting that courts on occasion vacate arbitration awards which clearly "ignore [s ] or deviate" from the contract being construed, the Employer Brief analogizes the Cashen Award to a contract provision subject to interpretation by the Undersigned, and contends that because the Award limits relief to "back pay," the Undersigned's Award must be similarly limited.

5. The Employer Brief at p. 27 contends that the Cashen Award precludes relief to the Union in the form of attorney fees and interest thereon because the Cashen Award" . . . is specific and devoid of any direction of relief to anyone or any entity other than Grievant." The Employer Brief also *argued* that the "framed" issue is similarly preclusive. The Brief cited a number of arbitration awards for the proposition that: it is not generally customary for arbitrators to award interest or attorneys' fees unless the employer's action in denying back

**Exhibit 28**

pay was willful, capricious, arbitrary, vindictive, in bad faith, or in the absence **[*82]** of an express grant of authority to do so.

The Employer Brief further asserts that while "there has been an extended period of litigation, the Union has not proved that the Employer acted in bad faith." It further argues that the "Appellate Division's [original ] reversal of Justice McInerny's confirmation [in 1983 ] of the Cashen Award establishes that the Employer's actions have been in good faith and premised upon a reasonable and sound assertion of rights."

6. At p. 31 of the Employer Brief, the Employer advances the argument that for all the reasons it previously advanced with respect to limiting the authority of the Undersigned to awarding back pay only, also apply to the Union's claim for contributions to the Pension Fund.

* * *

### Analysis of the Company's Arguments

Attention is turned hereafter to evaluation of the arguments advanced by the Employer, as summarized previously.

The Employer *argued* that grievant's back pay should be confined to the period between his discharge in 1980 and the October 5, 1981 Award of Arbitrator Cashen, or soon thereafter. I do not agree.

First, the Employer advanced the view that Grievant's leaving MKB, after his Union Business Agent told him in October 1981 to present himself for employment at the Employer's facility constituted a "voluntary resignation," and therefore relief should not extend beyond October 1981. Grievant's reliance on the Business Agent's report and advice was reasonable. Equally reasonable was his expectation that having "won his case" in arbitration, the Employer would reinstate him. In the judgment of the Undersigned, the Record does not prove a "voluntary resignation," and the Employer's argument in that regard is rejected.

Second, the Employer further *argued* that after it refused reinstatement of Grievant in October 1981, that Grievant "withdrew from the propane industry," failed in "his obligation to seek interim employment," and that generally Grievant's efforts to obtain employment "fell far short of the diligence required," and that therefore the period of his back pay entitlement should end in October 1981. The Employer's assertions are contradicted by the record evidence which demonstrated that from the date of Grievant's dismissal in October 1980 until December 1985, when Grievant went on Social Security, Grievant's gross income was $45,667, of which $838.00 was unemployment insurance benefits. The Arbitrator is persuaded that Grievant's annual earnings of approximately $9,000 constituted proof of diligence, particularly in view of the fact that he was semi-skilled and over 60 years of age. Because the Record demonstrated that he extended reasonable efforts to mitigate damages, the Employer's position is rejected.

Third, the Employer reiterated its view that the discharge of Grievant in 1980 was for just cause, and asserted in support of this view that the "record evidence establishes" same. The Employer's attempt to relitigate the propriety of its 1980 dismissal in the instant arbitration is obviously inappropriate and improper, in light of the conclusive determination to the contrary of the judicial tribunal in which it advanced the same meritless assertions that Cashen erred and that Grievant was discharged for just cause. This argument therefore is given no weight whatsoever.

Moreover, the Employer's suggestion that the Arbitrator has the authority to consider the merits of the 1980 discharge would seem to be inconsistent with its argument that the Undersigned's authority is derived from and strictly limited by Arbitrator Cashen's Award.

Fourth, the Employer contended that because Grievant's job of delivering and picking up 100-pound tanks was "eliminated" on January 31, 1981 as a result of the changeover to

**Exhibit 28**

delivery of propane by means of tank truck with hose extensions, therefore any relief accorded Grievant should cease on that day. However, the Record is clear that this changeover was gradual and that other employees, who, like Grievant, had previously performed tank delivery and pickup duties, were assigned to the duties associated with the new delivery method. The change in the Employer's method of delivery did not "eliminate" other employees' jobs, and the Employer offered no persuasive evidence that Grievant's job would have been eliminated had he not been discharged. To the contrary, it seems Grievant would have been assigned the duties associated with the new delivery method.

Fifth, in furtherance of the view that the relief cutoff date should be January 31, 1981, the Employer noted that the drivers of the larger new trucks were required to possess a Class 3 license. Because Grievant has only a Class 4 license, he therefore could not **[*83]** have driven the new trucks. The Record reveals that, but for the wrongful discharge, Grievant would have obtained a Class 3 license, just as his fellow drivers did, thus satisfying the motor vehicle department's requirements. The Employer's argument rests on a strained interpretation of the Record, and in my judgment is meritless.

* * *

Similarly, the Arbitrator is unpersuaded by the Employer's claim that the Undersigned lacks jurisdiction to award back pay beyond the date (October 1981) of the Cashen Award or that the back pay period ended when the Contract expired.

First, the Employer *argued* that a July 1982 strike "terminated" the existing Collective Bargaining Agreement, [4] including Grievant's right to have arbitrated his claim for any relief after that date. In support of this assertion, the Employer cites the dissent of Justice Whittaker in the 1960 Supreme Court decision, United Steelworkers of *America v. Enterprise Wheel & Car Corp.,* **46 LRRM 2423**. The Court majority adopted the exact contrary view to that urged here by the Employer, holding that employees enjoy the right to have grievances adjudicated, and arbitrators enjoy the authority to issue binding awards of grievances, notwithstanding contract termination. A quotation from the dissent in Enterprise Wheel can hardly be given any weight by the Undersigned.

Second, as to jurisdiction, the Employer *argued* that the "submission" foreclosed the Undersigned from awarding any remedy other than back pay between October 1980 and October 1981, less earnings and unemployment insurance, and that the scope of the authority of the Undersigned is confined exclusively to awarding to Grievant the back pay ordered in the 1981 Award of Arbitrator Cashen. That was the appropriate relief had the Employer met its contractual obligations and reinstated Grievant immediately upon receipt to Mr. Cashen's Award. Having elected not to do so, and having wrongfully denied Grievant the employment to which he was entitled until his retirement in 1985, the Employer and not the Grievant must bear the cost of the Employer's contract breach.

The Undersigned will give force and effect to Arbitrator Cashen's specific direction that Grievant was to be reinstated to employment in October 1981 with back pay to October 1980, and will accord to Grievant all the benefits to which he would have been entitled had the Employer not twice breached its contract. This will necessarily include wages and interest up to 1985 when Grievant retired (minus earnings and unemployment benefits), contributions in behalf of Grievant to the Pension Fund up to January 31, 1983 when the Employer ceased contributions, plus interest, and Grievant's profit sharing entitlement, plus interest, and interest in all three areas up to 1987 and until payment is made.

All of the above forms of relief fall squarely within the Union's Demand For Arbitration of July 12, 1985, and the agreed on submission. Therefore, the Undersigned is wholly justified in such exercise of arbitral authority as will provide a remedy for Grievant which matches the loss he sustained. Because the loss was extensive and the breach egregious, the remedy will be comprehensive and proportionate.

**Exhibit 28**

The Arbitrator's authority to grant the Union's claim for reimbursement for reasonable legal fees incurred to obtain enforcement of the Cashen Award is dealt with in the Opinion at pp. 61-66 [ **91 LA 92** -93 ] herein.

* * *

**The Union's Position**

A review of the Union claims, the method of calculating them, and the arguments on which the claims are based follows:

First, claims in behalf of and payable to Grievant are for wages he would have earned had he not been improperly discharged, minus earnings and unemployment benefits, plus simple interest at 16%, and a payment in lieu of profit-sharing benefits. Second, pension contributions on behalf of and payable to the Local 282, I.B.T. Pension Plan, plus simple interest at 16%. Third, reasonable attorneys' fees incurred to enforce the Cashen Award, the Undersigned to retain jurisdiction to conduct hearings to ascertain the amount thereof and to issue an Award on same.

The above fall into five distinct time periods:

> First, the period between Grievant's discharge on October 20, 1980 to October 5, 1981, the date of the Cashen Award.
>
> Second, the period October 4, 1981 to January 31, 1983, during which there existed a collective bargaining agreement between the Parties. [5]
>
> Third, the period February 1, 1983, when the Agreement expired, to December 24, 1985, when Grievant retired.[*84]
>
> Fourth, December 25, 1985 to March 31, 1987, the approximate date on which Briefs of the Parties were filed in the instant matter.
>
> Fifth, April l, 1987 to the date on which payment is actually made of the sums awarded by the Undersigned. [6]

As to Wages: The claims in behalf of Grievant for October 20, 1980 to October 5, 1981, the Union *argued*, is the retroactive wage payment directed by the Cashen Award, and accordingly is due and payable.

The wage claim in behalf of Grievant for the period October 6, 1981 to January 31, 1983, the Union *argued*, is due because, had Grievant been reinstated as directed by the Award, he would have continued to work until January 31, 1983 under the terms of the Agreement.

As to the third period, February 1, 1983 to December 24, 1985, the Union contended that Grievant would have continued to work at Glover until he retired, and is thus entitled to the wages he would have received had the Company not wrongfully discharged him and wrongfully refused to comply with the Cashen Award.

As to Interest: In addition to simple interest at 16% [7] for the first three periods, the Union also asked simple interest at 16% for the fourth period (December 25, 1985 to March 31, 1987), and the fifth period (April 1, 1987 to the date on which actual payment of all of the above sums is tendered).

The Union urged that only by awarding interest for all five periods will Grievant obtain a full make-whole remedy for: 1) the wages improperly denied him because of his unjust dismissal by the Employer in 1980 in violation of the Agreement; 2) by its improper refusal to reinstate him pursuant to the Cashen Award, also in violation of the Agreement; 3) by its refusal to pay back wages; 4) by its refusal to pay contractually mandated pension contributions and Grievant's profit-sharing entitlement, after the Court, in 1986, directed compliance with the Cashen Award, thus necessitating the instant arbitration.

**Exhibit 28**

The Union, noting the Employer's persistent recalcitrance and its unmeritorious resort to judicial process for five years to block enforcement of the Cashen Award, anticipates the possibility that the Employer may seek to vacate or refuse to comply with this Award. It is this which prompts the Union to seek interest for the fifth period on all sums, from April 1, 1987 to the date of actual payment.

* * *

Computation of Back Pay: In computing the back pay due Grievant as a make-whole remedy, the Union relies on various authorities, [8] and on the NLRB Casehandling Manual Part III, Section 10536, quoted in Un.B. at pp. 5 & 6, and cited, in pertinent part, as follows:

> "In calculating back pay, the NLRB will apply one of four basic back pay formulas, depending upon the circumstances of the case. NLRB Casehandling Manual Part III (hereinafter 'Compliance Manual') Section 10536. Two of those formulas (the third and fourth), requiring comparisons with other similarly-situated employees, are not available here, because Synergy has not provided the relevant documentation. Of the remaining two formulas, the first, which takes the unlawfully discharged employee's earnings prior to his discharge, and projects them into the future, is applicable only for short periods of time where wages do not change. Compliance Manual Section 10538.2(d). Therefore, the Board's second basic formula is the most appropriate one. See Compliance Manual Section 10540. That formula takes the discharged employee's average hours of work per week during the period immediately prior to his discharge, and multiples those hours by the rates of pay he would have received during the back pay period, with overtime hours converted to their straight-time equivalent.
>
> In determining net back pay, we have taken B's 'gross back pay'-- i.e., the earnings he would have received had he not been discharged--and then subtracted his interim earnings as well as unemployment compensation."

The Union calculated that the gross back pay due Grievant from the date of discharge on October 24, 1980 to December 24, 1985 to be $102,952; that his gross earning and unemployment benefits [9] for the same period to be $45,667; and that deducting the latter from the former results in a net back pay claim in the amount of $57,285. The details of the Union's method of [*85] calculating the above back pay and deductions are not quoted herein in the interests of brevity.

These calculations yield the following results:

Gross Back Pay Interim Earnings and Unemployment Net Back Pay 1980 $2,869 $1,206 $1,663 1981 $16,111 $9.328 $6,783 1982 $17,901 $5,953 $11,948 1983 $19,834 $8,354 $11,480 1984 $22,173 $9,894 $12,279 1985 $24,064 $10,932 $13,132 Total $102,952 $45,667 $57,285

As to Interest on Back Pay: In addition, the Union makes claim for simple interest at 16% on back wages, but only subsequent to October 9, 1981, the date of the Cashen Award. The interest claim rests on the following arguments.

The first argument is that interest is due because the Employer, by failing to comply in 1981 with the Cashen Award, breached Article 12(e) of the Collective Bargaining Agreement, which states:

> "There shall be compliance by the parties with an arbitration award issued pursuant hereto within fifteen (15) days after its issue."

This breach, the Union urged, damaged Grievant and interest is therefore payable to make Grievant whole.

**Exhibit 28**

Second, the Union contended that:

> " . . . Where there is a lengthy delay between discharge and the Award, arbitrators will generally award interest in order to ensure a true 'make whole' remedy."

The Union further *argued* that:

> "While in a typical case awarding interest may not always be necessary, in a case such as this one where the Employer has engaged in such extreme delaying tactics, resulting in a second post-award hearing six years after the unlawful discharge, an interest award is clearly necessary to compensate B for the delay in receiving his backpay, and to avoid rewarding Synergy for its recalcitrance."

The claim for interest also rests on citation of a number of arbitration awards in situations similar to the instant one. The specific rate of interest of 16% rests on the following reasoning and authorities:

> "The National Labor Relations Board awards interest in back pay cases based upon the rate used by the Internal Revenue Service, compounded quarterly. *Florida Steel Corp.,* **231 NLRB 651** [ **96 LRRM 1070** ] (1977 ). Since 1980, that rate has varied from 11% to 20%. See IRSRev. Rul. 85-47. Under New York State's General Obligations law, interest may be charged at an 18% annual rate, without compounding. The Union proposes that 16%, simple interest, without compounding, is a reasonable rate (particularly in light of the much higher prevailing rates in the early 1980's) that roughly coincides with the average rates used by the NLRB,* (* In fact, because of the lack of compounding, the proposed 16% simple interest rate produces less interest than the NLRB formula.") but which is much easier to compute than the NLRB's varying and quarterly compounded rate. For the sake of simplicity, the interest will be computed as if the full year's back pay were due on July 1 of each year (rather than one half prior to July 1 and one half after July 1).

The Union, in summary, claims that the sum of $32,255 in interest is due and payable for the 2nd, 3rd and 4th periods (October 20, 1981 to March 31, 1987).

The Union's calculation of interest on net back pay [10] excludes the period before issuance in October 1981 of the Cashen Award, and thus it uses December 1, 1981 as the date on which interest begins to accrue, and it yields the following result:

Net Back Pay Duration of Interest Payment Simple Interest at 16% Total 1980 $1,663 5 1/3 years $1,419 $3,082 1981 $6,783 5 1/3 years $5,788 $12,571 1982 $11,948 4 3/4 years $9,080 $21,028 1983 $11,480 3 3/4 years $6,888 $18,368 1984 $12,279 2 3/4 years $5,403 $17,682 1985 $13,132 1 3/4 years $3,677 $16,809

For each day after March 31, 1987, the Union urged additional interest accrues at the rate of $25 per day ($57,285 X .16), divided by 365.

The Time Span To Be Used For Determining Grievant's Back Pay: The Union[*86] Brief addressed the following five issues bearing on the span of time for which Grievant is entitled to back pay: A) Grievant's efforts to find work after his discharge; B) Termination of the Collective Bargaining Agreement in January 1983; C) the existence of a drivers' strike at Glover from February to April 1983, D) Grievant's physical condition, E) the possibility that, had Grievant been reinstated promptly in 1981, pursuant to the Cashen Award, he again would have been discharged, and a brief summary of these arguments follows hereafter:

As to Grievant's efforts to obtain work from October 20, 1980, the date of his discharge to October 9, 1981, the date of the Cashen Award, the Union first refers to Section 12(f) of the

**Exhibit 28**

Local 282 Contract, which provides that employees reinstated after discharge shall receive "full back pay for all time lost," and does not impose on B "an obligation to mitigate damages"; second, the Union notes that the Cashen Award did not impose on Grievant "any obligation to mitigate damages"; and third, quotes Shakespeare & Shakespeare Prods. Co., **9 LA 813** (BNA), 817-18 (1948) (Platt, Arb.) as follows:

> ". . . While it may be proper to deduct from a back pay award sum actually earned . . . or sum received . . . through unemployment insurance . . . no authority exists in an arbitrator to penalize an employee financially for failing to have earnings."

The Union further *argued* that "even if there was an obligation to mitigate damages, B satisfied it," in that he made "reasonable efforts" to find employment, and the Union quotes a number of arbitration awards concerning various standards to be applied, and Un.B., p. 14 is quoted as follows:

> ". . . [B ] is not held to the 'highest standard of diligence.' *NLRB v. Arduini Mfg. Co.,* **394 F.2d 420**, 422-23 [ **68 LRRM 2129** ] (1st Cir. 1968 ). An employee's lack of success is irrelevant; he need only make an 'honest good faith effort.' *NLRB v. Cashman Auto Co.,* **223 F.2d 832**, 836 [ **36 LRRM 2269** ] (1st Cir. 1955 ). Moreover, any uncertainties are to be resolved against the wrongdoer. Rikal West, Inc., **274 NLRB No. 170** [ **119 LRRM 1018** ] (1985 ). In addition, the burden is on the employer to prove that the grievant would have been unsuccessful in securing interim employment. *Great Plains Beef Co.,* **255 NLRB 1410** [ **107 LRRM 1097** ] (1981 )."

The Union summarized its view on mitigation of damages as follows:

> "B sought work at locations in reasonable proximity to his home, and did in fact find work for most of the back pay period. He applied to machine shops, to Conservative Bottled Gas, and to half a dozen places he was sent by Unemployment and was prepared to perform 'any kind of employment, regardless of rate of pay.' In light of his age, he was lucky to do as well as he did. Moreover, Synergy presented absolutely no evidence that B would have found additional work even if he had made extraordinary efforts. Synergy presented no testimony whatever that any jobs were available anywhere for a man of B's age and skills. In the absence of such evidence, there is no basis for limiting the back pay Award."

The Union Brief notes the Employer's argument that because the Collective Bargaining Agreement, as extended, terminated in January 1983, that Grievant was therefore an "at will" employee terminable at any time, for any reason and therefore no back pay is due him beyond January 1983. In reply, the Union Brief cites *United Steelworkers v. Enterprise Wheel & Car Corp.,* **363 U.S. 593** [ **46 LRRM 2423** ] (1960 ). In this decision, the Court rejected a lower court's refusal to confirm an aspect of an arbitration award granting back pay after contract expiration because the employer would have paid the employee whatever it desired and discharged him for any reason. The Supreme Court upheld the back pay arbitration award notwithstanding the contract's expiration. The Union closed its argument by stating that:

> "In light of Enterprise Wheel & Car, any argument that termination of the contract also terminated the back pay obligation at the prevailing rate paid to other employees is frivolous."

In amplification of the preceding, the Union, in its Reply Brief, stated:

> " . . . this is not the first time that Synergy has claimed that backpay is not payable for the period after the contract as extended expired. In August 1982, Glover discharged Local 282's shop steward and two other union members. Glover sought to stay arbitration, but federal district Judge Jack Weinstein ordered

**Exhibit 28**

arbitration of the discharges, and the United States Court of Appeals *affirmed* the decision. Glover Bottled Gas Corp. v. Local Union No. 282, I.B.T., No. CV-82-3183 (E.D.N.Y. 1982), *aff'd* **711 F.2d 478** [ **113 LRRM 3211** ] (2d Cir. 1983 ). Subsequently, Arbitrator Norman Brand ordered all three employees reinstated with backpay. The award was subsequently confirmed despite Synergy's argument that Professor Brand lacked authority to award backpay for the period after the expiration of the contract. Glover Bottled Gas Corporation v. Local Union No. 282, I.B.T., No. CV-84-2728, (E.D.N.Y. 1984), *aff'd*, **767 F.2d 907** (2d Cir. 1985 ). Thus, Synergy's attack on an arbitrator's authority to award backpay subsequent to the contract's expiration has already been rejected by the federal courts. . . ."

As to the Employer's view that because Synergy drivers were on strike from February to April 1983 Grievant is not entitled to pay for that period, the Union *argued* that back pay should not be denied Grievant for that period, and its view is, in pertinent part, quoted as follows:[*87]

" . . . the general rule is that back pay may not be tolled during the pendency of a strike. NLRB Compliance Manual Sections 10560 & n.1; East Texas Steel Castings Co., **116 NLRB 1336**, 1339-40 [ **38 LRRM 1470** ] (1956 ). The reason for this rule is that an assumption that any particular employee would have joined the strike would necessarily be 'based upon conjecture and speculation.' Id. Insofar as 'the employer's own discrimination against the claimants has made it impossible to ascertain whether they would have gone on strike in the absence of such discrimination, the uncertainty must be resolved against the employer.' Id. Here, in particular, there is no warrant for presuming that B would have joined the strike, in that B had worked for Synergy during the pendency of a strike in 1976. Moreover, he was never active in union affairs, and never attended union meetings or ratification votes."

As to whether or not Grievant's physical condition shortly after his retirement on December 24, 1985, when he developed a brain tumor would have prevented him from doing his job in 1985, the Union, in its Brief, noted that Grievant:

". . . was in excellent physical shape prior to his retirement, and performed heavy labor at the Arboretum; saw a physician once in six years, and then only for a cold or virus; showed no symptoms of physical distress until about the time of his retirement, when he began to lose weight, and was able to perform without difficulty his work as a laborer at the Arboretum. Indeed, he 'never missed a day' on that job.

Further, though Synergy employees are given physical examinations every two years, the Union noted that the Employer did not present testimony to:

" . . . show that B's tumor would have been revealed by an exam, nor that the tumor had been in existence for any substantial period of time. Neither was there any evidence that the Synergy exam was any more thorough than the visit B had with Dr. Citriale in 1985."

The Union also noted that, though:

"Synergy was provided with access to B's medical records, and was entitled to present expert testimony to show that B was physically disabled prior to his retirement, [that ] the Company's failure to do so suggests that Synergy was unable to find a qualified expert to support the Company's position. Accordingly, any claim that B was

**Exhibit 28**

unable to perform his job duties is unsupported by any evidence in
the record."

As to the Employer's view that Grievant, had he been promptly reinstated in October 1981
pursuant to the Cashen Award, would have been discharged again, the Union argues, first,
that such assumption is "wholly speculative" and therefore without merit. In connection
therewith, the Union notes that it was precisely the Company's unwarranted refusal to
comply with the Cashen Award by reinstating Grievant which was an absolute bar to
obtaining certain knowledge of Grievant's employment after reinstatement. The Union also
contends that if the Company believed it would have had just cause to discharge Grievant
after reinstatement, it should have reinstated him and sought to discharge him again, rather
than ask the Undersigned "to speculate as to B's status with the Company had he been
reinstated."

Moreover, the Union, noting that by October 1981 the Company discontinued delivery and
use of 100-pound tanks such as Grievant handled before his discharge in 1980, and which
had been the area of Grievant's alleged productivity problems leading to his discharge,
argues that Russell's testimony on Grievant's "so-called shortcomings" are therefore
irrelevant. The Union also *argued* that the work Grievant did at the Arboretum was "much
more physically taxing than [it ] would have been at Synergy after it substituted for pick up
and delivery of 100-pound tanks" delivery of propane by tank truck, by filling stationary
tanks in its customers' facilities by means of a flexible hose pulled from the truck to the
tank. The preceding, the Union contended, makes the Company's argument that had
Grievant been reinstated he would have been fired, "the most tendentious argument
suggested by Synergy."

### Dues

The Union notes that, pursuant to Section 13 of the Glover-I.B.T., Local 282 Collective
Bargaining Agreement, in effect at the time of dismissal of Grievant in 1980, the Company
was required to deduct Union dues from Grievant's wages and to remit same to Local 282.
In its Brief, at pp. 11 and 28, the Union argues that:

> " . . . Synergy was obligated under the Agreement to pay as
> damages those dues, (see Hill, Remedies in Arbitration, p. 243). The
> Union believes that as a practical matter that the appropriate
> course in light of Synergy's litigious history is for the Arbitrator to
> direct that as a condition of payment of his back pay, B pay his
> dues (of .05 cents per hour) for the back pay period plus interest
> directly to Local 282."

The "back pay period," as the Union calculated it, is from October 1980 to December 24,
1985, the date on which Grievant went on Social Security. The Union calculated that
Grievant worked an average of "45.90 straight-time equivalent hours per week" in 1980.

* * *

Local 282 Pension Fund Contributions: Based on Section 9 [11] of the Collective [*88]
Bargaining Agreement, and based on the Union's view, reviewed previously, that the make-
whole remedies should cover the period between Grievant's discharge in October 1980 to
January 31, 1983, the expiration date of the extended Local 282-Glover Collective Bargaining
Agreement, the Union seeks contributions to the Local 282 Pension Fund, hereafter the
"Fund" for that period, and in addition, simple interest at 16% to the date said principal sum
and interest is actually paid.

The Union's method of computation of the contributions, plus interest, due to the Fund, in
pertinent part, is set forth hereafter:

> "Pursuant to Section 9 of the Collective Bargaining Agreement (Us),
> Synergy owes $1.05to the Local 282 Pension Fund for each and

**Exhibit 28**

> every hour paid for (not to exceed $8.40 per day) prior to February 1, 1982. Effective February 1, 1982 through June 30, 1982, the contribution rate was $1.25 per hour. Effective July 1, 1982, the rate was $1.51 per hour. Contributions were maintained pursuant to the contract's terms through January 31, 1983, at which time Synergy terminated contributions and subsequently commenced its own profit-sharing plan.
>
> As previously shown, during the period prior to his discharge, B was paid for an average of 45.90 hours per week. The record does not reflect how many of the 5.90 average hours per week of overtime represents weekend or holiday work for which contributions are due. Assuming that contributions are due for half of the 5.90 hours per week of overtime yields an average of 42.95 hours per week for which contributions are due.
>
> At the contractual rate of $1.05 per hour for the period from October 24, 1980 - January 31, 1982, contributions should therefore be $45.10 per week (42.95 x 1.05) or a total of $2977 (45.10 x 66 weeks). At the rate of $1.25 per hour from February 1, 1982 - June 30, 1982, contributions should be $53.69 per week, for a total of $1181 ($53.69 x 22 weeks). At the contractual $1.51 rate, contributions should be $64.85 per week, or a total of $1946 (64.85 x 30 weeks) for the period from July 1, 1982 through January 31, 1983. Hence, the total contributions due should be $6104 ($2977 + $1181 + $1946).
>
> With simple interest of 16% on the contributions due, beginning (for sake of mathematical simplicity) on January 1, 1982, accrued interest through March 31, 1987 on the $6104 is $5127, yielding a total amount due of $11,231 plus $2.68 per day from April 1, 1987 until the date of payment."

Synergy Gas Corp. Profit Sharing Contributions: The Union, noting that the Parties stipulated that Synergy drivers were entitled to profit-sharing contributions equal to 4.19006 percent for the period April 1, 1983 to March 30, 1984, based on its previous calculations, asserts that Grievant's back pay for that period is $20,419, and thus yields a profit-sharing contribution of $856.00.

The above, as well as the calculations following, are all based on the Union's view of Grievant's employment status previously stated. Thus, the Union noted that for the period April 1, 1984 to March 31, 1985, the profit-sharing contribution was 4.6876, which, when multiplied by Grievant's back pay for that period of $24,064, yields the sum of $1,062. The Union Brief noted that the contribution rate has not yet been determined for the period April 1, 1985 to March 31, 1986, but it assumed it to be 4%, and therefore the Union asserts that for that period it would be the sum of $722.00.

Thus, the Union urged that the total contributions due Grievant are $2,640.00.

The Union's Brief notes that Synergy's position is that Grievant is not entitled to receive monies in "his profit- sharing account because he was not fully vested." Countering the above, the Union *argued* in its Brief that:

> " . . . as a matter of law, Synergy is incorrect, since under ERISA Section 203(a), a participant's benefits must be fully vested upon a participant's attainment of normal retirement age. B, of course, retired after reaching age 65.
>
> In addition, although Mr. Russell testified that he didn't think that prior service with the employer was credited for vesting purposes, he is, as a matter of law wrong, because under Section 203 (b)(1) of ERISA, in computing years of service, all of an employee's years of

**Exhibit 28**

service 'with the employer or employers maintaining the plan shall be taken into accou nt.'**

** (Section 203(b)(1) sets forth certain exceptions to this rule, none of which are applicable here.")

In addition, the Union *argued* as follows:

"Synergy has refused to provide the Union with a copy of its profit sharing plan, [12] therefore, it is unclear whether Mr. Russell's lay understanding of that Plan is incorrect or whether the Plan is unlawfully administered. However, it is unnecessary for this Arbitrator to interpret ERISA or to rule on any questions of external law. Instead, the Arbitrator may elect one of two approaches that avoid deciding questions of entitlement under ERISA. The first would [*89] be to require Synergy to make the $2,640 contribution to the profit-sharing plan, and to leave the question of B's entitlement to that money to further litigation under ER1SA.*** (***Even where it appears that an employee might receive no benefit from contributions, an employer owing back pay must still make these contributions or make equivalent payments. See *Finishline Industries,* **181 NLRB 756**, 760 [ **74 LRRM 1654** ] (1970 ).") The second would be the approach used by the NLRB when it is uncertain as to whether an employee will enjoy the benefit of a fringe benefit--i.e., to direct that payment be made directly to the employee. See NLRB Casehandling Manual Section 10552.3 & n.8; *Rice Lake Creamery Co.,* **151 NLRB 1113**, 1126 [ **58 LRRM 1542** ]. While either approach would be reasonable, the Union proposes that payment directly to B would be preferable, in that it would avoid the necessity for future litigation between the parties, even though B would in a sense be penalized by the loss of the tax advantages and accrued interest he would enjoy if contributions were made directly to the profit-sharing plan.

The Union, in its Reply Brief, supplemented the preceding arguments, as follows:

"In its brief, Synergy claims that B was not vested under Synergy's profit sharing plan. . . . in fact, the Plan, submitted post-hearing by the Union with the Arbitrator's approval and without opposition by the employer's counsel, demonstrates that B was entitled to full vesting. Article 6.4(b) of the Plan provides for full vesting after 10 'Years of Service,' with partial vesting after 5 years. The only services excluded are Years of Service prior to the effective date of the Plan, which was January 1, 1975 (see Plan page 1), and years of service prior to the time an Employee attained his twenty-second birthday. Article 6.4(f). 'Years of Service' for vesting purposes is, in turn, defined as a Plan Year in which an Employee completes 1000 'Hours of Service.' Article 1.32. 'Hours of Service,' in turn, includes 'each hour for which an Employee is directly or indirectly compensated or entitled to compensation, by the Employer' (without regard to whether he was a Plan Participant throughout that time), including 'Hours of Service for back pay awarded or agreed to by the Employer without regard to mitigation.' Article 1.18 (emphasis added). Accordingly, with at least 9 1/2 Years of Service with the Employer as of his December 24, 1985 retirement, B was at least 85%, and probably 100% vested in his profit-sharing account. Article 6.4(b)."

Attorneys' Fees: In pertinent part, the Union urged, as to attorneys' fees, as follows:

**Exhibit 28**

" . . . attorneys' fees are not sought for arbitrating the discharge, but as an element of the Union's damages resulting from the Employer's defiant refusal to comply with the Cashen Award, in violation of Section 12(e) of the Agreement.

In such circumstances, arbitrators do routinely award fees. Thus, in *Sonic Knitting Industries,* **65 LA 453**, 469 (1975 ), Arbitrator Helfand stated that while attorneys' fees are not awarded for 'ordinary contract administration,' additional fees going beyond ordinary contract administration will be awarded. Similarly, in *Leavenworth Times,* **71 LA 396**, 408 (1978 ), Arbitrator Wilbur Bothwell stated the general rule as follows:

The arbitrator believes that an arbitrator does have jurisdiction and authority to award damages, including attorneys' fees, under appropriate circumstances, even though the Agreement contains no language authorizing the arbitrator to award damages.

See also *Litton Systems v. Local 522,* **90 LRRM 3176** (S.D. Ohio 1975 ) (*enforcing* arbitrator's award of attorneys' fees); Basic Vegetable Products, Inc., **64 LA 620** (1975 ) (Gould, Arb.); Sunshine Convalescent Hosp., **62 LA 276** (1974 ) (Lennard, Arb.); John Morrell & Co., 69 Lab. Arb. (BNA) 264 (1977) (Conway, Arb.).

Had Synergy complied with the Cashen Award, much human tragedy would have been avoided and Local 282 would not have been required to expend huge sums of money obtaining the back pay that Arbitrator Cashen ordered paid almost six years ago. Accordingly, Local 282 is entitled to payment of reasonable attorneys' fees and costs incurred in seeking to obtain compliance with the Cashen Award."

In addition, the Union *argued* that:

"Because Synergy has never willingly complied with an arbitration Award, it is almost inevitable that further proceedings will be required. Consequently, rather than awarding a fixed amount of attorneys' fees at this time, the Arbitrator should find that Local 282 is entitled to its reasonable attorneys' fees in seeking compliance with the Cashen Award, while retaining jurisdiction to determine the exact amount of those fees."

In its Reply Brief, the Union rounded out its argument on arbitral authority to award attorneys' fees, and stated:

"For example, in *Fortex Mfg. Co. v. Local 1065, Amalgamated Clothing Workers,* **99 LRRM 2303** (M.D. Ala. 1978 ), the Court confirmed an arbitrator's award of attorneys' fees against a union for a wildcat strike. There, the arbitrator had noted two bases for awarding attorneys' fees: first, citing the Supreme Court decision in *Alyeska Pipe Line Service Co. v. Wilderness Society,* **421 U.S. 240** [**10 FEP Cases 826** ] (1975 ), that attorneys' fees are appropriate where the offending party has acted in "bad faith"; second, that attorneys' fees are appropriate where they are an intrinsic element of the aggrieved party's damages. Here, of course, Synergy's flagrant disregard of Arbitrator Cashen's Award as confirmed by the courts justifies an award of attorneys' fees on either ground. Accordingly, while Local 282 does not seek attorney's fees for the period prior to the Cashen Award, the Union is entitled to its reasonable attorneys' fees incurred subsequent to that Award."

**Exhibit 28**

After careful consideration of all the evidence and argument advanced by [*90] both Parties, I find that the Grievant is entitled to the relief requested by the Union, and I find that the Union is entitled to the relief sought, except for the Dues claim which both in scope and form needs to be dealt with differently. [13]

The Undersigned has also carefully considered the Union's arguments for and the methods it used in calculating the relief it argues is due Grievant and the Local. The Union's arguments are persuasive, its calculations have been found to be appropriate, logical and accurate [14] and have been adopted by the Undersigned.

The issue [15] to be decided here is what relief, if any, is to be awarded Grievant pursuant to the Cashen Award of October 5, 1981.

Arbitrator Cashen, having found that Grievant's discharge in October 1980 was without just cause, directed that:

> 1. Grievant was to be "reinstated retroac- tive to the date of his discharge."

> 2. Grievant was to be provided "with a lump sum back pay award equal to the difference between what Grievant would have received in full employment with Glover during the period in question minus any amounts actually earned from other employment or received as unemployment insurance during the period."

Because of the passage of time, the above typical, straight-forward award of relief has become more complex.

It is my judgment that, pursuant to the Cashen Award and on the basis of the Record evidence and argument submitted, Grievant's reinstatement to employment would have resulted in his receiving all of the benefits of employment by the Employer from 1980 to his retirement on December 24, 1985. Under the Cashen Award this defines Grievant's back pay entitlement.

Thus, in the first instance, Grievant is entitled to:

> 1. A sum equal to the difference between the wages and unemployment benefits he received, and what he would have received in full employment by the Employer for the periods:

> Oct. 24, 1980 (Dischg. date) to Oct. 5, 1981 (Cashen Award date), and

> Oct. 6, 1981 to Dec. 24, 1985 (Retirement date).

> 2. Monies due under the Profit Sharing Plan from April 1, 1983 to December 24, 1985.

> 3. Payment for his account of the contractually mandated contributions to the Local 282 Pension Trust Fund from October 1980 to January 31, 1983, when the Collective Bargaining Agreement, as extended, expired.

The Cashen Award and the issue jointly framed by the Parties herein both refer to "back pay" and the phrase "back pay" when used by arbitrators customarily refers to both wages and fringe benefits. The preceding, in combination, provide ample jurisdictional justification when awarding "back pay" to also award payment of pension contributions and profit sharing. Moreover, the phrase "back pay" has been construed in situations similar to the instant one by the NLRB and the courts, including the U.S. Supreme Court, to include fringe benefits such as pension contributions and profit sharing. Thus, it is appropriate for the Undersigned to look to both for guidance in so construing this phrase [16] because their determinations in similar matters are analogous to the determinations made here.[*91]

**Exhibit 28**

Awarding simple interest at 16% on all of the above principal sums, starting at the appropriate dates and continuing until payment is actually made, is appropriate and essential to make Grievant whole for the damages suffered in consequence of, first, non-compliance with the Cashen Award, and, second, the Employer's two contract violations.

The two contract violations [17] of the Employer were: first, discharge of Grievant without "just cause," in violation of Section 12(e) of the Agreement; second, failure to comply within fifteen days with Arbitrator Cashen's Award, in violation of selection 12(f) of the Agreement.

The Supreme Court in *Steelworkers v. Enterprise Wheel & Car Corp., 46 LRRM 2425*, held that an arbitrator's award is legitimate provided " . . . it draws its essence from the collective bargaining agreement."

The remedy fashioned here as to Grievant is based in the first instance on the terms of the Cashen Award but is also based squarely on the above two contract breaches, and is thus a legitimate exercise of arbitral authority.

The Employer's principal arguments on the limited authority of the Undersigned as set forth herein have been carefully reviewed and are herewith rejected as meritless and unpersuasive.

* * *

The above would seem sufficient. However, the number and range of the Union claims, and the number and range of the Employer's arguments that the Arbitrator's authority is limited exclusively to determining Grievant's back pay between the date of his discharge and the date of the Cashen Award, and that all other claims are outside the jurisdiction of the Undersigned, suggest that one further element of the scope of arbitral authority of the Undersigned be addressed.

In essence, the Employer has *argued* that the Undersigned should ignore, and is required to ignore, the passage of six years when measuring the scope of relief to be accorded to Grievant pursuant to the 1981 Cashen Award. It has been found that all of the Employer's arguments in that regard have been considered and found wanting.

Often it has been said that "Justice delayed is justice denied." Sadly, this often is true. However, this Award will accord to Grievant the justice to which he is now entitled to redress the balance for the past injustices imposed on him.

The first injustice occurred when, in 1980, Grievant, in violation of the Contract, was discharged without just cause. The second injustice occurred when he was denied reinstatement in 1981 as directed by Arbitrator Cashen, also in violation of the Agreement. The third injustice occurred when Grievant was denied the full fruits of that Award for almost six years because of unfounded claims that Arbitrator Cashen acted improperly.

An arbitrator's remedial authority is not limitless. Here, however, the refusal to comply with the Cashen Award and the Employer's breach of contract has extended from 1980 to date. Therefore, the remedy awarded Grievant necessarily has to be co-extensive.

It is only by granting interest, as urged by the Union, on the sums due Grievant for wages and profit sharing benefits will he be fully made whole. The same is the case with respect to pension contributions which, had they been made would have accumulated interest in the Pension Fund.[18] It is indeed well within the scope of arbitral authority, indeed it is the arbitrator's obligation, to make whole a grievant for a contract breach. Here, the breaches were extreme, the losses suffered considerable, and thus the make-whole remedy is necessarily substantial.

* * *

Turning to the issue of attorneys' fees, the Employer correctly asserts that arbitrators rarely issue awards granting reimbursement for such expenditure.

At pp. 16-17 herein [ **91 LA 81** -82 ] are the Employer's arguments that the Undersigned lacks authority to award reasonable attorneys' fees. In addition, the Employer would have

**Exhibit 28**

the Undersigned ignore the passage of time caused by its meritless efforts to vacate Arbitrator Cashen's Award.

In rejecting those arguments, it suffices to say in the first instance, that the remedial authority of arbitrators includes, when contract violations are found, the authority to fashion remedies to make grieving employees whole.[*92]

The Employer's two-fold breach of its contractual obligations--discharge of Grievant without just cause, and refusal to comply with Arbitrator Cashen's Award--compelled Local 282 to incur substantial litigation costs to secure for Grievant the benefits of that Award to which he was by contract entitled.

Therefore, in directing that Grievant be made whole for the Employer's contractual violations, it is logical and appropriate to reimburse the Union for its legal expenses (after a full due process hearing [19]) which were incurred over 5 1/2 years to achieve for Grievant his just entitlement pursuant to the Agreement and the Cashen Award. In sum, just as and because Grievant is to be made whole, so also is the Union entitled to be made whole for its expenses to produce that result.

Further, in deciding to award reimbursement to the Union for counsel fees incurred to enforce the Cashen Award, the Arbitrator places great emphasis and relies heavily on the unusual Section 12(e) contractual obligation that " . . . there shall be compliance by the parties with an arbitration award . . . ."

Moreover, the courts have held that the Employer's grounds for non-compliance with Arbitrator Cashen's Award were meritless. This seems additional justification for awarding the Union reimbursement for reasonable attorneys' fees incurred because of its persistent efforts to enforce the Cashen Award and to make Grievant whole for Employer breaches of the Agreement.

* * *

In addition, and separate from the above grounds for awarding reimbursement to the Union for its legal expenses, it seems wholly appropriate to follow the example of many courts [20] which indeed award legal costs to a litigant when faced with conscious, deliberate, and egregious wrongdoing by another. It is my view that the Employer, in bad faith, [21] consciously and deliberately chose to violate its contractual obligations. The Employer, though agreeing to arbitrate disputes and agreeing to comply with arbitration awards, did not do so in the instant matter. Because of this, and because the Employer engaged in over five years of litigation fruitlessly seeking to establish misconduct on the part of Arbitrator Cashen, it thus compelled the Union to litigate a wholly spurious and unmeritorious claim of arbitral misconduct.

Further proof of the Employer's bad faith is found in the October 21, 1983 N.Y. State Supreme Court decision issued, after a trial directed by the Appellate Division on the factual issue of the Employer's allegation of misconduct by Arbitrator Cashen, i.e., that he improperly refused to accept evidence.

The court, in pertinent part, held as follows:

> "The testimony at the hearing, however, reveals that counsel for the petitioner [Glover ] was happy with her case on the basis of the oral testimony alone.
>
> After the hearing was concluded, the parties submitted their respective briefs to the arbitrator. The employee's attorney pointedly focused on the petitioner's failure of proof in presenting documentary evidence whereby it might have been determined whether or not the employee's performance under the circumstances shown was inadequate. *Petitioner's attorney neither made any attempt to call the arbitrator's attention to the fact the employee's worksheets for the period were in fact made available for inspection by the arbitrator and that they were still available, nor did*

**Exhibit 28**

*she seek to reopen the hearing to enable her to present such proof."*
(Emphasis supplied.)

The court then stated:

> "Upon the evidence presented, the court is unable to conclude that the arbitrator was guilty of the misconduct detailed in the petition. Accordingly, petitioner's motion to vacate the award is denied and respondent's cross-motion to confirm is granted."

The underscored portion of the above finding of the court justifies the conclusion that the Employer's allegation of arbitral misconduct was not just error, but was pretextual, a sham, fashioned to frustrate the arbitral process, and was advanced in "bad faith," and as such indicates a "state of mind affirmatively operating with furtive design or ill will." In the immediately preceding, the Undersigned finds still further justification for directing reimbursement to the Union for its legal expenses.[*93]

It appears that this is not the first time the Employer has refused to abide by an arbitration Award. It is noted that the Employer in 1982 refused to arbitrate the discharge of the Union Shop Steward and two other employees. This refusal was held to be unlawful by the Southern District Court, which the Employer then appealed to the 2nd Circuit, which ordered arbitration. Pursuant thereto, Arbitrator Norman Brand directed reinstatement and back pay for the employees. Again the Employer refused to comply and only did so after the 2nd Circuit so directed.

The above [22] fortifies the Arbitrator in the conclusion that the Employer acted in bad faith in the instant matter. In addition, it fully justifies the further conclusion that the Employer has consistently, and as a matter of conscious policy, acted in "bad faith." These acts of bad faith were not due to oversight or a mere discrepancy between the Employer's contractual commitment to arbitrate and to abide by the results thereof, but rather it consists of repeated actions over many years diametrically opposite to those obligations, one wholly at odds with public policy favoring the use of arbitration as the means of resolving contract disputes between labor and management.

## AWARD

Having carefully reviewed all of the testimony and evidence submitted, and having carefully reviewed the arguments set forth in the Briefs and Reply Briefs of the Parties, it is decided and awarded as follows:

I. The Employer, subject to III-A. herein, is directed to pay forthwith to B:

A. Back pay in the amount of $57,285 plus accrued interest from October 20, 1980 through March 31, 1987 in the amount of $32,255, for a total of $89,540;

B. Simple interest at 16% on the above back pay which totals $25.00 per day from April 1, 1987 until the date of payment;

C. $2,640 in lieu of profit-sharing plan contributions, plus simple interest at 16% (totaling $1.16 per day) from April 1, 1987 until the date of payment.

II. The Employer is directed to pay forthwith to Local 282 Pension Trust Fund:

A. Contributions from October 24, 1980 through January 31, 1983 in the amount of $6,104 plus accrued interest from January 1, 1982 through March 31, 1987 in the amount of $5,127, for a total of $11,231;

B. Simple interest at 16% of $2.68 per day from April 1, 1987 until the date of payment.

III-A. The Employer is to deduct from the $57,285 to be paid to Grievant in I-A above, a sum equal to the dues specified in Article 13(a) and 13(b) of the Agreement, that would have

**Exhibit 28**

been deducted from the wages of Grievant (after deducting for wages earned and unemployment benefits) that Grievant would have earned working for the Employer for the period October 5, 1980 to January 31, 1983 plus simple interest at 16% accruing beginning December 1, 1981 to the date of payment, and said sum is to be calculated on the basis of the Union's calculations as set forth in its Brief, and said sum is to be paid forthwith to Local 282, I.B.T., and in the event the Union concludes that the amount paid is incorrect it may, on prompt written notice to the Employer and the Undersigned, submit its dues claim at the hearing referred to below in III-B, and the Undersigned retains jurisdiction to determine said amount.

III-B. The Employer is directed to pay to Local 282, I.B.T. a sum equal to the reasonable attorneys' fees incurred as a result of litigating the Employer's refusal to comply with Arbitrator Cashen's Award of October 9, 1981 in violation of Section 12(e) of the Glover-282 I.B.T. Collective Bargaining Agreement (Union Exhibit 2), and the Undersigned herewith retains jurisdiction to determine the amount of said fees, and hearings on same will be scheduled as promptly as possible, and jurisdiction is retained until such hearing and determination is made.

---

**fn** *

[ED. NOTE ]: This award was upheld in *Synergy Gas Co. v. Sasso,* **129 LRRM 2041** (CA 2, 1988).

**fn** 1

In its Demand For Arbitration dated July 12, 1985, Local 282 states as the issue to be arbitrated the following: "How much money and what other relief are B and Local 282 and affiliated funds entitled to receive pursuant to the arbitration award of James Cashen dated October 5, 1981?" This Demand was filed pursuant to Union Exhibit 2, the Collective Bargaining Agreement between the above Parties effective August 1, 1979 to July 31, 1982, extended by the Parties to January 31, 1983, which, in Article 12, contains a provision for arbitration of unresolved disputes by an arbitrator chosen from the panel of the AAA.

In the course of colloquy, the Arbitrator achieved agreement between the Parties on the above--stipulated submission while simultaneously, and repeatedly, stating that he would adjudicate all of the Union's claims under it, especially in light of the above July 12, 1985 Demand For Arbitration.

**fn** 2

Union Exhibit 1-I.D. states Grievant was employed on July 27, 1976; also.

**fn** 3

Glover Bottled Gas Corp. changed its name to Synergy Gas Corp. Hereafter, reference to Glover Bottled Gas Corp./Synergy will be the "Employer."

**fn** 4

As noted previously, the Parties extended the Agreement to January 31, 1983.

**fn** 5

The Agreement expired on July 31, 1982, but was extended by the Parties until January 31, 1983.

**fn** 6

April 1, 1987 is the proximate date of submission of Briefs in the instant matter, and reflects a "cut-off" date in the Union's computations.

**Exhibit 28**

**fn** 7

See pp. 32-34 herein [ **91 LA 85** ] for the Union's reasoning and authorities for seeking the specific amount of 16%.

**fn** 8

Hill, Remedies in Arbitration (1981), pp. 60-62, 65; Elkouri & Elkouri, How Arbitration Works (4th Ed., 1985), pp. 408-410. In addition, the Union cites *Fibreboard Paper Products Corp.,* **180 NLRB No. 33** [ **72 LRRM 1617** ] (1969 ) for the proposition that: "A back pay remedy need not be exact; a formula should be adopted that is reasonably designed to produce as close an approximation as possible, with any uncertainty to be 'resolved against the wrongdoer whose conduct made certainty impossible.' "

**fn** 9

The Union added in its Brief the following footnote: "Unemployment Compensation is not normally deductible from a back pay *Award. NLRB v. Gullet Gin Co.,* **340 U.S. 361**, 364 [ **27 LRRM 2230** ] (1950 ); National Rejectors, **38 LA 1091**, 1092 (Wagner, Arb.); Union Carbide Corp.,56 707, 708 (1971) (Williams, Arb.). However, because Arbitrator Cashen directed that unemployment insurance be deducted, the Union's calculations will treat unemployment compensation as a deductible item."

**fn** 10

Net back pay is the amount of Grievant's pay due after deducting from his gross back pay his earnings and unemployment benefits. See p. 33 herein [ **91 LA 87** ] for schedule thereof.

**fn** 11

Section 9 requires contributions, in various specified dollar amounts, "for each and every hour worked and every hour paid for, including regular work days, Saturdays, Sundays, Holidays and Vacation Days to the Local 282 Pension Trust Fund."

**fn** 12

The Undersigned notes that after the hearings, and on April 29, 1987, the Union supplied the Undersigned with a copy of the Plan, sending copy of same to Company counsel.

**fn** 13

Payment of Union dues by check-off from Grievant's wages was provided for in Article 13(a)(b) of the Collective Bargaining Agreement. Grievant received no wages from the Employer from October 1980 to January 31, 1983 when the Agreement expired; thus, no dues were forwarded to the Union in that period. The Union has requested that the Award condition payment of monies due Grievant on payment to the Union of regular dues and administrative dues, plus interest.

As formulated, this claim is between the Union and the Grievant. As such, it is not adjudicatible by the Undersigned because jurisdiction in the instant matter is limited to determination of issues in dispute between the Employer and the Union, acting in behalf of Grievant and itself.

Because under the Agreement dues would have been deducted from Grievant's wages and forwarded to the Local had Grievant been reinstated in 1981, the Award will direct the Employer to deduct from the monies awarded to Grievant herein a sum equal to the "monthly union dues" specified in Article 13(a), and the " . . . special administrative dues of five cents for each hour worked . . .", as specified in Article 13(b), but not as requested by the Union for the period October 20, 1980 to the date of Grievant's retirement on December 24, 1985, but rather from October 20, 1980 to January 31, 1983, when the Agreement as extended expired, plus simple interest of 16% until the date of payment.

**Exhibit 28**

**fn** 14

The Employer had in its possession the Union Brief, which details its methodology and assumptions. The Employer also had access to wage and hours records of Grievant. Nevertheless, in the Employer's Reply Brief it criticized the Union's methodology and assumptions regarding Grievant's hourly earnings, hours worked, averaging of approximately six hours of overtime, merely because it was "dependent on speculation." Such blanket assertion has little weight, especially as the Employer had both the opportunity and data to expressly demonstrate inaccuracies in the Union's calculations. That the Employer in its Reply Brief did not do so fortifies the Undersigned in the above conclusion.

**fn** 15

After the Parties agreed on the issue to be arbitrated, quoted at pp. 1-2 herein [ *91 LA 00* ], the Undersigned stated to each attorney that under the phrase in the stipulated issue, "What relief, if any, . . . ", both were free to argue the validity of every claim advanced by the Union, and that the instant Award would dispose of each claim because each fell within the purview of Arbitrator Cashen's Award, quoted at pp. 4-5 herein [ *91 LA 00* ].

**fn** 16

See generally NLRB Compliance Manual and cases cited therein. See *Artim Transportation System, Inc.,* **193 NLRB 179**, 184 [ **78 LRRM 1607** ] (1971); *Inland Steel Co. v. NLRB,* **170 F.2d 247**, 250-51 [ **22 LRRM 2506** ] (7th Cir. 1948 ), *cert. denied,* **336 U.S. 960** [ **24 LRRM 2019** ] (1949 ); Evening News Ass'n, **68 LA 1318** (BNA) (1977) (Vol. 2, Arb.).

**fn** 17

Section 12(e) of the Agreement states: "There shall be compliance by the parties with an arbitration Award issued pursuant hereto within 15 days after its issuance." Section 12(f) states: "In the case of an arbitration based on the discharge of an employee. . .and in the event that the arbitrator finds that the discharge was not justified, the employee shall be reinstated, with full back pay for all time lost."

**fn** 18

Though no evidence was presented, it seems reasonable to assume that Grievant's pension benefits and social security benefits may well be subject to upward adjustment in consequence of this Award.

**fn** 19

The Union Brief urged the Undersigned to retain jurisdiction for purposes of conducting a hearing to determine the amount of the Local's disbursements for reasonable legal fees. The Employer's Brief and Reply Brief, while asserting the view that such reimbursement was improper, did not address the issue of retention of jurisdiction for a hearing to determine reasonable legal expenses.

**fn** 20

In Alyeska, the U.S. Supreme Court held that one of the standards for granting attorneys' fees was bad faith. For citation, see p. 52 herein [ *91 LA 00* ].

**fn** 21

Black's Law Dictionary, 1979 Ed. defines bad faith: ". . . a refusal to fulfill some duty or contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . 'bad faith' is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest

**Exhibit 28**

purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will. . . ."

**fn** 22

See p. 39 herein [ **91 LA 87** ] for citations.

**Exhibit 28**



200 State Street, 7th floor
Boston, MA 02109
Telephone: (617)451-6600
Fax: (617)451-0763

June 9, 2025

Jack J. Canzoneri, Esq.
McDonald Lamond Canzoneri LLC
352 Turnpike Road, Suite 210
Southborough, MA 01772-1756
Via Email to: jcanzoneri@masslaborlawyers.com

Marc A. Sugerman
FordHarrison
300 S. Orange Ave, Ste. 1300
Orlando, FL 32801
Via Email to: msugerman@fordharrison.com

Case Number: 01-24-0000-7400

Massachusetts Nurses Association
-and-
St. Vincent Hospital
Grievance: The Employer has improperly instructed the Labor Relations Connection to cease any purported administration of, or any other participation of any kind, in the Employer's currently pending matters.

Dear Parties:

Given the parties' agreement to extend the brief filing deadline and subsequent filing of post-brief motions without seeking leave in this matter, Arbitrator Loconto will require additional time to file his Opinion and Award in this matter.  He intends to deliver the award **by June 16, 2025**.

Sincerely,

Patrick Kimm
Case Administrator
Direct Dial: (617)695-6014
Email: PatrickKimm@adr.org
Fax: (617)451-0763

cc :   Michael T. Loconto, Esq.          Alan J. McDonald, Esq.
       Christopher Borruso
       Rhett Cavicchi
       Jason R. Powalisz, Esq.
       Christopher T. Borruso
       Nicole Tordesillas
       Robin Gannon
       Wendy McGill
       Lisa  Defazio
       Samantha E. Sinclair, Esq.

**Exhibit 29**

| | |
|---|---|
| **From:** | AAA Frank Binda <FrankBinda@adr.org> |
| **Sent:** | Wednesday, June 11, 2025 12:11 PM |
| **To:** | Samantha Sinclair; Marc A. Sugerman |
| **Cc:** | jcanzoneri@masslaborlawyers.com; jpowalisz@masslaborlawyers.com; AAA Patrick Kimm |
| **Subject:** | RE: Massachusetts Nurses Association v. St. Vincent Hospital - Case 01-24-0000-7400 |

**Caution: Originated Outside FordHarrison.**

Case Number: 01-24-0000-7400
Massachusetts Nurses Association
-and-
St. Vincent Hospital
Grievance: The Employer has improperly instructed the Labor Relations Connection to cease any purported
administration of, or any other participation of any kind, in the Employer's currently pending matters.

Dear Counsel:

Although Arbitrator Loconto had advised the parties on May 28, 2025, that he may require additional time to render the decision, per the Rules, any extension of the award timeframe requires party consent. Since we do not have party consent to an extension, the award due date remains as established when the hearing was closed, which is June 09, 2025.

The arbitrator has informed the AAA that he will issue the decision tomorrow.

Sincerely,
Frank Binda




**Frank Binda**
Assistant Vice President

American Arbitration Association
1301 Atwood Ave, Suite 211N, Johnston, RI 02919
**T:** 401 868 4627 **F:** 866 644 0234
adr.org | icdr.org | aaaicdrfoundation.org

Heather Santo, Assistant Vice President
Northeast Case Management Center

The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, discl
distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immedia
reply email and destroy all copies of the transmittal. Thank you.

**From:** Samantha Sinclair <ssinclair@masslaborlawyers.com>
**Sent:** Wednesday, June 11, 2025 10:45 AM
**To:** AAA Patrick Kimm <PatrickKimm@adr.org>; AAA Frank Binda <FrankBinda@adr.org>
**Cc:** jcanzoneri@masslaborlawyers.com; jpowalisz@masslaborlawyers.com; Marc A. Sugerman <msugerman@fordharrison.com>
**Subject:** Re: Massachusetts Nurses Association v. St. Vincent Hospital - Case 01-24-0000-7400

**Exhibit 30**

*** External E-Mail – Use Caution ***

Mr. Kimm,

Please forward this response to Arbitrator Loconto.

MNA once again objects to the direct communication with Arbitrator Loconto by the Hospital.  Mr. Sugerman is aware of Arbitrator Loconto's numerous rulings on this topic and continues to disregard those rulings and the AAA rules.  MNA asks that Arbitrator Loconto reiterate his ruling, once again, since the Hospital apparently must be reminded continuously at each junction of the arbitration process that it must act rationally and follow the rules like everyone else.

Further, MNA objects to the Hospital's request for trivial information and documents/emails.  The Hospital and Mr. Sugerman know this proceeding is being administered by AAA and its requests are a further transparent attempt to harass AAA and the Arbitrator and to waste time and resources of the parties.  In this arbitration, as with many arbitrations between the parties, the parties have agreed upon an extension for the filing of their briefs.  In many cases between the parties, arbitrators have similarly requested such extensions.  I am not aware of a single instance where the parties have denied that request.  The Arbitrator is entitled to the modest one-week extension, just as the parties have been afforded in this case.  Consequently, MNA asks Arbitrator Loconto to rule that the Hospital's request be denied.

Thank you.
Samantha Sinclair

On Wed, Jun 11, 2025 at 10:13 AM Marc A. Sugerman <msugerman@fordharrison.com> wrote:

Mr. Loconto and Mr. Binda,

The Hospital is in receipt of the attached and we object. According to AAA Rules 34 and 36, neither the arbitrator nor the AAA has authority to extend the 30 day deadline by which the arbitrator must issue his award. In issuing the attached, the Arbitrator and AAA have worked together to violate those rules by unilaterally extending the time for issuing the award. We therefore ask that each of you state in writing your positions on the following: (1) whether AAA is administering this case; and (2) whether AAA rules apply to this proceeding. If it is your position that AAA is administering this case and that its rules apply, please explain the consequence for this violation. If there is no consequence for violating AAA rules, please so state.

We also ask that Mr. Binda state separately why, instead of explaining its rules to the arbitrator, AAA worked together with the arbitrator to extend the deadline for the arbitrator to issue his award in violation of AAA rules.

Finally, in the interest of full transparency, we request copies of all communications between AAA and the arbitrator on this subject.

2

**Exhibit 30**

We look forward to your prompt responses.


Thank you,


Marc




## Marc A. Sugerman  📇

*Attorney at Law*

FORDHARRISON  in

300 South Orange Avenue, Suite 1300 | Orlando, FL 32801
msugerman@fordharrison.com | P: 407-418-2308

*FHPromise* | **Subscribe**


-----Original Message-----
From: PatrickKimm@adr.org <PatrickKimm@adr.org>
Sent: Monday, June 9, 2025 8:25 AM
To: RGannon@mnarn.org; jpinkham@mnarn.org; Nicole R. Tordesillas <ntordesillas@fordharrison.com>;
Christopher.Borruso@tenethealth.com; Christopher.Borruso@tenethealth.com; jcanzoneri@masslaborlawyers.com;
shilli@masslaborlawyers.com; wmcgill@mnarn.org; mtl@locontoadr.com; jpowalisz@masslaborlawyers.com; Marc A.
Sugerman <msugerman@fordharrison.com>; ldefazio@masslaborlawyers.com; rhett.cavicchi@tenethealth.com;
ssinclair@masslaborlawyers.com
Subject: Massachusetts Nurses Association v. St. Vincent Hospital - Case 01-24-0000-7400

3

**Exhibit 30**

Caution: Originated Outside FordHarrison.

Hello,

Please review the attached correspondence regarding the above-referenced case.

Feel free to contact me with any questions, comments or concerns you have related to this matter.

Thank you.

*ATTORNEY WORK PRODUCT - PRIVILEGED & CONFIDENTIAL*

The information contained in this message from Ford & Harrison LLP and any attachments are privileged and confidential and intended only for the named recipient(s). If you have received this message in error, you are prohibited from reviewing, copying, distributing or using the information. Please contact the sender immediately by return email and delete the original message and attachments. In the absence of an executed engagement letter or fee contract, no attorney client relationship is established by this communication.

--

**Samantha E. Sinclair**
McDonald Lamond Canzoneri LLC
352 Turnpike Road, Suite 210
Southborough, Massachusetts 01772
(508) 485-6600 Voice (ext. 106)
(508) 485-4477 Fax
email: ssinclair@masslaborlawyers.com
website:  www.masslaborlawyers.com

This document is intended only for the use of the person to whom it is addressed.  It may contain information that is privileged, confidential and exempt from disclosure under applicable law.   If you are not the intended recipient, any dissemination, distribution, copying or use of this document is strictly prohibited.  If you have received this communication in error, please notify me immediately at the e-mail address above and delete all copies of this communication.

4

**Exhibit 30**

| | |
|---|---|
| **From:** | AAA Frank Binda <FrankBinda@adr.org> |
| **Sent:** | Friday, July 11, 2025 11:18 AM |
| **To:** | Samantha Sinclair; Marc A. Sugerman |
| **Cc:** | jcanzoneri@masslaborlawyers.com; jpowalisz@masslaborlawyers.com; AAA Patrick Kimm |
| **Subject:** | RE: Massachusetts Nurses Association v. St. Vincent Hospital - Case 01-24-0000-7400 |

**Caution: Originated Outside FordHarrison.**

Re: Massachusetts Nurses Association v. St. Vincent Hospital - Case 01-24-0000-7400

Dear Counsel:

The union has indicated it will provide the information by July 12, 2025; therefore, there is no need to clarify the timeframe in the award—the employer's response is due by August 11, 2025.

Communications between the AAA and the arbitrator are not shared.

Sincerely,
Frank Binda




**Frank Binda**
Assistant Vice President

American Arbitration Association
1301 Atwood Ave, Suite 211N, Johnston, RI 02919
**T:** 401 868 4627 **F:** 866 644 0234
adr.org | icdr.org | aaaicdrfoundation.org
**Explore the new ADR.org**

Heather Santo, Assistant Vice President
Northeast Case Management Center

The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, discl... distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immedia... reply email and destroy all copies of the transmittal. Thank you.

**From:** Samantha Sinclair <ssinclair@masslaborlawyers.com>
**Sent:** Thursday, July 10, 2025 12:59 PM
**To:** AAA Frank Binda <FrankBinda@adr.org>
**Cc:** Marc A. Sugerman <msugerman@fordharrison.com>; jcanzoneri@masslaborlawyers.com; jpowalisz@masslaborlawyers.com; AAA Patrick Kimm <PatrickKimm@adr.org>
**Subject:** Re: Massachusetts Nurses Association v. St. Vincent Hospital - Case 01-24-0000-7400

**\*\*\* External E-Mail – Use Caution \*\*\***

Good afternoon, Mr. Binda,

Thank you for your attention to this matter, and for removing Arbitrator Loconto consistent with his rulings on direct communications.

MNA responds first by rejecting the Hospital's false argument that Arbitrator Loconto's communication regarding the deadline is anything more than a clarification of the Arbitrator's intent, and not a

**Exhibit 31**

modification of his Award.  Therefore, there is no obligation for the AAA or that Arbitrator to state a position on the administration of this case or its rules, since there is no violation of such rules.

Second, MNA plans to transmit the documentation to the Hospital by Saturday, July 12.  As a practical matter, even given Arbitrator Loconto's clarification of his award that MNA has until July 14 to submit documentation for its attorney's fees, still MNA plans to submit such documentation to the Hospital by July 12.  Accordingly, MNA likewise expects and anticipates the Hospital will deliver payment to MNA by no later than 30 days thereafter, or by August 11, as required by Arbitrator Loconto's Award.

Thank you.
Samantha Sinclair


On Wed, Jul 9, 2025 at 3:29 PM AAA Frank Binda <FrankBinda@adr.org> wrote:

Thank you.


I have removed Michael Loconto from the discussion and ask the union respond to the employer's request below as soon as possible considering the fast approaching deadline.


Best,

Frank Binda




**Frank Binda**
Assistant Vice President

American Arbitration Association
1301 Atwood Ave, Suite 211N, Johnston, RI 02919
**T:** 401 868 4627 **F: 866 644 0234**
adr.org | icdr.org | aaaicdrfoundation.org
**Explore the new ADR.org**

Heather Santo, Assistant Vice President
Northeast Case Management Center

The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, dis distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immed reply email and destroy all copies of the transmittal. Thank you.

**From:** Marc A. Sugerman <msugerman@fordharrison.com>
**Sent:** Wednesday, July 9, 2025 1:22 PM
**To:** Michael Loconto <mtl@locontoadr.com>; Frank Binda <BindaF@adr.org>
**Cc:** jcanzoneri@masslaborlawyers.com; jpowalisz@masslaborlawyers.com; AAA Patrick Kimm <PatrickKimm@adr.org>; Samantha Sinclair <ssinclair@masslaborlawyers.com>
**Subject:** RE: Massachusetts Nurses Association v. St. Vincent Hospital - Case 01-24-0000-7400

**Exhibit 31**

**\*\*\* External E-Mail – Use Caution \*\*\***

Mr. Loconto and Mr. Binda,

We are in receipt of the below in which Mr. Loconto purports to modify his award and we object. Preserving all other objections and without waiving any, we note that Rule 40 permits an arbitrator to "to correct any clerical, typographical, technical, or computational errors in the award" where other preconditions were met. Those preconditions were not met here. Nor is Mr. Loconto's modification of the award the correction of an error. It is a rewriting of the award itself, which award was originally issued late in violation of AAA rules. The Award states "the Union shall promptly provide the Employer's representatives with copies of all invoices... to substantiate the attorney's fees and costs incurred during the period described above. For the avoidance of doubt, promptly shall mean <u>no later than 30 days</u> following the date of this Award." Mr. Loconto has now re-written the award to require the union to provide the required materials by "the next business day <u>following the expiration of 30 days</u>." He has no authority to rewrite his award as he has done here.

We therefore again ask that each of you state in writing your positions on the following: (1) whether AAA is administering this case; and (2) whether AAA rules apply to this proceeding. If it is your position that AAA is administering this case and that its rules apply, please explain the consequence for this violation. If your position is that there is no consequence for violating AAA rules, please so state.

We also ask that Mr. Binda issue an administrative ruling that Mr. Loconto has again acted in violation of AAA rules.

Finally, in the interest of full transparency, we request copies of all communications between AAA and the arbitrator on this subject.

We look forward to your prompt responses.

Thank you,

Marc

**Exhibit 31**



## Marc A. Sugerman 🔲

*Attorney at Law*



# FORDHARRISON 🔗

300 South Orange Avenue, Suite 1300 | Orlando, FL 32801
msugerman@fordharrison.com | P: 407-418-2308

***FHPromise*** | **Subscribe**

**From:** AAA Patrick Kimm <PatrickKimm@adr.org>
**Sent:** Tuesday, July 8, 2025 1:51 PM
**To:** Samantha Sinclair <ssinclair@masslaborlawyers.com>
**Cc:** jcanzoneri@masslaborlawyers.com; jpowalisz@masslaborlawyers.com; Marc A. Sugerman <msugerman@fordharrison.com>
**Subject:** RE: Massachusetts Nurses Association v. St. Vincent Hospital - Case 01-24-0000-7400

**Caution: Originated Outside FordHarrison.**

Ms. Sinclair,

Per Arbitrator Loconto:

The next business day following the expiration of 30 days should be considered the deadline (accordingly, 7/14), absent a mutual agreement between the parties to extend or other good cause request for an extension.  I acknowledge that these materials may be considerable.

4

# Exhibit 31




**AAA Patrick Kimm**
Case Administrator

American Arbitration Association
200 State Street, 7th Floor, Boston, MA 02109
**T:** 617 695 6014 **F:** 617 451 0763 **E:** PatrickKimm@adr.org
adr.org | icdr.org | aaaicdrfoundation.org
**Explore the new ADR.org**

The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, dis… distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immed… reply email and destroy all copies of the transmittal. Thank you.

**From:** Samantha Sinclair <ssinclair@masslaborlawyers.com>
**Sent:** Monday, July 7, 2025 6:27 PM
**To:** AAA Patrick Kimm <PatrickKimm@adr.org>
**Cc:** jcanzoneri@masslaborlawyers.com; jpowalisz@masslaborlawyers.com; msugerman@fordharrison.com
**Subject:** Re: Massachusetts Nurses Association v. St. Vincent Hospital - Case 01-24-0000-7400

*** External E-Mail – Use Caution ***

Good afternoon, Mr. Kimm,

I ask that you please forward this clarifying question to Arbitrator Loconto regarding the deadline for MNA to submit documentation of its attorney's fees per the award.

The award provides a thirty day deadline that MNA should identify and provide documentation of its applicable attorney's fees to the Hospital.  I calculate that thirty day deadline to fall on Saturday, July 12.  Where that is a weekend, please ask Arbitrator Loconto to clarify whether the deadline is the next business day immediately following July 12, which would be Monday, July 14.

Thank you.

Samantha

**Exhibit 31**

On Thu, Jun 12, 2025 at 4:36 PM <PatrickKimm@adr.org> wrote:

Hello,

Please review the attached correspondence regarding the above-referenced case.

Feel free to contact me with any questions, comments or concerns you have related to this matter.

Thank you.

--

_____

**Samantha E. Sinclair**

McDonald Lamond Canzoneri LLC
352 Turnpike Road, Suite 210
Southborough, Massachusetts 01772
(508) 485-6600 Voice (ext. 106)
(508) 485-4477 Fax
email: ssinclair@masslaborlawyers.com
website: www.masslaborlawyers.com

This document is intended only for the use of the person to whom it is addressed.  It may contain information that is privileged, confidential and exempt from disclosure under applicable law.   If you are not the intended recipient, any dissemination, distribution, copying or use of this document is strictly prohibited.  If you have received this communication in error, please notify me immediately at the e-mail address above and delete all copies of this communication.

*ATTORNEY WORK PRODUCT - PRIVILEGED & CONFIDENTIAL*

The information contained in this message from Ford & Harrison LLP and any attachments are privileged and confidential and intended only for the named recipient(s). If you have received this message in error, you are prohibited from reviewing, copying, distributing or using the information. Please contact the sender immediately by return email and delete the original message and attachments. In the absence of an executed engagement letter or fee contract, no attorney client relationship is established by this communication.

--

_____

**Samantha E. Sinclair**

6

**Exhibit 31**

McDonald Lamond Canzoneri LLC
352 Turnpike Road, Suite 210
Southborough, Massachusetts 01772
(508) 485-6600 Voice (ext. 106)
(508) 485-4477 Fax
email: ssinclair@masslaborlawyers.com
website:  www.masslaborlawyers.com

This document is intended only for the use of the person to whom it is addressed.  It may contain information that is privileged, confidential and exempt from disclosure under applicable law.   If you are not the intended recipient, any dissemination, distribution, copying or use of this document is strictly prohibited.  If you have received this communication in error, please notify me immediately at the e-mail address above and delete all copies of this communication.

McDonald Lamond Canzoneri LLC
352 Turnpike Road, Suite 210
Southborough, Massachusetts 01772
(508) 485-6600 Voice (ext. 106)
(508) 485-4477 Fax
email: ssinclair@masslaborlawyers.com
website:  www.masslaborlawyers.com

This document is intended only for the use of the person to whom it is addressed.  It may contain information that is privileged, confidential and exempt from disclosure under applicable law.   If you are not the intended recipient, any dissemination, distribution, copying or use of this document is strictly prohibited.  If you have received this communication in error, please notify me immediately at the e-mail address above and delete all copies of this communication.

**Exhibit 31**